PADUANO & WEINTRAUB LLP
1251 AVENUE OF THE AMERICAS
NINTH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: 212-785-9100
TELECOPIER: 212-785-9099

July 28, 2010

**VIA ELECTRONIC FILING**

The Honorable Beth P. Gesner
United States Magistrate Judge
United States District Court for the District of Maryland
101 W. Lombard Street
Baltimore, Maryland 21201

>    Re:   Feldman's Medical Center Pharmacy, Inc.
>          v. CareFirst, Inc., Civil Action No. 1:10-cv-00254-WDQ

Dear Judge Gesner:

  Plaintiff Feldman's Medical Center Pharmacy submits this letter in accordance with the Court's Order of July 21, 2010 and in response to Defendant CareFirst, Inc.'s July 26, 2010 letter to the Court.

  CareFirst asserts that the "only" issue for resolution is whether as a matter of law, a licensed Maryland retail pharmacy (in this case, Feldman's) is required to have an RSA to dispense and deliver – via common carrier – injectable medicine to its patients. CareFirst would have this Court believe that the only issue determining whether a retail pharmacy is required to have an RSA to dispense injectable medicines is whether such pharmacy entered a patient's home. CareFirst is wrong in its framing. Further, its arguments here are in actuality motions for summary judgment or partial summary judgment, and must be made as such.[1]

## Background

  This case is actually about an insurance company trying to bounce hemophiliacs from its insurance rolls because of the high dollar value of the insureds' claims. Hemophiliacs live in constant danger of bleeding to death and therefore many hemophiliacs must inject themselves with a blood clotting factor prophylactically in addition to when they actually have "a bleed." Prior to the mid-1990s, treatment for hemophiliacs involved injections of blood clotting factor derived from the human blood supply. Out of approximately 22,000 people with

---

[1] In support of its application here, CareFirst cites no law in support of its position that depositions or other discovery be limited to the RSA issue.

PADUANO & WEINTRAUB LLP

hemophilia in the United States, some 10,000 were infected with HIV in the 1980s and 1990s because of contamination of the blood bank supply. Pharmaceutical companies therefore developed recombinant or synthetic products that replaced the missing clotting factor in a hemophiliac patient without subjecting that patient to the risks and diseases inherent in the human blood supply. Such synthetic clotting factor is very expensive, made more so by the small number of hemophiliacs in the United States.

There has been a concerted effort by the Blue Cross and Blue Shield Association ("BCBSA") during the last several years to find a reason to deny these high-value claims. The insurers try to push hemophiliacs into Hemophilia Treatment Centers which are federally funded, taking the patients off the insurers books, but such centers are often located hundreds if not thousands of miles from patients' homes. Because the hemophilia community is so small, insurers are emboldened to act in ways they would never contemplate with, for example, cancer patients, who have much more political influence.

Feldman's, along with its parent company Factor Health Management ("FHM") and various other companies that provide services to the hemophiliac community, have been harassed by insurance companies – and in particular, the BCBSA and its licensees – for years. Through a Freedom of Information Act request, Feldman's has learned that FHM and another affiliated pharmacy, FCS Pharmacy, Inc. ("FCS"), have been the subject of an investigation by the Food and Drug Administration. The investigation was initiated by Blue Cross and Blue Shield of Florida, as shown on the documents attached as <u>Exhibit A</u>. After a thorough investigation, the FDA eventually closed its investigation because there was "no evidence" showing any wrongdoing. Emails and other correspondence discovered in both the case before this Court and in other cases involving BCBS licensees show the BCBSA and its licensees (including CareFirst) conducting their own investigations of FHM, FCS and Feldman's, as well as attempting to involve the FDA and the Justice Department in additional investigations of FHM and its business partners. None of these investigations has turned up any wrongdoing on the part of FHM, its affiliates, or its business partners.

In light of this history, it is not surprising that CareFirst now seeks to limit this case to just the "RSA issue." CareFirst has no factual or legal defense here.

