# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER   *
PHARMACY, INC.
       Plaintiff     *

   v.                  *        CIVIL NO. SKG-10-254

CAREFIRST, INC.,       *

       Defendant.    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

On June 1, 2009, Plaintiff Feldman's Medical Center and Pharmacy, Inc. ("FMCP" or "Plaintiff") sued Defendant CareFirst, Inc. ("CareFirst" or "Defendant") in the Circuit Court for Baltimore County for $1,588,127.77 plus interest for breach of contract, unjust enrichment, and bad faith arising out of CareFirst's denial of reimbursement to FMCP for factor drugs it provided to CareFirst's insureds. (ECF No. 2). CareFirst removed to this Court pursuant to 28 U.S.C. § 1441. (ECF No. 1). The case was referred to the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF No. 94).

On March 4, 2011, FMCP moved for summary judgment, seeking as relief: (i) judgment on Counts I through III for non-payment of invoices in the amount of $109,989.32; (ii) interest on the unpaid contributions in the amount of $886,483.93; (iii)

1

attorneys' fees and costs; and (iv) such other and further relief as the Court deems just and proper. (ECF No. 100, 1-2). FMCP asserted alternative theories of recovery: Maryland contract law; § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132; and unjust enrichment. (ECF No. 100-1). FMCP asserted entitlement to prejudgment interest under Md. Code Ann., Insur. § 15-1005 (the "Maryland Prompt Pay Statute") or, alternatively, under ERISA § 502. (Id.). CareFirst opposed FMCP's motion for summary judgment and moved for partial summary judgment with respect to FMCP's claims for reimbursement and prejudgment interest under the Maryland Prompt Pay Statute. (ECF No. 109). CareFirst did not, however, assert entitlement to summary judgment under § 502 of ERISA. See id. The Court held motions hearings on June 9, 2011 and August 11, 2011 pursuant to Local Rule 105.6. (ECF No. 128).

During the pendency of the litigation, CareFirst paid $1,547,054.87 in satisfaction of FMCP's claims for reimbursement[1], as well as $23,017.00 in prejudgment interest.

---

[1] The Court notes several discrepancies in the record regarding the amount due and the amount paid to FMCP in satisfaction of the principal balance of the claims at issue. The Complaint states that FMCP sought payment in the amount of $1,588,127.77. (ECF No. 2). The Hanson Declaration states that CareFirst paid $1,704,295.27 (ECF No. 116, ¶ 75) and CareFirst's combined opposition and motion for partial summary judgment states that "[FMCP] has received about $1.7 million in payments already, which is actually more than it sought in the Complaint." (ECF No. 110, 5). For the purposes of this decision, the Court

The parties agree that the only issue presently pending
before the Court is FMCP's claim for prejudgment interest.  (ECF
No.  121, 2).[2]  For the reasons set forth herein, the Court
GRANTS IN PART FMCP's motion for summary judgment with respect
to its claim for prejudgment interest under ERISA § 502 but
DENIES IN PART FMCP's motion for summary judgment with respect
to its claim for prejudgment interest under the Maryland Prompt
Pay Statute.  The Court GRANTS IN PART CareFirst's motion for

accepts as correct the figure paid on the universe of claims
that parties agreed upon in correspondence submitted to the
Court on August 18 and 19, 2011, and as stated in the
Supplemental Declaration of Jaime Hanson ("Hanson Supplemental
Declaration") submitted as an attachment thereto.  (ECF Nos.
144, 145).  As cited above, this figure is $1,547,054.87.  A
chart attached to the Hanson Supplemental Declaration and
submitted by CareFirst indicates that CareFirst paid the claims
between September 17, 2010 and December 24, 2010.  (ECF No.
145).
[2]CareFirst in its combined opposition and motion for partial
summary judgment disputed FMCP's claim for non-payment of
invoices totaling $109,989.32, which it referred to as claims
pertaining to patients "A, B, and C," on the basis that these
three claims are for services rendered after the filing of the
Complaint on June 1, 2009.  (ECF No. 109, 1).  The parties
subsequently stipulated that "Plaintiff is not seeking any
relief in this matter with respect to the claims identified in
Defendant's Motion for Partial Summary Judgment relating to
patients "A, B, and C."  (ECF No. 120-2).  Thus, the Court shall
not address the claims pertaining to patients A, B, and C
totaling $109,989.32 or the issue of whether payment is due on
the claims included in the Complaint.  Similarly, the Court
shall not address FMCP's entitlement to attorneys' fees and
costs under ERISA, as FMCP has clarified that it "only mentioned
the attorneys' fees issue in its Motion to put the Court on
notice that it intends to seek attorneys' fees if it is
successful in this case," but does not seek such relief at this
time.  (ECF No. 120, 5 n.2).  After judgment is entered, the
Court shall consider and award attorneys' fees under ERISA, as
appropriate.

partial summary judgment as to FMCP's claim for additional
reimbursement in the amount of $109,989.32.  In fact, the issue
of FMCP's entitlement for these patients is moot given the
parties' stipulation.  See supra n.2.  The Court further DENIES
IN PART CareFirst's motion for summary judgment with respect to
FMCP's claim for additional interest.

For the reasons set forth below, the Court orders
prejudgment interest under ERISA § 502 at the federal
postjudgment rate set forth in 28 U.S.C. 1961.  Interest shall
be determined on a claim-by-claim basis using the 1-year
constant maturity Treasury yield, as published by the Board of
Governors of the Federal Reserve System, for the calendar week
preceding the date on which interest begins to accrue for each
individual claim.  For all claims for factor drugs dispensed
prior to December 11, 2008, prejudgment interest shall accrue
from the 31st day after each individual claim was received by
CareFirst until paid.  For all claims for factor drugs dispensed
after December 11, 2008, with the exception of two claims
(invoice numbers 17790 and 17629 for services rendered on April
9, 2009 and March 27, 2009 respectively), prejudgment interest
shall accrue from the 31st day after the claim was received by
CareFirst until paid.  With respect to these two remaining
claims, there exists a genuine dispute of material fact
regarding whether certain conditions to payment were met and, if

so, when they were met.  Accordingly, the Court does not award
prejudgment interest on these claims at this time.  To be clear,
prejudgment interest shall cease to run on all claims for which
interest is due, whether for factor drugs dispensed before or
after December 11, 2008, on the date that each individual claim
was paid.[3]  In addition, CareFirst shall be credited $23,017 for
interest already paid to FMCP.

The parties should submit within two weeks of the date of
this Memorandum Opinion and Order ("Order") an accounting of
their prejudgment interest calculations for each of the 38
individual claims for which interest is due under this Order,
and the total sum due.  If either party intends to move for
summary judgment with respect to prejudgment interest on the
remaining two claims, it should do so within two weeks of this
Order.  If the moving party believes that resolution requires a
hearing, it should make this known to the Court within two weeks
as well.  Of course, the Court strongly suggests that the
parties try to resolve these two remaining claims, without
further litigation.

---

[3] In response to the Court's letter order dated August 18, 2011
requesting additional information (ECF No. 135), CareFirst
submitted along with the Hanson Supplemental Declaration a chart
indicating the date of service, date of claim, and date of
payment for each claim at issue.  (ECF No. 145).  The Court does
find as a matter of fact that the payment dates submitted by
CareFirst are accurate as FMCP does not dispute them.

## I. HISTORY OF DISPUTE

### A. FACTUAL BACKGROUND

FMCP is a Maryland specialty pharmacy that dispenses drugs used to treat hemophilia, von Willebrand disease, hepatitis, and HIV. (ECF No. 2, ¶ 1). CareFirst is a Maryland health insurer and independent licensee of the Blue Cross Blue Shield Association. (Id., ¶ 2). In support of their respective motions for summary judgment, FMCP and CareFirst provided declaration testimony, deposition excerpts, documentary evidence, and correspondence. The essential facts of the case, either undisputed or, where disputed, recited in the light most favorable to the nonmovant, are as follows.

FMCP submitted claims to, and was reimbursed by, CareFirst and its predecessors, starting from FMCP's inception in the mid-1980s. (SUMF, ECF No. 100-2, ¶ 52; Bostwick Decl., ECF No. 104, ¶ 33). Beginning in the 1990s, FMCP submitted certain prescription drug claims through CareFirst's "EPIC" contract. (White Decl., ECF No. 120-5, ¶ 4) (EPIC was a consortium of pharmacies to which FMCP was a party that joined together to obtain certain efficiencies). Under a subscriber agreement dated August 12, 1997 (the "Participating Professional Provider Agreement" or "PPP Agreement"), FMCP became a "participating" or "par" provider in CareFirst's network and secured its entitlement to direct payment for insurance claims submitted for

"covered services." (ECF No. 2, Ex. A); see also (Becker Decl., ECF No. 46-2, ¶ 5). FMCP asserts that it submitted claims to CareFirst directly for services that were not covered by the EPIC contract and that CareFirst paid FMCP directly for these claims pursuant to the PPP Agreement, or if there was no applicable contract, FMCP was paid as a non-participating provider at reimbursement rates set by CareFirst. (White Decl, ECF No. 120-5, ¶ 4). CareFirst does not dispute this.

Factor Health Management ("FHM"), a Florida company, purchased FMCP from its founder in October 2007. (Bostwick Decl., ECF No. 104, ¶ 20).[4] Prior to acquisition by FHM, FMCP dispensed prescription drugs and durable medical equipment ("DME"), such as wheelchairs, canes, and catheters. (White Decl., ECF No. 120-5, ¶ 2). In addition to common prescription drugs, FMCP dispensed more expensive medicines, including insulin, drugs used to treat cancer and hepatitis, and vaccinations. (Id. at ¶ 2). FMCP maintains that patients either visited the retail location or FMCP would deliver to their homes, but FMCP did not provide home health care services

---

[4] FMCP was a wholly-owned subsidiary of FHM during the time period relevant to the underlying suit. On December 19, 2009, FMCP's assets were sold to Rajendra Appalaneni. (Bostwick Decl., ECF No. 104, at ¶ 21). The sale of FMCP's assets specifically excluded receivables, including any money received from CareFirst in connection with the claims at issue in this case. (Id.).

to the patients. (Id.). After FMCP was purchased by FHM, it continued to dispense prescription drugs and DME, but also began to distribute "factor drugs" to patients with hemophilia. (Id. at ¶ 5).