CareFirst initially argued in its pleadings that Feldman's did not have the proper contract with CareFirst to dispense the factor products and then in depositions indicated that the claims were denied for reasons having to do with medical necessity. When it became clear that those lines of argument would not work, CareFirst started focusing on its RSA theory. However it is Feldman's that has sued CareFirst for payment, and Feldman's should not be required to limit the issues in a way that favors CareFirst, particularly in the absence of any motion for

2

PADUANO & WEINTRAUB LLP

summary judgment or partial summary judgment by CareFirst. It is therefore far from clear that the only issue here is whether a retail pharmacy is required to have an RSA to dispense medicine to its patients, and Feldman's has the right to show CareFirst's changing justifications for its refusal to honor its commitments to its sick patients.

Furthermore, CareFirst is incorrect when it asserts that the only issue bearing on the question of whether a retail pharmacy is required to have an RSA is whether such pharmacy's employees enter a patient's home. CareFirst itself cites to Maryland statutes in its July 26 letter in an attempt to show that entering a patient's home is not the only activity that requires an RSA, and the statutes also show that just entering a patient's home by itself does not trigger a requirement for an RSA, unless it is coupled with performance of a particular service.

Therefore, even if the issues are limited to whether Feldman's is required to have an RSA, Feldman's is entitled to conduct discovery on every reason CareFirst may give for *why* Feldman's is allegedly required to have an RSA even though it did not enter patients' homes.

### Feldman's is Entitled to Take the Noticed Depositions

As was detailed in Feldman's July 22 letter to this Court, deposition testimony from CareFirst's own employees indicates that CareFirst – at least initially – invalidated Feldman's claims because of something the pharmacy director or medical director found in their reviews. CareFirst now claims that medical necessity had nothing to do with the claims denials. But if CareFirst has been changing its justifications for denial, that bears directly on CareFirst's culpability. CareFirst asserts that "[t]here is no evidence that either Mr. Wong or Dr. Winn denied any of Feldman's claims." This is not borne out by an examination of the deposition testimony of various CareFirst employees, as shown in Feldman's July 22 letter. Feldman's must have an opportunity to ask questions of Mr. Wong and Dr. Winn if it is to understand CareFirst's actions in this case. If Mr. Wong and Dr. Winn played no role in the denial of claims, and testify to that under oath, they will be short depositions.

With regard to Ms. Chavarria's deposition, CareFirst simply asserts that Ms. Chavarria's testimony is unnecessary because the letter she wrote to Ms. Fagan came "long after the RSA issue had become the center of this litigation." Ms. Fagan's testimony, however, shows that she and Ms. Chavarria spoke numerous times, including about Feldman's. Such conversations did not begin in April 2010. Ms. Chavarria apparently played the lead role for CareFirst in coordinating with Ms. Fagan's office, and if CareFirst wishes to make the RSA issue "the center of this litigation," then it cannot preclude Feldman's – particularly under the liberal discovery rules of the Federal courts – from taking deposition testimony from the CareFirst employee most knowledgeable about the facts of the RSA issue.

PADUANO & WEINTRAUB LLP

### Feldman's Document Requests and Interrogatories Should Be Permitted

Feldman's Second Set of Interrogatories[2] and Third Request for Production ask for two categories of items that are each related to the supposedly critical RSA issue. The first relates to other pharmacies reimbursed by CareFirst for dispensing factor products with or without an RSA.[3] The second relates to definitions of terms that are implicated – but not always defined by – the RSA regulations.[4] Both are appropriate avenues for discovery.

**Other Pharmacies.** CareFirst has asserted that Feldman's is required to have an RSA license in order to dispense and deliver life-saving medication to a patient's house. According to testimony from the woman who runs the office that issues the RSA licenses for the State of Maryland, there is no such requirement. Barbara Fagan further testified that she is not aware of any specialty pharmacy in the State of Maryland that is required by Maryland law to have an RSA license. Therefore, it is absolutely relevant when Feldman's asks CareFirst to identify the pharmacies that have been reimbursed by CareFirst for dispensing the same medications dispensed by Feldman's (Interrogatory No. 27), pharmacies that have been reimbursed pursuant to an RSA (Interrogatory No. 28), pharmacies that were reimbursed by Medicare with or without an RSA (Interrogatory No. 32), and other pharmacies that CareFirst required to obtain an RSA prior to obtaining reimbursement for blood-clotting factor medications (Interrogatory No. 33).