Hemophilia is a hereditary genetic disorder that impairs the body's natural ability to control blood clotting. (ECF No. 100-2, ¶ 1; Bostwick Decl., ECF No. 104, ¶ 6; Levi Report (annexed to the Bostwick Decl.) at (V)(b)(i)). Because hemophiliacs' bodies do not produce sufficient clotting factor to stop bleeding quickly, they must inject or infuse blood clotting factor ("factor" or "factor drugs") in order to prevent a potentially fatal bleed out. (ECF No. 100-2, ¶¶ 3-5). FMCP reports that the medication dispensed to patients in connection with the claims at issue in this case consisted of self-injectible synthetic recombinant clotting factor replacement medication, of which Advate is an example. (ECF No. 100-2, ¶ 140; Bostwick Decl., ECF No. 104, ¶ 87).

CareFirst informed FMCP on August 22, 2008 that it could not reimburse claims for factor drugs because – according to CareFirst – FMCP did not have the correct type of contract with CareFirst. (ECF No. 100-2, ¶ 120; Bostwick Decl., ECF No. 104, ¶ 55 and Exhibit 27). CareFirst informed FMCP that it needed a Home Infusion Therapy ("HIT") contract in order to dispense factor drugs as a CareFirst participating provider and that FMCP

only had a Durable Medical Equipment ("DME") contract.  (ECF No. 100-2, ¶ 120; Bostwick Decl., ECF No. 104, ¶ 55).  CareFirst advised FMCP that it needed to obtain a Resident Services Agency ("RSA") license.  (ECF No. 100-2, ¶ 124; Gardner Decl., ECF No. 12-3, ¶¶ 8 & 9; ECF No. 17, ¶ 6).  There is no dispute that CareFirst had paid claims for factor drugs to FMCP (ECF No. 104, ¶ 56) but CareFirst states that payment was inadvertent as a result of automated processing.  <u>See</u> (Hanson Decl., ECF No. 116, ¶¶ 27-31).

On August 20, 2010, CareFirst submitted a letter to the Court reporting that it had received an "opinion" from the Maryland Board of Pharmacy regarding the RSA licensing issue.  (ECF No. 74).  CareFirst stated that, on the basis of the Pharmacy Board's opinion, it was "now ready to pay the claims at issue."  (<u>Id.</u>).  As stated <u>supra</u>, these claims were paid to FMCP between September 17, 2010 and December 24, 2010 (ECF No. 145).  CareFirst maintains that it was prepared to deposit at least some of the disputed claim amount into a court registry at any earlier date.[5]  <u>See</u> <u>infra</u>.

### B.  PROCEDURAL BACKGROUND

This dispute began in state court.  In its complaint filed in state court, FMCP alleged that CareFirst had failed to

---

[5] <u>See</u> (ECF No. 17, $236,864.52 for John Does 1 and 2).

correctly and timely pay $1,588,127.77 in legitimate claims for reimbursement submitted by FMCP for provision of factor to CareFirst's insureds. (ECF No. 2, ¶ 9). In Counts I and II (breach of contract and unjust enrichment), FMCP pled alternative theories of recovery. See (ECF No. 2, ¶¶ 29, 35). The complaint alleges that CareFirst is in breach of contract and was unjustly enriched because "[FMCP] properly provided Covered Services to patients pursuant to the PPP Agreement and is entitled to be paid thereunder"; "alternative[ly], [FMCP] is entitled to be reimbursed as an out-of-network provider for the Covered Services it provided to CareFirst's insureds." (Id.). The complaint focused on the PPP, under which FMCP became an "in-network" or "participating" provider for covered services provided to CareFirst Members, see (Id., ¶¶ 8-9, 13-16), but did not state the basis of FMCP's alternative claim that it is entitled to reimbursement as an "out-of-network provider." (Id., ¶¶ 29, 35).

On September 11, 2009, in the state litigation, FMCP responded to an interrogatory about agreements with CareFirst that FMCP relied on in asserting its claims. (ECF No. 53-4). The response stated that "[FMCP] is entitled to provide factor to . . . patients as an out-of-network provider to the extent any such patient's health benefits provide for such coverage." (Id.). On November 25, 2009, CareFirst then filed a Third-Party

Complaint and Counter-Complaint for Interpleader, naming FMCP patients "John Does 1 and 2" ("the Does") as third-party defendants. (ECF No. 17). The Interpleader Complaint alleged that FMCP was a "non-participating provider" of factor because the PPP did not cover that treatment. See (ECF No. 17, ¶¶ 8-11). Because FMCP was a "non-participating provider," any CareFirst member who obtained factor at FMCP was required to submit a claim to CareFirst, which would reimburse the member — not FMCP. (Id., ¶ 14). FMCP could then seek payment from the member. (Id.). CareFirst alleged that the Does were members who had obtained factor from FMCP, and asserted that the interpleader was necessary because FMCP and the Does had potentially adverse claims. CareFirst maintained that if the court found that FMCP was a participating provider of factor, CareFirst would have to reimburse FMCP; if FMCP was a non-participating provider, CareFirst would have to reimburse the Does. (Id., ¶¶ 36-37).

On January 4, 2010 FMCP moved for summary judgment on the FMCP's Third-Party Complaint and opposed the interpleader. (ECF No. 46-7). FMCP argued that the interpleader was inappropriate because FMCP's claims were not adverse to the Does' claims. As FMCP explained: "Whether or not [FMCP] is a 'Participating Provider' or a 'Non-Participating Provider' — one of the critical issues in the underlying suit — makes no difference in

determining whether there are any adverse claims. If [FMCP] is a participating provider, then even CareFirst acknowledges that [it] would be obligated to pay [FMCP] for factor . . . . If [FMCP] is a non-participating provider, then the Service Agreement/Assignment of Benefits and the affidavits of John DOES 1 and 2 conclusively prove that FMCP is the party entitled to receive payment from CareFirst." (Id., 7-8) (internal citation and quotation marks omitted). FMCP attached to its motion the Service Agreements/Assignments of Benefits (the "Assignments") from the Does. (Id., Ex. A). These Assignments stated that "[u]nder no circumstances" was the insured to retain any payment from his insurer for FMCP products and authorized FMCP "to bill for services and receive payment directly from [the patient's] private health Insurance." (Id.). FMCP opposed the interpleader action and thus the deposit of some of disputed claim monies in the court's registry.

On February 1, 2010, CareFirst removed to this Court. (ECF No. 1). CareFirst's Notice of Removal alleged that at least some of FMCP's state law claims are "completely preempted" by § 502 of ERISA. (Id. at ¶ 13). On March 3, 2010, FMCP moved to remand. (ECF No. 46). On June 29, 2010, this Court in an opinion by Judge Quarles denied FMCP's motion for remand on the ground that "one of FMCP's claims was completely preempted by §

502(a) of ERISA, thus providing federal question jurisdiction."
(ECF No. 53, 1).

Beginnning on or about September 24, 2010, CareFirst began
paying the outstanding claims at issue in this case (ECF No.
100-2, ¶ 170), ultimately paying $1,547,054.87 to FMCP (Hanson
Decl., ECF No. 116, ¶ 75).[6]  In addition, CareFirst has paid
$23,017.00 in interest on the claims based upon its own position
on when interest began to accrue under the Maryland Prompt Pay
Statute.  See (Hanson Decl., ECF No. 116, ¶¶ 80-83).[7]
Accordingly, the issue before the Court is the interest due on
the claims which now have been paid.

### III.  LEGAL STANDARD

The purpose of the summary judgment inquiry is to examine
"the plaintiff's case to determine whether the plaintiff has
proffered sufficient proof, in the form of admissible evidence,
that could carry the burden of proof of his claim at trial."
Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir.
1993).  Under Federal Rule of Civil Procedure 56, the moving

---

[6] See footnote 2 supra.

[7] CareFirst explains by way of the Hanson Declaration that, in
reaching its figure of $23,017, "interest was calculated
differently for the claims pre-dating [FMCP's] receipt of its
RSA (which happened on December 11, 2008) and for the claims for
services after that date." (Hanson Decl., ECF No. 116, ¶¶ 80-
83).  The Court addresses FMCP's interest calculations in
greater detail below.

party is entitled to summary judgment if it shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Materiality is determined by the substantive law pertaining to a particular claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stricker v. Eastern Off Road Equip., Inc., 935 F. Supp. 650, 653 (D. Md. 1996).

Once the moving party has met this requirement, the burden shifts to the nonmoving party to prove there is a genuine issue for trial and that evidence exists to prove the elements of the party's substantive law claims. Celotex, 477 U.S. at 321; Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sylvia Development Corp. v. Calvert County, 48 F.3d 810, 817 (4th Cir. 1995); Fed. R. Civ. P. 56 (e). To survive summary judgment, the non-moving party must produce "specific facts showing that there is a genuine issue for trial," and may not rest upon the "bald assertions of [its] pleadings." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586. The non-moving party "must do more than present a 'scintilla' of evidence in its favor." Sylvia Development Corp., 48 F.3d at 818 (quoting Anderson, 477 U.S. at 252). If the nonmoving party fails to prove an essential element of its case, all other facts become immaterial and the moving party should be granted judgment as a matter of law "because the nonmoving party has

failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323.