**Injectables vs. Infusables.** CareFirst repeatedly asserts that the "critical question in this litigation is whether Feldman's needed a RSA" to dispense and deliver medication to its hemophiliac patients. One of the criteria for requiring an RSA is whether a service provider engaged in "home infusion" of a patient. "Home infusion" requires an RSA license according to Ms. Fagan, but delivery of self-injectable medication does not. Therefore it is clearly relevant whether CareFirst considers Feldman's to have been providing home infusion, or delivery of self-injectables.

Furthermore, CareFirst asserts that Feldman's "signed an affidavit under oath indicating that Feldman's engaged in activities that required it to cross the thresholds of its patients' homes." When Feldman's was told by CareFirst that Feldman's would only be reimbursed for the factor products it was dispensing if Feldman's first obtained an RSA, Feldman's did what any sensible company would do – it immediately sought to obtain an RSA, even though it did not believe such an RSA was required, so that it could be paid.[5] With millions of dollars in claims on

---

[2] All interrogatories referred to herein are contained in the Second Set of Interrogatories served on CareFirst by Feldman's on April 28, 2010.

[3] Interrogatories 27, 28, 32, 33, 34, and 35 and Requests for Production Nos. 47-51.

[4] Interrogatories 29, 30, and 31 and Requests for Production Nos. 52 and 53.

[5] Notably, although CareFirst has acknowledged its responsibility to pay claims for medication dispensed by Feldman's <u>after</u> the date Feldman's obtained an RSA license, <u>no payment</u> for any of those post-RSA claims have yet been made by CareFirst, even though Feldman's obtained its RSA

4

PADUANO & WEINTRAUB LLP

the line, Feldman's was not prepared to just stand on principle. The RSA application asked the applicant to check the box indicating the service to be provided by the applicant for which it required an RSA. However, because Feldman's did not actually need an RSA to dispense and deliver medication to its patients, there was no category that obviously fit the services Feldman's provided to its patients. Feldman's therefore checked the box of the category that – to the layperson who completed the application – seemed the most appropriate. That category was "home infusion therapy," which the individual filling out the application did not realize was a term of art in the industry. **At no time, however, did Feldman's ever provide "home infusion therapy" to its patients.** Feldman's merely dispensed and delivered self-injectable medication to its patients. If CareFirst is arguing that Feldman's should be assumed to have provided the services indicated in its application for the RSA (even if Feldman's did not, in fact, provide such services), then Feldman's must be entitled to inquire into the difference between infusable medications (those that CareFirst *asserts* Feldman's provided) and self-injectable medications (those that Feldman's *actually* provided).

Today, July 28, 2010, Feldman's received email correspondence from CareFirst seeking a 30(b)(6) deposition of Feldman's. In the emails (attached hereto as Exhibit B), CareFirst's counsel asserted that the "primary focus [of the deposition] will be on Feldman's research of the RSA requirement, why it applied for the RSA, discussions with CareFirst about the RSA, the RSA application itself and the services and goods it provided to its factor clients." Feldman's does not object to CareFirst asking questions on such topics, but if CareFirst is permitted to ask those questions – only the last of which has anything to do with the question of whether Feldman's is required to have an RSA – then Feldman's must certainly be permitted to take the limited discovery it has requested.

For the foregoing reasons, Feldman's is entitled to take the depositions of Dr. Winn, Mr. Wong, and Ms. Chavarria, and CareFirst should be required to respond to Feldman's Second Set of Interrogatories and Third Request for Production.

Respectfully,

/s/ Jordan D. Becker

Jordan D. Becker

cc: Patrick P. de Gravelles, Esq. (via electronic mail)
    Dean Stocksdale, Esq. (via electronic mail)
    Thomas O'Toole, Esq. (via electronic mail)

---

in December 2008.