The role of the Court at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter," but rather to determine whether "there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986). In determining a motion for summary judgment, inferences which may be "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita, 475 U.S. at 587-88 (quoting United States v. Diebold, Inc., 396 U.S. 654, 655 (1962)). Only inferences which are "reasonable" may be considered by the court. Sylvia Development Corp., 48 F.3d at 817-18.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials ... or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that

an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). Evidence submitted both in support of and in opposition to a motion for summary judgment must be admissible and based on personal knowledge. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

## IV. ANALYSIS

The sole issue presently before the Court is FMCP's entitlement to prejudgment interest on its claims for reimbursement for factor drugs. In order to recover prejudgment interest, FMCP must establish that there is no genuine dispute as to material fact and that it is entitled as a matter of law to an award under either the Maryland Prompt Pay Statute or § 502 of ERISA. (ECF No. 126, 9). The distinction between these two mutually-exclusive theories of relief is significant. An award of interest at the prescribed statutory rate is mandatory under the Maryland Prompt Pay Statute, Md. Code Ann., Insur., 15-1005(f)(2), whereas both the right to an award of prejudgment interest and the rate are discretionary under ERISA, Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1030-31 (4th Cir. 1993)(en banc).

To the extent that the PPP Agreement makes FMCP a "par provider" with respect to factor drugs, its right to reimbursement arises in contract and the Maryland Prompt Pay

Statute governs prejudgment interest on the previously unpaid claims. On the other hand, if FMCP is not a par provider of factor drugs under the PPP Agreement, then its entitlement to reimbursement arises from the insurance contracts between CareFirst and the insureds to whom FMCP dispensed factor drugs. The parties agree that these employer-sponsored insurance plans fall within the scope of ERISA's civil enforcement provision, which provides that a plan participant or beneficiary may bring a civil action to recover benefits due or to enforce rights under the plan. 29 U.S.C. § 1132. Under this scenario, FMCP has derivative standing to sue CareFirst only to the extent that it has valid assignments of benefits from CareFirst's insureds, enabling it to "stand in the shoes" of the plan beneficiaries to whom it dispensed factor to enforce their rights under ERISA. In the event that FMCP is entitled to direct payment only as an assignee of CareFirst's insureds, ERISA completely preempts state law with respect to its claim for reimbursement and prejudgment interest. Under ERISA, the Court has broad discretion to determine FMCP's right to prejudgment interest and the applicable rate of interest. See (ECF No. 53); see also Quesinberry, 987 F.2d at 1030-31. Thus, whether FMCP is a par provider of factor drugs under the PPP Agreement is determinative of which theory of interest recovery applies.[8]

---

[8] FMCP raised an additional argument for the first time at the

The Court finds for the reasons set forth herein that there is no dispute of material fact as to the scope of the PPP Agreement and that, as a matter of law, FMCP was not a participating provider with respect to factor drugs, during the relevant time period. In addition, the Court finds there is no dispute of material fact as to FMCP's standing as an assignee to sue CareFirst under ERISA § 502, 29 U.S.C. § 1132, for nonpayment of claims and prejudgement interest. CareFirst has waived any objection to the validity of FMCP's assignments and has conceded liability for payment of the principal balance of the claims at issue and indeed has paid FMCP directly for the claims. Although ERISA § 502 does not explicitly address prejudgment interest, courts have found that both the right to an award and the interest rate are discretionary in ERISA

June 9, 2011 hearing, that is, that FMCP had an implied contract with CareFirst based upon a course of dealing since FMCP's founding entitling it to direct payment for factor products as a par provider. FMCP argues that the PPP Agreement is irrelevant under this theory of the case. This claim was not raised in the Complaint or in motions papers. On the contrary, FMCP attached the PPP Agreement to its Complaint and argued that it is the controlling contract. In addition, the deposition testimony of Julia White, a staff pharmacist for FMCP, indicates that FMCP began to distribute factor drugs to patients after FMCP was purchased by FHM in 2007. (ECF No. 120-5, ¶ 5). Counsel for the plaintiff confirmed this during the August 11, 2011 motions hearing. Thus, there could be no implied contract arising out of a course of dealing stretching back to FMCP's founding with respect to FMCP's provision of factor drugs and CareFirst's reimbursement for the same. Finally, of course, CareFirst is not now challenging FMCP's entitlement to reimbursement for the cost of the factor or indeed interest – just the amount and manner of interest.

actions.  For the reasons articulated below, the Court finds
that an award of prejudgment interest at the federal
postjudgment rate in 28 U.S.C. § 1961 is necessary and
appropriate in this case to compensate FMCP for loss of use of
its funds.  Accordingly, FMCP's motion for summary judgment is
GRANTED IN PART and DENIED IN PART and CareFirst's motion for
partial summary judgment is DENIED, but FMCP's claim for
prejudgment interest under the Maryland Prompt Pay Statute is
rejected.

**A.  FMCP's Entitlement to Prejudgment Interest under the PPP
     Agreement and the Maryland Prompt Pay Statute**

FMCP asserts in its motion for summary judgment that it is
a participating provider under the PPP Agreement with respect to
factor drugs, that CareFirst breached the PPP Agreement by
failing to reimburse FMCP for factor drugs dispensed to
CareFirst's insureds, and that FMCP is therefore entitled to a
mandatory award of prejudgment interest under the Maryland
Prompt Pay Statute, Md. Code Ann., Insur. § 15-1005(f), in the
amount of $866,483.93.  (ECF No. 100-1).  FMCP argues that
factor is covered under the PPP Agreement because the contract
by its own terms is not limited to any particular service.  (ECF
Nos. 100-2, 22; 17, ¶ 8).  CareFirst argues that the PPP
Agreement is limited to Durable Medical Equipment ("DME") and
does not cover provision of factor.  CareFirst had maintained

that in order to be reimbursed directly for factor, providers in CareFirst's network must have a Home Infusion Therapy ("HIT") contract. Thus, the Court must establish whether there exists a dispute of material fact relevant to whether FMCP is a par provider with respect to factor drugs under the PPP Agreement and, if there is not, must interpret the contract in order to conclude whether either FMCP or CareFirst are entitled to judgment as a matter of law. See <u>United Servs. Auto. Ass'n v. Riley</u>, 393 Md. 55, 78 (2006) (contract interpretation is a question of law that may be properly determined on summary judgment).

Summary judgment is appropriate in breach of contract cases if the parties' intentions are clear based on the plain and unambiguous language of the contract. <u>Geo Plastics v. Beacon Dev. Co.</u>, 2011 U.S. App. LEXIS 11619 (4th Cir., Jun. 8, 2011); <u>see also</u> <u>Pac. AG Group v. H. Ghesquiere Farms, Inc.</u>, 420 Fed. Appx. 278 (4th Cir., Mar. 29, 2011). By its own terms, the PPP Agreement is governed by Maryland law (ECF No. 2, Ex. A, ¶ 42), which follows the principle of the objective interpretation of contracts. <u>Ledo Pizza Sys. v. Ledo Rest., Inc.</u>, 407 Fed. Appx. 729 (4th Cir., Jan. 7, 2011). In determining the intentions of contracting parties under the objective theory of contracts, courts look at what a reasonable person in the same position would have understood as the meaning of the agreement regardless

of the intent of the parties at the time of contract formation. (Id.); see also Stratakos v. Parcells, 172 Md. App. 464 (2007).

An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations. Pac. AG Group, 2011 U.S. App. LEXIS at *5-6 (internal citations omitted). Determining whether language in a contract is susceptible to more than one meaning requires an examination of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution. Riley, 393 Md. at 80 (quoting Pacific Indem. v. Interstate Fire & Cas., 302 Md. 383, 388 (1985)). Where a contract is ambiguous, summary judgment is nevertheless appropriate if the ambiguity can be definitively resolved by reference to extrinsic evidence. Ledo Pizza, 407 Fed. Appx. 729; the see also Red Roof Inns, Inc. v. Scottsdale Ins. Co., 2011 U.S. App. LEXIS 5858 (4th Cir., Mar. 22, 2011).

In accordance with the principles of contract interpretation set forth above, the Court turns first to the relevant language of the PPP Agreement. By way of the PPP Agreement dated August 12, 1997, FMCP became a "Participating Provider" in the Blue Cross Blue Shield of Maryland ("BCBSM") network and elected to become part of BCBSM's Preferred Provider

Network ("PPN").[9] (ECF No. 2, Ex. A). Per the PPP Agreement, "Participating Provider means any provider who contracts with BCBSM to be paid directly for rendering Covered Services." (<u>Id.</u> at ¶ 5). "Covered Service" is defined in the PPP Agreement as "a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM Program in which he/she is enrolled." (<u>Id.</u> at ¶ 3). The PPP Agreement further provides that "You agree to provide Covered Services to Members in accordance with the terms and conditions of this Agreement; within the scope of your professional license or certification; and in accordance with, and subject to the provisions of the subscription agreements for the BCBSM programs." (<u>Id.</u> at ¶ 9).

The PPP Agreement requires CareFirst to reimburse FMCP for any "Covered Services" it provides to CareFirst's insureds, stating that,

> [w]e agree to pay claims for Covered Services rendered to Members and/or to provide notification to you and the Members of the denial of a claim stating the specific reasons for the denial, in a timely manner, as provided by Maryland Law. We retain sole authority to determine what is a Covered Service and who is a Member. We agree to pay interest on the amount of an unpaid claims or any portion thereof in accordance with Maryland law.

---

[9] BCBSM subsequently became CareFirst.

(Id. at ¶ 20).  In addition, the PPP Agreement provides that

"BCBSM agrees that you may bill and collect directly from

Members charges for services that have been determined not to be

Covered Services."  (Id. at ¶ 23).  This is because, "[i]n the

case of services rendered by a non-participating provider,

CareFirst typically pays claims to members who are in turn

responsible for paying the provider.  On the other hand,

CareFirst pays a participating provider directly when the

provider renders services to a CareFirst insured."  (Hanson

Decl., ECF No. 116, ¶ 53).  The PPP Agreement also sets forth a

procedure for appeal, which establishes that BCBSM will provide

FMCP with a procedure to appeal any decisions made in connection

with the contract, FMCP will file any appeal within 90 days of

the date it receives notice of CareFirst's determination that is

the subject of the appeal, and both parties will be bound by the

decision of an appeals committee.  (ECF No. 2, Ex. A, ¶ 36).

Next to a space labeled "Field of Practice or Specialty" on page

7 of the PPP Agreement, there is a handwritten notation stating

"DME – (Pharmacy)."  See id.  There is no other mention of "DME"

in the body of the 8-page contract.  See id.

CareFirst asserts that the handwritten notation indicates

that the PPP Agreement is limited to Durable Medical Equipment

("DME").  See (Anuszewski Decl., ECF No. 117, ¶ 19) ("In 1997,

CareFirst (then known as BlueCross BlueShield of Maryland)

entered into a contract under which Feldman's became a par DME provider."); see also (ECF No. 17, ¶¶ 9-10) ("The contracts issued by CareFirst that cover providers who send factor products to insureds' homes are referred to as Home Infusion Therapy contracts, or "HIT" contracts. The PPP Agreement referred to in the Complaint did not cover factor products. Instead, it covered only [DME].") DME "is medical equipment such as canes, wheelchairs, catheters and the like." (Gardner Decl., ECF No. 120-3, ¶ 7). "The definition of DME in the industry excludes item such as factor products which are used up. DME by definition is reusable . . ." (ECF No. 17, ¶ 10).

FMCP argues that, "[c]ontrary to the allegations made by CareFirst, the [PPP] agreement . . . does not contain any limitations on the type of services that may be provided to CareFirst's insureds." (Gardner Decl., ECF No. 120-3, ¶ 4). Accord Id. at ¶ 10 ("[t]he PPP Agreement speaks for itself and does not restrict coverage to durable medical equipment or any other specific products"); see also (Bostwick Decl., ECF No. 104, ¶ 35).[10] Given that there is only one handwritten notation mentioning "DME" in the contract, and this notation does not on

---

[10] The PPP Agreement most certainly by explicit terms limits providers to provision of services and supplies "within the scope of your professional license or certification." (ECF No. 2, Ex. A, ¶ 9). Accordingly, if FMCP needed an RSA or HIT certification for provision of factor, this contract, independent of the DME notation, would not allow that.

its face limit the products or services covered, and that the remainder of the agreement does not refer definitively to "field of practice or specialty," the contract language does not plainly and unambiguously establish that the PPP Agreement renders FMCP a participating provider only with respect to DME. Thus, extrinsic evidence relevant to the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution must be considered.

The standard contracting practices of CareFirst provide relevant context for interpretation of the PPP Agreement. In her declaration testimony, Lisa Anuszewski, a Contract Manager for Carefirst, explains that,

> Because there are so many different types of medical services, CareFirst maintains many different provider networks. For example, CareFirst maintains a network of participating durable medical equipment ("DME") providers, a network of retail pharmacies, a network of hospitals, networks of many different physician specialties (such as cardiologists, orthopedists, pediatricians, etc.) The contract which a provider enters is meant to be specific to a particular network. Therefore, a provider can be par for one type of service, but non-par for another.

(ECF No. 117, ¶¶ 12-14). The Anuszewski Declaration further states that "[i]t is CareFirst's standard contracting policy the providers of Factor VIII who are based in Maryland and who want to be par with CareFirst join CareFirst's HIT network." (ECF No. 117, ¶ 29). CareFirst maintains that "because FMCP had a

DME contract, but not a HIT contract, it was a participating provider for purposes of DME, but a non-participating provider for factor products." (ECF No. 17, ¶ 11). CareFirst's statement that "[t]he contract which a provider enters is meant to be specific to a particular network" suggests that FMCP's characterization of the contract as unrestricted to any particular products or services is wrong.

FMCP did not provide any evidence controverting Ms. Anuszewski's characterization of CareFirst's contracting practices. While Ms. Gardner, formerly of FMCP, gave her own interpretation of the PPP Agreement as not limiting the services FMCP could provide under that Agreement (see Gardner Decl., ECF No. 120-3, ¶ 4), she did not present any evidence controverting Ms. Anuszewski's testimony on contracting practices. Additionally, Ms. Gardner would have no personal knowledge of the formation of the subject PPA agreement as she joined FMCP in 2003, years after the 1997 agreement was executed. (Id. at ¶ 2). While there was a dispute as to whether an RSA or HIT was ever required for FMCP to become a par provider for factor, there is no dispute on the contracting practices of CareFirst, that is, that the PPP agreement for "DME" was not viewed as authorizing FMCP as a par provider for factor. As Ms. Anuszewski stated: "[t]he contract which a provider enters is meant to be specific to a particular network. Therefore, a

provider can be par for one type of service, but non-par for
another." (ECF No. 117, ¶¶ 13-14). Indeed, Ms. Gardner of FMCP
states that "the distinction [between a provider as
participating or non participating] is within CareFirst's
control." See (Gardner Decl., ECF No. 120-3, ¶ 5).

The circumstances of the parties at the time of execution
of the PPP Agreement further support CareFirst's
characterization of the contract. FMCP did not begin to
dispense factor until FHM acquired the company approximately ten
years after the parties entered the PPP Agreement. In addition,
Anuszewski explains in her declaration testimony that,

> [FMCP] also maintains a par contract with
> CareFirst through the EPIC network of pharmacies
> . . . The scope of the EPIC contract is basically
> standard prescription medication that is
> routinely filled by a neighborhood pharmacy. If
> [FMCP's] 1997 contract covered all services that
> it could provide as a licensed pharmacy, then
> joining and staying in the EPIC network would
> have been completely superfluous.

(ECF No. 117, ¶¶ 24, 26, 27). Under the objective theory of
contracts, the parties would not reasonably have understood that
FMCP desired to become a participating provider with respect to
factor and that the PPP agreement covered factor.

The Anuszewski Declaration further states that, "[t]he
background documents related to the [PPP Agreement] show that
Feldman's inquired about becoming a par DME provider. No other
type of medical service was ever mentioned in those documents."

(Id. at ¶ 20).  Correspondence from BCBSM to FMCP attached to the PPP Agreement and collectively submitted as Exhibit A to FMCP's Complaint provides further extrinsic evidence that FMCP sought to become a par DME provider and that BCBSM considered the application as so limited.  (ECF No. 2, Ex. A).  The letter states,

> Dear Provider,
>
> In response to your inquiry regarding your request for a Durable Medical Equipment provider account number with Blue Cross Blue Shield of Maryland, Inc. (BCBSM), please provide us with the following information...

(Id. at 14).  On the form following the introductory statement reproduced above, BCBSM requested a "detailed description of the services being rendered and/or equipment/supplies used," and FMCP responded "rental of wheelchairs, purchase or rental of walkers, glucometers [and] supplies, ostomy supplies, misc. small DME."  (Id.).  The PPP Agreement provides that "[a]pplications or other documents required by BCBSM for participation under this Agreement shall be incorporated in and made part hereof."  (ECF No. 2, Ex. A, ¶ 46).  It is not disputed that the form included in the correspondence from BCBSM referenced supra is required by BCBSM for participation in the PPP Agreement and therefore part of the contract.  FMCP submitted it as an attachment to the PPP Agreement.  FMCP

provides no evidence controverting this or other CareFirst extrinsic evidence on the meaning of FMCP's PPP Agreement.

Having reviewed the record before it, this Court concludes that there is no genuine dispute of material fact regarding whether FMCP's PPP Agreement covers provision of factor, and that this issue turns upon interpretation of the contract and extrinsic evidence. Considered in the aggregate, the notation in the PPP Agreement indicating that FMCP's specialty is "DME – (Pharmacy)," and associated correspondence and documents, CareFirst's standard practice of contracting with providers to become par with respect to specific networks, and FMCP's participation in the EPIC network, demonstrate that FMCP is not, as a matter of law, a participating provider with respect to factor under the PPP Agreement.[11]

---

[11] This analysis resolves the issue of whether FMCP is entitled as a matter of law to direct reimbursement for factor drugs as a "par provider." However, the Court notes that previously in this case there was a separate dispute as to whether FMCP was entitled to reimbursement for provision of factor even as a "non-participating provider" because CareFirst believed that FMCP did not have the required licensure. CareFirst maintained that FMCP was required by Maryland law to have a Resident Services Agency ("RSA") license in order to dispense factor. FMCP maintains that it never needed a RSA license and that, although it eventually did obtain a RSA license on December 8, 2008, it did so only to placate CareFirst in an effort to secure reimbursement. (Gardner Decl., ECF No. 120-3, ¶ 11) ("Although we continued to believe that Feldman's did not need an RSA under the law, we still relied on CareFirst's representations and demands that CareFirst required that Feldman's obtain one in order to be paid for the claims that had been submitted. Therefore, we completed the necessary applications.").

## B. FMCP's Entitlement to Prejudgment Interest under ERISA § 502 of as an Assignee of CareFirst's Insureds

FMCP argues that even if it is a non-par provider with respect to factor drugs, it is entitled to reimbursement and prejudgment interest under ERISA § 502. (ECF No. 120, 11). FMCP may only recover under ERISA § 502 if there exists no dispute of material fact as to whether: (1) it has valid assignments from CareFirsts's insureds and (2) it has standing on the basis of the assignments to recover benefits due under the employer-provided insurance plans. 29 U.S.C. § 1132. The Court finds that FMCP has satisfied its burden and is entitled as a matter of law to assert its right under ERISA § 502 to direct reimbursement for factor drugs. Given that CareFirst has

---

CareFirst asserts, pointing to FMCP correspondence with the Office of Health Care Quality about whether it needed an RSA, that FMCP sought the RSA license for reasons other than CareFirst's insistence, (ECF No. 121, 3-5). Indeed, there seems to be some support for that view. However, this dispute is not material, to whether FMCP had a PPP Agreement governing provision of factor, as a matter of law. Relying in large part on an advisory opinion from the Maryland Board of Pharmacy regarding this issue, CareFirst effectively, if not expressly, has conceded that FMCP was not required to have an RSA license in order to drop ship factor to patients' homes. Believing it to be relevant to FMCP's claim for prejudgment interest under the Maryland Prompt Pay Statute, the parties discuss at great length in their briefing the issue of whether FMCP needed a RSA license to dispense factor, and whether CareFirst's belief that FMCP needed such a license was reasonable. The Court shall not address this inquiry here, however, as it has already determined that FMCP cannot recover under the Maryland Prompt Pay Statute as a matter of law. While the circumstances of CareFirst's delay in payment might be relevant in choice of interest rate, it is not relevant here to determine the scope of the PPP Agreement.

acknowledged that payment is due for the factor, waived any argument regarding "the invalidity of the assignments" and paid the principal balance, only the question of FMCP's entitlement to prejudgment interest, including the rate of such interest and the time periods for which interest is due, remains.

Both FMCP's right to interest and the rate of interest lie within the Court's discretion in this case given that ERISA § 502 preempts the Maryland Prompt Pay Statute. The Court finds that award of prejudgment interest is necessary to compensate FMCP and that the federal statutory post-judgment interest rate under 28 U.S.C. § 1961 is appropriate. The Court finds that there is no genuine dispute as to material fact regarding when interest began to run on the claims for services rendered prior to December 11, 2008. With respect to this group of claims, the Court finds that, as a matter of law, interest began to accrue on the 31st day after the date each claim was submitted. The Court also finds that interest began to accrue on the 31st day after the date the claims were submitted for the claims for services rendered after December 11, 2008, except for two particular claims. As set forth below, the Court finds that there exists a genuine dispute of material fact as to whether and when CareFirst requested certain documentation necessary for the processing and payment of these two claims. Thus, the Court does not award interest on these two claims. The Court further

finds that interest ceased to run for each individual claim on the date CareFirst paid the claim.

### 1. FMCP's Standing as an Assignee of CareFirst's Insureds

FMCP asserts that it has valid assignments of benefits from the CareFirst insureds to which it dispensed factor and contends that, based on these assignments, it is entitled to seek direct payment from CareFirst, regardless of its status as a par or non-par provider under the PPP Agreement. (ECF No. 120, 11). Notwithstanding certain statements in its motion papers, as made absolutely clear in the hearings, CareFirst does not challenge the validity of the assignments that FMCP has from CareFirst's insureds. See also (ECF No. 127, 5)( "[FMCP's] only cognizable rights are those it has by virtue of being an ERISA assignee."). Based on the record before it, the Court finds that FMCP has standing as a valid assignee to seek prejudgment interest under ERISA § 502.

It is undisputed that the patients to whom FMCP dispensed factor drugs obtained their health insurance from CareFirst through employer-sponsored plans that are governed by ERISA. (ECF No. 53, 10)(internal citation omitted). ERISA § 502(a) empowers certain classes of people to bring civil actions to recover benefits due under such plans. 29 U.S.C. § 1132(a)(1)(B) ("[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him

under the terms of his plan."). A majority of courts have recognized that health care providers may acquire derivative standing to bring an action against a health benefit plan payor to recover the benefits payable under the plan for services rendered by the provider to the participants in or beneficiaries of the plan. Although the Fourth Circuit has not addressed this issue, the Court previously held in this case that FMCP has standing because "a health care provider has derivative standing under ERISA by obtaining a written assignment from a participant or beneficiary of his right to payment of medical benefits." (ECF No. 53, 10-11) (collecting authority)(stating that "other circuits have consistently recognized such standing when based on the valid assignment of ERISA . . . benefits by participants and beneficiaries."); see also 133 A.L.R. Fed. 109 ("Health care providers often rely on assignments of benefits from their patients in order to receive payment directly under the health insurance policies or other health benefit plans covering the patients.").

Thus, in order to demonstrate entitlement as a matter of law to prejudgment interest under § 502 of ERISA, FMCP must initially demonstrate that it has valid assignments from each of the CareFirst insureds to which dispensed factor in conjunction with the claims for reimbursement at issue in this case. In support of its motion for summary judgment, FMCP submitted

declaration testimony indicating that it has written assignments
of benefits from each of the eight CareFirst insureds to whom it
dispensed factor in conjunction with the claims at issue in this
case. (Bostwick Decl., ECF No. 104, ¶¶ 39-40)("Each of the
patients to whom [FMCP] dispensed Factor signed an Assignment of
Benefits pursuant to which they assigned and transferred 'to FHM
and FCS all rights, title and interest to reimbursement payable
to me for services provided by FHM, FCS and its associated
contract provider' . . . Each patient also requested 'that FHM
act on my behalf to submit charges for services rendered by FCS
or its associated contract providers and I hereby authorize
payment directly to FHM, FCS or its associated contract
providers of any benefits otherwise payable for items/services,
at a rate not to exceed FHM's regular charges for such
items/services.'"). In addition, FMCP submitted copies of each
of these assignments for the Court's review in advance of the
August 11, 2011 hearing. (ECF No. 137).

CareFirst stated in its motion for partial summary judgment
that "[a]s is typically the case, the insurance contracts at
issue in this matter do not allow the members to assign their
rights to payment to a non-par provider to any other person."
(ECF No. 110, 7); see also (Hanson Decl., ECF No. 116, 76-
77)(stating that the insurance contracts for at least six of the
eight insureds implicated in this case prohibit the member from

assigning his or her benefits).  Nevertheless, CareFirst does
not move for summary judgment on FMCP's assignment-based claims
under ERISA and conceded unequivocally on the record during the
August 11, 2011 hearing that it has waived any objection to the
validity of the assignments.

Accordingly, the Court finds that FMCP is a valid assignee
with standing to assert the rights of CareFirst's insureds under
their employer-sponsored health benefit plans for the factor as
a covered service.

### 2. ERISA Preemption of FMCP's Claim for Prejudgment Interest under the Maryland Prompt Pay Statute

ERISA's civil enforcement provision, § 502(a), preempts
state law claims that come within its scope and converts those
claims into federal claims under § 502.   <u>Metropolitan Life
Insur. Co. v. Taylor</u>, 41 U.S. 58, 64-64 (1987); <u>Darcangelo v.
Verizon Commc'ns., Inc.</u>, 292 F.3d 181, 187 (4th Cir.
2002)(internal citations and quotation marks omitted). As this
Court previously explained in this case, "[a] state claim is
preempted by § 502 if: (1) the plaintiff has standing under §
502(a); (2) the claim is within the scope of § 502(a); and (3)
the claim is not capable of resolution without interpretation of
the ERISA plan."  (<u>Id.</u> at 9)(citing <u>Sonoco Prods. Co. v.
Physicians Health Plan, Inc.</u>, 338 F.3d 366, 372 (4th Cir.
2003)).  Each of these requirements is met here.

FMCP's claims for reimbursement for factor drugs, which have now been paid, and consequently its claim for prejudgment interest, are dependent upon and derive from FMCP's right to recover benefits under ERISA plans. See Hermann Hospital, 845 F.2d at 1290 (holding that a third-party provider's state law claims were preempted by ERISA where those claims were "dependent on, and derived from, the rights of the plan beneficiaries to recover benefits under the terms of the plan.").

### 3. Award of Prejudgment Interest under ERISA § 502

Congress' purpose in enacting ERISA in 1974 was "to promote the interests of employees and their beneficiaries in employee benefit plans, . . . and to protect contractually defined benefits." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989)(internal citations and quotations omitted). However, the original legislation did not address several substantive remedies. As a result of this omission, the Supreme Court has determined that extra-contractual damages, compensatory damages, and punitive damages are not available under ERISA. Despite this strict interpretation of ERISA's language, however, the Court has permitted a participant or beneficiary to recover prejudgment interest as part of a claim for unpaid benefits. Similarly, all circuits have adopted prejudgment interest as a remedy under ERISA to prevent the unjust enrichment.

Federal law controls the issuance of prejudgment interest awarded on federal claims.  See City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 194 (1995).  "ERISA does not specifically provide for prejudgment interest, and absent a statutory mandate the award of prejudgment interest is discretionary with the trial court."  Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1030-31 (4th Cir. 1993)(en banc). The presumption in favor of prejudgment interest, especially in ERISA cases, is widely recognized, however.  Ehrman v. The Henkel Corp. Long-Term Disability Plan and Prudential Life Insur. Co., 194 F.Supp.2d 813, 821 (2002)(citing Rivera v. benefit Trust Life Insur. Co., 921 F.2d 692, 696-97 (7th Cir. 1991)).  "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss."  City of Milwaukee, 515 U.S. at 195.  Prejudgment interest is viewed as a form of compensatory damage designed to place the plaintiff in the same position as if no violation had occurred.  Id.  A participant whose ERISA benefits are delayed but ultimately paid prior to judgment, as in this case, may seek to recover interest on the delayed payment as a form of "other equitable relief" under ERISA, even though there has been no underlying judgment awarding such benefits.  Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193 (3d Cir. 2004).

In exercising its discretion to award prejudgment interest, the Court may take into consideration "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'" Jones v. UNUM Life Insur. Co. of Am., 223 F.3d 130, 139 (2d Cir. 2000)(quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996)).

There is no issue in this case of whether CareFirst owed payment as a matter of law – whether to its insureds or FMCP – for the claims for factor drugs at issue in this case. Although CareFirst previously argued that it could not pay FMCP because it did not have the necessary license to dispense factor drugs in accordance with Maryland law, it has since abandoned this position and paid the balance due on the claims. FMCP suffered a loss of opportunity to use the funds to which it was entitled because CareFirst erroneously denied payment on the basis that FMCP needed an RSA license. FMCP contends that loss of these funds necessitated the December 19, 2009 sale of its assets. (Bostwick Decl., ECF No. 104, at ¶ 21). FMCP does not, however, state that the sale was financially disadvantageous, nor does FMCP attempt to quantify any loss from the sale. Nor would it seem that such a loss, if proven, would be recoverable. See

<u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248 (1993) (Money damages cannot be awarded under ERISA).

In any event, FMCP's failure to present a more full picture of this alleged consequence prevents any consideration of it in selecting the appropriate interest rate. However, in the Court's judgment, interest is necessarily awarded in this case both to fully compensate the FMCP for loss of use of funds wrongly withheld and to prevent CareFirst from unfairly benefitting by its delay in payment.

Having found that an award of prejudgment interest is necessary, the Court must determine the appropriate rate, which "for cases involving federal questions is a matter left to the discretion of the district court." <u>Quesinberry</u>, 987 F.2d at 1031 (relying on <u>United States v. Dollar Rent A Car Systems, Inc.</u>, 712 F.2d 938, 940 (4th Cir. 1983)). Both parties recognize that the applicable interest rate in an ERISA action lies within the Court's discretion (ECF No. 126, 10; ECF No. 127, 6-8). FMCP urges the Court to apply the escalating Maryland Prompt Pay Statute rate (<u>id.</u> at 11), and asserts that "FMCP can be compensated only if it is granted a <u>substantial</u> award of interest" (<u>id.</u> at 9)(emphasis in the original).[12] FMCP

_____

[12] The Maryland Prompt Pay Statute provides that:

> (1) If an insurer, nonprofit health service plan, or health maintenance organization fails to pay a

also notes that "[t]he Maryland pre-judgment statutory interest rate is 6% per annum." (Id.) (citing Md. Const. Art. III, § 57).

Thus, while FMCP argues for the Maryland Prompt Pay interest formula, and mentions the state statutory interest rate of 6% - all higher than the Section 1961 rate - FMCP does not demonstrate, or indeed even argue, that the federal rate does not "place it in the position [it] would have occupied but for the defendants wrongdoing." Ford v. Uniroyal Pension Plan, 154 F.3d 613, 619 (3rd Cir. 1998). FMCP merely conclusorily declares that it "can be compensated only if it is granted a substantial award of interest." (ECF No. 127, 9) (emphasis in the original).

---

clean claim for reimbursement or otherwise violates any provision of this section, the insurer, nonprofit health service plan, or health maintenance organization shall pay interest on the amount of the claim that remains unpaid 30 days after receipt of the initial clean claim for reimbursement at the monthly rate of:

(i) 1.5% from the 31st day through the 60th day;
(ii) 2% from the 61st day through the 120th day; and
(iii) 2.5% after the 120th day.

Md. Code Ann., Insur. § 15-1005(f). The structure of this interest scheme, which increases over time, suggests that it is intended as a penalty that will incentivize prompt payment of claims, rather than an approximation of the payee's loss as a result of being deprived of the funds.

CareFirst contends that the Maryland Prompt Pay Statute should be excluded from consideration because interest under its terms amounts to a penalty (ECF No. 127, 6), and submits that two alternative rates are justifiable in this case: (1) the federal post-judgment interest rate in 28 U.S.C. § 1961(a) (the "Section 1961 rate") and (2) the prime rate. (ECF No. 127, 6-7).

Generally, "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of a particular case require a different rate." Blankenship v. Liberty Life Assurance Company of Boston, 486 F.3d 620, 628 (9th Cir. 2007)(citing Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1164 (9th Cir. 2001)). A number of courts have approved the Section 1961 rate to compute pre-judgment interest on ERISA damage awards. See e.g., Cottrill v. Sparrow, Johnson, & Ursillo, Inc., 100 F.3d 220, 224-25(1st Cir. 1996); Masker v. TMG Life Ins. Co., 54 F.3d 1322, 1331 (8th Cir. 1995); Sweet v. Consolidated Aluminum Corp., 913 F.2d 268, 270 (6th Cir. 1990); Blanton v. Anzalone, 760 F.2d 989, 992 (9th Cir. 1985). While the Fourth Circuit has let an award of a Virginia state interest rate of 6% stand in Quisenberry without discussion, 987 F.2d 1031, it has not declared a position on the appropriate rate nor

provided any definitive guidance.  While FMCP argues that the Fourth Circuit in Quisenberry "specifically endorsed the use of a state statutory rate" see (ECF No. 126,4), the Court disagrees.[13]  "The essential rationale for awarding prejudgment interest is to insure that an injured party is fully compensated for its loss."  City of Milwaukee v. Cement Division, National Gypsum Co., 515 U.S. 189, 195 (1995).

The Court finds that the Section 1961 rate adequately compensates FMCP for loss of the use of its funds and does not amount to a penalty against CareFirst.  See Ford v. Uniroyal Pension Plan, 154 F.3d 613, 618 (6th Cir. 1998) ("Although prejudgment interest is typically not punitive, an excessive prejudgment interest rate would overcompensate an ERISA plaintiff, thereby transforming the award of prejudgment interest from a compensatory damage award to a punitive one in contravention of ERISA's remedial goal of simply placing the plaintiff in the position he or she would have occupied but for the defendant's wrongdoing.").  In addition, "use of the federal rate promotes uniformity in ERISA cases and provides an

---

[13] FMCP is correct that some courts have imposed the state rate of interest, see, e.g., Gruber v. Unum Life Ins. Co. of America, 195 F. Supp. 2d 711, 719 (D. Md. 2002).  The determinant is whether the rate is compensatory as a matter of fact.  The § 1961 rate in 2002 is unknown.  What is clear is that there is no automatic adoption of the state statutory rate in ERISA cases.

objective measure of the value of money over time." Edmonds, 1998 WL 782016, at *2 (citing Cottrill, 100 F.3d at 225).

The Court does not believe that there is "substantial evidence that the equities in [this] particular case require a different - [higher] rate." Blankenship, supra. Notably in Blankenship, the plaintiff presented a factual record that Liberty Life's wrongful nonpayment of ERISA benefits required him to sell his investment, a mutual fund which had a 10.01% rate of return during the relevant period. The Ninth Circuit found on this record that "the district court did not abuse its discretion in awarding prejudgment interest at a rate that exceeded the standard Treasury bill rate." Id. at 628. Similarly, in Fox v. Fox, 167 F.3d 880, 884 (4th Cir. 1999), there was a factual basis for the 12% prejudgment interest rate awarded – the S & P performance during the relevant time period. Accord Meyer v. Berkshire Life Ins. Co., 250 F. Supp. 2d 544, 573-74 (D. Md. 2003) (8% prejudgment interest rate awarded based on evidence of market performance during relevant time period).

FMCP did not prevent any evidence justifying a higher interest rate to fully comensate the company for the loss of the use of monies during the relevant time period. Without such evidence, the Court declines to grant any interest rate higher than allowed under § 1961.

Finally, FMCP seems to suggest that a higher interest rate should be imposed because "CareFirst wrongly refused to pay in excess of $1.8 million in properly submitted invoices for well more than 32 months." See (ECF No. 126, 4). However, an award under ERISA cannot be punitive, only compensatory. CareFirst asserts that its belief that FMCP was improperly licensed was based upon FMCP's own representations about its services and practices. See (ECF No. 110, 25 and exhibits cited therein). FMCP counters that "on information and belief, CareFirst knew that [it was not true that FMCP required a RSA license]." See (ECF No. 104, ¶ 57). See also (Id., ¶¶ 59-60). There is a dispute as to fact as to whether FMCP ever told CareFirst that it was not required to have a RSA. Compare (Anuszewski Dec., ECF No. 117, ¶¶ 36, 41) with (Gardner Decl., ECF No. 120-3, ¶ 6). The evidence paints a picture of legitimate confusion, on both sides and indeed on the part of the involved agencies. There is arguably a picture of bureaucratic miscommunication, but not of venality. The parties have submitted correspondence from various FMCP and CareFirst representatives relevant to the RSA issue to both the Board of Pharmacy and the Office of Health Care Quality. It appears for some period of time FMCP thought it might need an RSA license for the medical equipment and supplies it provided and sometimes delivered. See, e.g., (ECF No. 121, Ex. B – May 12, 2008 letter from FMCP to office of

Health Care Quality); (ECF No. 121, Ex. B – May 23, 2008 letter to FMCP from DHMH requesting RSA license). While ultimately wrong on FMCP's need for an RSA license for provision of factor, and FMCP must be compensated for its loss of use of the delayed payment for factor, there is no clear basis in fact that CareFirst's position was frivolous or ill-motivated, and even if so shown, no basis in the law to impose a high interest rate to punish CareFirst for its conduct.

Having decided to adopt the Section 1961 rate in this case for the reasons set forth above, the Court must define the other variables necessary to calculate prejudgment interest in this case. As stated above, prejudgment interest serves principally to compensate a plaintiff for the loss of use of money over time. To ascertain the effect of the loss of the use of money, "it is necessary to determine when the wrongful deprivation occurred and the duration of the deprivation." Edmonds, 1998 WL 782016, at *3. In this case, the applicable rate is the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date on which interest begins to accrue for each of the individual claims at issue.

The parties dispute the date on which interest should begin to accrue. At issue are 40 distinct claims for factor drugs dispensed to eight individual patients between February 6, 2008

and the filing of this action on June 1, 2009.[14]  CareFirst

argues that the claims should be divided into two categories for

the purpose of calculating interest: claims for service pre-

dating and post-dating December 11, 2008, the date on which FMCP

obtained its RSA license.[15]  For clarity and ease of reference,

_____

[14] The record reflects numerous discrepancies with respect to the
universe of claims at issue in this case.  Exhibit B to the
Complaint is a table of 36 claims (ECF No. 2, Ex. B); in
correspondence submitted to the Court on August 18, 2011, FMCP
stated that it seeks interest with respect to 42 claims (ECF No.
143); and a chart submitted on the same day by CareFirst showed
45 claims (ECF No. 145).  The Court sought clarification from
the parties and the parties have now agreed that there are 40
distinct claims at issue, and that this represents the entire
universe of claims that CareFirst paid in satisfaction of the
principal balance owed to FMCP in this matter.  See (ECF No.
146)("Upon consultation with CareFirst's counsel and further
review, we have determined that two invoices were inadvertently
included in the list provided to the Court.  Accordingly,
Plaintiff is submitting a revised list of 40 invoices for which
it seeks interest.").  Thus, the universe of claims at issue on
the underlying motions is restricted to the following invoice
numbers: 14900, 15259, 12555, 13617, 13967, 14319, 14727, 14917,
15291, 15787, 16500, 16849, 17360, 17675, 17981, 14685, 14904,
15321, 16035, 16348, 16702, 17313, 17790, 13636, 13912, 15811,
17538, 18590, 13202, 13205, 16502, 17629, 18258, 13463, 13887,
14914, 16089, 16368, 16843, and 17514.  See (ECF No. 145)(chart
indicating that each of these claims, and only these claims, are
at issue).

[15] CareFirst reportedly used this approach to calculate the
interest it has already paid to FMCP in the amount of $23,017.
The Hanson Declaration explains that,

> CareFirst has already paid $23,017.00 in
> interest to [FMCP] for the claims at issue
> in this case.  This interest was calculated
> differently for the claims for services pre-
> dating [FMCP's] receipt of its RSA (which

the Court will refer to these two categories as "pre-RSA" and "post-RSA" claims. FMCP maintains that interest began to run on the 31st day after FMCP submitted each of its individual claims and was at no point tolled. (ECF No. 120, 26).

With respect to the pre-RSA claims, CareFirst asserts that, prior to December 11, 2008, a reasonable dispute existed as to whether FMCP was properly licensed to dispense factor drugs. (ECF No. 110, 20-21). CareFirst further contends that payment did not become due, and interest therefore should not run, until after the licensure dispute was resolved to its satisfaction by the Pharmacy Board's August 18, 2010 advisory opinion, which stated that a pharmacy does not require an RSA to drop ship

---

happened December 11, 2008) and for the claims for services after that date.

For claims for services prior to December 11, 2008, interest was calculated starting on September 17, 2010. That date was used because it is the 31st day after the date on which CareFirst received the oral decision from the Board of Pharmacy that [FMCP] could drop ship Factor VIII without an RSA – August 18, 2010.

For the claims for services after December 11, 2008, interest was calculated starting on August 18, 2010. The reason that CareFirst used that day to start the interest was because it assumed that CareFirst had used its 30-day period[15] to pay those claims in the time between which I received the records for certain members. . . and the day on which CareFirst filed its interpleader action.

(ECF No. 116, ¶¶ 80-83).

factor drugs to patients' homes in accordance with Maryland law.[16] (ECF No. 110, 17). Under the Maryland Prompt Pay Statute, an insurer must pay a properly submitted or "clean" claim within 30 days. Md. Code Ann., Insur. § 15-1005(c). Based upon this standard, CareFirst contends that – even though it has voluntarily paid the claims on the basis that FMCP in fact never needed an RSA – interest should accrue from September 17, 2010, the 31st day after it received the Pharmacy Board's opinion. (ECF No. 110, 17).

---

[16] CareFirst also argues in its motion for summary judgment that, even if the Court finds that FMCP was at all relevant times operating within the scope of its license, payment never became due on the underlying claims because FMCP failed to submit them on the proper form (the Universal Prescription Drug Claim Form). (ECF No. 110, 25)(citing COMAR 31.10.11.06, which states that "[t]hird-party payors shall accept the Universal Prescription Drug Claim form as the sole instrument for filing claims with third-party payors for prescription drugs."). CareFirst asserts that the HCFA 1500, on which FMCP submitted the claims at issue, is not to be used for "[p]harmacies or pharmacists which are filing claims for prescription drugs." (Id.)(citing COMAR 31.10.11.02.B.4). In response, FMCP submitted declaration testimony indicating that FMCP has always submitted claims on the HCFA 1500 form, as it did for each of the claims at issue in this case, and that CareFirst has never before objected or indicated in any way that the form was deficient. See (Puente Decl., ECF No. 120-4, ¶¶ 2-7); (White Decl., ECF No. 120-5, ¶ 7). CareFirst did not submit any evidence contradicting FMCP's declaration testimony. Indeed, CareFirst itself states that it "does not raise this issue to claw back any payments or assert that it owed absolutely no interest." (ECF No. 11, 22). Also, it appears that CareFirst has waived its argument that FMCP's claims were not "clean" because they were not submitted on the proper forms by not asserting it within 30 days or a reasonable time following submission of claims for reimbursement, and is estopped from raising it now as a way to avoid payment of claims long overdue, or as a basis to delay onset of interest accrual.

The Court finds that, with respect to the pre-RSA claims, interest accrues from the 31st day after each claim was submitted irrespective of CareFirst's beliefs about FMCP's licensure requirements.  The Court notes that the Maryland Prompt Pay Statute, which governs timeliness of payment of claims for health care services under Maryland law, makes no provision for withholding payment based upon a "reasonable belief" that the claim is somehow improper.  Indeed, the Maryland General Assembly amended the statute in 2000 to omit the provision that "this section does not apply when there is a good faith dispute about the legitimacy of a claim or the appropriate amount of reimbursement."  Md. Code Ann., Insur. § 15-1005.  In this case the Court does not have to decide whether CareFirst was obligated to pay the claims under the Prompt Pay statute notwithstanding its question regarding RSA licensure. However, by refusing payment on the grounds that FMCP was not properly licensed, CareFirst accepted the risk that its position was inaccurate.  CareFirst was wrong about FMCP's need for a RSA license.  CareFirst should not benefit from its error. CareFirst could have deposited the amount billed for factor drugs in an interest bearing escrow account until the issue was resolved.  Instead, however, CareFirst withheld the funds and benefited from their use until it ultimately paid the claims during the pendency of the litigation.  As FMCP points out in

its briefing, the claims at issue did not become "clean" when the Pharmacy Board rendered its advisory opinion; rather, the Pharmacy Board merely confirmed that the claims were "clean" from the moment they were submitted. (ECF No. 120, 19). Thus, the date that the wrongful deprivation occurred, and on which interest begins to run in this case, is the 31st day after each pre-RSA claim was submitted. Thus, the interest to be applied during the entire period, that is, until the claim was paid, is the Section 1961 interest rate for the calendar week preceding the date on which interest begins to accrue for each of the claims at issue. While the Court understands that the federal rate decreased over the period of interest entitlement (ECF No. 127, Ex. 1), the Court is awarding FMCP the (higher) interest in effect as of interest entitlement began throughout the period and is not requiring computation on a weekly basis, as the interest rate changes. Obviously, if CareFirst had paid FMCP when it was entitled to the money, FMCP could have made other decisions about use of the money which might have brought a more favorable return. See Edmonds v. Hughes Aircraft Co., 1998 WL 782016 (E.D. Va.). Finally, the interest should be compounded monthly to more closely put FMCP in the position it otherwise would have been in. See Ehrman v. The Henkel Corp., 194 F. Supp. 2d 813, 821-22 (C.D. Ill. 2002) and cases cited therein. The Court does not penalize CareFirst by reaching this

conclusion, but rather ensures that the party bearing the risk for the underlying error is not unjustly enriched.

With respect to the post-RSA claims, CareFirst contends that interest began to accrue on August 18, 2010, the date of the Pharmacy Board's advisory opinion. (ECF No. 116, ¶¶ 80-83). CareFirst argues that it requested additional documentation from FMCP with respect to the post-RSA claims, thereby effectively stopping the interest "clock." (ECF No. 121, 5). CareFirst again invokes the Maryland Prompt Pay Statute rubric (ECF No. 121, 5), citing the notice provision in Md. Code Ann., Insur. § 15-1005(c), which provides that:

> Within 30 days after receipt of a claim for reimbursement from a person entitled to reimbursement . . . an insurer, nonprofit health service plan, or [HMO] shall:
> (1) mail or otherwise transmit payment for the claim in accordance with this section; or
> (2) send a notice of receipt and status of the claim that states:
> (i) that the insurer, nonprofit health service plan, or [HMO] refuses to reimburse all or part of the claim and the reason for the refusal;
> (ii) that, in accordance with § 15-1003(d)(1)(ii) of this subtitle, the legitimacy of the claim or the inappropriateness of the amount of reimbursement is in dispute and additional information is necessary to determine if all or part of the claim will be reimbursed and what specific information is necessary; or
> (iii) that the claim is not clean and the specific information necessary

> for the claim to be considered a
> clean claim.

The Hanson Declaration explains that "it is perfectly normal for CareFirst to sometimes require a provider to submit medical records to support a claim. When this happens, the claim is not considered clean until the documentation is received. CareFirst then has 30 days from receipt of the medical records to process the claim." (ECF No. 116, ¶ 32-33). The Hanson Declaration further states that "[i]n some instances, CareFirst has reason to more carefully scrutinize claims from a given provider. One way to do so is to "pend" claims from that provider in CareFirst's systems, meaning that claims from the provider will not be allowed to go through the automated claims processing systems." (Id. at ¶ 34). The Special Investigations Unit at CareFirst pended the post-RSA claims to investigate numerous "red flags" it had identified related to FMCP's billing for factor drugs. (ECF No. 116, ¶¶ 11-22). Exhibit A to the Hanson Declaration is a letter dated July 22, 2009 from Ms. Hanson to FMCP requesting additional information for each of the post-RSA claims. The letter states as follows:

> CareFirst Special Investigations has received
> several claims for services billed by [FMCP] as
> detailed in the enclosed chart. In order for
> CareFirst Special Investigations to complete the
> processing of these claims, we need additional
> information for each claim as indicated. The
> claims will be placed in our closed files, but

will be reviewed when the necessary information is received.

(ECF No. 116, Ex. A). Exhibit E to the Declaration of Patrick deGravelles ("deGravelle Declaration") submitted in support of CareFirst's motion for summary judgment is email correspondence from Mr. deGravelles dated September 25, 2009 again requesting additional records in support of the post-RSA claims. (ECF No. 115, Ex. E). The Hanson Declaration states that Ms. Hanson "finally received the records for the post-December 11, 2008 claims on October 2, 2009." (ECF No. 116, ¶ 47); see also (ECF No. 110, 10)("in the case of services provided after FMCP received its RSA (December 11, 2008), the necessary records were received by CareFirst on October 2, 2009."). Upon receiving the records, Ms. Hanson states that she "immediately sent them to ICORE, which is a an entity CareFirst uses to review certain types of claims." (Hanson Decl., ECF No. 116, ¶ 48). Once ICORE approved the claims, CareFirst "stood ready to pay." (Id. at ¶ 49). CareFirst asserts that, because it did not consider FMCP to be a par provider with respect to factor drugs, it filed an interpleader action within 30 days of receiving the records, and requested that the Circuit Court for Baltimore County (where the case was then pending) direct the clerk to accept the amount until such time as it was determined whether the members or [FMCP] should be paid. (ECF No. 110, 11)(citing Hanson Decl., ECF No. 116, ¶ 51). FMCP opposed the interpleader action. (ECF No. 47-

2).  CareFirst asserts that its interpleader action also stops the interest "clock" with respect to the post-RSA claims because it represents a good faith attempt to make payment.  (ECF No. 121, 5).

The Court first addresses CareFirst's argument that its request for additional documentation tolls the accrual of interest on the post-RSA claims.  CareFirst points to its request on July 22, 2009 for additional medical information for some 21 individual post-RSA "dates of service" (or claims) as the justification for its delay in payment of the post-RSA claims and its argument that interest should not run on these claims until FMCP provided the requested information.  (ECF No. 116, Ex. A).  At the August 11, 2011 hearing in this matter, CareFirst argued that these requests satisfy the notice requirement in Md. Code Ann., Insur. § 15-1005(c).  This is a largely untenable argument, however, in light of the Prompt Pay Statute requirements for timely processing of claims.  Ms. Hanson's records request is dated July 22, 2009, more than 30 days after the date of service for each of the 21 claims identified in an attached chart ("Patient List").  (ECF No. 116, Ex. A).  Thus, the request was untimely when considered for payment purposes and does not toll the accrual of interest on the post-RSA claims.  See Md. Code Ann., Insur. § 15-1005(c) (stating that any additional information required to process a claim must be requested within 30 days).

Also at the August 11, 2011 hearing, CareFirst raised the argument that "provider vouchers" issued to FMCP satisfy the notice

requirement of Md. Code Ann., Insur. § 15-1005(c) with respect to the post-RSA claims. Following the hearing, CareFirst submitted these vouchers, which had previously been produced in discovery, for the Court's review. (ECF No. 138). Given that CareFirst did not raise the issue of its requests for documentation with respect to the pre-RSA claims in its submissions and did not raise the provider voucher argument until the August 11, 2011 hearing, the Court shall restrict its consideration of the provider vouchers to the post-RSA claims, for which CareFirst argued that outstanding documentation requests tolled the accrual of interest.

The provider vouchers indicate, even to a lay person without expertise in medical claims coding and processing, that CareFirst withheld payment on certain claims for a variety of discrete reasons, including incomplete documentation, or that the service is not a covered benefit when performed by this provider type. See (ECF No. 138). Of the 21 claims included on Ms. Hanson's July 22, 2009 Patient List (ECF No. 116, Ex. A), only two corresponding provider vouchers identify the need for more information as the reason payment was withheld, see (ECF No. 138)(stating "A-This claim cannot be processed because the medical documentation that the provider of service supplied to us is incomplete. The information still needed is the medical records for this service").[17] As to the rest of the

---

[17] The Patient List identified claims by patient's name, patient's date of birth, and date of service. (ECF No. 116, Ex.

claims on the Patient List, either no denial code was listed, or CareFirst did not provide documentation or another reason, besides insufficient medical information, was listed. In other words, only two of the provider vouchers appear to request the same type of medical records information for post-RSA claims as the July 22, 2009 records request did. These two claims are invoice numbers 17790 and 17629 for services rendered on April 9, 2009 and March 27, 2009 respectively. As stated above, the provider vouchers must issue to FMCP within 30 days of the date the claim was received by CareFirst in order to satisfy the 30-day notice requirement in the Maryland Prompt Pay Statute, Md. Code Ann., Insur. § 15-1005(c). Two critical pieces of information necessary to determine whether interest is due and the start date of interest entitlement are unclear from the provider vouchers: (1) the date on which each of the two claims was received by CareFirst and (2) the date CareFirst issued provider vouchers corresponding to the these two claims.[18] If these two dates are more than 30 days apart, then CareFirst's request for medical records in the provider vouchers was untimely under the Maryland

A). The Court crossreferenced the date of service of each claim with the dates of service on the provider vouchers submitted by CareFirst in order to determine the invoice number. (ECF No. 138).

[18] Because CareFirst paid these claims, entitlement to some interest is due _unless_ paid by the 31st day after a "clean" claim was submitted. As to the claims, there might be a further dispute as to whether the claims were "clean" when submitted, making interest due by the 31st day after initial submission.

Prompt Pay Statute and do not toll the accrual of interest with respect to the claims with invoice numbers 17790 and 17629. It is also not clear from the record before the Court when the medical records requested by way of the provider vouchers were ultimately submitted to CareFirst (whether as part of the records submitted on October 2, 2009 or otherwise). Without that date – the date that the claim was "clean," it is not possible to compute the start date of interest entitlement.

In sum, with respect to the claims with invoice numbers 17790 and 17629, there exists a genuine dispute of material fact as to whether interest was tolled between the date on which CareFirst issued the provider voucher (if the voucher was issued within 30 days of the date of service) and when the medical records requested in the provider voucher were received by CareFirst (the date of which is not clear from the record). As to all the other post RSA claims, payment was due and interest accrues from the 31st day after the claim was submitted, as with the pre-RSA claims, computation of interest throughout the period of interest entitlement shall be at the applicable federal rate on the onset date of interest entitlement.

Finally, with respect to CareFirst's argument that the interest clock again was tolled when it attempted by interpleader action to pay the amount due for the post-RSA claims into the Circuit Court for Baltimore County, the Court finds that the interest continued to accrue. As stated above, the prejudgment interest award in this case

is intended to compensate FMCP and to prevent CareFirst from being unjustly enriched, as it had use of the principal during this period.[19]

## V. CONCLUSION

For the reasons set forth above, the Court finds that FMCP is not entitled to prejudgment interest under the Maryland Prompt Pay Statute as it is not a par provider with respect to factor drugs under the PPP Agreement. Based on its assignments of benefits from CareFirst's insureds, however, FMCP is entitled to direct reimbursement under ERISA § 502. Given that FMCP's right to payment arises from ERISA's civil enforcement provision, which completely preempts the Maryland Prompt Pay Statute, ERISA also governs FMCP's claim for prejudgment interest. Considering that the award of prejudgment interest is intended to compensate the plaintiff for the loss of use of its money and thereby to make it whole, and considering that FMCP's right to payment arose under federal law and the use of the federal rate will promote both uniformity and predictability under ERISA and in the absence of any strong equities in FMCP's

---

[19] Also for this reason, the Court need not reach FMCP's argument that it is entitled to summary judgment on its motion for unjust enrichment. The prejudgment interest award serves to ensure that CareFirst is not unjustly enriched by its delay in paying the underlying claims for factor drugs and any potential relief on the unjust enrichment claim would be duplicative.

favor, the Court concludes that the appropriate rate is the federal postjudgment interest rate under 28 U.S.C. § 1961.

Thus, the Court GRANTS IN PART and DENIES IN PART FMCP's motion for summary judgment and finds FMCP entitled to prejudgment interest under ERISA § 502, not under the Maryland Prompt Pay Statute.  The Court GRANTS IN PART CareFirst's motion for partial summary judgment as to FMCP's claim for additional reimbursement in the amount of $109,989.32 and DENIES IN PART CareFirst's motion for summary judgment with respect to FMCP's claim for interest under the Maryland Prompt Pay Statute.

For all claims for services rendered prior to December 11, 2008, prejudgment interest shall accrue from the date of the wrongful deprivation of benefits — in this case, the 31st day after each claim for factor drugs was received — until the date of payment for each individual claim.  Prejudgment interest shall accrue from the 31st day after the claim was submitted to CareFirst for each claims for factor drugs dispensed after December 11, 2008, with the exception of two claims (invoice numbers 17790 and 17629 for services rendered on April 9, 2009 and March 27, 2009 respectively).  With respect to these two claims, there exists a genuine dispute of material fact regarding whether certain prerequisites to payment were outstanding and, if so, when they were satisfied.  Prejudgment interest shall cease to run on all claims for which interest is

due, whether for factor drugs dispensed before or after December 11, 2008, on the date that each individual claim was paid. In addition, CareFirst shall be credited $23,017 for interest already paid to FMCP.

The parties should submit within two weeks of the date of this Memorandum Opinion and Order an accounting of their prejudgment interest calculations for each of the 38 individual claims for which interest is due under this Order, and the total sum due. If either party intends to move for summary judgment with respect to prejudgment interest on the two remaining claims, it should do so within two weeks of this Memorandum Opinion and Order. If the moving party believes that resolution requires a hearing, it should make this known to the Court within two weeks as well.


Date: 10/24/11                    _____/s/_____
                                  Susan K. Gauvey
                                  United States Magistrate Judge