IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

FELDMAN'S MEDICAL CENTER          )
PHARMACY, INC.,                   )
                                  )
            Plaintiff,            )        Civil Action No. WDQ-10-254
                                  )
            v.                    )
                                  )
CAREFIRST, INC.,                  )
                                  )
            Defendant.            )

_____

## DECLARATION OF JARRETT T. BOSTWICK IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

JARRETT BOSTWICK, under penalty of perjury, deposes and says:

1.     I am the Chief Executive Officer and General Counsel of Factor Health Management, Inc. ("FHM"), the parent company of Plaintiff Feldman's Medical Center Pharmacy, Inc. ("Feldman's").  I submit this Declaration in support of Feldman's Motion for Summary Judgment and on personal knowledge unless otherwise stated.

2.     The behavior of defendant CareFirst, Inc. ("CareFirst"), an enormous health insurance company, toward Feldman's, a small pharmacy, and its patients has been outrageous.  As will be described in detail below, in an effort to avoid payment of $1,782,009 in properly submitted claims, CareFirst lied to Feldman's, ignored the facts that Feldman's provided to it, forced Feldman's to obtain unnecessary licenses and simply, and without basis in law or fact, refused

to pay claims.  (In my opinion, it engaged in this conduct to ruin Feldman's so that CareFirst's insured's would be forced to receive their (very expensive) drugs from a CareFirst aligned provider or a very undesirable federal government clinic).  However, once its duplicity was uncovered, CareFirst abandoned its pretenses and defenses and began to pay most, but not all, of the claims at issue.  CareFirst's outrageous conduct forced Feldman's to incur enormous legal fees, and destroyed its business to the point that FHM had to sell certain assets of Feldman's (FHM retains the right to any recovery in this lawsuit).

3.   On this motion, Feldman's requests that the Court recognize that CareFirst has never had a legitimate basis for refusing to pay the claims at issue, determine that CareFirst is liable to Feldman's for all damages requested in its Complaint, and grant it summary judgment.

### Background

4.   Feldman's, a pharmacy in Columbia, Maryland, provides a very expensive blood clotting factor treatment ("Factor") to patients throughout the United States who are suffering from hemophilia or other blood clotting disorders.  Hemophilia and other blood clotting disorders are life threatening diseases which often require this very costly Factor treatment.  Feldman's has provided specialty pharmacy and health management care coordination services to patients since 1986.

5.   Starting in 2008, defendant CareFirst stopped paying properly submitted claims, based on a series of erroneous positions it took concerning

Feldman's operations, the type of contract that Feldman's and CareFirst had and the types of licenses that Feldman's needed. Despite the fact that Feldman's regularly provided the information necessary to permit CareFirst to determine that there was no reason for CareFirst to withhold payment, CareFirst insisted on denying Feldman's appropriate reimbursement. It was only after Feldman's was required to commence this lawsuit, and after fifteen months of litigation, CareFirst agreed to pay the claims at issue, with a few exceptions that will be discussed in detail below. CareFirst's actions violated the law, in my opinion, and have badly damaged Feldman's.

## Hemophilia Treatment

6. Hemophilia is a hereditary genetic disorder that impairs the body's natural ability to control blood clotting. Hemophiliac patients experience prolonged bleeding from the slightest wound, as well as painful internal bleeding without apparent cause. Expert Witness Report of Mark Levi dated November 12, 2010 ("Levi Report") at (V)(b)(i) (A copy of the Levi Report is annexed hereto as Exhibit1); BCBSA00999 (a true and correct copy of a document dated February 6, 2008 bearing Bates Stamp Numbers BCBSA00999-01000 that Plaintiffs received via a subpoena to the Blue Cross Blue Shield Association (the "BCBSA") entitled "Summary for Medical Directors Conference Call/Factor VIII" is annexed hereto as Exhibit 2).

7. Hemophiliacs' bodies do not produce sufficient blood clotting factor to clot their blood. As a result, hemophiliacs are literally in mortal danger

any time they suffer a cut or a bruise.  In a "normal" person's body, the blood's normal clotting factor would stop the bleeding in short order.  However, for a hemophiliac, an injection of the deficient clotting Factor is necessary so that the patient does not "bleed out" and die.  Levi Report at (V)(b)(i) (Exhibit 1).

8.    Prior to 1993, the typical treatment for a hemophiliac was an infusion of replacement clotting factor that was derived from human blood plasma that had been donated to a blood bank.  In the 1980s and 1990s, much of the blood supply in the United States became tainted with blood containing the HIV virus.   Out of approximately 22,000 hemophiliacs in the United States, approximately 10,000 became infected with HIV as a result of this contamination of the blood bank supply.  Many hemophiliacs also became infected with hepatitis and other diseases.  Pharmaceutical companies therefore developed recombinant or synthetic products that replace the missing clotting factor in a hemophiliac patient without subjecting that patient to the risks and diseases inherent in the human blood supply.  Levi Report at (V)(b)(i) (Exhibit1).

9.    Such synthetic clotting Factor—which is at issue here—is very expensive, made more so by the small number of hemophiliacs in the United States and the required regular injection treatments. Affidavit of William Jamison sworn to August 5, 2009 and submitted in connection with FMCP's Reply Papers in Further Support of the Motion for Preliminary Injunction ("Jamison Aff."), a copy of which is annexed hereto as Exhibit 3); Levi Report at (V)(b)(i), p. 4 (Exhibit1); Expert

Witness Report of Donna Horn RPh, DPh dated November 12, 2010 ("Horn Report") at (V)(b)(i), p.5(A copy of the Horn Report is annexed hereto as <u>Exhibit 4</u>).

10.    Hemophiliacs typically infuse themselves with clotting Factor at home.  With a minimal amount of training a patient (or a child's family members) can inject himself (virtually all hemophiliacs are male), and that is how Factor is typically administered.     For example, ADVATE, Antihemophilic Factor (Recombinant) (Plasma/Albumin Free), is administered directly into the bloodstream and works by temporarily raising the level of Factor VIII in the blood, thus allowing the body's blood clotting process to function properly. Horn Report at (V)(b)(i), p.5 (<u>Exhibit 4</u>) With proper care and access to medication, hemophiliacs can live fairly normal lives.  But without such care or medication, hemophilia is debilitating and ultimately fatal. Levi Report at (V)(b)(i) (<u>Exhibit 1</u>); Jamison Aff. ¶ 9 (<u>Exhibit 3</u>).

11.    Many hemophiliacs inject themselves with the Factor as they suffer a bleed and they recover in due course.  But many other patients, must be treated prophylactically with regular infusions of clotting factor in order to keep clotting levels sufficiently high to prevent spontaneous bleeding episodes. BCBSA00999 (<u>Exhibit 2</u>).

12.    Each hemophiliac is different, and, despite recommended dosage levels on the package inserts for recombinant (i.e., synthetic) clotting factors, there is no way to tell the proper course of treatment or dosage for a hemophiliac other than through trial and error. Jamison Aff., ¶ 8 (<u>Exhibit 3</u>).    The

appropriate dosage for any particular patient may, and often does, change throughout the patient's lifetime.

13.    "Self-injectable drugs" are commonly defined as those products that more often than not will be administered by the individual patient or caregiver within the home, versus within a clinic-based setting. Horn Report at (V)(b)(i), p.5 (Exhibit 4).

14.    On the other hand, "infusable drugs" are administered through a needle into the body over a period of longer than two or three minutes. Deposition of Winston Wong, the Pharmacy Director for CareFirst, dated August 17, 2010 ("Wong Tr.) at 52:6 (selected pages from the Wong Tr. are annexed hereto as Exhibit 5).

## Specialty Pharmacies

15.    There are more than 56,000 community pharmacies, including traditional chain pharmacies, food and pharmacy combinations, mass merchandise pharmacies and independent pharmacies, including "niche" pharmacies, providing ambulatory prescriptions to patients across the United States.    Community pharmacy practice is one of the most regulated professions in the country. Horn Report at (V)(b)(i), p. 4-5 (Exhibit 4).

16.    Specialty drugs are prescription medications for complex conditions that require special handling, administration, or monitoring. Not only are the drugs for these conditions high in cost, they can be high maintenance, meaning

that they require specialized delivery and administration on an ongoing basis. Horn Report at (V)(b)(i), p. 4 (Exhibit 4).

17. Not all community pharmacies will dispense specialty drugs. These products tend to present challenges of inventory, product knowledge, administration tools and delivery and require an enormous investment in capital to maintain inventories of Factor.  Independent pharmacies, such as Feldman's, can make a successful business by serving these niche specialty markets, including hemophilia and other related bleeding disorders. National chain pharmacies such as CVS Caremark and Walgreens offer specialty drugs through their mail order services, but not usually through their local pharmacies. Horn Report at (V)(b)(i), p. 4-5 (Exhibit 4).

18. Both chain and independent pharmacies offering specialty medications through delivery and mail service are required to operate under the same board of pharmacy regulations that govern conventional medication dispensing in the state in which the pharmacy is physically located. Horn Report at (V)(b)(i), pp. 5 – 6 (Exhibit 4).

19. Pharmacies have pharmacy licenses issued by the state that govern the scope of their operations.  Deposition of Janet Chavarria, a Business Analyst in CareFirst's Institutional Credentialing Department, dated October 28, 2010 ("Chavarria Tr.") at 11:12 – 14 (selected pages from the Chavarria Tr. are annexed hereto as Exhibit 6).[1]

---

[1] Annexed hereto as collective Exhibit 7 are relevant portions of the Maryland

## Background of Feldman's

20.     Feldman's is a Maryland corporation, with its principal place of business located at 11055 Little Patuxent Parkway, Columbia, Maryland 21044 and is a nationally accredited retail pharmacy. Feldman's is licensed by the State of Maryland and accredited by The Joint Commission, formerly the Joint Commission on Accreditation of Healthcare Organizations. Deposition of Lisa Anuszewski, a Contract Manager for Institutional Contracting at CareFirst, dated October 13, 2009 ("Anuszewski Tr.") at 41:1 (selected pages from the Anuszewski Tr. are annexed hereto as Exhibit 9).   FHM purchased Feldman's from its founder in October 2007.

21.     Feldman's was a wholly-owned subsidiary of FHM prior to the sale of certain assets to Rajendra Appalaneni on December 17, 2009. The sale of Feldman's assets specifically excluded receivables, including any money received from CareFirst in connection with the claims at issue in this case.   FHM sold Feldman's because of the financial difficulties caused by CareFirst's refusal to pay Feldman's claims.

22.     Prior to its sale, Feldman's was increasingly focused on providing specialty pharmacy products and services for the specialty disease states of hemophilia, von Willebrand disease, hepatitis, and HIV.   In addition to its

---

Annotated Code of Health Occupations §§12-201 *et seq.* and annexed hereto as Exhibit 8 are relevant pages from the Maryland Board of Pharmacy website setting forth the Board of Pharmacy's mission statement.

traditional pharmacy practice, Feldman's became a leader in supplying Factor replacement medication to hemophiliacs in Maryland and elsewhere.

23.     Feldman's attained its leading role by focusing on customer service and ensuring that patients received their medication as quickly as possible, even if it meant operating on timetables that most pharmacies – whether large chains or community or family operations – could not or would not.

### Background of CareFirst

24.     CareFirst is the dominant insurer in Maryland, and generates billions of dollars in revenue yearly.  CareFirst has used its power and size to destroy Feldman's through its campaign of misinformation and duplicity designed to withhold payments from Feldman's with no basis.

25.     CareFirst is a Maryland corporation with its principal office located at 10455 Mill Run Circle, Owings Mills, Maryland 21117.  Deposition of Jaime Hanson, an investigator employed by Defendant, dated March 8, 2010 ("Hanson Tr.") at 5:11 – 12 (selected pages from the Hanson Tr. are annexed hereto as Exhibit 10).

26.     CareFirst was incorporated as a non-profit corporation on January 16, 1998.  Along with its affiliates CareFirst of Maryland, Inc. ("CFMI") and Group Hospitalization and Medical Services, Inc. ("GHMSI"), CareFirst does business as CareFirst BlueCross BlueShield.  CareFirst Consolidated Financial Statements for Years Ended December 31, 2008 and 2009 at 6.  (True and correct

copies of relevant pages from the CareFirst Consolidated Financial Statements are annexed hereto as Exhibit 11).

27.    According to Maryland Insurance Commissioner Ralph S. Tyler, CareFirst is an important company with a "unique mission in the marketplace." Press Release issued by the Maryland Insurance Administration and the Maryland Insurance Administration's January 2010 Report on CareFirst Premiums and Surplus (the "Surplus Report").  (True and correct copies of relevant pages of the Surplus Report are annexed hereto as Exhibit 12).

28.    As nonprofit health service plans, CFI, CFMI and GHMSI must: Provide affordable and accessible health insurance to their insureds; Assist and support public and private health care initiatives for those without health insurance; and Promote the integration of a health care system that meets the health care needs of all residents residing in the geographic area served by the companies. Surplus Report  (Exhibit 12).

29.    Out of a potential market of 6.3 million people in Maryland, Northern Virginia, West Virginia, North Carolina, and Washington, D.C., at the end of 2008 CareFirst insured 3.3 million people, capturing 43% of an otherwise fractured market.   CareFirst's next largest competitor had only 15% of the total market.   "CareFirst BluePrint: CareFirst Market Share by Region" a true and correct copy of which is annexed hereto as Exhibit 13.

30.    For the 2009 fiscal year, CareFirst had $6.8 billion of revenue and $96.8 million of net income. CareFirst 2009 Annual Report to the Community,

p. 24, a true and correct copy of which is annexed hereto as <u>Exhibit 14</u>. CareFirst has approximately $3.7 billion in assets. CareFirst Consolidated Financial Statements, p. 2 (<u>Exhibit 11</u>).

      31.    CareFirst holds the Blue Cross and Blue Shield trademarks for Maryland, the District of Columbia and Northern Virginia. Surplus Report (<u>Exhibit 12</u>).The BCBSA is a national federation of 39 independent, community-based and locally operated Blue Cross and Blue Shield companies.  CareFirst is a member of the BCBSA.  Annexed hereto as <u>Exhibit 15</u> are true and correct copies of relevant informational pages from the BCBSA website.

      32.    As is described on the BCBSA website, BlueCard is a national program that enables members of one BCBSA licensee to obtain healthcare services while traveling or living in another BCBSA licensee's service area. (<u>Exhibit 15</u>).

### The Relationship Between Feldman's and CareFirst

      33.    Feldman's has submitted claims to, and was reimbursed by, CareFirst and its predecessors since the 1970s until the instant dispute, and without any problems.

      34.    On August 12, 1997, Feldman's and Blue Cross Blue Shield of Maryland (CareFirst's predecessor) entered into a Participating Professional Provider Agreement (the "PPP Agreement").  Pursuant to paragraph 3 of the PPP Agreement, Feldman's agreed to provide "Covered Services" to CareFirst's insureds.  A true and correct copy of the PPP Agreement is annexed hereto as <u>Exhibit 16</u>.

35.   "Covered Services" are defined in the PPP Agreement as "a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM Program in which he/she is enrolled."   PPP Agreement ¶ 3 (Exhibit 16). The PPP does not include any limitations on the type of services that may be provided to CareFirst's insureds.

36.   Pursuant to the rules of the BCBSA and the BlueCard system, Feldman's is permitted to service any patient who is insured by a BCBSA licensee. The BCBSA licensee that is local to the service provider – the "host plan," in this case CareFirst – is then responsible for administering the claims on behalf of the BCBSA licensee with whom the patient has its insurance.  The two patients whose claims are at issue in the Third Party Complaint, however, are directly insured by CareFirst, so CareFirst is solely responsible for the administration and payment of the claims.

37.   By law, patients can get their medications from any licensed pharmacy that the patient chooses.   CareFirst cannot force a patient to use a particular pharmacy.  (Wong Tr. at 104:13 – 106:2; 123:16 – 19) (Exhibit 5). Therefore, CareFirst is obligated to reimburse providers such as Feldman's even in the absence of an agreement.

### Feldman's' Dispensing of Factor

38.   In the ordinary course of business, a patient submits a valid prescription from a physician to Feldman's for Factor, setting forth the number of units and the required type of Factor.  Prior to shipment, Feldman's would obtain

precertification of the proposed treatment from CareFirst, and thereafter would ship the Factor to the patient and submit a claim for the service to CareFirst. Thereafter, CareFirst would issue an Explanation of Benefits, and remit payment. CareFirst alone sets the reimbursement rates through publicly available schedules. This procedure is how millions of prescriptions are filled and reimbursed throughout the country each day and how Feldman's operated with CareFirst since 1986.

39.    Each of the patients to whom Feldman's dispensed Factor signed an Assignment of Benefits pursuant to which they assigned and transferred "to FHM and FCS all rights, title and interest to reimbursement payable to me for services provided by FHM, FCS and its associated contract provider."

40.    Each patient also requested "that FHM act on my behalf to submit charges for services rendered by FCS or its associated contract providers and I hereby authorize payment directly to FHM, FCS or its associated contract providers of any benefits otherwise payable for items/services, at a rate not to exceed FHM's regular charges for such items/services."

41.    The PPP Agreement requires CareFirst to pay Feldman's' claims for Covered Services "in a timely manner, as provided by Maryland law." PPP Agreement ¶ 20 (Exhibit 16).    As is discussed in detail below, Maryland law requires payment within 30 days.

42.    Feldman's was never required to have a contract of any type with CareFirst to get paid for the Factor Drugs FMCP dispensed to CareFirst's insureds. Deposition of Michelle Powell, a Senior Director of Claims Operation at

CareFirst, dated October 13, 2009 ("Powell Tr.) at 24:2 – 26:3 (selected pages from the Powell Tr. are annexed hereto as Exhibit 17).

43.   CareFirst was obligated to reimburse its patients for costs incurred when the patient used a non-participating provider and submitted claims to CareFirst.  Powell Tr. at 24:2 – 26:3 (Exhibit 17).

44.   Despite Feldman's' rendering of Covered Services pursuant to the PPP Agreement, and the timely submission of claims for payment, in breach of the PPP Agreement, CareFirst failed and refused to correctly and timely pay $1,782,009  in legitimate claims submitted by Feldman's as of April 14, 2009, the date the Complaint was filed and thereafter.

## Investigation of FHM and its Affiliates

45.   CareFirst and its fellow BCBSA licensees throughout the country have engaged in a coordinated effort to deny reimbursement for factor claims to FHM and its affiliates, including Feldman's.  In my opinion, the BCBSA and its licensees recognize that they could increase their profits by essentially forcing patients to obtain Factor from pharmacies affiliated with the insurers, rather than from independent pharmacies.  The evidence is clear that, for years, these companies have attempted to use whatever means are at their disposal to refuse to pay these claims.  On information and belief, CareFirst's attempts to withhold payments to Feldman's were not isolated incidents, or an accident, but instead were motivated by the BCBSA's desire to destroy FHM and its affiliates.

46.   In 2006, the Miami field office of the FDA commenced an investigation into FHM, FCS, and their affiliates.   United States Food & Drug Administration Office of Criminal Investigation Report of Factor Health Management from November 30, 2007 through February 20, 2008, obtained via a Freedom of Information Act request ("FDA Report") at 12.   By February 20, 2008, the FDA had closed its investigation because it found no any evidence of the suspected diversion.   FDA Report at 37.   A true and correct copy of the FDA report is annexed hereto as Exhibit 18).

47.   CareFirst began "investigating" FHM and its affiliates in July 2005 with the receipt of an "SIU Alert" from the National Anti-Fraud Director ("NAFD") of the BCBSA. Annexed hereto as Exhibit 19 is a true and correct copy of a July 5, 2005 memorandum from BCBSA National Anti-Fraud Director Byron Hills to all BCBS Licensee Anti-Fraud Managers/Directors bearing Bates number BCBSA 02606; Hanson Tr. at 15:5, 55:3 – 5 (Exhibit 10).   The real purpose of the "investigation" was to find ways to limit the "serious exposure" of CareFirst and other BCBSA licensees to high cost payments for Factor Drugs. This was admitted by Jaime Hanson – a special investigator in CareFirst's SIU – in a December 5, 2007 email to her boss, Elizabeth (Betty) Foreman.   CFI 00222 (a true and correct copy of this document is annexed hereto as Exhibit 20).   The SIU Alert was based on allegations that FHM was hiring hemophiliacs to get them group coverage, and then selling product to them.   Hanson Tr. at 15:11] (Exhibit 10).   That "investigation" was not legitimate and ended at least "a couple of years ago" when

CareFirst was "not able to identify that [FHM was] out of compliance." Deposition of Andrea B. Cherenzia, Director of Special Investigations at CareFirst, dated March 9, 2010 ("Cherenzia Tr.") at 22:13 (selected pages from the Cherenzia Tr. are annexed hereto as Exhibit 21).

48.    CareFirst then changed the focus of its investigation to Factor in general and specifically the amount of Factor dispensed.   Hanson Tr. at 31:16 ; (Exhibit 10); Cherenzia Tr. at 13:9 – 11 (Exhibit  21).

49.    In a memorandum distributed to the medical directors in advance of a February 6, 2008 conference call, Calvin Sneed of the BCBSA and ringleader of the "investigation" – wrote that "[t]he SIUs would like to know what medical policies exist for hemophiliacs, and if it's possible to establish coverage and/or payment restrictions (caps?), underwriting and enrollment controls, due to the high cost of factor VIII drugs." BCBSA 01000 (Exhibit 2).  On February 12, 2008, Sneed sent out a request to all BCBSA licensees, seeking data relating to the amount of payments made to pharmacies dispensing Factor VIII. Memorandum entitled "Factor VIII Investigation Summary" dated October 6, 2008 bearing Bates numbers BCBSA 01001 - 03 at 01002, a true and correct copy of which is annexed hereto as Exhibit 22.  BCBSA set up a Factor VIII Strike Force to look into "billing irregularities." E-mail from Calvin Sneed, BCBSA to Charles Joseph dated November 14, 2008 bearing Bates number BCBSA 00818, a true and correct copy of which is annexed hereto as Exhibit 23.   The Strike Force held conference calls every four to six weeks.  Deposition of Elizabeth Foreman, a Manager of Special

Investigations for Carefirst, dated August 14, 2009 ("Foreman Tr.) at 127:14 –
127:21 (selected pages from the Foreman Tr. are annexed hereto as <u>Exhibit 24</u>).

50.    On March 13, 2008, Winston Wong – CareFirst's Pharmacy
Director – wrote to Jaime Hanson that "I spoke to my counterpart at bcbsf.  They
are in the midst of litigation. Definitely a red flag.  Only problem is that they cannot
nail down a problem.  Kinda like us, it feels wrong."  On March 18, 2008, Jaime
Hanson forwarded Wong's email to her supervisors, William Lisanty, Andrea
Cherenzia, and Betty Foreman.    True and correct copies of these documents
bearing Bates numbers CFI 06245 – 46 are annexed hereto as <u>Exhibit 25</u>.

51.    On May 16, 2008, CareFirst participated in a conference call
with the FDA (Texas office), NAFD, Blue Cross Blue Shield of Texas, and Blue
Cross Blue Shield of Illinois at which the FDA proposed a theory that a company
will hire hemophiliacs to develop a patient pool for the company's specialty
pharmacy, then will order more Factor than the patient needs and sell the
remainder on the grey market. Factor VIII Investigation Summary (<u>Exhibit 22</u>).

52.    CareFirst has not identified any instances of Feldman's – or any
of its affiliates – diverting Factor to the grey market.  Foreman Tr. at 52:19 (<u>Exhibit
24</u>); Hanson Tr. at 60:15 – 18 (<u>Exhibit 10</u>).

53.    Despite the memos, emails, meetings, conference calls and
investigations, none of CareFirst, the BCBSA, the "home plans," the FBI, the FDA,
or any Federal, state, or local law enforcement agency has identified any
wrongdoing by FHM or any of its affiliates, including Feldman's.  Wong Tr. at

179:9 (Exhibit 5); Foreman Tr. at 52:19 and 91:19 (Exhibit 24); Hanson Tr. at 60:15 – 18 and 62:1 – 3; (Exhibit 10); Deposition of Calvin Sneed, a Senior Anti-Fraud Consultant with BCBSA, dated November 8, 2010 ("Sneed Tr.") at 35:15 – 36:6 (selected pages from the Sneed Tr. are annexed hereto as Exhibit 26).

54.     Notwithstanding the fact that no wrongdoing has been found by its investigators Ms. Hanson, Ms. Foreman and Ms. Cherenzia, or by any other entity that has investigated it, CareFirst put a hold on all claims for Factor submitted by Feldman's.  Hanson Tr. at 22:16 – 18 (Exhibit 10).

### CareFirst Demands That Feldman's Obtain a Different Contract For No Legitimate Reason

55.     On August 22, 2008, CareFirst informed Feldman's that CareFirst would not reimburse claims for Factor because Feldman's allegedly did not have the correct type of contract with CareFirst (despite the fact that CareFirst did not need any contract to be reimbursed for the services it provided).  E-mails from Nick Onorato of CareFirst to Joel Yerton of FHM dated August 22, 2008 bearing Bates numbers CFI 03195-196 (Exhibit 27)  Prior to this date, and in reliance on CareFirst's representations and prior payments, Feldman's shipped a significant amount of Factor to CareFirst's insureds.

56.     Despite the fact that Feldman's procedures with respect to dispensing Factor had not changed, CareFirst advised Feldman's that Feldman's needed a home infusion therapy ("HIT") contract in order to dispense Factor as a CareFirst participating provider, and that Feldman's only had a durable medical equipment ("DME") contract. CFI 03195 (Exhibit 27). However, contrary to

CareFirst's position, the PPP was not limited to reimbursement for DME claims. The only reference to DME in the PPP Agreement is a handwritten notation in the signature block that identifies Feldman's "Field of Practice or Specialty" as "DME – (Pharmacy)."   PPP Agreement at p. 7 (Exhibit 16).   The PPP Agreement did not reference HIT, but CareFirst had paid numerous claims for Factor prior to this time.

57.    In addition, CareFirst advised Feldman's that Feldman's needed a residential service agency ("RSA") license to be eligible for a HIT contract with CareFirst. CFI 03196 (Exhibit 27).   However, this was not true, and, on information and belief, CareFirst knew this.

58.    As part of its scheme to deny payments to Feldman's CareFirst falsely advised Feldman's that – even if Feldman's was dispensing factor as a non-participating provider – Feldman's needed an RSA license to get reimbursed by CareFirst for the cost of any factor dispensed to CareFirst's insureds, because the RSA license was required by Maryland law.

59.    On August 22, 2008, Joel Yerton, then an employee of FHM, sent an email to CareFirst explaining that "I think we might have gotten confused on IV vs. Med Specialty. Feldman's Pharmacy is not a traditional Home Infusion company. They would be more aligned with your Medical Specialty Agency. Does this help?"   CFI 03196 (Exhibit 27); CareFirst's Response for Feldman's Request for Admission No. 16 (Exhibit 28).   Thus, Mr. Yerton made it clear that Feldman's was not a HIT provider, and should not require a different contract, or an RSA license. CareFirst always knew that Feldman's did not provide services in any

patient's home and if CareFirst was confused about this, it could have simply called Feldman's to confirm.

60.   Janet Chavarria – a Business Analyst in CareFirst's Institutional Credentialing Department--and a recipient of Yerton's August 22 email, understood Yerton's statement to mean "he's saying [Feldman's is] not a home infusion company." Chavarria Tr. at 77:14 – 15 (Exhibit 6).   However, CareFirst continued to insist, contrary to the facts, that Feldman's would need an HIT contract and an RSA license.

61.   In reliance on CareFirst's incorrect information, on January 6, 2009, Feldman's completed the Request for Information ("RFI") that served as the application to become a part of the CareFirst network of HIT providers.  A true and correct copy of the RFI bearing Bates numbers CFI 03204 – 03210 is annexed hereto as Exhibit 29); Chavarria Tr. at 127:12 – 13 (Exhibit 6).  Feldman's trusted CareFirst, and, desperate to be paid our staff naively complied with CareFirst's demands.

62.   Feldman's only applied to become a HIT participating provider for CareFirst because CareFirst had advised Feldman's that it could only receive reimbursement for factor as HIT participating provider. CFI 03195 (Exhibit 27).

63.   Typically, a provider will indicate on the RFI the type of service for which they are seeking a contract. Chavarria Tr. at 123:21 – 124:1 (Exhibit 6). On its RFI, Feldman's indicated that it performed the following services: DME, (Injectibles) Hemophilia, Hep-C, HIV, Oncology and Rheumatoid Arthritis.  RFI at

CFI 03205 (Exhibit 29).   Feldman's RFI did not say that Feldman's was a home infusion therapy provider. Chavarria Tr. at 76:1 – 6 (Exhibit 6).   In an RFI seeking a HIT contract, "the facility type should indicate HIT, ASC, home health agency, skilled nursing, whatever it is that they're coming in as." Chavarria Tr. at 75:6 – 15 (Exhibit 6).

64.   CareFirst's Pharmacy Director, Winston Wong (who is not licensed to practice in Maryland) and Director of Special Investigations Andrea Cherenzia have both testified that specialty pharmacies can by law dispense Factor.   Wong Tr. at 63:2; 9:3-5 (Exhibit 5); Cherenzia Tr. at 42:15 – 17 (Exhibit 21), Maryland law permits any pharmacy with a valid pharmacy license to dispense medication to patients with a valid prescription, including but not limited to Factor Drugs.   Title 12 of Md. Code Ann., Health Occ. (West) (relevant provisions of Title 12 are annexed hereto as Exhibit 7).

65.   On April 2, 2009, Jaime Hanson– an investigator for CareFirst – sent an email to Chavarria titled "Follow-up Feldman's Pharmacy."   Hanson informed Chavarria that Feldman's was "telling me that the state of MD doesn't require them to have an RSA to provide infusion therapy meds to patients.  Are you familiar with those regs? I've gotten different information from the Pharmacy Board than the [Special Investigations] unit @ Capital Blue Cross." E-mail from Jaime Hanson to Janet Chavarria dated April 2, 2009 bearing Bates number CFI 03694, a true and correct copy of which is annexed hereto as Exhibit 30.

66.    Despite this information from Feldman's, CareFirst continued to insist that Feldman's needed both a new HIT contract with CareFirst, and an RSA from the State of Maryland.  CareFirst relied on these false requirements as a basis to deny reimbursement of valid claims for legitimate Covered Services.

### Feldman's Obtains the RSA License that it Did Not Need; CareFirst Continues to Refuse to Pay Claims Anyway

67.    A "residential service agency" is a home health care agency, which is a form of in-home care, "as opposed to going to an assisted living or a nursing home.  They can have somebody come into their home and help provide whatever care is identified by a registered nurse that would do the initial assessment."  See Deposition of Barbara Fagan, a Program Manager for the Ambulatory care unit of the Office of Health Care Quality of the Maryland Department of Health and Mental Hygiene ("OHCQ") dated June 18, 2010 ("Fagan Tr.") at 17:1-5 (selected transcript pages of the Fagan Tr. are annexed hereto as Exhibit 31).

68.    An RSA license is issued by the OHCQ.  Fagan Tr. at 43:8 – 15 (Exhibit 31); Levi Report at (V)(b)(ii), p. 5 (Exhibit 1).

69.    A health care provider is only required to possess an RSA license for the provision of "home health care for compensation to an unrelated sick or disabled individual in the residence of that individual."  Levi Report at (V)(b)(ii), p. 5 (emphasis added) (Exhibit 1).

70.    An RSA license is also required for a provider to enter a patient's home in order to set up an intravenous line, or to teach the patient how to

set up such equipment.  Fagan Tr. at 24:18 – 22; 26:3 – 7 (Exhibit 31); Chavarria

Tr. at 110:3 (Exhibit 6).  If a provider does not cross the threshold of a patient's

home, then an RSA is not needed. Fagan Tr. at 26:8 – 10 (Exhibit 31).

  71. In connection with the claims at issue in this case, Feldman's

role was only to fill the patients' prescriptions by dispensing the medication written

in the prescription by an authorized prescriber (COMAR 10.13.12.01) either (a) to

the patient in Feldman's retail pharmacy or (b) by delivery of the prescription via

common carrier to the home of the patient or to an agent authorized by the patient.

At no time did any Feldman's employee or agent enter a patient's home for the

purpose of injecting a patient with any medication or for the purpose of instructing

a patient in the administration of the medication, or for any other purpose covered

by 19-4A of the Maryland Code or COMAR 10.07.05.  Relevant portions of the

Health-General Article: Code of Maryland Regulations §§ 19-4A-01 *et seq.*

("COMAR") are annexed hereto as Exhibit 32. Upon information and belief,

CareFirst always knew this.

  72. COMAR 10.34.25 deals with the delivery of "filled prescriptions

for individual patients by United States Postal Service, common carrier, or delivery

system to an address within the State." (COMAR § 10.34.25)   Nowhere in

COMAR 10.34.25 is there a requirement for a pharmacy to obtain a residential

service agency license prior to delivering medication to a patient. (COMAR §

10.34.25) (Exhibit 32).

73.   Feldman's did not need an RSA license to dispense the factor s to its patients, either in person or via common carrier. Levi Report at (V)(a), p. 3 (Exhibit 1); Fagan Tr. at 26:8 – 10 (Exhibit 31). Nevertheless, at CareFirst's insistence, Feldman's did apply for and receive an RSA license on December 11, 2008. Document produced by OHCQ pursuant to subpoena on April 27, 2010 ("OHCQ Documents"), bearing Bates number RSA 3, a true and correct copy of which is annexed hereto as Exhibit 33).

74.   Even after Feldman's obtained the RSA license, CareFirst refused to make payment on the Feldman's claims—even those that related to services provided *after* December 11, 2008.

### CareFirst Continues to Seek Guidance from the OHCQ Based On Incorrect Assumptions About Feldman's

75.   In June 2009, Jamie Hanson – an investigator for CareFirst – asked Chavarria to call the Maryland Board of Pharmacy and Barbara Fagan at the OHCQ for clarification about the scope of an RSA license. Chavarria Tr. at 93:20 – 22 (Exhibit 6).

76.   In an email on June 12, 2009, Chavarria informed Jaime Hanson and Lisa Anuszewski that she left a voice mail with Fagan asking "what an RSA with service of 'infusion therapy' allowed the provider to do and I asked if a RSA was required to ship Factor VIII." E-mail from Janet Chavarria to Jaime Hanson and Lisa Anuszewski dated June 12, 2009 bearing Bates number CFI 03168, a true and correct copy of which is annexed hereto as Exhibit 34.

77.   In an email on June 16, 2009, Chavarria reported back to Hanson about her calls with Anna Jeffers of the Board of Pharmacy and Barbara Fagan of OHCQ. Chavarria relayed Jeffers' statement that a "Pharmacy License issued by the MD Board of Pharmacy licenses the provider to sell to individuals and compound drugs." CFI 03168 (Exhibit 34); Chavarria Tr. at 94:20 (Exhibit 6). Chavarria also informed the email recipients that Fagan referred her to the COMAR regulations, and that neither Fagan nor Jeffers knew anything about Factor VIII. CFI 03168 (Exhibit 34).

78.   On April 14, 2010, Janet Chavarria wrote a letter to Barbara Fagan of the OHCQ.  Chavarria Tr. at 33:8 (Exhibit 6).  Chavarria wrote the April 14 Letter in connection with this litigation.  Chavarria Tr. at 48:19–22 (Exhibit 6), in order to get clarification regarding the types of providers that required an RSA license.   Chavarria at 34:21–35:5 (Exhibit 6).   The scenario presented in Chavarria's letter assumed that a retail pharmacy was acting as a home infusion therapy provider and asked the OHCQ whether such an entity required an RSA. Docket No. 65-10 (Exhibit 35).[2]  This scenario, however, had no relationship to what services Feldman's actually provided.

79.   On April 16, 2010, Fagan responded to Chavarria's letter. Fagan advised that "if a company that providers (sic) Home Infusion Therapy to a patient in their home, including delivery, set up and maintenance, that company is

_____

[2]      References to "Docket" in this Declaration are references to the documents filed in this litigation via the Court's Pacer electronic filing database.

required to be licensed as a Residential Service Agency by the Office of Health Care Quality."  Docket No. 65-10 (emphasis added) (Exhibit 35).

80.   At no time did Feldman's provide any services to a patient in that patient's home, nor did Feldman's provide Home Infusion Therapy to any patient, and CareFirst had been informed of this fact.   Nevertheless, CareFirst continued to refuse to pay the claims.

81.   On July 1, 2010, because it had become clear during the discovery taken in this case that CareFirst's defenses based on the lack of an RSA license were without merit, Patrick de Gravelles, Litigation General Counsel for CareFirst, wrote a letter to the Maryland Board of Pharmacy.  In Mr. de Gravelles' email, he posed two questions to the Board of Pharmacy, the most relevant of which was: "Assuming that the pharmacy only shipped the factor products and supplies to patients' homes via common carrier, and there was no other healthcare provider who had an RSA overseeing the home-based therapy, was the pharmacy acting in accordance with its full service license prior to receiving an RSA?" E-mails from Anna Jeffers of the Board of Pharmacy to Patrick de Gravelles, dated July 7, 2010, true and correct copies of which are annexed hereto as Exhibit 36.

82.   On July 26, 2010 CareFirst wrote a letter to the Court.  Even though Mr. de Gravelles had recently asked the Board of Pharmacy whether a pharmacy like Feldman's needed an RSA license to ship factor products to patients' homes, CareFirst nevertheless asserted to the Court – in no uncertain terms – that

"the plain language of the statutes makes home delivery of medicines and items like needles and syringes enough to require an RSA."  Docket No. 67 at 3.

83.    On August 18, 2010, the Maryland Board of Pharmacy conducted a public meeting to discuss, among other things, Mr. de Gravelles' July 1, 2010 letter.

84.    On August 23, 2010, LaVerne G. Naesea, Executive Director of the Maryland Board of Pharmacy, wrote a letter to Mr. de Gravelles advising that a pharmacy acting in the manner described in Mr. de Gravelles' July 1 email was acting within the scope of its pharmacy license and the Maryland Pharmacy Act, and that no RSA was required to conduct such activities.  A true and correct copy of this letter is annexed hereto as Exhibit 37. CareFirst did not disclose to either Feldman's or the Court that it had raised the issue with the Board of Pharmacy and disclosed the adverse opinion only because the Board of Pharmacy posted a public hearing notice concerning the RSA issue to the internet

85.    In connection with each claim at issue in this case, Feldman's acted in the manner described in Mr. de Gravelles' July 1 email.  In connection with each claim at issue in this case, Feldman's either dispensed the factor to the patient in person, or shipped the factor to the patient's home via common carrier.

86.    Prior to the Pharmacy Board's opinion that Feldman's did not need an RSA, CareFirst had asserted that the only issue in the case was whether or not Feldman's required an RSA to deliver factor to patients' homes. Docket No. 52 at p. 1; Docket No. 61 at p. 2; Docket No. 74 at p. 1; Docket No. 67 at p. 1.

87.   In connection with the claims at issue in this case, Feldman's role was to fill the patients' prescriptions by dispensing the medication indicated in the prescription either (a) to the patient in Feldman's retail pharmacy or (b) by delivery of the prescription via common carrier to the home of the patient or to an agent authorized by the patient.   The medication dispensed to the patients in connection with the claims at issue in this case consisted of self-injectable synthetic recombinant clotting factor replacement medication, of which Advate is an example.  Levi Report at (V)(b)(ii) (Exhibit 1).

### Attempts to Resolve this Dispute Prior to the Litigation

88.   Prior to filing its Complaint, Feldman's engaged in exhaustive efforts to resolve its disputes with CareFirst.   Nurys Puente and others at her direction worked with CareFirst employees to try to obtain the payment that was due to Feldman's for the unpaid claims.

89.   Feldman's complied with every request for documentation from CareFirst, and in some cases has provided the same documentation on several different occasions to several different departments within CareFirst. Feldman's made numerous telephone calls and sent emails to CareFirst, but no progress was made on resolution of the outstanding claims.   There is not a single document requested by CareFirst that was not provided to it by FHM or Feldman's on CareFirst's request.

90.    On May 4, 2009, Feldman's – acting through its counsel – sent a demand letter (the "Demand Letter") to CareFirst's General Counsel seeking payment of the outstanding claims plus interest.

91.    On May 15, 2009, CareFirst responded to Feldman's Demand Letter, denying that any amounts were owed on the outstanding claims.  Based on CareFirst's subsequent admissions, described below, it had no basis on law or fact to deny the claims at that time.

### CareFirst Admits Liability and Pays Most of the Claims

92.    On June 23, 2010, CareFirst filed a letter with the Court asserting that "the only critical issue to be resolved in this case is whether Feldman's needed an RSA to operate in the way that it did with regard to factor products. If Feldman's did not, then CareFirst will pay Feldman's for the pre-December 11, 2008 claims. If Feldman's did, CareFirst will not pay those claims as Feldman's was then acting in contravention of Maryland law for doing so."  Docket No. 52.

93.    Its defenses shredded and exposed as contrived, and obviously fearing sanctions, CareFirst wrote a letter to the Court on August 20, 2010, stating that CareFirst had sought an opinion from the Pharmacy Board regarding the RSA license issue, had received a response, "and based on that response is now ready to pay the claims at issue." Docket No. 74 at 1.

94.    On September 2, 2010, CareFirst took the extraordinary step of filing a Motion to Withdraw its Motion for Leave to File an Amended Pleading, and

representing to the Court that CareFirst "is ready to pay the claims at issue" based on the opinion received from the Pharmacy Board. Docket No. 80.

95.    On September 21, 2010, Feldman's and CareFirst held a settlement conference before Magistrate Judge Gesner, but no settlement was reached.

96.    On or about September 24, 2010, CareFirst began paying the outstanding claims at issue in this case. However, there are three claims that have not been paid by CareFirst to Feldman's. Details concerning these claims are described in greater detail in the accompanying Declaration of Nurys Puente.    One claim, for the amount of $32,721.42, we have been informed by CareFirst, was paid directly to the patient, rather than to Feldman's in accordance with the PPP. This is the only claim that CareFirst has paid to a patient—all other claims were paid directly to Feldman's as required by the PPP and CareFirst's policies.

97.    Two additional claims, one for $33,738.30, and one for $43,529.60, were rejected by CareFirst for being allegedly submitted untimely. However, I have been informed by the FHM employees responsible for submitting these claims that they were submitted to CareFirst in a timely manner—on July 22, 2009 and August 12, 2009, respectively.

### Interest and Attorneys' Fees

98.    Feldman's is entitled to recover interest and attorneys' fees and costs from CareFirst.[3]

---

[3] Feldman's will seek its attorneys' fees and costs at the appropriate time.

99.   Feldman's is entitled to recover interest accrued on the unpaid invoices pursuant to Maryland Code §15-1005 (Exhibit 38).

100.   CareFirst has admitted that it is obligated to pay interest on the claims pursuant to Maryland Code §15-1005, because as of the date of this Declaration, it paid interest on 37 claims, in an amount totaling $23,017.00.  On or about January 13, 2011, CareFirst provided FMCP with a spreadsheet reflecting that CareFirst would be making a small, interest payment on the claims at issue pursuant to Maryland Code § 15-1005.   A copy of this spreadsheet, with the patients' names redacted, is annexed hereto as Exhibit 39. Based upon that spreadsheet, CareFirst has apparently taken the position that although it owes interest, interest did not begin to accrue until: (i) 30 days after receipt of the Board of Pharmacy's "opinion" that FMCP did not require a RSA license for pre-December 11, 2008 invoices; and (ii) the day of receipt of the opinion for post-December 11, 2008 claims.

101.   However, Section 15-1005 provides that insurers must pay claims within 30 days after **receipt** of such claims, and many of the claims at issue were submitted years before payment.  Therefore, although CareFirst has admitted liability for interest payments, its interest payments to date are woefully insufficient and not in accordance with Maryland law.   Annexed hereto as Exhibit 40 is a spreadsheet that calculates the amount of interest due under Section 15-1005, based on the dates of submission of the claims and the dates of payment. Therefore, Feldman's is entitled to interest in the amount of $886,483.93.

## Conclusion

102. CareFirst has behaved egregiously.  It has used its size and financial power not, as should be expected, to support a company that has provided exemplary service to its patients—CareFirst's insureds—but instead to try to crush it by refusing, without basis, to pay claims for life-saving factor.  The evidence demonstrates clearly that CareFirst improperly denied these claims, and the strongest evidence of this fact is that CareFirst ultimately threw in the towel and paid the bulk of the claims at issue.  On behalf of Feldman's FHM, the insureds and all who have had their lives severely disrupted by CareFirst's wrongdoing, I ask that the Court punish CareFirst.

For these reasons, Feldman's respectfully requests that the Court grant it summary judgment on its claims against CareFirst.

**Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 3, 2011.**

Jarrett Bostwick

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FELDMAN'S MEDICAL CENTER PHARMACY, INC., | ) ) ) | |
| Plaintiff, | ) | Civil Action No. WDQ-10-254 |
| v. | ) ) | |
| CAREFIRST, INC. | ) ) | |
| Defendant, | ) | |
| v. | ) ) | |
| John DOES 1 and 2 | ) ) | |
| Third-Party-Defendants, | ) ) | |

---

## EXPERT WITNESS REPORT

### OF

### Mark Levi, P.D.

Dated:     November 12, 2010
           Owings Mills, Maryland

I.      Introduction

        In August 2010 I was retained as an expert witness by Feldman's Medical Center Pharmacy, Inc. ("Feldman's") in Feldman's v. CareFirst, Inc. ("CareFirst"), Civil Action No. WDQ-10-254, pending in the United States District Court for the District of Maryland.  In connection with that retention, Feldman's requested that I prepare a Report based on my knowledge and more than 40 years experience as a practicing Maryland-licensed pharmacist, and former Commissioner and President of the Maryland Board of Pharmacy.  This Report contains opinions I am prepared to offer as testimony at trial, addressing whether Feldman's followed pharmacy industry best practices in its delivery of injectable prescription products to patients via common carrier, as well as whether Feldman's was required to have a Residential Service Agency license issued by the State of Maryland Office of Health Care Quality in order to properly dispense and deliver such medications to patients via common carrier.

        My conclusions and opinions based on my education, experience and knowledge of the pharmacy industry, as well as on the information provided to me by Feldman's, are offered with a reasonable degree of certainty, and are set forth below.


II.     Qualifications

        I am qualified to offer testimony as an expert witness on matters relating to pharmacy practice in Maryland based on my decades of experience as a pharmacist and as a state regulator overseeing the practice of pharmacy in the State of Maryland.

        I have been involved in community pharmacy since 1965 as a clerk and since 1970 as a Registered Pharmacist in the State of Maryland.  In 1970, I graduated from the University of Maryland School of Pharmacy, and have worked since then as a practicing pharmacist.  From 1977 to 1999, I was owner of Medical Arts Pharmacy in Baltimore, Maryland and from 2005 until 2010, I was a partner in Joppa Road Pharmacy in Parkville, Maryland.  In addition, I served as Chief Operating Officer of EPIC Pharmacies, Inc. – a not-for-profit buying group of hundreds of independently owned pharmacies across the United States – from 1999 to 2004 and prior to that, from 1995 to 1999, served on EPIC Pharmacies' Board of Directors.  From 1980 through 1988, I had financial interests in six other independent pharmacies.

        In addition to my work as a practicing pharmacist, I have also been active in the profession of pharmacy.  I have served as a Commissioner of the Maryland State Board of Pharmacy (2003-2007), as well as on the Board of Pharmacy's Subcommittee on Errors and Pharmacy Technicians (1999-2003), and

2

as the President of the Maryland State Board of Pharmacy (2006-2007). I have also served the Maryland Pharmacists Association as a member of the Board of Directors (1986-1992) and as its President (1991-1992); as a member of the Maryland Medicaid Advisory Committee (1999-2005); and as a member of the Board of Directors of the Baltimore Metropolitan Pharmaceutical Association (1980-1992). In recognition of some of my career achievements, in 1996 I was awarded the Innovative Pharmacist of the Year Award, and in 2004 I was awarded the Seidman Distinguished Achievement Award, a lifetime achievement award, in each case presented by the Maryland Pharmacists Association.

A more detailed description of my employment history and professional activities is attached as Exhibit A to this Report.

## III.    Previous Expert Testimony

In the past four years, I have not testified as an expert at any trial or deposition.

## IV.    Information Considered in Forming Opinion

In compiling this report, I have considered materials provided to me by counsel at Paduano & Weintraub LLP. A complete list of the materials that I considered and/or relied upon is attached as Exhibit B. I have also referred to Maryland pharmacy laws and regulations, as well as my experience as a practicing pharmacist for more than 40 years. In addition, I have also gathered information through my visit to Feldman's and my conversations with Feldman's pharmacist Julie White and Jarrett Bostwick, CEO of Factor Health Management, Inc. ("FHM"), the parent company of Feldman's.

## V.    Expert Opinion

### a.    Conclusions

After reviewing the documents provided to me by Feldman's and its attorneys at Paduano & Weintraub, LLP, and speaking to Ms. White and Mr. Bostwick, it is my considered opinion that Feldman's followed pharmacy industry best practices in its delivery of self-injectable prescription products to patients. Furthermore, it is my considered opinion that Feldman's did not need a Residential Service Agency ("RSA") license to deliver self-injectable factor replacement drugs to its hemophiliac patients.

3

b.    Basis for Conclusions

i.    Background on Hemophilia and Clotting Factor

Hemophilia is a hereditary genetic disorder that impairs the body's natural ability to control blood clotting.  Simply put, hemophiliacs' bodies do not produce sufficient blood clotting factor to clot the hemophiliacs' blood.  As a result, hemophiliacs are literally in mortal danger any time they suffer a cut or a bruise.  In a "normal" person's body, the blood's normal clotting factor would stop the bleeding in short order.  However, for a hemophiliac, an injection of the deficient clotting factor is necessary so that the patient does not "bleed out" and die.  These injections can be done by a doctor or nurse, but with a minimal amount of training a patient (or a patient's family member(s)) can inject himself (due to a genetic quirk, virtually all hemophiliacs are male).  With proper care and access to medication, hemophiliacs can live fairly normal lives.  But without such care or medication, hemophilia is debilitating and ultimately fatal.

Prior to 1993, the typical treatment for a hemophiliac was an infusion of replacement clotting factor that was derived from human blood plasma that had been donated to a blood bank.  In the 1980s and 1990s, much of the blood supply in the United States became tainted with blood containing the HIV virus.  Out of approximately 22,000 hemophiliacs in the United States, approximately 10,000 became infected with HIV as a result of this contamination of the blood bank supply.  Many hemophiliacs also became infected with hepatitis.  Pharmaceutical companies therefore developed recombinant or synthetic products that replace the missing clotting factor in a hemophiliac patient without subjecting that patient to the risks and diseases inherent in the human blood supply.  Such synthetic clotting factor is very expensive, made more so by the small number of hemophiliacs in the United States.  Advate is the brand name of one of the recombinant pharmaceutical drugs that are used by hemophiliacs to prevent bleeding.

Clotting factor is only effective when it is administered through intravenous injection or intravenous infusion.  An "infusible" drug is generally defined as a drug that involves a slow and/or prolonged intravenous delivery and generally requires third party assistance.  "Self-injectable" drugs – which include but are not limited to clotting factor drugs – are often self-administered in the home via intravenous injection, and involve a much faster delivery than infusible drugs.

Feldman's has been supplying self-injectable clotting factors – for example, Advate – to patients on an outpatient basis.  The medication was delivered to Feldman's on an as-needed basis from the Factor Health Management warehouse in Florida, and was dispensed by Feldman's to its patients in accordance with Maryland pharmacy law.  I have been informed that the medicine was delivered by Feldman's – typically to the patient's home – either by an

4

employee of Feldman's, courier driver, or by common carrier, with the appropriate signatures collected. In no case did the individual making the delivery do anything other than deliver the medicine to the patient, even when the person making such delivery was a Feldman's employee. In the most appropriate analogy, this delivery would not be any different than delivering insulin to a diabetic patient. On certain occasions a pharmacist made emergency deliveries and conducted some face to face consulting with a patient or the patient's parents.

### ii.    Residential Service Agency Licenses

A Residential Service Agency ("RSA") license is issued by the Office of Health Care Quality of the Maryland Department of Health and Mental Hygiene ("OHCQ"). A health care provider is required to possess an RSA license for the provision of "home health care for compensation to an unrelated sick or disabled individual in the residence of that individual."[1] Such RSA license is required in addition to any other professional license the provider is required to possess. The OHCQ does not specifically license or regulate pharmacies. Rather, pharmacies are only subject to OHCQ oversight and licensure if the pharmacy provides home health care services in addition to its pharmacy services.

Feldman's is a pharmacy located in the State of Maryland. It is regulated under Title 12 of the Maryland Code and COMAR 10.34 and holds a permit issued by the Maryland Board of Pharmacy. Feldman's employs pharmacists who are licensed by the Maryland Board of Pharmacy. Pursuant to 12-406 of the Maryland Code, a pharmacy that has a permit issued by the Maryland Board of Pharmacy is authorized "to establish and operate the pharmacy while the pharmacy permit is effective." Feldman's pharmacy permit is effective, and was effective throughout the relevant period of the claims at issue in this case.[2]

As discussed above, my conversations with Feldman's pharmacist Ms. White and FHM CEO Mr. Bostwick, as well as my review of documents provided to me by Feldman's, indicate that at no time did any Feldman's employee enter a patient's home to administer the clotting factor medication, or to instruct the patient in how to administer the medication. In connection with the claims at issue in this case, Feldman's role was to fill the patients' prescriptions by dispensing the medication indicated in the prescription either (a) to the patient in Feldman's retail pharmacy or (b) by delivery of the prescription via common carrier to the home of the patient or to an agent authorized by the patient. The medication dispensed to the patients in connection with the claims at issue in this case consisted of self-injectable synthetic recombinant clotting factor replacement medication, of which Advate is an example. At no time did any Feldman's employee or agent enter a

---

[1] Maryland Code, 19-4A-01 (emphasis added).

[2] Feldman's obtained its RSA license on December 11, 2008, at the insistence of CareFirst.

patient's home for the purpose of injecting a patient with any medication or for the purpose of instructing a patient in the administration of the medication, or for any other purpose covered by 19-4A of the Maryland Code or COMAR 10.07.05.

Nevertheless, I understand that CareFirst insisted that Feldman's obtain an RSA license to get reimbursement for clotting factor claims submitted to CareFirst, and that for almost two years CareFirst refused to pay any claims for clotting factor medication dispensed by Feldman's prior to the date Feldman's obtained its RSA license.[3]  Based on the services provided by Feldman's, there is, however, no requirement that Feldman's possess an RSA license and the RSA license may not be used by CareFirst as a justification for its refusal to pay the claims for clotting factor medication submitted by Feldman's.

### 1.   COMAR 10.34.25

COMAR 10.34.25 is the section of the Code of Maryland Regulations that defines the scope of a pharmacist's activities in connection with the delivery of "filled prescriptions for individual patients by United States Postal Service, common carrier, or delivery system to an address within the State." The delivery of medication to a patient's home by Feldman's is well within the scope of COMAR 10.34.25.  Even when a Feldman's pharmacist made an emergency delivery to a patient, it was to make sure that the patient had the appropriate amount of the clotting factor medication, and not to administer any such medication.

Pursuant to COMAR 10.34.25.03:

A.    A prescription medication may be delivered to the patient for whom the prescription is prescribed, wherever the patient is located; or

B.    Instead of delivering medication directly to the patient under §A of this regulation, medication may be delivered to:

(1)    An agent authorized by the patient; or

(2)    The residence of the patient, regardless of whether the patient is present at the residence at the time of delivery.

Nowhere in COMAR 10.34.25 is there a requirement for a pharmacy to obtain an RSA license prior to delivering medication to a patient.

---

[3] I have also been informed that CareFirst did not pay claims that were submitted by Feldman's for clotting factor dispensed even after Feldman's obtained its RSA license, but I am not aware of any justification for such post-RSA refusal to pay.

2.   19-4A-01 of the Maryland Code and
COMAR 10.07.05.01

19-4A-01 of the Maryland Code defines a "residential service agency" as "any person that is engaged in a nongovernmental business of employing or contracting with individuals to provide home health care for compensation to an unrelated sick or disabled individual in the residence of that individual."

COMAR 10.07.05.01 further defines a residential service agency and sets the parameters for activities for which an RSA license is required.  It is my opinion that the activities carried out by Feldman's for the claims at issue in this case do not meet the definitions in COMAR 10.07.05.01 and that Feldman's therefore did not need an RSA license to deliver clotting factor medication to its patients' homes.

"Home health care" is defined by 19-4A-01 of the Maryland Code and COMAR 10.07.05.01(6) as including any of the following services:

(1) Audiology and speech pathology;

(2) Dietary and nutritional services;

(3) Drug services;

(4) Home health aid;

(5) Laboratory;

(6) Medical social services;

(7) Nursing;

(8) Occupational therapy;

(9) Physical therapy;

(10) Provision of invasive medical equipment; and

(11) Home medical equipment services.

"Drug services" is not defined by the Maryland Code, COMAR, or any other regulations or case law in the State of Maryland, but as a matter of practice is understood to mean the infusion of medication by a health care provider and not to a simple delivery of medication.

"Invasive medical equipment" is defined by COMAR 10.07.05.01(9) as

7

any device that invades tissue or a body cavity for the purpose of maintaining treatment modalities, including but not limited to:

(a) Intravenous lines whether enteral or parenteral;

(b) Catheters;

(c) Ventilators;

(d) Respirators;

(e) Gastric or nasogastric tubes;

(f) Stomas; and

(g) Ostomies.

"Home medical equipment" is defined by 19-4A-01(c) of the Maryland Code as "the delivery, installation, maintenance, or replacement of, or instruction in the use of, medical equipment used by a sick or disabled individual to allow the individual to be maintained in a noninstitutional environment."

"Medical equipment" is defined by 19-4A-01(d) as

technologically sophisticated medical devices including:

(1) Oxygen and oxygen delivery systems;

(2) Ventilators;

(3) Respiratory disease management devices;

(4) Electronic and computer driven wheelchairs and seating systems;

(5) Apnea monitors;

(6) Transcutaneous electrical nerve stimulator (T.E.N.S.) units;

(7) Low air loss cutaneous pressure management devices;

(8) Sequential compression devices;

(9) Neonatal home phototherapy devices;

(10) Feeding pumps; and

8

(11) Other similar equipment as defined in regulations established by the Secretary.

At no time did Feldman's provide to its patients any of the services in 19-4A-01 or COMAR 10.07.05.01(6) for any of the claims at issue in this case. Furthermore, I have seen no evidence that Feldman's conducted any activities that would have necessitated the possession of an RSA license.

### 3.   Maryland Board of Pharmacy Opinion Letter

On August 18, 2010, the Maryland Board of Pharmacy conducted a public meeting.  One of the items discussed at the public meeting was a July 1, 2010 email written to the Board of Pharmacy by Patrick de Gravelles, Litigation General Counsel for CareFirst.  In Mr. de Gravelles' email, he posed two questions to the Board of Pharmacy, the most relevant of which was: "Assuming that the pharmacy only shipped the factor products and supplies to patients' homes via common carrier, and there was no other healthcare provider who had an RSA overseeing the home-based therapy, was the pharmacy acting in accordance with its full service license prior to receiving an RSA?"

On August 23, 2010, LaVerne G. Naesea, Executive Director of the Maryland Board of Pharmacy, wrote a letter to Mr. de Gravelles advising that a pharmacy acting in the manner described in Mr. de Gravelles' July 1 email was acting within the scope of its pharmacy license and the Maryland Pharmacy Act, and that no RSA was required to conduct such activities.  Although Feldman's was not named in either Mr. de Gravelles' July 1 email or Ms. Naesea's August 23 letter, it is clear that the scenario presented in Mr. de Gravelles' email is the exact scenario that Feldman's engaged in with regard to the claims at issue in this case.

On June 18, 2010, Feldman's conducted a deposition of Barbara Fagan, program manager for the ambulatory care unit of the Maryland Office of Health Care Quality.  In that deposition, Ms. Fagan confirmed that no RSA license was required to simply deliver medication to a patient's home.

## VI.      Compensation

For my work as an expert witness, I have been compensated at the rate of $200 per hour for research, reviews, reports, and consultations; and $300 per hour for preparation for testimony and deposition, trial testimony and deposition.

All opinions stated in this report are stated within a reasonable degree of chain pharmacy operation certainty. I reserve the right to amend, modify, or supplement this opinion report if and when additional information is brought to my attention.

Mark Levi, P.D.

### MARK A. LEVI, P.D.

Graduated University of Maryland School of Pharmacy
1970
Board of Directors Baltimore Metropolitan Pharmaceutical Association
1980 to 1992
Board of Directors Maryland Pharmacists Association
1986 to 1992
President of Maryland Pharmacists Association
1991 to 1992
Board of Directors EPIC Pharmacies, Inc.
1995 to 1999
Maryland Medicaid Advisory Committee
1999 to 2005
Subcommittees on Errors and Pharmacy Technicians Maryland State Board
of Pharmacy
1999 to 2003
Maryland State Board of Pharmacy Commissioner
2003 to 2007
President of Maryland State Board of Pharmacy
2006 to 2007


Board of Directors Kappa Chapter of AZO Pharmaceutical Fraternity
1970 to 1980
Board of Directors Maryland Cystic Chapter Cystic Fibrosis
1985 to 1992
Board of Directors Maryland Juvenile Diabetes Association
1993 to 1996
Board of Directors Maryland Retailers Association
1996 to 1999

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Order of the Double Star- AZO Pharmaceutical Fraternity
1991
Innovative Pharmacist of the Year- Maryland Pharmacists Association
1996
Seidman Distinguished Achievement Award- Maryland Pharmacists
Association
2004

Owner of Medical Arts Pharmacy
1977 to 1999
Chief Operating Officer EPIC Pharmacies, Inc.
1999 to 2004
Partner Joppa Road Pharmacy
2005 to present

**EXHIBIT B**

## DOCUMENTS REVIEWED

1.   Feldman's Hemophilia Patient Handbook

2.   Factor Health Management Patient Surveys

3.   Factor Health Management – FCS Pharmacy Patient Assessment Form

4.   Factor Health Management – FCS Pharmacy Consent for Release of Information Form

5.   Sample Infusion Log

6.   Factor Health Management – FCS Pharmacy National Disaster/Emergency Plan

7.   Factor Health Management – FCS Pharmacy Safety Checklist

8.   Factor Health Management – FCS Pharmacy Service Agreement/Assignment of Benefits

9.   Correspondence between CareFirst, Inc. and the Maryland Office of Health Care Quality

10.   Correspondence between CareFirst, Inc. and the Maryland Board of Pharmacy

11.   Maryland Code, Title 12

12.   Maryland Code, 19-4A

13.   COMAR 10.07.05

14.   COMAR 10.34.25

15.   Transcript of Barbara Fagan deposition, June 18, 2010

16.   Feldman's Responses and Objections to CareFirst's Third Set of Interrogatories

17.   Advate package insert

EXHIBIT 2

SUMMARY FOR MEDICAL DIRECTORS
CONFERENCE CALL
FEBRUARY 6, 2008
FACTOR VIII

BACKGROUND

Hemophilia is a disease in which normal blood clotting is impaired. Hemophiliac patients experience prolonged bleeding from the slightest wound, as well as painful internal bleeding without apparent cause.

Hemophiliacs are nearly always sex-linked, transmitted through the female line only to male infants. Males affected by the most common form are unable to synthesize Factor VIII, a protein involved in the clotting of blood. Treatment is primarily with Factor VIII (now mass-produced by recombinant techniques), but the hemophiliac remains at risk from the slightest incident of bleeding. Affected males should be very careful to avoid serious injuries. The disease is a painful one that causes deformities of joints.

The U.S. Centers for Disease Control estimates that there are about 18,000 Americans afflicted with either type A or B hemophilia. The small incidence of the disease may be due to the fact that there is a test to identify carriers of the disease. This test, coupled with genetic counseling, helps people of carrier or disease status make more informed reproductive choices. In addition, there is also a prenatal test available to determine whether or not a fetus is going to be affected by the disease.

There have been advances in the treatment of hemophilia over the years, but an August 9, 2007 New England Journal of Medicine article seemed to offer the best hope yet for young boys to prevent painful joint disease resulting from prolonged bleeding over the course of years. The report concluded that prophylaxis with recombinant factor VIII could prevent joint damage and decrease the frequency of joint and other hemorrhages in young boys with severe hemophilia A. Recommended treatment included use of factor VIII every other day rather than on an episodic basis. The cost of factor VIII at this rate could reach an average cost of about $300K per year per patient.

BLUE PLAN SIU ACTIVITY

Several years ago, two Blue Plans experienced high dollar exposure for the cost of factor VIII, believed to have been paid to specialty pharmacy groups. Separately, they researched the group's activities and concluded they had obtained coverage under false pretenses, and negotiated with them to stop submitting claims as well as forfeit unpaid claims.

In 2005, a Plan SIU reported they had identified a 5 member group that submitted over $500K in claims over a 6 month period for factor VIII, all of which were received from the same Florida based pharmacy. Subsequent investigation showed that the pharmacy and/or group members were closely affiliated with hemophiliac advocacy organizations that support active and normal lifestyles for the hemophiliac community. It also introduced the unusual circumstance of members holding the dual role of employer.

**CONFIDENTIAL**       **BCBSA00999**

Similar investigations by Plan SIUs have uncovered various methods used by groups to obtain coverage for hemophiliac patients possibly by ruse. Such activity involved members moving from one group to another in a concerted effort. For example, a member of a covered group applied for coverage under another group/business name because it was believed that coverage under the existing group may have been in jeopardy. The new business was underwritten and members from the old group were moved to the new group. The business may or may not be legitimate.

Investigators have found that medical records sometimes do not support the volume of factor VIII being prescribed or that medical records are not being made available for review.

Several ongoing investigations with similar circumstances have been referred to law enforcement agencies, but none have resulted in conclusive evidence of fraud.

Plans seem to be experiencing a spike in factor VIII claims.


MEDICAL POLICY

The SIUs would like to know what medical policies exist for hemophiliacs, and if it's possible to establish coverage and/or payment restrictions (caps?), underwriting and enrollment controls, due to the high cost of factor VIII drugs. It has been suggested that a tracking mechanism or empty vial exchange for new drugs would inhibit the possibility that drugs could be re-sold on the grey market.

Also, would assigning the drug benefit as a medical benefit or pharmacy benefit help to contain factor VIII costs?

**CONFIDENTIAL**      **BCBSA01000**

EXHIBIT 3

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.,
    Plaintiff,

v.

CAREFIRST, INC.
    Defendant.

IN THE

CIRCUIT COURT

FOR

BALTIMORE COUNTY

Case No. 03-C-09-6257

---

STATE OF PENNSYLVANIA    )
                           )   ss.:
COUNTY OF DAUPHIN       )

**WILLIAM JAMISON**, under penalty of perjury, deposes and says:

    1.     I am 54 years old and have suffered from hemophilia since birth. As such, I have relied on prescription medicine and supplies to inject such medication for my entire life. I suffer from Hemophilia Type A with a severe factor 8 deficiency. Without medication and proper supplies, I will bleed to death. For instance, if I even just hit my head, that could cause internal bleeding leading to my death.

    2.     I am employed by Factor Health Management ("FHM"), where I serve as Director of Health Care Advocacy and Public Policy. In that role, I am a hemophilia educator and I have served as a keynote speaker to various groups across the country. I have also taught classes on hemophilia at MIT and Penn State University, and have published numerous articles on hemophilia.

    3.     Due to the particular medication and supplies that are required to treat hemophilia, I – like other hemophiliacs – cannot just go to the local pharmacy to get the medication that I need. My prescription medication is only available from specialty providers. In choosing a provider, it is vital that the provider be immediately responsive to my medical

Exhibit A

needs and able to overnight medication to my home or wherever I am located at the time. Furthermore, it is essential that I am always sent the correct medication. If a particular pharmacy did not provide exceptional customer service or a rapid response to its hemophiliac patients, those patients could face death, even from a seemingly "minor" injury.

4.      I use all the medication I receive and never resell any of the medication or give it to anyone else, nor have I ever heard of anyone doing so in all the years I have been involved with hemophilia education and treatment. The blood factor used to treat hemophiliacs does not produce a "high" nor does it have other effects that would render it susceptible to abuse.

5.      Furthermore, most insurance plans have a lifetime maximum cap on benefits for any one patient. In the case of hemophiliacs, due to the high cost of the factor, it is virtually certain that every patient will reach the lifetime cap on benefits if the patient is lucky to live for so long. If a patient were to stockpile "extra" factor that was not for the patient's own use, and then give away or sell such factor on a (nonexistent, in my opinion) black market, such "extra" factor would hasten the arrival at the lifetime cap on such patient's benefits, thereby forcing the patient to cover the exorbitant cost of the factor by himself, without any reimbursement from insurance. As I previously mentioned, in all my years working with hemophiliacs and hemophilia education, I have never once heard of such stockpiling or reselling of blood factor.

6.      I generally place regular orders every month or so for shipments of medication and supplies. However, if for example I am injured and suddenly get a bleed, I rely on my pharmacy to send me additional factor medication immediately.

7.      I usually keep enough medication and supplies on hand for a few extra days because it is vital that I treat any bleed immediately. Any delay in treating a bleed -- for

example if I run out of my medication – would cause severe crippling of my joints and a delay of as little as two hours could be fatal. Time is therefore of the essence for me, and I need to treat any bleed immediately at the onset of the bleed. In addition, any delay in treatment of a bleed can lead to significant damage to the affected area and will increase the cost of treatment to resolve the bleed with possible hospitalization, again, increasing costs.

8.     Every patient is different, and even if two patients seem the same on paper, they may require very different levels of factor to stop their bleeds and save their lives. A doctor who has not treated a particular patient and does not intimately know the patient's medical history cannot accurately determine the level of factor necessary to stop that patient's bleeds, even if the doctor has access to some of the patient's medical records.

9.     Because hemophilia is so rare – I believe the latest numbers from the Centers for Disease Control indicate that approximately 22,000 patients suffer from hemophilia A and B in the United States with only about 13,700 of those patients requiring regular treatment – most doctors and hospitals do not really know anything about the disorder. With proper care and access to medication, hemophiliacs can live fairly normal lives. But without such care or medication, hemophilia is debilitating and ultimately fatal.

10.     Out of the approximately 22,000 people with hemophilia in the United States, approximately 10,000 were infected with HIV in the 1980s and 1990s because all products to treat hemophilia were blood and plasma products at that time. Those rates of infection with HIV caused pharmaceutical companies to synthesize genetically engineered recombinant factor products. The expense of developing the genetically engineered factor products caused the price for treatment of hemophilia to spike to the levels they are at today.

3

This affiant, William Jamison, herein being duly sworn upon oath, deposes and states that the facts stated in the foregoing affidavit are true and correct according to his best knowledge, information and belief.

Dated: _August 5, 2009_          _William Jamison_

                                                        William Jamison

Subscribed and sworn to before me this _5th_ day of _August_, 2009.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Lori Ann Blazina, Notary Public
Lower Paxton Twp., Dauphin County
My Commission Expires June 11, 2013
Member, Pennsylvania Association of Notaries

                                          Notary Public

                                          My commission expires

EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FELDMAN'S MEDICAL CENTER PHARMACY, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. WDQ-10-254 |
| v. | ) ) | |
| CAREFIRST, INC. | ) ) | |
| Defendant, | ) ) | |
| v. | ) ) | |
| John DOES 1 and 2 | ) ) | |
| Third-Party-Defendants, | ) ) | |

EXPERT WITNESS REPORT

OF

Donna M. Horn, RPh, DPh

Dated:     November 12, 2010
           Norwood, Massachusetts

## I.      Introduction

In August 2010 I was contacted and retained by Paduano & Weintraub LLP, on behalf of its client, Feldman's Medical Center Pharmacy, Inc. ("Feldman's").  I was retained as an expert witness in Civil Action No. WDQ-10-254, pending in the United States District Court for the District of Maryland. Pursuant to Federal Rule of Civil Procedure 26(a)(2), I was asked to prepare a report containing the opinions I was prepared to offer as testimony at trial, addressing the standards of community pharmacy practice with particular regard to delivery of injectable prescription products to patients via mail service.

My conclusions and opinions based on my education, experience and knowledge of the pharmacy industry, offered with a reasonable degree of certainty, are set forth below.

## II.     Qualifications

I am qualified as an expert witness on matters relating to professional pharmacy practice standards and related pharmacy laws and regulations.  My qualifications are based on my experience as a pharmacist and as a state regulator overseeing the practice of pharmacy in Massachusetts.

I was licensed in 1983 as a registered pharmacist in Massachusetts. My entire practice has been in community pharmacy as a staff pharmacist, pharmacy manager, regional pharmacy manager and regulatory affairs manager. In 1993 I was appointed to the Massachusetts Board of Registration in Pharmacy. I served as a member, hearings officer, secretary and president during my 11 years on the board. I was also elected to various positions in the National Association of Boards of Pharmacy ("NABP") – an impartial professional organization that supports the state boards of pharmacy in creating uniform regulations to protect public health – serving as the Association's President and Chairman of the Board.

As a staff pharmacist I have firsthand experience dispensing prescriptions within the regulatory framework and understand the challenges of the expanded role of the pharmacist to include patient safety and appropriate delivery of patient care. As the manager of regulatory affairs, I wrote many policies and procedures governing the pharmacists working in the retail stores in which I worked or managed.

During my term as a state pharmacy board member, I authored regulations, policies and best practices to help pharmacists in Massachusetts interpret, explain and supplement the pharmacy laws in our state. Some of the

2

policies I initiated, researched and wrote include: technician's role, training requirements and scope of authority, computerized compendia, automated dispensing devices, customized packaging, medication error and adverse drug event reporting, and self inspection forms for pharmacy license renewal, to name just a few.

I was also involved in the writing of best practice recommendations which can be found on the Massachusetts Board of Registration in Pharmacy website www.state.ma.us/reg/boards/ph. Of note are the Continuous Quality Improvement program, promoting ease of access to appropriate reference materials, monitoring prescription usage in chronic disease state patients, drug recall procedures, proper staffing guidelines and incorporating strategies to optimize therapeutic outcomes.

As a national regulatory leader with the National Association of Boards of Pharmacy, I developed a 50-state and an international perspective of regulations and laws that pertain to the practice of pharmacy. I served on many committees and task forces reviewing current trends, forecasting future roles, and writing model rules and regulations that many states have adopted.

A more detailed description of my employment history, professional activities and publications is attached as Exhibit A to this Report.

## III.   Previous Expert Testimony

In the past four years, I have testified as an expert at trial or by deposition three times.  The matters in which I testified are as follows:

A.   USA, et al. v. Merck-Medco Managed Care, LLC, et al., Case No. 00-CV-737 , November 2005

B.   Metzner v. Walgreen's Pharmacy, December 2006

C.   Group Hospitalization & Med. Servs., d/b/a CareFirst Blue Cross Blue Shield v. Merck-Medco Managed Care, L.L.P., No. CAM-L-4144-03, November 2007

## IV.   Information Considered in Forming Opinion

In compiling this report, I have considered materials provided to me by counsel at Paduano & Weintraub LLP.  A complete list of the materials that I considered and/or relied upon is attached as Exhibit B.  I have also referred to state pharmacy laws and regulations and model rules of the NABP. In addition, I have

also gathered information through conversations with Feldman's pharmacist Julie White and Factor Health Management CEO Jarrett Bostwick.

## V.     Expert Opinion

### a.     Conclusions

It is my opinion that Feldman's follows best practices for community pharmacies and complies with state regulations and laws regarding prospective drug review, the distribution of patient-oriented written information leaflets for prescription drugs and mail delivery.[1]  Further, it is my opinion that the medication Feldman's dispenses to its hemophiliac patients is self-injectable and that Feldman's delivers such injectable prescription medicines to its patients within the standards of practice, at the same or higher level as their colleagues in the community pharmacy industry.

### b.     Basis for Conclusions

#### i.     The Standard of Practice in the Community Pharmacy Setting

There are more than 56,000 community pharmacies, including traditional chain pharmacies, food and pharmacy combinations, mass merchandise pharmacies and independent pharmacies, including 'niche' pharmacies, providing ambulatory prescriptions to patients across the United States. Over the past few years there has been an increasing pharmacist shortage, nationwide. Although the overall supply of pharmacists has grown, there has been an unprecedented demand for their services that has not been met by the number of practicing pharmacists. Prescription volume has grown by 44% since 1992[2] as well as the range of activities demanded of today's pharmacists such as counseling, drug utilization review and administrative duties.

Successful management of rare and complex conditions requires specialization and focus. Specialty drugs are prescription medications for complex conditions that require special handling, administration, or monitoring. Not only are the drugs for these conditions high in cost, they can be high maintenance, meaning that they require specialized delivery and administration on an ongoing basis. Not all community pharmacies will dispense specialty drugs. These products tend to present challenges of inventory, product knowledge, administration tools and delivery. Independent pharmacies, such as Feldman's, can make a successful

---

[1] http://www.feldmanspharmacies.com/index.aspx?page=8600 accessed 8-5-2010

[2] Drug Topics 06 MediaKit

4

business by serving these niche specialty markets. National chain pharmacies such as CVS Caremark[3] and Walgreens[4] offer specialty drugs through their mail order services, and not usually through their local pharmacies.

One of the major chronic conditions under the specialty category is hemophilia and other related bleeding disorders. Bleeding disorders are high-maintenance and costly because they require regular injection treatments. The products used to treat hemophilia tend to present challenges to physicians, payers, pharmacies, and manufacturers. They require special data and handling requirements. Approximately 20,000 people in the United States suffer from hemophilia, and treatment can cost up to $125,000 per patient per year, according to Hemophilia Health Services, a division of Accredo Health, Inc.[5]

Hemophilia prepackaged clotting factor drugs lend themselves to the mail-order opportunity. Because clotting factor is not effective when taken orally, it must be administered through self injection. 'Self-injectables' are commonly defined as those products whose administration is <u>more often than not</u> going to be conducted by the individual patient or caregiver within the home, versus within a clinic-based setting.[6] For example, ADVATE, <u>Antihemophilic Factor</u> (Recombinant) (Plasma/Albumin Free), is administered directly into the bloodstream and works by temporarily raising the level of factor VIII in the blood, thus allowing the body's blood clotting process to function properly. Patients and/or caregivers are provided with information from the manufacturers on proper techniques for self administration for this medication and other clotting factors.[7]

These injectable drugs require special delivery methods when brought to the patient's home, especially if they need refrigeration. As with conventional medications, these injectables are labeled and delivered to patients for self administration.

Community pharmacy practice is one of the most regulated professions in the country. Both chain and independent pharmacies offering these specialty medications through delivery and mail service are required to operate

---

[3] https://www.caremark.com/wps/portal/HEALTH_RESOURCES?topic=specialty accessed 8-5-2010

[4] http://www.walgreenshealth.com/whc/clientPortal/pbm/jsp/spec_pharmacy.jsp accessed 8-5-2010

[5] http://findarticles.com/p/articles/mi_m0NKV/is_7_3/ai_89237271/ accessed 8/15/2010

[6] http://www.drugmanagementforum.com/forum/managed-care-issues-injectable-drugs/7789-definition-self-injectable.html accessed 8/15/2010

[7] http://www.drugs.com/advate.html#ixzz0wJJQ2PbK

under the same board of pharmacy regulations that govern conventional medication dispensing in the state in which the pharmacy is physically located.

State boards of pharmacy set regulations and parameters within which pharmacists practice. Pharmacy standards are shaped by current practices of the industry as a whole, within the regulatory framework. The boards monitor compliance with these standards so the pharmacists clearly understand what is expected of them. Two of the more important regulations set by state boards ensure that pharmacists conduct a prospective drug utilization review (PDUR) and to make an offer to counsel patients.

Although some states may have slight variances, most state board regulations define PDUR as requiring a pharmacist, prior to dispensing prescription medication, to screen for possible drug therapy problems including therapeutic duplication, drug-drug interactions, incorrect dosage or duration of drug treatment, drug-allergy interactions and clinical abuse and misuse.[8] Feldman's complies with this regulation through its contract with McKesson's Pharmaserve to process the patient prescriptions. In addition, Factor Health Management, Inc. (the parent company of Feldman's at the relevant time) utilized CPR+ and select staff had access to this database. The drug database provider for CPR+ was Medi-Span.

Pharmacy computer systems have become a common and essential professional tool to increase staff efficiency and support effective drug therapy monitoring. Medi-Span has been a leader in pioneering clinical intelligence for over 30 years, providing comprehensive, integratable drug information to health care professionals worldwide. Medi-Span belongs to the Clinical Tools division of Wolters Kluwer Health, which uses its industry leading information products to create next-generation integrated drug and disease databases and point-of-care information tools. These tools aid healthcare professionals in disease management, error reduction, workflow, and patient management in many segments of the health care industry, including hospitals, community pharmacies, pharmaceutical manufacturers, home health care, and physician offices.[9]

In the Omnibus Budget Reconciliation Act of 1990 (OBRA '90), Congress gave pharmacies a clear mandate to offer to counsel Medicaid patients. Since 1990, boards of pharmacy in 36 states have extended the OBRA '90 mandate by requiring some type of counseling for all patients. Maryland regulations require that prior to dispensing the medication to the patient or caregiver, the pharmacist or the designee of the pharmacist make an <u>offer</u> to counsel the patient or the caregiver. This offer can be made in writing when prescriptions are being delivered or mailed to a patient's home. Feldman's complies with this community

---

[8] OBRA 90  42U.S.C.A. 13967-8

[9] www.computertalk.com/Profiles

6

pharmacy regulation by offering patients an offer to counsel for all their new medication, whether conventional medication or specialty medication; verbally for those patients who come into the store and in writing for those patients that opt for delivery or mail service. Every delivery ticket was preprinted with a phone number and a statement indicating that if the patient had any questions they could call the pharmacist.

Pharmacists practicing in community pharmacy are also mandated to comply with Public Law 104-180, regarding written consumer medication information (CMI). CMI is one method pharmacists use to provide their patients with information on the proper use of their medications, possible side effects, adverse reactions and general information. The Federal Food and Drug Administration (FDA) has been requiring written information be provided to consumers since 1968. Feldman's complies with this community pharmacy mandate to dispense written educational information for all of the medications it dispenses, both conventional and specialty injectable medication. For example, Feldman's sent a drug monograph with each patient's delivery, satisfying the FDA requirements and conforming with industry best practices.

### ii.    How the Standards of Practice are accomplished in the Community Pharmacy Setting

Pharmacists practicing in the community environment follow certain routine steps to ensure that prescriptions are filled without error and that the appropriate medication is received by the patient. Once a prescription is obtained by the pharmacy it goes through a number of phases.

<u>Computer entry phase</u>:

Under the supervision of a pharmacist, technicians make sure that all information required to fill a new prescription is available. This includes the spelling of the patient's last name and first name; the date of birth of the patient; the patient's telephone number; the doctor's name if the name is not legible and does not appear in typed print at the top of the prescription; allergy and insurance information; and the date the prescription was written. Often times, there are some basic clarifications to be made in the written prescription order. Unfortunately, prescribers occasionally omit important information or write illegibly, making it difficult for the pharmacist to identify specific instructions for the use of the medication. In these instances, the pharmacist needs to speak with the prescriber to clarify the meaning of the written order. The pharmacy staff, technician or pharmacist, then begins to enter the prescription information into the computer system. Any significant drug interactions occurring with the patient's medication requires the pharmacist attention and intervention. A label is then printed that is used to fill the prescription. Feldman's makes standard and reasonable attempts to

obtain all necessary patient and prescriber information to properly fill medications for all its patients despite their delivery options.

Dispensing phase:

The dispensing phase of the prescription process involves technicians obtaining the stock medication and matching it with the patient's label, filling the medication quantity ordered, affixing the patient specific label to the product being dispensed and/ or compounding or reconstituting powders when allowed by regulation, under the supervision of the pharmacist.  For those pharmacies with bar- code scanners, all medication bottles taken from stock are scanned against the bar-code on the patient's price sheet/information sheet to make sure the correct medication has been retrieved before continuing. Technicians who work in pharmacies that do not use bar-code scanners compare the National Drug Code (NDC) number of the stock bottle to the NDC number on the patient label. The numbers must match before the medication can be dispensed. The NDC serves as a universal product identifier for human drugs. Feldman's produces patient specific labels for the medications it dispenses whether conventional or specialty injectable medications. Feldman's Pharmacy uses both bar code scanning and NDC number check during this dispensing phase of the process.

Verification phase:

The pharmacist ensures that the medication is appropriate for the patient, verifying that it is the right drug, route, dose, duration, and directions. The pharmacist most often judges the appropriateness of the drug's dosage or strength based upon the patient's age and/or relative weight. The pharmacist judges the appropriateness of the duration of therapy by judging the quantity prescribed (along with the number of renewals authorized) against the type of conditions for which the drug is prescribed. The pharmacist reads the label that has been placed on the prescription. Written directions, which were checked as the information was entered into the computer record system by the technician, are rechecked against the same written order by the pharmacist. The contents of the vial or package are checked against the manufacturer's stock bottle or package to ensure that what was prescribed is the same as what was placed in the vial or package. Warning labels are placed on the prepared medication to warn the patient of side-effects, interactions, or other important messages. Feldman's pharmacists follow standardized processes and procedures to check and label every prescription for accurateness before the medication leaves the pharmacy.

The verification step also involves checking for interactions by performing PDUR. In performing PDUR, most pharmacists are assisted by DUR software applications that are resident on their pharmacies' computer systems. A pharmacy benefits manager or claims processor may also use DUR software applications online at the time of electronic claims adjudication. Both systems issue

an electronic alert when a prescription claim violates pre-established criterion for appropriate drug use.[10] In community pharmacy, the computer system compares all new medication orders/prescriptions with the patient's current medication and medical history profile (medical conditions) on file at that particular location, to detect dosage problems, potential contraindications, drug-drug interactions, drug-disease interactions, drug-laboratory interactions, and therapeutic duplication before dispensing. Automation and computerization of medication use processes and tasks can lessen human fallibility by limiting reliance on memory.[11] The pharmacist must resolve all edits and alerts before dispensing the final product to the patient. Upon identifying DUR edits during prospective drug review, state board of pharmacy regulations require pharmacists to take appropriate measures to ensure the proper care of the patient which may include consultation with prescribing practitioners and or direct consultation with the patient. Feldman's uses McKesson's Pharmaserve software to assist it's pharmacists in their professional judgment regarding appropriate medication use for each patient before the medication is delivered to the patient.

<u>Pick-up phase</u>:

The pharmacy staff member presenting the prescription at the counter or preparing it for delivery/mail ensures that the customer receives the correct medication by:

- Verifying the patient's name, address, and birth date.

- Verifying the number of prescriptions to be received. Prescriptions for the same patient often get bagged separately.

- Verifying all prescription receipts in case there are any handwritten notes from the pharmacist (for example, new insurance, allergy alerts, refrigeration required, need to counsel the patient, etc.)

- Verifying that the bags are sealed in a manner that allows them to be opened without damaging receipts or literature.

---

[10] *'The Role of Pharmacy Computer Systems in Preventing Medication Errors'* from the Journal of the American Pharmacist Association, Elizabeth A. Chrischilles, Thomas R. Fulda, Patricia J. Byrns, Susan C. Winkler, Michael T. Rupp, Michelle A. Chui

[11] *'A Systematic Approach to Preventing Medication Errors'*, Michael A. Jackson, BS Pharm, RPh, Wesley G. Reines, PharmD

Feldman's has specific policies and procedures for delivery of patient medication in person or to their home. These policies and procedures reflect current standards for community pharmacy.

Patient Counseling phase:

Professional pharmaceutical care includes patient counseling when a patient requests it and when it is deemed necessary by the pharmacist. The objectives of patient counseling are to: answer the patient's questions, help foster the patient's compliance with their medication therapy, determine if potential or actual medication therapy problems exist, and to help resolve an actual medication therapy problem. Feldman's offers and extends patient counseling and educational information to all patients in person and/or via telephone, as required by the Maryland state board of pharmacy, in the same manner as other licensed community pharmacies.

## VI.    Compensation

For my work as an expert witness, I have been compensated at the rate of $350 per hour for research, reviews, reports, and consultations; and $450 per hour for preparation for testimony and deposition, trial testimony and deposition. I will also be paid $100 per hour for any travel time.

All opinions stated in this report are stated within a reasonable degree of chain pharmacy operation certainty. I reserve the right to amend, modify, or supplement this opinion report if and when additional information is brought to my attention.

Donna M. Horn, RPh, DPh

10

---

### Donna M. Horn, RPh, DPh (Hon.)
**21 Worcester Dr. Norwood, MA 02062**
**781-762-4605 (Home Office)      donnamhorn@comcast.net      781-248-4963 (Cell)**

---

## Summary:

- Over 4 years of medication error analysis and prevention recommendations
- Over 15 years of combined regulatory and community pharmacy experience.
- A national leader with a 50- state and an international perspective of regulations and laws that pertain to the practice of pharmacy.
- Served as a member, hearings officer, secretary and president during an 11 year period on the Massachusetts board of pharmacy.
- Elected to various positions in the National Association of Boards of Pharmacy, serving as the association's President and as its Chairman of the Board.
- First name basis with numerous boards of pharmacy executive directors, staff and members.
- Proven ability to develop systems that streamline procedures, increase productivity while complying with federal and state regulations and laws.
- Skilled at designing and implementing educational programs for pharmacists and technicians.
- Expert witness for pharmacy standards practice for both state and federal regulatory cases

## Education:
Massachusetts College of Pharmacy and Allied Health Sciences BS
Pharmacy graduate, cum laude
RHO CHI National Honor Society

University of Utah School of Alcohol and other Drug Dependencies - Dupont Merck Grant

## Licensure:
Commonwealth of Massachusetts: Registered Pharmacist
Oklahoma State Board of Pharmacy: Doctor of Pharmacy (Hon.)

## Regulatory Experience:
**Massachusetts Board of Registration in Pharmacy, member 1993 to 2004**
➤        President 2002-2003
        Secretary 2001-2002
                Continuing Education programs on Pharmacy Law
                Chairperson, Strategic Planning Committee
                Chairperson, Technician Regulations Committee
                Liaison to Massachusetts Health Council

## Donna M. Horn, RPh, DPh (Hon.)

> Liaison to Massachusetts Chain Pharmacy Council
> Chairperson of Pharmacy Board Regulations Committee

**National Association of Boards of Pharmacy, 1993 to 2006**
> President 4/04- 5/05, Chairman of the Board through 2006
> President-Elect 5/03-5/04 Treasurer 5/02-5/03
> Executive Committee Member for District 1 5/96 to 5/99, re-elected 5/99 to 5/02
> "Commissioner's Special Citation" presented by the Food and Drug
> Administration (FDA), Dept of Health and Human Services, May 2004 for my
> contribution to the NABP Model Rules for the Licensure of Wholesale
> Distributors to combat counterfeit drugs entering the US drug supply.
> > Task Force 'Privacy'
> > Budget and Finance Committee
> > Committee on Constitution and Bylaws
> > Government Affairs Committee
> > Task Force 'Model Guidelines for Formulary Development'
> > Task Force 'Standardization of Technicians' Role and Competencies'
> > Task Force 'Patient Compliance and Intervention Program'
> > Executive Committee Liaison to Advisory Committee on Examinations
> > Automation Task Force

**Massachusetts Department of Public Health,**
> Member Medical Review Group for Electronic Data Transfer Program
> Editorial Board for 'Pharmacy Update'
> Member 'Medication Dispensing Advisory Group' and 'Automation Task Force'

## Professional Experience:

**Institute for Safe Medication Practices (ISMP),** Horsham, PA, May 2006 to present
> Director Patient Safety- Community Pharmacy
> > Directs ISMP's patient safety activities in community/ambulatory practice
> > Responsibilities include community/ambulatory consulting, contributing
> > editor for ISMP newsletters and national publications, participant in
> > analysis of ISMP's error reporting program, medication error prevention
> > research through government and private grant foundations and various
> > special projects

**Brooks Pharmacy,** Warwick, RI, 2002 to May 2006
> HIPAA Privacy Officer, Brooks Pharmacy and Eckerd Pharmacy
> > Merged, relocated and transitioned the Privacy Office and Legal
> > Compliance Offices of Brooks and Eckerd Pharmacy Corporations with
> > little previous knowledge of the scope of responsibilities entailed and
> > without involving other departments, well within the imposed deadline.
> >
> > Identified differences in operating procedures between the two companies
> > and wrote all new policies and procedures for pharmacy teams in regards
> > to HIPAA rules.

### Donna M. Horn, RPh, DPh (Hon.)

> Continuous monitoring of state laws as they apply to HIPAA rules in the states in which Brooks/ Eckerd operates.

> Respond to HIPAA complaints, requests for confidential communications and access of records as needed from outside the company and from the stores.

> Manager of Regulatory Affairs, Assistant Privacy Officer,
> > Recognized by field staff for improving communications between regulators and store staff in order for all stores to comply with necessary regulations.

> > Established protocol for a company-wide Quality Assurance Program and procedure for monitoring prescription incidents.

> > Spearheaded implementation of an on-line Store Operations Manual containing policies and procedures, as well as, quick regulatory look-up guide for all department and store staff use resulting in increased compliance and less regulatory complaints.

> > Instituted an on-line HIPAA Privacy Training program for all pharmacists, technicians and store managers, resulting in a greater than 96% training compliance rate.

> > Developed and wrote more than 25 policies and procedures for pharmacists in regards to operating procedures, state and federal guidelines and regulatory compliance issues.

> Pharmacy Specialist 2/02 to 9/02
> > Pharmacy Operational support for 28 stores in Metropolitan Boston and Southeastern Massachusetts
> > Successfully converted 28 Osco Drug stores to Brooks Pharmacies to include all personnel, data and technical training well before deadline.
> > Professional Relations: Liaison to Massachusetts College of Pharmacy and Allied Health Sciences, Worcester Campus, and Northeastern University.
> > Government Affairs: Liaison for Massachusetts Board of Registration in Pharmacy, Massachusetts State Legislature, Drug Enforcement Agency, Massachusetts Department of Public Health

**Osco Drug**, Boston, MA, 1983 –2002
> Regional Pharmacy Manager,
> > Pharmacy Operational support for 28 stores in Metropolitan Boston and Southeastern Massachusetts, including direct accountability for over 80 registered pharmacists and annual pharmacy sales in excess of 25 million dollars, government affairs liaison, professional liaison and human resources responsibilities
> Previous Responsibilities included:
> > Pharmacist Contributor Editor for Savon (Osco) Healthy Living Magazine

# Donna M. Horn, RPh, DPh (Hon.)

Pharmacy and Government Affairs Specialist
Manager of Provider Relations of New England
Pharmacy Manager and staff pharmacist

## Research:
*Preventing Errors Introduced by the Use of Electronic Prescribing*, Poon, E, et al 2006

*Using Risk Models Identify and Prioritize Outpatient 'High-Alert' Medications,* Cohen, M, et al 2007

*Risk-Informed Interventions in Community Pharmacy: Implementation and Evaluation,* Cohen, M, et al 2008

## Professional Associations:
URAC Healthcare Accrediting Organization
    Pharmacy Accreditation Advisory Group 2008 to 2010
    Pharmacy Measurement Development Group 2008 to 2010
American Society for Pharmacy Law
    Board of Directors 2006 to present
Massachusetts State Pharmacist Association
    Continuing Education Programs on 'Board of Pharmacy Update'
    "2003 Alumni Achievement Award", Massachusetts College of Pharmacy and
Health Sciences, June 2003
    "Nathan Goldberg Award", Massachusetts Pharmacists Association
Pharmaceutical Care Committee
    Membership Committee
Massachusetts College of Pharmacy/AHS alumnae member
    Preceptor for interns and externs
    Strategic Planning Retreat - External Environment Subcommittee member
Lambda Kappa Sigma - professional fraternity for women in pharmacy
    Educational Grants Committee
    Continuing Education Committee
    Archives Committee
    "Ruth Davies Flaherty Service Award"
    "Award of Merit"
    President, Alpha Alumnae Chapter
    Regional Supervisor for New England and New York Chapters
    President, Alpha Collegiate Chapter
American Pharmacists Association
    APhA Foundation: Peoples Pharmacy School committee member 2010
    Strategic and Tactical Analysis Team on Payment
    2006-2007 Policy Committee
Massachusetts Pharmacists Recovery System
Boston Druggist Association
Massachusetts Chain Pharmacy Council
New England Sinai Hospital and Rehabilitation Center, Sinai Board of Advisors,

Donna M. Horn, RPh, DPh (Hon.)

**Presentations:**
"Mediation Reconciliation: An Important Safety Step"
Lambda Kappa Sigma Biennial Conference, July 2010
"Helping Patients Understand and Manage Risks Associated with Medications"
American Pharmacists Association, March 2010
"Hot Law Topic Roundtable: Patient Safety and Quality Assurance Act"
American Pharmacists Association, March 2010
"Improving Medication Safety in Community Pharmacy: Assessing Risk And
Opportunities For Change"
NABP/AACP district 6,7,8 meeting, September 2009 and New England Pharmacy
Conference 2009
"Safe Medication Practices: Roadmap to Preventing Medication Errors in Nuclear
Pharmacy" American Pharmacists Association, April 2009
"Keeping Your Patients Safe: Error Reporting and Reduction Strategies",
American Pharmacists Association, April 2009
"America's Medicine Cabinet", American Pharmacists Association, April 2008
"Hot Law Topic Roundtable E-Rx Issues", American Pharmacists Association,
April 2008
"A Team Approach to Improving Medication Use and Decreasing Medication
Errors", American Pharmacists Association, April 2008
"Preventing Medication Errors - Now and for Tomorrow", National Alliance of
State Pharmacy Associations, April 2008
"Medication Error Reduction Strategies: How Reporting Errors Makes a
Difference", Oregon State Pharmacy Association, September 2008 and Gold Standard
Conference October 2009
"Preventing Medication Errors Associated with Insulin Therapy" numerous 2008
"Top 10 Adverse Drug Reactions and Medication Errors", National Pharmacists
Association, July 2008,
"Educating and Inspecting for Quality and Safety: Proactively Minimizing
Medication Errors in Community Pharmacy", NABP/AACP meeting September 2008
"Creating a Safer Prescription Label for Patients – ISMP Guidelines"
NABP/AACP meeting October 2008
"Introduction to Just Culture and the Role of Accountability" NABP/AACP
meeting November 2007
Forewarned is Forearmed: *Recently Reported Medication Errors and How to
Avoid Them in Your Pharmacy,* National Association of Chain Drug Stores, August 2008
"Health Care Privacy: HIPAA standards and regulations", Providence Business
News and COX Communications,
"Emerging Technologies for Enhanced Patient Care" Moderator NABP Annual
Meeting, Phoenix
"Prescription for Quality and Patient Safety" Documentary video, Institute for the
Advancement of Community Pharmacy, September 2001
"HRSA Report on Pharmacy Manpower Shortage" Moderator NABP Annual
Meeting, Seattle, Washington,

## Donna M. Horn, RPh, DPh (Hon.)

"Understanding the PBM Operation" Moderator NABP Health Law Officers Conference, Biloxi, Mississippi,

"Pharmacy Software Review" Moderator NABP Annual Meeting, Nashville, Tennessee

"New Member Seminar" Moderator NABP Annual Meeting, Nashville, Tennessee,

"Committee and Task Force Reports" Moderator NABP Annual Meeting, Albuquerque, New Mexico,

"Credentialing Pharmacists" Massachusetts Health Council Annual Continuing Education Program January, NACDS Congressional Conference,

"Interacting with the Board of Pharmacy" National Association of Chain Drug Stores Regional Meeting,

"Competence for Lifelong Practice" Moderator NABP Annual Meeting, Orlando, Florida,

"Collaborative Practice Agreements: A Status Report" Moderator NABP Executive Officers Conference Fort Myers, Florida,

"The Role of Boards of Pharmacy with Impaired Pharmacists" Sponsored by National Association of Boards of Pharmacy, Salt Lake City, Utah,

"Telepharmacy: A Line to the future or a Wrong Number?" Moderator NABP Annual Meeting, San Diego, California,

"Competence or Conditions: When Errors Occur in the Pharmacy", Moderator NABP Health Law Officers Conference Savannah, Georgia,

"HIV Prevention for Injection Drug Users: The Role of Sterile Syringes", Mass. Dept. of Health Aids Bureau and the CDC office of HIV/AIDS,

"Third New England Drug Diversion Seminar", Drug Enforcement Administration and Mass Dept. of Public Health

"District 1 Joint Meeting and Law Review", NABP,

"Pharmacy Law and OBRA Review", Western Mass. Pharmaceutical Association,

"Pharmacy Law and OBRA Review", Greater Lowell Pharmacists Association,

"Pharmacy Law Seminar", Boston Association of Retail Druggists,

"The Pharmacist's Increasing Liabilities", 'Pharmacists PRN newsletter,

"Open Panel Discussion with the Board of Pharmacy and Dept. of Public Health", Western Mass Pharmaceutical Association,

## Publications:

*A Community Pharmacy Team's Role in Medication Reduction Strategies*
California Pharmacist Spring 2009 Vol. LVI, No. 2  www.cpha.com

*Medication Reconciliation: A Survey of Community Pharmacies and Emergency Departments*
Patient Safety and Quality Healthcare May/June 2010 Volume 7 issue 3  www.psqh.com

EXHIBIT B

## DOCUMENTS REVIEWED

1.  Feldman's Hemophilia Patient Handbook

2.  Factor Health Management Patient Surveys

3.  Factor Health Management – FCS Pharmacy Patient Assessment Form

4.  Factor Health Management – FCS Pharmacy Consent for Release of Information Form

5.  Sample Infusion Log

6.  Factor Health Management – FCS Pharmacy National Disaster/Emergency Plan

7.  Factor Health Management – FCS Pharmacy Safety Checklist

8.  Factor Health Management – FCS Pharmacy Service Agreement/Assignment of Benefits

EXHIBIT 5

1

```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND

-----------------------------:
FELDMAN'S MEDICAL CENTER      :
PHARMACY, INC.,               :
                              :
      Plaintiff,              :
                              :
            v.                :  Civil Action No.:
                              :  WDQ-10-254
CAREFIRST, INC.,              :
                              :
      Defendant,              :
                              :
            v.                :
                              :
JOHN DOES 1 AND 2,            :
                              :
      Third-Party Defendants. :
-----------------------------:
```

                         Baltimore, Maryland
                    Tuesday, August 17, 2010


Deposition of:

                 WINSTON WONG

called for oral examination by counsel for

Plaintiff, pursuant to notice, at 201 North Charles

Street, Suite 2102, Baltimore, Maryland 21201,

Before Belinda D. Lomax of Capital Reporting, a

Notary Public in and for the State of Maryland,

beginning at 10:01 a.m., when were present on

behalf of the respective parties:

Capital Reporting Company
Wong, Winston  08-17-2010

7

1      Q    Control.  Is that a word you have used in

2  that context?

3      A    If you want to use the word control, yes,

4  that's within my radar screen.

5      Q    You used that word before, right?

6      A    Yes.

7      Q    In terms of biologics, correct?

8      A    Yes.

9      Q    So one of your jobs, if I understand it

10  correctly, as you sit here now, is to control the

11  amount of money that CareFirst pays out in respect

12  to biologics; is that right?

13      A    Again, how are you using the term

14  control?

15      Q    To limit the amount of dollars that

16  leaves CareFirst.

17      A    If you are using it in that context, no.

18      Q    In what context would you use control in

19  terms of your role?

20      A    My role in terms of controlling the use

21  of biologics is to ensure that we are -- that the

22  biologics are used for a safe and appropriate

Capital Reporting Company
Wong, Winston  08-17-2010

8

1   indication at a safe and appropriate dose.

2           MR. PADUANO:   Could I have that last

3   answer read back, please?

4           (The record was read by the court

5           reporter as requested.)

6   BY MR. PADUANO:

7       Q    What do you mean by safe and appropriate

8   indication?

9       A    Meaning that the biologic was used for

10  its approved indication.

11      Q    When you say indication, what do you

12  mean, sir?

13      A    Why the drug is being used or

14  administered, what is the drug intended to be

15  treating.

16      Q    When you say safe and appropriate dose in

17  your prior answer, what do you mean?

18      A    That it is being used in the dose and

19  according to the dosing parameters established by

20  the FDA.

21      Q    Are you a medical doctor?

22      A    I am a pharmacist.

Capital Reporting Company
Wong, Winston  08-17-2010

9

1      Q      Have you ever attended medical school?

2      A      No.

3      Q      Are you licensed to practice medicine in

4   the State of Maryland?

5      A      No.

6      Q      Any other state?

7      A      No.

8      Q      Are you authorized in this state or any

9   other to prescribe drugs to any person?

10      A      No.

11      Q      Have you ever been so authorized?

12      A      No.

13      Q      Are you suggesting that you make

14   determinations regarding whether a biologic is

15   necessary or not for a patient?

16      A      Yes.

17      Q      Not being authorized to practice medicine

18   and not being authorized to write a prescription,

19   how could you make such a judgment, sir?  Setting

20   aside the fact that you didn't go to medical

21   school, how would you be in a position to make such

22   a judgment?

Capital Reporting Company
Wong, Winston  08-17-2010

10

1      A     I am making the adjustment based upon my

2  pharmacy degree, pharmacy training, and ultimately

3  evaluating the use of the drug for the indication

4  that it is being used for.

5      Q     Am I correct one of your roles -- you

6  don't see patients, right?

7      A     That is correct.

8      Q     So you would make the determination

9  regarding indication and dosage, you said, based on

10 your training and education in pharmacy, but

11 without any of the requisite licenses or medical

12 education, correct?

13     A     That is correct.

14     Q     Do you regularly give interviews to the

15 media regarding how CareFirst attempts to control

16 the expense that attends biologics?

17     A     How do you define regular?

18     Q     When was the last time you had an

19 interview regarding how CareFirst is going to save

20 money regarding biologics?

21     A     I don't recall.

22     Q     Biologics, am I correct, that's not a

Capital Reporting Company
Wong, Winston  08-17-2010

51

1          You can answer.

2          THE WITNESS:   Which table again?

3          MR. PADUANO:   Table 1.

4          THE WITNESS:   Okay.

5   BY MR. PADUANO:

6     Q    "Guide to ADVATE Dosing for Treatment of

7   Bleeding Episodes in Adults and Children," do you

8   see that?

9     A    Yes.

10    Q    Have you ever seen this before, sir?

11    A    Not in this particular form but I have

12   seen it, yes.

13    Q    In whatever work you did regarding

14   whatever claim Ms. Hanson handed to you, did you

15   make use of the guidelines set forth in Table 1?

16    A    I did not.

17    Q    Can you tell me what an injectable is?

18    A    An injectable is any drug that is

19   administered via, I guess for lack of a better

20   term, a needle.

21    Q    What's an infusible?

22    A    It's a form of an injectable.

Capital Reporting Company
Wong, Winston  08-17-2010

52

1     Q     Do you distinguish between the two?

2     A     An injectable is an overall term of a

3  drug that's given through a syringe and a needle or

4  though a needle into the body as a form of

5  administration.

6           An infusion would be a drug that is

7  administered through a needle into the body over a

8  period of longer than two or three minutes.

9     Q     What's the patient's role, if any,

10 regarding the administration of an infusible?

11    A     The patient's role would be just

12 receiving the drug.

13    Q     An injectable, am I correct that the

14 patient can administer the injection him or

15 herself, right?

16    A     In the case of a self administered

17 injectable, yes.

18    Q     Did you ever study how Factor products

19 are administered to hemophiliacs?

20    A     In my hospital days, yes.

21    Q     So date your study for us.  When was

22 that?

57

1        A      I don't know because that's a different

2    scope of practice.

3        Q      You never did, right?

4        A      I never did.

5        Q      Are you familiar with pharmacists who

6    practice in Maryland who deliver drugs to patients?

7        A      No, no.

8        Q      You used the term specialty pharmacy a

9    moment ago in your testimony.  What's a specialty

10   pharmacy?

11       A      A specialty pharmacy is what we use to go

12   and deliver high cost drugs or biologics to our

13   members.

14       Q      When you say to your members, who do you

15   mean?

16       A      Patients.

17       Q      How many specialty pharmacies are there

18   in Maryland?

19       A      I do not know.

20       Q      Do you have a list of the specialty

21   pharmacies in Maryland who deliver high cost drugs

22   to your members?

Capital Reporting Company
Wong, Winston  08-17-2010

58

1     A     No.

2     Q     How do you know they exist?

3     A     I know they exist.  You asked me how many

4   are there.

5     Q     Approximately how many are there?

6     A     I do not know.

7     Q     Is there someone within CareFirst who

8   keeps track of the number of specialty pharmacies

9   who deliver high cost drugs to your members?

10     A     I do not know.

11     Q     What's the -- strike that.  Do you

12   personally deal with specialty pharmacies who

13   deliver high cost drugs to your members?

14     A     Personally, no.

15     Q     You used the term specialty pharmacy.

16   Does that distinguish that pharmacy from, say, a

17   Long's, Walgreen's, CVS or something?

18     A     Generally specialty pharmacies focus on

19   high cost injectables.

20     Q     Why is that?

21     A     Because those patients usually require

22   more close monitoring and they provide extra

Capital Reporting Company
Wong, Winston  08-17-2010

62

1   pharmacist, if I don't look it up myself, yes.

2       Q    Have you ever taken any Factor products?

3       A    No.

4       Q    Are you aware of any special relationship

5   between doctors and patients who take Factor

6   products?

7       A    I know there are those special

8   relationships, yes.

9       Q    Those people are typically quite ill,

10  correct?

11      A    If they are not controlled, yes.

12      Q    Even when they are controlled, there is

13  always a concern of grave illness, correct?

14      A    Correct.

15      Q    And those patients work very closely with

16  their physician and the physician's staff, correct?

17      A    Correct.  But you were asking your

18  question in terms of a generalized specialty

19  pharmacy.

20      Q    And specialty pharmacies, as opposed to

21  retail pharmacies, they are the ones who dispense

22  high cost drugs and injectables such as Factor

Capital Reporting Company
Wong, Winston  08-17-2010

63

1   products, correct?

2        A    Correct.

3             MR. DE GRAVELLES:   Objection.   Assumes

4   facts not in evidence and misstates prior

5   testimony.   Misstates the record.

6   BY MR. PADUANO:

7        Q    In your experience, sir, Long's and

8   Walgreen's, CVS, they don't stock Factor products,

9   do they?

10       A    Not at their general retail stores, no.

11       Q    Is insulin an injectable?

12       A    Yes.

13       Q    Is insulin an infusible?

14       A    It could be.

15       Q    What else is a drug that's an injectable

16  and could be an infusible?

17       A    I can't think of one right off.

18       Q    What do you consider Factor products to

19  be?

20       A    Infusibles.

21       Q    That's based on your experience from 16

22  and 17 years ago?

Capital Reporting Company
Wong, Winston  08-17-2010

97

1    CareFirst on the one hand and specialty pharmacies

2    on the other hand regarding the dispensing of

3    particular drugs without regard to any particular

4    patient?

5         A    There is nothing regular, no.

6         Q    Do you send out such communications on

7    occasion regarding particular drugs?  Again,

8    without regard to any patient.

9         A    No.

10        Q    Do you send out -- strike that.  Does

11   CareFirst communicate with pharmacies regarding

12   licensing and credentialing on any type of regular

13   or routine basis?

14        A    Again, under the prescription benefit,

15   no.

16        Q    How about on the major medical side?

17        A    I do not know.

18        Q    Who would know that?

19        A    The provider of contracting.

20        Q    What is a participating provider?

21        A    One who is contracted with CareFirst.

22        Q    What is a non-participating provider?

Capital Reporting Company
Wong, Winston  08-17-2010

1    A    One who is not contracted with us.

2    Q    Is participating analogous to an

3  in-network provider?

4         MR. DE GRAVELLES:  Objection.  Calls

5  for speculation and legal conclusion.

6         THE WITNESS:  I don't know for sure.

7  BY MR. PADUANO:

8    Q    Non-participating, is that analogous to

9  an out-of-network provider?

10    A    Again, I'm not sure.

11    Q    But you have heard those terms as well,

12  in-network and out-of-network, right?

13    A    I have heard the terms, but usually it

14  applies to a medical provider.  I don't know what

15  the specific distinctions are.

16    Q    When you mean medical provider, what do

17  you mean?

18    A    Major medical provider.

19    Q    A major medical provider?

20    A    As opposed to prescription benefit

21  provider.

22    Q    Where would the prescription benefit

Capital Reporting Company
Wong, Winston  08-17-2010

99

1   provider land?  Is that entity a participating or

2   non-participating vendor?  I need some help on the

3   terms.

4        A     Participating would be one who is

5   contracted to provide prescription services to our

6   members.  A non-participating would be one who is

7   not contracted to provide services to our members.

8        Q     There are specialty pharmacies within

9   Maryland and wholesalers outside the state that are

10  not contracted to provide member benefits under the

11  major medical side, right?

12       A     I just missed your question.

13       Q     Am I correct that there are specialty

14  pharmacies within Maryland that provide services to

15  CareFirst members who are not contracted with

16  CareFirst?

17       A     I don't know for sure.

18       Q     Who knows that?

19       A     Provider Networks.

20       Q     Is Provider Networks different than

21  Network Credentialing?

22       A     Provider Networks is an overall term.

Capital Reporting Company
Wong, Winston  08-17-2010

104

1   vendors come in presenting programs to manage -- it

2   is a hemophiliac management program.

3       Q    Is part of your job, sir, directing

4   patients to pharmacies?

5       A    It's not so much to direct patients to

6   pharmacies.  It's more to develop or to take a look

7   at drug utilization programs looking for

8   appropriateness.

9       Q    Does CareFirst have a business, a

10  legitimate interest in having patients use some

11  pharmacies over others?

12      A    No.

13      Q    A patient in Maryland who is a CareFirst

14  member has the right to go to whatever licensed

15  pharmacy the patient chooses, correct?

16      A    That is correct.

17      Q    Am I correct that CareFirst is to take no

18  action that would interfere in a patient's right to

19  select a provider, correct?

20          MR. DE GRAVELLES:   Objection.  Calls for

21  a legal conclusion.  Calls for speculation.

22  BY MR. PADUANO:

Capital Reporting Company
Wong, Winston  08-17-2010

105

1      Q     You can answer.

2      A     We cannot force a patient to use a

3   specific pharmacy, correct.

4      Q     And you are not supposed to take action

5   that encourages a patient to use one pharmacy over

6   another, correct?

7           MR. DE GRAVELLES:   Objection.  Counsel,

8   you are testifying as to the law, which is

9   inaccurate testimony.  The law recognizes we can

10  provide different pricing for different places.

11  BY MR. PADUANO:

12     Q     I will ask it this way.  Based on your

13  experience and the three licenses you hold, is it

14  true that CareFirst is not supposed to direct

15  patients to certain pharmacies as opposed to

16  others?

17          MR. DE GRAVELLES:   Same objection.

18          THE WITNESS:   It has nothing to do with

19  my license as a registered pharmacist.  It's

20  Maryland law.

21  BY MR. PADUANO:

22     Q     CareFirst may not make such a direction;

Capital Reporting Company
Wong, Winston  08-17-2010

1   is that right?

2        A     Right.

3        Q     Did you speak to Ms. Cherenzia regarding

4   this e-mail when you sent it on May 23rd?

5        A     I do not recall specifically.  That's

6   over a year ago.

7        Q     It's more than two years ago.

8        A     Two years ago.  You're right.

9        Q     What's the context?  What's happening?

10  Why are you communicating with Special

11  Investigations regarding fraud and abuse of

12  specialty pharmacies?

13       A     Again, I don't remember the specific

14  context in which she was asking me about the

15  program or why she posed the question.

16       Q     Did anyone tell you at that time that

17  CareFirst had problems with the Plaintiff providers

18  in this case?

19       A     Not that I can recall.

20       Q     When was the first time you heard of

21  Feldman's Pharmacy?

22       A     I had actually heard of Feldman's

Capital Reporting Company
Wong, Winston  08-17-2010

123

1   strike that.  This is part of the documentation you

2   reviewed and identified, the documentation packet

3   you identified a moment ago; is that correct?

4        A    Right.

5        Q    The next line in that paragraph says,

6   quote, "Pharmacy Management and the Medical

7   Director are also reviewing the future feasibility

8   of implementing one specialty pharmacy to process

9   all CareFirst hemophilia blood products."

10       A    Yes.

11       Q    What does that refer to?

12       A    We were looking -- again, we were looking

13   at programs that we could implement to review

14   Factor product claims.  Even though this statement

15   was made, this is not truly what we were going to

16   do.  As you said, we cannot drive a patient to use

17   a specific pharmacy.

18       Q    You can't do that, right?

19       A    Right.

20       Q    So Andrea Cherenzia, what she really

21   means here, processing of claims as opposed to

22   doing what she specifically said, and that is

Capital Reporting Company
Wong, Winston  08-17-2010

132

1     A    It's a pharmacy that focuses in on high

2  cost injectables.

3     Q    A specialty pharmacy, does it differ in

4  any other way from a retail pharmacy?

5         MR. DE GRAVELLES:   Excuse me.  I will

6  object to that.  It calls for a legal conclusion.

7  BY MR. PADUANO:

8     Q    Are you aware of any rules or regulations

9  in Maryland that define the term specialty

10  pharmacy?

11     A    No.

12     Q    It's just a term that's thrown up in the

13  business to signify a pharmacy that's got a more

14  focused clientele, right?

15         MR. DE GRAVELLES:   Objection.  That

16  misstates the record.  You are testifying and

17  that's incorrect.

18         THE WITNESS:   Not a clientele.  A

19  focused therapeutic area.

20  BY MR. PADUANO:

21     Q    That would be what?

22     A    High cost injectables.

133

1      Q      Is that your definition, or is that

2    something that you have seen in the literature?

3      A      It's my general description.

4      Q      Some people in your business may consider

5    specialty pharmacies to be those places that

6    specialize in durable medical equipment, right?

7             MR. DE GRAVELLES:     Objection.   Calls for

8    speculation.

9             THE WITNESS:     It's one of those terms

10   that has a wide assortment of definitions within

11   the industry.

12   BY MR. PADUANO:

13     Q      Right.  So specialty pharmacy means

14   whatever the speaker may want it to mean at the

15   time, right?

16     A      I guess you could put it that way, yes.

17     Q      And there is not a rule or definition

18   that you have seen in your years in the business

19   that specifically defines that term, correct?

20     A      Correct.

21     Q      Now, does CareFirst publish any

22   definitions of what a specialty pharmacy is?

149

1       Q      Do you see the entry that's dated

2   November 12th, 2008?

3       A      There are two of them, it looks like.

4       Q      The first one.

5       A      Yes.

6       Q      Do you see the sentence that says, quote,

7   "Also advised I need to contact other plans,

8   specifically Independence, BCBS of PA, to advise of

9   recent conversation with Contracting that Feldman's

10  is not eligible as a medical specialty pharmacy or

11  HIT provider and we will only be allowing claims

12  for DME supplies," end quote?  Do you see that?

13      A      Yes.

14      Q      What is a HIT provider?

15      A      Home infusion therapy.

16      Q      What is home infusion therapy?

17      A      It's where medications are delivered to a

18  home and it's infused at home.

19      Q      Infused at home by whom?

20      A      Usually a nurse.

21      Q      Are you aware, sir, of any claims at

22  issue in this litigation where a nurse, a doctor or

154

1   services from Feldman's?

2      A    I am not aware, no.

3      Q    Can you name any person -- strike that.

4   Has anyone ever told you that Feldman's provided

5   nursing services to anybody for anything?

6      A    No.

7      Q    What was to be discussed with you and

8   Stacy Briedenstein as referenced in that paragraph?

9           MR. DE GRAVELLES:   Objection.  Calls for

10  speculation.

11          THE WITNESS:   I don't really know here.

12  BY MR. PADUANO:

13     Q    Who is Lisa, Anuszewski,

14  A-N-U-S-Z-E-W-S-K-I?

15     A    I believe she is a contract manager.

16     Q    CareFirst?

17     A    Yes.

18     Q    For whom does she work?

19     A    I'm not sure who she directly works for.

20     Q    Durable medical equipment is what, sir?

21     A    It is medical equipment such as

22  wheelchairs, crutches, ostomy bags.  It's literally

Capital Reporting Company
Wong, Winston  08-17-2010

155

1   equipment.

2       Q    And you say that you had met Mr. Feldman,

3   Les Feldman, years ago, right?

4       A    Correct.

5       Q    You knew that Feldman's dispensed drugs

6   in addition to dispensing DME, right?

7       A    I knew of him as a pharmacy, yes.

8       Q    And you knew that it was a pharmacy to

9   which CareFirst, for many years prior to 2008, paid

10  claims, right?

11      A    Under the prescription benefit, yes.

12      Q    And were you aware of any limitation on

13  the licensed drugs that Feldman's Pharmacy could

14  provide to CareFirst members at any point in time?

15      A    No.

16      Q    Sitting here now, are you aware of any

17  limitation on the services that Feldman's could

18  properly provide to CareFirst members?

19      A    No.

20      Q    Are CareFirst members, any of the ones at

21  issue in this case, were they ever informed that

22  they could not receive their Factor products

Capital Reporting Company
Wong, Winston  08-17-2010

178

1       A    Not specifically.

2       Q    Let me go down to the last e-mail there

3    where Ms. Skillern has written, "I'm having a

4    meeting with Winston Wong on Tuesday, August 12th,

5    2008."  Do you see that?

6       A    Yes.

7       Q    What does CAAS mean?

8       A    I do not recall specifically what it is

9    an acronym for, but it is corporate audit and

10   something services.

11      Q    Now, it asks for -- strike that.  Who is

12   David Horwath?

13      A    I do not know.

14      Q    Who is Brian Schumberg?

15      A    I do not know.

16      Q    Did you ever see a document that

17   corresponds with the second sentence of Ms.

18   Skillern's e-mail that speaks to a high level

19   summary of listing audit deliverables and

20   outstanding issues or concerns relative to pharmacy

21   activity?

22      A    I do not recall.

Capital Reporting Company
Wong, Winston  08-17-2010

179

1     Q     Have you ever seen any document that

2  indicates some type of inappropriate conduct

3  engaged in by Feldman's?

4     A     I do not recall.

5     Q     Sitting here right now, you can't

6  describe for me, am I correct, a document from

7  CareFirst that describes any wrongdoing engaged in

8  by Feldman's; is that correct?

9     A     That's correct.

10          MR. PADUANO:   Let me have marked, sir

11  and hand to you a document marked as Wong Number

12  16.

13          (Wong Deposition Exhibit Number 16 was

14          marked for identification.)

15  BY MR. PADUANO:

16     Q     Do you recall writing the e-mail in Wong

17  Number 16?

18     A     I don't remember specifically writing

19  this, no.

20     Q     Do you know who you sent that to, Wong

21  16?

22     A     It looks like I sent it to Jaime.

EXHIBIT 6

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

--------------------------------:

FELDMAN'S MEDICAL CENTER,          :

PHARMACY INC.,                     :

        Plaintiff,          :

      vs.                     : Civil Action No.

CAREFIRST, INC.,                   : 1:10-CV-0254-WDQ

        Defendant.          :

--------------------------------:

               Baltimore, Maryland

               Thursday, October 28, 2010


Deposition of:

        JANET CHAVARRIA

called for oral examination by counsel for Plaintiff,

pursuant to notice, at the Law Offices of Cardaro &

Peek, L.L.C., 201 N Charles Street, Room 2100,

Baltimore, Maryland, before Fazier Walle, of Capital

Reporting Company, a Notary Public in and for the

State of Maryland, beginning at 10:39 a.m., when were

present on behalf of the respective parties:

Capital Reporting Company
Chavarria, Janet  10-28-2010

10

1   understand that your responsibilities have not changed

2   since 2004?

3       A    In 2007, I began to backfill a position that

4   was vacated.  So, in addition to institution

5   credentialing, I also was taking care of delegation

6   oversight.

7       Q    What is delegation oversight?

8       A    We have delegated credentialing groups.  And

9   when we once enter into an agreement like that with

10  the delegate, we then have to go out annually and

11  review their credentialing filings and document that

12  everything that they're doing meets the terms of the

13  agreement that we hold with them.

14      Q    What does delegate mean in the way that

15  you're using it?

16      A    In when -- instead of us -- okay, let's just

17  take Mercy for an example, Mercy Medical Center.

18  Instead of them sending their credentialing filings in

19  to us, we delegate the function to them.  They're part

20  of our network but then we have to audit their

21  credentialing filings.  This is professional

22  credentialing.  Not the institutional.

Capital Reporting Company
Chavarria, Janet  10-28-2010

11

1      Q      What do you mean by professional

2  credentialing?

3      A      Physician's files, practitioners.

4      Q      So, institutional credentialing, what do you

5  mean?

6      A      Facilities.

7      Q      Where do pharmacies fall in in the

8  professional credentialing institutional credentialing

9  terms you've just used?

10     A      Pharmacies -- we don't credential

11  pharmacies.

12     Q      Pharmacies have licenses issued by the State

13  that governs the scope of their operations, correct?

14     A      Yes.

15     Q      That is, CareFirst does not have separate

16  rules or regulations for the services that a

17  particular pharmacy can provide to a CareFirst member,

18  right?

19            MR. GRAVELLES:  Objection.  Calls for

20  speculation.

21     Q      You can answer the question.

22     A      Can you repeat it, please?

Capital Reporting Company
Chavarria, Janet  10-28-2010

12

1      Q      Sure.

2             (Record read.)

3      A      I don't know.

4      Q      Have you ever seen in your

5   twenty-six-and-a-half years rules or regulations that

6   report or limit or restrict or govern particular

7   services that a particular pharmacy can provide

8   CareFirst system?

9      A      I don't work with services.  That's outside

10  of the scope of what I do.

11     Q      What do you work with?

12     A      Institutional credentialing.

13     Q      And institutions provide services to

14  CareFirst members, right?

15     A      Right.

16     Q      So, in the context of the pharmacies, have

17  you ever seen a document that governs what services a

18  pharmacy can provide to a CareFirst member?

19            MR. GRAVELLES:  Objection.  Calls for

20  speculation.

21     A      I'm not sure how you're referring to

22  services.

23

1  network exists.  I have fifteen hundred facilities

2  that I manage.  I don't have them committed to memory.

3      Q    Okay.  I'm just asking for one entity in

4  Maryland you've ever come across that is designated an

5  HIT provider in CareFirst parlance.

6      A    Off the top of my head, I don't know.

7      Q    So, who do I have to ask to learn the names

8  of the HIT providers that are known to CareFirst?

9      A    I don't know.

10      Q    Was anyone responsible for examining or

11  auditing or credentialing HIT providers?

12          MR. GRAVELLES:  Objection.  That's compound.

13          Can you read that back please?

14          MR. PADUANO:  I'll withdraw the question.

15      Q    Is there anyone at CareFirst who's

16  responsible for credentialing HIT providers?

17      A    Yes.

18      Q    Who is it?

19      A    Yes.

20      Q    And you can't give us the name?

21      A    No.

22      Q    Have you credentialed any HIT providers in

24

1   2010?

2       A    Yes.

3       Q    How many?

4       A    I don't know.

5       Q    Where are the documents kept that would

6   reflect that an HIT provider was credentialed in the

7   State of Maryland in 2010?

8       A    I don't know where documents are kept --

9   HIT's credentialed in the State of Maryland?  Is that

10  your question?

11      Q    I will withdraw the question.

12           I asked you where I would find any documents

13  to aid your recollection as to which HIT providers you

14  credentialed in Maryland in 2010?

15      A    I don't know.

16      Q    How do you actually go ahead -- just assume

17  you did credential some entity with CareFirst in 2010,

18  would there be paper involved?

19      A    Yes.

20      Q    What would you do with the paper?

21      A    I would create a file.

22      Q    So, where are your files?

Capital Reporting Company
Chavarria, Janet  10-28-2010

25

| 1 | A | At Columbia Gateway. |
|---|---|---|
| 2 | Q | Who keeps your files? |
| 3 | A | They're stored in a file cabinet. |
| 4 | Q | Where? |
| 5 | A | At Columbia Gateway. |
| 6 | Q | You said that before, ma'am. |
| 7 |   | Where exactly? |
| 8 | A | On the fourth floor. |
| 9 | Q | Is it near your desk? |
| 10 | A | It is. |
| 11 | Q | Do you have an office? |
| 12 | A | No. |
| 13 | Q | Are you part of a bull pen? |
| 14 | A | Open cubicles? |
| 15 | Q | Yes. |
| 16 | A | Yes. |
| 17 | Q | So, how many file cabinets do you have? |
| 18 | A | Probably at least ten. |

19    Q    In those ten file cabinets would be the

20   documents that you worked on to credential any HIT

21   providers?

22       A    Yes.

Capital Reporting Company
Chavarria, Janet  10-28-2010

31

1    A    I wouldn't know.

2    Q    Who would know?

3    A    I don't know.

4    Q    Do you typically interact with the State of

5    Maryland regarding credentialing?

6    A    I have occasion to do that, yes.

7    Q    When was the last time you did it?

8    A    Sometime in 2010.

9    Q    When was the first time you did it?

10   A    2004.

11   Q    Who did you contact?

12       MR. GRAVELLES:  Which time?

13       MR. PADUANO:  2004.

14   A    I don't recall.

15   Q    Why did you contact the State of Maryland in

16   2004?

17   A    If I need clarification on licensing, I

18   contact the different licensing agencies at the State.

19   Q    What do you mean "clarification of

20   licensing?"

21   A    If I were to have a question about the type

22   of license that the State would require a certain

32

1   facility type to have, I would call the source and

2   clarify.

3       Q     Would you write a letter or would you call?

4       A     I have done both.

5       Q     Do you have a collection of letters that you

6   sent to the State of Maryland regarding questions

7   regarding licenses since 2004?

8       A     I don't store those.

9       Q     You don't save them?

10      A     No.

11      Q     Do they go in the provider's files?

12      A     No.  I wouldn't put them in a provider file.

13      Q     Why not?

14      A     It wouldn't be specific to a provider.

15      Q     So, you've never written a letter to the

16  State of Maryland regarding a specific provider?

17            MR. GRAVELLES:  Objection.  Misstates prior

18  testimony.

19      A     I've corresponded.

20      Q     The question is, have you ever sent a letter

21  to the State of Maryland regarding a specific

22  provider?

33

1    A    No.

2    Q    To whom did you report to in April of 2010?

3    A    Stephanie Benton.

4    Q    We have marked this as Exhibit number 1.

5         (Chavarria Exhibit Number 1 was marked for

6         identification.)

7    Q    Do you recognize the document, ma'am?

8    A    Yes.

9    Q    Did you write this?

10   A    Yes.

11   Q    Did you consult with anyone prior to the

12   time you wrote it?

13        MR. GRAVELLES:  I will instruct the witness

14   not to disclose any communications with counsel.  But

15   other than that, you can answer.

16   Q    I haven't asked you about communication with

17   counsel.  I've asked if you consulted with anyone

18   prior writing it, yes or no?

19   A    Just counsel.

20   Q    I don't want you to divulge any substance

21   that was exchanged between you and counsel right now.

22   I'd like to know the name of counsel?

34

1     A     Patrick.

2     Q     That's Mr. Gravelles sitting next to you?

3     A     Yes.

4     Q     Now, have you ever communicated with

5   Ms. Fagan prior to April 1, 2010?

6     A     Yes.

7     Q     How many times?

8     A     Many.

9     Q     Have you ever met her before?

10    A     Not in person.

11    Q     Did you write that first sentence that's

12  there in your letter?

13    A     Yes.

14    Q     What is a residential service agency's

15  license?

16    A     A license that allows a provider to enter a

17  residential setting.

18    Q     Have you ever seen actual regulations in

19  Maryland for RSAs?

20    A     I don't know.

21    Q     Now, what made you think when you wrote that

22  sentence that there was some type of RSA license

35

1  requirement for home infusion therapy agencies in

2  Maryland?

3      A    I knew there was that requirement.  I wanted

4  clarification.  I knew because I had seen that

5  document.

6      Q    What requirement was there, ma'am, that you

7  just referred to?

8      A    The State issues RSA licenses to home

9  infusion therapy providers.

10     Q    Who told you that?

11     A    I see them.  I see the documents.

12     Q    What documents?

13     A    Residential service agency licenses.

14     Q    You're talking about home health care

15  agencies; aren't you?

16     A    No.  I'm talking about the residential

17  service agency licenses that authorize a provider type

18  to do home infusion.

19     Q    Give us the name of one, one entity?

20     A    I don't know.

21     Q    We're going to find those documents that's

22  in the ten file cabinets, right?

Capital Reporting Company
Chavarria, Janet  10-28-2010

36

1      A      Yes.

2      Q      Are there hundreds of them, thousands of

3  them?

4      A      Hundred of files?

5      Q      Hundreds of providers.

6      A      I have fifteen hundred facilities.

7      Q      How many home infusion therapy agencies do

8  you have in your files?

9      A      Under fifty.

10     Q      You can't give us the name of one?

11     A      No.

12     Q      But, when you wrote this, you had some

13  reason to believe there was an RSA license requirement

14  for a home infusion therapy agency?  Is that what I

15  understand the sentence to be?

16     A      I wanted clarification.

17     Q      You'll agree with me that's not what that

18  says, right?

19            MR. GRAVELLES:   Objection.   That's

20  ambiguous.   What's not what it says?

21     Q      Your sentence doesn't ask for clarification;

22  your sentence is declaring there are requirements for

Capital Reporting Company
Chavarria, Janet 10-28-2010

46

1    that I wanted to be clear on the license requirement

2    for HIT.

3        Q    Well, did you identify a problem or did Lisa

4    identify licensing requirements for HIT?

5        A    I don't know their problem was identified.

6        Q    So, when you wrote the letter, you weren't

7    aware of a specific problem; is that correct?

8        A    I was aware that I wanted clarification.

9        Q    And, this letter concerns a specific

10   provider; doesn't it?

11       A    There's not a specific provider mentioned

12   here.

13       Q    When you wrote it, did you have a specific

14   provider involved in your mind, ma'am?

15       A    Yes.

16       Q    Who?

17       A    Feldman's.

18       Q    What was your concern about Feldman's as of

19   April 14, 2010?

20       A    I was trying to clarify the HIT license

21   requirement through Barbara Fagan's office, the RSA

22   license requirement, the document itself, the license.

Capital Reporting Company
Chavarria, Janet  10-28-2010

47

1    Q    Did you make any inquiries prior to April

2  14, 2010 regarding that HIT license you referred to?

3    A    I don't recall.

4    Q    There is no such thing as a HIT license,

5  right?

6    A    There's a residential service agency license

7  that authorizes them to provide that service.

8    Q    Sure let's focus on my question.  There's no

9  such thing as a HIT license, right?

10   A    True.

11   Q    Have you ever made contact with the State

12  regarding Feldman's prior to April 14, 2010?

13   A    No.

14   Q    Why is that?

15   A    I don't contact the State regarding specific

16  providers.

17   Q    But you did in this instance, correct?

18   A    I was asking about a license.

19   Q    Regarding Feldman's, correct?

20        (Witness not responding.)

21   Q    We have established that this letter is

22  about Feldman's, right?

48

1          MR. GRAVELLES:  Objection.

2     A    The letter was not about Feldman's.

3     Q    Okay.  So, what providers did you have in

4  mind when you wrote the letter besides Feldman's?

5     A    Any HIT provider.  Any HIT provider that may

6  have been applying.

7     Q    Name one.

8     A    Feldman's.

9     Q    You're telling me under oath that Feldman's

10 had an application to be a HIT provider in April of

11 2010?

12         MR. GRAVELLES:  Objection.  That misstates

13 her testimony.

14    A    I don't know where their application was in

15 2010.

16    Q    It's well after the time Feldman's sued,

17 right?  You're aware of that sitting here; aren't you?

18    A    Yes.

19    Q    You wrote this letter in connection with

20 litigation, right?  It had nothing to do with an

21 application by Feldman's, correct?

22    A    I guess.

49

1          I wrote the letter to receive clarification of

2    the RSA HIT license.

3      Q    Tell us the name of another HIT provider

4    that the subject of your letter covered besides

5    Feldman's, the name?

6      A    Actually, I think in -- I can't remember the

7    name of the facility.

8      Q    Well, what documents do you need to see that

9    concerned you in April of 2010 that would cause you to

10   write to the State of Maryland regarding this topic?

11     A    I don't understand your question.

12     Q    Well, you've established that Feldman's --

13   you testified that Feldman's was in your mind when you

14   wrote this letter.  My question is, what documents

15   would you need to see to refresh your recollection

16   regarding any other entity that would have had the

17   issues that you raised in your letter pending at that

18   time?

19     A    The purpose of the letter was to clarify the

20   RSA.

21          MR. PADUANO:  Can I get the question read

22   back, please?

Capital Reporting Company
Chavarria, Janet  10-28-2010

50

1          (Record read.)

2      Q    Can you answer my question, please?

3      A    There is no such document.  There is no

4  specific document that would refresh my memory for

5  that.

6      Q    I need to clarify this, because it's serious

7  for our case.

8          Is there an entity, a provider, a facility,

9  that this letter addresses in whole or in part that

10  you can name besides Feldman's --

11      A    No.

12      Q    -- yes or no?

13          Now, why did you demand from Ms. Fagan a

14  written response to your question, specifically

15  addressing your question?

16      A    I wanted -- I wanted it in writing so there

17  was a record of it.

18      Q    Why?

19      A    Because a phone conversation would have had

20  no record.

21      Q    Well, how often did you made demands to the

22  State of Maryland for a written response to a

51

1  question?  Ever?

2     A     I have made -- I have e-mailed, I'm certain,

3  over the course of time.

4     Q     It's a formal letter on letterhead; isn't

5  it?

6     A     It is.

7     Q     My question is, have you ever sent a letter

8  to the State of Maryland demanding a written

9  explanation of anything?

10    A     I don't remember.

11          MR. PADUANO:  Mr. Gravelles, we'd call for

12  any such documents that this witness or anyone at

13  CareFirst has ever authored.

14          MR. GRAVELLES:  You want all documents that

15  anyone at CareFirst ever authorized?  You're going to

16  have a lot of documents on your hands.

17          MR. PADUANO:  I want the documents, letters

18  on letterhead, that this witness or anyone else at

19  CareFirst has written to the State of Maryland

20  specifically to the Department of Health and Mental

21  Hygiene demanding for written explanation regarding

22  any topic.

Capital Reporting Company
Chavarria, Janet 10-28-2010

72

1    Q    So, why did you assume that they did?

2    A    That's what I always think a HIT provider

3    does.  I think a HIT provider goes into the home.

4    Q    So, you guessed?

5         MR. GRAVELLES:  Objection.  That misstates

6    the testimony.

7    A    I believe a HIT provider goes into the home.

8    Q    I understand.  But as to Feldman's, as of

9    August 20, 2008, you guessed as to what Feldman's did

10   or didn't do, correct?

11        MR. GRAVELLES:  Objection.  That misstates

12   testimony.

13   A    I think of HIT provider goes into the home.

14   Q    I understand.  But you had no idea what

15   Feldman's did or did not do, correct?

16        MR. GRAVELLES:  Objection.  Misstates prior

17   testimony.

18   A    The contract manager said they were a HIT

19   provider so I have to look at them like a HIT.

20   Q    Who told you they were a HIT provider?

21        MR. GRAVELLES:  Objection.  Asked and

22   answered.

Capital Reporting Company
Chavarria, Janet  10-28-2010

73

1       A      Nick.

2       Q      So, did Nick ever ask anyone at Feldman's

3  whether Feldman's entered a patient's home to infuse

4  drugs?

5              MR. GRAVELLES:   Objection.   Calls for

6  speculation.

7       A      I don't know.

8       Q      Did you ask Nick that?

9       A      No.

10      Q      Because that is the ultimate question,

11 right?

12             MR. GRAVELLES:   Objection.   I have no idea

13 what that means.

14      A      That question wouldn't come into the scope

15 of credentialing.   Because once I'm informed that

16 there's a home infusion therapy provider, my

17 understanding would be they're going into the home.

18      Q      Okay.   So, in order for Nick to say

19 truthfully to you that they were a home infusion

20 provider, he would have had to ask the question of

21 whether Feldman's entered the door and infused

22 patients and had gotten a "yes" answer to that

Capital Reporting Company
Chavarria, Janet  10-28-2010

74

1  question, correct?

2      MR. GRAVELLES:  Objection.  That misstates

3  the testimony.  Counsel, you're confusing two things

4  and you know it, but we'll clarify that later.

5      MR. PADUANO:  Can you repeat the question,

6  please?

7      (Record read.)

8      MR. GRAVELLES:  I'll also object because it

9  calls for a legal conclusion.

10      You can answer.

11  A    I don't know how to answer that question.

12  Nick and I wouldn't have talked about that.

13  Q    All right.  You told Nick that Feldman's did

14  not qualify for review as an HIT; is that correct?

15  A    I would have said they wouldn't have had the

16  licensure.  That's what I would have said.  I would

17  have said the credentials don't pass.  They don't have

18  the right documentation.

19  Q    Right.  Let's go to the page that's 31987.

20  A    Okay.

21  Q    You write "Nick" -- this is on August 21,

22  2008.  You write, "Nick, these applications do not

Capital Reporting Company
Chavarria, Janet 10-28-2010

75

1   qualify for review as HIT." Do you see that?

2     A   Yes.

3     Q   What does that mean?

4     A   Well, can I reference this?

5     Q   Sure.

6     A   As part of my answer? When I looked at

7   this, when I looked at the top of page 2, and it said

8   "injectables," and it doesn't -- it doesn't -- this is

9   the section where the facility type should indicate

10   HIT, ASC, home health agency, skilled nursing,

11   whatever it is that they're coming in as. So, I'm

12   thinking that I'm referring to that when I'm saying

13   they're not calling themself a HIT so they don't

14   qualify as a HIT, so don't bring me this as a HIT

15   because it's not.

16     Q   Right.

17     A   That's what I was trying to say.

18     Q   Because they're a pharmacy, right? You

19   can't make a pharmacy a HIT?

20     MR. GRAVELLES: Objection. That misstates

21   testimony. That's just not true.

22     A   Well, I think they were a DME provider. But

Capital Reporting Company
Chavarria, Janet 10-28-2010

76

1    as far as this particular application as a HIT, it

2    should have said -- it should say home infusion

3    therapy.

4        Q    Right, sure.

5        A    And it didn't.  So, really Nick shouldn't

6    have given it to me if it's not a HIT.

7        Q    Right.

8             So because Feldman's didn't say it was a

9    HIT, you didn't consider the application to be a HIT

10   provider, right?

11       A    That is true.

12       Q    And, did you know at this point that there

13   was more than a million dollars in unpaid claims that

14   Feldman's had submitted to CareFirst?

15       A    No.

16       Q    Did you know what was the inspiration for

17   Feldman's to try to obtain CareFirst's contracts in

18   the first place?

19       A    No.

20       Q    Did anybody ever tell you that the Feldman's

21   hadn't been paid on its outstanding claims?

22             MR. GRAVELLES:  Objection.

77

1      Q     If you go to page 3196, do you recall

2   receiving this e-mail that says, "Hi, Judy.  I think

3   we might have gotten confused on IV versus med

4   specialty, Feldman's Pharmacy," the one that's dated

5   August 22, 2008 on pages 3196?

6      A     I don't remember receiving it but I think I

7   am copied on it.

8      Q     Right.

9            And at that point, Mr. Yerton is making

10  clear that Feldman's should not be considered a home

11  infusion company, right?

12           MR. GRAVELLES:   Objection.  It misstates the

13  testimony.  Calls for speculation.

14     A     Well, based on what he's saying here, he's

15  saying it's not a home infusion company.

16     Q     If you go to the next page, 3195, it says

17  that the credentialing specialist is on vacation for a

18  week.  Was that you?

19     A     Yes.

20     Q     Now, at the top of the page, Mr. Nick

21  Onorato has said -- Do you recall receiving this?  He

22  says, "The only way Factor VIII drugs are covered is

Capital Reporting Company
Chavarria, Janet  10-28-2010

90

1    call Ms. Fagan to seek clarification.

2        Q    Did you tell Ms. Hanson that you were not

3    qualified to render an opinion regarding the scope of

4    a license issued by the State of Maryland?

5        A    I don't recall saying it.

6        Q    Now, the next document, on top of there, did

7    you get a response from anyone to your June 12, 2009

8    e-mail?  You'll see the next one in the chain is from

9    you to Ms. Hanson.  Do you see that?

10       A    This one?

11       Q    Yes.

12       A    I don't remember.

13       Q    You see it has a different subject line

14   there?

15       A    The HMA.

16       Q    On the two e-mails that is.

17       A    I don't remember if I heard back from her or

18   not.  I was running a big project at the time.

19       Q    What was the big project?

20       A    It was a DME recredentialing project.

21            MR. PADUANO:  Mr. Gravelles, I'd ask that

22   you go back and examine this production.  You will see

Capital Reporting Company
Chavarria, Janet  10-28-2010

91

1   the subject lines of these two e-mails do not match up

2   nor do the recipients.  They're presented to us as a

3   chain.  And, as we discussed before, it would appear

4   to be the June 12, 2009 e-mail at least is not

5   complete.  I would ask you to inquire.

6       Q    Did you write the e-mail on the top?

7       A    Yes.

8       Q    It says, "Barbara Fagan of Office of Health

9   Care Quality referred me to COMAR regulation."  You

10  see that, right?

11      A    Yes.

12      Q    Both of these components are covered under

13  the service, "infusion therapy."  Do you see that?

14      A    Yes.

15      Q    You write, "The RSA license with service

16  infusion therapy does not monitor what is infused by

17  the provider."  Do you see that?

18      A    Yes.

19      Q    What does that mean?

20      A    It means the RSA does not monitor what is

21  infused by the provider.

22      Q    The RSA is a law.  It doesn't monitor

Capital Reporting Company
Chavarria, Janet  10-28-2010

92

1   anything, right?

2        A     The RSA is a license.

3        Q     Law, promulgated by the State of Maryland,

4   correct?

5        A     Yes.  It's also a document.

6        Q     When you say "monitor," what are you

7   referring to?

8        A     I think the implication there was that

9   the -- under the scope of the license, the -- what was

10  being infused by the provider wasn't being monitored

11  under the scope.

12       Q     Do you mean to say that it's not just a

13  factor drug, it could be any drug that's infused to a

14  patient in a patient's home?  Is that what you meant

15  to say?

16       A     I wouldn't have singled out factor.

17       Q     I didn't say that.  But is that what you

18  meant to say in that sentence?  That is that the

19  license is not specific to a particular drug, it's to

20  whatever drug is infused by the provider at the

21  patient's home; is that what you meant to say?

22       A     Yes.

Capital Reporting Company
Chavarria, Janet 10-28-2010

93

1      Q      What does your next paragraph have to do

2   with RSAs?

3      A      This is in regards to an inquiry that I made

4   to the Board of Pharmacy explaining how -- this is not

5   my area of expertise at all so I really am trying to

6   reacquaint myself with the content of this paragraph

7   because I don't credential pharmacies, so this had to

8   do with a call made to Anna Jeffers.

9      Q      Let me stop you there.  How did you get Anna

10  Jeffers' name?

11     A      Probably I would have done a -- like an

12  internet search.  She's with the Maryland Board of

13  Pharmacy.  That's where I was trying to contact.  So,

14  I would have just tried to find someone there to

15  answer a question; provide clarification about the

16  scope of the license, because pharmacy falls outside

17  of institutional credentialing.  Apparently, Jaime is

18  asking me a question that I can't answer so I'm trying

19  to go to a source.

20     Q      Did Ms. Hanton, special investigator, ask

21  you to make this call?

22     A      Yes.

94

1     Q     As to both Ms. Fagan and Ms. Jeffers, you

2  knew you were making the phone calls concerning

3  Feldman's, correct?

4     A     Yes.

5     Q     And, at the time you made the phone calls

6  and the contacts, you were focused on the shipment

7  by -- the dispensing by Feldman's Factor VIII,

8  correct?

9     A     I was focused on trying to understand and

10  report back the scope of the license.

11     Q     Well, look at the next paragraph.  You wrote

12  where you start, "Neither is familiar with Factor

13  VIII."

14           That means you mentioned Factor VIII to them,

15  right?

16     A     I guess, I did.

17     Q     And, you were told by Anna Jeffers that a

18  pharmacy issued by Maryland allowed the pharmacy to

19  sell to individuals compound drugs correct?

20     A     Yes.

21     Q     And, were you told at that time that

22  Feldman's had the full license set for a Maryland

95

1   pharmacy?

2            MR. GRAVELLES:   Objection.   Vague.

3       A    I think we knew that already.

4       Q    That's what's referred to in your second

5   paragraph there, right?

6       A    I don't think specifically.   I mean, the

7   out-of-state -- because it said out-of-state.   Um --

8       Q    Do you know where Feldman's is based?

9       A    No.

10      Q    Did anyone ever tell you where Feldman's was

11  based?

12      A    There's two Feldman's DMEs I think in --

13  around Columbia, or Chartwell or -- but they're DME.

14      Q    Your sentence there that says, "CDS, DEA,

15  and Pharmacy License is the full license set for a

16  Maryland Pharmacy."   Do you see that?

17      A    Yes.

18      Q    What does CDS refer to?

19      A    Controlled Dangerous Substance.

20      Q    What does DEA refer to?

21      A    Oh, gosh.   Drug Enforcement Agency.

22      Q    What's the pharmacy license refer to?

96

```
 1     A     There is a license that's just called a

 2  Pharmacy License.

 3     Q     So, at the time you made that phone call,

 4  did you have it confirmed to you that Feldman's had

 5  the -- a full license set to operate in Maryland?

 6     A     No, I didn't inquire about that because I

 7  think they were on file.  I think they had that.

 8     Q     So, you passed this information on to

 9  Ms. Hanson and Ms. Anuszewski and Stephanie Benton,

10  right?

11     A     Yes.

12     Q     Did you get a response?

13     A     I don't remember.

14     Q     At this point in time, were you aware of any

15  reason at all why Feldman's could not operate pursuant

16  to its license issued by the State of Maryland?

17     A     No.

18     Q     Did anyone at this point in time ever

19  brought to you any reason why claims submitted by

20  Feldman's to CareFirst could not be paid?

21     A     Claims are never discussed with me.

22     Q     That's not my question.
```

106

1    document.

2        Q    Who gave you the document?

3        A    The facility submitted it.

4        Q    When?

5        A    I don't know.

6        Q    Let's go to the first page.  You see the

7    second e-mail on bottom there, it says -- Ms. Hanson

8    is -- it appears to be conversations she's had with

9    Feldman's.  Do you see that?

10       A    I -- I have forgotten this e-mail but I

11   understand what she's saying.

12       Q    Okay.

13            Did you tell her at that point in time that

14   never was it required for Feldman's to have an RSA if

15   it did not cross the threshold of the patient's door

16   to infuse the patient?

17       A    No.

18       Q    Why not?

19       A    Because I wouldn't have said that.

20       Q    But you knew that was the standard, right?

21            MR. GRAVELLES:  Objection.  Misstates prior

22   testimony.  Calls for a legal conclusion; calls for

107

1   speculation.

2      A    My understanding of a HIT provider is that

3   they're going into the home.  So that's how I see a

4   HIT provider.  I don't see them as anything but going

5   into the home.

6      Q    Ms. Hanson is writing here about providing

7   infusion therapy meds.  So the meds could come, the

8   patients can pick up the meds, the meds can be

9   delivered, but so long as the meds aren't infused in

10  the patient's home and the delivery crosses the door,

11  there's no requirement for an RSA, right?  You always

12  knew that?

13         MR. GRAVELLES:  Objection.  That calls for a

14  legal conclusion; it calls for speculation.

15         You can answer if you know.

16     A    If I'm -- if I'm credentialing them as a

17  HIT, they would have to have the license and I'm --

18  I'm thinking that the provider is going into the home.

19     Q    Right.

20     A    So, to me, if they're not going into the

21  home, they're not a HIT.

22     Q    Okay.

Capital Reporting Company
Chavarria, Janet  10-28-2010

108

1      A      They're --

2      Q      Got it.

3             Just dispensing the drugs, right?

4      A      I don't know what really to classify them

5      as.  But to me, they're not a HIT.

6      Q      Well, you know that home infusion therapy

7      medications are prescriptions drugs, right?

8      A      Yes.

9      Q      To get in the CareFirst world, you're

10     talking about things that require prescriptions,

11     correct?

12            MR. GRAVELLES:  Objection.  That's not true.

13     That assumes facts not in evidence.

14     Q      In the context of a HIT, isn't that true,

15     ma'am?

16     A      I would think the -- I would think that the

17     infusion is under doctor's order by way of

18     prescription or whatever.  But I'm not -- I would

19     think this but I don't know.  It's outside of the

20     scope of the --

21     Q      I understand.

22            So, did you respond to Ms. Hanson here that

109

1   in response to her paragraph there that just the mere

2   provision of infusion therapy meds does not require an

3   RSA and never has?

4            MR. GRAVELLES:   Objection.   Calls for

5   speculation and a legal conclusion.

6       A    Can you repeat the question, please?

7       Q    I will ask a better question and withdraw

8   the question.

9            In response to Ms. Hanson's e-mail, and

10  specifically her third paragraph, did you ever tell

11  her that an RSA is not required if the provider is

12  simply delivering home -- delivering infusion therapy

13  meds as opposed to crossing the patient's door?

14      A    No.

15           MR. GRAVELLES:   I will object to that.   That

16  assume facts not in evidence.   The answer is no.

17  That's all right.   It's on the record.

18      Q    Why no?   Why would you have told her that?

19      A    I wouldn't have told her that.

20      Q    Well, her sentence there suggests that an

21  RSA is required just to provide home infusion therapy

22  meds, and that's wrong, right?

110

1          MR. GRAVELLES:  Objection, it calls for a

2   legal conclusion; speculation.

3      A     The RSA is required if the provider is going

4   into the home.

5      Q     And you knew that at this time, correct?

6      A     Yes.

7      Q     You knew that since 2004, right?

8          MR. GRAVELLES:  Counsel, you just asked her

9   earlier if she could interpret a license.  She said

10  no.  What's the point of this?

11     Q     Can you answer the question, ma'am?

12         MR. GRAVELLES:  Again, it calls for legal

13  speculation to which the witness has already testified

14  she can't testify.

15         -- it doesn't make it right.  Just because

16  someone puts it in an e-mail, it doesn't make it

17  right.

18     Q     You've known that was a requirement, that

19  is, crossing the threshold of the patient's door in

20  connection with the administering of home infusion

21  therapy medications, that's the link to an RSA and

22  you've known that since 2004, right?

Capital Reporting Company
Chavarria, Janet  10-28-2010

120

1    Q    Does CareFirst have providers who are not

2    credentialed with CareFirst as specialty pharmacies?

3    A    I don't have anything to do with specialty

4    pharmacies.

5    Q    Must home infusion providers be credentialed

6    with CareFirst in order to be paid for services

7    provided?

8         MR. GRAVELLES:  Objection.  Calls for

9    speculation.

10   Q    To and through CareFirst members?

11        MR. GRAVELLES:  Calls for speculation.

12   Q    In order for a home infusion therapy agency

13   to be reimbursed by CareFirst, must it have a contract

14   with CareFirst?

15        MR. GRAVELLES:  Calls for speculation.

16   A    I don't think so.

17   Q    A provider can be, as you said before, a par

18   provider, a non-par provider?

19   A    Yes.

20   Q    Correct?

21        What's the difference between a par and

22   non-par?  In network, out of network?

Capital Reporting Company
Chavarria, Janet  10-28-2010

121

1          MR. GRAVELLES:  Calls for speculation.

2     A     Par is contracted, non-par is not.

3     Q     Do you know what network and out of network

4  means?

5     A     I don't use that terminology, so I don't

6  know.

7     Q     Do you know what it means generally in

8  CareFirst, whether you use the term or not?

9     A     I don't -- I'm not exposed to in-network/out

10 of network in the realm of what I do so.

11    Q     My question is generally within CareFirst,

12 are you familiar with the use of the term, yes or no?

13    A     No.

14    Q     Are you familiar with -- in the last line

15 that's referred to in Chavarria number 10 the BCBSA

16 investigation at a national level?

17    A     I'm not aware of that.

18    Q     Do you know what the connection is, if any,

19 to this investigation at a national level and the RSA

20 issues that you dealt with?

21    A     No.

22    Q     Is there any?

Capital Reporting Company
Chavarria, Janet  10-28-2010

122

1      A    I don't know.

2      Q    Let me hand to you a document we will mark

3   as Chavarria number 11 which is a collection of

4   e-mails, and the first page of which is stamped CFI

5   03185 through 3188.

6           (Chavarria Exhibit Number 11 was marked for

7           identification.)

8      Q    If go to the last e-mail in this trail, the

9   second to last page of this exhibit, please?

10          Do you recall receiving this e-mail from

11  Mr. Onorato that's dated August 22, 2008 and addressed

12  to you, Ms. Gilmore, Mr. Yerton and Nurys Puente?

13     A    I've seen this.

14     Q    Did you respond to this e-mail?

15     A    No.

16     Q    Do you see the reference in the e-mail to a

17  DME agreement?

18     A    Yes.

19     Q    What's a DME agreement?

20     A    Durable Medical Equipment.

21     Q    Is there a document that's labeled Durable

22  Medical Equipment that you've ever seen in your

123

1   experience at CareFirst?

2       A    No.

3       Q    So, that's a DME agreement?

4       A    Oh. I'm sorry.

5            MR. GRAVELLES:  I'm sorry.  Can you read

6   back his last question and her answer?  I think their

7   there is a problem with the question.  If you read it

8   back, it will be clear.

9            (Record read.)

10      Q    Providers in CareFirst world don't get

11  contracts to provide one type of product or service;

12  do they?

13           MR. GRAVELLES:  Objection.  Calls for

14  speculation.

15      A    I don't know about contracting.

16      Q    When you're reviewing credentialing, you're

17  looking for one type of product to be provided by the

18  provider?

19      A    Yes, yes.

20      Q    What?  What's an example?

21      A    On the RFI, they would indicate the type of

22  service they are trying to contract with us to do

Capital Reporting Company
Chavarria, Janet  10-28-2010

124

1  business for.  For example, it would be surgy center,

2  it could be a home health agency.

3      Q     Hold on, one second.

4            For a surgy center, they would not list all

5  the surgeries, would they?

6      A     While it's not a requirement of the

7  application, many times they do.

8      Q     So, there's not a requirement of all the

9  types of procedures to be identified; is there?

10           MR. GRAVELLES:  I'm going to object to that

11  because its calls for speculation.

12           THE WITNESS:  If I can go back and look at

13  that document that's in here?

14           MR. GRAVELLES:  Ask him.

15      A     Would you like me to look at the RFI?  If

16  it's asked for them to list it out, it would be on

17  here.

18      Q     Is there a CareFirst requirement that a

19  perspective provider identify every service the

20  provider is ever going to supply?

21      A     Not from a credentialing standpoint.  Aside

22  from that, I don't know.

Capital Reporting Company
Chavarria, Janet  10-28-2010

125

1      Q      So, number 11 here, it says there, "Joel,

2  the main reason we're attempting to get Feldman's

3  Pharmacy approved as a HIT provider is because all of

4  claims issues that Feldman's is currently having, is

5  because Feldman's is attempting to bill for a Factor

6  VIII Hemophilia drugs."  Do you see that?

7      A      Yes.

8      Q      The next line says, "These drugs were being

9  built under the DME agreement and therefore were

10 rejecting."  Do you see that?

11     A      Yes.

12     Q      Not withstanding the English that's used, do

13 you know what that means?

14     A      She's experiencing a billing problem.

15     Q      Pharmacies are allowed to submit the bills

16 to CareFirst for covered claims, right?

17            MR. GRAVELLES:  Objection.  Calls for

18 speculation.

19     A      I don't know about claims submission.

20     Q      The next line says, "The only way that

21 Factor VIII drugs are covered is under our Home

22 Infusion Therapy Agreements."  Do you see that?

Capital Reporting Company
Chavarria, Janet  10-28-2010

126

1      A      Yes.

2      Q      Is that true?

3             MR. GRAVELLES:  Calls for speculation.

4      A      I don't.

5      Q      When you saw this, do you know if it was

6   true or not?

7      A      No, I wouldn't have known if it was true or

8   not.

9      Q      Why are you copied on the e-mail?

10            MR. GRAVELLES:  Objection.  Calls for

11  speculation.

12     A      I don't know.

13     Q      You see Ms. Puente's e-mail to

14  Ms. Anuszewski dated April 13, 2009?

15     A      Yes.

16     Q      Did you see that at or about the time you

17  contacted Ms. Fagan and Ms. Jeffers?

18     A      I don't recall the time line.

19     Q      If you look at the first e-mail in the chain

20  from Ms. Puente dated April 22, 2009, you see the

21  reference to unpaid claims of more than 1.5 million

22  dollars, first page of the document?

Capital Reporting Company
Chavarria, Janet  10-28-2010

127

1     A     Yes, I see it.

2     Q     Were you involved in this process where

3  Ms. Anuszewski is asking for an RFI application in

4  April of 2009 and the response --

5     A     She would have acted independently and just

6  forwarded it to me.  No, I would have had no

7  involvement at that level.

8     Q     Do you know what these two e-mails address

9  or concern?

10     A     I never seen them until right now.

11     Q     Can you tell us what RFI application is for?

12     A     It's an application to become a provider in

13  the CareFirst network.

14     Q     For what?

15     A     Could be any type of facility.

16     Q     Thank you.

17           From let me hand you a document -- did you

18  ever make a determination whether Factor VIII drugs

19  are required to be provided by HIT agencies?

20     A     I have no knowledge of Factor VIII drugs.

21     Q     You don't know anything about it?

22     A     I do not.

128

1      Q      Let me hand you a document marked as

2    Chavarria 12, which is a collection of e-mails, first

3    page of which is stamped CFI 03605 and end in 3607.

4             (Chavarria Exhibit Number 12 was marked for

5             identification.)

6             MR. GRAVELLES:  Can you reread the last

7    question and answer please.

8             (Record read.)

9      Q      Have you seen any of these e-mails, ma'am?

10     A      No.

11     Q      Do you know who Dottie Humes is?

12     A      Yes.

13     Q      Who is she?

14     A      She's a external provider rep for CareFirst.

15     Q      What's that mean?

16     A      She would go out to deal with clients

17   externally to assist them with things, open issues,

18   problems.

19     Q      So, would she be the person actually dealing

20   with, say, a pharmacy if a pharmacy had issues?

21     A      I don't know what networks she's responsible

22   for.  They divide them up.  It's possible.

Capital Reporting Company
Chavarria, Janet  10-28-2010

129

1    Q    If you go to the last e-mail there in the --
2    sorry -- the first e-mail in the chain, dated October
3    16, 2008.
4         Ms. Chavarria, I notice that these e-mails
5    do not have -- they have apparently redacted or
6    otherwise not seen on the document the "tos," the
7    "copies" and the "subjects" for the e-mails on pages 1
8    and 2 of the exhibit?
9         MR. GRAVELLES:  They're not redacted.
10        MR. PADUANO:  I would ask for the
11   recipients, the copies of the subjects be provided.
12        MR. GRAVELLES:  Actually, they have been.
13   It's actually how they printed out.
14   Q    You seen any of these e-mails, ma'am?
15   A    No, sir.
16   Q    Do you see the reference there Ms. Hanson on
17   the last page makes about "how horribly frustrating
18   infusion therapy and drugs can be."  Do you see that
19   reference?
20   A    I see that.
21   Q    Did she express that to you at any point in
22   time?

130

```
 1    A    No.

 2    Q    Do you know what that refers to?

 3    A    No.

 4    Q    Does that refer to the cost that CareFirst

 5   in course because of infusion therapy and drugs?

 6         MR. GRAVELLES:  It calls for speculation.

 7    A    I don't know.

 8    Q    On your twenty-six-and-a-half years, what's

 9   the horribly frustrating aspect of infusion therapy

10   and drugs?

11         MR. GRAVELLES:  Objection.  Calls for

12   speculation.

13    A    I don't know.

14    Q    Do you work with Dottie Humes?

15    A    No.

16    Q    Who is Dena Whitener, W-H-I-T-E-N-E-R?

17    A    She's a rep as well.  I don't know her --

18    Q    Second page identifies her as the ancillary

19   representative.

20    A    Dena Whitener.

21    Q    Yes, who works with Feldman's.  Do you see

22   that, second page of the exhibit?
```

EXHIBIT 7

Westlaw.

West's Annotated Code of Maryland Currentness
    Health Occupations
        Title 12. Pharmacists and Pharmacies

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw

MD Code, Health Occupations, T. 12, Subt. 1, Refs & Annos                                   Page 1

West's Annotated Code of Maryland Currentness
   Health Occupations
      Title 12. Pharmacists and Pharmacies
        Subtitle 1. Definitions; General Provisions

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

▷

West's Annotated Code of Maryland Currentness
  Health Occupations (Refs & Annos)
    Title 12. Pharmacists and Pharmacies (Refs & Annos)
      Subtitle 1. Definitions; General Provisions (Refs & Annos)
      → **§ 12-101. Definitions**

<Section effective through September 30, 2010. See, also, section effective October 1, 2010.>

### In general

(a) In this title the following words have the meanings indicated.

### Authorized prescriber

(b) "Authorized prescriber" means any licensed dentist, licensed physician, licensed podiatrist, licensed veterinarian, certified nurse midwife to the extent permitted in § 8-601 of this article, certified nurse practitioner to the extent permitted in § 8-508 of this article, or other individual authorized by law to prescribe prescription or nonprescription drugs or devices.

### Board

(c) "Board" means the State Board of Pharmacy.

### Compounding

(d)(1) "Compounding" means the preparation, mixing, assembling, packaging, or labeling of a drug or device:

    (i) As the result of a practitioner's prescription drug order or initiative based on the practitioner/patient/pharmacist relationship in the course of professional practice; or

    (ii) For the purpose of, or incident to, research, teaching, or chemical analysis and not for the sale or dispensing of the drug or device.

    (2) "Compounding" includes the preparation of drugs or devices in anticipation of a prescription drug order based on routine, regularly observed prescribing patterns.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Delegated pharmacy act

(e)(1) "Delegated pharmacy act" means an activity that constitutes the practice of pharmacy delegated by a licensed pharmacist under this title and regulations adopted by the Board.

   (2) "Delegated pharmacy act" does not include:

      (i) An act within the parameters of a therapy management contract as provided under Subtitle 6A of this title;

      (ii) The administration of an influenza vaccination in accordance with § 12-508 of this title;

      (iii) The delegation of a pharmacy act by a registered pharmacy technician, pharmacy student, or pharmacy technician trainee;

      (iv) A pharmacy activity performed by a pharmacy student in accordance with § 12-301(b) of this title;

      (v) A pharmacy activity performed by an applicant for a license to practice pharmacy in accordance with regulations adopted by the Board; or

      (vi) The performance of other functions prohibited in regulations adopted by the Board.

Device

(f)(1) "Device" means a device used in the diagnosis, treatment, or prevention of disease.

   (2) "Device" does not include any:

      (i) Surgical or dental instrument;

      (ii) Physical therapy equipment;

      (iii) X-ray apparatus; or

      (iv) Component part or accessory of any of these items.

Direct supervision

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(g) "Direct supervision" means that a licensed pharmacist is physically available on-site to supervise the performance of delegated pharmacy acts.

### Dispense, dispensing

(h) "Dispense" or "dispensing" means the procedure which results in the receipt of a prescription or nonprescription drug or device by a patient or the patient's agent and which entails the:

   (1) Interpretation of an authorized prescriber's prescription for a drug or device;

   (2) Selection and labeling of the drug or device prescribed pursuant to that prescription; and

   (3) Measuring and packaging of the prescribed drug or device in accordance with State and federal laws.

### Distribute

(i)(1) "Distribute" means the process resulting in the provision of a prescription or nonprescription drug or device to a separate, intervening individual, licensed and practicing under this article, prior to administration of the provided drug or device to the patient pursuant to a prescription issued by an authorized prescriber.

   (2) "Distribute" does not include the operations of a person who holds a permit issued under § 12-6C-03 of this title.

### License

(j) "License" means, unless the context requires otherwise, a license issued to a pharmacist by the Board to practice pharmacy.

### Licensed pharmacist

(k) "Licensed pharmacist" means, unless the context requires otherwise, a pharmacist who is licensed by the Board to practice pharmacy.

### Nonprescription drug

(l) "Nonprescription drug" means a drug which may be sold without a prescription and which is labeled for use by the consumer in accordance with the requirements of the laws and regulations of this State and the federal government.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### Nonresident pharmacy

(m) "Nonresident pharmacy" means a pharmacy located outside this State that, in the normal course of business, as determined by the Board, ships, mails, or delivers drugs or devices to a person in this State pursuant to a prescription.

### Pharmaceutical care

(n) "Pharmaceutical care" means the provision of a patient's drug regimen for the purpose of achieving definite outcomes related to the cure or prevention of a disease, elimination or reduction of a patient's symptoms, or arresting or slowing of a disease process by identifying, resolving, or preventing actual or potential drug therapy problems and which may include patient counseling and providing information to licensed and certified health care providers.

### Pharmacist

(o) "Pharmacist" means an individual who practices pharmacy regardless of the location where the activities of practice are performed.

### Pharmacy

(p) "Pharmacy" means an establishment in which prescription or nonprescription drugs or devices are compounded, dispensed, or distributed.

### Pharmacy permit

(q) "Pharmacy permit" means a permit issued by the Board to establish and operate a pharmacy.

### Pharmacy student

(r) "Pharmacy student" means an individual who is enrolled as a student in a school or college of pharmacy approved by the Board or accredited by the Accreditation Council for Pharmacy Education.

### Pharmacy technician trainee

(s) "Pharmacy technician trainee" means an individual engaged in a Board approved pharmacy technician training program.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### Practice pharmacy

(t)(1) "Practice pharmacy" means to engage in any of the following activities:

(i) Providing pharmaceutical care;

(ii) Compounding, dispensing, or distributing prescription drugs or devices;

(iii) Compounding or dispensing nonprescription drugs or devices;

(iv) Monitoring prescriptions for prescription and nonprescription drugs or devices;

(v) Providing information, explanation, or recommendations to patients and health care practitioners about the safe and effective use of prescription or nonprescription drugs or devices;

(vi) Identifying and appraising problems concerning the use or monitoring of therapy with drugs or devices;

(vii) Acting within the parameters of a therapy management contract, as provided under Subtitle 6A of this title;

(viii) Administering an influenza vaccination, a vaccination for pneumococcal pneumonia or herpes zoster, or any vaccination that has been determined by the Board, with the agreement of the Board of Physicians and the Board of Nursing, to be in the best health interests of the community in accordance with § 12-508 of this title;

(ix) Delegating a pharmacy act to a registered pharmacy technician, pharmacy student, or an individual engaged in a Board approved pharmacy technician training program;

(x) Supervising a delegated pharmacy act performed by a registered pharmacy technician, pharmacy student, or an individual engaged in a Board approved pharmacy technician training program; or

(xi) Providing drug therapy management in accordance with § 19-713.6 of the Health--General Article.

(2) "Practice pharmacy" does not include the operations of a person who holds a permit issued under § 12-6C-03 of this title.

### Registered pharmacy technician

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(u) "Registered pharmacy technician" means an individual who is registered with the Board to perform delegated pharmacy acts.


Registration

(v) "Registration" means, unless the context requires otherwise, a registration issued by the Board to perform delegated pharmacy acts under the supervision of a licensed pharmacist.


Supervision

(w) "Supervision" means reviewing the work, guiding and directing the activities, and monitoring the performance of an individual.


CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1981, c. 182, § 1, eff. July 1, 1981; Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1990, c. 283, § 1, eff. May 2, 1990; Acts 1990, c. 352, § 1, eff. July 1, 1990; Acts 1991, c. 55, § 1, eff. April 9, 1991; Acts 1997, c. 614, § 1, eff. Oct. 1, 1997; Acts 2000, c. 61, § 7, eff. April 25, 2000; Acts 2002, c. 157, § 2, eff. July 1, 2002; Acts 2002, c. 249, § 1, eff. Oct. 1, 2002; Acts 2004, c. 339, § 1, eff. Oct. 1, 2004; Acts 2006, c. 523, § 1, eff. July 1, 2006; Acts 2009, c. 60, §§ 1, 5, eff. April 14, 2009; Acts 2009, c. 304, § 1, eff. Oct. 1, 2009; Acts 2009, c. 314, § 1, eff. Oct. 1, 2009; Acts 2009, c. 315, § 1, eff. Oct. 1, 2009; Acts 2010, c. 72, § 1, eff. April 13, 2010.


**Formerly** Art. 43, § 250.


The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

▷

West's Annotated Code of Maryland Currentness
  Health Occupations (Refs & Annos)
    Title 12. Pharmacists and Pharmacies (Refs & Annos)
      Subtitle 1. Definitions; General Provisions (Refs & Annos)
      → **§ 12-101. Definitions**

<Section effective October 1, 2010. See, also, section effective through September 30, 2010.>

### Definitions

(a) In this title the following words have the meanings indicated.

### Authorized prescriber

(b) "Authorized prescriber" means any licensed dentist, licensed physician, licensed podiatrist, licensed veterinarian, certified nurse midwife to the extent permitted in § 8-601 of this article, certified nurse practitioner to the extent permitted in § 8-508 of this article, or other individual authorized by law to prescribe prescription or nonprescription drugs or devices.

### Board

(c) "Board" means the State Board of Pharmacy.

### Compounding

(d)(1) "Compounding" means the preparation, mixing, assembling, packaging, or labeling of a drug or device:

  (i) As the result of a practitioner's prescription drug order or initiative based on the practitioner/patient/pharmacist relationship in the course of professional practice; or

  (ii) For the purpose of, or incident to, research, teaching, or chemical analysis and not for the sale or dispensing of the drug or device.

(2) "Compounding" includes the preparation of drugs or devices in anticipation of a prescription drug order based on routine, regularly observed prescribing patterns.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Delegated pharmacy act

(e)(1) "Delegated pharmacy act" means activity that constitutes the practice of pharmacy delegated by a licensed pharmacist under this title and regulations adopted by the Board.

(2) "Delegated pharmacy act" does not include:

(i) An act within the parameters of a therapy management contract as provided under Subtitle 6A of this title;

(ii) The administration of an influenza vaccination in accordance with § 12-508 of this title;

(iii) The delegation of a pharmacy act by a registered pharmacy technician, pharmacy student, or pharmacy technician trainee;

(iv) A pharmacy activity performed by a pharmacy student in accordance with § 12-301(b) of this title;

(v) A pharmacy activity performed by an applicant for a license to practice pharmacy in accordance with regulations adopted by the Board; or

(vi) The performance of other functions prohibited in regulations adopted by the Board.

Device

(f)(1) "Device" means a device used in the diagnosis, treatment, or prevention of disease.

(2) "Device" does not include any:

(i) Surgical or dental instrument;

(ii) Physical therapy equipment;

(iii) X-ray apparatus; or

(iv) Component part or accessory of any of these items.

Direct supervision

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(g) "Direct supervision" means that a licensed pharmacist is physically available on-site to supervise the performance of delegated pharmacy acts.

### Dispense, dispensing

(h) "Dispense" or "dispensing" means the procedure which results in the receipt of a prescription or nonprescription drug or device by a patient or the patient's agent and which entails the:

  (1) Interpretation of an authorized prescriber's prescription for a drug or device;

  (2) Selection and labeling of the drug or device prescribed pursuant to that prescription; and

  (3) Measuring and packaging of the prescribed drug or device in accordance with State and federal laws.

### Distribute

(i)(1) "Distribute" means the process resulting in the provision of a prescription or nonprescription drug or device to a separate, intervening individual, licensed and practicing under this article, prior to administration of the provided drug or device to the patient pursuant to a prescription issued by an authorized prescriber.

  (2) "Distribute" does not include the operations of a person who holds a permit issued under § 12-6C-03 of this title.

### License

(j) "License" means, unless the context requires otherwise, a license issued to a pharmacist by the Board to practice pharmacy.

### Licensed pharmacist

(k) "Licensed pharmacist" means, unless the context requires otherwise, a pharmacist who is licensed by the Board to practice pharmacy.

### Nonprescription drug

(l) "Nonprescription drug" means a drug which may be sold without a prescription and which is labeled for use by the consumer in accordance with the requirements of the laws and regulations of this State and the federal government.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### Nonresident pharmacy

(m) "Nonresident pharmacy" means a pharmacy located outside this State that, in the normal course of business, as determined by the Board, ships, mails, or delivers drugs or devices to a person in this State pursuant to a prescription.

### Pharmaceutical care

(n) "Pharmaceutical care" means the provision of a patient's drug regimen for the purpose of achieving definite outcomes related to the cure or prevention of a disease, elimination or reduction of a patient's symptoms, or arresting or slowing of a disease process by identifying, resolving, or preventing actual or potential drug therapy problems and which may include patient counseling and providing information to licensed and certified health care providers.

### Pharmacist

(o) "Pharmacist" means an individual who practices pharmacy regardless of the location where the activities of practice are performed.

### Pharmacy

(p) "Pharmacy" means an establishment in which prescription or nonprescription drugs or devices are compounded, dispensed, or distributed.

### Pharmacy permit

(q) "Pharmacy permit" means a permit issued by the Board to establish and operate a pharmacy.

### Pharmacy student

(r) "Pharmacy student" means an individual who is enrolled as a student in a school or college of pharmacy approved by the Board or accredited by the Accreditation Council for Pharmacy Education.

### Pharmacy technician trainee

(s) "Pharmacy technician trainee" means an individual engaged in a Board approved pharmacy technician training program.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### Practice pharmacy

(t)(1) "Practice pharmacy" means to engage in any of the following activities:

(i) Providing pharmaceutical care;

(ii) Compounding, dispensing, or distributing prescription drugs or devices;

(iii) Compounding or dispensing nonprescription drugs or devices;

(iv) Monitoring prescriptions for prescription and nonprescription drugs or devices;

(v) Providing information, explanation, or recommendations to patients and health care practitioners about the safe and effective use of prescription or nonprescription drugs or devices;

(vi) Identifying and appraising problems concerning the use or monitoring of therapy with drugs or devices;

(vii) Administering an influenza vaccination, a vaccination for pneumococcal pneumonia or herpes zoster, or any vaccination that has been determined by the Board, with the agreement of the Board of Physicians and the Board of Nursing, to be in the best health interests of the community in accordance with § 12-508 of this title;

(viii) Delegating a pharmacy act to a registered pharmacy technician, pharmacy student, or an individual engaged in a Board approved pharmacy technician training program;

(ix) Supervising a delegated pharmacy act performed by a registered pharmacy technician, pharmacy student, or an individual engaged in a Board approved pharmacy technician training program; or

(x) Providing drug therapy management in accordance with § 19-713.6 of the Health--General Article.

(2) "Practice pharmacy" does not include the operations of a person who holds a permit issued under § 12-6C-03 of this title.

### Registered pharmacy technician

(u) "Registered pharmacy technician" means an individual who is registered with the Board to perform delegated pharmacy acts.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Registration

(v) "Registration" means, unless the context requires otherwise, a registration issued by the Board to perform delegated pharmacy acts under the supervision of a licensed pharmacist.

Supervision

(w) "Supervision" means reviewing the work, guiding and directing the activities, and monitoring the performance of an individual.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1981, c. 182, § 1, eff. July 1, 1981; Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1990, c. 283, § 1, eff. May 2, 1990; Acts 1990, c. 352, § 1, eff. July 1, 1990; Acts 1991, c. 55, § 1, eff. April 9, 1991; Acts 1997, c. 614, § 1, eff. Oct. 1, 1997; Acts 2000, c. 61, § 7, eff. April 25, 2000; Acts 2002, c. 157, § 2, eff. July 1, 2002; Acts 2002, c. 249, § 1, eff. Oct. 1, 2002; Acts 2004, c. 339, § 2, eff. June 1, 2008; Acts 2006, c. 523, § 2, eff. June 1, 2008; Acts 2009, c. 60, §§ 1, 5, eff. April 14, 2009; Acts 2009, c. 304, § 1, eff. Oct. 1, 2009; Acts 2009, c. 314, § 1, eff. Oct. 1, 2009; Acts 2009, c. 315, § 1, eff. Oct. 1, 2009; Acts 2010, c. 72, § 1, eff. April 13, 2010.

**Formerly** Art. 43, § 250.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw

C

West's Annotated Code of Maryland Currentness
  Health Occupations (Refs & Annos)
    Title 12. Pharmacists and Pharmacies (Refs & Annos)
      Subtitle 1. Definitions; General Provisions (Refs & Annos)
      → **§ 12-102. Right to practice pharmacy, pharmaceutical care**

Definitions

(a)(1) In this section the following terms have the meanings indicated.

(2) "In the public interest" means the dispensing of drugs or devices by a licensed dentist, physician, or podiatrist to a patient when a pharmacy is not conveniently available to the patient.

(3) "Personally preparing and dispensing" means that the licensed dentist, physician, or podiatrist:

  (i) Is physically present on the premises where the prescription is filled; and

  (ii) Performs a final check of the prescription before it is provided to the patient.

In general

(b) This title does not limit the right of an individual to practice a health occupation that the individual is authorized to practice under this article.

Preparation, dispensing of prescriptions, generally

(c) This title does not prohibit:

  (1) A licensed veterinarian from personally preparing and dispensing the veterinarian's prescriptions;

  (2) A licensed dentist, physician, or podiatrist from personally preparing and dispensing the dentist's, physician's, or podiatrist's prescriptions when:

    (i) The dentist, physician, or podiatrist:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

    1. Has applied to the board of licensure in this State which licensed the dentist, physician, or podiatrist;

    2. Has demonstrated to the satisfaction of that board that the dispensing of prescription drugs or devices by the dentist, physician, or podiatrist is in the public interest;

    3. Has received a written permit from that board to dispense prescription drugs or devices except that a written permit is not required in order to dispense starter dosages or samples without charge; and

    4. Posts a sign conspicuously positioned and readable regarding the process for resolving incorrectly filled prescriptions or includes written information regarding the process with each prescription dispensed;

(ii) The person for whom the drugs or devices are prescribed is a patient of the prescribing dentist, physician, or podiatrist;

(iii) The dentist, physician, or podiatrist does not have a substantial financial interest in a pharmacy; and

(iv) The dentist, physician, or podiatrist:

    1. Complies with the labeling requirements of § 12-505 of this title;

    2. Records the dispensing of the prescription drug or device on the patient's chart;

    3. Allows the Division of Drug Control to enter and inspect the dentist's, physician's, or podiatrist's office at all reasonable hours;

    4. Except for starter dosages or samples without charge, provides the patient with a written prescription, maintains prescription files in accordance with § 12-403(b)(13) of this title, and maintains a separate file for Schedule II prescriptions;

    5. Does not direct patients to a single pharmacist or pharmacy in accordance with § 12-403(b)(8) of this title; and

    6. Does not receive remuneration for referring patients to a pharmacist or pharmacy; or

(3) A hospital-based clinic from dispensing prescriptions to its patients.

Dispensing drugs, samples

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(d) This title does not prohibit:

  (1) A licensed veterinarian from personally dispensing a drug or device sample to a patient of the veterinarian; or

  (2) A licensed dentist, licensed physician, or licensed podiatrist from personally dispensing a drug or device sample to a patient of the licensed dentist, licensed physician, or licensed podiatrist if:

    (i) The sample complies with the labeling requirements of § 12-505 of this title;

    (ii) No charge is made for the sample; and

    (iii) The authorized prescriber enters an appropriate record in the patient's chart.

Administering prescription drugs

(e)(1) This title does not prohibit a dentist, physician, or podiatrist from administering a prescription drug or device in the course of treating a patient.

  (2) For the purposes of paragraph (1) of this subsection, "administering" means the direct introduction of a single dosage of a drug or device at a given time, whether by injection or other means, and whether in liquid, tablet, capsule, or other form.

Labeling requirements

(f)(1) This title does not prohibit a dentist, physician, or podiatrist from personally dispensing a starter dosage of a prescription drug or device to a patient of the dentist, physician, or podiatrist, provided that:

    (i) The starter dosage complies with the labeling requirements of § 12-505 of this title;

    (ii) No charge is made for the starter dosage; and

    (iii) The dentist, physician, or podiatrist enters an appropriate record on the patient's chart.

  (2) For the purposes of paragraph (1) of this subsection, "starter dosage" means an amount of drug or device sufficient to begin therapy:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(i) Of short duration of 72 hours or less; or

(ii) Prior to obtaining a larger quantity of the drug or device to complete the therapy.

### Medical facilities

(g) This title does not prohibit a dentist, physician, or podiatrist from dispensing a prescription drug or device in the course of treating a patient:

(1) At a medical facility or clinic that specializes in the treatment of medical cases reimbursable through workers' compensation insurance;

(2) At a medical facility or clinic that is operated on a nonprofit basis;

(3) At a health center that operates on a campus of an institution of higher education; or

(4) At a public health facility, a medical facility under contract with a State or local health department, or a facility funded with public funds.

### General merchants

(h) This title does not limit the right of a general merchant to sell:

(1) Any nonprescription drug or device;

(2) Any commonly used household or domestic remedy; or

(3) Any farm remedy or ingredient for a spraying solution, in bulk or otherwise.

### Dispensing permits

(i) A dentist, physician, or podiatrist who fails to comply with the provisions of this section governing the dispensing of prescription drugs or devices shall:

(1) Have the dispensing permit revoked; and

(2) Be subject to disciplinary actions by the appropriate licensing board.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1986, c. 691, §§ 1, 2, eff. Jan. 1, 1987; Acts 1987, c. 11, § 1, eff. April 2, 1987; Acts 1989, c. 608, § 1, eff. July 1, 1989; Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1991, c. 21, § 3, eff. Oct. 1, 1991; Acts 1997, c. 614, § 1, eff. Oct. 1, 1997; Acts 1998, c. 21, § 1, eff. April 14, 1998; Acts 2009. c. 45. § 1, eff. Oct. 1, 2009.

**Formerly** Art. 43, §§ 249, 271.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

West's Annotated Code of Maryland Currentness
    Health Occupations
        ⌐▣ Title 12. Pharmacists and Pharmacies
        ⌐▣ Subtitle 2. State Board of Pharmacy

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw

C

West's Annotated Code of Maryland Currentness
    Health Occupations (Refs & Annos)
        Title 12. Pharmacists and Pharmacies (Refs & Annos)
            Subtitle 2. State Board of Pharmacy (Refs & Annos)
            → § 12-201. State Board of Pharmacy

There is a State Board of Pharmacy in the Department.


CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 2002, c. 157, § 2, eff. July 1, 2002.


**Formerly** Art. 43, § 257.


The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

C

West's Annotated Code of Maryland Currentness
  Health Occupations (Refs & Annos)
    ʳ🔲 Title 12. Pharmacists and Pharmacies (Refs & Annos)
      ʳ🔲 Subtitle 2. State Board of Pharmacy (Refs & Annos)
        → **§ 12-202. Board members**

Composition

(a)(1) The Board consists of twelve members.

(2) Of the twelve Board members:

(i) Ten shall be licensed pharmacists, including:

1. Two who at the time of appointment practice primarily in chain store pharmacies;

2. Two who at the time of appointment practice primarily in independent pharmacies;

3. Two who at the time of appointment practice primarily in an acute-care hospital;

4. One who at the time of appointment practices primarily in a pharmacy that provides services to a long-term care facility;

5. One who at the time of appointment practices primarily in a pharmacy that specializes in the provision of home infusion/home care services; and

6. Two pharmacists at-large; and

(ii) Two shall be consumer members.

(3)(i) The Governor shall appoint the chain store pharmacist members, with the advice of the Secretary, from a list of names submitted to the Secretary and the Governor by the Maryland Association of Chain Drug Stores.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(ii) The Governor shall appoint the independent pharmacist members, with the advice of the Secretary, from a list of names submitted to the Secretary and the Governor by the Maryland Pharmacists Association and the Maryland Pharmaceutical Society.

(iii) The Governor shall appoint the acute-care hospital pharmacist members, with the advice of the Secretary, from a list of names submitted to the Secretary and the Governor by the Maryland Society of Health-System Pharmacists.

(iv) The Governor shall appoint the long-term care facility pharmacist member, with the advice of the Secretary, from a list of names submitted to the Secretary and the Governor by the Maryland Chapter of the American Society of Consultant Pharmacists.

(v) The Governor shall appoint the home infusion/home care pharmacist member, with the advice of the Secretary, from a list of names submitted to the Secretary and the Governor by the Maryland Society of Health-System Pharmacists.

(vi) The Governor shall appoint the at-large pharmacist members, with the advice of the Secretary, from a list of all names submitted to the Maryland Pharmacists Association, and then forwarded to the Secretary and the Governor.

(vii) Except for the at-large vacancies, the number of names on each list submitted to the Secretary and the Governor under this paragraph shall be three times the number of vacancies.

(4) For each pharmacist vacancy:

(i) The Board shall notify all licensed pharmacists and other interested parties of record in the State of the vacancy to solicit nominations to fill the vacancy and provide information for contacting a representative of the group that submits the list of names to the Governor under paragraph (3) of this subsection; and

(ii) Except for the at-large vacancies, each association that is responsible for submitting a list of nominees to the Secretary and the Governor under this section shall:

1. Issue a nomination form upon the request of any licensed pharmacist and consider all nominations received by the association's deadline;

2. Form a committee, which recognizes diversity within the State in geographic distribution, sex, race, and age, comprised of at least five pharmacists to review nominations, interview all qualified nominees in a meeting open to the public, and select three names for each vacancy to be submitted to the Secretary and the Governor; and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

3. In the event that fewer than three qualified nominees are submitted to the association, select any additional names that are needed to complete the list required to be submitted to the Secretary and the Governor under this section.

(5) The Governor shall appoint the consumer members with the advice of the Secretary and the advice and consent of the Senate.

(6) Each member of the Board shall be a resident of this State.

(7) A member of the Board shall be recused from all aspects of the licensing exam if that Board member:

(i) Is a member of the board of trustees at a school of pharmacy;

(ii) Is a teacher at a school of pharmacy; or

(iii) Acquires the member's primary source of income through employment by a school of pharmacy.

Pharmacist members

(b) Each pharmacist member of the Board shall:

(1) Be skilled and competent in practicing pharmacy; and

(2) Have at least 5 years of active pharmacy practice.

Consumer members

(c) Each consumer member of the Board:

(1) Shall be a member of the general public;

(2) May not be or ever have been a pharmacist or in training to become a pharmacist;

(3) May not have a household member who is a pharmacist or in training to become a pharmacist;

(4) May not participate or ever have participated in a commercial or professional field related to practicing pharmacy;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(5) May not have a household member who participates in a commercial or professional field related to practicing pharmacy; and

(6) May not have had within 2 years before appointment a substantial financial interest in a person regulated by the Board.

### Financial interests

(d) While a member of the Board, a consumer member may not have a substantial financial interest in a person regulated by the Board.

### Oath

(e) Before taking office, each appointee to the Board shall take the oath required by Article I, § 9 of the Maryland Constitution.

### Term

(f)(1) The term of a member is 4 years.

(2) The terms of members are staggered as required by the terms provided for members of the Board on July 1, 1981.

(3) At the end of a term, a member continues to serve until a successor is appointed and qualifies.

(4) A member who is appointed after a term has begun serves only for the rest of the term and until a successor is appointed and qualifies.

(5) To the extent practicable, the Governor shall fill any vacancy on the Board within 60 days of the date of the vacancy.

(6) A member may not serve more than 2 consecutive full terms.

### Removal

(g)(1) The Governor may remove a member for incompetence or misconduct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2) Upon the recommendation of the Secretary, the Governor may remove a member whom the Secretary finds to have been absent from 2 successive Board meetings without adequate reason.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1992, c. 325, § 1, eff. July 1, 1992; Acts 1992, c. 433, § 1, eff. Oct. 1, 1992; Acts 1992, c. 434, § 1, eff. Oct. 1, 1992; Acts 1993, c. 5, § 1, eff. April 13, 1993; Acts 1997, c. 530, § 1, eff. Oct. 1, 1997; Acts 1998, c. 21, § 1, eff. April 14, 1998; Acts 2009, c. 60, § 5, eff. April 14, 2009.

**Formerly** Art. 43, § 257.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw

West's Annotated Code of Maryland Currentness
  Health Occupations (Refs & Annos)
     Title 12. Pharmacists and Pharmacies (Refs & Annos)
       Subtitle 2. State Board of Pharmacy (Refs & Annos)
         → § 12-203. Officers

In general

(a) From among its pharmacist members, the Board annually shall elect a president, a secretary, and a treasurer.

Election and duties

(b) The Board shall determine:

    (1) The manner of election of officers; and

    (2) The duties of each officer.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1992, c. 433, § 1, eff. Oct. 1, 1992.

**Formerly** Art. 43, § 258.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

West's Annotated Code of Maryland Currentness
    Health Occupations (Refs & Annos)
        ⚑ Title 12. Pharmacists and Pharmacies (Refs & Annos)
        ⚑ Subtitle 2. State Board of Pharmacy (Refs & Annos)
        ➡ **§ 12-204. Meetings, compensation, and staff**

### In general

(a) A majority of the members then serving on the Board is a quorum to do business.

### Time and location of meetings

(b) The Board shall determine the times and places of its meetings.

### Compensation and reimbursement for expenses

(c) Each member of the Board is entitled to:

(1) Compensation in accordance with the budget of the Board; and

(2) Reimbursement for expenses at a rate determined by the Board.

### Staff

(d)(1) The Board may employ a staff in accordance with the budget of the Board.

(2) The Board may designate 1 of its staff as an executive director.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1984, c. 112, § 1, eff. July 1, 1984; Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1992, c. 272, § 1, eff. July 1, 1992.

**Formerly** Art. 43, § 259.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

C

West's Annotated Code of Maryland Currentness
  Health Occupations (Refs & Annos)
    Title 12. Pharmacists and Pharmacies (Refs & Annos)
      Subtitle 2. State Board of Pharmacy (Refs & Annos)
    → **§ 12-205. Additional powers and duties of Board**

### In general

(a) In addition to the powers set forth elsewhere in this title, the Board may adopt:

(1) Rules and bylaws that are necessary to do its business;

(2) Rules and regulations to carry out the provisions of this title;

(3) Rules and regulations that are necessary to protect the public health, safety, and welfare and that establish standards for practicing pharmacy and operating pharmacies, including rules and regulations that govern:

(i) Methods of advertising and promotion; and

(ii) Standards for filling and refilling prescriptions; and

(4) A code of conduct that specifies which behaviors are either required or prohibited in the practice of pharmacy.

### Recordkeeping requirements

(b) In addition to the duties set forth elsewhere in this title, the Board shall:

(1) Keep a record that includes:

(i) The name and place of the business or the home address of each licensed pharmacist and each registered pharmacy technician;

(ii) The facts concerning the issuance of that pharmacist's license; and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(iii) The facts concerning the issuance of that pharmacy technician's registration;

(2) Prepare and deliver to the Governor, the Secretary, and the Maryland Pharmacists Association an annual report that:

(i) Summarizes the condition of pharmacy in this State; and

(ii) Includes a record of the proceedings of the Board; and

(3) Disclose any information contained in a record to any health occupations regulatory board or agency of this State or another state if the health occupations regulatory board or agency of this State or another state requests the information in writing.

### Public information, protection

(c) In addition to the duties set forth elsewhere in this title, the Board may initiate such programs and projects as deemed necessary to inform or protect the public.

### Examinations

(d)(1) The Board shall adopt standards for approving examinations under § 12-6B-02(b)(4) of this title.

(2) The Board shall approve any examination that meets the standards adopted under paragraph (1) of this subsection including:

(i) Employer based pharmacy technician examinations;

(ii) Nationally recognized pharmacy technician examinations; and

(iii) Examinations for certification as a pharmacy technician.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1985, c. 220, § 1, eff. July 1, 1985; Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1997, c. 615, § 1, eff. Oct. 1, 1997; Acts 2006, c. 523, § 3, eff. July 1, 2006.

**Formerly** Art. 43, §§ 258, 268.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

C

West's Annotated Code of Maryland Currentness
　　Health Occupations (Refs & Annos)
　　　　Title 12. Pharmacists and Pharmacies (Refs & Annos)
　　　　　　Subtitle 3. Licensing (Refs & Annos)
　→ **§ 12-308. Expiration, renewal of license**

### In general

(a)(1) A license expires on the date set by the Board unless it is renewed for an additional term as provided in this section.

(2) A license may not be renewed for a term longer than 2 years.

### Renewal notice

(b)(1) Except as provided in paragraph (2) of this subsection, the Board shall send to each licensee, at least 1 month before a license expires, a renewal notice by first-class mail to the last known address of the licensee.

(2) If requested by a licensee, the Board shall send to the licensee, at least two times within the month before a license expires, a renewal notice by electronic means to the last known electronic address of the licensee.

(3) If a renewal notice sent by electronic means under paragraph (2) of this subsection is returned to the Board as undeliverable, the Board shall send to the licensee a renewal notice by first-class mail to the last known address of the licensee.

(4) A renewal notice sent under this subsection shall state:

(i) The date on which the current license expires;

(ii) The date by which the renewal application must be received by the Board for the renewal to be issued and mailed before the license expires; and

(iii) The amount of the renewal fee.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

West's Annotated Code of Maryland Currentness
    Health Occupations
        ⌐▦ Title 12. Pharmacists and Pharmacies
        ⌐▦ Subtitle 3. Licensing

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to
117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479,
589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

C

West's Annotated Code of Maryland Currentness
   Health Occupations (Refs & Annos)
      Title 12. Pharmacists and Pharmacies (Refs & Annos)
         Subtitle 3. Licensing (Refs & Annos)
         → **§ 12-301. License requirements**

### In general

(a) Except as otherwise provided in this title, an individual shall be licensed by the Board before the individual may practice pharmacy in this State.

### Experiential learning programs

(b) This section does not apply to a pharmacy student participating in an experiential learning program of a college or school of pharmacy under the supervision of a licensed pharmacist.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1997, c. 614, § 1, eff. Oct. 1, 1997; Acts 2006, c. 523, § 3, eff. July 1, 2006.

**Formerly** Art. 43, §§ 249, 250.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

West's Annotated Code of Maryland Currentness
  Health Occupations (Refs & Annos)
    Title 12. Pharmacists and Pharmacies (Refs & Annos)
      Subtitle 3. Licensing (Refs & Annos)
      → **§ 12-302. License qualifications**

### In general

(a) To qualify for a license, an applicant shall be an individual who meets the requirements of this section.

### Good moral character

(b) The applicant shall be of good moral character.

### Age

(c) The applicant shall be at least 18 years old.

### Education

(d) The applicant shall:

  (1) Be a graduate of a school or college of pharmacy that is approved by the Board or accredited by the American Council on Pharmaceutical Education; and

  (2) Have completed the professional experience program that the Board requires.

### Examination

(e) Except as otherwise provided in this title, the applicant shall pass an examination given by the Board under this subtitle.

### Foreign schools

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(f)(1) In this subsection, "foreign school or college of pharmacy" means a school or college of pharmacy that is not located in any state in the United States.

(2) The Board may waive the requirements of subsection (d)(1) of this section for an applicant who is a graduate of a foreign school or college of pharmacy, provided that the applicant passes an examination approved by the Board in addition to the examinations otherwise given by the Board under this subtitle.

Oral competency

(g)(1) The Board shall require, as part of its examination or licensing procedures, an applicant for a license to practice pharmacy to demonstrate an oral competency in the English language by passing a Board approved standardized test of oral competency.

(2) The Board shall adopt regulations that establish a procedure for testing an individual who because of the individual's speech or hearing impairment is unable to complete satisfactorily a Board approved standardized test of oral competency.

(3) If any disciplinary charge or action that relates to a problem with the oral communication of the English language is brought against a licensee under this title, the Board shall require the licensee to pass a Board approved standardized test of oral competency.

(4) The Board may not require an applicant for a license to practice pharmacy, who was previously licensed in another state to practice pharmacy, to demonstrate an oral competency in the English language, if the other state's examination and licensing procedures at the time the applicant was licensed in the other state included an oral competency component similar to the oral competency component in this State's examination and licensing procedures.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1996, c. 511, § 1, eff. Oct. 1, 1996; Acts 1997, c. 614, § 1, eff. Oct. 1, 1997.

**Formerly** Art. 43, § 261.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

C

West's Annotated Code of Maryland Currentness
   Health Occupations (Refs & Annos)
     Title 12. Pharmacists and Pharmacies (Refs & Annos)
       Subtitle 3. Licensing (Refs & Annos)
        → **§ 12-307. Practice of pharmacy, authorized activities**

In general

(a) A license authorizes the licensee to practice pharmacy while the license is effective.

(b) Except as otherwise provided in this section, a pharmacist may engage in dispensing or distributing only from a pharmacy holding a pharmacy permit issued by the Board.

(c)(1) Pursuant to regulations adopted by the Board, a licensed pharmacist may engage in dispensing or distributing from a setting not holding a pharmacy permit only upon receiving the prior approval of the Board.

   (2) The Board shall adopt regulations that authorize a pharmacist to dispense or distribute from a remote location for the benefit of a health care facility that uses a remote automated medication system in accordance with § 12-605 of this title.

Delegation of duties

(d) A licensed pharmacist may delegate pharmacy acts to a registered pharmacy technician, pharmacy student, or pharmacy technician trainee provided that the delegated pharmacy acts:

   (1) Are directly supervised by a licensed pharmacist;

   (2) Are not required to be performed by a licensed pharmacist;

   (3) Are within the education, training, experience, and area of practice of the delegating licensed pharmacist; and

   (4) Are appropriate to the education, training, and experience of the registered pharmacy technician, pharmacy student, or pharmacy technician trainee.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1990, c. 6, § 11, eff. Feb. 16, 1990; Acts 1997, c. 614, § 1, eff. Oct. 1, 1997; Acts 2006, c. 523. § 3, eff. July 1, 2006; Acts 2008, c. 215, § 1, eff. June 1, 2008; Acts 2008. c. 216. § 1. eff. June 1, 2008.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw

c

West's Annotated Code of Maryland Currentness
    Health Occupations (Refs & Annos)
        Title 12. Pharmacists and Pharmacies (Refs & Annos)
            Subtitle 4. Pharmacy Permits (Refs & Annos)
            → **§ 12-404. Pharmacy permits; applications**

### In general

(a) To apply for a pharmacy permit, an applicant shall:


    (1) Submit an application to the Board on the form that the Board requires; and


    (2) Pay to the Board an application fee set by the Board.


### Multiple permits

(b) For each pharmacy permit for which a person applies, the person shall submit a separate application and pay a separate application fee.


CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1989, c. 562; Acts 1990, c. 6, § 11, eff. Feb. 16, 1990.


**Formerly** Art. 43, § 268.


The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

c

West's Annotated Code of Maryland Currentness
    Health Occupations (Refs & Annos)
        Title 12. Pharmacists and Pharmacies (Refs & Annos)
        Subtitle 4. Pharmacy Permits (Refs & Annos)
            → § 12-406. Pharmacy permits; authorized activities

A pharmacy permit authorizes the pharmacy permit holder to establish and operate the pharmacy while the pharmacy permit is effective.

CREDIT(S)

Added by Acts 1981, c. 8, § 2, eff. July 1, 1981. Amended by Acts 1990, c. 6, § 11, eff. Feb. 16, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 8

## MISSION STATEMENT

To protect Maryland consumers and to promote quality healthcare in the field of pharmacy through licensing pharmacists and registering pharmacy technicians, issuing permits to pharmacies and distributors, setting pharmacy practice standards and through developing and enforcing regulations and legislation, resolving complaints, and educating the public.

EXHIBIT 9

Capital Reporting Company
L. Anuszweski

Page 1

IN THE CIRCUIT COURT OF MARYLAND

FOR BALTIMORE COUNTY

**CONFIDENTIAL**

-------------------------------------:

FELDMAN'S MEDICAL CENTER PHARMACY,

INC.,                                 **ORIGINAL**

                                      :

            Plaintiff,                :

      vs.                             :Case No.

                                      :

CAREFIRST, INC.,                      :03C09006257

                                      :

            Defendant.                :

-------------------------------------:

                    Baltimore, Maryland

                Tuesday, October 13, 2009

Deposition of:

      LISA ANUSZEWSKI

called for oral examination by counsel for

Plaintiff, pursuant to notice, at Baroody &

O'Toole, 201 North Charles Street, Suite 2102,

Baltimore, Maryland, before Kellie Scott, of

Capital Reporting Company, a Notary Public in and

for the State of Maryland, beginning at 10:07 a.m.,

when were present on behalf of the respective

parties:

**Capital Reporting Company**
**L. Anuszweski**

Page 11

1     Q.  I'm sorry.  Before that you worked at

2  CIGNA?

3     A.  That's correct.

4     Q.  And what did you do at CIGNA?

5     A.  Contracting implementation manager.

6     Q.  Now, you said you started at CareFirst in

7  2007.

8     A.  Yes.

9     Q.  What was your title then?

10     A.  Senior reimbursement analyst.

11     Q.  And what was your role?

12     A.  I performed analysis for the contract

13  managers for any negotiation that was occurring, so

14  I did the financial analysis.

15     Q.  And could you just explain a little more

16  about what that means?

17     A.  Sure.  When a provider requests to

18  negotiate their contract, there's an analysis

19  performed on prior years utilization and then the

20  impact of what we think the request will be.  So

21  it's determining the financial impact of any

22  negotiation.

Page 12

1     Q.  Okay.  And how long did you have that

2  position?

3     A.  I was there for about a year.

4     Q.  Until when?

5     A.  2008.

6     Q.  And then what?

7     A.  I moved to a contract manager position in

8  institutional contracting.

9     Q.  And what are your responsibilities -- is

10  that your position now?

11     A.  That's correct.

12     Q.  What are your responsibilities as a

13  contracting manager?

14     A.  I handle several types of institutional

15  contracts, skilled nursing facility, home health

16  hospice, durable medical equipment, home infusion

17  therapy, specialty pharmacy.  I handle the entire

18  contract from the start of the contract where we're

19  actually generating the agreements to any

20  amendments and rate negotiations.

21     Q.  Now, you say that you handle institutional

22  contracting.  Is there another division that

**Capital Reporting Company**
**L. Anuszweski**

Page 13

1   handles a different kind of contracting?

2      A.  Yes.  There's one area that handles

3   professional contracts, which is typically

4   physician contracts.

5      Q.  Okay.  And you said you report to Ms.

6   Colbert?

7      A.  Yes.

8      Q.  And who does Ms. Colbert report?

9      A.  Stacy Breidstein.

10     Q.  And what's her title?

11     A.  ABP.

12     Q.  And other than yourself and Ms. Colbert,

13  who else is in your group?

14     A.  There's other contract managers.  There's

15  three other contract managers.

16     Q.  And what are their names?

17     A.  James Doty, Andrea Ponykala and Emily

18  Hoopes, and then we have three support staff on the

19  team.

20     Q.  Do you know whether any of those three

21  individuals had any involvement at all with

22  Feldman's Medical Center?

**Capital Reporting Company**
**L. Anuszweski**

Page 40

1          MR. DE GRAVELLES:  Are you saying that's

2     in response to what appears above it?

3          MR. BECKER:  It's a chain of --

4          MR. DE GRAVELLES:  Yeah, in a chain of

5     emails, the latter goes on top.  You said, "You

6     wrote back."

7          MR. BECKER:  Withdrawn.

8     BY MR. BECKER:

9          Q.  Was the email at the bottom of the page

10    sent before or after the piece at the top?  Do you

11    know?

12         A.  I don't know.  Janet's email isn't date

13    and time stamped.

14         Q.  What's JCAHO?

15         A.  The Joint Commission.

16         Q.  What's the Joint Commission?

17         A.  It's an accreditation body.

18         Q.  And is that a Maryland entity, or is that

19    national?

20         A.  National.

21         Q.  And is that an entity that CareFirst uses

22    to review or assist in reviewing credentialing?

Page 41

1     A.  We don't use them, per se.  We require our

2   providers to be accredited, and JCAHO is one of the

3   accreditation bodies.

4          MR. BECKER:  Okay.  Let's mark this next

5   document as Exhibit 4.

6          (Anuszewski Exhibit Number 4 was marked

7          for identification.)

8   BY MR. BECKER:

9     Q.  This appears to be a chain of emails which

10  start on the second page, July 29th, 2008 from

11  Nurys Puente, and then at the bottom of the first

12  page there's an email from Nurys Puente and it

13  appears to be going to Mr. Onorato.

14         Do you see that?

15    A.  Yes.

16    Q.  And then -- I'm sorry -- from the bottom

17  of the first page it appears there's an email from

18  Mr. Onorato to Ms. Puente.

19         Do you know who Ms. Puente is by the way?

20    A.  Yes.

21    Q.  Who is she?

22    A.  She works for Factor Health Management.

EXHIBIT 10

1

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MARYLAND

- - - - - - - - - - - - - - -:
FELDMAN'S MEDICAL CENTER       :
PHARMACY INC.,                 :
                               :
            Plaintiff,         :
                               :
     vs.                       :Case No.:
                               :03-C-09-006257
CAREFIRST AND JOHN DOES 1      :
AND 2,                         :
                               :
            Defendants.        :
- - - - - - - - - - - - - - -:
                               Baltimore, Maryland

                               Monday, March 8, 2010


Deposition of:



            JAIME HANSON

called for oral examination by counsel for the

Plaintiff, pursuant to notice, at the Law Offices of

Baroody and O'Toole, 201 North Charles Street, Suite

2102, Baltimore, Maryland, before Diane Humke, a

Notary Public in and for the State of Maryland,

beginning at 10:15 a.m., when were present on behalf

of the respective parties:

Capital Reporting Company
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

5

```
1              P R O C E E D I N G S

2   WHEREUPON,

3                  JAIME HANSON

4   called as a witness, and after having been first duly

5   sworn, was examined and testified as follows:

6               EXAMINATION BY COUNSEL FOR THE PLAINTIFF

7               BY MR. BECKER:

8        Q    Can you please state your name and business

9   address, please?

10       A    Jaime Hanson, J-A-I-M-E H-A-N-S-O-N and

11  business address is 10455 Mill Run Circle, Owings

12  Mills, Maryland 21117.

13       Q    Thank you.

14           MR. BECKER:  Can we mark this as Hanson Exhibit

15           number 1?

16               (Hanson Exhibit 1 was marked for

17               identification.)

18           BY MR. BECKER:

19       Q    Ms. Hanson, have you ever seen that document

20  before?

21       A    I have.

22       Q    When did you see this?
```

Capital Reporting Company
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

6

1     A     A couple of months ago.

2     Q     Did you provide your attorney documents to

3 produce in connection with this document, Exhibit

4 number

5 1?

6     A     Not specifically for this document. I had

7 already produced documents that fulfilled this.

8     Q     We should identify this document. This is a

9 notice of deposition, correct?

10     A     Yes.

11     Q     And attached to it on the last page is a

12 subpoena?

13     A     Yes.

14     Q     And it asks you if you look on the last page

15 to produce all documents, correspondence including

16 internal correspondence and communications including

17 electronic mail concerning they're relating to any

18 investigation of Carefirst or any investigation by

19 Carefirst or any other entity of Feldman's and/or

20 Factor Health Management. Do you see that?

21     A     Uh-huh.

22     Q     So you're saying you didn't produce any

Capital Reporting Company
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

7

1   documents in the context of -- in response to this

2   Exhibit number 1?

3        A     Not specifically.

4        Q     But you've previously produced documents to

5   your attorneys?

6        A     Yes.

7        Q     And they were documents that would fit into

8   those categories?

9        A     Yes.

10       Q     Correspondence including internal

11   correspondence?

12       A     Yes.

13       Q     And any communications, e-mails or other

14   documents relating to any investigation of Feldman's

15   and/or Factor Health Management?

16       A     Yes.

17       Q     Did you prepare any reports relating to

18   Feldman's, Factor Health Management or FCS Pharmacy?

19       A     Specifically reports?

20       Q     Yes.

21       A     Regarding?

22       Q     Any of those entities.

13

1     Q     Does he fit the same level of Ms. Foreman,

2  above Ms. Foreman, below Ms. Foreman in the hierarchy?

3     A     He would be below Ms. Foreman, but does not

4  report to her.

5     Q     And he's in the DC office?

6     A     Yes.

7     Q     And everybody else we've talked about, Ms.

8  Foreman, Ms. Trenzia and Ms. Skeller; are they all in

9  the Owings Mills' office?

10    A     They're physically located there.

11    Q     As opposed to what when you say they're

12  physically located there?

13    A     Bill would report to Andrea and ultimately

14  to Gwen, but he does not report to Betty.

15    Q     That's okay. I understand.

16          Did you work on any investigation relating to

17  Factor Health Management, FCS Pharmacy or Feldman's?

18    A     Yes.

19    Q     Can you tell me which of those entities you

20  had any role looking into?

21    A     All of them.

22    Q     Onto than yourself, and I believe we've

14

1   identified Ms. Foreman has worked on those -- on the

2   investigation of those entities, anybody else involved

3   in working on the investigation of any of those three

4   entities?

5        A      Bill did work on -- he worked on a group

6   audit.

7        Q      And what group audit was that?

8        A      Related to Rupal Productions. One of his

9   auditors started that group audit.

10       Q      And who was that?

11       A      Maria Powl.

12       Q      Were you involved in any audits of Rupal

13  Productions?

14       A      Yes.

15       Q      Why were you investigating Rupal Productions?

16       A      Because they were affiliated with FCS.

17       Q      And why would that cause you to do an

18  investigation simply because they were affiliated with

19  that pharmacy?

20       A      Because it all rolled up into the same part.

21  It all rolled up into the same general investigation.

22       Q      At what point did you first get involved in

15

1  any investigation of any of the entities we talked

2  about, Rupal Care -- excuse me; Rupal, Feldman's, FCS

3  Pharmacy, Factor Health Management?

4       A     I don't remember the exact date or time.

5       Q     Do you recall how it came to pass?

6       A     We received a memo from the group

7  (inaudible) discussing a scheme involving Factor

8  products.

9       Q     Do you recall what that scheme was about

10  allegedly?

11      A     It talked about a large group -- I believe

12  it specified Factor Health on hiring people with

13  hemophilia, involving them in the group and then

14  selling them product.

15      Q     Are you aware of any reason why it would be

16  improper for a company to hire hemophiliacs and then

17  sell product to them?

18      A     It talked about the propensity to bill more

19  than what's actually being utilized.

20      Q     And that was what to your knowledge started

21  the investigation?

22      A     Yes.

16

1    Q    How did you get a copy of this memo?

2    A     It was given to me by my boss.

3    Q    Which boss was that?

4    A     Betty.

5    Q    Did she direct you to begin an investigation?

6    A     Yes, she asked me to look into it.

7    Q    And do you have any recollection as to what

8  year this was?

9    A     I want to say the end of '96, but I'm not

10  certain.

11    Q    And --

12    A     Could be the end of '97.

13    Q    You think it was in 1997 that this

14  investigation started?

15    A     I think it was. Towards the last quarter.

16    Q    How long did that investigation last?

17    A     It's still ongoing.

18    Q    It's still ongoing. So it's been going on for

19  thirteen years?

20    A     Oh my gosh. 2007. I'm sorry.

21    Q    Okay. Just trying to clarify.

22    A     I'm sorry. It's been a while.

Capital Reporting Company
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

17

1      Q      What -- so Ms. Foreman -- we've established

2   that Ms. Foreman directed you to perform the

3   investigation. Did she tell you anything specific to do

4   or to look for?

5      A      She handed me this memo and asked me to look

6   into it. It's typical when we get memos like that.

7      Q      What did you do next?

8      A      I looked at the group of --

9      Q      This is Rupal you were looking at?

10     A      Yeah, I believe -- we ran data on our

11  Factor-8 utilization and we noticed that the high

12  utilizes all worked -- most of them worked for Rupal

13  Productions. There was a large cluster of our part for

14  high utilizes worked for Rupal, which caused us to

15  focus on that group. We pulled documentation for a

16  large sample of patients from all groups. I think I

17  probably looked at - - I probably looked at five

18  different groups who were purchasing Factor-8 from

19  small pharmacies. I also looked at a couple of the

20  large pharmacies, the -- I'm trying to think of the

21  best word. The national pharmacies. I tried to look at

22  several pharmacies among the patient utilization, but

18

1    Factor Health or FCS Pharmacy stood out as having all

2    of their product being purchased by people at Rupal and

3    that was a trend that was a warning to us.

4        Q     Who else internally did you communicate with

5    about this investigation?

6        A     Bill assisted me with getting some claims

7    information and Betty and Andrea. We received -- at the

8    same time we -- within a month or so of starting to

9    look at this, we received information from our

10   actuarial group also flagging Rupal as having a very

11   high utilization, which is not uncommon. We get a lot

12   of tips from other areas when they see -- like our

13   sales areas. The actuarial area will say when they have

14   a flag and would like us to look at a group. So while

15   we had to communicate memos to Gwen, we also had to I

16   believe send out a memo to the actuary -- the chief

17   actuary to let him know that we were looking at this

18   and at some point, we brought our pharmacy management

19   into the picture for guidance and to let them know what

20   we were doing in case they could come up with any ideas

21   to help us get a better grip on managing the high

22   dollars cost.

19

1      Q      Have you produced copies of the documents

2    that you refer to? The reports?

3      A      Yes.

4      Q      At this point, the investigation is focusing

5    on FCS pharmacy and Rupal?

6      A      Yes.

7      Q      Not Feldman's?

8      A      Not at the beginning. Feldman's came into

9    play later.

10      Q      With respect to your investigation of Rupal

11    and FCS Pharmacy, has that investigation come to a

12    close?

13      A      Not an official closing. Rupal had gone out

14    of business. Most of their employees had left our group

15    coverage. It's still out there pending. If we were to

16    get any claims, they should stop in the system.

17      Q      Was there ever any determination that there

18    was any wrongdoing involved?

19      A      Nothing concrete, no.

20      Q      When you say if any additional claims come

21    in, they'll be stopped? Is that what you said?

22      A      We flag claims so that we can review them

20

1   before they're finalized.

2        Q     When you say flag them, how does that work?

3        A     It's a pends that special investigations can

4   place in the system at a member level or a provider

5   level.

6        Q     To your knowledge, what pends are currently

7   in the system relating to -- let's just start with FHM

8   or FCS Pharmacy?

9        A     FCS pharmacy I believe we had pends at the

10   patient level because we could not place it at the

11   pharmacy level and we just asked for medical records or

12   pharmacy records including the standard documentation

13   that would need to be sent in with a claim so that we

14   can review leading logs and lot numbers and things

15   along those lines just to make sure the documentation

16   is agreeing with the medical necessity.

17       Q     Do you have the ability to put the hold on

18   claims or does somebody else in the hierarchy?

19       A     We cannot go into the system -- I cannot go

20   into the system and pend a claim. I have to ask for it

21   to be done.

22       Q     Who do you ask?

Capital Reporting Company
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

21

1    A      It depends on the system. We have contacts.

2   We send e-mails to various people based on the system.

3   I think Bill may be able to pend certain systems and

4   then we go to other people. We send e-mails based on

5   policies or standard operating procedures.

6    Q    What system are you referring to?

7    A      We have several different processing

8   systems. We have a local system called Care, national

9   system called Nasco and another system called Flax.

10   Q    As to FCS pharmacy, what systems are they

11  being -- are claims being held -- that's a terrible

12  question.

13        With respect to FCS pharmacy, are there holds

14  in all of the systems, some of the systems to your

15  knowledge?

16   A      I believe they only had patients on the Flax

17  system.

18   Q    When you want to put a hold on a system, you

19  send an e-mail to somebody and request it?

20   A    But it has to be approved by management.

21   Q    Who has to approve your request for holds?

22   A      Normally Betty and with a case like this,

**Capital Reporting Company**
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

22

1   Andrea would be aware of it as well.

2        Q     Who approved the hold with respect to FCS?

3        A     I can't remember.

4        Q     But it was approved?

5        A     Yes.

6        Q     Is there a difference between a pre-payment

7   review and a hold?

8        A     (Inaudible) and it's a pend.

9        Q     Does that mean when a claim is inputting to

10  the system, it gets flagged and kicked out and doesn't

11  proceed through to the end of processing?

12       A     It doesn't kick out. It just pends and it

13  means that the examiner routes the claim to special

14  investigations and asks us to look at it and approve

15  it.

16       Q     As with respect to Feldman's, are you aware

17  of any holds or pends with respect to their claims?

18       A     Yes, we pended all of their Factor-8 claims

19  or Factor claims period.

20       Q     Which system was that in?

21       A     I believe all of the systems.

22       Q     Why was that pend put on?

Capital Reporting Company
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

23

1      A      Because they're not an approved ID provider.

2      Q      Who made a determination that they're not an

3 approved ID provider?

4      A      That's part of our contracting and

5 credentialing areas review. We (Inaudible)

6      Q      The pend that's put on Feldman's claims was

7 not put in by SIU?

8      A      It was put in by SIU.

9      Q      It was?

10      A      We were looking at them.

11      Q      And what were you looking at them for?

12      A      We were looking at their billing of Factor-8

13 and their involvement with FCS and Rupal Productions

14 and we realized that there were problems with them

15 billing Factor-8 and we got in discussions with

16 contracting and pharmacy management and that they did

17 not have the right kind of contract with us. We pended

18 the claims from going out while we could -- from paying

19 while we could determine what needed to be done with

20 their contract and if they met the requirements and if

21 they had the proper documentation to substantiate the

22 medical needs.

24

1      Q      Have you ever seen the contract that

2   Feldman's has with Carefirst?

3      A      I've seen a copy of it.

4        MR. BECKER:   Let's mark this as Hanson Exhibit

5   2.

6            (Hanson Exhibit 2 was marked for

7            identification.)

8            BY MR. BECKER:

9      Q      Can you identify this document?

10     A      It looks like a copy of a DME contract.

11     Q      Where does it say that the covered services

12  are limited to it being --

13     A      It says in response to your inquiry

14  regarding your request for durable medical equipment

15  provider account number with Blue Cross-Blue Shield,

16  please provide us with the following information.

17     Q      But the contract itself -- looking at the

18  contract itself, which defines on the first page

19  covered services, which says a medically necessary

20  service or supply provided to a member for which the

21  member is entitled to receive a benefit under the BCBSM

22  program, which he/she is enrolled or anywhere else; is

29

1    O'Neil. Who is Ed O'Neil?

2        A    I just explained that.

3        Q    Say it again, please. I'd appreciate it.

4        A    Ed O'Neil is the actuary.

5        Q    The actuary, okay. You were copied on this e-

6    mail?

7        A    Yes.

8        Q    Did you take any action as a result of having

9    received this?

10       A    No, I was just copied in on it.

11       Q    What additional steps did you take with

12   respect to your review of FCS or of FCS Pharmacy other

13   than you said you pulled the claims and reviewed them?

14       A    I requested medical records.

15       Q    Who reviewed the medical records?

16       A    If there was a question regarding the

17   substantiation of services, then they went to pharmacy

18   management along with claims and we requested

19   documentation such as leading logs, physician's orders,

20   prescriptions. Anything that tied in with the claim to

21   substantiate utilization.

22       Q    Was there any finding with respect to the

30

1   actions of FCS or Rupal during this investigation?

2        A    I believe there were some services that were

3   not paid at 100%. I believe some services were marked

4   down slightly, but I can't remember specifics. It's

5   been a while since I've looked at the case.

6        Q    When did that investigation become inactive?

7        A    When we stopped receiving claims.

8        Q    Do you recall when that was?

9        A    I don't recall a specific date.

10       Q    Do you recall when the investigation relating

11  to Feldman's began?

12       A    I don't know dates anymore. I'm sorry. It

13  started when Feldman's started -- when Feldman's

14  started billing claims -- Factor-8 claims and when

15  Feldman's employees left employment at Feldman's and

16  showed up on the Rupal payroll.

17       Q    And you don't recall what year this was?

18       A    I don't.

19       Q    What about the fact that Feldman's began

20  submitting Factor-8 claims caused the special

21  investigations unit to start looking into their claims?

22       A    We were looking at Factor-8 as a whole. We

Capital Reporting Company
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

31

1    were focused on FCS, but Factor-8 as a whole was still

2    the subject of our investigation. I had flags coming

3    from different areas that had all landed on my desk.

4        Q    Does that include investigations of other

5    companies?

6        A    Yes.

7        Q    How many other companies?

8        A    I was looking -- I can think of one other

9    specific company in the Midwest that I never determined

10   the link to FCS. I can think of either one or two who

11   were going to more mainstream pharmacies that I had

12   pulled information and had reviewed in pharmacy

13   management.

14       Q    Why was it that you were investigating

15   Factor- 8 in general?

16       A    Because it's a very expensive product and we

17   do not -- we did not at the time have anything in place

18   to monitor the use and we didn't have any kind of risk

19   management in place for it.

20       Q    Are you familiar with a Factor-8 strike force

21   initiative?

22       A    We have a task force.

32

1          MR. BECKER:  Let's mark this as Hanson Exhibit

2     5.

3               (Hanson Exhibit 5 was marked for

4               identification.)

5          BY MR. BECKER:

6      Q    Have you ever seen that document before?

7      A    I have.

8      Q    What is the document?

9      A     It is a meeting agenda from March 24, 2009

10    and it discusses several different Blue Cross-Blue

11    Shield plans and different types of investigations that

12    we had going on as we tried to figure out if there's

13    anything we can do to minimize our risk and exposure

14    and see if there's a widespread problem with Factor-8.

15     Q    Was it a face-to-face meeting or a telephone

16    meeting?

17     A    I believe this was a telephone meeting.

18     Q    And you were one of the participants?

19     A    I'm pretty sure.

20     Q    Your name is on the list of attendees?

21     A    Yes.

22     Q    Does this help at all for you to place when

53

```
 1        MR. BECKER:  Let's mark this as Hanson 10,

 2     please.

 3            (Hanson Exhibit 10 was marked for

 4         identification.)

 5        BY MR. BECKER:

 6    Q    Can you identify what this document is?

 7    A     It's an e-mail communication between myself

 8  and Deb. I e-mailed her in a response to a request that

 9  she sent out and I copied Betty and Andrea as well as

10  Calvin.

11    Q    What does this communication relate to?

12    A     Lot numbers on the Factor-8 claims.

13    Q    These relate to the claims processed by Wal-

14  Mart?

15    A     Processed by Wal-Mart and claims that I

16  received from SCF through Florida.

17    Q    Why are you communicating with Ms. Robles

18  about this?

19    A     She was the intermediary between the FDA

20  agents at the time. She sent out a request asking for

21  lot numbers so that they could -- they wanted to start

22  tracking lot numbers.
```

54

1     Q     Do you know time who Tony Hennessy is?

2     A     Yes.

3     Q     Who is he?

4     A     An FDA agent that I met in Dallas.

5     Q     Did you communicate with him concerning

6  Carefirst's investigation of Factor Health Management,

7  FCS Pharmacy or Feldman's?

8     A     Yes.

9     Q     And what did you discuss with him?

10    A     I don't remember specifically. I told him

11 about our case and he gave us advice for things to

12 watch out for and to look for.

13    Q     Meaning?

14    A     He told us to look for diversion. That was

15 something that he was trying to prove.

16    Q     Anything else that he suggested to you?

17    A     I don't remember. It's been so long.

18       MR. BECKER:  How long have we been going for? It

19       seems like we've been going about an hour-and-a-

20       half.

21       MR. GRAVELLES:  Okay.

22          (Brief recess.) (Hanson Exhibit 11 was

Capital Reporting Company
Hanson, Jaime - CONFIDENTIAL - 03-08-2010

55

1          marked for identification.)

2          BY MR. BECKER:

3     Q    Can you identify this document?

4     A    This is the memo that started our

5  investigation.

6     Q    This is the one you referred to earlier and

7  it's dated October 26, 2007?

8     A    Yes.

9     Q    Does that refresh your recollection as to

10  when the investigation took place?

11     A    Yes. The top snippet where it says Jaime,

12  please check blah, blah, blah, that's when Betty gave

13  it to me.

14     Q    That's her handwriting?

15     A    Yes.

16     Q    Is anything in your handwriting on this page?

17     A    The NAVP and pin number.

18     Q    What are they?

19     A    Those are the pharmacy identifying numbers.

20     Q    Which pharmacy?

21     A    FCS.

22     Q    Those are both numbers for FCS?

59

1     A     I don't remember.

2     Q     The last one is summary reports and

3   comparison of Factor actual usage and Factor billed

4   such has been provided by Deb Robles in her review. Do

5   you recall whether you sent that?

6     A     No, I don't believe I sent anything like

7   that.

8     Q     In the next paragraph, Mr. Snee writes I know

9   we are all anxious to be hearing about those -- about

10  whom those folks might be and why they received Factor

11  intended for others. Do you see that?

12    A     Yes.

13    Q     In your investigation, did you ever uncover

14  any situation in which a patient -- excuse me. In which

15  somebody other than the intended recipient received the

16  Factor?

17    A     I had situations where Factor was sent to

18  someone other than the patient.

19    Q     Relating to Feldman's, FHM or FCS Pharmacy?

20    A     Yes.

21    Q     In those situations, did you investigate

22  them?

60

1      A      Most of those situations I did.

2      Q      And did you determine in any case that the

3   Factor did not go to the patient?

4      A      No, I did not.

5      Q      Why didn't you investigate all of those

6   circumstances?

7      A      Some of those circumstances were out-of-

8   state and were referred to other plans.

9      Q      Did you -- do you know whether the other

10  plans investigated the -- whether or not Factor was

11  ultimately received by the patient?

12     A      I don't know.

13     Q      You didn't receive a report on that?

14     A      No, I didn't.

15     Q      Are you aware of any situations in which a

16  Feldman's or FHM or Factor Health Management patient

17  diverted Factor to the black market or green market?

18     A      No.

19     Q      Have you discovered any evidence that any

20  patients of Feldman's or FHM or FCS Pharmacy abused

21  Factor-8 in any way?

22     A      No.

61

1      Q     Have you ever spoken with a Feldman's

2  patient?

3      A     Yes.

4      Q     On how many occasions?

5      A     Several occasions.

6      Q     Relating to their use of Factor?

7      A     Yes.

8      Q     Have you ever spoken with a Feldman's patient

9  outside of the context of the use of Factor?

10     A     To setup interviews.

11     Q     Relating to the use of Factor. My question is

12  have you ever had an occasion to talk to Feldmans'

13  patients for any reason other than to discuss their use

14  of Factor like for the use of medical equipment or any

15  other kind of services?

16     A     I can't think of any.

17     Q     What was the purpose of your talking to the

18  Feldmans' patients?

19     A     To interview them about their Factor-8.

20     Q     What information were you seeking?

21     A     How they received their product, their

22  utilizations, any background that they can give me.

62

1      Q     In any of those interviews, did you uncover

2    evidence of any improprieties?

3      A     No.

4      Q     Have you ever discussed with a Feldman's

5    patient that they should use another provider for their

6    Factor?

7      A     No.

8      Q     Do you know whether -- if any doctor that was

9    on Carefirst's payroll in any way had any role in

10   denying claims or placing holds on any of the claims at

11   issue?

12     A     A medical review was done. We had a doctor

13   who assisted with the review by the pharmacy management

14   department.

15     Q     Who was that?

16     A     I know Dr. Wynn was involved and maybe Dr.

17   Nadani, but I really don't think he was involved for

18   long.

19     Q     What was the purpose of Dr. Wynn's

20   involvement?

21     A     He was -- I believe he signed off on some of

22   the pharmacy management reviews of the claims when we

63

1  sent them documentation to look at the utilization and

2  he was also involved in the credentialing review

3  process. We asked him to look at the (inaudible) on the

4  participating provider network.

5       Q    Was there any determination that there was

6  improper utilization?

7       A    I can't differentiate the two, Feldman's --

8  I don't think -- there wasn't with Feldman's. I don't

9  we had any issues with that, but with FCS, we did down

10 code a couple.

11      Q    When you say down code, what does that mean?

12      A    They went over the allowable assee that the

13 doctor wrote for and were denied (inaudible) amount.

14      MR. BECKER:  Let's mark this as Exhibit 13.

15           (Hanson Exhibit 13 was marked for

16           identification.)

17      BY MR. BECKER:

18      Q    Can you identify what this document is?

19      A    This is an e-mail from me to Winston in our

20 pharmacy management area. This was a request for review

21 on one of the claims for FCS.

22      Q    This was an FCS claim by the Feldman's plan?

EXHIBIT 11

CONSOLIDATED FINANCIAL STATEMENTS
AND OTHER FINANCIAL INFORMATION

CareFirst, Inc. and Affiliates
Years Ended December 31, 2009 and 2008
With Report of Independent Auditors

CareFirst, Inc. and Affiliates

Consolidated Financial Statements
and Other Financial Information

Years Ended December 31, 2009 and 2008

## Contents

Report of Independent Auditors.................................................................................................1

Audited Consolidated Financial Statements

Consolidated Balance Sheets .....................................................................................................2
Consolidated Statements of Operations .....................................................................................3
Consolidated Statements of Changes in Reserves .....................................................................4
Consolidated Statements of Cash Flows....................................................................................5
Notes to Consolidated Financial Statements..............................................................................6

Other Financial Information (2009 only)

Report of Independent Auditors on Other Financial Information ..............................................54
Consolidating Balance Sheet .....................................................................................................55
Consolidating Statement of Operations .....................................................................................57



**Ernst & Young LLP**
621 East Pratt Street
Baltimore, Maryland 21202

Tel: + 1 410 539 7940
Fax: + 1 410 783 3832
www.ey.com

## Report of Independent Auditors

Board of Directors of CareFirst, Inc.
Board of Directors of CareFirst of Maryland, Inc.
Board of Trustees of Group Hospitalization and Medical Services, Inc.

We have audited the accompanying consolidated balance sheets of CareFirst, Inc. and affiliates (collectively referred to as the Company) as of December 31, 2009 and 2008, and the related consolidated statements of operations, changes in reserves and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2009 and 2008, and the consolidated results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States.

As discussed in Note 2 to the consolidated financial statements, on January 1, 2009, the Company changed its method of accounting for uncertainty in income taxes upon the adoption of FASB guidance.

As discussed in Note 2 to the consolidated financial statements, on April 1, 2009, the Company changed its method of accounting for other than temporary impairments.

*Ernst & Young LLP*

March 1, 2010

A member firm of Ernst & Young Global Limited

# CareFirst, Inc. and Affiliates

## Consolidated Balance Sheets
*(In Thousands)*

|  | December 31 | |
|  | 2009 | 2008 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 210,422 | $ 272,014 |
| Short-term investments | 48,004 | 39,423 |
| Advances to providers | 213,580 | 220,908 |
| Accounts receivable, less allowance for doubtful accounts of $22,086 and $19,316 as of December 31, 2009 and 2008, respectively | 541,658 | 528,520 |
| Interest income receivable | 14,334 | 10,880 |
| Other current assets | 733,389 | 648,279 |
| Deferred tax assets, net | 25,525 | 20,441 |
| Total current assets | 1,786,912 | 1,740,465 |
| | | |
| Long-term investments | 1,536,303 | 1,425,058 |
| Other invested assets | 20,676 | 1,143 |
| Property, equipment and capitalized software, net | 274,823 | 215,298 |
| Goodwill | 29,956 | 29,956 |
| Other assets | 30,287 | 22,660 |
| Deferred tax assets, net | 14,486 | 35,375 |
| Total assets | $ 3,693,443 | $ 3,469,955 |
| | | |
| **Liabilities and reserves** | | |
| Current liabilities: | | |
| Short-term borrowings | $ 171,361 | $ 168,050 |
| Medical claims payable | 545,960 | 589,963 |
| Accounts payable and accrued expenses | 341,430 | 279,915 |
| Unearned revenues | 137,934 | 158,289 |
| Group experience funds and advances | 875,953 | 795,536 |
| Note payable, current portion | 266 | 281 |
| Total current liabilities | 2,072,904 | 1,992,034 |
| Note payable, noncurrent | 296 | 561 |
| Long-term employee benefit obligations | 118,819 | 153,197 |
| Other liabilities | 25,243 | 27,644 |
| Total liabilities | 2,217,262 | 2,173,436 |
| | | |
| Reserves: | | |
| Retained earnings | 1,615,429 | 1,508,214 |
| Accumulated other comprehensive loss | (139,248) | (211,695) |
| Total reserves | 1,476,181 | 1,296,519 |
| Total liabilities and reserves | $ 3,693,443 | $ 3,469,955 |

*See accompanying notes.*

CareFirst, Inc. and Affiliates

Consolidated Statements of Operations
*(In Thousands)*

| | Year Ended December 31 | |
| --- | --- | --- |
| | **2009** | 2008 |
| Premiums earned | **$ 6,574,533** | $ 6,320,242 |
| Amounts attributable to self-funded arrangements | **3,840,288** | 3,584,373 |
| Less amounts attributable to claims under self-funded arrangements | **(3,617,583)** | (3,365,585) |
| Other | **44,332** | 45,127 |
| Net revenue | **6,841,570** | 6,584,157 |
| | | |
| Operating expenses: | | |
| Cost of care | **5,684,833** | 5,572,973 |
| General and administrative | **1,152,870** | 1,023,454 |
| Total operating expenses | **6,837,703** | 6,596,427 |
| Income (loss) from operations | **3,867** | (12,270) |
| | | |
| Investment income, net | **122,924** | 112,617 |
| Other than temporary impairment losses on investments: | | |
| Total other than temporary impairment losses on investments | **(25,649)** | (91,195) |
| Portion of other than temporary impairment losses recognized in other comprehensive income | **6,881** | – |
| Other than temporary impairment losses on investments recognized in net income | **(18,768)** | (91,195) |
| Other income (loss), net | **3,664** | (178) |
| Income before provision (benefit) for income taxes | **111,687** | 8,974 |
| Provision (benefit) for income taxes | **14,867** | (373) |
| Net income | **$ 96,820** | $ 9,347 |

*See accompanying notes.*

CareFirst, Inc. and Affiliates

Consolidated Statements of Changes in Reserves
*(In Thousands)*

Years Ended December 31, 2009 and 2008

| | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | | Total Reserves |
|---|---|---|---|---|
| | | Unrealized Gains (Losses) on Securities, Net | Defined Benefit Plans Adjustments | |
| Balance, as of January 1, 2008 | $ 1,498,867 | $ 53,720 | $ (47,743) | $ 1,504,844 |
| Net income | 9,347 | – | – | 9,347 |
| Other comprehensive loss, net of tax: | | | | |
| Change in net unrealized gains and losses on securities, net of reclassification adjustments | – | (95,777) | – | (95,777) |
| Defined benefit plans adjustments | – | – | (121,895) | (121,895) |
| Other comprehensive loss | | | | (217,672) |
| Total comprehensive loss | | | | (208,325) |
| Balance, as of December 31, 2008 | 1,508,214 | (42,057) | (169,638) | 1,296,519 |
| Cumulative effect of adopting FASB guidance on OTTI, net of tax | 4,886 | (3,940) | – | 946 |
| Cumulative effect of adopting FASB guidance on uncertain tax positions | 5,509 | – | – | 5,509 |
| Net income | 96,820 | – | – | 96,820 |
| Other comprehensive income, net of tax: | | | | |
| Change in net unrealized gains and losses on securities, net of reclassification adjustments | – | 60,283 | – | 60,283 |
| Defined benefit plans adjustments | – | – | 16,104 | 16,104 |
| Other comprehensive income | | | | 76,387 |
| Total comprehensive income | | | | 173,207 |
| Balance, as of December 31, 2009 | $ 1,615,429 | $ 14,286 | $ (153,534) | $ 1,476,181 |

*See accompanying notes.*

# CareFirst, Inc. and Affiliates

## Consolidated Statements of Cash Flows
*(In Thousands)*

|  | Year Ended December 31 | |
|  | 2009 | 2008 |
| --- | ---: | ---: |
| **Operating activities** | | |
| Net income | $ 96,820 | $ 9,347 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 63,493 | 50,239 |
| Realized gains on investments, net | (42,293) | (40,375) |
| Other than temporary impairment of investments | 18,768 | 91,195 |
| Realized (gains) losses on embedded derivatives | (14,618) | 16,933 |
| Provision for deferred income taxes | 1,791 | 16,257 |
| Loss (gain) on equity method investments | 578 | (468) |
| Gain on sale of invested assets | (970) | – |
| Changes in operating assets and liabilities: | | |
| Decrease (increase) in advances to providers | 7,328 | (25,168) |
| Increase in accounts receivable, net | (13,138) | (29,448) |
| (Increase) decrease in interest income receivable | (3,454) | 3,628 |
| Increase in other current assets | (85,110) | (92,931) |
| Increase in other assets | (7,627) | (53,860) |
| (Decrease) increase in medical claims payable | (44,003) | 50,598 |
| Increase (decrease) in accounts payable and accrued expenses | 60,450 | (22,488) |
| (Decrease) increase in unearned revenues | (20,355) | 2,071 |
| Increase in group experience funds and advances | 80,417 | 109,596 |
| Decrease in other liabilities | (16,652) | (34,706) |
| Net cash provided by operating activities | 81,425 | 50,420 |
| | | |
| **Investing activities** | | |
| Purchases of investments | (2,286,195) | (3,516,033) |
| Proceeds from sales and maturities of investments | 2,282,306 | 3,636,128 |
| Purchases of other invested assets | (20,766) | (1,012) |
| Distributions of other invested assets | 625 | 550 |
| Proceeds from sales of other invested assets | 1,000 | – |
| Purchases of property, equipment and capitalized software, net | (123,018) | (94,961) |
| Net cash (used in) provided by investing activities | (146,048) | 24,672 |
| | | |
| **Financing activities** | | |
| Increase (decrease) in short-term borrowings | 3,311 | (148) |
| Repayment on long-term debt | (280) | (779) |
| Net cash provided by (used in) financing activities | 3,031 | (927) |
| | | |
| Net (decrease) increase in cash and cash equivalents | (61,592) | 74,165 |
| Cash and cash equivalents at beginning of year | 272,014 | 197,849 |
| Cash and cash equivalents at end of year | $ 210,422 | $ 272,014 |
| | | |
| **Supplemental disclosures** | | |
| Cash paid for income taxes | $ 10,313 | $ 15,954 |

*See accompanying notes.*

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements
*(In Thousands)*

December 31, 2009

## 1. Organization

CareFirst, Inc. (CFI) and affiliates (collectively referred to as the Company) provide a comprehensive array of health insurance and managed care products and services primarily through indemnity health insurance, health maintenance organization (HMO) coverage and health benefits administration. Other products and services include preferred provider and point of service networks, fee-for-service arrangements, third-party administrator services and other managed care services. These products and services are provided to individuals, businesses and governmental agencies primarily in the State of Maryland and in the Washington, D.C. metropolitan area.

CFI was incorporated on January 16, 1998, to become the not-for-profit parent of CareFirst of Maryland, Inc. (CFMI) and Group Hospitalization and Medical Services, Inc. (GHMSI). These affiliates do business as CareFirst BlueCross BlueShield. CFMI and GHMSI also hold joint interests in a health maintenance organization subsidiary, CareFirst BlueChoice, Inc. (CFBC).

Certain business has been written by CFMI and GHMSI which represents contracts outside the historic CFMI and GHMSI service areas (cross-jurisdictional sales). In 2006, the Boards of CFI, CFMI and GHMSI approved redistribution of earnings between CFMI and GHMSI related to cross-jurisdictional sales. The income or loss from operations from this cross-jurisdictional business would be transferred via a quota-share reinsurance contract from the company that earned them to the company in whose service area they were earned. The Company received regulatory approval for these earnings redistributions, effective January 1, 2008. This agreement has no impact on the consolidated financial statements of CFI.

Also in 2006, the Boards of CFI, CFMI, and GHMSI approved earnings redistributions to evenly share changes in the statutory surplus of CFBC. In 2008, the Boards approved in principle the creation of a new holding company, CareFirst Holdings, LLC. (CHC), which would be owned 50%/50% by CFMI and GHMSI. Following regulatory approval, the establishment of CHC would satisfy the earnings redistributions of CFBC.

## 2. Summary of Significant Accounting Policies

### Basis of Presentation

The Company's consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States (GAAP).

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 2. Summary of Significant Accounting Policies

### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of CFI and its affiliates: CFMI, GHMSI, and CFBC. All intercompany transactions have been eliminated in consolidation.

### Use of Estimates

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates.

### Reclassifications

Certain amounts from the prior year consolidated financial statements have been reclassified in order to conform to the current year presentation.

### Fair Value of Financial Instruments

The carrying amounts of financial instruments, including cash and cash equivalents, advances to providers, accounts receivable, interest income receivable, short-term borrowings, accounts payable and accrued expenses, unearned revenues, and note payable, current portion approximate fair value given the short-term nature of these financial instruments.

### Cash and Cash Equivalents and Short-term Borrowings

Cash and cash equivalents include amounts invested in accounts which are readily convertible to cash. Investments with contractual maturities of three months or less from the date of original purchase are classified as cash and cash equivalents. In accordance with the Company's cash management policy of maximizing the amount of funds invested in income-earning assets, the Company routinely anticipates the timing and amount of future cash flows. This policy frequently results in the existence of negative book cash balances, which are reflected as short-term borrowings in the accompanying consolidated financial statements.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 2. Summary of Significant Accounting Policies (continued)

### Short-term Investments

Short-term investments include investments with remaining maturities of one year or less, but greater than three months, at the time of acquisition and are carried at fair value.

### Accounts Receivable

Accounts receivable primarily represent uncollected amounts earned from insured and self-funded groups. Provision is made for accounts considered uncollectible and/or potential adjustments, which arise as a result of review by management or a third party.

### Advances to Providers

The Company has advances on deposit with certain regulated hospitals in the State of Maryland. These advances permit the Company to earn discounts of 2.25% and 2.00% of allowed inpatient and outpatient charges, respectively, by these hospitals.

### Investments

*Investment Securities*

Investments consist primarily of U.S. Treasury and agency securities, state and municipal securities, foreign governments securities (U.S. dollar-denominated), corporate fixed maturity securities, mortgage-backed securities, asset-backed securities, convertible bonds and equity securities.

The Company has determined that its fixed maturity and equity securities are available-for-sale. Fixed maturity and equity securities are carried at estimated fair value based on quoted market prices for the same or similar instruments (refer to Note 8 *Fair Value Measurements* for discussion of valuation methods). The Company's policy is to classify all investments with contractual maturities within one year as current. Investment income is recognized when earned and reported net of investment expenses. Unrealized holding gains and losses are excluded from earnings and are reported as a separate component of accumulated other comprehensive loss until realized, unless the losses are deemed to be other than temporary. Realized gains or losses,

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

including any provision for other than temporary declines in value, are included in the consolidated statements of operations. For purposes of computing realized gains and losses, the specific-identification method of determining cost was used.

*Evaluating Investments for Other than Temporary Impairments (OTTI)*

The Company periodically performs evaluations, on a lot-by-lot and security-by-security basis, of its investment holdings in accordance with its impairment policy to evaluate whether any declines in the fair value of investments are other than temporary. This evaluation consists of a review of several factors, including but not limited to: length of time and extent that a security has been in an unrealized loss position; the existence of an event that would impair the issuer's future earnings potential; and the near term prospects for recovery of the market value of a security. Any unrealized loss identified as other than temporary was recorded directly in the consolidated statements of operations prior to April 1, 2009. As of April 1, 2009, the Financial Accounting Standards Board (FASB) issued, and the Company adopted, guidance for recognition and presentation of other than temporary impairment, or FASB OTTI guidance. Accordingly, any credit-related impairment of fixed maturity securities that the Company does not intend to sell, and is not likely to be required to sell, is recognized in the consolidated statements of operations, with the noncredit-related impairment recognized in other comprehensive income.

For equity securities, there was no change in the impairment methodology. The Company considers the various factors described above, including its intent and ability to hold the equity security for a period of time sufficient for recovery to cost. Where the Company lacks the intent or ability, the security's decline in fair value is deemed to be other than temporary and the entire difference between fair value and cost is recognized in the consolidated statements of operations.

For fixed maturity securities where fair value is less than amortized cost, and that are not deemed to be credit-impaired, the Company has asserted that it has no intent to sell and that it believes it is more likely than not that it will not be required to sell the investment before recovery of its amortized cost basis. If such an assertion had not been made, the security's decline in fair value is deemed to be other than temporary and the entire difference between fair value and amortized cost is recognized in the consolidated statement of operations.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 2. Summary of Significant Accounting Policies (continued)

For fixed maturity securities, a critical component of the evaluation for OTTI is the identification of credit-impaired securities, where the Company does not expect to receive cash flows sufficient to recover the entire amortized cost basis of the security. The difference between the present value of projected future cash flows expected to be collected and the amortized cost basis is recognized as credit-related OTTI in the consolidated statements of operations. If fair value is less than the present value of projected future cash flows expected to be collected, the portion of OTTI related to other than credit factors is recorded in other comprehensive income.

In order to determine the amount of credit loss for a fixed maturity security, the Company calculates the recovery value by performing a discounted cash flow analysis based on the present value of future cash flows expected to be received. The discount rate is generally the effective interest rate of the fixed maturity security prior to impairment.

When determining the collectability and the period over which the fixed maturity security is expected to recover, the Company considers the same factors utilized in its overall impairment evaluation process described above. Additional considerations are made when assessing the unique features that apply to certain structured securities such as residential mortgage-backed, commercial mortgage-backed and asset-backed securities. These additional features include, but are not limited to: the quality of underlying collateral; expected prepayment speeds; current and forecasted loss severity; consideration of payment terms of underlying assets backing a particular security; and the payment priority within the tranche structure of the security.

Based on its evaluation, the Company has recorded OTTI as follows:

|  | Year Ended December 31 | |
|  | 2009 | 2008 |
| --- | --- | --- |
| Equity securities | $ 6,342 | $ 65,351 |
| Fixed maturity securities | 12,426 | 25,844 |
| Total | $ 18,768 | $ 91,195 |

The Company believes that it has adequately reviewed its investment securities for OTTI and that its investment securities are carried at fair value. However, over time, the economic and market environment may provide additional insight regarding the fair value of certain securities, which could change management's judgment regarding OTTI. This could result in realized

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 2. Summary of Significant Accounting Policies (continued)

losses relating to other than temporary declines being charged against future income. Given the judgments involved, there is a continuing risk that further declines in fair value may occur and additional material OTTI may be recorded in future periods.

*Derivative Financial Instruments*

A derivative is typically defined as an instrument whose value is "derived" from an underlying instrument, index or rate, has a notional amount, requires little or no initial investment and can be net settled. In accordance with FASB guidance, all investments in derivatives are recorded at fair value. Included within the Company's long-term investments are certain financial instruments which contain embedded derivatives (options embedded in convertible fixed maturity securities). Derivatives embedded within non-derivative instruments are bifurcated from the host instrument when the embedded derivative is not clearly and closely related to the host instrument. These instruments have no hedge designation and as such, changes in the fair value are recorded as realized gains and losses. The Company recognized realized gains (losses) of $14,618 and $(16,933) related to the embedded derivatives, in investment income, net for the years ended December 31, 2009 and 2008, respectively.

*Securities Lending*

Prior to 2009, the Company participated in securities lending transactions whereby the Company lent investments in exchange for collateral. The Company had no securities on loan as of December 31, 2009 and 2008; however, it intends to re-establish its securities lending program at some point in the future.

**Other Invested Assets**

Other invested assets consist of direct investments in limited partnerships and a limited liability company, which are accounted for under the equity method. The unrealized gains and losses from the underlying investments are reported in investment income, net in the accompanying consolidated statements of operations. The Company's investments in a limited partnership, BlueCross BlueShield Venture Partners LP, and a limited liability company, National Account Service Company LLC, had a book value of $2,498 and $18,178 respectively as of December 31, 2009.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

During December 2009, the Company sold its investment in a limited partnership and recognized a gain of $970.

**Property, Equipment and Capitalized Software**

Property, equipment and capitalized software are recorded at cost and are depreciated using the straight-line method over useful lives ranging from three to five years for purchased computer and telecommunications equipment, three to eight years for capitalized software, and five to twelve years for furniture and equipment. Leasehold improvements are amortized over the terms of the respective leases or over the estimated useful lives of the improvements, if shorter than the lease term. The Company periodically assesses the carrying value of these fixed assets for purposes of determining any asset impairment.

Certain costs related to the development or purchase of internal-use software are capitalized and amortized over the estimated useful life of the software. Computer software costs that are incurred in the preliminary project stage are expensed as incurred. Direct consulting costs, payroll and payroll-related costs for employees incurred during the development stage that are directly associated with each project are capitalized and amortized over the estimated useful life of the software once placed into operation.

**Goodwill**

Goodwill represents the excess of the cost of businesses acquired over the fair value of the net identifiable assets at the date of acquisition. The Company follows FASB guidance and does not amortize goodwill. The Company has determined that it has five reporting units: third-party administrative, HMO, indemnity risk, indemnity non-risk, and the FEP. All of the Company's goodwill has been allocated to the HMO reporting unit (CFBC) at December 31, 2009 and 2008. The Company tests goodwill for impairment on an annual basis, or more frequently if circumstances indicate that a possible impairment has occurred. The Company uses discounted cash flow techniques to determine the price that could be received in a current transaction to sell the asset assuming the asset or asset group (in-use premise) would be at highest and best use. The Company completed its annual goodwill impairment evaluations at October 1, 2009 and 2008. These evaluations indicated that the estimated fair value of the HMO reporting unit exceeded its carrying value and thus no impairment loss was recognized for the years ended December 31, 2009 and 2008. There were no changes in the carrying amount of goodwill of $29,956 during the years ended December 31, 2009 and 2008.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 2. Summary of Significant Accounting Policies (continued)

**Other Assets**

Other assets primarily consist of prepaid expenses, the cash surrender value of life insurance policies, federal and state income tax recoverable and amounts due from the Office of Personnel Management (OPM) under the FEP contracts (refer to *Summary of Significant Accounting Policies – Federal Employee Program* and *Federal Employee Program – HMO).*

**Retirement Benefit Plans**

The Company sponsors various plans that provide defined benefit pension and other postretirement benefits covering eligible employees. Pension and other postretirement benefits are recorded in accordance with FASB guidance. The Company recognizes the funded status of the benefit obligations for each of its plans as a current and noncurrent asset or liability on the consolidated balance sheets. The actuarial gains or losses, prior year costs and credits, and remaining net transition asset or liability that have not been included in net periodic costs are recognized, net of tax, as a component of accumulated other comprehensive loss. Other postretirement benefits represent outstanding obligations for retiree health benefits. Liabilities for pension and other postretirement benefits are recorded based on the amount by which the actuarial present value of benefits exceeds the fair value of plan assets. The current portion of the liabilities is the value of payments over the next twelve months that is greater than the plan assets. The current portion is classified as accounts payable and accrued expenses and the noncurrent portion is classified as long-term employee benefit obligations, respectively, in the accompanying consolidated balance sheets. The Company uses the year end balance sheet date as the measurement date for all defined benefit pension and other postretirement benefit plans.

**Note Payable**

Effective January 1, 2005, a new subsidiary of GHMSI was created to operate the Federal Employee Program (FEP) Operations Center, which had previously been operated by GHMSI under a contract with the BCBSA. Service Benefit Plan Administrative Services Corporation (SBP), is 90% owned by GHMSI and 10% owned by BCBSA (refer to *Summary of Significant Accounting Policies – FEP Operations Center* for additional information).

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

In connection with the creation of SBP, fixed assets previously owned by GHMSI and used by the FEP Operations Center were sold to SBP at their net book value as of January 1, 2005. The costs of these fixed assets were funded under a revolving credit agreement with BCBSA. The amount available under the line of credit is $15,000. The line of credit bears interest at variable rates. The balance outstanding under this line of credit was $562 and $842 as of December 31, 2009 and 2008, respectively.

**Revenue Recognition**

Premiums are recognized as earned on a monthly basis for the period the health care coverage is in effect. Unearned revenues represent prepayments of premiums for future health care coverage.

The Company provides coverage for certain groups whose contracts provide for payments based on group experience factors (experience-rated contracts). Under these contracts, revenue is generally recorded on the basis of incurred claims, plus retention. In certain cases, maximum rates are established by contract, and losses can result if claims and retention exceed these maximum rates. Any such losses are recorded in the year incurred and may, in many cases, be recouped against subsequent years' gains.

The Company participates with other BlueCross and BlueShield plans in administering certain health care benefits of various accounts of the other plans. Administrative fees are generally recognized as earned and are recorded as a reduction of general and administrative expenses.

Certain claim payments, premium rates, administrative expense reimbursements and provider discounts are subject to review and potential retroactive adjustment by third parties. Reserves to reduce revenue are established for potential obligations arising from such reviews. Management believes that the resolution of these claims will not be materially different from amounts recorded in the accompanying consolidated financial statements.

**Cost of Care and Medical Claims Payable**

The Company negotiates contractual agreements with physicians and medical management groups to provide defined health care services to its members. All other physician and institutional services are provided by medical providers to whom the Company pays fees based upon fee schedules. Cost of care is recognized in the period in which members receive medical

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

services. In addition to actual benefits paid, cost of care includes the impact of accruals for estimates of reported and unreported claims, which are unpaid as of the balance sheet dates. The liability for medical claims payable, as discussed in more detail below, is computed in accordance with generally accepted actuarial practices and is based upon past claims payment experience, together with other current factors which, in management's judgment, require recognition in the calculation.

Each reporting period, the Company estimates its liability for medical care services that have been rendered on behalf of insured members but for which claims have either not been received or processed. The Company develops its estimates for medical care services incurred but not reported using an actuarial process that is consistently applied.

The actuarial models consider factors such as time from the dates of service to claims receipt, claims backlogs, seasonal variances in medical care consumption, provider rate changes, medical care utilization and other medical cost trends, membership volume and demographics and other factors. Depending on the health care provider and type of service, the typical billing lag for services can vary significantly. Substantially all claims related to medical care services are known and settled within twelve months from the date of service.

The Company regularly re-examines its previously established medical claims payable estimates based on actual claim submissions and other changes in facts and circumstances. As the liability estimates recorded in prior periods become more exact, the Company increases or decreases the amounts of the estimates and includes the changes in estimates in cost of care in the period in which the changes are identified. If the revised estimate of prior period cost of care is less than the previous estimate, the Company decreases reported cost of care in the current period. Conversely, if the revised estimate of prior period cost of care is greater than the previous estimate, the Company increases reported cost of care in the current period. Due to the uncertainties inherent in the claims estimation process, it is at least reasonably possible that the actual claims paid could differ materially from the amounts accrued in the accompanying consolidated balance sheets.

**Income Taxes**

The Company's provision (benefit) for income taxes reflects the estimated current and future tax consequences of all events that have been recognized in the consolidated financial statements as measured by the provisions of currently enacted tax laws and rates applicable to future periods.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 2. Summary of Significant Accounting Policies (continued)

### Comprehensive Income (Loss)

Comprehensive income (loss) encompasses all changes in reserves and includes net income, net unrealized gains or losses on available-for-sale securities, the noncredit component of OTTI on fixed maturity securities, and defined benefit plans adjustments. Comprehensive income (loss) is net of reclassification adjustments to adjust for items currently included in net income, such as realized gains or losses on investment securities.

### Federal Employee Program

CFMI and GHMSI participate in the Federal Employee Health Benefits Program (FEHBP) with other BlueCross BlueShield plans. This program includes an experience-rated contract between OPM and the BCBSA, which acts as an agent for the participating BlueCross BlueShield plans. In addition, each participating plan, including CFMI and GHMSI, executes a contract with BCBSA which obligates each participating plan to underwrite FEP benefits in its service area. Premium rates are developed by BCBSA and approved by OPM annually. These rates determine the funds that will be available to the participating BlueCross BlueShield plans to provide insurance to Federal employees that enroll with the BlueCross BlueShield FEHBP.

The excess of gross premiums for the life of the program over the charges for the life of the program on an accrual basis is considered the special reserve under the contract between OPM and BCBSA. Each year, OPM also allocates additional funds to a contingency reserve which may be utilized by the participating plans in the event that funds set aside from annual premiums are insufficient or fall below certain prescribed levels by OPM. Funds available to each participating BlueCross BlueShield plan, including the special reserve and the contingency reserve, are held at the U.S. Treasury, including amounts unused from prior periods. Any funds which remain unused upon termination of the BCBSA contract, after the claims run-out and reimbursement of allowable administrative expenses, would be returned to OPM for the benefit of the FEHBP. The BCBSA contract renews automatically each year unless written notice of termination is given by either party.

In accordance with the BCBSA contract, OPM holds the unused funds on behalf of CFMI and GHMSI to provide funding for claims, administrative expenses, and other charges to the contract. CFMI and GHMSI, along with other BlueCross BlueShield plans who participate in the FEHBP contract, have an unrestricted right to draw funds being held in the special reserve for

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

any valid claim or expense. The unaudited amounts being held in the special reserve are $3,522,412 and $2,356,278, as of December 31, 2009 and 2008, respectively. The unaudited amounts being held in the contingency reserve are $4,535,454 as of September 30, 2009 and $4,158,212 as of December 31, 2008. If the balance of the special reserve is exhausted or falls below certain prescribed levels, OPM will transfer funds from the contingency reserve to the special reserve.

Amounts incurred in excess of the total reserves held at the U.S. Treasury for the FEHBP would not be reimbursed to CFMI or GHMSI.

Based upon formulas developed by BCBSA, CFMI and GHMSI have recorded their allocable share of the special reserve being held by OPM as an asset, with an equivalent amount recorded as a rate stabilization reserve included in other current assets and group experience funds and advances, respectively, in the accompanying consolidated balance sheets. These amounts are $650,604 and $553,397 as of December 31, 2009 and 2008, respectively.

FEP represented approximately 58% and 59% of consolidated accounts receivable as of December 31, 2009 and 2008, respectively. FEP represented approximately 35% and 36% of consolidated net revenue for the years ended December 31, 2009 and 2008, respectively.

**Federal Employee Program – HMO**

CFBC has an experience-rated HMO contract with the OPM to provide managed health care services under the FEHBP.

The excess of gross premiums for the life of the program over the charges for the life of the program on an accrual basis is considered the special reserve under the contract between OPM and CFBC. Each year, OPM also allocates additional funds to a contingency reserve, which may be utilized by CFBC in the event that funds set aside from annual premiums are insufficient or fall below certain prescribed levels. OPM funds available to CFBC are held at the U.S. Treasury, including amounts unused from prior periods. Any funds which remain unused upon termination of the contract, after the claims run-out and reimbursement of allowable administrative expenses, would be returned to OPM for the benefit of the FEHBP. The OPM contract renews automatically each year unless written notice of termination is given by either party.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

In accordance with the OPM contract, OPM holds the unused funds on behalf of CFBC to provide funding for claims, administrative expenses, and other charges to the contract. CFBC has an unrestricted right to draw funds being held in the special reserve for any valid claim or expense. The amounts being held in the special reserve are $9,986 and $12,624 as of December 31, 2009 and 2008, respectively. The amounts being held in the contingency reserve are $26,492 and $26,837 as of December 31, 2009 and 2008, respectively. If the balance of the special reserve is exhausted or falls below certain prescribed levels, OPM will transfer funds from the contingency reserve to the special reserve. Amounts incurred in excess of the total reserves held at the U.S. Treasury for the FEBHP would not be reimbursed to CFBC.

CFBC has recorded the amount of the special reserve being held by OPM as an asset, with an equivalent amount recorded as a rate stabilization reserve. These amounts are included in other current assets and group experience funds and advances, respectively, in the accompanying consolidated balance sheets.

FEHBP represented less than 1% of consolidated accounts receivable as of December 31, 2009 and 2008. FEHBP represented approximately 2% and 1% of consolidated net revenue for the years ended December 31, 2009 and 2008, respectively.

**FEP Operations Center**

SBP performs certain administrative functions as the national operations center for FEP under its ten-year cost-reimbursement contract, which was effective January 1, 2005, with BCBSA. The reimbursement of allocable costs under this contract is recorded as a reduction to general and administrative expenses. FEP reimbursed the Company for costs incurred in connection with this agreement totaling $94,558 and $87,636 for the years ended December 31, 2009 and 2008, respectively.

**Medicare Part D Benefits**

Effective January 1, 2006, FirstCare, Inc. (FirstCare), a wholly-owned subsidiary of CFS Health Group, Inc. (CFS), which in turn is a wholly-owned subsidiary of CFMI, began serving as a plan sponsor offering Medicare Part D prescription drug insurance coverage under a contract with the Centers for Medicare and Medicaid Services (CMS). From January 1, 2006 to December 31,

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

2008, CFMI, GHMSI and BCBSD, Inc. (BCBSD) were operating under a quota-share reinsurance contract with FirstCare. The agreement, which renews annually unless terminated prior to renewal, relates to all Medicare Part D insurance policies written by FirstCare for individuals living in CFMI's, GHMSI's and BCBSD's service areas. Under the terms of the agreement, CFMI, GHMSI and BCBSD assume all underwriting risk on the business written in their respective service areas. Effective January 1, 2009, BCBSD opted out of the reinsurance contract with FirstCare, and the business FirstCare writes in BCBSD's service area is being ceded to CFMI. All revenue, claims costs and expenses related to the members covered by the quota-share reinsurance contract with respect to CFMI and GHMSI are included in the accompanying consolidated statements of operations for the years ended December 31, 2009 and 2008.

Under the Medicare Part D program, there are six separate elements of payment received by FirstCare during the plan year. These payment elements are as follows:

- CMS Premium – CMS pays a fixed monthly premium per member to FirstCare for the entire plan year.

- Member Premium – Additionally, each member pays a fixed monthly premium to FirstCare for the entire plan year.

- Low-Income Premium Subsidy – For qualifying low-income members, CMS pays some portion or all of the member's monthly premiums to FirstCare on the member's behalf.

- Catastrophic Reinsurance Subsidy – CMS pays FirstCare a cost reimbursement estimate monthly to fund the CMS obligation to pay approximately 80% of the costs incurred by individual members in excess of the individual annual out-of-pocket maximum. A settlement is made based on actual cost experience subsequent to the end of the plan year.

- Low-Income Member Cost Sharing Subsidy – For qualifying low-income members, CMS pays on the member's behalf some portion or all of a member's cost sharing amounts, such as deductibles and coinsurance. The cost sharing subsidy is funded by CMS through monthly payments to FirstCare. FirstCare administers and pays the subsidized portion of the claims on behalf of CMS, and a settlement payment is made between CMS and FirstCare based on actual claims experience subsequent to the end of the plan year.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 2. Summary of Significant Accounting Policies (continued)

- CMS Risk-Share – If the ultimate per member per month benefit costs of any Medicare Part D regional plan varies more than 5.0 percentage points above or below the level estimated in the original bid submitted by the plan and approved by CMS, there is a risk-share settlement with CMS that is settled subsequent to the end of the plan year. The risk-share adjustment, if any, is recorded as an adjustment to premiums earned and accounts receivable, net or other liabilities.

The CMS Premium, the Member Premium, and the Low-Income Premium Subsidy represent payments for FirstCare's insurance risk coverage under the Medicare Part D program and therefore are recorded as premiums earned in the accompanying consolidated financial statements. Premiums earned are recognized ratably over the period in which eligible individuals are entitled to receive prescription drug benefits. FirstCare records premium payments received in advance of the applicable service period as unearned revenues.

The Catastrophic Reinsurance Subsidy and the Low-Income Member Cost Sharing Subsidy represent cost reimbursements under the Medicare Part D program. FirstCare is fully reimbursed by CMS for costs incurred for these contract elements and, accordingly, there is no insurance risk to FirstCare.

As of December 31, 2009 and 2008, the Company estimated a receivable of $1,493 and $5,014, respectively, is due under the risk-sharing provisions with CMS.

**Sale of Joint Venture Partnership/Leaseback of Building**

Effective December 22, 2006, CFMI entered into a transaction in which CFMI sold its 50% share of a joint venture that owns the Company's Corporate Headquarters in Owings Mills, Maryland. In connection with the sale, the Company entered into a 12-year operating lease effective January 1, 2007. These transactions are accounted for as a sale-leaseback with no continuing involvement. The gain on the sale of the joint venture along with other deferred rent received of $12,693 is being recognized ratably over the remaining lease term. The balance of the deferred income as of December 31, 2009 and 2008 is $9,519 and $10,577, respectively. As of December 31, 2009 and 2008, the current portion of $1,058 is classified as accounts payable and accrued expenses and the non-current portion of $8,461 and $9,519, respectively, is classified as other liabilities in the accompanying consolidated financial statements.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

**Recent Accounting Pronouncements**

In June 2009, the FASB established the FASB Accounting Standards Codification, or Codification, as the single source of GAAP recognized by the FASB to be applied by nongovernmental entities in the preparation of financial statements. Beginning in September 2009, Codification supersedes all then-existing non-SEC accounting and reporting standards. All other non-grandfathered non-SEC accounting literature not included in the Codification became non-authoritative. Following Codification, the FASB will not issue new standards in the form of Statements, FASB Staff Positions or Emerging Issues Task Force Abstracts. Instead, it will issue Accounting Standard Updates, which will serve to update Codification, provide background information about the guidance and provide the basis for conclusions on the changes to Codification. Codification does not change or alter existing GAAP, and, therefore, did not have a material impact on the Company's consolidated financial statements.

In June 2006, the FASB issued guidance on accounting for uncertainty in income taxes. The guidance clarifies the accounting for income taxes by prescribing a minimum recognition threshold, which all income tax positions must achieve before being recognized in the financial statements. The guidance requires companies to determine whether it is "more likely than not" that a tax position will be sustained upon examination by the appropriate taxing authorities before any part of the tax benefit can be recorded in the financial statements. It also provided guidance on the recognition, measurement, and classification of income tax uncertainties, along with any related interest and penalties. Previously recorded income tax benefits that no longer meet this standard are required to be charged to earnings in the period that such determination is made. In addition, the guidance requires expanded annual disclosures, including a rollforward of the beginning and ending aggregate unrecognized tax benefits as well as specific detail related to tax uncertainties for which it is reasonably possible the amount of the unrecognized tax benefit will significantly increase or decrease within twelve months. The Company adopted this guidance effective January 1, 2009, which resulted in an increase to 2009 beginning retained earnings of $5,509 *(refer to Note 10 Income Taxes* for additional information).

On February 12, 2008, the FASB delayed, for one year, the effective date of its fair value measurement guidance for all nonfinancial assets and liabilities, except those that are recognized or disclosed in the financial statements on at least an annual basis. The Company adopted FASB fair value measurement guidance as of January 1, 2008, except for those provisions that were

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**2. Summary of Significant Accounting Policies (continued)**

deferred (refer to Note 8 *Fair Value Measurements* for additional information). The Company adopted the deferred fair value measurement provisions as of January 1, 2009. The Company's adoption of the deferred provisions of the FASB fair value measurement guidance did not have a material impact on its consolidated financial statements.

In December 2008, the FASB issued guidance that requires additional disclosures about assets held in an employer's defined benefit pension and other postretirement plans, including fair value measurement disclosures. The Company adopted this guidance for the financial statements issued for the year ended after December 31, 2009 (refer to Note 9 *Retirement Plans and Other Postretirement Benefit Plans* for additional information). The Company's adoption of this guidance did not have a material effect on its consolidated financial statements.

In April 2009, the FASB issued guidance that amends the accounting for OTTI by establishing new criteria for the recognition of OTTI on fixed maturity securities and also requiring additional financial statement disclosure. The new criteria requires OTTI to be recognized if either a credit-related loss is deemed to have occurred or the company has the intention to sell a security that is in an unrealized loss position or will more likely than not be required to sell a security that is in an unrealized loss position (refer to *Summary of Significant Accounting Policies – Investments* for the Company's OTTI evaluations of fixed maturity securities in accordance with the new guidance). Upon the adoption of the FASB OTTI guidance, the Company evaluated securities held at April 1, 2009 for which a previous OTTI was recognized, and identified those fixed maturity securities that the Company does not currently intend to sell or will be required to sell and for which previous OTTI recognized included a noncredit component. Additionally, the Company separately assesses the realizability of deferred tax assets related to losses on fixed maturity securities recorded in accumulated other comprehensive loss (AOCL). As such, to the extent that the Company expects to recover the unrealized losses on available-for-sale fixed maturity securities by holding the securities until recovery or maturity, the related deferred tax assets will reverse as the unrealized losses reverse and no valuation allowance is required. Therefore, the cumulative effect of adopting the FASB OTTI guidance includes the reversal of the valuation allowance related to the noncredit losses reclassified to AOCL. The Company's adoption of the FASB OTTI guidance resulted in an increase to retained earnings of $4,886 with a corresponding adjustment of $3,940, net of tax, to AOCL as of April 1, 2009. The difference between these adjustments of $946 represents the release of the valuation allowance on deferred tax assets described above. (refer to Note 4 *Investments* and Note 11 *Other Comprehensive Income (Loss)* for additional information*).*

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 2. Summary of Significant Accounting Policies (continued)

In May 2009, the FASB issued subsequent events guidance which establishes general standards of accounting for and disclosure of events that occur through the balance sheet date but before financial statements are issued or are available to be issued. Financial statements are considered to be available to be issued when they are complete in a form and format that complies with GAAP and all necessary approvals for issuance, such as from management, the board of directors, and/or significant shareholders, have been obtained. The date through which an entity has evaluated subsequent events and the basis for that date should also be disclosed. The Company adopted this guidance for the annual financial statements issued for the year ended December 31, 2009. The Company has evaluated subsequent events that have occurred for recognition or disclosure through March 1, 2010, the date the financial statements were available to be issued. The Company's adoption of this guidance did not have a material impact on its consolidated financial statements.

There were no other new accounting pronouncements issued during the year ended December 31, 2009 that had a material impact on the Company's financial position, operating results or disclosures.

## 3. Regulatory Matters

The Company is subject to regulation and supervision by regulatory authorities of the various jurisdictions in which CFI and its affiliates are licensed to conduct business. The authorities mandate, among other things, the maintenance of minimum statutory reserves and unassigned funds and prohibit certain transactions between the affiliates within the Company without prior regulatory approval. In addition, the Company must also comply with various conditions, restricting certain operations and financial transactions, that were contained in regulatory orders approving the affiliation of CFMI and GHMSI.

Financial statements filed by CFI and its affiliates with their respective state insurance regulators are prepared in accordance with statutory accounting practices prescribed or permitted by said regulators, which differ from GAAP. The most significant differences result from the exclusion of certain assets from statutory capital and surplus, differences in the carrying value of investments, valuation of investments in subsidiaries, treatment of subsidiary net income (loss) as an unrealized capital gain (loss), and the modification or exclusion of certain Codification guidance.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

*(In Thousands)*

### 3. Regulatory Matters (continued)

At December 31, 2009, the Company's regulated subsidiaries' statutory reserves and unassigned funds exceed the minimum statutory requirements as determined by each of the jurisdictions in which those subsidiaries conduct business.

### 4. Investments

The Company's short-term and long-term investments consist of the following:

| | Amortized Cost Basis | Gross Unrealized Gains | Gross Unrealized Losses | Noncredit Component of OTTI Recognized in AOCL | Fair Value |
|---|---|---|---|---|---|
| **December 31, 2009** | | | | | |
| U.S. Treasury and other U.S. government agencies securities | $ 371,569 | $ 857 | $ 16,320 | $ – | $ 356,106 |
| State and municipal securities | 31,523 | 458 | 672 | – | 31,309 |
| Foreign governments securities | 1,655 | 34 | 9 | – | 1,680 |
| Corporate fixed maturity securities | 486,802 | 26,566 | 6,878 | – | 506,490 |
| Options embedded in convertible securities | 28,013 | – | – | – | 28,013 |
| Government sponsored enterprise mortgage-backed securities | 377,585 | 10,103 | 1,350 | – | 386,338 |
| Residential mortgage-backed securities | 130,614 | 267 | 13,697 | 6,881 | 110,303 |
| Commercial mortgage-backed securities | 16,253 | 356 | 193 | – | 16,416 |
| Other asset-backed securities | 14,727 | 513 | 60 | – | 15,180 |
| Publicly-traded index funds | 90,078 | 23,820 | – | – | 113,898 |
| Privately-held equity securities | 3,651 | 4,531 | – | – | 8,182 |
| Publicly-traded equity securities | 10,062 | 619 | 289 | – | 10,392 |
| Total investments | $ 1,562,532 | $ 68,124 | $ 39,468 | $ 6,881 | $ 1,584,307 |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 4. Investments (continued)

| | Amortized Cost Basis | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| **December 31, 2008** | | | | |
| U.S. Treasury and other U.S. government agencies securities | $ 106,550 | $ 3,016 | $ 149 | $ 109,417 |
| State and municipal securities | 8,630 | 60 | 62 | 8,628 |
| Corporate fixed maturity securities | 499,901 | 7,956 | 32,993 | 474,864 |
| Options embedded in convertible securities | 10,254 | – | – | 10,254 |
| Government sponsored enterprise mortgage-backed securities | 411,463 | 9,346 | 963 | 419,846 |
| Residential mortgage-backed securities | 224,687 | 481 | 33,827 | 191,341 |
| Commercial mortgage-backed securities | 20,124 | – | 2,686 | 17,438 |
| Other asset-backed securities | 13,868 | 296 | 850 | 13,314 |
| Publicly-traded index funds | 201,078 | 173 | 2,205 | 199,046 |
| Privately-held equity securities | 3,651 | 4,531 | – | 8,182 |
| Publicly-traded equity securities | 16,114 | 90 | 4,053 | 12,151 |
| Total investments | $ 1,516,320 | $ 25,949 | $ 77,788 | $ 1,464,481 |

The amounts shown above as amortized cost basis include the effects of OTTI of investments previously recognized through net income.

The amortized cost and estimated fair value of fixed maturity securities at December 31, 2009, by contractual maturity, are shown below. Actual maturities may differ from contractual maturities of mortgage-backed securities because borrowers have the right to call or prepay obligations with or without call or prepayment penalties.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**4. Investments (continued)**

|  | Amortized Cost Basis | Fair Value |
|---|---|---|
| Within 1 year | $ 48,066 | $ 48,004 |
| After 1 year through 5 years | 233,095 | 238,173 |
| After 5 years through 10 years | 274,206 | 278,244 |
| After 10 years | 364,195 | 359,177 |
| Mortgage-backed securities | 539,179 | 528,237 |
| Total | $ 1,458,741 | $ 1,451,835 |

*Continuous Gross Unrealized Loss for Investments by Category*

The following tables present the gross unrealized losses and fair value, of the Company's investment securities in an unrealized loss position, aggregated by investment category and by length of time that the securities have been in a continuous unrealized loss position. The unrealized loss amounts presented below at December 31, 2009 include the noncredit component of OTTI loss. Fixed maturity securities on which a noncredit OTTI loss has been recognized in accumulated other comprehensive loss are categorized by length of time as being less than one year or greater than one year in a continuous unrealized loss position based on the point in time that the estimated fair value initially declined to below the amortized cost basis and not the period of time since the unrealized loss was deemed a noncredit OTTI loss.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 4. Investments (continued)

| | Fair Value < 1 year | Unrealized Losses < 1 year | Fair Value > 1 year | Unrealized Losses > 1 year | Total Unrealized Losses |
|---|---|---|---|---|---|
| **December 31, 2009** | | | | | |
| U.S. Treasury and other U.S. government agencies securities | $ 296,607 | $ 16,008 | $ 5,376 | $ 312 | $ 16,320 |
| State and municipal securities | 21,127 | 658 | 806 | 14 | 672 |
| Foreign governments securities | – | – | 762 | 9 | 9 |
| Corporate fixed maturity securities | 95,110 | 2,355 | 64,567 | 4,523 | 6,878 |
| Government sponsored enterprise mortgage-backed securities | 135,411 | 1,291 | 1,613 | 59 | 1,350 |
| Residential mortgage-backed securities | 4,701 | 66 | 87,407 | 20,512 | 20,578 |
| Commercial mortgage-backed securities | – | – | 5,365 | 193 | 193 |
| Other asset-backed securities | 374 | 2 | 4,552 | 58 | 60 |
| Publicly-traded equity securities | 6,328 | 88 | 942 | 201 | 289 |
| Total investments | $ 559,658 | $ 20,468 | $ 171,390 | $ 25,881 | $ 46,349 |

| | Fair Value < 1 year | Unrealized Losses < 1 year | Fair Value > 1 year | Unrealized Losses > 1 year | Total Unrealized Losses |
|---|---|---|---|---|---|
| **December 31, 2008** | | | | | |
| U.S. Treasury and other U.S. government agencies securities | $ 26,258 | $ 124 | $ 2,007 | $ 25 | $ 149 |
| State and municipal securities | 514 | 24 | 5,901 | 38 | 62 |
| Corporate fixed maturity securities | 218,237 | 17,359 | 92,938 | 15,634 | 32,993 |
| Government sponsored enterprise mortgage-backed securities | 41,531 | 573 | 7,669 | 390 | 963 |
| Residential mortgage-backed securities | 94,581 | 25,022 | 31,491 | 8,805 | 33,827 |
| Commercial mortgage-backed securities | 12,789 | 2,170 | 4,650 | 516 | 2,686 |
| Other asset-backed | 5,869 | 274 | 4,095 | 576 | 850 |
| Publicly-traded index funds | 116,100 | 2,205 | – | – | 2,205 |
| Publicly-traded equity securities | 7,825 | 3,763 | 851 | 290 | 4,053 |
| Total investments | $ 523,704 | $ 51,514 | $ 149,602 | $ 26,274 | $ 77,788 |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**4. Investments (continued)**

*Realized Gains and Losses on the Sale of Investments*

A primary objective in the management of the fixed maturity and equity portfolios is to maximize total return relative to underlying liabilities and respective liquidity needs. In achieving this goal, assets may be sold to take advantage of market conditions or other investment opportunities, as well as tax considerations. Sales will generally produce realized gains and losses. In the ordinary course of business, the Company may sell securities for a number of reasons, including, but not limited to: (i) changes to the investment environment; (ii) expectation that the fair value could deteriorate further; (iii) desire to reduce exposure to an issuer or an industry; (iv) changes in credit quality; and (v) changes in expected cash flow.

Available-for-sale securities sold were as follows:

|  | Year Ended December 31 | |
|  | 2009 | 2008 |
| --- | ---: | ---: |
| Proceeds from sales | $ 2,131,973 | $ 2,804,949 |
| Gross realized gains | 60,953 | 71,082 |
| Gross realized losses | 18,660 | 30,707 |

For purposes of computing realized gains and losses, the specific-identification method of determining cost was used.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**4. Investments (continued)**

*Credit Loss Rollforward*

The table below presents a rollforward of the cumulative credit loss component of OTTI loss recognized in earnings on fixed maturity securities still held by the Company at December 31, 2009, for which a noncredit portion of the OTTI loss was recognized in other comprehensive income:

| | | |
|---|---:|---:|
| Balance, December 31, 2008 | $ | – |
| Credit loss component of OTTI loss not reclassified to other comprehensive loss in the cumulative effect transition adjustment | | 1,563 |
| Additions: | | |
| Initial impairments — credit loss OTTI recognized on securities not previously impaired | | 7,631 |
| Additional impairments — credit loss OTTI recognized on securities previously impaired | | 4,795 |
| Reductions: | | |
| Due to sales (or maturities, pay downs or prepayments) during the year of securities previously credit loss OTTI impaired | | (665) |
| Balance, December 31, 2009 | $ | 13,324 |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

### 5. Property, Equipment and Capitalized Software

Property, equipment and capitalized software are comprised of the following:

| | December 31 | |
| | 2009 | 2008 |
| --- | --- | --- |
| Leasehold improvements | $ 62,374 | $ 53,246 |
| Purchased computer equipment and software | 121,565 | 103,349 |
| Capitalized software | 406,915 | 324,302 |
| Furniture and equipment | 72,270 | 63,755 |
| | 663,124 | 544,652 |
| Less accumulated depreciation and amortization | 388,301 | 329,354 |
| Property, equipment and capitalized software, net | $ 274,823 | $ 215,298 |

Depreciation and amortization expense on property, equipment and capitalized software was $63,493, and $50,239 for the years ended December 31, 2009 and 2008, respectively, and is included as a component of general and administrative expenses in the accompanying consolidated statements of operations. For the years ended December 31, 2009 and 2008, the Company recognized an impairment loss of $1,863 and $4,198, respectively, as a result of the annual evaluation of property, equipment and capitalized software, in accordance with FASB guidance.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**6. Medical Claims Payable**

Activity in the liability accounts for medical claims is summarized as follows:

|  | 2009 | 2008 |
|---|---|---|
| Balance at January 1 | $ 589,963 | $ 539,364 |
| Incurred related to: |  |  |
| Current year | 5,745,475 | 5,594,571 |
| Prior years | (60,642) | (21,598) |
| Total incurred | 5,684,833 | 5,572,973 |
|  |  |  |
| Paid related to: |  |  |
| Current year | 5,207,182 | 5,012,365 |
| Prior years | 521,654 | 510,009 |
| Total paid | 5,728,836 | 5,522,374 |
| Balance at December 31 | $ 545,960 | $ 589,963 |

Changes in the estimates associated with medical claims payable are recorded prospectively as changes in claims payment patterns, membership and utilization trends are identified and quantified.

For the years ended December 31, 2009 and 2008, approximately $(18,560) and $(18,627), respectively, of the incurred amount related to prior years was a result of changes in estimates for FEP contracts. These changes were offset by similar changes in revenue and thus, no significant change in income from operations arose as a result of these changes.

The negative amounts noted as "prior year" medical costs are favorable adjustments for claim estimates being settled for amounts less than originally anticipated. As noted above, these favorable changes from original estimates occur due to changes in medical utilization, mix of provider rates and other components of medical cost trends.

The Company accrues estimated claims processing expenses related to the liability for unpaid claims. These accruals totaled $21,190 and $20,649 as of December 31, 2009 and 2008, respectively, and are included in accounts payable and accrued expenses in the accompanying consolidated balance sheets.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 6. Medical Claims Payable (continued)

Anticipated subrogation included as a reduction to medical claims payable as of December 31, 2009 and 2008 was $4,351 and $4,824, respectively.

## 7. Lease Commitments

The Company leases certain administrative facilities, including its corporate offices, and equipment under operating leases. Some of these lease agreements contain escalation clauses for increases in real estate taxes and operating costs over base year amounts. These leases expire on various dates with renewal options available on many of the leases.

Future noncancelable minimum payments for leases are as follows:

| | |
|---|---:|
| 2010 | $ 32,857 |
| 2011 | 31,882 |
| 2012 | 31,576 |
| 2013 | 28,455 |
| 2014 | 23,491 |
| Thereafter | 81,742 |
| Total minimum payments | $ 230,003 |

Rent expense for the years ended December 31, 2009 and 2008 for all operating leases was $44,080 and $41,607, respectively, and has been included within general and administrative expenses in the accompanying consolidated statements of operations.

## 8. Fair Value Measurements

The FASB guidance on fair value measurement establishes a framework for measuring fair value and expands disclosures about fair value measurements. The fair value hierarchy is as follows:

*Level 1* – Quoted (unadjusted) prices for identical assets or liabilities in active markets.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**8. Fair Value Measurements (continued)**

*Level 2* – Other observable inputs, either directly or indirectly, including:

- Quoted prices for similar assets/liabilities in active markets;

- Quoted prices for identical or similar assets in non-active markets (few transactions, limited information, non-current prices, high variability over time);

- Inputs other than quoted prices that are observable for the asset/liability (e.g., interest rates, yield curves, volatilities, or default prices); and

- Inputs that are derived principally from or corroborated by other observable market data.

*Level 3* – Unobservable inputs that cannot be corroborated by observable market data.

In instances in which the inputs used to measure fair value fall into different levels of the fair value hierarchy, the fair value measurement has been determined based on the lowest level input that is significant to the fair value measurement in its entirety. The Company's assessment of the significance of a particular item to the fair value measurement in its entirety requires judgment, including the consideration of inputs specific to the asset. Management is responsible for the determination of fair value, and performs monthly analysis on the prices received from third parties to determine whether the prices appear to be reasonable estimates of fair value.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 8. Fair Value Measurements (continued)

The following table presents information about the fair value of the Company's financial assets on a recurring basis at December 31, 2009 and 2008:

| | Quoted Prices in Active Markets (Level 1) | Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Fair Value as of December 31, 2009 |
|---|---|---|---|---|
| **Assets** | | | | |
| Fixed maturity securities – available-for-sale: | | | | |
| U.S. Treasury and other U.S. government agencies securities | $ 233,228 | $ 122,878 | $ – | $ 356,106 |
| State and municipal securities | – | 31,309 | – | 31,309 |
| Foreign governments securities | – | 1,680 | – | 1,680 |
| Corporate fixed maturity securities | – | 534,503 | – | 534,503 |
| Government sponsored enterprise mortgage-backed securities | – | 386,338 | – | 386,338 |
| Residential mortgage-backed securities | – | 108,735 | 1,568 | 110,303 |
| Commercial mortgage-backed securities | – | 16,416 | – | 16,416 |
| Other asset-backed securities | – | 15,180 | – | 15,180 |
| Total fixed maturity securities | 233,228 | 1,217,039 | 1,568 | 1,451,835 |
| Equity securities – available-for-sale: | | | | |
| Publicly-traded index funds | – | 113,898 | – | 113,898 |
| Privately-held equity securities | – | – | 8,182 | 8,182 |
| Publicly-traded equity securities | 497 | 9,895 | – | 10,392 |
| Total equity securities | 497 | 123,793 | 8,182 | 132,472 |
| Total assets | $ 233,725 | $ 1,340,832 | $ 9,750 | $ 1,584,307 |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 8. Fair Value Measurements (continued)

| | Quoted Prices in Active Markets (Level 1) | Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Fair Value as of December 31, 2008 |
|---|---|---|---|---|
| **Assets** | | | | |
| Fixed maturity securities – available-for-sale: | | | | |
| U.S. Treasury and other U.S. government agencies securities | $   71,527 | $   37,890 | $   – | $   109,417 |
| State and municipal securities | – | 8,628 | – | 8,628 |
| Corporate fixed maturity securities | – | 485,118 | – | 485,118 |
| Government sponsored enterprise mortgage-backed securities | – | 419,846 | – | 419,846 |
| Residential mortgage-backed securities | – | 144,170 | 47,182 | 191,352 |
| Commercial mortgage-backed securities | – | 17,438 | – | 17,438 |
| Other asset-backed securities | – | 13,303 | – | 13,303 |
| Total fixed maturity securities | 71,527 | 1,126,393 | 47,182 | 1,245,102 |
| Equity securities – available-for-sale: | | | | |
| Publicly-traded index funds | – | 199,046 | – | 199,046 |
| Privately-held equity securities | – | – | 8,182 | 8,182 |
| Publicly-traded equity securities | – | 12,151 | – | 12,151 |
| Total equity securities | – | 211,197 | 8,182 | 219,379 |
| Total assets | $   71,527 | $ 1,337,590 | $   55,364 | $ 1,464,481 |

The following methods and assumptions were used to estimate the fair value of each class of financial instrument:

***Fixed maturity securities.*** Fixed maturity securities consist of U.S. Treasury and other U.S. government agencies securities, state and municipal securities, foreign governments securities, corporate fixed maturity securities, mortgage-backed securities and other asset-backed securities, which are all held as available-for-sale investments. The fair value of U.S. Treasury securities is determined by an active price for an identical security in an observable market and is therefore classified as Level 1. Other U.S. government agencies securities, state and municipal securities,

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)

*(In Thousands)*

**8. Fair Value Measurements (continued)**

foreign governments securities, corporate fixed maturity securities, mortgage-backed securities and other asset-backed securities that are priced by independent pricing services using observable inputs are classified as Level 2. Certain mortgage-backed securities where the fair value is obtained from the Company's internal discounted cash-flow model (2009 only) and non-binding broker quotes (2008 only) are classified as Level 3.

*Equity securities.* Equity securities consist of publicly-traded index funds, publicly-traded equity securities (common stocks and preferred stocks), and privately-held equity securities which are held as available-for-sale investments. Common stocks valued at the closing price reported on the exchanges are classified as Level 1. Fair value of publicly-traded index funds and preferred stocks where market quotes are available but are not considered actively traded are classified as Level 2. Fair values of privately-held equity securities, where there has been limited trading activity or where less price transparency exists around the inputs to the valuation, are classified as Level 3.

A reconciliation of the beginning and ending balances of assets measured at fair value on a recurring basis using Level 3 inputs as December 31, 2009 and 2008 is as follows:

|  | Fixed Maturity Securities | Equity Securities | Total |
|---|---|---|---|
| Beginning balance at January 1, 2009 | $ 47,182 | $ 8,182 | $ 55,364 |
| Total gains and losses: |  |  |  |
| Realized in net income | (781) | – | (781) |
| Unrealized in accumulated other comprehensive loss | 2,694 | – | 2,694 |
| Purchases, (sales), issuances, and (settlements), net | (31,568) | – | (31,568) |
| Transfers out of Level 3 | (15,959) | – | (15,959) |
| Ending balance at December 31, 2009 | $ 1,568 | $ 8,182 | $ 9,750 |
| Change in unrealized losses included in net income related to assets still held | $ 4,013 | $ – | $ 4,013 |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 8. Fair Value Measurements (continued)

| | Fixed Maturity Securities | Equity Securities | Total |
|---|---|---|---|
| Beginning balance at January 1, 2008 | $           – | $    7,012 | $    7,012 |
| Total gains and losses: | | | |
| Realized in net income | (2,520) | – | (2,520) |
| Unrealized in accumulated other comprehensive loss | (5,624) | 1,170 | (4,454) |
| Purchases, (sales), issuances, and (settlements), net | 43,333 | – | 43,333 |
| Transfers into Level 3 | 11,993 | – | 11,993 |
| Ending balance at December 31, 2008 | $  47,182 | $    8,182 | $  55,364 |
| | | | |
| Change in unrealized losses included in net income related to assets still held | $    2,367 | $           – | $    2,367 |

## 9. Retirement Plans and Other Postretirement Benefit Plans

Prior to December 31, 2002, CFMI and GHMSI maintained qualified noncontributory defined benefit retirement plans covering substantially all full-time employees. Effective December 31, 2002, these plans merged to become the CareFirst, Inc. Retirement Plan. Although the Company merged the CFMI and GHMSI plans, it has committed to maintain separate recordkeeping of plan assets and benefit obligations so that it will comply with certain regulatory restrictions that apply to CFMI and GHMSI. Consistent with the standards for multiple-employer plan accounting, CFMI and GHMSI have accounted for their net pension obligation as if the plans had remained separate. In November 2007, the Company approved a freeze to the Plan, effective January 1, 2009, whereby employees hired on or after January 1, 2009, are no longer eligible to participate in the Plan. These employees participate in an enhanced 401(k) program.

During 2005, in connection with the creation of SBP, a separate qualified noncontributory defined benefit retirement plan was established covering substantially all full-time SBP employees. A Voluntary Employee Beneficiary Association (VEBA), a tax-exempt trust, was also established to fund certain healthcare benefits for eligible SBP employees. Contributions to the VEBA during 2009 and 2008 were $852 and $675, respectively.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**9. Retirement Plans and Other Postretirement Benefit Plans (continued)**

The annual contributions exceeded the minimum funding standards set forth in the Employee Retirement Income Security Act of 1974, as amended (ERISA). The plans provide for eligible employees to receive benefits based principally on years of service with the Company and a percentage of certain compensation prior to normal retirement.

The Company also has nonqualified supplemental retirement benefit plans covering certain officers, which provide for eligible employees (and former employees) to receive additional benefits based principally on compensation and years of service. These plans provide for incremental benefit payments so that total benefit payments equal amounts that would have been payable from the Company's principal retirement plans if it were not for limitations imposed by income tax regulations.

In addition, the Company provides certain health care benefits for retired employees. Substantially all CFMI and GHMSI employees become eligible for those benefits if they have at least ten years of service, are at least age 55, and have the Company's medical benefit coverage at the time of termination or retirement. The Company's postretirement benefit program provides for a specific credit amount, which may be used to purchase health insurance upon retirement. The credit amount is based upon the retiree's age and years of service with the Company. The Company funds postretirement benefits as benefits are paid.

The following table sets forth the obligations, funded status, and amount recognized for the pension benefits, which include the qualified and nonqualified pension plans described above, and other postretirement benefits described above, in the accompanying consolidated financial statements as of December 31:

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**9. Retirement Plans and Other Postretirement Benefit Plans (continued)**

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| **Accumulated benefit obligations** | $ **593,557** | $ 525,173 | $ **77,655** | $ 71,287 |
| | | | | |
| **Change in projected benefit obligations** | | | | |
| Benefit obligations at beginning of year | $ **531,838** | $ 503,871 | $ **71,287** | $ 74,051 |
| Service cost | **22,867** | 23,432 | **2,181** | 2,177 |
| Interest cost | **32,619** | 30,640 | **4,317** | 4,263 |
| Benefits paid | **(22,325)** | (28,225) | **(3,327)** | (3,833) |
| Plan amendments | **–** | 1,044 | **–** | (3,422) |
| Actuarial loss (gain) | **35,554** | 1,076 | **3,197** | (1,949) |
| Benefit obligations at end of year | $ **600,553** | $ 531,838 | $ **77,655** | $ 71,287 |
| | | | | |
| **Change in plan assets** | | | | |
| Fair value of plan assets at beginning of year | $ **425,007** | $ 479,993 | $ **2,534** | $ 2,851 |
| Actual return on plan assets | **100,133** | (115,739) | **656** | (859) |
| Employer contributions | **26,542** | 88,978 | **4,102** | 4,416 |
| Benefits paid | **(22,325)** | (28,225) | **(3,359)** | (3,874) |
| Fair value of plan assets at end of year | $ **529,357** | $ 425,007 | $ **3,933** | $ 2,534 |
| | | | | |
| Funded status | $ **(71,196)** | $ (106,831) | $ **(73,722)** | $ (68,753) |
| | | | | |
| **Net amount included in the consolidated balance sheets** | | | | |
| Current liabilities | $ **(21,887)** | $ (18,129) | $ **(4,212)** | $ (4,258) |
| Noncurrent liabilities | **(49,309)** | (88,702) | **(69,510)** | (64,495) |
| Net amount at December 31 | $ **(71,196)** | $ (106,831) | $ **(73,722)** | $ (68,753) |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 9. Retirement Plans and Other Postretirement Benefit Plans (continued)

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | **2009** | **2008** | **2009** | **2008** |
| **Amounts included in accumulated other comprehensive loss that have not been recognized in net periodic benefit cost** | | | | |
| Net actuarial loss | $  **185,215** | $  210,008 | $  **11,357** | $  8,933 |
| Prior service asset | **(4,252)** | (6,554) | **(1,421)** | (1,698) |
| Transition liability | **–** | – | **1,019** | 1,359 |
| Net amount at December 31 | $  **180,963** | $  203,454 | $  **10,955** | $  8,594 |

The estimated net actuarial loss and prior service asset for the defined benefit pension plans that will be amortized from accumulated other comprehensive loss into net periodic benefit costs over the next fiscal year are $8,759 and $(2,302), respectively.

The estimated net actuarial loss, prior service asset and transition liability for other postretirement benefit plans that will be amortized from accumulated other comprehensive loss into net periodic benefit costs over the next fiscal year are $496, $(277) and $340, respectively.

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | **2009** | **2008** | **2009** | **2008** |
| **Components of net periodic benefit cost** | | | | |
| Service cost | $  **22,867** | $  23,432 | $  **2,181** | $  2,177 |
| Interest cost | **32,619** | 30,640 | **4,317** | 4,263 |
| Expected return on plan assets | **(41,704)** | (38,563) | **(112)** | (126) |
| Amortization of transition liability | **–** | – | **340** | 340 |
| Amortization of prior service asset | **(2,302)** | (2,354) | **(277)** | (277) |
| Net recognized actuarial loss | **1,916** | 1,633 | **228** | 477 |
| Net periodic benefit cost for the year ended December 31 | $  **13,396** | $  14,788 | $  **6,677** | $  6,854 |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

### 9. Retirement Plans and Other Postretirement Benefit Plans (continued)

The weighted-average assumptions used in calculating the benefit obligations for all plans are as follows:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Discount rate – benefit obligation | **5.50%** | 6.50% | **5.75%** | 6.50% |
| Discount rate – net benefit cost | **6.50%** | 6.25% | **6.50%** | 6.25% |
| Expected return on plan assets | **8.00% / N/A\*** | 8.50% / N/A\* | **N/A** | N/A |
| Rate of compensation increase | **4.50%** | 4.50% | **N/A** | N/A |
| Annual rate of increase in the per capita cost of covered health care benefits | **N/A** | N/A | **6.00%** | 6.00% |

\* As of December 31, 2009 and 2008, the expected return on plan assets is 8.00% and 8.50%, respectively, for qualified pension benefits and N/A for nonqualified pension benefits. The Company contributes to the nonqualified pension plans as benefits are paid.

The discount rates used to determine the Company's pension and other postretirement plan obligations were based on a Aa yield curve represented by a series of annualized individual discount rates. Each bond issue underlying the yield curve is required to be non-callable and have a rating of Aa or better by Moody's Investor Service, Inc. or a rating of AA or better by Standard & Poor's. The yields are used to discount future pension and postretirement benefit plan cash flows at an interest rate specifically applicable to the timing of each respective cash flow. The sum of these discounted cash flows are totaled into a single present value and an equivalent weighted-average discount rate is calculated by imputing the singular interest rate that equates the total present value of the stream of future cash flows. This resulting interest rate, rounded, is used by the Company as its discount rate.

An important factor in determining the pension expense is the assumption for expected long-term rate of return on plan assets. The Company uses a total portfolio return analysis in the development of its assumption. Factors such as past market performance, the long-term relationship between fixed maturity and equity securities, interest rates, inflation and asset allocations are considered in the assumption. The assumption includes an estimate of the additional return expected from active management of the investment portfolio. Peer data and historical returns are also reviewed for appropriateness of the selected assumption.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

### 9. Retirement Plans and Other Postretirement Benefit Plans (continued)

The expected long-term rate of return for the qualified pension plans' total assets is based on the expected return of each of the investment categories, weighted based on the median of the target allocation for each class. The key objective of the pension asset portfolio is to meet the assumed actuarial rate of return while maintaining a diversified asset allocation. Equity securities are expected to return 8% to 12% over the long-term, while cash and fixed maturity securities are expected to return between 4% and 6%. Based on historical experience, the CareFirst, Inc. Retirement Committee (Retirement Committee) expects that the qualified pension plans' active asset managers will provide a modest (0.5% to 1.0% per annum) premium to their respective market benchmark indices.

The Company's pension investment policy, as established by the Retirement Committee, is to provide for growth of capital with a moderate level of volatility by investing assets through adequate asset diversification per the target allocations stated below. Plan assets include a diversified mix of investment grade fixed maturity securities, equity securities and alternatives across a range of sectors and levels of capitalization to maximize the long-term return for a prudent level of risk. The assets are reallocated as needed to meet the target allocations and achieve the target return. The investment policy is reviewed on a quarterly basis, under the advisement of a certified investment advisor, to determine if the policy should be changed. The weighted-average asset allocations by asset category for the qualified pension plans are as follows:

| | Target Allocation | December 31, 2009 | December 31, 2008 |
|---|---|---|---|
| Domestic equity securities | 30% – 50% | 37% | 30% |
| International equity securities | 15% – 25% | 19 | 16 |
| Emerging markets equity securities | 0% – 10% | 7 | 2 |
| Real estate | 0% – 10% | 3 | 6 |
| Fixed maturity securities | 25% – 35% | 33 | 24 |
| Cash and cash equivalents | Residual | 1 | 22 |
| Total | | 100% | 100% |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

### 9. Retirement Plans and Other Postretirement Benefit Plans (continued)

As shown above, the Company's actual weighted-average asset allocations were not within the target allocations for certain asset categories at December 31, 2008. The Company funded the qualified pension plan in December 2008, but did not invest the cash and cash equivalents prior to December 31, 2008. The assets were reallocated to meet the target asset allocations in the first week of 2009.

The investment policy related to the VEBA provides that the assets in the trust be invested in a "balanced" type of fund that provides diversification reasonably similar to an asset allocation of 60% domestic equity securities and 40% fixed maturity securities.

The fair value of the Company's qualified pension plan assets at December 31, 2009, by asset category are as follows:

| Asset Category | Quoted Prices in Active Markets (Level 1) | | Other Observable Inputs (Level 2) | | Unobservable Inputs (Level 3) | | Total Fair Value as of December 31, 2009 | |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 9,647 | $ | – | $ | – | $ | 9,647 |
| Fixed maturity securities: | | | | | | | | |
| U.S. Treasury and other U.S. government agencies securities | | 9,034 | | 1,709 | | – | | 10,743 |
| State and municipal securities | | – | | 1,768 | | – | | 1,768 |
| Corporate fixed maturity securities | | – | | 32,030 | | – | | 32,030 |
| Government-sponsored enterprise mortgage-backed securities | | – | | 33,782 | | – | | 33,782 |
| Residential mortgage-backed securities | | – | | 1,159 | | – | | 1,159 |
| Other asset-backed securities | | – | | 1,077 | | – | | 1,077 |
| Equity securities: | | | | | | | | |
| Domestic companies | | 16,592 | | – | | – | | 16,592 |
| International companies | | 43,500 | | – | | – | | 43,500 |
| Mutual funds (a) | | – | | 96,082 | | – | | 96,082 |
| Private equity funds (b) | | – | | 271,372 | | 15,538 | | 286,910 |
| Total assets | $ | 78,773 | $ | 438,979 | $ | 15,538 | $ | 533,290 |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

### 9. Retirement Plans and Other Postretirement Benefit Plans (continued)

(a) This category represents investments in investment grade fixed maturity securities.

(b) This category includes several common/collective trust funds that invest approximately 62% in domestic equity index funds, 19% in international equity securities, 13% in emerging markets equity securities, and 6% in real estate investment trusts.

The following methods and assumptions were used to estimate the fair value of each class of financial instrument:

*Cash equivalents.* The carrying value of cash equivalents approximates fair value as maturities are less than three months.

*Fixed maturity securities.* Fixed maturity securities consist of U.S. Treasury and other U.S. government agencies securities, state and municipal securities, corporate fixed maturity securities, mortgage-backed securities and other asset-backed securities. The fair value of U.S. Treasury securities is determined by an active price for an identical security in an observable market and is therefore classified as Level 1. Other U.S. government agencies securities, state and municipal securities, corporate fixed maturity securities, mortgage-backed securities and other asset-backed securities that are priced by independent pricing services using observable inputs are classified as Level 2.

*Equity securities.* Equity securities consist of domestic and international common stocks, which are denominated in U.S. dollars. Common stocks valued at the closing price reported on the exchanges are classified as Level 1.

*Mutual funds.* Mutual funds' net asset value is calculated as of the close of business of the NYSE. The fair value of the mutual funds is the market quoted price but the funds are not considered actively traded; therefore, mutual funds are classified as Level 2.

*Private equity funds.* Private equity funds consist of common/collective trust funds in domestic, international and emerging markets equity securities as well as a real estate investment trust fund. The fair value of the funds where the redemption value of the units of participation (sum of the market value of its underlying investments) is determined by observable inputs on a daily basis is classified as Level 2. The fair value of the real estate investment trust fund is determined by valuation techniques using unobservable inputs, including discounted cash flow analysis, which are classified as Level 3.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**9. Retirement Plans and Other Postretirement Benefit Plans (continued)**

The preceding methods may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, although the Company believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

The table below sets forth a summary of changes in the fair value of the Company's Level 3 pension plan investments for the year ended December 31, 2009.

|  | Private Equity Funds* |
|---|---|
| Beginning balance at January 1, 2009 | $  24,194 |
| Unrealized losses relating to instruments still held at the reporting date | (9,569) |
| Purchases, (sales), issuances, and (settlements), net | 913 |
| Ending balance at December 31, 2009 | $  15,538 |

\* Represent investments in real estate investment trust fund.

*Cash Flows*

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid from the pension benefit plans and other postretirement benefit plans for the years ending December 31:

|  | Pension Benefits | Other Postretirement |
|---|---|---|
| 2010 | $    65,723 | $    4,360 |
| 2011 | 41,698 | 4,643 |
| 2012 | 42,049 | 4,855 |
| 2013 | 45,440 | 5,039 |
| 2014 | 45,372 | 5,234 |
| 2015 through 2019 | 192,227 | 31,163 |
|  | $  432,509 | $  55,294 |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 9. Retirement Plans and Other Postretirement Benefit Plans (continued)

The Company expects to make contributions of $21,892 and $4,956, respectively, to the pension benefit plans and other postretirement benefit plans during 2010.

In addition, the Company sponsors 401(k) plans for the benefit of all eligible employees. The Company contributes to certain of these plans and recognized expenses of $6,736 and $5,806 for the years ended December 31, 2009 and 2008, respectively.

## 10. Income Taxes

The Company files a consolidated federal income tax return. The federal statutory income tax rate for the Company is 35 percent. For federal income tax purposes, the Company benefits from a special deduction available to certain BlueCross and BlueShield organizations under Internal Revenue Code Section 833(b) (the 833(b) deduction). The 833(b) deduction results in the Company incurring federal income taxes at the Tentative Minimum Tax (TMT) rates of 20 percent. As a result, the Company's income tax provision is reduced from the statutory rate of 35 percent to account for the benefit of the 833(b) deduction. The Company could lose the benefit of the 833(b) deduction in the future if there is a change in the tax law, if CFMI and/or GHMSI cease to be not-for-profit, if CFMI's and/or GHMSI's reserves reach certain levels, or if certain other events occur. If the Company can no longer use the 833(b) deduction, the Company will incur federal income taxes at the statutory rate of 35 percent net of available Alternative Minimum Tax (AMT) credits.

CFMI is exempt from Maryland state income tax under Title 10, Subtitle 1, Section 10-104(2) of the Maryland Code and is governed by Title 14, Subtitle 1, Section 14-102 of the Maryland Insurance Code. GHMSI is exempt from all income taxes in the District of Columbia, Maryland and Virginia. Subsidiary operations are subject to the applicable state income taxes.

Provision (benefit) for income taxes includes deferred income taxes resulting primarily from temporary differences between the tax basis of assets and liabilities and their reported amounts in the consolidated financial statements. In addition, generally, the Company's TMT liability results in AMT credits for future use. AMT credits do not expire under current law. The Company records its deferred tax assets and liabilities at the federal statutory rate of 35 percent. Because the Company anticipates continued benefits of the 833(b) deduction, its net deferred tax assets have been reduced by valuation allowances to the amounts realizable at the TMT rates. Generally, changes to the Company's valuation allowances are accounted for in the Company's

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**10. Income Taxes (continued)**

income tax (benefit) provision. If the Company were to incur federal income taxes at the statutory rate of 35 percent primarily due to the loss of the 833(b) deduction, at such time, the Company will also evaluate the continued need for any existing valuation allowances on its deferred tax assets.

The principal sources of temporary differences include nondeductible accruals, accounts receivable, property and equipment, capitalized software costs, pension and postretirement obligations, medical claims payable, unrealized gains and losses on investments, and AMT credits. The Company experienced significant declines in the value of its investment portfolio during 2008. As a result, the Company recognized losses in its consolidated statement of operations as well as through other comprehensive loss. These losses are not recognized for income tax purposes until the investments are disposed and result in deferred tax assets. For the year ending December 31, 2008, the Company performed additional analysis of its deferred tax assets related to unrealized losses from its investments. The realization of these deferred tax assets was limited by the Company's ability to generate capital gains through sales of securities in an unrealized gain position, holding fixed maturity securities to maturity, or the carry-back of prior year capital gains. Because of these limitations, for the year ending December 31 2008, the Company recorded a valuation allowance of $12,097 against deferred tax assets arising from OTTI of investments. This valuation allowance was recorded through the Company's tax benefit. The Company also recorded a valuation allowance of $1,132 related to other deferred tax assets for unrealized losses included in other comprehensive loss at December 31, 2008. The Company experienced significant increases in the value of its investment portfolio during 2009. As a result, there are sufficient unrealized investment gains of adequate amount and character available to support the realizability of its deferred tax assets related to unrealized losses from investments. Accordingly, the Company reversed the valuation allowances recorded through the income tax benefit in the prior year. At December 31, 2009, the Company does not maintain any valuation allowances to offset its gross deferred tax assets related to unrealized losses from its investments.

As of December 31, 2009 and 2008, the Company had deferred tax assets of $420,902 and $424,532, (net of valuation allowances of $278,006 and $277,456) respectively, and deferred tax liabilities of $102,885 and $91,260, respectively. At December 31, 2008 these amounts also include the deferred tax assets and related valuation allowances from investment losses discussed above. A substantial amount of the valuation allowance in 2008 and the entire valuation allowance in 2009 is related to the difference between the 35% statutory rate and the 20% TMT

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

### 10. Income Taxes (continued)

rate. Management has determined, based on the Company's long-term history of operating earnings and its expectations for the future, that income of the Company will more likely than not be sufficient to realize fully any net recorded deferred tax assets.

The provision (benefit) for income taxes consists of the following components:

|  | Year Ended December 31 | |
|  | 2009 | 2008 |
|---|---|---|
| Current: | | |
| Federal | $ 12,009 | $ (16,001) |
| State | 1,067 | (629) |
| | 13,076 | (16,630) |
| Deferred: | | |
| Federal | 1,278 | 16,350 |
| State | 513 | (93) |
| | 1,791 | 16,257 |
| Provision (benefit) for income taxes | $ 14,867 | $ (373) |

The provision (benefit) for income taxes for 2009 and 2008 differs from the statutory rate of 35 percent principally as a result of the 833(b) deduction, changes in tax contingency reserves and changes in the valuation allowance.

In June 2006, the FASB issued guidance on accounting for uncertainty in income taxes. The FASB guidance requires the evaluation of a tax position under a two-step process. The first step requires that the enterprise determine whether it is more likely than not that a tax position will be sustained. The second step is the amount of benefit to be recognized in the financial statements and is determined as the largest amount of benefit that is greater than 50 percent likely of being realized upon settlement. The cumulative effect of applying the provisions of the guidance shall be reported as an adjustment to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that fiscal year, presented separately.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

### 10. Income Taxes (continued)

In 2008, the FASB delayed the effective date for the implementation of accounting for uncertainty in income taxes for nonpublic entities. The deferral was granted to allow nonpublic entities more time to implement the guidance on accounting for uncertainty in income taxes and to allow the FASB time to develop implementation guidance for such entities. The Company deferred the implementation of uncertainty in income taxes in accordance with the aforementioned deferral provisions. On September 2, 2009, the FASB issued guidance that provides additional implementation guidance on the accounting for uncertainty in income taxes and eliminates certain disclosure requirements for nonpublic entities. The additional implementation guidance is effective upon the adoption of the FASB guidance on accounting for uncertainty in income taxes for annual financial statements for years beginning after December 15, 2008. Accordingly, the Company adopted the additional implementation guidance and implemented the FASB guidance on accounting for uncertainty in income tax positions effective January 1, 2009 with a favorable adjustment to retained earnings of $5,509. The Company records interest and penalties on its uncertain tax positions as part of its income tax provision. The Company's total unrecognized tax benefit at December 31, 2009 of $4,185 includes $35 interest (net of federal benefit) that was recognized in its consolidated statement of operations. The Company is subject to examination by the Internal Revenue Service and state taxing authorities. In general, the Company's tax years 2008 and forward remain open under the statutes of limitation and subject to examination. The Company does not anticipate any significant changes to its uncertain tax positions within the next 12 months.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**11. Other Comprehensive Income (Loss)**

The components of other comprehensive income (loss), including the reconciliation of net unrealized holding gains and losses to net unrealized holding gains and losses, net of reclassification adjustments and taxes, the noncredit component of OTTI on investments, and the impact of recording the defined benefit plans adjustments, are as follows:

| | Before-Tax Amount | Tax Benefit (Expense) | Net-of-Tax Amount |
|---|---|---|---|
| **Year Ended December 31, 2009** | | | |
| Net unrealized gains and losses arising during the period | $ 108,041 | $ (24,850) | $ 83,191 |
| Less reclassification adjustments for net gains and losses realized or recognized in net income | 23,606 | (6,137) | 17,469 |
| Net unrealized gains and losses | 84,435 | (18,713) | 65,722 |
| Noncredit component of OTTI on investments | (6,881) | 1,442 | (5,439) |
| Defined benefit plans adjustments | 20,128 | (4,024) | 16,104 |
| Total other comprehensive income | $ 97,682 | $ (21,295) | $ 76,387 |
| | | | |
| **Year Ended December 31, 2008** | | | |
| Net unrealized gains and losses arising during the period | $ (170,423) | $ 34,525 | $ (135,898) |
| Less reclassification adjustments for net gains and losses realized or recognized in net income | (50,819) | 10,698 | (40,121) |
| Net unrealized gains and losses | (119,604) | 23,827 | (95,777) |
| Defined benefit plans adjustments | (152,220) | 30,325 | (121,895) |
| Total other comprehensive loss | $ (271,824) | $ 54,152 | $ (217,672) |

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 12. Commitments and Contingencies

CFI and its affiliates have employment contracts and other benefit arrangements with certain executives which contain provisions that could trigger the acceleration of certain benefits and/or payment of additional compensation. Such acceleration occurs upon termination of employment without cause or "good reason" as defined in the contract. Additional acceleration occurs if said termination occurs "in connection with a change of control." Potential incremental payments related to sums owed for a termination in connection with a change of control have not been accrued as of December 31, 2009 or 2008, as the Company believes that the relevant triggering events have not occurred.

In December 2008, the District of Columbia's City Council Committee on Public Services and Consumer Affairs (D.C. City Council) passed legislation giving the District of Columbia's Insurance Commissioner (Commissioner) authority to cap GHMSI's statutory reserves attributable to the District of Columbia and compel the offering of an expanded open enrollment product in the District of Columbia. Pursuant to this law, a hearing was held in September 2009 by the Commissioner to inquire into the appropriateness of GHMSI's reserve level. A decision is expected by the Commissioner in the first half of 2010.

Various other lawsuits, including class action lawsuits and other claims, occur in the normal course of business and are pending against the Company. The Company records accruals for such matters when a loss is deemed to be probable and estimable. Management, after consultation with legal counsel, is of the opinion that the lawsuits and other claims, when resolved, will not have a material adverse effect on the accompanying consolidated financial statements; however, there can be no assurance in this regard.

In the jurisdictions in which the Company is licensed to conduct business, associations have been created for the purpose, among others, of protecting insured parties under health insurance policies. The Company is contingently liable for assessments in any calendar year, in order to provide any required funds to carry out the power and duties of the associations.

The Company, through CFI, operates under licensing agreements with BCBSA, whereby the Company uses the service marks of BCBSA in the course of its business. The Company files periodic reports with BCBSA.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

## 12. Commitments and Contingencies (continued)

CFMI and GHMSI entered into an intercompany agreement that requires CFMI or GHMSI, or their respective subsidiaries, to provide the financial resources necessary to satisfy the respective statutory or regulatory reserve requirements, subject to specific limitations, if either CFMI or GHMSI or their respective subsidiaries fail to meet or maintain their respective statutory or regulatory reserve requirements as required by law, or if such transfer of financial resources is needed to satisfy any other legally enforceable obligation.

During 2008, the Company, through its affiliates (CFMI and GHMSI) made a commitment to fund $15,000 into the BlueCross BlueShield Venture Fund Limited Partnership. The amount of the unfunded commitment was $11,748 at December 31, 2009. The Company anticipates that the additional amount will be invested in the limited partnership over the next four years.

The Company's professional liability coverage is on a claims-made basis. Should the claims-made policy not be renewed or replaced with equivalent insurance, claims based on occurrences during its term, but reported subsequently, will be uninsured. The claims-made policy has been renewed through November 1, 2010. The Company also purchased an extended reporting period (ERP) endorsement to ensure that claims made against physicians that were employed by the Company are insured. This ERP for the medical malpractice program covered the period November 2, 2004 through November 1, 2009. Reserves have been established to cover estimated exposure related to this program not covered by the ERP.

The Company has a commitment for a credit facility with a commercial bank under which certain of its affiliates may borrow up to a maximum amount of $60,000. There have been no draws made on this line of credit during 2009 or 2008.

The Company insures individuals who are qualified Medicare beneficiaries. Medicare law identifies the primary payer and secondary payer of claims when individuals are insured by both the Company and Medicare. Principally as a result of information systems programming errors, the Company incorrectly paid certain claims in years prior to 2009 as the secondary payer rather than as the primary payer. The issues were communicated to the Centers for Medicare and Medicaid Services (CMS) in May 2009. The Company has implemented corrective measures to (1) correctly identify Medicare beneficiaries that should be paid primary and (2) modify information systems to correctly adjudicate claims on behalf of Medicare beneficiaries.

CareFirst, Inc. and Affiliates

Notes to Consolidated Financial Statements (continued)
*(In Thousands)*

**12. Commitments and Contingencies (continued)**

Based on its interpretation of Medicare law, the Company believes it is liable for improperly processed claims for the period from January 1, 2006 to December 31, 2008. CFI has provided CMS with the data of the incorrectly paid claims and offered to settle its obligations to CMS for approximately $19 million. Accordingly, CFI has recorded a liability of $19,044 at December 31, 2009 for this proposed settlement. The liability is included in the caption accounts payable and other accrued expenses in the accompanying 2009 consolidated balance sheet. The settlement remains subject to government approval. While there can be no assurances that the settlement will be accepted, or that CMS will accept the Company's legal interpretation that Medicare law limits its liability in this matter to the Company's proposed settlement amount, the Company's management, after consultation with legal counsel, does not believe the final resolution of this matter will result in additional material liabilities to the Company.

Other Financial Information



**Ernst & Young LLP**
621 East Pratt Street
Baltimore, Maryland 21202

Tel: + 1 410 539 7940
Fax: + 1 410 783 3832
www.ey.com

## Report of Independent Auditors
## on Other Financial Information

Board of Directors of CareFirst, Inc.
Board of Directors of CareFirst of Maryland, Inc.
Board of Trustees of Group Hospitalization and Medical Services, Inc.

Our audit was conducted for the purpose of forming an opinion on the December 31, 2009 consolidated financial statements taken as a whole. The consolidating information is presented for purposes of additional analysis and is not a required part of the December 31, 2009 consolidated financial statements. Such information has been subjected to the auditing procedures applied in our audit of the December 31, 2009 consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the December 31, 2009 consolidated financial statements taken as a whole.

*Ernst & Young LLP*

March 1, 2010

A member firm of Ernst & Young Global Limited

## CareFirst, Inc. and Affiliates

### Consolidating Balance Sheet
*(In Thousands)*

December 31, 2009

| | CareFirst, Inc. | CareFirst of Maryland, Inc. and Subsidiaries | Group Hospitalization and Medical Services, Inc. and Subsidiaries | CareFirst BlueChoice, Inc. and Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ 332 | $ 43,958 | $ 84,154 | $ 81,978 | $ – | $ 210,422 |
| Short-term investments | – | 9,600 | 18,923 | 19,481 | – | 48,004 |
| Advances to providers | – | 138,981 | 34,101 | 40,498 | – | 213,580 |
| Accounts receivable, net | – | 192,047 | 289,783 | 59,828 | – | 541,658 |
| Due from affiliates, net | – | 36,770 | 182 | 18,790 | (55,742) | – |
| Interest income receivable | 2 | 2,533 | 6,475 | 5,324 | – | 14,334 |
| Other current assets | – | 195,417 | 527,046 | 10,926 | – | 733,389 |
| Deferred tax assets, net | – | 8,471 | 7,333 | 9,721 | – | 25,525 |
| Total current assets | 334 | 627,777 | 967,997 | 246,546 | (55,742) | 1,786,912 |
| Long-term investments | 135 | 286,071 | 775,182 | 474,915 | – | 1,536,303 |
| Other invested assets | – | 10,338 | 10,338 | – | – | 20,676 |
| Property, equipment and capitalized software, net | – | 160,746 | 114,077 | – | – | 274,823 |
| Investment in affiliates | – | 291,387 | 194,258 | – | (485,645) | – |
| Goodwill | – | 12,710 | – | 17,246 | – | 29,956 |
| Other assets | – | 10,978 | 19,309 | – | – | 30,287 |
| Deferred tax assets, net | – | 16,046 | – | 427 | (1,987) | 14,486 |
| Total assets | $ 469 | $ 1,416,053 | $ 2,081,161 | $ 739,134 | $ (543,374) | $ 3,693,443 |

55

CareFirst, Inc. and Affiliates

Consolidating Balance Sheet (continued)
*(In Thousands)*

December 31, 2009

| | CareFirst, Inc. | CareFirst of Maryland, Inc. and Subsidiaries | Group Hospitalization and Medical Services, Inc. and Subsidiaries | CareFirst BlueChoice, Inc. and Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| **Liabilities and reserves** | | | | | | |
| Current liabilities: | | | | | | |
| Short-term borrowings | $ — | $ 76,046 | $ 87,610 | $ 7,705 | $ — | $ 171,361 |
| Medical claims payable | — | 136,670 | 273,523 | 135,767 | — | 545,960 |
| Due to affiliates, net | 461 | — | 42,727 | 12,554 | (55,742) | — |
| Accounts payable and accrued expenses | — | 168,424 | 127,204 | 45,802 | — | 341,430 |
| Unearned revenues | — | 32,685 | 65,648 | 39,601 | — | 137,934 |
| Group experience funds and advances | — | 288,336 | 575,557 | 12,060 | — | 875,953 |
| Note payable, current portion | — | — | 266 | — | — | 266 |
| Total current liabilities | 461 | 702,161 | 1,172,535 | 253,489 | (55,742) | 2,072,904 |
| Note payable, noncurrent | — | — | 296 | — | — | 296 |
| Deferred taxes, net | — | — | 1,987 | — | (1,987) | — |
| Long-term employee benefit obligations | — | 73,714 | 45,105 | — | — | 118,819 |
| Other liabilities | — | 18,651 | 6,592 | — | — | 25,243 |
| Total liabilities | 461 | 794,526 | 1,226,515 | 253,489 | (57,729) | 2,217,262 |
| Reserves: | | | | | | |
| Retained earnings | — | 693,773 | 921,656 | 482,396 | (482,396) | 1,615,429 |
| Accumulated other comprehensive income (loss) | 8 | (72,246) | (67,010) | 3,249 | (3,249) | (139,248) |
| Total reserves | 8 | 621,527 | 854,646 | 485,645 | (485,645) | 1,476,181 |
| Total liabilities and reserves | $ 469 | $ 1,416,053 | $ 2,081,161 | $ 739,134 | $ (543,374) | $ 3,693,443 |

CareFirst, Inc. and Affiliates

Consolidating Statement of Operations
*(In Thousands)*

December 31, 2009

| | CareFirst, Inc. | CareFirst of Maryland, Inc. and Subsidiaries | Group Hospitalization and Medical Services, Inc. and Subsidiaries | CareFirst BlueChoice, Inc. and Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Premiums earned | $ – | $ 1,821,778 | $ 2,875,973 | $ 1,876,782 | $ – | $ 6,574,533 |
| Amounts attributable to self-funded arrangements | – | 2,684,625 | 1,155,663 | – | – | 3,840,288 |
| Less amounts attributable to claims under self-funded arrangements | – | (2,532,259) | (1,085,324) | – | – | (3,617,583) |
| Other | 445 | 22,351 | 21,421 | 115 | – | 44,332 |
| Net revenue | 445 | 1,996,495 | 2,967,733 | 1,876,897 | – | 6,841,570 |
| Operating expenses: | | | | | | |
| Cost of care | | 1,589,036 | 2,576,669 | 1,519,128 | – | 5,684,833 |
| General and administrative | 413 | 428,471 | 391,999 | 331,987 | – | 1,152,870 |
| Total operating expenses | 413 | 2,017,507 | 2,968,668 | 1,851,115 | – | 6,837,703 |
| Income (loss) from operations | 32 | (21,012) | (935) | 25,782 | – | 3,867 |
| Investment income, net | (26) | 22,100 | 60,730 | 40,120 | – | 122,924 |
| Other than temporary impairment (OTTI) losses on investments: | | | | | | |
| Total OTTI losses on investments | – | (9,062) | (12,047) | (4,540) | – | (25,649) |
| Portion of OTTI losses recognized in other comprehensive loss | – | 1,977 | 4,468 | 436 | – | 6,881 |
| OTTI losses on investments recognized in income | – | (7,085) | (7,579) | (4,104) | – | (18,768) |
| Equity in gain of affiliate | – | 27,666 | 18,444 | – | (46,110) | – |
| Other (loss) income, net | (6) | 319 | 2,195 | 1,156 | – | 3,664 |
| Income before (benefit) provision for income taxes | – | 21,988 | 72,855 | 62,954 | (46,110) | 111,687 |
| (Benefit) provision for income taxes | – | (6,480) | 4,503 | 16,844 | – | 14,867 |
| Net income | $ – | $ 28,468 | $ 68,352 | $ 46,110 | $ (46,110) | $ 96,820 |

57

EXHIBIT 12



MARTIN O'MALLEY
Governor

ANTHONY G. BROWN
Lt. Governor

**MARYLAND**

**INSURANCE**
**ADMINISTRATION**

RALPH S. TYLER
Commissioner

BETH SAMMIS
KAREN STAKEM HORNIG
Deputy Commissioners

200 St. Paul Place, Suite 2700  Baltimore, Maryland 21202
Direct Dial:  410-468-2007    Fax: 410-468-2020
Email: kbarrow@mdinsurance.state.md.us
1-800-492-6116   TTY: 1-800-735-2258
www.mdinsurance.state.md.us

<u>**FOR IMMEDIATE RELEASE**</u>

# INSURANCE REGULATOR ISSUES REPORT
# REGARDING CAREFIRST SURPLUS

**Baltimore, MD (January 8, 2010)** – The Maryland Insurance Commissioner Ralph S. Tyler today issued a report establishing a surplus range for  CareFirst of Maryland Inc. (CFMI) and Group Hospitalization and Medical Services Inc (GHMSI) — CareFirst BlueCross BlueShield's (CareFirst) largest companies — and recommending a new regulatory approach to better protect individuals and employers depending on CareFirst for health care coverage.

"The importance of this company and its unique mission in the marketplace require that we, as regulators, pay special attention to both the company's financial stability and the affordability of its products for the protection of consumers," said Tyler.  "We have recommended to the General Assembly that this review not end here but be mandated to be revisited at least every five years."

The MIA engaged the Invotex firm in October 2009 to carry out a review of CareFirst's surplus and provide a framework to determine if company surplus is excessive.  That report and other oral and written testimony were provided at a public hearing in November 2009.

An insurance company's surplus is measured in terms of a risk-based capital (RBC) ratio, which is a ratio of how much capital the company actually has versus a formula calculation of the minimum capital the company needs for solvency based on its size and amount of risk.  The MIA adopted the following target surplus ranges from its expert's analysis – 825 to 1075 percent of RBC for CMFI and 700 to 950 percent of RBC for GHMSI.

CFMI's actual RBC ratio was calculated at 503 percent - clearly below these recommendations.  GHMSI's actual ratio was calculated at 845 percent - placing it solidly within this range.  Two other independent experts substantially agreed with the adopted ranges.  The MIA will use these target surplus ranges and actual surplus projections when reviewing proposed premium rates to ensure the long-term financial strength of these important companies.

Consumers may obtain the full MIA report and the supporting documentation used in this review online at <u>www.mdinsurance.state.md.us</u> .

Page 2

*The Maryland Insurance Administration (MIA), founded as the Maryland Insurance Division in 1872, is an independent State agency located in downtown Baltimore.  This agency regulates Maryland's $26 billion insurance industry and makes certain that insurance companies, health plans and producers (agents and brokers) comply with Maryland insurance law.  The MIA also licenses over 110,000 producers and approximately 1,500 insurance companies, regulates insurance rates, monitors insurer solvency, investigates consumer complaints and travels across the State providing consumers with educational materials on insurance.  These materials may also be found at www.mdinsurance.state.md.us.*

-30-

EXHIBIT 13

CareFirst
BlueCross BlueShield

# CareFirst Footprint

A regional affiliation of Blues plans
with presence in Maryland, D.C.,
Northern Virginia, West Virginia and
North Carolina with:

- Nearly $7 billion in
  revenues
- 3.3 million members
- Nearly 5,000
  associates
- Potential market of
  6.3 million customers
- #1 provider network
- #1 market position



**CAREFIRST MARKET SHARE BY REGION**

Maryland: ~45%

DC: ~32%

Northern Virginia: ~30%

Year-End 2008 Marketshare

Other BCBS 2%
Military 4%
WellPoint 2%
Coventry 1%
CIGNA 4%
Kaiser 7%
Aetna 12%
United 15%
Other 10%
CareFirst 43%

Total Insured Population = 6.32M

6

EXHIBIT 14





CATALYST   IER FUTURE

CAREFIRST
2009 REPORT
TO THE
COMMUNITY



**OUR MISSION** In accordance with the Charter of the nonprofit health service plan, the mission of CareFirst BlueCross BlueShield shall be to:

provide affordable and accessible health insurance to the plan's insureds and those persons insured or issued health benefit plans by affiliates or subsidiaries of the plan;

assist and support public and private health care initiatives for individuals without health insurance; and

promote the integration of a health care system that meets the health care needs of all the residents of the jurisdictions in which the nonprofit health service plan operates.

Annotated Insurance Code of Maryland §14-102

ABOUT THIS REPORT In the past, CareFirst BlueCross BlueShield (CareFirst) has produced an Annual Report and a Community Report. Recognizing that our business, mission, and community giving are all intimately linked, we have produced a combined report for 2009.

# FEDERAL HEALTH CARE REFORM WILL SERVE AS A CATALYST FOR WIDE-REACHING CHANGE IN OUR HEALTH CARE SYSTEM

What does it mean to be a catalyst? Once you get past the scientific definition of the word in *Webster's Dictionary,* it is defined as an organization, individual or event that "provokes significant change." In the world of health care, there are perhaps no better words to describe the period that began in 2009 and that will continue for many years to come—it will be a time of significant change. The Patient Protection and Affordable Care Act that Congress spent much of 2009 shaping before its formal enactment in early 2010 represents the most sweeping change to health care in the United States since the creation of the Medicare and Medicaid programs 45 years ago.

CareFirst will not merely be swept along by this change; we seek to be a catalyst for positive health care change in our own right. For our members, the tens of thousands of employers we serve, the physicians with whom we work closely and the broader community of which we are a part, we are designing programs that will produce positive change and measurable results for years to come.

That is why we are taking new, thoughtful, and purposeful steps to reshape the health plans we offer our members in ways that will provide them with meaningful incentives to monitor and improve their own health. It is the driving force behind our efforts to shape new ways to reward physicians for comprehensively managing the care of their patients and serving as efficient stewards of consumers' hard-earned health care dollars. And it's why we have put *such* a sharp focus in our community programs on helping to set mothers and their children on an early path to healthy and productive lives.

We recognize just how much the members and employers we serve continue to struggle with the still rising costs of health care. Similarly, we know that there are community health care needs begging to be met. At CareFirst, we have a unique mission and mandate that requires us to meet these challenges head on. We intend to do just that in the years to come.

CHET BURRELL
*President & Chief Executive Officer*
*CareFirst BlueCross BlueShield*

3

ADVANCING OUR ABILITY
TO SERVE MEMBERS AND
EMPLOYERS BETTER

CareFirst's "members" come in many shapes and sizes: from the individual who shops for health insurance coverage online; to a small business with a handful of employees; to large national companies with headquarters in the region. CareFirst counts nearly 3.4 million people as members and the organization's more than 5,000 employees are working hard every day to find new and better ways to serve our current members and make coverage available and affordable to as many people as possible.

To that end, CareFirst continued in 2009 a major technology facelift that will over time improve customer service and efficiency. And, we invested substantial time and effort in shaping HealthyBlue, a new portfolio of products to be available in 2010 that will provide meaningful financial rewards for members who work closely with their primary care physician to stay healthy and achieve healthy outcomes. While those are some of the major advancements on the horizon, CareFirst is always moving forward to meet the needs of current and prospective members.

*Engaging Employees and Employers for Healthier Lives and Workplaces*

With health care continuing to get more expensive, employers are looking for ways to improve the personal health of their employees and lower costs. There's no easy answer, but core to any real effort to control costs is an increased focus on being and getting healthy. To help employers and employees do just that, CareFirst launched a comprehensive on-line wellness how-to program available at **www.carefirst.com/workplacewellness**.

CareFirst's Workplace Wellness on-line tool kit takes employers through a four-step process that begins with gaining executive support for wellness efforts and continues through creating an appropriate evaluation process. The site also includes an easy-to-access library of all of CareFirst's wellness-related materials, details on monthly workplace wellness webinars, and information on how to consult with CareFirst health promotion specialists.

### Reaching Out to a Growing Community

CareFirst's Mid-Atlantic service area includes some of the most rapidly growing Hispanic communities in the nation. With expanding access to coverage as a key component of its mission, the company took a number of steps to improve outreach to Latinos in the community to make them aware of and give them better access to the health coverage available through CareFirst. Some of those efforts included:

- Making certified translators available at enrollment meetings and benefit fairs for area employers

- Translating sales and marketing materials and revising them with a culturally-appropriate design

- Extending advertising efforts to websites and radio stations with significant reach into Latino communities to raise awareness of coverage offerings and availability.

### Helping Consumers Find the Right Coverage

With myriad health plans available, it can be tough to find the right coverage. That can be particularly true for consumers who are searching for health care coverage on their own, without the assistance of a broker or an employer's human resources department. To make that process as easy, understandable and convenient as possible, CareFirst introduced a new online tool – Ask Blue. The site provides a simple, 8-minute interactive video, customized to provide information applicable to the individual's specific location, lifestyle, budget and medical needs. Ask Blue is accessible by visiting the "Members & Visitors" section of www.carefirst.com, and clicking on online tools and services.

6

**Wellness Program Recognized**
CareFirst was among the first health care organizations to be accredited by the National Committee for Quality Assurance for its workplace wellness program. CareFirst's designation as "NCQA Accredited" is the result of an assessment process measuring 10 areas for providing effective wellness and health promotion. NCQA established the program to help employers evaluate independent, standardized results on wellness programs and choose the best fit for their organizations.











ER HEALTH: NOV







It's one thing to make a contribution to a charity that does good work—organizations supporting worthwhile community efforts abound. But it's quite another to seek and shape opportunities for catalytic giving that hold the potential to stimulate lasting and productive change that benefits individuals, families and communities. Increasingly, CareFirst has focused its multi-faceted CareFirst Commitment initiative on such catalytic gifts that aim to better the health care system and produce long-term positive impacts on the community.

In 2009, we gave this catalytic approach additional focus by honing in on one of the most pressing, unmet health concerns across the Mid-Atlantic region we serve. For a region reknowned for its outstanding medical care, maternal and child health are shockingly poor in some communities. Too many infants are dying or starting their lives with overwhelming health disadvantages. Addressing this concern requires greater coordination of care and services, as well as identification of and outreach to mothers at risk through a new community-centric approach that offers hope for long-term change. CareFirst has forged significant community partnerships on this front. It's just one of many examples of the way CareFirst is making catalytic investments to improve our community health now and in the future.

9

IN MARYLAND

### Helping Mothers Help Themselves and Help Their Children

CareFirst made a significant financial commitment to maternal and child health in April 2009, joining the City of Baltimore to announce **B'More for Healthy Babies**, a major, citywide campaign to improve birth outcomes. In 2007 (the most recent year with complete data), the rate of infant deaths in Baltimore City was 11.3 for every 1,000 live births. That's compared to an overall infant death rate in the United States of 6.22 per 1,000 live births and a statewide rate in Maryland of 7.9. The problem is substantially worse among African Americans living in Baltimore City, resulting in what amounts to a health crisis at the neighborhood level. CareFirst's partnership with the Baltimore City Health Department—$3 million over three years—targets multiple communities and introduces support systems and services critical to stemming this crisis and addressing it for years to come. Through aggressive outreach and education at a peer level, CareFirst hopes to increase access to pre- and post-natal health services in struggling neighborhoods and, as a result, help ensure that more expectant mothers get the care they so badly need.

As a not-for-profit health plan and the largest organization of its type in the region, CareFirst recognizes its role in improving the quality of and access to health care for the communities we serve.

### New Intensive Care Connections

**Maryland eCare** is a group of independent hospitals collaborating to improve patient safety and care by addressing the impacts resulting from a shortage of intensive care doctors serving rural Maryland communities. Maryland eCare hospitals include Atlantic General Hospital (Berlin), Calvert Memorial Hospital (Prince Frederick), Peninsula Regional Medical Center (Salisbury), St. Mary's Hospital (Leonardtown), and Washington County Health System (Hagerstown). In May 2009, CareFirst's partnership with Maryland eCare produced the state's first remotely monitored e-ICU (intensive care unit) platform at Calvert Memorial Hospital. Patients in critical care were able to receive around-the-clock care, through a mix of on-site intensive care physicians and physicians working electronically from 130 miles away. On-site nurses at Calvert Memorial could count on attending intensive care unit physicians working at the eCare monitoring center at Christiana Care, in Wilmington, Delaware. This advancement in technology can help member hospitals manage in the face of a short supply of intensivists and provide care more efficiently.

### Health Care for Maryland's Homeless and Uninsured

The lingering economic recession left more people in Maryland and throughout the region in need of basic services. CareFirst worked on many fronts to expand access to health services to help Marylanders through the recession. We teamed with **Health Care for the Homeless** to continue providing medical care for the Baltimore region's homeless. Of the ongoing effort, Jeff Singer, President and Chief Executive Officer of Health Care for the Homeless, said the organization's work "…is made more effective by partners like CareFirst BlueCross BlueShield. CareFirst helps us improve the health of people experiencing homelessness by getting them off the street and back into the mainstream."

CareFirst also teamed with organizations such as **MobileMed** and **Nehemiah House** to bring much-needed services to many in the region that have slipped through the cracks. Efforts to find and treat medical and dental problems early, for example, can help those who might otherwise go without dental care avoid the life-threatening illnesses that can develop from neglecting potentially serious oral health conditions.

In Prince George's and Montgomery Counties, CareFirst teamed with Maryland Governor Martin O'Malley and the advocacy group **Health Care for All** to expand the **#211 hotline service** for Maryland's uninsured and help Marylanders enroll in Medicaid. To date, the program has connected about 50,000 Marylanders with the care they too often go without.

10

It is estimated that about 132,000 Maryland seniors are vulnerable to a gap in prescription drug coverage known as the Medicare Part D donut hole. CareFirst stepped forward again in 2009 to fill the gap for low-income Maryland seniors, contributing $4 million to the **Maryland Senior Prescription Drug Assistance Program (MD SPDAP)**.

## IN THE DISTRICT OF COLUMBIA

CareFirst partnered with the D.C. Department of Health to engage women with at-risk pregnancies, providing them with case managers who can help guide them to healthy birth outcomes. CareFirst also teamed with the Department of Health to provide parenting counsel to new mothers and encourage safe sleeping for infants. We funded programs to mentor D.C. teens on healthy living and to empower them to prevent HIV and AIDS. In partnership with the **Girl Scouts of America, Girls Inc.**, and the **Boys and Girls Clubs of D.C.**, CareFirst is attempting to encourage healthy living at an early age that can be carried into adulthood. These are just some of the ways we are working together with organizations and communities to improve the District's health care future.

### Live Healthier, Sleep Easier

The rate of infant death in the District of Columbia (12.6 per 1,000 live births) parallels the rates in some developing and under-developed countries. **Healthy Start**, an initiative to reduce infant mortality in the District, uses nurse case managers and family support counselors to provide comprehensive care and services for underserved women in the District. CareFirst, through a partnership with the D.C. Department of Health, is funding the program over three years, along with an initiative (**Safe Cribs**) to provide free cribs for families and mentoring on ways to reduce the tragic instances of Sudden Infant Death Syndrome (SIDS).

Healthy Start is working directly with dozens of District expectant mothers to ensure healthy births and a healthy start for newborns. Program participants benefit from education and prenatal and postpartum home visits. The program is complemented by an effort that distributed 500 cribs in 2009. Each family receiving a free crib attended educational classes on how to provide safe sleeping environments for their babies. These programs are made possible by more than $1 million in combined grant funding to the District.

11

Since the inception of CareFirst Commitment, a multi-pronged approach to address health care needs in our community, we've made significant strides in addressing the most important health care issues.

*Fighting Tough Health Battles*

In 2009, the District's office on HIV and AIDS released a startling estimate that infection rates for residents ages 12 and over exceeded epidemic thresholds. CareFirst, in 2009, teamed with **City Year Washington, D.C.**, and the **Summit Health Institute for Research and Education (S.H.I.R.E.), Inc.**, contributing $100,000 to each organization to educate and mentor area youth on the dangers of HIV and AIDS and the empowerment of healthy living. With programs designed to develop peer mentors, more than 3,000 middle and high school students in D.C. have been reached.

*Growing Strong Youth for Tomorrow*

CareFirst teamed with the Girl Scouts of America and the Boys and Girls Clubs of Greater Washington D.C. in 2009 to help mentor more than 5,300 at-risk teens. Through grants totaling $175,000, CareFirst invested in these programs to introduce youth, ages 6 to18, to the life skills they need for healthy lives stretching well into adulthood. The Girl Scout's "Grow Strong" program teaches about 4,500 D.C.-area girls, most of whom are from low-income and ethnic minority families, how to live strong and healthy lives. The girls were invited to two-week camp programs that seek to prevent childhood obesity, under-age pregnancy, and HIV infection. The girls receive mentoring during camp and are given take-home kits to share what they have learned with their families. The Boys and Girls Club's "Adopt a Club" campaign reached 858 at-risk youth, pulling them off the streets and into activity programs in supportive and mentoring environments. The broad range of programs administered by the Adopt-a-Club program assists youth to find alternatives to reacting with violence to conflicts among their peers.

## IN NORTHERN VIRGINIA

CareFirst issued a $1.6 million request for proposals from community-based organizations to find local solutions for improving maternal and infant health. CareFirst sought to plant seeds of innovation that could reshape how expectant mothers access and receive care. In 2009, CareFirst funded a technology-based program to reach expectant mothers with important information about pregnancy and helped a local clinic improve patient care coordination. Other programs target high-risk pregnancies, including those in urban communities with high incidence of infant mortality, low birth weights, and sudden infant death syndrome. CareFirst is also providing funding to provide uninsured residents much-needed prescription medications through **NOVA ScriptsCentral**.

12

*R U redE 4 a healthy stRt?*

**The Healthy Mothers Healthy Babies Coalition** is implementing Text4Baby, a technology-based initiative to reach about 5,000 English- and Spanish-speaking expectant mothers with information about topics critical to healthy pregnancies and infant care. Phone-based text messaging will be used as a central component of the program to reach expectant mothers. CareFirst has contributed $300,000 to support the program. That's just one of the innovative programs underway to focus on healthy starts for Virginia mothers and their children. Other organizations benefitting from CareFirst funding include:

**ARLINGTON PEDIATRIC CENTER** – is implementing an Electronic Medical Records system, enhancing clinical care for 2,500 children and helping parents and doctors better work in concert for improved health outcomes.

**NORTHERN VIRGINIA FAMILY SERVICES** – is expanding its Healthy Families Program, providing more women with support counseling and improved access to health care for high-risk African American women who are pregnant or parenting young children.

**INOVA HEALTH SYSTEM FOUNDATION** – is focusing on reducing infant mortality among Hispanic women through a comprehensive community engagement program in Falls Church. Community volunteers from the Hispanic Congregational Health Partnership and Inova Health Source will be recruited and trained to guide expectant mothers

through perinatal care, the critical time shortly before and after birth.

**ALEXANDRIA NEIGHBORHOOD HEALTH SERVICES INC. (ANHSI)** – is establishing a Prenatal Care Case Management program to reduce incidence of low-birth weight, treat depression associated with pregnancy and parenting, and address pediatric staffing shortages. ANHSI focuses on prenatal care for low-income patients.

**NORTHERN VIRGINIA URBAN LEAGUE (NOVAUL)** – is reaching out to 230 first-time pregnant and parenting mothers in Alexandria and Fairfax through the organization's Resource Mothers Program. NOVAUL targets African American teenagers and disadvantaged adolescents, helping clients access prenatal care and teaching healthy parenting skills through on-site and in-home visits.

**SUDDEN INFANT DEATH SERVICES** – is providing new, portable infant cribs and education on how to promote safe infant sleeping for parents in northern Virginia.

Through CareFirst Commitment and other charitable giving from 2005-2009, we have dedicated more than $170 million to worthwhile programs and organizations.

13



The last year—perhaps more than at any time in history—brought substantial discussion about how to change and improve our nation's health care system. What can be done to give more people access to coverage? What steps can be taken to control health care costs that are rising steadily and making health care unaffordable for so many? What methods can be brought to bear to improve health care quality?

Focusing on questions such as these isn't something new at CareFirst. We've been taking steps to improve the health care delivery system—both for the benefit of our members and the broader community we serve—for years. CareFirst has developed programs that are truly catalytic in nature; they promote change in the health care system that is positive and lasting. From efforts to expand nursing care that begin with an individual committed nurse, to initiatives designed to reshape how primary care is delivered, CareFirst is taking steps that can make our health system stronger and better.

15

### Pushing For Health Care Change

As a not-for-profit health insurer, CareFirst's mission is uniquely different from many of its large for-profit competitors. The company has a legislatively mandated charge to provide affordable and accessible health care coverage, assist and support public health initiatives, and promote health care system improvements that benefit the communities we serve. That's why CareFirst didn't wait to support major reform to the health care system. While federal health care reform was still in its early stages, CareFirst helped shape and joined with key Maryland legislators to introduce a concept for universal health care coverage called the Healthy Maryland plan. The concepts at the heart of the plan included guarantees of coverage regardless of health status and pre-existing conditions, subsidies to make coverage more affordable and other tenets that eventually were included in federal reform.

### Making Primary Care a Primary Focus

There is near-universal agreement that one key element of improving health care is to find new ways to engage individuals in strong relationships with their primary care physicians (PCPs). PCPs are in a unique position to assess a patient's overall health status, identify potential health issues, manage chronic conditions and ensure they are getting the care they need when and where appropriate. Today, unfortunately, a number of factors conspire to limit the ability of PCPs to fill this critically important role. In 2009, CareFirst began a major Patient-Centered Medical Home pilot program.

Patient-Centered Medical Homes represent a model of primary health care delivery based on an ongoing personal relationship between a patient and a patient's doctor and care team. Working together, physicians, nurses, nurse assistants and other medical and health professionals provide a medical "home" to meet all of a patient's medical needs. CareFirst's pilot, the largest of its kind in the region, includes nine primary care practices serving 35,000 CareFirst members and more than 150,000 patients across the region. The $6 million two-year program is just a precursor to a major new initiative designed to improve primary care delivery by rewarding physicians for engaging patients, improving quality, and providing cost-efficient care.

16



### Expanding the Nursing Pool...
### One Teacher at a Time

CareFirst launched Project RN in 2007 to address the pressing need for nursing faculty in the region. A shortage in nursing faculty was identified as a key factor limiting the number of undergraduate nursing slots available to students in CareFirst's service area. Project RN provided $80,000 stipends to help students complete graduate degrees and qualify to teach in nursing programs within two years. In exchange, the graduate student beneficiaries agree to teach for three years in a nursing education program in Maryland, the District of Columbia or Northern Virginia. Eight program participants are now in teaching positions and can contribute to the education of hundreds of new nurses through their three-year commitments, and others are finishing up their degrees and seeking teaching positions. In addition to this initiative, CareFirst is a major supporter of the Maryland Hospital Association's "Who Will Care?" initiative which also aims to dramatically increase the number of nurses educated in Maryland.



Alexandria Community Trust
Alexandria Neighborhood Health Services, Inc.
American College of Preventive Medicine
American Heart Association
American Lung Association
Arlington Free Clinic
Arlington Pediatric Center (VA)


Boys and Girls Clubs of Greater Washington
Bread for the City


Capital Area Food Bank
Capital Breast Care Center
CASA de Maryland, Inc.
Children's Law Center, Inc.
Children's National Medical Center
Chinese Women's League, DC Chapter
City Year Washington
Columbia Lighthouse for the Blind
Columbia Road Health Services
Community Family Life Services
Community Foundation for the National
   Capital Region
Community Services for Autistic Adults
   & Children (CSAAC)
Concert for Life
Congressional Hunger Center
Covenant House
Cultural Tourism, DC


DC Area Health Education Center
DC Central Kitchen, Inc.
DC Chamber of Commerce
DC Children and Youth Investment Trust
   Corporation
DC Federation of Civic Associations, Inc.
DC Wheel Productions, Inc.
District of Columbia Department of Health
District of Columbia Hospital Association
District of Columbia Primary Care Association
Doctors Community Hospital Foundation
Doorways for Women and Families

Economic Club of Washington DC
Educational Video in Spanish
Everybody Wins DC


Fairfax County Government
Federal City Council
Fight for Children, Inc.
Foundation Schools


George Mason University
Georgetown University Children's
   Medical Center
George Washington University
Girl Scouts of the National Capital Area
Girls Inc. of the Washington, DC Metro Area
Greater DC Cares
Greater Washington Board of Trade
Greater Washington Foundation of Insurance
   & Financial Advisors
Greater Washington Hispanic Chamber
   of Commerce
Greater Washington Urban League


Health Outreach Information Network
Healthcare Council (NCA)
Hispanic College Fund, Inc.
Howard University


INOVA Health System Foundation
INOVA Juniper Program
IONA Senior Services


Jamaican Women of Washington, Inc.
Joint Center for Political and Economic Studies
John F. Kennedy Center for the Performing Arts
Juvenile Diabetes Research Foundation-
   Capital Chapter

**K**
Kingsbury School
Knock-Out Abuse Against Women

**L**
Leadership Arlington
Leadership Greater Washington
Leukemia & Lymphoma Society

**M**
March of Dimes
Marymount University
Mary's Center for Maternal and Child Care
Medical Society of Virginia Foundation
MedStar Research Institute
Mentors, Inc.
Metro Teens AIDS
Montgomery County Chamber of Commerce
Montgomery County Community Foundation

**N**
Nannie Helen Burroughs School
National Gay & Lesbian Chamber of Commerce
National Healthy Mothers, Healthy Babies
    Coalition
National Committee for Quality Assurance
NEA Foundation
Neediest Kids
New Hope Housing, Inc.
Northern Virginia Family Service
Northern Virginia Urban League
Northwest Federal Credit Union

**P**
PHI Community Foundation
Planned Parenthood of Metropolitan
    Washington
Prince George's Community Foundation
Prince George's County Health Department
Prince George's County Public Schools
Providence Hospital Foundation

**R**
Ron Brown Scholar Fund

**S**
Sibley Memorial Hospital
Sister to Sister Everyone Has a Heart
    Foundation
Smithsonian Institution
Spanish Catholic Center, Inc.
Sudden Infant Death Services of the
    Mid-Atlantic

**T**
Temple Beth Ami
The Links, Inc.
The Virginian
The Wellness Community of Greater
    Washington, DC
Thurgood Marshall Academy
Tigerlily Foundation

**U**
United Way of the National Capital Area
United Way of West Virginia

**V**
Virginia Hispanic Chamber of Commerce
Virginia Hospital Center

**W**
Washington Hospital Center Foundation
Washington Sports and Entertainment
    Charities, Inc.
Whitman-Walker Clinic
Women's Center

**Y**
YMCA of Metropolitan Washington
Yvette Alexander Constituent Fund

19

CareFirst donated to the following Maryland (excluding Prince George's and Montgomery counties) organizations in 2009.

**A**
Alliance for Lupus Research
Alzheimer's Association Greater Maryland
    Chapter
American Cancer Society
American Diabetes Association
American Heart Association
American Red Cross of Central Maryland
Antietam Healthcare Foundation
Associated Black Charities

**B**
B & O Railroad Museum
Baltimore Association of Health Underwriters
Baltimore City Department of Transportation
Baltimore City Health Department
Baltimore City Healthy Start, Inc.
Baltimore County Chamber of Commerce
Baltimore County Department of Aging
Baltimore County Police Foundation
Baltimore Hispanic Chamber of Commerce
Baltimore Medical System
Baltimore Symphony Orchestra
Baltimore Teachers Union
Baltimore Urban Debate League
Big Brothers Big Sisters of Central Maryland,
    Southern Maryland & Lower Eastern Shore
Big Brothers Big Sisters of the Alleghenies
Board of Education of Wicomico County
Boy Scouts of America - Baltimore Area Council
Boys and Girls Club of Annapolis and Anne
    Arundel County (MD)
Boys and Girls Club Washington County
Brook Lane Health Services
Business Volunteers Unlimited

**C**
Cal Ripken, Sr. Foundation
Calvert Memorial Hospital Foundation, Inc.
Cancer Support Foundation, Inc.
Center for Urban Families
Chesapeake Center for Youth Development
Chesapeake Habitat for Humanity
Chesapeake Urology Associates
Children's Guild
College of Southern Maryland Foundation
Columbia Foundation
Community College of Baltimore County
    Foundation, Inc.
Community Foundation of Charles County

**D**
Domestic Violence Center of Howard County
Downtown Partnership of Baltimore
Dyslexia Tutoring Program

**E**
Economic Alliance of Greater Baltimore
Ed Block Courage Award Foundation, Inc.
Edward Lee Mason III Memorial Scholarship

**F**
Family Crisis Center of Baltimore County
Fellowship of Christian Athletes
Fort Meade Alliance
Foundation of the National Student Nurses
    Association
Friends of Patterson Park

**G**
Goodwill Industries of the Chesapeake
Greater Baltimore Committee

**H**
Hippodrome Foundation, Inc.
Hispanic College Fund, Inc.
Hood College
Hospice of the Chesapeake
House of Ruth
Howard Community College Educational
    Foundation, Inc.
Howard County Economic Development
    Authority
Howard Hospital Foundation

**I**
Independent College Fund of Maryland
International Festival

**J**
Jane's Legacy Foundation
Johns Hopkins University School of Nursing
Juvenile Diabetes Research Foundation -
    Maryland Chapter

**K**
Kennedy Krieger Institute
Kent County Public Schools
Kidcare

20

www.carefirstcommitment.com

Leukemia & Lymphoma Society
LifeBridge Health
Light Health & Wellness Comprehensive
    Services, Inc.
Living Classrooms Foundation
Loyola University of Maryland


March of Dimes
Marian House, Inc.
Maryland Association of Boards of Education
Maryland Black Caucus Foundation
Maryland Citizens Health Initiative
Maryland Food Bank
Maryland Mentoring Partnership
Maryland Science Center
Maryland Society for Sight
Maryland Zoo in Baltimore
MedBank of Maryland, Inc
Morgan Family Foundation
Morgan State University Foundation


National Aquarium in Baltimore
National Association of Black Accountants
    (Baltimore)
National Family Resiliency Center
National Great Blacks in Wax Museum
National Kidney Foundation Of Maryland
North Baltimore Center


Opportunity Builders, Inc.


Penn-Mar Organization
Reginald F. Lewis Museum of Maryland
    African American History & Culture


Ride Across Maryland Foundation

Saint Pius X School
Salisbury Area Chamber of Commerce
SEED Foundation
Shepherd's Clinic
Sister to Sister Foundation - Baltimore
Sojourner-Douglass College
St. Agnes Foundation
Stella Maris Hospice Program
Stevenson University


The Burn Foundation
The Hiding Place
The Links, Inc. Baltimore Chapter
The Wellness Community (Delmarva)
Total Health Care, Inc.
Towson University
TurnAround, Inc.


United Way of Central Maryland
United Way of the Lower Eastern Shore
University of Maryland Medical System
    Foundation
University of Maryland School of Nursing


We Promote Health
Western Maryland Health System Auxiliary
Wicomico County Health Department
William E. Proudford Sickle Cell Fund, Inc.


Y of Central Maryland
Youth for Tomorrow
YWCA of Annapolis and Anne Arundel County



## AREAS OF GIVING

Each year, we establish a budget to reflect the health care needs and priorities of the communities we serve in Washington, D.C., Maryland and Northern Virginia with an overarching goal of dedicating resources to initiatives that catalyze change and create systemic efficiencies in the health care delivery system. In priority order, the highest portion of our CareFirst contributions goes toward:

**Subsidies and Enhanced Health care Access Programs** Support for City and State programs which provide access for large vulnerable populations—those unable to otherwise receive health care services, or have only limited access to those services. This represents the largest portion of our giving budget.

• In 2009, CareFirst received and evaluated 772 requests for funding.

• During the year, 342 grants were approved for funding.

**Catalytic Giving** Support for programs and other initiatives that stimulate productive change and improvements in the health care system over the long term.

**Programmatic Initiatives** Program support which targets a specific population and/or addresses a major health care issue, and that has specific measurements for success.

**Targeted Health Related Giving Through Others** CareFirst seeks opportunities to support organizations that provide direct health care or related services for the underserved.

**Corporate Memberships and Community Sponsorships** CareFirst funds certain opportunities related to corporate sponsorships and memberships with business/civic organizations, to build strong relationships and develop visible partnerships with the community. This represents the smallest portion of our giving budget.

## 2009 RESULTS

| GIVING CATEGORY | ($000) |
|---|---:|
| Corporate Memberships | $   173 |
| Community Sponsorships | 974 |
| Targeted Health Giving Through Others | 2,339 |
| Programmatic Initiatives | 2,144 |
| Catalytic Giving | 5,765 |
| Subsidies and Enhanced Access Programs | 33,716 |
| SUBTOTAL | 45,111 |
| OTHER | 922 |
| **TOTAL** | **$  46,033** |

# 2009 PERFORMANCE

As the economy struggled toward recovery in 2009, insurers nationwide saw broad erosion in membership. CareFirst mostly managed to buck this trend, with total enrollment holding almost steady from 2008. After a year in which net income for the company dropped precipitously, improving financial markets buoyed the company's investment portfolio contributing to a rebound in net income. Though a not-for-profit, CareFirst requires net income to fund financial reserves held for members' protection and to invest in information technology and other programs for the benefit of members.

24

**TOTAL MEMBERSHIP**
in millions



**MEDICAL CARE SPENDING**
in billions



**REVENUE**
in billions



**NET INCOME**
in millions

www.carefirst.com

## CAREFIRST IS A MAJOR TAXPAYER

While CareFirst is a not-for-profit and a leading giver in the region, many people mistakenly believe CareFirst's not-for-profit status exempts the organization from taxes. Not so, as the chart below illustrates.

| Jurisdiction | Taxes Paid in 2009 |
|---|---|
| Federal | $ 689,000 |
| State of Maryland | $ 28,935,850 |
| District of Columbia | $ 15,259,500 |
| Virginia | $ 10,258,700 |
| Other Jurisdictions | $ 53,600 |
| **Total CareFirst Taxes** | **$ 55,196,650** |



**CareFirst, Inc. Board of Directors**

Larry D. Bailey, CPA
*President, LDB Consulting, Inc.*

Gregory V. Billups
*President & CEO*, Systems
Maintenance & Technology, Inc.

Trena Taylor Brown
*President*
Taylor Brown Associates LLC

William F. Bruther, M.D., P.C.*
*(Non-Voting Member)*
Ophthalmologist

N. Thomas Connally, M.D.
*Medical Director*
The Arlington Free Clinic

Michel L. Daley
*Managing Member*
Zanzibar on the Waterfront, LLC

Michael J. Kelly
*Board Member*
National Senior Citizens Law Center

Elizabeth Oliver-Farrow
*Chairperson & CEO*
The Oliver Group, Inc.

Elizabeth St. J. Loker
*Former Vice President,*
*Systems and Engineering*
The Washington Post

C. James Lowthers
*President*, United Food & Commercial
Workers Union, Local 400

Natalie O. Ludaway
*Vice Chairman*, CareFirst, Inc.
*Managing Member*
Leftwich & Ludaway, LLC

Floretta D. McKenzie, Ed.D.
*Senior Advisor*
American Institutes for Research

Michael R. Merson
*Chairman*, CareFirst, Inc.
*President*, Michael Merson, LLC

Kevin G. Quinn
*President*
Wye River Group, Inc.

Wayne L. Rogers
*(Non-Voting Member)*
*President*, Synergics, Inc.

Giuseppe Savona
*Former Vice President &*
*Chief Financial Officer*
United Health Group
Government Programs

Loretta L. Schmitzer
*Vice President, Government Affairs*
The Boeing Company

Robert L. Sloan
*President & CEO*
Sibley Memorial Hospital

James Wallace, CPA
*President*
The Wallace Group

Kathleen M. White, Ph.D., R.N.
*Associate Professor & Director of*
*the Masters Program*
Johns Hopkins University School of Nursing

Robert M. Willis, Esq.
*President & CEO*
McCarran Ferguson CaptiveManagement
Company, Inc.

*Deceased

**Maryland Affiliate**
(CareFirst of Maryland, Inc.)

Andrea M. Amprey
*Executive Vice President & Co-Owner*
Amprey & Associates

Barbara Blount Armstrong
*President*, Armstrong Enterprises

Gregory V. Billups
*President & CEO*, Systems
Maintenance & Technology, Inc.

James A. D'Orta, M.D.
*Chairman, Board of Directors*
Consumer Health Services, Inc.

Joseph G. Hall
*Vice President, Investment*
*Management Division*
Goldman Sachs & Co

Michael J. Kelly
*Chairman*, CareFirst of Maryland, Inc.
*Board Member*
National Senior Citizens Law Center

Richard N. Kramer
*Chief Operating Officer*
PinnacleCare

Elizabeth St. J. Loker
*Former Vice President,*
*Systems and Engineering*
The Washington Post

Kevin G. Quinn
*President*
Wye River Group, Inc.

26

Margaret Scott Schiff, CPA, MBA
*Former Vice President,*
*Finance & Human Resources*
The Washington Post

Loretta L. Schmitzer
*Vice President, Government Affairs*
The Boeing Company

James J. Xinis
*President & CEO*
Calvert Memorial Hospital

**National Capital Area Affiliate**
(Group Hospitalization and Medical Services, Inc.)

Larry D. Bailey, CPA
*President*
LDB Consulting, Inc.

N. Thomas Connally, M.D.
*Medical Director*
The Arlington Free Clinic

Linda Washington Cropp
*Former Chairman*
Council of the District of Columbia

Faye Ford Fields
*President & CEO*
Integrated Resource
Technologies, Inc.

Elizabeth Oliver-Farrow
*Chairman & CEO*
The Oliver Group, Inc.

Natalie O. Ludaway
*Chairperson*
Group Hospitalization and
Medical Services, Inc.
*Managing Member*
Leftwich & Ludaway, LLC

Carlos Rodríguez, Ph.D.
*Principal Research Scientist*
American Institute for Research

Ralph J. Rohner
*Professor*
Catholic University of
America School of Law

Robert L. Sloan
*President & CEO*
Sibley Memorial Hospital

James Wallace, CPA
*President*
The Wallace Group

Robert M. Willis, Esq.
*President & CEO*
McCarran Ferguson Captive
Management Company, Inc.

**Senior Leadership**

Chet Burrell
*President and Chief Executive Officer*

Michael Avotins
*Senior Vice President*
*Large Group Administrative Service Unit*

G. Mark Chaney
*Executive Vice President and Chief Financial Officer*

Rita Costello
*Senior Vice President*
*Strategic Marketing and Product Development*

Gregory A. Devou
*Executive Vice President and Chief Marketing Officer*

M. Bruce Edwards
*Senior Vice President*
*Networks Management*

Michael Felber
*Senior Vice President*
*Sales*

Greg Maguire
*Senior Vice President*
*Technology and Operational Support*

Steven J. Margolis
*Senior Vice President*
*Small and Medium Group Administrative Service Unit*

Kevin O'Neill
*Senior Vice President*
*Strategic Managed Care Initiatives*

John A. Picciotto
*Executive Vice President and General Counsel*

Fred Plumb
*Senior Vice President*
*Federal Employee Program Administrative Service Unit*

Jon Shematek, M.D.
*Senior Vice President and Chief Medical Officer*

Gwendolyn D. Skillern
*Senior Vice President and General Auditor*

Andrew F. Sullivan
*Senior Vice President*
*Consumer Direct Administrative Service Unit*

Maria Harris Tildon
*Senior Vice President*
*Public Policy and Community Affairs*

Kenny W. Kan
*Senior Vice President and Chief Actuary*

David D. Wolf
*Executive Vice President*
*Medical Services and Corporate Development*



10455 Mill Run Circle
Owings Mills, Maryland 21117-5559

**www.carefirstcommitment.com**

CareFirst BlueCross BlueShield is the business name of Group Hospitalization and Medical Services, Inc. which is an independent licensee of the Blue Cross and Blue Shield Association. ® Registered trademark of the Blue Cross and Blue Shield Association. ®' Registered trademark of CareFirst of Maryland, Inc.

EXHIBIT 15

 **BlueCross BlueShield Association**

### About the Blue Cross and Blue Shield Association

Enter Search Term

The Blue Cross and Blue Shield Association (BCBSA) is a national federation of 39 independent, community-based and locally operated Blue Cross and Blue Shield companies.

Throughout our 80-year history, the 39 Blue Cross and Blue Shield companies (http://www.bcbs.com/coverage/find/plan/) have provided millions of families with top-quality, affordable health insurance.

- Represents the nation's oldest and largest family of health benefits companies
- BCBS Brands are the most recognized in the health insurance industry
- Headquarters in Chicago with offices in Washington, D.C. (http://www.bcbs.com/about/contact/)
- Approximately 1,000 employees
- BCBSA Departments and National Programs (http://www.bcbs.com/news/press/facts/departments.html)

#### BCBS Companies

Collectively, the Blue Cross and Blue Shield System provides healthcare coverage for more than 98 million people or one-in-three Americans.

- 39 Blue Cross and Blue Shield companies
- Among the 20 largest employers in the U.S.
- Healthcare coverage available in all 50 states, the District of Columbia and in Puerto Rico
- Nationwide, more than 90 percent of hospitals and 80 percent of physicians contract with BCBS companies – more than any other insurer

#### BCBS History

Today, the Blue Cross and Blue Shield Brands are registered in more than 170 countries.  To find out the history behind healthcare's most recognized Brands, visit the BCBS Timeline (http://www.bcbs.com/about/history/) .

**BlueCross BlueShield Association**

Enter Search Term

### BlueCard®

BlueCard is a national program that enables members of one Blue company to obtain healthcare services while traveling or living in another Blue company's service area. The program links participating healthcare providers with the independent Blue companies across the country and in more than 200 countries and territories worldwide, through a single electronic network for claims processing and reimbursement.

*Within the United States*

1. Always carry your current Blue Plan ID card.

2. In an emergency, go directly to the nearest hospital.

3. To find nearby doctors and hospitals, call BlueCard Access at **1.800.810.BLUE (2583)** or visit the BlueCard Doctor and Hospital Finder (http://provider.bcbs.com/) .

4. Call your Blue Plan for pre-certification or prior authorization, if necessary. The phone number is located on your Blue Plan ID card. **Note: This phone number is different from the BlueCard Access number mentioned above.**

5. When you arrive at the participating doctor's office or hospital, show the provider your ID card. The provider will identify your benefits through one of these symbols:

 Traditional/ Indemnity Benefits

**PPO** ® PPO Benefits

After you receive care, you should:

- Not have to complete any claim forms.
- Not have to pay upfront for medical services, except for the usual out-of-pocket expenses (non-covered services, deductible, co-payment and coinsurance).
- Receive an explanation of benefits from your Blue Plan.

*Around the world*

1. Verify your international benefits with your Blue Plan before leaving the United States. Coverage may be different outside the country.

2. Always carry your current Blue Plan ID card.

3. In an emergency, go directly to the nearest hospital.

4. If you need to locate a doctor or hospital, or need medical assistance services, call the BlueCard Worldwide Service Center at **1.800.810.BLUE (2583)** or call collect at **1.804.673.1177**, 24 hours a day, seven days a week. An assistance coordinator, in conjunction with a medical professional, will arrange a physician appointment or hospitalization, if necessary.

5. Call the BlueCard Worldwide Service Center at **1.800.810.2583** or collect at **1.804.673.1177** when you need inpatient care. In most cases, you should not need to pay upfront for inpatient care at participating BlueCard Worldwide hospitals except for the out-of-pocket expenses (non-covered services, deductible, co-payment and co-insurance) you normally pay. The hospital should submit your claim on your behalf. In addition to contacting the BlueCard Worldwide Service Center, call your Blue Plan for pre-certification or pre-authorization. You can find the phone number on your Blue Plan ID card. Note: this number is different from the phone number listed above.

6. You will need to pay upfront for care received from a doctor and/or non-participating hospital. Then complete a BlueCard Worldwide claim form and send it with the bill(s) to the BlueCard Worldwide Service Center (the address is on the form). The claim form is available from your Blue Plan, the BlueCard Worldwide Service Center, or online at BlueCard Worldwide (http://www.bcbs.com/coverage/bluecard/bluecard-worldwide-exp.html) .

### Away from Home Care®

As a Blue Plan HMO member, you can enjoy peace of mind by having access to healthcare benefits across the country. Away From Home Care provides convenient healthcare coverage while you are away from your Home HMO and temporarily residing in a participating HMO's service area. Away From Home Care is available in many states and the District of Columbia.

**Guest Membership**

Guest Membership is designed to address your healthcare needs if you have one of the following situations:

- Students— attending school out of state
- Families Apart—family members residing in different
- HMO service areas
- Long-Term Traveler—long-term work assignment in another state, or retirees with a dual residence

The Away From Home Care Program ensures that you have ongoing access to the care you need while residing away from home. Here is how the program works:

- Contact your Home HMO if you or a covered dependent are going to be away from home for at least 90 consecutive days.
- Your Home HMO will advise you if a participating HMO is in the area where you will be staying.
- Your Home HMO will work with you to complete a Guest Membership application, if there is a participating HMO in the area where you will be staying. Your Home HMO will mail you the application for signature. Once it is signed, the Home HMO will forward it to the participating Host HMO in your destination location.
- Your Host HMO will provide you with a membership ID card, a primary care physician, and instructions on how to access your benefits while using your Guest Membership.
- Call your Host HMO primary care physician for an appointment when you need medical care.

EXHIBIT 16



# BlueCross BlueShield
# of Maryland
An Independent Licensee of the
Blue Cross and Blue Shield Association

## PARTICIPATING PROFESSIONAL PROVIDER AGREEMENT

## SCOPE OF AGREEMENT

This Participating Professional Provider Agreement is between Blue Cross and Blue Shield of Maryland, Inc., (hereinafter referred to as "BCBSM"), and you (hereinafter sometimes referred to as "Provider") and governs your participation as a BCBSM Participating Provider in the BCBSM Program. This Agreement applies to all Covered Services you provide.

## DEFINITIONS

1. **BCBSM Program** means a health care benefit or services program which is partially or wholly underwritten and/or administered by BCBSM; or which is partially or wholly underwritten by a subsidiary or affiliate of BCBSM and for which BCBSM has been identified as the administrator.

2. **Allowed Benefit** for Covered Services under this Agreement is as follows: the Allowed Benefit payable to a Participating Provider for a Covered Service will be the lesser of (1) the practitioner's actual charge or (2) the practitioner's BCBSM profile rate in effect on the date that the service is rendered.

3. **Covered Service** means a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM Program in which he/she is enrolled.

4. **Member** means any eligible person covered under a BCBSM Program.

5. **Participating Provider** means any provider who contracts with BCBSM to be paid directly for rendering Covered Services.

6. **Preferred Provider** means any Participating Provider who has agreed to comply with any and all Preferred Provider policies and procedures, including acceptance of the Preferred Provider Allowed Benefit as payment in full for Covered Services provided to Members enrolled in Preferred BCBSM Programs.

7. **Preferred Provider Allowed Benefit (PPAB)** for Covered Services is 90% of the Allowed Benefit.

8. **Practitioner** means one legally entitled by license to practice the healing arts and perform within the scope of that license in the state where services are rendered.

## SERVICES

9. You agree to provide Covered Services to Members in accordance with the terms and conditions of this Agreement; within the scope of your professional license or certification; and in accordance with, and subject to, the provisions of the subscription agreements for the BCBSM Programs.

10. You agree that all services provided to Members under this Agreement shall be provided by you or by a duly licensed or certified person under your direct supervision.

11. You agree to use your best efforts to comply with all reasonable administrative policies and procedures established by BCBSM that are related to the delivery and reimbursement of Covered Services and you agree to comply with the applicable BCBSM Cost Containment Programs.

12. You agree to clearly identify to Members, prior to rendering treatment, your level of participation with BCBSM (Participating, Preferred, etc.). BCBSM shall make available upon request materials which, when prominently posted in Providers office(s), meet this requirement.

13. BCBSM shall perform certain administrative functions relating to BCBSM Programs, which may include but not be limited to, processing claims, marketing, enrollment, issuance of Member identification cards, Member service, and administration of Member complaints and appeal procedures.

14. BCBSM shall be solely responsible for the establishment and coordination of all general policies governing the delivery of Covered Services to Members, including procedures relating to quality management, utilization review, and medical records.

## BILLING

15. You agree to comply with our billing and claims procedures and to submit claims within 30 days after completion of service in an electronic billing format or on an approved billing form, both as approved by BCBSM. In either instance, you accept full responsibility for all claims submitted. You further agree that if submitting electronically, each bill can be associated with a source document and a patient's signature. Claims initially submitted more than 1 year beyond the service date will generally be denied and may not be billed to the Member. If the initial claims submission to BCBSM is made more than one year after the date of service because of circumstances not reasonably within your control, BCBSM at its option shall,

    1. process the claim as if it were timely filed, or

    2. deny payment of claims and direct Provider to balance bill Member, or

    3. uphold the denial and direct Provider not to balance bill the Member.

16. You agree to use the most appropriate procedure and diagnostic codes when billing for services rendered and not to unbundle charges into separate procedure codes when a single code is more appropriate. You agree that if billed codes are re-assigned or rebundled by BCBSM, you will accept the Allowed Benefit for those services as payment in full. If you dispute the re-assignment or rebundling by BCBSM, the appeal mechanisms described in Paragraph 36 (entitled Procedure for Appeal) of this Agreement shall apply.

If a BCBSM Program is the only coverage involved, you agree not to bill, charge, collect or seek compensation from a Member, or any person responsible for a Member, for an amount in excess of the Allowed Benefit for Covered Services provided to a patient under the applicable BCBSM Program.

**All instances of Third Party Liability shall be covered by Paragraph 34 of this Agreement.**

18. We agree to provide you with timely access to claims, benefit, and eligibility information on Members.

## PAYMENT

19. We agree to pay you directly the Allowed Benefit, less any applicable coinsurance, copay or deductible amounts, for Covered Services.

20. We agree to pay claims for Covered Services rendered to Members and/or to provide notification to you and the Members of the denial of a claim stating the specific reasons for the denial, in a timely manner, as provided by Maryland Law. We retain sole authority to determine what is a Covered Service and who is a Member. We agree to pay interest on the amount of an unpaid claim or any portion thereof in accordance with Maryland law.

21. If Provider renders Covered Services to a subscriber of a Health Maintenance Organization affiliated with BCBSM (hereinafter HMO) and those Covered Services are not rendered pursuant to the authorized HMO referral process, then BCBSM, as administrator, agrees to reimburse Provider directly for said services at Allowed Benefit. This paragraph applies only to those products for which BCBSM has been identified as the out-of-network claims administrator.

22. You agree to charge the Member for any applicable coinsurance, copay or deductible amounts in accordance with and subject to the provisions of the subscription agreements for the relevant BCBSM Program and not to waive the payment of such amounts by the Member.

23. BCBSM agrees that you may bill and collect directly from Members charges for services that have been determined not to be Covered Services. You agree not to bill a Member for any service for which payment is denied due to a BCBSM determination that said service is not medically necessary, unless the member has agreed, in writing, to be personally financially liable for payment for said medically unnecessary services.

24. You agree that if BCBSM overpays you, we have the right to recover such overpayment by offset against future payments. The right of BCBSM to recover said overpayments shall be limited to those periods of time as set forth under the provisions of Annotated Code of Maryland, Health General Article, Section 4-403 (b) (c) as it relates to medical record keeping. If you dispute recovery of all or part of an alleged overpayment,the appeal mechanisms described in Paragraph 36 (entitled Procedure for Appeal) of this Agreement, shall apply.

## QUALITY & UTILIZATION MANAGEMENT

25. You agree to cooperate with us and assist the Member in complying with all contractual provisions in an effort to maximize the benefit available to the Member. For example, certain BCBSM Programs require the Member to obtain approval in advance of rendering services. Reduction of benefits because of the Member's non-compliance shall be and remain the responsibility of the Member.

26. Both parties agree that BCBSM has the right to review any and all documents and medical records reasonably required to adjudicate claims and perform our duties under this Agreement including, but not limited to, post payment audits. You agree, upon the request of BCBSM, to provide copies of these documents and records at no charge.

27. Both parties agree, in accordance with applicable state law, to preserve the confidentiality of the medical information obtained in treating Members, and you agree to permit an on-site audit of medical records of any Member upon reasonable notice and during regular business hours or at such other mutually agreed time and place.

28. You represent that you are a health care provider licensed or certified in the state in which you are practicing and you agree to notify us immediately of the suspension, withdrawal, revocation, termination, or expiration of your professional license or certification, or if debarred, suspended, or voluntarily excluded from participating in Medicare, Medicaid, or Federal Employees Health Benefits Programs.

29. If credentialing information is required for your participation with BCBSM, you agree to supply the requested information and to inform BCBSM on a timely basis of any subsequent material changes in the information supplied, and of any major occurrence that could impair your ability to perform your duties under this Agreement.

30. Any other health professionals employed by or providing services for you shall be duly licensed or certified under applicable law. If you are billing for the services of any other health professionals employed by or providing services for you, you certify that said other health professionals are supervised by you according to currently accepted standards of professional practice.

## RELATIONSHIP OF THE PARTIES

31. You shall perform your duties hereunder as an independent contractor. Both parties acknowledge that this Agreement in no way limits your rights or availability to other employment contemporaneously with or following your performance under this Agreement. As an independent contractor, you shall bear full responsibility for any and all of your taxes and fees. Neither of the parties hereto, nor any of their respective employees, shall be construed to be the agent, employee, or representative of the other.

32. You have a duty to exercise independent medical/professional judgment as required within the scope of you license or certificate (if a license or certificate is required), in your delivery of or referral for services. You agree that eligibility of a service for coverage by BCBSM will not influence your judgment in the decision to recommend or render such service.

## ELECTIONS

33. You agree to provide Covered Services to all Members and not to refuse, withhold from, deny or discriminate against any Member the provision of Covered Services because of the race, gender, creed, color, national origin, marital status, or physical or mental handicap of any Member. You agree to give equal access to BCBSM Members as to any other fee-for-service patient. You retain the right to request that a Member select another provider, if this request results from Member unmanageability and/or history of Member non-compliance with provider recommended treatment modalities which has resulted in the impossibility of the creation or maintenance of the provider/patient relationship between you and the Member.

## COMPENSATION

34. You agree to abide by the applicable BCBSM general policies with regard to filing claims and accepting reimbursement under the Coordination of Benefits (COB), subrogation, Personal Injury Protection (PIP), workers' compensation, Medicare assignment and Medicare non-assignment, TEFRA and other provisions of law.

35. It is recognized by the parties that Provider may have contractual relationships with certain subsidiaries of BCBSM. If a Member seeks care from Provider pursuant to a subscription agreement with a subsidiary of BCBSM, then payments shall be made to Provider in accordance with your agreement with that subsidiary. This agreement is not intended to supersede existing or future contractual relationships which Provider may enter with subsidiaries or affiliates of BCBSM.

## PROCEDURE FOR APPEAL

36. BCBSM agrees to provide you with a procedure to appeal any decisions made in connection with this Agreement. You agree to file any appeal within 90 days of the date you received notice of our determination or policy that is the subject of the appeal. In the course of an appeal process, said appeal may ultimately be referred to a committee which includes physicians or other health care providers. Any decision made by such committee shall be binding on both parties. You agree not to bill the Member for any amounts in dispute during the pendency of the appeal. If the appeal involves a payment dispute, BCBSM agrees not to effect recovery of disputed overpayments during the pendency of the appeal.

## GENERAL PROVISIONS

37. BCBSM and the Provider agree to cooperate fully with each other in administering the various provisions of this Agreement.

38. You agree to notify us in writing within 30 days of any change in business address/location, business name, and/or ownership and any addition or deletion of names of practitioners and/or professionals who are subject to this Agreement.

39. You agree that we may publish or otherwise identify your name as part of a list of Participating Providers that we may use in marketing and administering BCBSM Programs. We agree to represent to Members that you are a specialist in your self-designated field(s) of specialized medical practice: (1) if you are a Maryland physician, if you have been identified as a specialist in that field by the State Board of Physician Quality Assurance as provided by Maryland law; or (2) if you are a physician not practicing in Maryland, you have been identified as a specialist by the appropriate board as recognized by the American Board of Medical Specialties.

40. Any notice required to be given by Provider under this Agreement must be given in writing by registered or certified mail, postage prepaid.

41. The failure of either party to enforce or insist upon compliance with any provisions of this Agreement in any instance shall not be construed as or constitute a waiver of that party's right to enforce or insist upon compliance with such provision, rule, or regulation, either currently or in the future.

42. This Agreement shall be governed by the laws of the State of Maryland and represents the full and complete understanding of the parties with respect to this Agreement and the relationship created therein.

## TERM AND TERMINATION

43. The initial term of this Agreement shall be for one year from the effective date indicated herein. This Agreement shall automatically renew without notice from year to year unless terminated in accordance with the provisions herein.

44. Either party may terminate this Agreement by giving 60 days written notice to the other party. We reserve the right to amend this Agreement, with the exception of your right to terminate, by sending you written notice 30 days prior to the effective date of any amendment. If you choose to terminate on account of a proposed amendment, then the date of said termination will be the effective date of the amendment, notwithstanding the failure of either party to give 60 days written notice. In the event termination of this Agreement occurs, you agree to identify to Members, prior to rendering treatment, that you no longer are participating with BCBSM. BCBSM shall make available upon request materials which, when prominently posted in Provider's office(s), meet this requirement.



*i*SCLOSURE

45. You hereby expressly acknowledge your understanding that this Agreement constitutes a contract between you and BCBSM, that Blue Cross and Blue Shield of Maryland, Inc. is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans (the "Association") permitting Blue Cross and Blue Shield of Maryland, Inc. to use the Blue Cross and Blue Shield Service Marks in a portion of the State of Maryland, and that BCBSM is not contracting as the agent of the Association. You further acknowledge and agree that you have not entered into this Agreement based upon representations by any person other than BCBSM and that no person, entity, or organization other than BCBSM shall be held accountable or liable to you for any of BCBSM's obligations to you created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of BCBSM other than those obligations created under other provisions of this Agreement.

## APPLICATION

46. Applications or other documents required by BCBSM for participation under this Agreement shall be incorporated in and made part hereof. Material misrepresentation made in any of said applications or documents may constitute grounds for immediate termination of this Agreement by BCBSM.

## PRIOR AGREEMENTS

47. This Agreement upon execution by the parties supersedes and voids any and all prior Participating Provider Agreements between the parties hereto.

Accepted by Provider:
Feldman's Medical Center Pharmacy
Name of Provider/Practice

David Caldwell RPh
Authorized Signature

Pharmacist - in - charge
Print Name/Title

Date: August 12, 1997

Accepted by Blue Cross and
Blue Shield of Maryland, Inc.

By:_____

Print Name/Title

For BCBSM Use Only
Agreement
Effective Date:_____

Please supply the following information: If this is a partnership or corporation, please provide a list containing names and specialties of all practitioners.

Billing Address: Feldman's Medical Center Pharmac
11055 Little Patuxent Parkway
Columbia MD 21044

Telephone No: 410-964-8444

Office Address: same as above
_____
_____
_____

Telephone No:_____

NOTE: If you have multiple office addresses, please indicate here(X) and supply addresses and phone numbers on separate attachments.

52 - 1450108 _____ Federal Tax ID

DME - Pharmacy )  Field of Practice
or Specialty

## ATTACHMENT A



### Option to Participate in the
### PREFERRED PROVIDER NETWORK

As a Participating Provider you have the option to request inclusion in BCBSM Preferred Provider Programs. The terms and conditions of preferred participation include:

1. Provider agrees to provide services to any Members covered under BCBSM Preferred Provider Programs in accordance with their subscription agreements.

2. Provider agrees to be listed in Preferred directories and also agrees that he/she will only be listed in directories for those employee groups whose preferred hospitals include at least one at which he/she has admitting privileges.

3. Provider agrees that unless it is medically necessary to do otherwise, to refer all BCBSM Preferred Provider Program Members only to Preferred Providers and to admit only to Preferred institutions and/or facilities relevant to that Member.

4. Provider agrees to accept as payment in full for Covered Services rendered to Members enrolled in BCBSM Preferred Provider Programs the Preferred Provider Allowed Benefit.

5. Provider agrees to make best efforts to submit required notifications and/or authorizations necessary to maximize Preferred Member benefits, prior to care being rendered or referred.

Should you choose not to accept inclusion in BCBSM Preferred Provider Programs, the terms and conditions of this Attachment A shall not apply. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

Please indicate below whether you elect inclusion.

- I/we elect inclusion in the BCBSM Preferred Provider Program pursuant to the provisions of Attachment A herein which shall be incorporated in and made a part of the foregoing Participating Professional Provider Agreement.

| | |
|---|---|
| _Dayus Caldwell_ | _8-12-97_ |
| Authorized Signature | Date |

- I/We do not elect inclusion. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

| | |
|---|---|
| | |
| Authorized Signature | Date |



**BlueCross BlueShield
of Maryland**
An Independent Licensee of the
Blue Cross and Blue Shield Association

## NEW PROVIDER DATA FOR GROUPS

Please complete this form (print or type) and return it with your Blue Cross and Blue Shield of Maryland agreement(s), if applicable; **no agreements required for non-participating status.** The data requested is essential to implement your provider account number. **If this data is incomplete, we cannot assign a provider number.** Your assistance is appreciated.

### GROUP INFORMATION

Name of Group: Feldman's Medical Center Pharmacy, Inc.

*Check One:*

[X] Corporation       Date of Incorporation: 05/01/85 (Attach Articles of Incorporation)

[ ] Partnership       Date Partnership Formed: __/__/__ (Attach Partnership Agreement)

Corporate/Partnership Tax ID Number: 52- 1450108

Method of Billing:  [X] Manual/Paper

[ ] Electronic       Vendor Name _____

### PRACTICE INFORMATION

Billing Address: 11055 Little Patuxent Pkwy

Columbia MD 21044

Billing Agent: [X] No   [ ] Yes   Billing Agent Name _____

Contact Person: Gayle Caldwell       Phone Number: (410) 964-8444

Primary Office Address: 11055 Little Patuxent Pkwy

Columbia MD 21044

Contact Person: Gayle Caldwell       Phone Number: (410) 964-8444

List additional office locations on bottom of this sheet:   Fax Number: (410) 740-1377

Feldman's Dorsey Hall Pharmacy

9501 Old Annapolis Rd.

Ellicott City MD 21042

*MSA 8-12-97*

## PROVIDER PARTICIPATION

### WITH

### BLUE CROSS AND BLUE SHIELD OF MARYLAND

## ADVANTAGES

Over 80% of health care providers participate with Blue Cross and Blue Shield of Maryland (BCBSM).  This unique association affords you several advantages:

* **A competitive edge in the industry**
  BCBSM is the largest health insurance carrier in the state. Our customers know that a "Participating Provider" means a cost savings to them, as they are only responsible for deductible and copayment amounts up to the allowed benefit.

* **Direct reimbursement**
  Only participating providers can receive payment directly from BCBSM.

* **Dedicated account team service**
  BCBCSM has provided the Account Team Structure, dedicated account teams to service telephone and written inquiries from participating providers.  Non-participating provider telephone inquiries are sent directly into our voice response system, BLUE LINE.

## THE PARTICIPATING AGREEMENTS

You choose to participate by signing the Participating Provider Agreement.
> 1. Basic Agreement        2. Attachment A, Preferred Provider Network

The Participating Agreement & Attachment A are arranged as building blocks –
> – you must participate with the Basic program to be eligible for the Preferred Provider Programs

To obtain agreements:  You may obtain the Participating Agreement & Attachment A by contacting the Networks Development Department at (410) 528-7160 or (800) 746-1444 or by sending your written request to:

> BLUE CROSS AND BLUE SHIELD OF MARYLAND
> NETWORKS DEVELOPMENT AND PROVIDER CONTRACTING
> 10455 Mill Run Circle
> Owings Mills, Maryland  21117

The first type of preferred provider program, PPO, premiered in 1985 and answered the demands from group accounts to reduce premium payments without reducing employee benefits.

## WHAT IS A PPO?

A PPO is a subscriber driven preferred provider program. This means that:
- the patient/subscriber is responsible for staying within the network of preferred providers. Example: When the preferred provider refers a patient covered by a PPO program to a specialist - it is the patient's responsibility to ensure the specialist is a preferred provider.

- adhering to managed care provisions such as second surgical opinions, admissions review programs etc. is also the subscriber's responsibility. If these provisions are not met and the claim is denied or paid at a reduced amount, the subscriber is financially obligated.

## PREFERRED PROVIDER NETWORK (PPN)

To meet the challenges of our larger group accounts, the PPN network was developed. These programs combine cost savings, a wide range of benefits and a network of providers who are willing to be even more responsive to keeping the patient within the family of preferred providers and adhering to managed care provisions.

In contrast to the PPO programs, a PPN is a <u>provider</u> driven program. This means that:
- the PPN provider has agreed to ensure that the managed care provisions are met; if not, the provider may be penalized.

- when a PPN provider refers a patient covered by a PPN program to a specialist, it is the referring provider's responsibility to ENSURE that the specialist is in the PPN network.

## OUT-OF-NETWORK REFERRALS
When it is necessary to refer a patient covered by a PPN program to a non-PPN provider, the referring provider has agreed to contact the BCBSM's Provider Referral unit at (410) 581-3521 or (800) 492-2715 to advise BCBSM of the out of network referral. In this way, when the claim is received from the non-PPN provider, the patient will not be financially penalized for going out of network.

## REIMBURSEMENT

Reimbursement differs from the allowed benefit. Preferred Providers agree to accept a Preferred Provider Allowance (PPA) as payment in full. The PPA is 90% of the allowed benefit.

## WHAT ARE YOUR RESPONSIBILITIES?



**BlueCross BlueShield
of Maryland**
An Independent Licensee of the
Blue Cross and Blue Shield Association

### *1996 Disclosure Document*

This disclosure document explains the structure of the Blue Cross and Blue Shield system, the independent nature of every Blue Cross and Blue Shield Plan and the financial condition of Blue Cross and Blue Shield of Maryland, Inc. (BCBSM) and its subsidiaries.

CareFirst,* CFS Health Group, Columbia Medical Plan,* Delmarva Health Plan, FirstCare, FreeState Health Plan,* Paruxent Medical Group, Potomac Health,* Potomac Physicians, P.A. and Willse & Associates are subsidiaries or affiliates of Blue Cross and Blue Shield of Maryland, Inc.

The Blue Cross and Blue Shield Association licenses BCBSM, and other independent licensees, to offer certain products and services under the BLUE CROSS® and BLUE SHIELD® brand names and service marks.

Blue Cross and Blue Shield of Maryland, Inc. is an independent organization governed by its own Board of Directors and is solely responsible for its own debts and other obligations.

Neither the Blue Cross and Blue Shield Association nor any other organization using the BLUE CROSS® and BLUE SHIELD® brand names acts as the guarantor of Blue Cross and Blue Shield of Maryland's obligations or those of any other licensee.

### Blue Cross and Blue Shield of Maryland, Inc. and Subsidiaries
Condensed Balance Sheets[1] as of December 31, 1995 and 1994
(Dollars in thousands)

|                                         | 1995      | 1994      |
|-----------------------------------------|-----------|-----------|
| ASSETS:                                 |           |           |
| Cash and Investments                    | $385,553  | $302,739  |
| Premiums and Other Receivables          | 199,565   | 205,710   |
| Property and Equipment                  | 52,339    | 49,806    |
| Hospital Advances and Other Assets      | 153,926   | 183,414   |
| Total Assets                            | $791,383  | $741,669  |
| LIABILITIES AND RESERVES:               |           |           |
| Unpaid Claims Liability                 | $241,044  | $235,175  |
| Unearned Premiums and Other Advances    | 150,949   | 152,747   |
| Accounts Payable and Other Liabilities  | 129,216   | 143,433   |
| Total Liabilities                       | $521,209  | $531,355  |
| Reserves and Unassigned Funds[2]        | 270,174   | 210,314   |
| Total Liabilities and Reserves          | $791,383  | $741,669  |

\* Independent Licensees of the Blue Cross and Blue Shield Association

® Registered marks of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans.

[1] As derived from the audited financial statement of Blue Cross and Blue Shield of Maryland, Inc. and subsidiaries. For a complete copy of the organization's audited financial statements, which were prepared in accordance with generally accepted accounting principles, please call the Corporate Finance Department at (410) 998-5192. Certain amounts in the 1994 statements have been reclassified to be consistent with the 1995 presentation of condensed statements.

[2] Includes $197.8 million statutory surplus reported to the Maryland Insurance Administration by Blue Cross and Blue Shield of Maryland, Inc. as of 12/31/95.



**BlueCross BlueShield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

September 24, 1996

Dear Provider:

Effective November 1, 1996, Blue Cross and Blue Shield of Maryland will be making changes in the processing of certain durable medical equipment and medical supply claims. The following changes will take place on that date:

- All claims must be submitted with valid HCPCS procedure codes. If there is not an applicable code, the claim must be submitted with verbiage only. An invoice or vendor slip must accompany the claim form. The invoice or vendor slip must indicate the description of the item, price and the name of the vendor.

- Procedure codes E1399 and A4649 will no longer be acceptable codes to use on claims submitted by providers. BCBSM will assign these codes to services as necessary.

- If a claim is submitted with verbiage and an invoice or vendor slip is not attached, the claim will reject with remark code 52120 which indicates that the claim is being returned for additional information.

- If a claim is submitted with verbiage, and our Medical Review area can assign an appropriate code, the claim will reject with remark code 50346 which indicates to submit the claim using a valid procedure code. The provider will be responsible for resubmitting the claim with the appropriate procedure code.

If you have any questions concerning these new procedures, please contact the Provider Claims & Benefits Inquiry Department at 410-581-3577 or 800-437-2328.

Sincerely,

Ernest A. Viscuso
Director
Provider Contracting & Network Development

**BlueCross BlueShield**
**of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

Dear Provider:

In response to your inquiry regarding your request for a Durable Medical Equipment provider account number with Blue Cross Blue Shield of Maryland, Inc. (BCBSM), please provide us with the following information:

1.  Legal name and Federal Tax ID number of corporation/partnership
    *Feldman's Medical Center Pharmacy   TaxID# 52-1458188*

2.  Billing address and physical locatino (s), contact person — *Gayle Caldwell*
    and phone number *11055 Little Patuxent Parkway*
    *Columbia, MD 21044   410-964-8444*

3.  A list of officers (i.e., President, Vice-President, etc.)
    *President: Leslie S. Feldman*
    *V. Pres: Stefanie Feldman*

4.  Are you a contracted provider?        Yes_____   No__X_____

    If so, please provide the name of the facility or facilities

    _____

    _____

5.  Please provide a detailed description of the services being
    rendered and/or equipment/supplies used.

    *Rental of wheelchairs*        *Glucometers + supplies*
    *Purchase or*
    *Rental of walkers*             *Ostomy supplies.*
                                    *Misc small DME*

Please note the following guidelines for DME IV Therapy services when submitting a claim to BCBSM:

1.  All services must be itemized.

2.  A physician's certificate of necessity must be attached to each claim including the patient's diagnosis and/or condition.

3.  Nurses visits or consultations with the physician are non-covered services to you as a provider of care.

Corporation:

Other Pharmacy/billing address

Feldman's Dorsey Hall Pharmacy

9501 Old Annapolis Rd.

Ellicott City, MD 21042

410-730-8200

Fed Tax ID #: 52-1450188

Contact person: Andy Adams

Specialty: DME. Pharmacy.


**BlueCross BlueShield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.

March 25, 1998

Dear Pharmacy Colleague:

Beginning April 1, 1998, Blue Cross and Blue Shield of Maryland (BCBSMD) will be offering a **new Standardized Prescription Benefit Program**. The goal of the Standard Prescription Program is to both simplify the various pharmacy benefits currently offered by BCBSMD and to help manage the overall increases in prescription costs. The new program, developed primarily for our large employer group customers with HMO or traditional indemnity coverage, will be **phased in on an employer/group basis over the next twelve months starting April 1st**. Letters and brochures, included in a comprehensive communications plan, will be distributed to all customers as they transition into the new program. As a participating pharmacy, you should continue to reference the API (Advance Paradigm, Inc.) "on-line messaging" system as usual to confirm coverage eligibility guidelines and/or determine any copayment amounts.

Here is an overview of the changes you will see.

**The Standard Prescription Benefit**
The new Standard Prescription Benefit represents a departure from the traditional open formulary benefit currently offered by BCBSMD. Each employer group will select one of two new drug benefit formulary options: PERSONAL (closed formulary) or CHOICE (copay-driven formulary). Only our self-insured group customers will have the option of the current TRADITIONAL (open formulary) benefit structure. The current BCBSMD formulary will serve as the basis for all BCBSMD benefit options:

**Standard Benefit Option 1 - PERSONAL**
BCBSMD members who have the PERSONAL prescription coverage option are entitled to BCBSMD's formulary medications only. In addition, a two-tiered copay is in place, where a lower copay is charged for generic medications, and a higher copay for brand medications. *There is no benefit for non-formulary drugs without an authorization.* Physicians can obtain authorizations for non-formulary medications by calling API at 800-294-5979. In addition, participating pharmacies can call this same number to obtain a one time authorization if you are unable to contact a physician to change to a formulary medication.

**Standard Benefit Option 2 - CHOICE**
Members who select the CHOICE benefit will have coverage for a formulary or a non-formulary medication. A two-tiered copay structure is in place here also, where a lower copay is charged for both generic and formulary branded medications, and a higher copay is charged for non-formulary branded medications. No appeals process is in place for this benefit structure since the patient can still obtain any medication.

**Standard Benefit Option 3 - TRADITIONAL**
The traditional open formulary benefit will be made available to our self-insured customers only. This is the most similar to our current benefit structure and includes mandatory generic substitution. Copays can be either flat or two tiered (generic/brand).

**OTHER Pharmacy NEWS**

**Clinical Prior Authorization**
Each of the new standard benefit options will include the clinical prior authorization program. Drugs requiring prior authorization will be covered if determined to be medically indicated for the treatment of a covered medical condition. Authorizations can be obtained by having the physician call API at 800-294-5979.

**Diabetic Supplies**
New to the BCBSMD prescription benefit is the coverage of diabetic supplies. Diabetic supplies have been added to our maintenance listing, thus correcting problems with day supply limitations experienced earlier this year. No copayments will be collected for diabetic supplies, and the cost of the supplies will not accumulate against deductibles or benefit maximums.

**Maintenance Medication Listing**
The BCBSMD Maintenance Medication Listing will still be the basis for identifying medications available in a maintenance supply. Inclusion of a medication on the maintenance list is based upon the primary indication of the medication, safety profile with long term use, and concerns of patient monitoring that may be compromised with the dispensing of maintenance quantities.

Please call if you have any questions. We are available to work with you to ensure a smooth transition of these and any future pharmacy changes. I can be reached at 410-528-7897, if you have any questions or if you just need a copy of the BCBSMD formulary. Pharmacy customers may direct their questions to API at 800-241-3371 or to the BCBSMD Customer Service phone number listed on their membership card. Thank you.

Sincerely,

*Winston Wong*

Winston Wong, Pharm.D.
*Director, Pharmacy Management*

**BlueCross BlueShield of Maryland**

10455 Mill Run Circle • Owings Mills, MD 21117-5559

An Independent Licensee of the Blue Cross and Blue Shield Association.



September 22, 1997

Feldman's Medical Center Pharmacy
11055 Little Patuxent Pkwy.
Columbia, MD 21044

Dear Provider:

Thank you for becoming a **Participating** provider and member of the **Preferred Provider Network** with Blue Cross Blue Shield of Maryland, Inc. (BCBSM). Processing of your contracts has been completed for an effective date of **August 12, 1997** for provider number Y043FE. A copy of your contract will be forwarded to you.

You have been accepted as a member of our PPN. The benefit structure of the PPN encourages our members, through financial incentives, to seek care from PPN Practitioners. To assist our members, we publish directories identifying all health care professionals enrolled in our programs; you will be listed in future directories. In the interim, we have included your name in our telephone referral unit (410-581-3521 or 1-800-492-2715). Our telephone referral unit is operational daily to assist our subscribers and providers in locating PPN practitioners convenient to them.

Using your provider number as listed above on all of the claims that are submitted to us will assure payment directly to you. Claims received without the provider number will be returned to you.

The new state law called the "Uniform Claim Form Regulation" states that health care practitioners shall submit claims on the HCFA 1500.

You may call BCBSM's automated inquiry system "Blue Line" at 410-581-3535 or 1-800-248-8410 for information related to claims status, member eligibility, or benefits. Questions related to proper billing procedures or other claims issues should be directed to Account Team J at 410-581-3577. If you have any further questions about your contract status, you may contact the Professional Database Department at 410-528-7230 or 1-800-352-1448.

We appreciate your participation with BCBSM and your membership in our Preferred Provider Network. Thank you for your continued support as BCBSM strives to meet the healthcare needs of our subscribers.

Sincerely,

Eldean Krieger
Professional Database
106lt.mw

**ATTACHMENT A**



### Option to Participate in the
### PREFERRED PROVIDER NETWORK

As a Participating Provider you have the option to request inclusion in BCBSM Preferred Provider Programs. The terms and conditions of preferred participation include:

1. Provider agrees to provide services to any Members covered under BCBSM Preferred Provider Programs in accordance with their subscription agreements.

2. Provider agrees to be listed in Preferred directories and also agrees that he/she will only be listed in directories for those employee groups whose preferred hospitals include at least one at which he/she has admitting privileges.

3. Provider agrees that unless it is medically necessary to do otherwise, to refer all BCBSM Preferred Provider Program Members only to Preferred Providers and to admit only to Preferred institutions and/or facilities relevant to that Member.

4. Provider agrees to accept as payment in full for Covered Services rendered to Members enrolled in BCBSM Preferred Provider Programs the Preferred Provider Allowed Benefit.

5. Provider agrees to make best efforts to submit required notifications and/or authorizations necessary to maximize Preferred Member benefits, prior to care being rendered or referred.

Should you choose not to accept inclusion in BCBSM Preferred Provider Programs, the terms and conditions of this Attachment A shall not apply. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

Please indicate below whether you elect inclusion.

- I/we elect inclusion in the BCBSM Preferred Provider Program pursuant to the provisions of Attachment A herein which shall be incorporated in and made a part of the foregoing Participating Professional Provider Agreement.

|  |  |
|---|---|
| _Daynis Calwell_  8-12-97 | |
| Authorized Signature | Date |

- I/We do not elect inclusion. All other terms and conditions of this Participating Professional Provider Agreement shall remain in full force and effect.

|  |  |
|---|---|
| _____ | _____ |
| Authorized Signature | Date |

| Form **W-9**<br>(Rev. March 1994)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | **Give form to the**<br>**requester. Do NOT**<br>**send to the IRS.** |
|---|---|---|

**Please print or type**

Name (If joint names, list first and circle the name of the person or entity whose number you enter in Part I below. See instructions on page 2 if your name has changed.)

Leslie S. Feldman

Business name (Sole proprietors see instructions on page 2.)

Feldman's Medical Center Pharmacy

Please check appropriate box: ☐ Individual/Sole proprietor  ☒ Corporation  ☐ Partnership  ☐ Other ▶

Address (number, street, and apt. or suite no.)

11055 Little Patuxent Pkwy

City, state, and ZIP code

Columbia MD 21044

Requester's name and address (optional)

### Part I   Taxpayer Identification Number (TIN)

List account number(s) here (optional)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). For sole proprietors, see the instructions on page 2. For other entities, it is your employer identification number (EIN). If you do not have a number, see How To Get a TIN below.

**Note:** *If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.*

Social security number

| | | | | | | | | |
|-|-|-|-|-|-|-|-|-|

**OR**

Employer identification number

| 5 | 2 | 1 | 4 | 5 | 0 | 1 | 0 | 8 |
|---|---|---|---|---|---|---|---|---|

### Part II   For Payees Exempt From Backup Withholding (See Part II instructions on page 2)

▶

### Part III   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), **and**

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

**Certification Instructions.**—You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, the acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (Also see Part III instructions on page 2.)

**Sign Here**   Signature ▶ *Wayne Caldwell RPL*   Date ▶ 8-12-97

---

*Section references are to the Internal Revenue Code.*

**Purpose of Form.**—A person who is required to file an information return with the IRS must get your correct TIN to report income paid to you, real estate transactions, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA. Use Form W-9 to give your correct TIN to the requester (the person requesting your TIN) and, when applicable, (1) to certify the TIN you are giving is correct (or you are waiting for a number to be issued), (2) to certify you are not subject to backup withholding, or (3) to claim exemption from backup withholding if you are an exempt payee. Giving your correct TIN and making the appropriate certifications will prevent certain payments from being subject to backup withholding.

**Note:** *If a requester gives you a form other than a W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

**What Is Backup Withholding?**—Persons making certain payments to you must withhold and pay to the IRS 31% of such payments under certain conditions. This is called "backup withholding." Payments that could be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

If you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return, your payments will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester, or

2. The IRS tells the requester that you furnished an incorrect TIN, or

3. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

4. You do not certify to the requester that you are not subject to backup withholding under 3 above (for reportable

interest and dividend accounts opened after 1983 only), or

5. You do not certify your TIN. See the Part III instructions for exceptions.

Certain payees and payments are exempt from backup withholding and information reporting. See the Part II instructions and the separate **Instructions for the Requester of Form W-9.**

**How To Get a TIN.**—If you do not have a TIN, apply for one immediately. To apply, get Form SS-5, Application for a Social Security Number Card (for individuals), from your local office of the Social Security Administration, or Form SS-4, Application for Employer Identification Number (for businesses and all other entities), from your local IRS office.

If you do not have a TIN, write "Applied For" in the space for the TIN in Part I, sign and date the form, and give it to the requester. Generally, you will then have 60 days to get a TIN and give it to the requester. If the requester does not receive your TIN within 60 days, backup withholding, if applicable, will begin and continue until you furnish your TIN.

Cat. No. 10231X     Form **W-9** (Rev. 3-94)

# EXHIBIT 17

Page 1

IN THE CIRCUIT COURT OF MARYLAND

FOR BALTIMORE COUNTY

**CONFIDENTIAL**

-------------------------------------:

FELDMAN'S MEDICAL CENTER PHARMACY,          :

INC.,                                        :

                                             :

            Plaintiff,          :

      vs.                                   :Case No.

                                             :

CAREFIRST, INC.,                             :03C09006257

                                             :

            Defendant.          :

-------------------------------------:

                   Baltimore, Maryland

             Tuesday, October 13, 2009

Deposition of:

       MICHELLE POWELL

called for oral examination by counsel for

Plaintiff, pursuant to notice, at Baroody &

O'Toole, 201 North Charles Street, Suite 2102,

Baltimore, Maryland, before Kellie Scott, of

Capital Reporting Company, a Notary Public in and

for the State of Maryland, beginning at 1:06 p.m.,

when were present on behalf of the respective

parties:

**Capital Reporting Company**
**M. Powell**

| Page 22 |
|---|

1  agreement with CareFirst?
2      A. Again, going back, it depends on the
3  product.
4      Q. Okay.
5      A. Okay. And the level of contracting or
6  lack thereof that the provider may have in
7  association with that member's contract.
8      Q. Okay. This case, as I think you may be
9  aware, relates to a provision of something called
10 Factor VIII.
11         Are you familiar with what Factor VIII is?
12     A. Yes.
13     Q. What is Factor VIII?
14     A. Factor VIII is a drug that helps
15 hemophiliacs.
16     Q. And you're aware that the claims in this
17 case relate to requests for reimbursement for
18 provision of Factor VIII, right?
19     A. Uh-huh.
20     Q. Okay.
21        MR. DE GRAVELLES: I'm sorry. You have to
22 say yes.

| Page 23 |
|---|

1         THE WITNESS: Yes, yes.
2         MR. BECKER: Thank you.
3  BY MR. BECKER:
4      Q. Now, the claims that are at issue in this
5  case relating to the provision of Factor VIII, do
6  you know whether they were processed as in-network
7  or out-of-network claims?
8      A. No.
9      Q. You don't know?
10     A. No. I know that they were a nonpar DME
11 provider --
12     Q. Okay.
13     A. -- in our contract.
14     Q. Can you explain what that means?
15     A. They were contracted with CareFirst -- I'm
16 sorry -- as a par durable medical equipment
17 provider.
18     Q. When you say "par," that means
19 participating?
20     A. Correct.
21     Q. Okay.
22     A. Okay. Factor VIII is only covered under

| Page 24 |
|---|

1  our home infusion therapy contracts.
2      Q. So if a claim comes in -- and I understand
3  it's CareFirst's position in this lawsuit that
4  these claims are not covered by the contract that
5  existed at the time between CareFirst and
6  Feldman's.
7         Were the claims at issue then processed as
8  out-of-network claims?
9      A. No. They were -- they would have been
10 processed -- and I didn't look at each and every
11 claim, but they would have been processed and
12 stopped to be reviewed against their contract.
13     Q. Okay. And if the claim is submitted --
14 withdrawn.
15        What are you looking for when you say
16 you're reviewing it against the contract?
17     A. Is that provider licensed to provide that
18 service --
19     Q. Okay.
20     A. -- to that member.
21     Q. All right. And if the provider is
22 licensed to provide that service but doesn't have a

| Page 25 |
|---|

1  contract with CareFirst, how would that claim be
2  processed?
3      A. As a nonpar provider, if he's licensed.
4      Q. When you say "nonpar" -- and I'm going to
5  say out of network. Is that really the same thing?
6      A. No, it is not.
7      Q. Okay. So when you say processed as a
8  nonpar -- did you say a nonpar claim or --
9      A. Nonpar provider.
10     Q. Nonpar provider. What happens to the
11 claim at that point?
12     A. If he's licensed to render the service --
13     Q. Right.
14     A. -- and he's nonpar, the claim would come
15 in depending on the type of contract the member
16 has. And it could process depending on the level
17 of benefit for the service being rendered. It
18 could process in network or out of network. It
19 depends on the type of product that the member has.
20     Q. Okay.
21     A. If he has a PPO product and this is a
22 nonpar provider, it's going to process out of

7  (Pages 22 to 25)

**Capital Reporting Company**
**M. Powell**

| | Page 26 |
|---|---|
| 1 | network subject to out of network deductibles and |
| 2 | coinsurances, and payment would be directed to the |
| 3 | subscriber. |
| 4 | Q. Do you know how the claims at issue in |
| 5 | this lawsuit were processed? |
| 6 | A. No, not to the degree. I know that they |
| 7 | were rejected, some of them were rejected. |
| 8 | Q. Are you familiar with a phrase called |
| 9 | prepayment review? |
| 10 | A. Yes. |
| 11 | Q. What's prepayment review? |
| 12 | A. It's where there is a pend put on our |
| 13 | system that directs the examiner when they receive |
| 14 | that service for that provider to route that claim |
| 15 | to the area that wants to review the service. |
| 16 | Q. And who makes the determination to permit |
| 17 | a prepayment review? |
| 18 | A. It could be for numerous reasons. |
| 19 | Q. Are you aware of whether or not the claims |
| 20 | at issue in this case were subject to prepayment |
| 21 | review? |
| 22 | A. Yes. |

| | Page 28 |
|---|---|
| 1 | MR. BECKER: You can certainly instruct |
| 2 | her. I don't know if I agree with you. |
| 3 | MR. DE GRAVELLES: If you talk to someone |
| 4 | based on my instruction that you have to learn this |
| 5 | for the purpose of the deposition, you can talk |
| 6 | about that. |
| 7 | THE WITNESS: Oh, okay. Yes, I did talk |
| 8 | to Jamie Hanson. |
| 9 | BY MR. BECKER: |
| 10 | Q. And what did Ms. Hanson tell you? |
| 11 | A. She advised me that they were put on |
| 12 | Special Investigation review in looking at the |
| 13 | claims because of their contractual concerns with |
| 14 | administering this and concerns with the proper |
| 15 | licensing to provide the service. |
| 16 | Q. Mechanically Ms. Hanson wanted to or the |
| 17 | Special Investigations Unit wanted to put |
| 18 | prepayment review status or however or whatever you |
| 19 | want to call it. |
| 20 | What would you call it? What's the right |
| 21 | jargon for that? |
| 22 | A. SIU pend. |

| | Page 27 |
|---|---|
| 1 | Q. And when did you become aware of that? |
| 2 | A. When I spoke to my -- Patrick. |
| 3 | MR. DE GRAVELLES: Well, other than |
| 4 | speaking with counsel, you can answer it that way. |
| 5 | THE WITNESS: Oh, okay. Other than |
| 6 | speaking with counsel, no. |
| 7 | BY MR. BECKER: |
| 8 | Q. You weren't aware that these claims were |
| 9 | subject to prepayment review? |
| 10 | A. No. |
| 11 | Q. And did you ever ultimately determine who |
| 12 | at CareFirst placed the requirement of a prepayment |
| 13 | review on these claims? |
| 14 | A. Our Special Investigation Unit. |
| 15 | Q. And how did you find that out? |
| 16 | A. Through -- |
| 17 | Q. Other than through counsel? |
| 18 | A. No. |
| 19 | Q. Okay. |
| 20 | MR. DE GRAVELLES: Well, all right. I |
| 21 | think there's an issue here. Can I instruct her |
| 22 | what's proper attorney/client -- |

| | Page 29 |
|---|---|
| 1 | Q. Okay. They can simply enter that into the |
| 2 | system? |
| 3 | A. They work with the system area. There's a |
| 4 | process for it, and they would put certain criteria |
| 5 | in the claims adjudication system to make it pend. |
| 6 | Q. And you wouldn't find out about that? |
| 7 | A. No, because it would be in the system |
| 8 | automatically as part of the normal instructions. |
| 9 | Q. Would anybody in the claims side of the |
| 10 | world find out about that or approve it prior to it |
| 11 | happening? |
| 12 | A. No. |
| 13 | Q. It simply would be stuck in the system |
| 14 | without anybody knowing about it? |
| 15 | A. It would be put in and updated in the |
| 16 | system. |
| 17 | Q. Now, a claim would then pend as a result |
| 18 | of a Special Investigations pend. Who would then |
| 19 | review the claim? |
| 20 | A. SIU. |
| 21 | Q. Nobody in your department -- |
| 22 | A. No. |

8 (Pages 26 to 29)

EXHIBIT 18



**FOOD AND DRUG ADMINISTRATION**

Office of Criminal Investigations
Headquarters Field Office
7500 Standish Place, Room 250 N
Rockville, MD 20855

Date:  April 26, 2010

Request Number: 2009-10215

Paduano & Weintraub LLP
Jason Snyder
1251 Avenue of the Americas
Ninth Floor
New York, NY  10020

Subject of Request:  FACTOR HEALTH MANAGEMENT

Dear Sir/Madam:

This is in response to your request for record(s) from the Food and Drug Administration (FDA) pursuant to the Freedom of Information Act (FOIA).

Enclosed are copies of record(s) retrieved from a search of our office case files that comply with your request.  The request has been forwarded to other offices within FDA for further review and response if applicable.  A processing charge will be included in a separate invoice.

A review of the record(s) indicated that certain material needed to be deleted as it is not required to be publicly disclosed.  The following exemption(s) of FOIA, 5 U.S.C. 552, indicated by an "X" is/are the authority for denying you access to the non-disclosable material.

[   ] (b)(1) National security information concerning the national defense or foreign policy
[   ] (b)(2) Internal rules and practices
[   ] (b)(3) Prohibited from disclosure by other laws
[   ] (b)(4) Trade secret and confidential commercial information
[   ] (b)(5) Certain interagency and intra-agency communications
[   ] (b)(6) Information about individuals in personnel, medical and similar files when
        disclosure would constitute a clearly unwarranted invasion of privacy
[X] (b)(7) Records or information compiled for law enforcement purposes when disclosure
    [   ] (A) could reasonably be expected to interfere with enforcement proceedings
    [   ] (B) would deprive a person of a right to a fair trail or an impartial adjudication
    [X] (C) could reasonably be expected to constitute an unwarranted invasion of personal
        privacy
    [   ] (D) could reasonably be expected to disclose the identity of a confidential source

Page 2

**[X]** (E) would disclose techniques, procedures or guidelines for law enforcement investigations or prosecutions, if such disclosure could reasonably be expected to risk circumvention of the law

**[X]** (F) could reasonably be expected to endanger the life or physical safety of an individual

The Department of Health and Human Services' implementing regulations, 45 CFR 5.34, set forth the procedures for you to follow if you decide to appeal this decision not to provide you with the deleted information.  You should file any such appeal within 30 days and address it to the Deputy Assistant Secretary for Public Affairs, (Media), U.S. Department of Health and Human Services, Room 17A-46, 5600 Fishers Lane, Rockville, MD 20857.

*Office of Criminal Investigations*
*FOIA/Privacy Act Program*

Office of Criminal Investigations
Headquarters Field Office
FOIA/Privacy Act Program

Presentation referenced on page 20 has been withheld in its entirety – FBI document

E-mail referenced on page 20 has been withheld in its entirety – Special Investigations Unit Blue Cross Blue Shield of Florida document

Memo referenced on page 20 has been withheld in its entirety - – Special Investigations Unit Blue Cross Blue Shield of Florida document

Memo and e-mail referenced on page 21 have been withheld in their entirety - – Special Investigations Unit Blue Cross Blue Shield of Florida documents

List referenced on page 24 has been withheld in its entirety - – Special Investigations Unit Blue Cross Blue Shield of Florida document

302 memo referenced on page 27 has been withheld in its entirety – FBI document

Documents referenced on page 37 have been withheld in their entirety - – Special Investigations Unit Blue Cross Blue Shield of Florida documents

REPORT DATE 03/05/09

# CASE INITIATION / MANAGEMENT REPORT

CREATED BY : ▓▓▓▓

**CASE NUMBER**

2006    MIF    703  0268    -

CREATE DATE : 03/21/2006
DATE INITIATED : 03/28/2006

RELATED CASES :

DATE CLOSED : 02/22/2008
CLOSING CODE : AC
FORFEITURE : N

S / A  AGENT : LAST NAME:        FIRST NAME:
▓▓▓▓                 ▓▓▓▓

PRIMARY GEOGRAPHIC AREA

CASE TITLE :

CITY         STATE  COUNTRY
BOCA RATON    FL

FACTOR HEALTH MANAGEMENT

ACRONYM :
PRIMARY AGENCY :    FBI

AGENCY NAME :
FEDERAL BUREAU OF INVESTIGATIONS

MFCC CODE :
PRIMARY CASE TYPE    703.130

MFCC DESCRIPTION :
PDMA VIOLATION - CDER - DOMESTIC WHOLESALE

SECONDARY CASE TYPE :

CODE     DESCRIPTION

ORIGIN OF CASE - AGENCY :

ACRONYM   PRIVATE

AGENCY - FULL NAME   PRIVATE INDUSTRY

KBOX TICKET # :

PRODUCT NAME : MONONINE, NOVOSEVEN

INTERNATIONAL ASSOCIATIONS:

CITY         COUNTRY         SHIPPER  SUBJECT  PRD. ORG  MONEY    OTHER    REMARKS

SECONDARY LOCATION :

FDA 4

1

**PROBABLE VIOLATIONS:**

| TYPE | SEC. | SUB. | CITATION |
|------|------|------|----------|
| FEDERAL | 18 | 371 | CONSPIRACY |
| FEDERAL | 18 | 1347 | HEALTH CARE FRAUD |
| FEDERAL | 21 | 331 | FD & C PROHIBITED ACTS |

**SECONDARY AGENCY:**

| ACRONYM | NAME |
|---------|------|
| OCI | OFFICE OF CRIMINAL INVESTIGATIONS |

**LEGAL CONTACT:**

**SUMMARY OF ACTIVITY:**

THE FOOD AND DRUG ADMINISTRATION (FDA) OFFICE OF CRIMINAL INVESTIGATIONS (OCI), MIAMI FIELD OFFICE (MIF), PLANTATION, FL WAS CONTACTED BY THE FEDERAL BUREAU OF INVESTIGATION (FBI), MIAMI FILED OFFICE, MIAMI, FL ABOUT THE POSSIBLE DIVERSION OF PHARMACEUTICALS FROM FACTOR HEALTH MANAGEMENT (FHM). THE FBI REQUESTED FDA/OCI TO HELP IN THE INVESTIGATION FOR THE POSSIBLE DIVERSION OF PHARMACEUTICALS.

THE FBI RELATED THAT BLUE CROSS BLUE SHIELD OF FLORIDA (BCBSFL) REPORTED THAT FHM HAD FILED CLAIMS FOR OVER 13 MILLION DOLLARS SINCE JANUARY 1, 2004 FOR HEMOPHILIAC DRUGS. BCBSFL INDICATED THAT FHM HAD ABOUT 50 MEMBERS IN THE INSURANCE GROUP THAT APPEARED TO BE EMPLOYEES OF FHM AND ALSO HEMOPHILIACS. THE FBI STATED THAT BCBSFL HAS REQUESTED THE PRESCRIBING DOCTORS TO PROVIDE MEDICAL DOCUMENTATION TO SUBSTANTIATE THE MEDICAL CLAIMS AND ALL DOCTORS HAVE REFUSED. THE FBI BELIEVES THAT DUE TO THE LARGE VOLUME OF PRESCRIPTION DRUG CLAIMS BEING PAID TO FHM'S PHARMACY FCS PHARMACY, LOCATED IN THE SAME ADDRESS AND FHM, FOR A SMALL NUMBER OF PATIENTS, DRUGS ARE BEING ILLEGALLY DIVERTED FRO RESALE TO THE SECONDARY MARKET IN THE MIAMI AREA.

THE FBI ALREADY PRESENTED THE CASE TO THE US ATTORNEY'S OFFICE IN FORT LAUDERDALE, FL WHO HAS ASSIGNED AN ASSISTANT US ATTORNEY FOR THIS INVESTIGATION.

**INVESTIGATIVE PLAN:**



**SUSPECTS / SUBJECTS:**
FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC

**AGENT HISTORY:**

CASE IS BE ASSIGNED TO ▓▓▓▓▓ AS OF 5/15/2007.

**CLOSING INFO:**

NO EVIDENCE BEING OBTAINED TO INDICATE PHARMACEUTICALS ARE BEING DIVERTED.

MISC COMMENTS :


FIELD OFFICE APPROVAL:                                    DATE:

DAVID W. BOURNE, SPECIAL AGENT IN CHARGE

From: ▮▮▮▮▮▮▮▮▮▮
Sent: Wednesday, March 29, 2006 10:15 AM
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Cc: ▮▮▮▮▮▮▮
Subject: CIR REQUEST

THE FOLLOWING CIR REQUEST HAS BEEN APPROVED:

CASE TITLE: FACTOR HEALTH MANAGEMENT
CASE #: 2006-MIF-703-0268
CASE AGENT: ▮▮▮▮▮▮▮▮▮▮
DATE APPROVED: 03-28-2006
APPROVING OFFICIAL: SAIC, H. COLEMAN, IOD


▮▮▮▮▮▮▮▮▮▮
*Program Support Specialist*
*Headquarters, Office of Criminal Investigations*
*(301) 294-4059*

FDA 7

4

REPORT DATE 11/29/2007

# SUBJECT HISTORY FORM

SUBJECT ID : 105623

CREATE DATE : 11/29/2007

CREATED BY : ~~[redacted]~~

DATA TYPE : BUSINESS

FORFEITURE :

UPDATE DATE : 11/29/2007

CASE NUMBER

| YR | OFF | TYPE | # | I/P | J |
|----|-----|------|---|-----|---|
| 2006 | MIF | 703 | 0268 | - | |

S / A AGENT : LAST NAME: ~~[redacted]~~   FIRST NAME: ~~[redacted]~~

CASE TITLE : FACTOR HEALTH MANAGEMENT

SUBJECT - FIRM : FACTOR FOUNDATION OF AMERICA

SUBJECT - INDIVIDUAL LAST NAME:      FIRST NAME:      MIDDLE:      SUFFIX:

CAUTION :      PRIOR CRIMINAL RECORD :      DOB :

FUGITIVE :      CONCEALED WEAPON PERMIT :

HEIGHT:      WEIGHT:      HAIR COLOR:      EYE COLOR:      SEX:      RACE:      FBI#:

PLACE OF BIRTH:

CITY:      STATE: COUNTRY:

CITIZENSHIP INFO :

COUNTRY:

ALIAS

AKA - LAST NAME      AKA - FIRST NAME      AKA - MIDDLE NAME

SOCIAL SECURITY :

STATE LOC :

STATE / LOC # :      AGENCY

LICENSE :

LICENSE #      STATE      TYPE

PASSPORT INFO :

TYPE OF PASSPORT      COUNTRY      PASSPORT #

MISC. NUMBERS:

DESCRIPTION      NUMBER

~~[redacted]~~      ~~[redacted]~~

FDA 8

5

POLYGRAPH :
    DATE

OCCUPATION
    DESCRIPTION :

ADDRESSES

| ADDRESS | STREET | APT# | CITY | STATE | ZIP | COUNTRY |
|---------|--------|------|------|-------|-----|---------|
| 7700 | CONGRESS AVE | 3109 | BOCA RATON | FL | 33487 | USA |

PHONE INFORMATION

| TYPE | COUNTRY | AREA CODE | NUMBER |
|------|---------|-----------|--------|
| WORK | USA | 561 | 981-8814 |

DOMAIN REGISTRANT:

| NAME | ADDRESS | PHONE | EMAIL |
|------|---------|-------|-------|

ASSOCIATES :

| LAST NAME | FIRST NAME | ADDRESS | CITY | STATE | ZIP | PHONE | RELATION |
|-----------|------------|---------|------|-------|-----|-------|----------|

EMPLOYER / BUSINESS INFORMATION :

| ENDING DATE | STARTING DATE | BUSINESS NAME | ADDRESS | CITY | STATE | ZIP | COUNTRY |
|-------------|---------------|---------------|---------|------|-------|-----|---------|

| BUSINESS TYPE | AREA CODE | BUSINESS PHONE |
|---------------|-----------|----------------|

CARS :

| VIN | TAG | STATE | VEHICLE TYPE | MAKE | MODEL | YEAR | COLOR |
|-----|-----|-------|--------------|------|-------|------|-------|

BOAT :

| BOAT TYPE | CATEGORY | VESSELE NAME | VESSELE ID | HULL NUMBER | BRAND | COLOR | HULL SHAPE |
|-----------|----------|--------------|------------|-------------|-------|-------|------------|

| RADIO CALL SIGNAL | MAKE | MFG | OUTER HULL | PROPULSION | REGISTERED OWNER |
|-------------------|------|-----|------------|------------|------------------|

PLANE :

| REGISTRATION NUMBER | STATE | MAKE | MODEL | ENGINE | MFG SERIAL NUMBER | COLOR | YEAR |
|---------------------|-------|------|-------|--------|-------------------|-------|------|

VESSELS :

| TYPE | VESSEL NAME | HULL NUMBER | VESSEL ID | RADIO CALL SIGNAL | COUNTRY | COLOR | OWNER |
|------|-------------|-------------|-----------|-------------------|---------|-------|-------|

OTHER COMMENTS :

FDA 9

6

REPORT DATE 03/22/2006

# SUBJECT HISTORY FORM

SUBJECT ID : 86715

CREATE DATE : 03/21/2006

CREATED BY : ▓▓▓▓

DATA TYPE : BUSINESS

FORFEITURE :

UPDATE DATE :

CASE NUMBER

| YR | OFF | TYPE | # | L/P | J |
|-----|-----|------|---|-----|---|
| 2006 | MIF | 703 | | - | |

S / A AGENT : LAST NAME: ▓▓▓▓     FIRST NAME: ▓▓▓▓

CASE TITLE : FACTOR HEALTH MANAGEMENT

SUBJECT - FIRM : FCS PHARMACY, LLC

SUBJECT - INDIVIDUAL LAST NAME:     FIRST NAME:     MIDDLE:     SUFFIX:

CAUTION :     PRIOR CRIMINAL RECORD :     DOB :

FUGITIVE :     CONCEALED WEAPON PERMIT :

HEIGHT:     WEIGHT:     HAIR COLOR:     EYE COLOR:     SEX:     RACE:     FBI#:

PLACE OF BIRTH:

CITY:     STATE:   COUNTRY:

OCCUPATION

DESCRIPTION :

ADDRESSES

| ADDRESS | STREET | APT# | CITY | STATE | ZIP | COUNTRY |
|---------|--------|------|------|-------|-----|---------|
| 7700 | CONGRESS AVENUE | 1113 | BOCA RATON | FL | 33487 | USA |

PHONE INFORMATION

| TYPE | COUNTRY | AREA CODE | NUMBER |
|------|---------|-----------|--------|

ALIAS

AKA - LAST NAME     AKA - FIRST NAME     AKA - MIDDLE NAME

CITIZENSHIP INFO :

COUNTRY

FDA 10

7

PASSPORT INFO :
    TYPE OF PASSPORT     COUNTRY       PASSPORT #

SOCIAL SECURITY :

STATE LOC :
    STATE / LOC # :    AGENCY

LICENSE :
    LICENSE #           STATE    TYPE

POLYGRAPH :
   DATE

CARS :
   VIN          TAG   STATE  VEHICLE TYPE    MAKE    MODEL   YEAR  COLOR

BOAT :
   BOAT TYPE  CATEGORY  VESSELE NAME  VESSELE ID  HULL NUMBER  BRAND    COLOR    HULL SHAPE
      RADIO CALL SIGNAL   MAKE     MFG   OUTER HULL   PROPULSION  REGISTERED OWNER

PLANE :
   REGISTRATION NUMBER  STATE    MAKE    MODEL   ENGINE   MFG SERIAL NUMBER  COLOR    YEAR

VESSELS :
   TYPE     VESSEL NAME   HULL NUMBER  VESSEL  ID  RADIO CALL SIGNAL COUNTRY COLOR  OWNER

ASSOCIATES :

   LAST NAME   FIRST NAME   ADDRESS     CITY      STATE ZIP  PHONE     RELATION

EMPLOYER / BUSINESS INFORMATION :
   ENDING   STARTING
   DATE     DATE     BUSINESS NAME    ADDRESS      CITY     STATE ZIP  COUNTRY

      BUSINESS TYPE    AREA CODE  BUSINESS PHONE

MISC. NUMBERS:
   DESCRIPTION         NUMBER

OTHER COMMENTS :

OTHER COMMENTS:

FCS PHAMRACY IS RELATED TO FHM WHO IS SUSPECTED OF BILLING BCBSFL FOR MILLIONS OF
DOLLARS IN HEMOPHILIAC DRUGS THAT ARE SUSPECTED TO BEING DIVERTED INTO THE SCONDARY
MARKET.

REPORT DATE 01/20/2008

# SUBJECT HISTORY FORM

SUBJECT ID : 105623
CREATE DATE : 11/29/2007
CREATED BY : ▓▓▓▓▓▓▓▓
DATA TYPE : BUSINESS
FORFEITURE :
UPDATE DATE : 11/29/2007

CASE NUMBER

| YR | OFF | TYPE | # | I/P | J |
|------|------|------|------|------|------|
| 2006 | MIF | 703 | 0268 | - | |

S / A AGENT : LAST NAME:  ▓▓▓▓   FIRST NAME:  ▓▓▓▓

CASE TITLE : FACTOR HEALTH MANAGEMENT

SUBJECT - FIRM : FACTOR FOUNDATION OF AMERICA

SUBJECT - INDIVIDUAL LAST NAME:   FIRST NAME:   MIDDLE:   SUFFIX:

CAUTION :   PRIOR CRIMINAL RECORD :   DOB :

FUGITIVE :   CONCEALED WEAPON PERMIT :

HEIGHT:   WEIGHT:   HAIR COLOR:   EYE COLOR:   SEX:   RACE:   FBI#:

PLACE OF BIRTH:   CITIZENSHIP INFO :
CITY:   STATE: COUNTRY:   COUNTRY:

ALIAS
AKA - LAST NAME   AKA - FIRST NAME   AKA - MIDDLE NAME

SOCIAL SECURITY :

STATE LOC :
STATE / LOC # :   AGENCY

LICENSE :
LICENSE #   STATE   TYPE

PASSPORT INFO :
TYPE OF PASSPORT   COUNTRY   PASSPORT #

MISC. NUMBERS:
DESCRIPTION   NUMBER
▓▓▓▓   ▓▓▓▓▓▓▓▓

FDA 13

10

POLYGRAPH :
   DATE

OCCUPATION
   DESCRIPTION :

ADDRESSES

| ADDRESS | STREET | APT# | CITY | STATE | ZIP | COUNTRY |
|---------|--------|------|------|-------|-----|---------|
| 7700 | CONGRESS AVE | 3109 | BOCA RATON | FL | 33487 | USA |

PHONE INFORMATION

| TYPE | COUNTRY | AREA CODE | NUMBER |
|------|---------|-----------|--------|
| WORK | USA | 561 | 981-8814 |

DOMAIN REGISTRANT:

| NAME | ADDRESS | PHONE | EMAIL |
|------|---------|-------|-------|

ASSOCIATES :

| LAST NAME | FIRST NAME | ADDRESS | CITY | STATE | ZIP | PHONE | RELATION |
|-----------|------------|---------|------|-------|-----|-------|----------|

EMPLOYER / BUSINESS INFORMATION :

| ENDING DATE | STARTING DATE | BUSINESS NAME | ADDRESS | CITY | STATE | ZIP | COUNTRY |
|-------------|---------------|---------------|---------|------|-------|-----|---------|

| BUSINESS TYPE | AREA CODE | BUSINESS PHONE |
|---------------|-----------|----------------|

CARS :

| VIN | TAG | STATE | VEHICLE TYPE | MAKE | MODEL | YEAR | COLOR |
|-----|-----|-------|--------------|------|-------|------|-------|

BOAT :

| BOAT TYPE | CATEGORY | VESSELE NAME | VESSELE ID | HULL NUMBER | BRAND | COLOR | HULL SHAPE |
|-----------|----------|--------------|------------|-------------|-------|-------|------------|

| RADIO CALL SIGNAL | MAKE | MFG | OUTER HULL | PROPULSION | REGISTERED OWNER |
|-------------------|------|-----|------------|------------|------------------|

PLANE :

| REGISTRATION NUMBER | STATE | MAKE | MODEL | ENGINE | MFG SERIAL NUMBER | COLOR | YEAR |
|---------------------|-------|------|-------|--------|-------------------|-------|------|

VESSELS :

| TYPE | VESSEL NAME | HULL NUMBER | VESSEL ID | RADIO CALL SIGNAL | COUNTRY | COLOR | OWNER |
|------|-------------|-------------|-----------|-------------------|---------|-------|-------|

OTHER COMMENTS :

FDA 14

11

REPORT DATE  03/22/2006

# SUBJECT HISTORY FORM

SUBJECT ID : 86714

CREATE DATE : 03/21/2006

CREATED BY ▓▓▓▓

DATA TYPE : BUSINESS

FORFEITURE :

UPDATE DATE :

CASE NUMBER

| YR | OFF | TYPE | # | I/P | J |
|----|-----|------|---|-----|---|
| 2006 | MIF | 703 | | - | |

S / A AGENT : LAST NAME: ▓▓▓▓          FIRST NAME: ▓▓▓▓

CASE TITLE : FACTOR HEALTH MANAGEMENT

SUBJECT - FIRM : FACTOR HEALTH MANAGEMENT

SUBJECT - INDIVIDUAL LAST NAME:     FIRST NAME:          MIDDLE:     SUFFIX:

CAUTION :          PRIOR CRIMINAL RECORD :          DOB :

FUGITIVE :          CONCEALED WEAPON PERMIT :

HEIGHT:     WEIGHT:     HAIR COLOR:     EYE COLOR:     SEX:     RACE:     FBI#:

PLACE OF BIRTH:

CITY:          STATE:     COUNTRY:

OCCUPATION

DESCRIPTION :

ADDRESSES

| ADDRESS | STREET | APT# | CITY | STATE | ZIP | COUNTRY |
|---------|--------|------|------|-------|-----|---------|
| 7700 | CONGRESS AVENUE | 3109 | BOCA RATON | FL | 33487 | USA |

PHONE INFORMATION

| TYPE | COUNTRY | AREA CODE | NUMBER |
|------|---------|-----------|--------|

ALIAS

| AKA - LAST NAME | AKA - FIRST NAME | AKA - MIDDLE NAME |
|-----------------|------------------|-------------------|

CITIZENSHIP INFO :

COUNTRY

PASSPORT INFO :
    TYPE OF PASSPORT      COUNTRY          PASSPORT #

SOCIAL SECURITY :

STATE LOC :
    STATE / LOC # :      AGENCY

LICENSE :
    LICENSE #               STATE    TYPE

POLYGRAPH :
    DATE

CARS :
    VIN            TAG  STATE  VEHICLE TYPE      MAKE     MODEL   YEAR  COLOR

BOAT :
    BOAT TYPE  CATEGORY  VESSELE NAME  VESSELE ID  HULL NUMBER  BRAND    COLOR    HULL SHAPE
        RADIO CALL SIGNAL   MAKE     MFG   OUTER HULL   PROPULSION  REGISTERED OWNER

PLANE :
    REGISTRATION NUMBER  STATE   MAKE    MODEL   ENGINE  MFG SERIAL NUMBER  COLOR   YEAR

VESSELS :
    TYPE      VESSEL NAME   HULL NUMBER  VESSEL  ID  RADIO CALL SIGNAL COUNTRY COLOR  OWNER

ASSOCIATES :
    LAST NAME   FIRST NAME   ADDRESS      CITY      STATE ZIP  PHONE      RELATION

EMPLOYER / BUSINESS INFORMATION :
    ENDING  STARTING
    DATE     DATE    BUSINESS NAME   ADDRESS       CITY     STATE ZIP  COUNTRY

        BUSINESS TYPE     AREA CODE BUSINESS PHONE

MISC. NUMBERS:
    DESCRIPTION         NUMBER

OTHER COMMENTS :

OTHER COMMENTS:

FHM IS SUSPECTED OF BILLING BLUE CROSS BLUE SHIELD OF FLORIDA FOR MILLIONS OF DOLLARS IN
HEMOPHILIAC DRUGS THAT ARE SUSPECTED OF BEING DIVERTED INTO THE SECONDARY MARKET.

REPORT DATE 02/20/2008

# SUBJECT HISTORY FORM

SUBJECT ID : 86714

CREATE DATE : 03/21/2006

CREATED BY : ▓▓▓▓▓

DATA TYPE : BUSINESS

FORFEITURE :

UPDATE DATE :

CASE NUMBER

| YR | OFF | TYPE | # | I/P J |
|------|------|------|------|------|
| 2006 | MIF | 703 | 0268 | - |

S / A AGENT : LAST NAME: ▓▓▓▓   FIRST NAME: ▓▓▓▓

CASE TITLE : FACTOR HEALTH MANAGEMENT

SUBJECT - FIRM : FACTOR HEALTH MANAGEMENT

SUBJECT - INDIVIDUAL LAST NAME:      FIRST NAME:      MIDDLE:      SUFFIX:

CAUTION :      PRIOR CRIMINAL RECORD :      DOB :

FUGITIVE :      CONCEALED WEAPON PERMIT :

HEIGHT:      WEIGHT:      HAIR COLOR:      EYE COLOR:   SEX:   RACE:   FBI#:

PLACE OF BIRTH:      CITIZENSHIP INFO :

CITY:      STATE: COUNTRY:      COUNTRY:

ALIAS

AKA - LAST NAME      AKA - FIRST NAME   AKA - MIDDLE NAME

SOCIAL SECURITY :

STATE LOC :

STATE / LOC # :      AGENCY

LICENSE :

LICENSE #      STATE   TYPE

PASSPORT INFO :

TYPE OF PASSPORT      COUNTRY      PASSPORT #

MISC. NUMBERS:

DESCRIPTION      NUMBER

POLYGRAPH :

DATE

FDA 18

15

OCCUPATION
  DESCRIPTION :

ADDRESSES
  ADDRESS    STREET              APT#      CITY                    STATE ZIP  COUNTRY
  7700       CONGRESS AVENUE     3109      BOCA RATON              FL 33487 USA

PHONE INFORMATION
  TYPE      COUNTRY        AREA CODE   NUMBER

DOMAIN REGISTRANT:
  NAME                    ADDRESS                  PHONE        EMAIL

ASSOCIATES :

  LAST NAME    FIRST NAME    ADDRESS        CITY          STATE  ZIP  PHONE          RELATION

EMPLOYER / BUSINESS INFORMATION :
  ENDING    STARTING
  DATE      DATE      BUSINESS NAME      ADDRESS            CITY          STATE ZIP    COUNTRY

            BUSINESS TYPE        AREA CODE  BUSINESS PHONE

CARS :
  VIN                  TAG   STATE  VEHICLE TYPE        MAKE      MODEL    YEAR   COLOR

BOAT :
  BOAT TYPE  CATEGORY  VESSELE NAME  VESSELE ID   HULL NUMBER  BRAND       COLOR      HULL SHAPE
             RADIO CALL SIGNAL    MAKE      MFG    OUTER HULL    PROPULSION  REGISTERED OWNER

PLANE :
  REGISTRATION NUMBER  STATE    MAKE    MODEL    ENGINE   MFG SERIAL NUMBER  COLOR   YEAR

VESSELS :
  TYPE       VESSEL NAME    HULL NUMBER   VESSEL ID   RADIO CALL SIGNAL COUNTRY COLOR   OWNER

OTHER COMMENTS :
  FHM IS SUSPECTED OF BILLING BLUE CROSS BLUE SHIELD OF FLORIDA FOR MILLIONS OF DOLLARS IN
  HEMOPHILIAC DRUGS THAT ARE SUSPECTED OF BEING DIVERTED INTO THE SECONDARY MARKET.

REPORT DATE  02/20/2008

# SUBJECT HISTORY FORM

SUBJECT ID : 86715

CREATE DATE : 03/21/2006

CREATED BY : ▩▩▩▩

DATA TYPE : BUSINESS

FORFEITURE :

UPDATE DATE :

CASE NUMBER

| YR | OFF | TYPE | # | I/P | J |
|------|------|------|------|------|------|
| 2006 | MIF | 703 | 0268 | - | |

S / A AGENT :  LAST NAME: ▩▩▩       FIRST NAME: ▩▩▩

CASE TITLE : FACTOR  HEALTH  MANAGEMENT

SUBJECT - FIRM : FCS PHARMACY, LLC

SUBJECT - INDIVIDUAL LAST NAME:       FIRST NAME:       MIDDLE:     SUFFIX:

CAUTION :        PRIOR CRIMINAL RECORD :       DOB :

FUGITIVE :        CONCEALED WEAPON PERMIT :

HEIGHT:     WEIGHT:     HAIR COLOR:     EYE COLOR:   SEX:   RACE:    FBI#:

PLACE OF BIRTH:                        CITIZENSHIP INFO :

CITY:           STATE: COUNTRY:             COUNTRY:

ALIAS

AKA - LAST NAME        AKA - FIRST NAME    AKA - MIDDLE NAME

SOCIAL SECURITY :

STATE LOC :

STATE / LOC # :      AGENCY

LICENSE :

LICENSE #                 STATE   TYPE

PASSPORT INFO :

TYPE OF PASSPORT      COUNTRY        PASSPORT #

MISC. NUMBERS:

DESCRIPTION             NUMBER

POLYGRAPH :

DATE

OCCUPATION
  DESCRIPTION :

ADDRESSES
  ADDRESS     STREET          APT#      CITY                    STATE ZIP   COUNTRY
  7700        CONGRESS AVENUE   1113      BOCA RATON              FL 33487 USA

PHONE INFORMATION
  TYPE     COUNTRY        AREA CODE   NUMBER

DOMAIN REGISTRANT:
  NAME                    ADDRESS                    PHONE        EMAIL

ASSOCIATES :
  LAST NAME    FIRST NAME    ADDRESS       CITY        STATE ZIP   PHONE        RELATION

EMPLOYER / BUSINESS INFORMATION :
  ENDING    STARTING
  DATE      DATE      BUSINESS NAME    ADDRESS        CITY       STATE ZIP   COUNTRY
            BUSINESS TYPE       AREA CODE  BUSINESS PHONE

CARS :
  VIN             TAG   STATE  VEHICLE TYPE      MAKE     MODEL    YEAR  COLOR

BOAT :
  BOAT TYPE  CATEGORY  VESSELE NAME  VESSELE ID  HULL NUMBER  BRAND     COLOR     HULL SHAPE
       RADIO CALL SIGNAL    MAKE       MFG   OUTER HULL    PROPULSION  REGISTERED OWNER

PLANE :
  REGISTRATION NUMBER  STATE    MAKE    MODEL   ENGINE   MFG SERIAL NUMBER  COLOR   YEAR

VESSELS :
  TYPE      VESSEL NAME   HULL NUMBER   VESSEL ID  RADIO CALL SIGNAL COUNTRY COLOR   OWNER

OTHER COMMENTS :
  FCS PHAMRACY IS RELATED TO FHM WHO IS SUSPECTED OF BILLING BCBSFL FOR MILLIONS OF
  DOLLARS IN HEMOPHILIAC DRUGS THAT ARE SUSPECTED TO BEING DIVERTED INTO THE SCONDARY
  MARKET.



## Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## REPORT OF INVESTIGATION

| | |
|---|---|
| REPORTING OFFICE: | Miami Field Office |
| DOCUMENT NUMBER: | 05270 |
| CASE NUMBER: | 2006-MIF-703-0268 |
| RELATED CASE NUMBER: | |
| TYPE OF CASE: | 703.130, PDMA VIOLATION - CDER - DOMESTIC WHOLESALE |
| CASE TITLE: | FACTOR HEALTH MANAGEMENT |
| CASE AGENT: | |
| INVESTIGATION MADE AT | Boca Raton, FL |
| INVESTIGATION MADE BY | |
| REPORTING PERIOD | FROM: 03/28/2006   TO: 05/04/2006 |
| STATUS OF CASE: | Continued |

SYNOPSIS:            Received information from the FBI that Factor Health Management might be
diverting pharmaceuticals.

RESTRICTED INFORMATION

This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best interests of the Food and Drug Administration, Office of Criminal Investigations. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of Criminal Investigations.

UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION

REPORT SUBMITTED BY                                  DATE: 05/04/06

REPORT APPROVED BY:                                  DATE: 5/5/06
                     David W. Bourne, Special Agent In Charge

DISTRIBUTION:            MIF:  Original + 1cc
                         IOD:  1cc

FDA 22

19

2006-MIF-703-0268
Page 2 of 3

## 1. INTRODUCTION:

The food and Drug Administration (FDA) Office of Criminal Investigations (OCI), Miami Field Office (MIF), Plantation, FL was contacted by the Federal Investigations Bureau (FBI), Miami Field Office, Miami, FL about the possible diversion of pharmaceuticals from Factor Health Management (FHM). The FBI requested FDA/OCI to help in the investigation for the possible diversion of pharmaceuticals.

Reference is made to Case Initiation Report (CIR) date March 27, 2006.

## 2. DETAILS OF INVESTIGATION:

On March 22, 2006, ▓▓▓▓▓ met with ▓▓▓▓▓▓▓▓, FBI, Investigative Assistant (IA) ▓▓▓▓ ▓▓▓▓, FBI and Investigator ▓▓▓▓▓▓▓▓, Special Investigations Unit (SIU), Blue Cross Blue Shield of Florida (BCBSFL). During the meeting ▓▓▓▓▓▓ detailed that FHM, located at 7700 Congress Ave, Suite 3109, Boca Raton, Florida, 33487, and their pharmacy FCS Pharmacy, located at 7700 Congress Ave, Suite 1113, Boca Raton, Florida 33487 had billed BCBSFL for an estimated 13 million dollars worth in claims from January 1, 2004 until present for fifty individuals who worked at FHM who are allegedly Hemophiliacs. ▓▓▓▓▓▓ also indicated that BCBSFL requested medical records to support the claims from the prescribing doctors and only received the documentation regarding children but nothing for the adults. ▓▓▓▓▓▓ stated during the meeting that ▓▓ had coordinated with ▓▓▓▓ ▓▓▓▓▓▓ who was onboard with the investigation and was in the process of ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓requested the help of FDA/OCI in the investigation because it appeared that FHM might be diverting the high priced Hemophiliac drugs billed to BCBSFL. During the meeting ▓▓ ▓▓▓▓ received a copy of a presentation authored by ▓▓▓▓▓▓. A copy of the presentation and of the Report of Investigations by ▓▓▓▓▓▓ was placed in the case file.

On March 22, 2006, ▓▓▓▓▓▓ conducted a search for FHM and FCS Pharmacy using various commercial databases. The search revealed FHM had a wholesale license with the state of Florida and FCS had a valid pharmacy license in the state of Florida.

On April 6, 2006, ▓▓▓▓▓ received an e-mail from ▓▓▓▓▓▓ which indicated that on April 4, 2006, a former employee of FCS Pharmacy had reached out to Blue Cross Blue Shield in Pennsylvania and had made a comment that "FCS business practice was underhanded". A copy of the e-mail was placed in the case file.

On April 6, 2006, ▓▓▓▓▓ coordinated with ▓▓▓▓▓▓ who stated he had contacted▓▓▓▓▓ in an effort to schedule an interview with the person who had contacted BCBS about FCS Pharmacy.

On April 10, 2006, ▓▓▓▓▓received a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓from Novo Nordisk.

On April 12, 2006, ▓▓▓▓▓▓coordinated with ▓▓▓▓▓ about this investigation and possible similar investigations in Tennessee, Pennsylvania and Louisiana.

On April 12, 2006, ▓▓▓▓▓ coordinated with ▓▓▓▓▓▓ who related ▓▓▓ was going to provide information regarding the targets of this investigation and that subpoenas had been served at financial institutions.

On April 13, 2006, ▓▓▓▓▓ coordinated with ▓▓▓▓▓ about this investigation and was provided with a memorandum of investigation by ▓▓▓▓▓▓▓▓ stated that FHM and FCS Pharmacy could have been involved with ▓▓▓▓▓▓ company recently ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ based out of south Florida. A copy of the Memorandum was placed in the case file.

2006-MIF-703-0268
Page 3 of 3

On April 18, 2006, ▓▓▓▓ coordinated with ▓▓▓▓▓ who provided a memo of a similar investigation as FHM in Minnesota with a company called ▓▓▓▓▓▓▓. A copy of the memo was place in the case file.

On April 26, 2006, ▓▓▓▓ coordinated with ▓▓▓▓▓ who provided information describing international units of dosage used by Bayer. A copy of the email was placed in the case file.

On April 27, 2006, ▓▓▓▓ coordinated with ▓▓▓▓▓ who stated BCBSFL had received a change of address. FCS Pharmacy stated that effective April 13, 2006, their new address was FCS Pharmacy LLC, PO Box 533210, Atlanta, GA 30310-3210.

On April 28, 2006, ▓▓▓▓ coordinated with ▓▓▓▓▓▓ and provided her with a list of the Madison Associates Analysts who might help in this investigation.

On April 28, 2006, ▓▓▓▓ coordinated with ▓▓▓▓▓▓, Madison Associates, who was working at ▓▓▓▓▓ and provided ▓▓ with a list of names to ascertain if the names provided were costumers of ▓▓▓▓▓▓▓▓▓▓▓ was recently ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

On April 28, 2006, ▓▓▓▓ was contacted by ▓▓▓▓ who stated ▓▓▓▓, ▓▓▓▓▓▓ ▓▓▓▓▓ and FCS Pharmacy were costumers of ▓▓▓▓▓▓▓.

On May 2, 2006, ▓▓▓▓ sent a request to use Madison Associates Analysts in this investigation.

## 3. JUDICIAL ACTION:

N/A

## 4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:

N/A

## 5. STATUS OF INVESTIGATION:

Investigation continues with more investigative leads to follow against FHM and FCS Pharmacy.

## 6. SUSPECTS/DEFENDANTS/OTHER:

FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC

## 7. ATTACHMENTS:

N/A

2006-MIF-703-0268
Page 3 of 3

7. ATTACHMENTS:
   N/A



Food and Drug Administration
OFFICE OF CRIMINAL INVESTIGATIONS
REPORT OF INVESTIGATION

REPORTING OFFICE:        Miami Field Office

DOCUMENT NUMBER:       97930

CASE NUMBER:            2006-MIF-703-0268

RELATED CASE NUMBER:

TYPE OF CASE:           703.130, PDMA VIOLATION - CDER - DOMESTIC WHOLESALE

CASE TITLE:             FACTOR HEALTH MANAGEMENT

CASE AGENT:             ▓▓▓▓▓▓

INVESTIGATION MADE AT   Boca Raton, FL

INVESTIGATION MADE BY   ▓▓▓▓▓▓

REPORTING PERIOD        FROM: 05/06/2006    TO:  08/03/2006

STATUS OF CASE:         Continued

SYNOPSIS:               Received and reviewed documents from Factor Health Management.

RESTRICTED INFORMATION
This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best interests of the Food and Drug Administration, Office of Criminal Investigations. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of Criminal Investigations.
UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION

REPORT SUBMITTED BY  ▓▓▓▓▓▓▓▓▓▓▓▓      DATE:  8/3/06

REPORT APPROVED BY:  ▓▓▓▓▓▓▓▓▓       DATE: 8/9/06
                     David W. Bourne, Special Agent In Charge

DISTRIBUTION:        MIF:  Original + 1cc
                     IOD:  1cc

FDA 26

23

2006-MIF-703-0268
Page 2 of 3

1. INTRODUCTION:

The food and Drug Administration (FDA) Office of Criminal Investigations (OCI), Miami Field Office (MIF), Plantation, FL was contacted by the Federal Investigations Bureau (FBI), Miami Field Office, Miami, FL about the possible diversion of pharmaceuticals from Factor Health Management (FHM). The FBI requested FDA/OCI to help in the investigation for the possible diversion of pharmaceuticals.

Reference is made to Report of Investigation (ROI) dated May 5, 2006.

2. DETAILS OF INVESTIGATION:

On May 10, 2006, ▓▓▓▓▓ sent a request to Madison Associates in charge of Bio-Med Plus requesting any documentation regarding Facto Health Management.

On May 12, 2006, ▓▓▓▓▓ coordinated with ▓▓▓▓▓, Madison Associates who stated ▓ would be the analyst for this investigation.

On May 26, 2006, ▓▓▓▓▓ coordinated with ▓▓▓▓▓ who took pictures of Factor Health Management. Copies of the photos were placed in the case file.

On June 1, 2006, ▓▓▓▓▓ coordinated with Investigator (INV) ▓▓▓▓▓, Blue Cross and Blue Shield of Florida (BCBSFL), Jacksonville, FL, who provided a the provider list for FCS pharmacy. A copy of the list was placed in the case file.

On July 13, 2006, ▓▓▓▓▓ coordinated with, INV ▓▓▓▓▓, BCBSFL, ▓▓▓▓▓ and ▓▓ ▓▓▓▓▓, FBI. The meeting was conducted to brief ▓▓▓▓▓ on the particulars of this investigation. ▓▓▓▓▓ provided a list of person to interview by ▓▓▓▓▓ and ▓▓▓▓▓. After the meeting ▓▓▓▓▓ provided ▓▓▓▓▓ with documents ▓▓▓▓▓ provided ▓▓▓▓▓ with the information obtained from Bio-Med Plus about Factor Health Management.

On July 14, 2006, ▓▓▓▓▓ coordinated with ▓▓▓▓▓, BCBSFL, who provided information regarding Factor Health Management and ▓▓▓▓▓. A copy of the information was placed in the case file.

On July 15, 2006 ▓▓▓▓▓ reviewed documents ▓▓▓▓▓ provided by ▓▓ ▓▓▓▓▓.

On August 3, 2006, ▓▓▓▓▓ coordinated with ▓▓▓▓▓, FBI, about the particulars of this investigation and the upcoming interview of ▓▓▓▓▓ employee of Facto Health Management in Pennsylvania who had ▓▓▓▓▓ office and had informed them about how Factor Health Management was conducting a fraudulent business.

3. JUDICIAL ACTION:

N/A

4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:

N/A

2006-MIF-703-0268
Page 3 of 3

5. STATUS OF INVESTIGATION:

Investigation continues with more investigative leads to follow against FHM and FCS Pharmacy.

6. SUSPECTS/DEFENDANTS/OTHER:

FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC

7. ATTACHMENTS:

N/A



Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## REPORT OF INVESTIGATION

| | |
|---|---|
| REPORTING OFFICE: | Miami Field Office |
| DOCUMENT NUMBER: | *10441* |
| CASE NUMBER: | 2006-MIF-703-0268 |
| RELATED CASE NUMBER: | |
| TYPE OF CASE: | 703.130, PDMA VIOLATION - CDER - DOMESTIC WHOLESALE |
| CASE TITLE: | FACTOR HEALTH MANAGEMENT |
| CASE AGENT: | ████████ |
| INVESTIGATION MADE AT | Boca Raton, FL |
| INVESTIGATION MADE BY | ████████ |
| REPORTING PERIOD | FROM: 08/08/2006   TO: 12/15/2006 |
| STATUS OF CASE: | Continued |
| SYNOPSIS: | Interviewed ████████ Factor Health Management employee. |

### RESTRICTED INFORMATION
This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best interests of the Food and Drug Administration, Office of Criminal Investigations. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of Criminal Investigations.
### UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION

REPORT SUBMITTED BY ████████          DATE: *13/1-/00*

REPORT APPROVED BY ████████          DATE: *12/19/2006*

David W. Bournel, Special Agent In Charge

DISTRIBUTION:          MIF: Original + 1cc
                       IOD: 1cc

## 1. INTRODUCTION:

The food and Drug Administration (FDA) Office of Criminal Investigations (OCI), Miami Field Office (MIF), Plantation, FL was contacted by the Federal Investigations Bureau (FBI), Miami Field Office, Miami, FL about the possible diversion of pharmaceuticals from Factor Health Management (FHM). The FBI requested FDA/OCI to help in the investigation for the possible diversion of pharmaceuticals.

Reference is made to Report of Investigation (ROI) dated August 7, 2006.

## 2. DETAILS OF INVESTIGATION:

On August 10, 2006, ▓▓▓▓ and ▓▓▓▓▓▓▓, Federal Bureau of Investigations (FBI), interviewed ▓▓▓▓▓▓▓▓▓ employee of Factor Health Management. ▓▓▓▓ stated she worked for Factor Health Management as ▓▓▓▓▓▓ and during the time she worked for Factor she noticed what she thought was fraudulent methods of billing insurance companies. Reference is made to FBI 302 (Memorandum of Interview) authored by ▓▓▓▓▓. A copy of the 302 was placed in the case file.

During this reporting period ▓▓▓▓ coordinated with ▓▓▓▓▓▓▓, Madison Associates who stated ▓▓ was analyzing the information obtained from some of subpoenas served by the FBI on financial institutions used by Factor Health Management.

## 3. JUDICIAL ACTION:

N/A

## 4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:

N/A

## 5. STATUS OF INVESTIGATION:

Investigation continues with more investigative leads to follow against FHM and FCS Pharmacy.

## 6. SUSPECTS/DEFENDANTS/OTHER:

FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC

## 7. ATTACHMENTS:

N/A



Food and Drug Administration
OFFICE OF CRIMINAL INVESTIGATIONS
REPORT OF INVESTIGATION

REPORTING OFFICE:      Miami Field Office

DOCUMENT NUMBER:       *107817*

CASE NUMBER:           2006-MIF-703-0268

RELATED CASE NUMBER:

TYPE OF CASE:          703.130, PDMA VIOLATION - CDER - DOMESTIC WHOLESALE

CASE TITLE:            FACTOR HEALTH MANAGEMENT

CASE AGENT:            _____

INVESTIGATION MADE AT   Boca Raton, FL

INVESTIGATION MADE BY   _____

REPORTING PERIOD        FROM: 12/20/2006    TO: 03/15/2007

STATUS OF CASE:         Continued

SYNOPSIS:              Madison associates is reviewing financial files.

RESTRICTED INFORMATION
This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best interests of the Food and Drug Administration, Office of Criminal Investigations. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of Criminal Investigations.
UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION

REPORT SUBMITTED BY   _____     DATE: 3/15/07

REPORT APPROVED BY:   _____     DATE: 3/4/07
                      David W. Bourne, Special Agent In Charge

DISTRIBUTION:         MIF: Original + 1cc
                      IOD: 1cc

FDA 31

28

## 1. INTRODUCTION:

The food and Drug Administration (FDA) Office of Criminal Investigations (OCI), Miami Field Office (MIF), Plantation, FL was contacted by the Federal Investigations Bureau (FBI), Miami Field Office, Miami, FL about the possible diversion of pharmaceuticals from Factor Health Management (FHM). The FBI requested FDA/OCI to help in the investigation for the possible diversion of pharmaceuticals.

Reference is made to Report of Investigation (ROI) dated December 19, 2006.

## 2. DETAILS OF INVESTIGATION:

During this reporting period ⬛⬛⬛ coordinated with ⬛⬛⬛ Madison Associates who stated he was analyzing the information obtained from some of subpoenas served by the FBI on financial institutions used by Factor Health Management.

## 3. JUDICIAL ACTION:

N/A

## 4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:

N/A

## 5. STATUS OF INVESTIGATION:

Investigation continues with more investigative leads to follow against FHM and FCS Pharmacy.

## 6. SUSPECTS/DEFENDANTS/OTHER:

FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC

## 7. ATTACHMENTS:

N/A



# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## REPORT OF INVESTIGATION

| | |
|---|---|
| REPORTING OFFICE: | Miami Field Office |
| DOCUMENT NUMBER: | *110442* |
| CASE NUMBER: | 2006-MIF-703-0268 |
| RELATED CASE NUMBER: | |
| TYPE OF CASE: | 703.130, PDMA VIOLATION - CDER - DOMESTIC WHOLESALE |
| CASE TITLE: | FACTOR HEALTH MANAGEMENT |
| CASE AGENT: | ▓▓▓▓▓▓ |
| INVESTIGATION MADE AT | Plantation, FL |
| INVESTIGATION MADE BY | ▓▓▓▓▓▓▓▓ |
| REPORTING PERIOD | FROM: 03/16/2007   TO: 06/07/2007 |
| STATUS OF CASE: | Continued |
| SYNOPSIS: | Subpoena requests are pending at the U.S. Attorney's Office. |

RESTRICTED INFORMATION

This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best interests of the Food and Drug Administration, Office of Criminal Investigations. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of Criminal Investigations.

UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION

REPORT SUBMITTED BY ▓▓▓▓▓▓▓▓▓▓▓     DATE: 6/7/07

REPORT APPROVED BY: ▓▓▓▓▓▓▓▓▓▓     DATE: 6/1/01

David W. Bourne, Special Agent In Charge

DISTRIBUTION:     MIF: Original + 1cc
                  IOD: 1cc

FDA 33

30

2006-MIF-703-0268
Page 2 of 2

1. INTRODUCTION:

The food and Drug Administration (FDA) Office of Criminal Investigations (OCI), Miami Field Office (MIF), Plantation, FL was contacted by the Federal Investigations Bureau (FBI), Miami Field Office, Miami, FL about the possible diversion of pharmaceuticals from Factor Health Management (FHM).  The FBI requested FDA/OCI to help in the investigation for the possible diversion of pharmaceuticals.

Reference is made to Report of Investigation dated March 15, 2007.

2. DETAILS OF INVESTIGATION:

During this reporting period, the Reporting Agent (RA) coordinated with ▓▓▓▓▓▓▓▓▓▓ Madison Associates, who advised that ▓▓▓▓▓▓▓▓ FBI, requested six subpoenas for bank records in the U.S. Virgin Islands from the U.S. Attorney's Office.  To date, the subpoenas have not been issued.

3. JUDICIAL ACTION:

N/A

4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:

N/A

5. STATUS OF INVESTIGATION:

Investigation continues with the anticipation that subpoenas for Virgin Island bank records with be served.

6. SUSPECTS/DEFENDANTS/OTHER:

FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC

7. ATTACHMENTS:

N/A



## Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## REPORT OF INVESTIGATION

| | |
|---|---|
| REPORTING OFFICE: | Miami Field Office |
| DOCUMENT NUMBER: | *112840* |
| CASE NUMBER: | 2006-MIF-703-0268 |
| RELATED CASE NUMBER: | |
| TYPE OF CASE: | 703.130, PDMA VIOLATION - CDER - DOMESTIC WHOLESALE |
| CASE TITLE: | FACTOR HEALTH MANAGEMENT |
| CASE AGENT: | ▮▮▮▮▮▮▮ |
| INVESTIGATION MADE AT | Plantation, FL |
| INVESTIGATION MADE BY | ▮▮▮▮▮▮▮▮ |
| REPORTING PERIOD | FROM: 06/08/2007   TO: 09/04/2007 |
| STATUS OF CASE: | Continued |
| SYNOPSIS: | ▮▮▮▮▮▮▮, Madison and Associates, is reviewing financial records. |

RESTRICTED INFORMATION
This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best interests of the Food and Drug Administration, Office of Criminal Investigations. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of Criminal Investigations.
UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION

REPORT SUBMITTED BY   ▮▮▮▮▮▮▮▮▮▮   DATE: 09/04/2007

REPORT APPROVED BY: ▮▮▮▮▮▮▮▮▮ DATE: 9/5/07
David W. Bourne, Special Agent In Charge

DISTRIBUTION:   MIF: Original + 1cc
IOD: 1cc

FDA 35

32

2006-MIF-703-0268
Page 2 of 2

## 1. INTRODUCTION:

The food and Drug Administration (FDA) Office of Criminal Investigations (OCI), Miami Field Office (MIF), Plantation, FL was contacted by the Federal Investigations Bureau (FBI), Miami Field Office, Miami, FL, about the possible diversion of pharmaceuticals from Factor Health Management (FHM).  The FBI requested FDA/OCI to help in the investigation for the possible diversion of pharmaceuticals.

Reference is made to Report of Investigation dated June 11, 2007.

## 2. DETAILS OF INVESTIGATION:

On August 31, 2007███████████, FBI, advised that during this reporting period ███ served several subpoenas on banks located in the U.S. Virgin Islands.  ███████ advised that ███ received a few responses, which ███ forward to ██████████, Madison and Associates, for review. ████████ advised that to date ███ has not determined if FACTOR HEALTH MANAGEMENT has violated any criminal statutes.

Once all the financial records have been received and reviewed, a determination regading the course of this investigation will be made.

## 3. JUDICIAL ACTION:
N/A

## 4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:
N/A

## 5. STATUS OF INVESTIGATION:
Investigation continues with the anticipation that the financial document review will be completed during the next reporting period.

## 6. SUSPECTS/DEFENDANTS/OTHER:
FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC

## 7. ATTACHMENTS:
N/A



# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## REPORT OF INVESTIGATION

| | |
|---|---|
| REPORTING OFFICE: | Miami Field Office |
| DOCUMENT NUMBER: | *115619* |
| CASE NUMBER: | 2006-MIF-703-0268 |
| RELATED CASE NUMBER: | |
| TYPE OF CASE: | 703.130, PDMA VIOLATION - CDER - DOMESTIC WHOLESALE |
| CASE TITLE: | FACTOR HEALTH MANAGEMENT |
| CASE AGENT: | ▮▮▮▮▮▮▮▮▮ |
| INVESTIGATION MADE AT | Plantation, FL |
| INVESTIGATION MADE BY | ▮▮▮▮▮▮▮▮▮ |
| REPORTING PERIOD | FROM: 09/05/2007    TO: 11/29/2007 |
| STATUS OF CASE: | Continued |
| SYNOPSIS: | ▮▮▮▮▮▮▮Madison and Associates, continues to review financial records. A meeting was held with FBI agents and a BlueCross of Florida representative. |

**RESTRICTED INFORMATION**
This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best interests of the Food and Drug Administration, Office of Criminal Investigations. This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of Criminal Investigations.
**UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION**

| | | |
|---|---|---|
| REPORT SUBMITTED BY | ▮▮▮▮▮▮▮▮▮ | DATE: *11/29/07* |
| REPORT APPROVED BY: | *David W. Bourne, Special Agent in Charge* | DATE: *11/29/07* |
| DISTRIBUTION: | MIF: Original + 1cc | |
| | IOD: 1cc | |

FDA 37

34

2006-MIF-703-0268
Page 2 of 2

## 1. INTRODUCTION:

The Food and Drug Administration (FDA), Office of Criminal Investigations (OCI), Miami Field Office, was contacted by the FBI about the possible diversion of pharmaceuticals from FACTOR HEALTH MANAGEMENT (FHM). The FBI requested FDA/OCI to assist in the investigation. This case was referred to the FBI by BlueCross of Florida.

Reference is made to Report of Investigation dated September 5, 2007.

## 2. DETAILS OF INVESTIGATION:

On November 27, 2007, the Reporting Agent (RA) coordinated with ▉▉▉▉▉▉Madison and Associates; ▉▉▉▉▉▉▉▉▉and ▉▉▉▉▉▉FBI; and ▉▉▉▉▉, Investigator, SIU, BlueCross of Florida; at the Miami Field Office with the following results:

▉▉▉▉▉ provided ▉▉▉▉▉ electronic copies of bank records received ▉▉▉▉▉▉▉ which ▉▉▉▉▉will review.

▉▉▉▉▉advised that FACTOR FOUNDATION of AMERICA's (FFA) current loss ▉▉▉▉▉▉▉, which is expedentially higher than the average loss ▉▉▉▉▉▉. ▉▉▉▉advised that BlueCross of Florida continues to pay annual claims to FCS PHARMACY, which is owned by FHM, in excess of $5M. All claims are for medications that treat hemophilia.

BlueCross of Florida will determine the maximum medically necessary doses of the medications and provide an updated list of covered FFA employees.

▉▉▉▉▉will subpoena civil suit information regarding other insurance companies that ▉▉▉▉▉ ▉▉▉▉▉▉ and medical records of ten patients.

The RA will review previously obtained wholesaler records ▉▉▉▉▉▉▉ and ▉▉▉▉▉ at ▉▉▉ ▉▉▉▉▉ and subpoena Fed Ex and UPS records.

## 3. JUDICIAL ACTION:

N/A

## 4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:

N/A

## 5. STATUS OF INVESTIGATION:

Investigation continues with numerous leads pending.

## 6. SUSPECTS/DEFENDANTS/OTHER:

FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC
FACTOR FOUNDATION OF AMERICA*

## 7. ATTACHMENTS:

N/A



Food and Drug Administration
OFFICE OF CRIMINAL INVESTIGATIONS
REPORT OF INVESTIGATION

| | |
|---|---|
| REPORTING OFFICE: | Miami Field Office |
| DOCUMENT NUMBER: | 118109 |
| CASE NUMBER: | 2006-MIF-703-0268 |
| RELATED CASE NUMBER: | |
| TYPE OF CASE: | 703.130, PDMA VIOLATION - CDER - DOMESTIC WHOLESALE |
| CASE TITLE: | FACTOR HEALTH MANAGEMENT |
| CASE AGENT: | |
| INVESTIGATION MADE AT | Plantation, FL |
| INVESTIGATION MADE BY | |
| REPORTING PERIOD | FROM: 11/30/2007   TO: 02/20/2008 |
| STATUS OF CASE: | Closed |

SYNOPSIS:   FDA OCI and FBI investigation is closed with a referral being made to IRS
CID for evaluation.

RESTRICTED INFORMATION
This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best
interests of the Food and Drug Administration, Office of Criminal Investigations. This report shall not be released in response to a
Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of
Criminal Investigations.
UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION

REPORT SUBMITTED BY                                    DATE: 2/20/08

REPORT APPROVED BY:                                    DATE: 2/22/08
                David W. Bourne, Special Agent In Charge

DISTRIBUTION:        MIF: Original
                     IOD: 1cc

FDA 39

36

2006-MIF-703-0268
Page 2 of 3

## 1. INTRODUCTION:

The Food and Drug Administration (FDA), Office of Criminal Investigations (OCI), Miami Field Office, was contacted by the FBI about the possible diversion of pharmaceuticals from FACTOR HEALTH MANAGEMENT (FHM). The FBI requested FDA/OCI to assist in the investigation. This case was referred to the FBI by BlueCross of Florida.

Reference is made to Report of Investigation dated November 29, 2007.

## 2. DETAILS OF INVESTIGATION:

On December 14, 2007, Wage Report records regarding Factor Health Management, Factor Foundation of America, and FCS Pharmacy were received from the State of Florida, Department of Revenue.

On January 11, 2008, the following documents were received from Blue Cross/Blue Shield of Florida:

* Factor Foundation of America's group termination
* Factor Health Management/FCS Pharmacy member roster.

On January 25, 2008, five copies of Blue Cross Blue Shield of Florida, Inc. checks made payable to FCS Pharmacy were received from ███████ SIU, Blue Cross Blue Shield of Florida.

On February 5, 2008, a copy of the Factor Foundation member roster for the period of September 2006 to August 2007 was received from Blue Cross Blue Shield of Florida.

On February 15, 2008, the Reporting Agent met with ███████ FBI, and ███████ Madison and Associates. After a thorough review of the evidence gathered to date, a decision was made to close the investigation and refer the known information to the IRS CID for evaluation. Investigation to date has not produced evidence that a crime has been committed and/or pharmaceuticals are being diverted.

## 3. JUDICIAL ACTION:

N/A

## 4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:

N/A

## 5. STATUS OF INVESTIGATION:

Investigation is closed based on no evidence being obtained to indicate pharmaceuticals are being diverted, which the allegation of, triggered FDA OCI involvement. This matter is being referred to IRS CID for evaluation.

## 6. SUSPECTS/DEFENDANTS/OTHER:

FACTOR HEALTH MANAGEMENT
FCS PHARMACY, LLC
FACTOR FOUNDATION OF AMERICA

On February 20, 2008, all Subject History Forms were updated and place in the case file.

7. ATTACHMENTS:
   N/A

EXHIBIT 19

 

**BlueCross BlueShield Association**

An Association of Independent
Blue Cross and Blue Shield Plans

1310 G. Street, NW
Washington DC 20005
(202) 942-1092
(202) 942-1295

# Memo

**To:**   All BCBS Licensee Anti-Fraud Unit Managers/Directors

**From:** Byron Hollis, BCBSA, National Anti-Fraud Director (NAFD)

**CC:**   Darrell Langlois, BCBSLA

**Date:** July 5, 2005

**Re:**   SIU ALERT, 2005005 – FCS Pharmacy

---

The BCBSA-NAFD has received information from BlueCross BlueShield of Louisiana, regarding captioned entity. At your earliest convenience, please review your exposure to this provider, and if you identify potential losses, contact the investigator(s) listed below. Your prompt attention will allow us to quickly assess the system wide threat, if any, presented by this provider or scheme.

Blue Cross and Blue Shield of Louisiana (BCBSLA) recently acquired a small group customer and since December 4, 2004, incurred claims expense of over $500K for this five-member group. It appears that each employee of the group has one or more family members with a medical disorder requiring substantial amounts of medication.

All of the medications are coming from FCS Pharmacy located in Boca Raton, Florida. It appears that FCS Pharmacy (along with a related entity, Factor Health Management, LLC.) is affiliated with Factor Foundation of America. We have determined that our group is affiliated with both Factor Health Management and Factor Foundation of America. Relevant addresses for these companies include 7700 Congress Avenue, Suite 3109, Boca Raton, FL 33487 and P.O. Box 3015, Kingshill, St. Croix, US Virgin Islands, 00851.

*Via e-mail 6/30/05*

1

**BCBSA02606**

**CONFIDENTIAL**

CONFIDENTIAL

We are aware of two other Blue Plans with similar situations involving large claims expense.

**Because of on-going criminal investigations, please do not contact FCS Pharmacy or either of the parent companies without first communicating with our office.**

Please contact Kandyce Cowart at 225-295-2073 if you have any information regarding any of these parties, or if you have similar problems under different names. Also, please notify Calvin Sneed of my staff at 202-942-1084 for possible multi-plan coordination purposes.

Thank you for your prompt attention to this matter.

*NOTE: The information provided in this memo has not been verified by the Blue Cross Blue Shield Association. The information is provided to aid you in the performance of your anti fraud duties and for no other purpose. Do not take any punitive action against any individual or entity named in this memo without independent verification of the facts and proof of loss surrounding claims submitted to your organization.*

BCBSA02607
CONFIDENTIAL

EXHIBIT 20

**Foreman, Betty**

| | |
|---|---|
| From: | Jaime Hanson/ITD/BCBSMD@CareFirst [Jaime.hanson@carefirst.com] |
| Sent: | Wednesday, December 05, 2007 2:18 PM |
| To: | Betty Foreman/ITD/BCBSMD@CareFirst |
| Subject: | Re: Confidential FCS Pharmacy |
| Attachments: | NotesLink1.ndl; FCS PHARM 1.1.06 TO 9.30.07.XLS |

I'm open anytime this afternoon. Tomorrow is good too, I just have an on-line training w/ Argus from 11 to 1.

Thanks!

(I'll explain the request w/ Joan's area when we meet.)


Jaime M. Hanson
Medicare Part D Investigator
Phone: 410-998-7329
Fax: 410-720-5603

Betty Foreman/ITD/BCBSMD

| Betty Foreman/ITD/BCBSMD | To [          ] |
|---|---|
| | cc    [          ] |
| 12/05/2007 02:03 PM | Subject [          ] Link |

We need to meet and discuss. Let me know what is a good time for you. I can do this afternoon or tomorrow.

Also, did you ever get a response from Joan's area regarding data for this provider (I think you sent to her to do a query since it could involve Home claims)?

Betty Foreman
Supervisor, Special Investigations
Mail Stop OM2-745
Ph (410) 998-7215; Fax (410) 720-3025

Jaime Hanson/ITD/BCBSMD

| Jaime Hanson/ITD/BCBSMD | To [          ] |
|---|---|
| | cc    [          ] |
| 12/05/2007 12:56 PM | Subject [          ] |

Hi Betty! I needed Beth's help to figure out how to pull the claims for FCS Pharmacy and she ended up pulling the claims herself. Anyway, I think we have some serious exposure that warrants additional investigation. All the patients are somehow associated w/ the one group and in 2007 we paid over $6,700,00.00 where they billed just about $6,900,000. Can you please let me know how I should proceed?

Thank you so much and have a good afternoon!

1

onfidential

EXHIBIT 21

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ORIGINAL

---------------------------:
FELDMAN'S MEDICAL CENTER      :
PHARMACY, INC.,               :
                             :
            Plaintiff,        :
                             :
      v.                      : Civil Action No.
                             : WDQ-10-254
CAREFIRST, INC.,              :
                             :
            Defendant,        :
                             :
      v.                      :
                             :
JOHN DOES 1 and 2,            :
                             :
   Third-Party Defendants.    :
---------------------------:

                    Baltimore, Maryland
                    Tuesday, March 9, 2010
Deposition of:

      ANDREA B. CHERENZIA

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the offices of

Baroody & O'Toole, 201 North Charles Street, Suite

1650, Baltimore, Maryland 21201, Before Belinda D.

Lomax of Capital Reporting, a Notary Public in and

for the State of Maryland, beginning at 9:25 a.m.,

when were present on behalf of the respective

parties:

Capital Reporting Company
Cherenzia, Andrea B.  03-09-2010

12

1      Q     What about Bill Lisanty?  Who does he

2   report to?

3      A     Jeanne.

4      Q     Are you familiar with investigations that

5   were performed by Special Investigations of Factor

6   Health Management, FCS Pharmacy and Feldman's?

7      A     Yes.

8      Q     Okay.  And who in Special Investigations

9   worked on these investigations?

10     A     Jaime was the one that had the lead in

11  it.

12     Q     Anyone else that you can think of?

13     A     Betty assisted or they went back and

14  forth obviously because she was her manager.  I

15  can't think of anyone else that might have.

16     Q     Would you consider that to be one

17  investigation or two investigations, three

18  investigations, multiple investigations?

19     A     In my mind, I consider it two.

20     Q     Two.  Okay.  How do you distinguish

21  between them?

22     A     Factor Health and then Feldman's.

13

1        Q       And what's the distinguishing -- what's

2    the distinction in your mind?

3        A       Factor Health, when we were first

4    notified about it or asked to look at it by our

5    chief actuarial, because there was a big increase

6    in experience in their claims, we looked at them to

7    make sure that they were in compliance with small

8    group eligibility requirements.

9        Q       And Feldman's?

10       A       We were looking at the amount of -- the

11   amount of Factor VIII that's being dispensed.

12       Q       Do you recall which investigation was

13   earlier in time?

14       A       Factor.

15       Q       So what was the first time you became

16   aware of issues relating to Factor Health?

17       A       When the chief actuarial sent an e-mail

18   to me.  Actually, I think he left me a voice mail

19   and sent an e-mail.  I can't tell you the year.  I

20   probably have it in the documentation that I turned

21   over.

22       Q       Who is the chief actuary?

14

1      A.    Ed O'Neill.  He's retired now.

2      Q    What did Mr. O'Neill tell you?

3      A    He just asked to look at it because he

4  noticed a high increase in claims.

5            MR. BECKER:    Let's mark as Exhibit 1 --

6  I should have done this earlier.  We'll mark this

7  as Cherenzia Exhibit 1, please, and give it

8  directly to the witness.

9            (Cherenzia Deposition Exhibit Number 1

10            was marked for identification.)

11  BY MR. BECKER:

12      Q    I will ask you if you have ever seen this

13  document before?

14      A    This right here (indicating)?

15      Q    Take a look through all the pages.  Let

16  me know if you have seen any of it.

17      A    I have seen this (indicating).

18      Q    The last page?

19      A    Right.  I have it in my purse.

20      Q    That's the subpoena?

21      A    Yes.

22      Q    When did you first see that document?

Capital Reporting Company
Cherenzia, Andrea B.   03-09-2010

19

1      A     Yes.

2      Q     So you don't remember specifically what

3   it was about?  You don't have any specific

4   recollection beyond this general sense that there

5   was a question concerning certain employees of one

6   group?

7      A     Right.

8      Q     You don't remember the name of the group?

9      A     I can't think of it right now.

10     Q     Do you recall -- withdrawn.

11           MR. BECKER:   Let mark the next document

12   as Exhibit 3.

13           (Cherenzia Deposition Exhibit Number 3

14           was marked for identification.)

15   BY MR. BECKER:

16     Q     Can you identify what this document is?

17     A     It looks like an e-mail from Betty to

18   Winston, who is Associate Vice-president of

19   Pharmacy.  It looks like -- wait a minute.

20           It looks like I sent it but it looks like

21   it's from Betty.  It must Betty's copy.

22     Q     This is an e-mail that you sent to who?

20

1    A    Winston Wong.

2    Q    Who is Mr. Wong?

3    A    He is the Associate Vice-president of our

4  Pharmacy Department.

5    Q    And who else was copied on this?

6    A    Jaime Hanson, Betty Foreman, Jeanne

7  Willett and Bill Lisanty.

8    Q    Do you know why you were coping all of

9  them on this e-mail?

10   A    They may have had some -- doing some work

11 in the case.  Jeanne possibility because she was my

12 other manager.  Jaime because she was the lead and

13 Betty was her boss.

14   Q    And what was the purpose of this e-mail

15 to Mr. Wong?

16   A    We were asking Winston -- actually, I was

17 asking Winston if there was a pharmacist in his

18 shop who could review some of that medical

19 documentation and records for us.

20   Q    Do you know whether that ever happened?

21   A    Yes, it did.

22   Q    Other than Mr. Wong and Ms. Hanson and

Capital Reporting Company
Cherenzia, Andrea B.   03-09-2010

21

1  Ms. Foreman, Ms. Willett and Mr. Lisanty, do you

2  recall having any communications with anybody else

3  at CareFirst relating to this investigation?

4      A     I believe at one time there was a

5  conference call which Dan Wynn was on.

6      Q     What is Mr. Wynn's position?

7      A     He is one of the medical directors.

8      Q     What was the purpose of that call?

9      A     I believe to discuss the use of Factor.

10     Q     Do you recall any other conversations

11 with anybody else at CareFirst relating to this

12 investigation?

13     A     There may have been other conversations.

14 I cannot recall any of the other people that might

15 have been involved.

16     Q     Do you recall whether there were any

17 conversations outside of CareFirst with the BCBS

18 Association or any licensees of the BCBS

19 Association?

20     A     Yes.

21     Q     Relating to this particular

22 investigation?

22

1    A    Yes.

2    Q    When did that take place?

3    A    I would say it took place over the last

4  couple years.

5    Q    You can't pinpoint that any better?

6    A    No.

7    Q    So this investigation -- withdrawn.  The

8  investigation of Factor Health Management and FCS

9  Pharmacy relating to their compliance with small

10  group rules, has that investigation ended?

11    A.    Yes.

12    Q    When did that end?

13    A    I would say a couple years ago.  We were

14  not able to identify that they were out of

15  compliance.

16    Q    Now, you said that you had conversations

17  with other people, other members of the BCBS

18  Association and other licensees of the BCBS

19  Association relating to this investigation.  Was

20  that before or after the determination was made

21  that they were not out of compliance?

22    A    It would have been about the same time.

23

1    Q    With whom did you have these

2    communications?

3    A    Calvin Sneed.

4    Q    Anyone else you can think of?

5    A.   Byron Hollis.

6    Q    Anyone else?

7    A    Other members of Blues plans that would

8    have sat on the BCBSA anti fraud board.

9    Q    What was the context of these

10   communications?

11   A    Wondering if there was any kind of

12   diversion going on.

13   Q    How did those communications take place?

14   A.   Sometimes they were conference calls,

15   which I did not sit in on hardly at all, and board

16   meetings.

17   Q    Board meetings would be a face-to-face

18   meetings?

19   A    Correct.

20   Q    How often would those take place?

21   A.   The board meets once a quarter, four

22   times a year.  Doesn't necessarily mean every

24

1  meeting that it was a topic of discussion.

2      Q    How many meetings and conference calls

3  can you recall that the topic of Factor Health

4  Management or FCS as opposed to discussions related

5  to Feldman's were discussed?

6      A    Maybe I will say six over the course of

7  the time frame.

8      Q    What was the discussion -- withdrawn.  Do

9  you have any specific recollection of any of the

10  discussions?

11      A    Basically wondering why so much Factor

12  and where was it going.

13      Q    What were you told -- withdrawn.  Were

14  you told anything by any of the other participants

15  in these meetings?

16      A    I'm sure there was things told.  I cannot

17  recall, though.

18      Q    Were you ever able to determine that

19  there was any Factor being diverted?

20      A    No.  Me personally, no.

21      Q    And CareFirst, has CareFirst ever

22  determined that there was any Factor being diverted

Capital Reporting Company
Cherenzia, Andrea B.  03-09-2010

40

1            (Cherenzia Deposition Exhibit Number 5

2            was marked for identification.)

3  BY MR. BECKER:

4       Q    Is this the contract that you were

5  referring to as the DME contract?

6       A    I believe so.

7       Q    Can you tell me where specifically in the

8  document that it refers to the fact that it's

9  limited to DME?

10      A    I have seen this contract.  I don't know

11  it like the back of my hand.  So I'm not 100

12  percent familiar but --

13      Q    Go ahead.  I'm sorry.  Finish your

14  answer.

15      A    "They are a provider in response to your

16  inquiry regarding your request for a durable

17  medical equipment provider account number."  Right

18  there would say to me DME.

19      Q    But that's part of -- withdrawn.  The

20  contract itself, the agreement which I think is the

21  first eight pages of this document, are you aware

22  of any place where it limits reimbursement to

41

1    durable medical equipment?

2         MR. de GRAVELLES:    I will just place an

3    objection on the record to that characterization of

4    the first eight pages only being a contract as one

5    of counsel's opinion.  You can ask what the first

6    eight pages do, but as to the conclusion that it

7    was only eight pages I think is for the court to

8    determine.

9         You can answer.

10         THE WITNESS:    What was the question

11    again?  I'm sorry.

12         MR. BECKER:    I will state a new

13    question.

14    BY MR. BECKER:

15      Q    On the first page of Exhibit 5, which is

16    entitled "Participating Professional Provider

17    Agreement," it defines coverage service in

18    Paragraph 3 as, quote, "a medically necessary

19    service or supply provided to a Member for which

20    the Member is entitled to receive a benefit under

21    the BCBSM Program in which is he/she is enrolled."

22    Do you see that?

42

```
1      A    I see it.

2      Q    Is there anywhere in this exhibit or

3  anyplace else that you are aware of that limits

4  what a covered service is under this contract

5  solely to durable medical equipment?

6      A    I am not aware of it because I'm not

7  familiar enough with the contract.  If you look on

8  Page 7 of 8, it say DME, "Field of Practice or

9  Specialty," DME.

10     Q    What else does it say, just for

11 completeness?

12     A    Pharmacy in parentheses.

13     Q    So it says DME and pharmacy?

14     A    Pharmacy in parentheses.

15     Q.   To your knowledge, Factor is dispensed by

16 pharmacies, correct?

17     A    Specialty pharmacies.

18     Q    And what was it, to your knowledge, that

19 Feldman's was lacking in order to be able to

20 dispense Factor?

21     A    A certain licensure certification like we

22 talked about.  I don't recall what the actual title
```

43

1  of it is, though.

2      Q     But you were comfortable that the

3  research that was done by the investigator was

4  sufficient?

5      A     Research in combination with other

6  departments and counsel, yes.

7            MR. BECKER:   Let's mark as Exhibit 6

8  the next document.

9            (Cherenzia Deposition Exhibit Number 6

10            was marked for identification.)

11  BY MR. BECKER:

12      Q     Can you identify these documents?

13      A     Notes I took on April 30th, 2009.

14      Q     Actually, if you leaf through it, I think

15  you will note that there are different dates.   Can

16  you just confirm that?

17      A     Different dates, 4/17/09, 4/16/09, notes

18  I took.

19      Q     So this is in your handwriting?

20      A     It is, yes.

21      Q     What are the notes you took of what?

22      A     I'm sorry?

EXHIBIT 22

10/6/08

# INVESTIGATIVE SUMMARY
## Factor VIII Investigation
## October 6, 2008

## BACKGROUND

On July 5, 2005, the NAFD issued an SIU Alert concerning FCS Pharmacy located at 7700 Congress Avenue, Boca Raton, Florida. FCS got the attention of the Louisiana Plan SIU because of a small group customer with 5 employees that had caused over $500K in payments during a 6 month period. Investigation showed that at least one member of each employee's family was a hemophiliac and payments were for the hemophiliac drug, Factor VIII.

Investigation also showed that FCS was affiliated with Factor Health Management, LLC, with an additional address in St. Croix, Virgin Islands.

About the same time, the Florida Plan SIU reported findings concerning FCS to both the Florida Department of Insurance and the FBI. Florida's specific findings are not known, but by late 2007 it was evident no action would be taken by either of these agencies without additional information. It is believed that the FBI referred the information to the Florida office of the FDA.

Subsequent to the 2005 SIU alert, various Plan SIU personnel contacted the NAFD to report numerous activities relating to members, companies and pharmacies and the provision of Factor VIII. Some reported audits that revealed a lack of "scripts" to support the volume of product. Some reported member contacts suggesting that pharmacies were drop-shipping more Factor than what was prescribed. Some reported that employees of certain companies received salaries for no-show jobs or jobs that were otherwise bogus or questionable. These matters were largely local or regional matters that were still in development.

It was also learned that at least 2 Blue company's had entered into confidential agreements with such pharmacies (possibly FCS) to stop billing them in return for a waiver of the right to further reimbursement.

Other findings were that:

- Florida and Louisiana continued to monitor Florida's FCS investigation.
- North Carolina and Illinois were auditing/investigating the activities of Matrix, an affiliated company of Factor Foundation Pharmacy and FFP LLC, but not FCS.

**CONFIDENTIAL**                    BCBSA01001

- Tennessee worked with the FDA on a Factor case involving false patient pedigree's not related to FCS.
- Regence was involved in a local investigation not related to FCS
- There were no known Medicare or Medicaid investigations of FCS or Factor VIII related entities

## DATA REQUEST I

In 2007, the NAFD and NAAB agreed to obtain Factor VIII claims information from all Plans to determine claim volume and payment amounts.

On February 12, 2008, the NAFD informed all Plan SIUs that it had been monitoring activities relating to Factor VIII, and issued a Data Request (I) for the names, addresses and amounts paid to pharmacies providing Factor VIII. Review of this data showed that billings from FCS were nearly twice the amount per patient than the amount billed by other providers.

Additional feedback from Plans (especially Anthem Indiana) indicated that providers may have misrepresented company owners and affiliations, as well as small group workforce structure, in order to obtain coverage that did not meet participation and eligibility requirements. Together, the information showed Plans were pursuing audit and investigative leads involving payments for Factor VIII that were unwarranted, excessive, or contributing to stockpiling for nefarious purposes, such as re-sale.

On May 16, 2008 Texas FDA proposed a theory to the NAFD and the Texas, Illinois and Maryland Plans during a conference call that seemed to capture many of the experiences of our Plan SIUs, as follows:

- Company's hire hemophiliac patients to develop a patient pool that receives Factor directly from the company's Specialty Pharmacy.
- Specialty Pharmacy (sometimes the employer) orders, supplies and bills for more Factor than is required by the patient.
- Specialty Pharmacy resells the excess on the grey market.

We told the FDA (and Texas FBI) we were in the process of collecting and reviewing information from our Data Request and that we would inform them of the results of our review.

## DATA REQUEST II

On July 10, 2008, based on these and other findings the NAFD issued a second Data Request (II) to determine whether members were Plan-hopping to avoid detection or to avoid hitting life-time caps, and to try to ascertain whether Factor was being over-prescribed for eventual re-sale.

**CONFIDENTIAL**

BCBSA01002

We reviewed over 5100 data lines from 33 of the 39 Blue companies in response to our request. The data represents members that received Factor over the past 6 years. Investigation shows that about 638 members have been enrolled with more than one Blue plan during that period, involving 21 Plans. Many members have been enrolled in 3 or 4 Plans during that time. The NAFD is currently sharing some of the data with interested Plan SIUs.

## DATA REQUEST III (PROPOSED)

Recently, we learned that 2 SIUs have developed evidence to support excessive supplies of Factor. FCS Pharmacy is not the subject of either investigation and there is no apparent connection between the subject companies.

The NAFD is facilitating a meeting between 3 Pennsylvania Plan SIUs and the Maryland SIU relative to FCS employees that have been enrolled at 3 of these 4 Plans. The meeting is meant to identify areas of common interest and develop respective investigative plans, and the SIU staff has agreed to conduct preliminary work to assist the NAFD in drafting an additional Data Request (III).

The Data Request (III) will be related to the "matched" members from Data Request II and will be for:

- Member enrollment dates
- Member known addresses
- Names and addresses of affiliated Groups and/or Company's
- Names and addresses of pharmacy's used

This data may be used to:

- Isolate FCS members and other company's of interest
- Identify pharmacy's or other Factor distributors
- Rule out duplicate claims (BlueCard)
- Match with Medicaid rolls where possible
- Learn if members received Factor for which payment was made

## NEXT STEPS?

EXHIBIT 23

7.2007-3.2009.Emails

communication is strictly prohibited. If you have received this communication in error, please do not distribute it. Please notify the sender by e-mail at the address shown and delete or destroy the original message and any attachments. Thank you.

------------------------------------------------------------------------
This message was secured by <http://www.zixcorp.com> ZixCorp(R).
From:        Demers, Chris [CDemers@bcbsm.com]
Sent:        Friday, November 14, 2008 2:15 PM
To:          Sneed, Calvin
Cc:          Cedras, Doug
Subject:     FW: BCBSA reports
Attachments: BCBSA Strike Force Investigative Report 10 22 08 Format1 (2) (2).doc; BCBSA Strike Force Investigative Report 10 22 08 Format1 (4) (3).doc

Follow Up Flag: Follow up
Flag Status:    Flagged

Please see attached. Thanks.


Christine DeMers

Executive Assistant to

Gregory W. Anderson, VP

Corporate & Financial Investigations

248-448-8227

          ———————




------------------------------------------------------------------------
This message was secured by <http://www.zixcorp.com> ZixCorp(R).
From:      Sneed, Calvin
Sent:      Friday, November 14, 2008 12:57 PM
To:        'charles.joseph@bcbsfl.com'
Subject:   Factor Health/FCS Pharmacy

Follow Up Flag: Follow up
Flag Status:    Flagged

Good Afternoon Charlie,


I left a message for you this morning while you were in meetings. You may know that we have initiated a strike force investigation of captioned company located in Boca Raton, concerning possible billing irregularities. We understand the legal department is handling the matter for the Florida Plan and wanted to briefly discuss our case so that we do not in any way hinder your case. If you have a few minutes this afternoon I can be reached at 202.257.4994. Thanks Charlie.

Page 415

**CONFIDENTIAL**

**BCBSA00818**

7.2007-3.2009.Emails

Calvin Sneed

Sr. Anti Fraud Consultant

Blue Cross Blue Shield Association

1310 G Street, NW

Washington, DC   20005

From:   Casarella, AJ [AJ.Casarella@bcnepa.com]
Sent:   Thursday, November 13, 2008 2:45 PM
To:     Sneed, Calvin
Subject:        Factor 8 summary...
Attachments:    Case Summary - 20050018.doc; calvin-NLHC timeline.doc; Minutes for
091707b Meeting.doc

Follow Up Flag: Follow up
Flag Status:    Flagged

Calvin, let me know if there is anything else you may need me to bring
for our meeting in Phoenix.

   <<Case Summary - 20050018.doc>>   <<calvin-NLHC timeline.doc>>
<<Minutes for 091707b Meeting.doc>>

Thanks,

AJ Casarella
Fraud Manager
19 North Main
Wilkes- Barre, PA
570-200-1549


CONFIDENTIALITY NOTICE:
This message and any attachments originate by electronic mail from Blue Cross of
Northeastern Pennsylvania, First Priority Health, AllOne Health Management
Solutions, Inc. and their subsidiaries/affiliates ("BCNEPA").  Both this document
and any attachments are intended for the sole use of the addressee indicated above
and may contain proprietary, privileged and/or confidential information.  If you are
not the intended recipient of this message, you are hereby notified that any use or
disclosure of this information is strictly prohibited.  If you have received this
transmission in error, please notify the sender by reply email and delete the
original message immediately.  Thank you for your cooperation.


-------------------------------------------------------------------
This message was secured by ZixCorp(R).
From:   Sneed, Calvin
Sent:   Wednesday, November 12, 2008 1:59 PM
To:     'Ebner, Michael J.'; 'Deery, Christopher'
Subject:        FCS Louisiana

Follow Up Flag: Follow up
Flag Status:    Flagged

Darrell reports that the Group name is Factor Health Services, LLC.  This is the
same group that caused them to initiate the original SIU alert in 2005.  They first
used the St. Croix address and were told that would not fly.  They then tried to use
                              Page 416

**CONFIDENTIAL**

**BCBSA00819**

EXHIBIT 24

**Capital Reporting Company**
**CONFIDENTIAL**

IN THE CIRCUIT COURT FOR BALTIMORE COUNTY

```
------------------------------:
FELDMAN'S MEDICAL CENTER       :
PHARMACY, INC.,                :        ORIGINAL
                               :
              Plaintiff,       :
                               :
           vs.                 : Civil Action No.:
                               : 03-C-09-006257
CAREFIRST, INC.,               :
                               :
              Defendant.       :
------------------------------:
```

Baltimore, Maryland
Friday, August 14, 2009

Deposition of:
        ELIZABETH A. FOREMAN
called for oral examination by counsel for
Plaintiff, pursuant to notice, at 201 North Charles
Street, Suite 1650, Baltimore, Maryland 21201,
Before Belinda D. Lomax of Capital Reporting, a
Notary Public in and for the State of Maryland,
beginning at 9:35 a.m., when were present on behalf
of the respective parties:

Page 50

1      A.      Feldman's has been informed to give

2  us the medical records for all these outstanding

3  claims.

4      Q.      Has Feldman's complied with the

5  request?

6      A.      I don't know.  Jamie is the one

7  that's handling that.  They may have provided some,

8  but I'm not certain.

9      Q.      And when was this 500 unit

10  discrepancy -- strike that.  When was the shipment

11  that the 500 unit discrepancy pertained to?

12      A.      It would have had to have been after

13  December 18th, but I don't know.

14      Q.      Why do you say "after December

15  18th?"

16      A.      Because that's the date of the

17  prescription.

18      Q.      Any other issues or problems that

19  have been brought to your attention regarding any

20  of the claims submitted by Feldman's apart from the

21  contracting issues that you mentioned and this 500

22  unit discrepancy?

Capital Reporting Company
CONFIDENTIAL

Page 51

1          A.     Yes.  It's unusual that they shipped

2     the product to a sales rep, yet the patient claims

3     they get them direct.

4          Q.     What product has been shipped to a

5     sales rep?

6          A.     Factor VIII.

7          Q.     To which sales rep?

8          A.     They are in Virginia.  I don't know

9     their names.

10         Q.     For which patients?

11         A.

12         Q.     How many times did that occur?

13         A.     I couldn't give you a number, but

14    it seemed to be quite frequent.

15         Q.     Did you ask            why his

16    prescriptions were being shipped to a sales rep, in

17    your words?

18         A.     Yes.  He said that very, very seldom

19    happened, yet the records show that they did go

20    there.  So it was kind of contradictory.

21         Q.     The drugs went from where to where?

22         A.     Pardon me?

Capital Reporting Company
CONFIDENTIAL

Page 52

1          Q.      The drugs went from where to where?

2          A.      The drug went from Feldman's to a

3     sales rep, yet the patient claims they got it

4     directly shipped to them.  So I don't understand

5     how that happens.

6          Q.      Did you ask Mr.            ?

7          A.      He could not explain it.

8          Q.      He got the drugs, right?

9          A.      Yes.

10         Q.      How did he get the drugs?

11         A.      He claims he gets them direct

12    through FedEx, yet the FedEx records show they go

13    to a sales rep.

14         Q.      Then where do they go?

15         A.      Supposedly to the patient.

16         Q.      When you say "supposedly," have you

17    identified any prescription that has not been

18    received by a patient?

19         A.      Not yet.

20         Q.      When you say "not yet," why do you

21    say "not yet?"

22         A.      It doesn't mean it couldn't happen.

Page 53

1    I'm just saying we have not -- there is a

2    discrepancy in the statements.

3          Q.    You looked at all the claims, right?

4          A.    I haven't.

5          Q.    Jamie has?

6          A.    Not all of them.  Some were handled

7    by the operations area that did not come to her.

8          Q.    Has anyone brought to your attention

9    any prescription that has not been delivered to a

10   patient?

11         A.    Yes.

12         Q.    Which patient?

13         A.    It wasn't Feldman's.  I mean it was

14   a patient of ours with product but not dispensed by

15   Feldman's.

16         Q.    Was it dispensed by FCS?

17         A.    No.

18         Q.    Are there any prescriptions that

19   have been dispensed by FCS or Feldman's that you

20   have been told or you know did not end up in the

21   hands of a patient?

22         A.    Not that I know of.

**Capital Reporting Company**
**CONFIDENTIAL**

Page 89

1    Q.    Did you read this e-mail when you

2    got it?

3    A.    I may have.

4    Q.    Did you talk to anybody about it?

5    A.    I doubt it.

6    Q.    Why not?

7    A.    Because the investigation was mainly

8    being handled by Jamie, and I manage a lot of

9    people and have a lot of work.  So I'm on a daily

10    basis dealing with more than just this.  So I

11    cannot get into the details of every e-mail that's

12    sent to me.

13    Q.    Has anyone ever told you or have you

14    seen any documents that identify patients being

15    miles away or far away from the prescribing doctor?

16    A.    Could you repeat that?

17    Q.    Sure.

18    MR. PADUANO:   Can you read it back?

19    (The record was read.)

20    THE WITNESS:   I have heard Jamie

21    describe those kind of situations.

22    BY MR. PADUANO:

Page 90

1          Q.     Do you know the name of any patient

2     that was miles away from the prescribing doctor?

3          A.     No, I don't know offhand.

4          Q.     Have you heard of any problems or

5     difficulty with tracking lot numbers regarding any

6     of the prescriptions filled by FCS or Pharmacy

7     Matters or Feldman's?

8          A.     I know there have been issues

9     discussed.  Again, being more removed from the

10    specifics of the case, I can't answer that I know

11    that for a fact.

12         Q.     Do you know why Ms. Hanson wrote,

13    quote, the first line, "Hi, Deb!  I hope all is

14    well!  That's great that you found someone

15    interested in the case," end quote?  Do you know

16    why she wrote the last sentence?

17         A.     No.

18         Q.     Did you ever discuss with her

19    whether it was necessary or a good thing to

20    identify an FDA criminal agent willing to work with

21    CareFirst?

22         A.     Did I?

**Capital Reporting Company**
**CONFIDENTIAL**

Page 91

1        Q.      I will ask you a better question.

2   Did you discuss with her, in response to this,

3   whether there was any criminal activity that needed

4   to be investigated?

5        A.      I remember discussing that she had

6   been in contact with this person, Doug, and that he

7   wanted to come to our plan as well because he was,

8   you know, getting information from different plans.

9        Q.      Has he told you anything that's

10  criminal that concerns any of the claims submitted

11  to CareFirst?

12       A.      Yes.

13       Q.      What?

14       A.      As I mentioned, the one that was a

15  false claim.

16       Q.      That has nothing to do with FCS or

17  Feldman's?

18       A.      Not to my knowledge.

19       Q.      Has he mentioned anything that is

20  criminal or potentially criminal having to do with

21  FCS, Factor Health Management or Feldman's?

22       A.      I don't think so.

**Capital Reporting Company**
**CONFIDENTIAL**

Page 92

1          MR. PADUANO:   Let me hand you a

2    document that we're going to mark as Foreman Number

3    5.  It bears the bates stamps CFI00222 and 223.

4          (Foreman Deposition Exhibit Number 5

5    was marked for identification.)

6    BY MR. PADUANO:

7          Q.    Ms. Foreman, what's this spreadsheet

8    that's attached to this exhibit?

9          A.    It's probably -- this is from

10   December '07.  When we got the alert, we were

11   looking for claims billed by FCS Pharmacy.

12         Q.    Who is Beth Reinhard?

13         A.    She is an investigator in our D.C.

14   office.

15         MR. PADUANO:   I call for the

16   production of the attachment that is referenced on

17   the last page of Foreman Number 5.

18         THE WITNESS:   It should have been

19   provided.

20   BY MR. PADUANO:

21         Q.    Let's go to the next e-mail up.

22   This is one from Ms. Hanson to you?

**Capital Reporting Company**
**CONFIDENTIAL**

Page 126

1      Q.      Did Ms. Hanson?

2      A.      She may have.

3      Q.      Did you see a document that's

4  responsive to Foreman Number 12?

5      A.      Was that a question?

6              (The record was read.)

7              THE WITNESS:    Possible.

8              MR. PADUANO:    We call for the

9  production of any such document.

10             Let me hand you a document that's

11 being marked as Foreman Number 13, a two-page

12 document bearing bates stamp CFI00320 and 31.

13             (Foreman Deposition Exhibit Number

14 13 was marked for identification.)

15 BY MR. PADUANO:

16     Q.      Have you seen Foreman Number 13

17 before?

18     A.      Yes.

19     Q.      Who wrote Foreman Number 13?

20     A.      I'm not sure.  It may have been

21 Jamie.

22     Q.      Who gave you Foreman Number 13?

Capital Reporting Company
**CONFIDENTIAL**

Page 127

1          A.      It likely would have been Jamie.

2          Q.      Did Jamie visit Factor Health

3    Management in Florida?

4          A.      No.

5          Q.      So do you know what the source of

6    the information is that's contained in this memo?

7          A.      It looks like Candace Cower from the

8    Louisiana plan went with an auditor to FHM in

9    Florida.

10         Q.      So these are Jamie's notes of a

11   conversation with Candace Cower?  Is that your

12   understanding?

13         A.      Or the work group, right.

14         Q.      How closely is CareFirst coordinated

15   with the other BlueCross companies regarding FCS

16   and Feldman's?

17         A.      How close are we?

18         Q.      Coordinated, your activities.

19         A.      There have been conference calls

20   that are every four to six weeks, but that's the

21   main contact.

22         Q.      This has been going on, this

Page 128

1   investigation, for almost two years?

2         A.      That's when the alert came, but it

3   took a while for us to begin getting information

4   together.  So a little under two years.

5         Q.      But you stopped paying the claims in

6   December of 2007; is that right?

7         A.      I'm not aware of that.

8         Q.      When did you stop paying the claims?

9         A.      I don't know.  The operations area

10  was getting claims before we were involved, I would

11  imagine.

12                MR. PADUANO:   Let me hand you a

13  document being marked Foreman Number 14 that bears

14  the bates stamps CFI0223940.

15                (Foreman Deposition Exhibit Number

16  14 was marked for identification.)

17  BY MR. PADUANO:

18        Q.      Do you recognize Foreman Number 14?

19        A.      Yes.  My handwriting is at the top.

20        Q.      What does it say?

21        A.      "Need additional info from Andrea."

22        Q.      What additional info did you need?

EXHIBIT 25

**Hanson, Jaime**

| | |
|---|---|
| From: | Jaime Hanson/ITD/BCBSMD@CareFirst [Jaime.hanson@carefirst.com] |
| Sent: | Tuesday, March 18, 2008 12:54 PM |
| To: | Andrea Cherenzia/MD/CareFirst@CareFirst; JEANNE WILLETT/DC/CareFirst@CareFirst; WILLIAM LISANTY/DC/CareFirst@CareFirst; Betty Foreman/ITD/BCBSMD@CareFirst |
| Subject: | Fw: Contact w/ FCS Pharmacy |
| Attachments: | NotesLink1.ndl |

Not a major update, but I wanted to share an e-mail that I received from Winston last week. I'm sorry, I didn't realize that he hadn't replied to everyone.

I was just talking with Jeanne and FCS has not faxed the documentation to my attention yet. I am going to call them again this afternoon just to check in with them.

Jaime M. Hanson
Medicare Part D Investigator
Phone: 410-998-7329
Fax: 410-720-5603

----- Forwarded by Jaime Hanson/ITD/BCBSMD on 03/18/2008 12:53 PM -----

**Winston Wong PharmD/ITD/BCBSMD**      To [         ]

                                         cc    [         ]

03/13/2008 05:49 PM                       Subject [        ] Link

I spoke to my counterpart at bcbsf. They are in the midst of litigation. Defintely a red flag. Only problem is that they cannot nail down a problem. Kinda like us, it feels wrong

Ww

Jaime Hanson

----- Original Message -----

**From:** Jaime Hanson

**Sent:** 03/13/2008 05:46 PM EDT

**To:** Andrea Cherenzia; Winston Wong PharmD; Dr Daniel Winn; Charles Medani MD; Rita Lindie PharmD; JEANNE WILLETT; Phil Miller; Betty Foreman; WILLIAM LISANTY

**Subject:** Contact w/ FCS Pharmacy

Hello! Just an update to let you know that I spoke with the Patient Account Director at FCS Pharmacy this afternoon. They will be forwarding documentation to my attention tomorrow, Friday the 14th, for all

1

                                                                                    **CFI 06245**

outstanding claims. They were ordering medical records, including progress note based on the rejection they received from the Florida plan. It sounds as if they will be providing all the normal information, including the prescriptions, infusion logs and Fex-Ex tracking records.

I will prepare the documentation for review and forward it as it becomes available.

Thank you and have a great weekend!


Jaime M. Hanson
Medicare Part D Investigator
Phone: 410-998-7329
Fax: 410-720-5603

Confidential

CFI 06246

EXHIBIT 26

1

IN THE CIRCUIT COURT OF BALTIMORE COUNTY, MARYLAND

---------------------------------:
FELDMAN'S MEDICAL CENTER PHARMACY,:
INC.,                             :
            Plaintiff,            :
                                  :
      vs.                         : Action No.:
CAREFIRST, INC.,                  : 03-C-09-006257
            Defendant.            :
---------------------------------:

                            Washington, DC

                  Monday, November 8, 2010

Deposition of:

            CALVIN SNEED,

called for oral examination by counsel for

the Plaintiff, pursuant to notice, held at

the Offices of BlueCross BlueShield

Association, 1310 G Street, NW, Washington,

DC, before Lohna Esteb of Capital Reporting

Company, a Notary Public in and for the

District of Columbia, beginning at 8:50 a.m.,

when were present on behalf of the respective

parties:

Capital Reporting Company
Sneed, Calvin  11-08-2010

33

1      A     Not that I can think of.

2      Q     Who did you deal with at the FDA regarding

3   the Factor Entities?

4      A     Doug Czepa from the Nebraska office.

5      Q     Spell that for us.

6      A     It's a very odd spelling.  I want to say

7   C-Z-E-P-A, but ...

8      Q     When is the first time you met Mr. Czepa?

9      A     I don't think I've ever met him.

10     Q     When's the first time you spoke to him?

11     A     Sometime in -- probably sometime in late

12  2008.

13     Q     Why did you speak to Mr. Czepa in late

14  2008?

15     A     My recollection is it was a telephone

16  conference call between one or more of our plans and

17  Doug.

18     Q     Who were the plans on the phone with Doug?

19     A     I don't remember on the first call.  I

20  don't remember.

21     Q     Was CareFirst involved in conversations

22  with you and Doug?

# Capital Reporting Company
## Sneed, Calvin  11-08-2010

34

1      A      They were in some conference calls, yes.

2      Q      Why was Doug on the phone with you and

3 representatives of the plans?

4      A      That was arranged by the Iowa Plan.

5      Q      Why did the Iowa Plan arrange a call with

6 Doug and the other plans?

7           MR. CAZARES:  Objection to form.

8           THE WITNESS:  I'm not sure.

9 BY MR. PADUANO:

10      Q      What was discussed?

11      A      The plans were discussing with each other

12 the results of the progress of their investigations.

13      Q      When was the last time you had such a call

14 with Doug?

15      A      Either late 2009 or early 2010.

16      Q      What were the results discussed you were

17 told about?

18      A      It would have been a wide range of results

19 involving information that they gleaned from

20 interviews, information they gleaned from records

21 reviews, information they gleaned from -- between

22 themselves, others who were not on the call.

Capital Reporting Company
Sneed, Calvin 11-08-2010

35

```
 1      Q     What were the results?

 2      A     Can you be more specific?

 3      Q     I understood you to say you discussed the

 4  results of Doug's work with the plans.

 5            Did I understand you correctly?

 6      A     No.  I think I was saying that Doug -- I

 7  don't know about Doug.  I'm talking about the plans

 8  themselves.

 9      Q     So you heard the results of the plans' or

10  the progress of the plans' work?

11      A     Largely.

12      Q     What, if anything, did the plans find that

13  constituted wrongdoing by the Factor Entities?

14            MR. CAZARES:  Objection to form.

15            THE WITNESS:  There were numerous things

16        that were discussed that they were pursuing,

17        but the results of their investigations are

18        incomplete.

19  BY MR. PADUANO:

20      Q     Did you hear a plan participant or Mr.

21  Czepa say they had made a determination that any of

22  the Factor Entities had engaged in specific
```

36

1   wrongdoing?

2       A       No, not that I remember.

3       Q       Have you ever may a determination that any

4   of the Factor Entities ever engaged in any

5   wrongdoing?

6       A       No.

7       Q       During these phone calls, specifically I'm

8   concerned with the FDA phone calls to the plans'

9   participants, did the topic of something called an

10  RSA ever come up?

11      A       I believe so.

12      Q       What is an RSA?

13      A       I don't know.

14      Q       Who raised the fact of an RSA with you for

15  the first time?

16      A       I don't remember.

17      Q       What can you tell me about what an RSA is?

18      A       I don't know -- I -- what does it stand

19  for?

20      Q       Did someone from CareFirst ever raise an

21  RSA with you?

22      A       Possibly.

211

1    Foundation of America, Pharmacy Matters, in whole or

2    in part?

3        A    In part, yes.

4        Q    Who told you that Louisiana had negotiated

5    with any of the Factor Entities to stop submitting

6    claims as well as force them to forfeit unpaid

7    claims?

8            MR. CAZARES:  Objection. Form.

9            THE WITNESS:  I've read the rest of this

10       paragraph, and I would like to rephrase the

11       answer to a previous question.

12   BY MR. PADUANO:

13       Q    Go ahead.

14       A    As to the two plans, it was not Louisiana

15   and Florida.  There were two other separate plans.

16       Q    Okay.

17       A    I don't remember which ones they were.

18       Q    So it was not Louisiana and Florida?

19       A    It was not.

20       Q    Do you know which plans they were?

21       A    I don't remember.

22       Q    Do you think the groups' activities you're

212

1    referring to, you think those had something to do

2    with the Factor Entities we've defined?

3         A    Yes.

4         Q    Your next page, you refer to groups

5    obtaining coverage for hemophiliac patients,

6    possibly by ruse.

7              Do you see that?

8         A    I'm not seeing it.  Where is it?

9              Yes.

10        Q    Are the Factor Entities the subject of

11   this memorandum?

12        A    Yes.

13        Q    Did you tell people that the Factor

14   Entities were who you were writing about?

15             MR. CAZARES:  Objection. Form.

16             THE WITNESS:  Did I tell who?

17   BY MR. PADUANO:

18        Q    Anyone, that the specialty pharmacies and

19   the groups that are the subject of your memorandum

20   were the entities we've defined as the Factor

21   Entities?

22        A    I'm not sure I understand the question.

## Capital Reporting Company
### Sneed, Calvin  11-08-2010

213

1      Q      Did you ever speak to anybody regarding

2    this memorandum?

3      A      Yes.

4      Q      And when you spoke to people regarding

5    this memorandum, did you disclose to them that the

6    groups and the pharmacies you were writing about

7    were, in fact, the companies that we agreed at the

8    start of today we would call the Factor Entities?

9      A      I don't remember.

10     Q      Did you send this to CareFirst, this

11   memorandum?

12     A      I don't know.

13     Q      There was actually a conference call on

14   February 6, 2008?

15     A      Yes.

16     Q      This memorandum was written for medical

17   directors?

18     A      Yes.

19     Q      You never went to medical school?

20     A      No.

21     Q      The first paragraph of this memorandum,

22   where did you get that from, WikiHealth or

214

1    something?

2        A    Something like that.

3        Q    And did you think it was at all

4    presumptuous for you to be telling medical doctors

5    four paragraphs regarding what hemophilia is?

6        A    No.

7        Q    You thought that was important?

8        A    I thought it was important that they have

9    some background.

10       Q    They have their own background, don't

11   they?

12           MR. CAZARES:   Objection.  I think you're

13       starting to the badger witness.  I don't see

14       the relevance.

15   BY MR. PADUANO:

16       Q    This went to CareFirst's medical director,

17   didn't it, or was supposed to?

18       A    I don't know.

19       Q    Am I right that the real purpose of the

20   memorandum, the letter, the two sections you have

21   got there, that is, Blue Plan SIU Activity and

22   Medical Policy, right, that's what you wanted to

215

1    talk about in the conference call?

2        A    That's what the plan investigators wanted

3    to be -- wanted to be talked about.

4        Q    So were you on this conference call with

5    the medical directors?

6        A    I was.

7        Q    It would not be possible for you discuss

8    hemophilia with a doctor, right?

9             MR. CAZARES:  Objection.  Form.

10   BY MR. PADUANO:

11       Q    You're not competent to have a

12   conversation with a medical professional regarding

13   hemophilia, are you?

14            MR. CAZARES:  Objection.  Form.

15       Relevancy.

16            THE WITNESS:  I don't know.

17   BY MR. PADUANO:

18       Q    Do you know anything about hemophilia

19   apart from what you took from WikiHealth?

20       A    Apart from this, not a whole lot.

21       Q    But you knew enough about it to pose the

22   questions on the medical policy, right?

EXHIBIT 27

Joel,
The main reason we are attempting to get Feldman's Pharmacy approved as
a HIT provider is because all of the claims issues, that Feldman's is
currently having, is because Feldman's is attempting to bill for Factor
VIII, Hemophilia, Drugs.  These drugs were being billed under the DME
agreement and therefore were rejecting.  The only way that Factor VIII
drugs are covered is under our Home Infusion Therapy Agreements.
Contracting as a Medical Specialty Pharmacy will not make a difference
with this issue, which is the whole reason Feldman's is attempting to
contract in the first place.

Nick Onorato
CareFirst Institutional Contracting
Phone: 410-872-3835
Fax: 301-470-3192


|        | Judith E Gilmore/MD/CareFirst |
|--------|-------------------------------|
| To     | "Joel Yerton" <jyerton@factorhealth.com> |
| 08/22/2008 03:03 PM | |
| cc     | Janet.Chavarria@carefirst.com, Nicholas.Onorato@Carefirst.com, "Nurys Puente" <npuente@factorhealth.com> |
| Subject | RE: Feldmans HIT (2 applications) (Document link: Nicholas Onorato) |

It does make more sense, Joel - thank you.  I'll research for you.  Our
credentialing specialist will be on vacation next week, so I won't have
additional information until the following Monday at the soonest.
Judy Gilmore
Institutional Contracting
410-872-3516
fax:410-505-6649

7

CFI 03195

```
          "Joel Yerton"
          <jyerton@factorhe
          alth.com>
To
                      <JudithE.Gilmore@carefirst.com>,
          08/22/2008 02:48      <Janet.Chavarria@carefirst.com>
          PM
cc
                      <Nicholas.Onorato@Carefirst.com>,
                      "Nurys Puente"
                      <npuente@factorhealth.com>

Subject
                      RE: Feldmans HIT (2 applications)
```

Hi Judy!
I think we might have gotten confused on IV vs. Med Specialty. Feldman's
Pharmacy is not a traditional Home Infusion company. They would be more
aligned with your Medical Specialty Agency. Does this help?
~Joel

---

Joel Andrew Yerton
VP, Business Development - Managed Care
FactorHealth Management, LLC
7700 Congress Avenue, Suite 3109
Boca Raton, Fl 33487
O: 626-355-6707
M: 626-222-8784

-----Original Message-----
From: JudithE.Gilmore@carefirst.com
[mailto:JudithE.Gilmore@carefirst.com]
Sent: Thursday, August 21, 2008 6:48 AM
To: Janet.Chavarria@carefirst.com
Cc: Joel Yerton; Nicholas.Onorato@Carefirst.com; Nurys Puente
Subject: Re: Feldmans HIT (2 applications)

That would be me.
Joel, Nurys - if/when you obtain appropriate licensure for Home Infusion
Therapy, please contact me.  Thanks!
Judy Gilmore
Institutional Contracting
410-872-3516
fax:410-505-6649

          Janet

                                  8

**Confidential**                                                    **CFI 03196**

EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER
PHARMACY, INC.                          *
                                        *
Plaintiff and Counter-Defendant         *
                                        *
        v.                              *
                                        *
                                        *
                                        *   Civil Action No.:  1:10-cv-00254-WDQ
                                        *
CAREFIRST, INC.                         *
                                        *
Defendant, Counter-Plaintiff and        *
   Third-Party Plaintiff                *
                                        *
        v.                              *
                                        *
John DOES 1 and 2                       *
                                        *
Third-Party-Defendant,                  *
                                        *
* * * * * * * * * * * * * * * *   *   * * * * * * * * * * * * * * * *

## RESPONSES OF DEFENDANT CAREFIRST, INC. TO REQUESTS FOR ADMISSION OF FELDMAN'S MEDICAL CENTER PHARMACY, INC.

Defendant CareFirst, Inc. ("Defendant" or "CareFirst") hereby responds to the Requests for Admission served by Feldman's Medical Center Pharmacy, Inc. ("Feldman's"). As an initial matter, CareFirst notes that it does not issue insurance or pay claims. Rather, those are functions of CareFirst of Maryland, Inc. ("CFMI") and Group Hospitalization and Medical Services, Inc. ("GHMSI"). As used herein, the term "CareFirst" refers collectively to CareFirst, Inc., CFMI and GHMSI.

## RESPONSES

**REQUEST FOR ADMISSION NO. 1:** Admit that the terms of the Participating Professional Provider Agreement between Blue Cross and Blue Shield of Maryland, Inc. and Feldman's, dated as of August 12, 1997 (the "PPP Agreement"), provide for payment of any claims for "Covered Services," defined as "a medically necessary service or supply provided to a Member for which the Member is entitled to receive a benefit under the BCBSM program in which he/she is enrolled."

**RESPONSE FOR ADMISSION NO. 1:** CareFirst admits that the quoted language appears in the so-called PPP but further responds that Request for Admission No. 1 neither fully captures all of the relevant language of the so-called PPP nor does it accurately reflect the parties' understanding of that document.

**REQUEST FOR ADMISSION NO. 2:** Admit that the terms of the PPP Agreement do not refer to "durable medical equipment."

**RESPONSE FOR ADMISSION NO. 2:** Denied. The terms of the so-called PPP encompass all writing, including the phrase "DME" (*i.e.* durable medical equipment) entered in handwriting on the signature page. Moreover, the documents related to the so-called PPP, including correspondence between CareFirst and Feldman's, make it clear that the scope of the agreement was DME.

**REQUEST FOR ADMISSION NO. 3:** Admit that the services provided by Feldman's, as reflected in the Feldman's Claims (as defined below), were medically necessary.

**RESPONSE FOR ADMISSION NO. 3:** Admitted.

**REQUEST FOR ADMISSION NO. 4:** Admit that the service provided by Feldman's in connection with each of the Feldman's Claims was a "Covered Service" as defined in the PPP Agreement.

**RESPONSE FOR ADMISSION NO. 4:** Denied. CareFirst further states that whether or not claims for factor VIII were covered by the so-called PPP is an open legal issue on which Feldman's bears the burden of proof. CareFirst further responds that in order to expedite payment and ensure that home plans under the BlueCard program paid Feldman's directly, as opposed to paying members, CareFirst processed the claims under Feldman's provider number.

**REQUEST FOR ADMISSION NO. 5:** Admit that the Feldman's Claims were "clean claims" under Maryland Law.

**RESPONSE FOR ADMISSION NO. 5:** Denied. CareFirst further responds that on several occasions medical records were requested of Feldman's but Feldman's did not produce those until sometime in 2009.

**REQUEST FOR ADMISSION NO. 6:** Admit that CareFirst's investigation of Feldman's uncovered no evidence of fraud by Feldman's.

**RESPONSE FOR ADMISSION NO. 6:** Denied. CareFirst further responds that its investigation was initially triggered by evidence of improper activity that was consistent with several potential areas of concern, including fraud. Additional evidence of questionable activity (also consistent with fraud) was also uncovered during the investigation.

**REQUEST FOR ADMISSION NO. 7:** Admit that CareFirst's investigation of Feldman's uncovered no evidence of fraud by Factor Health Management.

**RESPONSE FOR ADMISSION NO. 7:** Denied. CareFirst further responds that its investigation was initially triggered by evidence of improper activity that was consistent with several potential areas of concern, including fraud. Additional evidence of questionable activity (also consistent with fraud) was also uncovered during the investigation.

**REQUEST FOR ADMISSION NO. 8:** Admit that CareFirst's investigation of Feldman's uncovered no evidence of fraud by FCS Pharmacy.

**RESPONSE FOR ADMISSION NO. 8:** Denied. CareFirst further responds that its investigation was initially triggered by evidence of improper activity that was consistent

4

with several potential areas of concern, including fraud.  Additional evidence of questionable activity (also consistent with fraud) was also uncovered during the investigation.

**REQUEST FOR ADMISSION NO. 9**: Admit that CareFirst's investigation of Feldman's uncovered no evidence of fraud by Pharmacy Matters.

**RESPONSE FOR ADMISSION NO. 9**:  Denied.  CareFirst further responds that its investigation was initially triggered by evidence of improper activity that was consistent with several potential areas of concern, including fraud.  Additional evidence of questionable activity (also consistent with fraud) was also uncovered during the investigation.

**REQUEST FOR ADMISSION NO. 10**: Admit that CareFirst's investigation of Feldman's uncovered no evidence of diversion of blood clotting factor drugs.

**RESPONSE FOR ADMISSION NO. 10**:  Denied.  CareFirst further responds that its investigation was initially triggered by evidence of improper activity that was consistent with several potential areas of concern, including diversion.  Additional evidence of questionable activity (also consistent with diversion) was also uncovered during the investigation.

**REQUEST FOR ADMISSION NO. 11**: Admit that CareFirst's investigation of

Feldman's uncovered no violation by Feldman's of any rule or procedure of CareFirst.

**RESPONSE FOR ADMISSION NO. 11**:  Denied.

**REQUEST FOR ADMISSION NO. 12:** Admit that the investigation of Feldman's – as coordinated by the Blue Cross Blue Shield Association and participated in by CareFirst – uncovered no evidence of any fraud by Feldman's, Factor Health Management, FCS Pharmacy, or Pharmacy Matters.

**RESPONSE FOR ADMISSION NO. 12**:  Denied.  CareFirst further responds that its participation in the described investigation was initially triggered by evidence of improper activity that was consistent with several potential areas of concern, including fraud.  Additional evidence of questionable activity (also consistent with fraud) was also uncovered during CareFirst's investigation.

**REQUEST FOR ADMISSION NO. 13:** Admit that the investigations of Feldman's and Feldman's affiliates by the Food and Drug Administration, the Federal Bureau of Investigation, the United States Attorney's office, and various state Attorneys General offices uncovered no evidence of any fraud by Feldman's, Factor Health Management, FCS Pharmacy, or Pharmacy Matters.

**RESPONSE FOR ADMISSION NO. 13**:  Denied.  At a minimum, investigating agencies that had access to the investigation described in Request for Admission No. 12

6

would have uncovered the same evidence of improper activity that was consistent with several potential areas of concern, including fraud.

**REQUEST FOR ADMISSION NO. 14:** Admit that Section 15-1005 of the Maryland Code requires health insurance companies to pay clean claims within 30 days of the date the claim was received by the insurer.

**RESPONSE FOR ADMISSION NO. 14:** Denied as stated. Assuming Plaintiff is referring to Section 15-1005 of Maryland's Health Insurance Article, CareFirst admits that the Section is Maryland's prompt pay statue that governs payment of healthcare claims. CareFirst further responds that it has already paid interest in accordance with that section for any claims paid after 30-days of submission of a clean claim.

**REQUEST FOR ADMISSION NO. 15:** Admit that within 30 days of the date the Feldman's Claims were each submitted to CareFirst, CareFirst did not provide Feldman's with the information required by Section 15-1005(c)(2) of the Maryland Code.

**RESPONSE FOR ADMISSION NO. 15:** Denied.

**REQUEST FOR ADMISSION NO. 16:** Admit that Feldman's informed CareFirst on August 22, 2008 that Feldman's was "not a traditional Home Infusion company."

**RESPONSE FOR ADMISSION NO. 16:** CareFirst admits that the quoted language

was received by CareFirst in an e-mail from Plaintiff.

**REQUEST FOR ADMISSION NO. 17:** Admit that Feldman's never represented itself to CareFirst as a "home infusion therapy provider."

**RESPONSE FOR ADMISSION NO. 17:** Denied.

**REQUEST FOR ADMISSION NO. 18:** Admit that prior to May 2010, no one at CareFirst asked Feldman's for a description of the services Feldman's was actually providing to its patients to whom it was dispensing blood clotting factor drugs.

**RESPONSE FOR ADMISSION NO. 18:** Denied.

**REQUEST FOR ADMISSION NO. 19:** Admit that under Maryland law, Feldman's was at no relevant time required to have an RSA license to dispense and deliver blood clotting factor drugs to patients insured by CareFirst.

**RESPONSE FOR ADMISSION NO. 19:** Denied.  Whether Feldman's required an RSA or not is ultimately a question of law that only a court of competent jurisdiction can answer.  In an attempt to expeditiously resolve this matter, CareFirst on multiple occasions requested that Feldman's counsel agree to submit that question to the Circuit Court of Maryland for the County of Baltimore, in which this case was pending at the time the requests were made.  Feldman's counsel did not even respond to those requests.

Having received no cooperation from Plaintiff's counsel, CareFirst independently sought an opinion from the Maryland Board of Pharmacy concerning Feldman's activities. Although the Board's decision was not necessarily legally binding on a court of competent jurisdiction, CareFirst nonetheless agreed to abide by the Board's decision that Feldman's did not need an RSA to "drop ship" factor products at individuals' homes.

**REQUEST FOR ADMISSION NO. 20**: Admit that CareFirst knew from (i) correspondence with the Maryland Office of Health Care Quality in June 2009, and (ii) a June 16, 2009 (Bates numbered CFI 03168) email from Janet Chavarria to Jamie Hanson, Lisa Anuszewski, and Stephanie Benton, that Feldman's was not required to have an RSA license to dispense blood clotting factor drugs.

**RESPONSE FOR ADMISSION NO. 20**:  Denied.

**REQUEST FOR ADMISSION NO. 21**: Admit that CareFirst has paid claims for blood clotting factor drugs that were submitted by pharmacies that did not possess an RSA license.

**RESPONSE FOR ADMISSION NO. 21**:  CareFirst admits that it paid such claims, but denies that it paid such claims to any Maryland-based pharmacies, such as Feldman's. CareFirst never contended that Maryland's RSA requirements applied to out-of-state pharmacies, which is why CareFirst has routinely paid claims to entities related to Feldman's, even though those entities had no RSA.  All Maryland-based pharmacies,

9

other than Feldman's, to which CareFirst has paid such claims have either had an RSA or

been exempt from the requirement to have one by virtue of being licensed as a home

health agency.

**REQUEST FOR ADMISSION NO. 22**: Admit that CareFirst has paid claims to

pharmacies other than Feldman's for blood clotting factor drugs that were submitted by

pharmacies that did not possess a home infusion therapy contract with CareFirst.

**RESPONSE FOR ADMISSION NO. 22**:  Denied.

**REQUEST FOR ADMISSION NO. 23**: Admit that blood clotting factor drugs, such as

Advate, are self-injectable drugs.

**RESPONSE FOR ADMISSION NO. 23**:  Denied.

**REQUEST FOR ADMISSION NO. 24**: Admit that a health insurance provider is not

permitted to require a patient to obtain medication from a specific pharmacy that the

insurance provider selects.

**RESPONSE FOR ADMISSION NO. 24**:  Admitted in part and denied in part.

CareFirst admits that an individual is free to obtain medication from any pharmacy,

although that does not necessarily mean that the person's insurance will provide coverage

for that medication.  CareFirst further responds that it denies that all types of insurers in

all jurisdictions are prohibited from requiring a member to utilize certain providers in order to obtain coverage.  Certain types of insurers, such as a health maintenance organizations, can specify the providers whom members must utilize to obtain coverage.

**REQUEST FOR ADMISSION NO. 25**: Admit that Feldman's is a member of the EPIC network of independent pharmacies and as such is entitled to payment under the contract between EPIC and CareFirst with regard to drug reimbursement claims that are submitted to CareFirst.

**RESPONSE FOR ADMISSION NO. 25**:  CareFirst admits that claims for certain drugs are payable under the EPIC contract, but deny that the claims at issue here (for factor products) were payable under that contract.  Moreover, it is clear that no one at Feldman's ever believed that factor products were payable under the EPIC pharmacy until after the initiation of the instant suit.

**REQUEST FOR ADMISSION NO. 26**: Admit that CareFirst had the unilateral ability to set reimbursement rates for claims submitted by Feldman's, including but not limited to the Feldman's Claims.

**RESPONSE FOR ADMISSION NO. 26**:  Denied.

Dated: January 24, 2011

Patrick de Gravelles
Bar No.  29245
Litigation General Counsel
CareFirst BlueCross BlueShield
840 First Street, N.W.
DC 12-08
Washington, D.C.  20065
(202) 680-7457
Attorney for CareFirst

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of January 2011, a copy of the foregoing Responses of Defendant CareFirst, Inc. to Requests for Admission of Feldman's Medical Center, Inc. was mailed, first-class, postage prepaid to Thomas O'Toole, Esq., Baroody & O'Toole, 201 N. Charles Street, Suite 2102, Baltimore, Maryland 21201 and Anthony Paduano, Esq., Paduano & Weintraub, 1251 Avenue of the Americas, Ninth Floor, New York, New York 10020, attorneys for Plaintiff Feldman's Medical Center Pharmacy, Inc.

_____
Patrick P. de Gravelles

EXHIBIT 29

### REQUEST FOR INFORMATION (RFI) APPLICATION

An application designed for Ancillary Providers in the Medical Community to become a participating CareFirst BlueCross BlueShield Institutional Provider.

Please complete all sections of this form.  Please print legibly or type responses.  Responses may be supported by attachments.  If a question or entire section does not apply to your organization, indicate "N/A".
*************************************************************************************************************

Legal Name of Provider (Note:  As registered with IRS and listed on IRS Form W-9 Request for Taxpayer Identification Number and Certification.  Please include "d/b/a", if applicable.)
Feldman Medical Center Pharmacy, Inc.

Would you like the above Legal Name to appear as listed in our participating provider directories?
☒ Yes         ☐ No *
*If NO, please state Provider Name to appear in our participating provider directories:

_____

Effective Date of Corporation:__03/14/1986_____

Is the Organization Incorporated?        ☒ Yes*         ☐ No
*If YES, list below state(s) of incorporation.
                                                 Maryland
*************************************************************************************************************

Directory Address **
**Note:  If additional directory addresses/locations are applicable, please complete a separate RFI for each location.

Directory Street Address:_11055 Little Patuxent Parkway_____
                                        Columbia, MD 21075
City, State, ZipCode_____
                                   Ph# 443-620-9990
Patient Appointment Telephone Number:_____

Office Manager/Telephone Number Lauren Wood  (443) 620-9990_____
*************************************************************************************************************

Billing Entity (Name):_Factor Health Management_____

Billing Street Address:_7700 Congress Ave Suite 3109_____

City, State, ZipCode:_Boca Raton, Fl 33487_____

Contact Person/Telephone Number:__Nurys Puente (561) 314-1701  x 357_____
*************************************************************************************************************

Payee (Name):_Feldman's Medical Center Pharmacy_____

Payee Street Address:_11055 Little Patuxent Parkway_____

City, State, ZipCode:_Columbia, MD 21075_____

Contact Person/Telephone Number:__Lauren Wood_____Phone:_(443) 620-9990_____
*************************************************************************************************************

### GENERAL INFORMATION
Please provide your National Provider Identification Number(s) (NPI)__1578558839____

Revised 09/04                                                                                   Page 1 of 5

**Confidential**                                                                         **CFI 03204**

Please list the types of services you provide to your Patients and Patrons: *(DME providers please specify type of equipment supplied; e.g. crutches, walkers, oxygen, diabetic supplies, etc.Virginia Office Based Ambulatory Surgical Centers /outpatient hospitals must submit a list of CPT4 codes performed.* See attached brochure for DME, (Injectibles) Hemophilia, Hep-C, HIV, Oncology and Rheumatoid Arthritis

**Ambulatory Surgery Centers (ASC)**
Please define the facility classification by indicating "YES" or "NO"

Class A (Local or No Anesthesia)          No

Class B (Local with IV Sedation)          No

Class C (Deep Sedation, General Anesthesia)     No

Does ASC employ the following facility-based physicians:  Anesthesiologists, Radiologists and/or Pathologists? ☐ Yes*
☒ No

If "YES", state Physician's Name(s) and current CareFirst BlueCross BlueShield Provider Identification Numbers for all Lines of Business:  Group Hospitalization and Medical Services, Inc. ("GHMSI"), CareFirst BlueChoice ("BlueChoice") and CareFirst of Maryland, Inc.  If services are out-sourced to a Vendor, please list Vendor Name(s).

Anesthesiologists:_____

Radiologists:_____

Pathologists:_____

Single Specialty _____     Multi-Specialty_____     Multiple Practices_____

Please list Specialty:_____

**Hours of Operation**   (Please describe your hours of operation):

Sun_____  Mon9am-7pm  Tues9am-7pm  Wed9am-7pm  Thurs9am-7pm  Fr9am-6pm  Sat9am-6pm

**Please list your local service area:**

| County | Areas/Town(s) |
|---|---|
| Columbia, Elkridge, Jessup, Woodbine, Glenelg | _____ |
| Marriottsville, Laurel, Savage,  Elliot City, Fulton | _____ |
| _____ | _____ |

**IF APPLICANT ANSWERS "YES" TO ANY OF THE BELOW QUESTIONS, PLEASE ATTACH AN EXPLANATION:**

Has the applicant ever been expelled or suspended from receiving payment under Medicare, Medicaid or any other type of insurance program?  Yes _____ (attach explanation)     No   X

Has the applicant ever been censured, placed on probation, had their license, certificate or permit suspended or revoked by any licensing or accrediting authority?          Yes _____(attach explanation)  No     X

Has the participation in any managed care or indemnity services provider network ever been revoked, suspended or sanctioned?    Yes _____(attach explanation)  No    X

Revised 09/04

Confidential                                                                          CFI 03205

Has the applicant been named in any professional liability action which resulted in a settlement or judgment against the applicant?       Yes _____(attach explanation)  No __X__

**1099 Information**  (Please attach a copy of IRS Form W-9 Request for Taxpayer Identification Number and Certification.)

IRS Taxpayer Identification Number    __20__ - __0269625__

Medicare Provider Number    __5618000001__

**Liability Insurance**  (Please attach a copy of the policy and any riders.)

Carrier    __Landmark Insurance Company__        Expiration Date ____02/15/09____

Coverage Amount Per Occurrence __$1,000,000.00__

Aggregate __$3,000,000.00__
**LICENSING AND APPROVAL**

**Licensure**    (Please attach a copy of all licenses listed below.)

License Number __P04707__        State __MD__  Date of Issuance __12/02/07__

License Number __13295968__        State __MD__  Date of Issuance __04/08/08__

License Number __R2716__        State __MD__  Date of Issuance __12/11/2008__

Have licensure requirements been waived by virtue of deemed status?        ☐ Yes        ☒ No

If yes, please indicate the organization through which the applicant has deemed status:

_____

If a MD or DC based provider, has the applicant obtained a Certificate of Need (CON)?        ☐ Yes   ☒ No

If yes, what geographical area does the CON authorize the applicant to serve (by county and town):

_____

**Accreditation/Certification**

| Accrediting/Certifying Body: | Yes | No* | Period Covered | Survey Schedule Date |
|---|---|---|---|---|
| Medicare | ____ | ____ | ____ | ____ |
| JCAHO | __X__ | ____ | __39 mo__ | __3/20/06__ |
| Other(s)(specify) | ____ | ____ | ____ | ____ |
| _____ | ____ | ____ | ____ | ____ |

*        If the applicant has not yet applied for accreditation, please describe any plans to seek accreditation, from which accrediting body and under what timetable.

If Medicare certified, indicate for which specialty areas certification is held and the Medicare number:

_____

**Please submit copies of all licenses, operating certificates and correspondences regarding accreditations and approvals, including survey reports.**

Revised 09/04                                                    Page 3 of 5

**Confidential**                                    **CFI 03206**

## ORGANIZATIONAL OWNERSHIP, GOVERNANCE AND MANAGEMENT

| Ownership | Yes | No | |
|---|---|---|---|
| For Profit Entity | __X__ | ____ | |
| Private Corporation | ____ | ____ | |
| Subsidiary of the above | ____ | ____ | |
| Public Entity | ____ | ____ | |
| Non-Profit Entity | ____ | ____ | |
| Other (specify) | __X__ | ____ | Limited Liability Company |

Is any part of your practice/organization hospital affiliated or based?

☐ Yes    ☒ No

If yes, please indicate the following information:  Name and location of Hospital(s); Privileged services authorized by Hospital.

Please list all parent or sponsoring organizations (including all organizations/individuals with more than ten (10) percent of ownership participation) and any arrangements the applicant has with physicians or other provider entities, including but not limited to joint ventures etc.
Pharmacy Management Associates, LLC Organized in MD

## STATISTICAL/FINANCIAL DATA

Please provide the following numbers:

| | Prior Year Actual | Current YTD | Current Year Projected | Next Year Projected |
|---|---|---|---|---|
| Average Weekly Census/Volume | 708 | 788 | 800 | 900 |
| Total Patients Treated Per Year | 4350 | 2940 | 4750 | 5250 |

Please indicate applicant's sources of payment by percentage:

| | Prior Year Actual | Current YTD | Current Year Projected | Next Year Projected |
|---|---|---|---|---|
| Paid Prescription Plan Care First Blue Cross Blue Shield | 15% | 15% | 20% | 25% |
| Other BC/BS Plans (Specify) | | | | |
| Anthem VA BCBS Independence | 5% | 40% | 45% | 50% |
| Medicare | 13% | 13% | 13% | 8% |
| Medicaid | 8% | 8% | 8% | 2% |
| Commercial Insurance | | | | |
| Other (Specify) | | | | |
| Paid Prescription Plan | 59% | 24% | 14% | 15% |

Revised 09/04

Confidential

CFI 03207

| Paid Prescription Plan | 59% | 24% | 14% | 15% |

The applicant's fiscal year is from         January         to     December 31

The above information will be utilized by CareFirst BlueCross BlueShield solely for its own purposes and will not be disclosed to others except as required for the purpose of verification.

I hereby certify that the statements and answers provided herein are complete and correct to the best of my knowledge and belief and have been made for the purpose of applying to become or continuing as a participating provider. I authorize CareFirst BlueCross BlueShield to verify any and all of the above information.

*Joel A. Yerton*

Name (Please Print)

*(signature)*

Signature

V.P *Factor Health Mgmt, LLC*

Title

(561) 314 – 1700

Telephone Number

1-6-2009

Date

Revised 02/04

Page 5 of 5

**Confidential**

CFI 03208

## ORGANIZATIONAL OWNERSHIP, GOVERNANCE AND MANAGEMENT

| Ownership | Yes | No | |
|---|---|---|---|
| For Profit Entity | X | ____ | |
| Private Corporation | ____ | ____ | |
| Subsidiary of the above | ____ | ____ | |
| Public Entity | ____ | ____ | |
| Non-Profit Entity | ____ | ____ | |
| Other (specify) | X | ____ | Limited Liability Company |

Is any part of your practice/organization hospital affiliated or based?
☐ Yes   ☒ No

If yes, please indicate the following information: Name and location of Hospital(s); Privileged services authorized by Hospital.

Please list all parent or sponsoring organizations (including all organizations/individuals with more than ten (10) percent of ownership participation) and any arrangements the applicant has with physicians or other provider entities, including but not limited to joint ventures etc.
Pharmacy Management Associates, LLC Organized in MD

### STATISTICAL/FINANCIAL DATA

| Please provide the following numbers: | Prior Year Actual | Current YTD | Current Year Projected | Next Year Projected |
|---|---|---|---|---|
| Average Weekly Census/Volume | 708 | 788 | 800 | 900 |
| Total Patients Treated Per Year | 4350 | 2940 | 4750 | 5250 |

Please indicate applicant's sources of payment by percentage:

| | Prior Year Actual | Current YTD | Current Year Projected | Next Year Projected |
|---|---|---|---|---|
| Paid Prescription Plan Care First Blue Cross Blue Shield | 15% | 15% | 20% | 25% |
| Other BC/BS Plans (Specify) | | | | |
| Anthem VA BCBS Independence | 5% | 40% | 45% | 50% |
| Medicare | 13% | 13% | 13% | 8% |
| Medicaid | 8% | 8% | 8% | 2% |
| Commercial Insurance | ____ | ____ | ____ | ____ |
| Other (Specify) | | | | |
| Paid Prescription Plan | 59% | 24% | 14% | 15% |

Revised 09/04

Page 4 of 5

Confidential

CFI 03209

Paid Prescription Plan _____   __59%__   __24%__   __14%__   __15%__

The applicant's fiscal year is from   __January__   to   __December 31__   _____

The above information will be utilized by CareFirst BlueCross BlueShield solely for its own purposes and will not be disclosed to others except as required for the purpose of verification.

I hereby certify that the statements and answers provided herein are complete and correct to the best of my knowledge and belief and have been made for the purpose of applying to become or continuing as a participating provider.  I authorize CareFirst BlueCross BlueShield to verify any and all of the above information.

_Joel A. Yerton_            **(561) 314 – 1700**
Name (Please Print)            Telephone Number

_signature_            _1-6-2009_
Signature            Date

_V.P Foster Health Mgmt, LLC_
Title

**Confidential**        **CFI 03210**

EXHIBIT 30

**Hanson, Jaime**

| | |
|---|---|
| From: | Janet Chavarria [janet.chavarria@carefirst.com] |
| Sent: | Friday, April 03, 2009 12:21 PM |
| To: | Jaime Hanson |
| Subject: | Re: Follow-up Feldman's Pharmacy |

Hi Jaime:

The are presently licensed as a Residential Service Agency approved with services for DME and Home Infusion by the Maryland Department of Health and Mental Hygiene Office of Health Care Quality.  License number R2716 is valid through 12/11/2009.


Janet L. Chavarria
Institutional Credentialing
CareFirst BlueCross BlueShield Networks Management
Provider Information & Credentialing Department
PHONE 410.872.3532
FAX 410.505.2414


|  | Jaime Hanson/ITD/BCBSMD | | |
|---|---|---|---|
|  | 04/02/2009 10:54 AM | To | Janet Chavarria/IMD/BCBSMD@CareFirst |
|  |  | cc |  |
|  |  | Subject | Re: Follow-up Feldman's Pharmacy |


I'm mainly concerned with the Little Patuxent Parkway location, that's where they bill their Factor VIII from.

They sent me of the RSAs as well - is that the license they need for infusion therapy?  (The copies I have are effective 12/11/08.)  I don't have copies of the pharmacy license, I just have what they printed from the Board of Pharmacy's website.

They are telling me that the state of MD doesn't require them to have an RSA to provide infusion therapy meds to patients.  Are you familiar with those regs?  I've gotten different information from the Pharmacy Board than the SI unit @ Capital Blue Cross.

Sorry to ask so many questions.  This is a very high-profile case and its driving me crazy!  Thank you for all your help!

Jaime M. Hanson, CPC
Medicare Part D Investigator
Phone:  410-998-7329
Fax:    410-720-5603

1

Confidential                                                                  CFI 03694

**Janet Chavarria/IMD/BCBSMD**
04/02/2009 10:44 AM

To  Jaime Hanson/ITD/BCBSMD@CareFirst
cc
Subject  Re: Follow-up Feldman's Pharmacy


there are two locations: (?)

8186 Lark Brown Road, Suite 11
Elkridge, MD 21075

& 11055 Little Patuxent Parkway
Columbia, Maryland 21044

I'm working with both locations to obtain missing or expired credentialing documents - they have been able to produce
their state issued Residential Service Agency Licenses which authorize them for DME and infusion therapy.

Janet L. Chavarria
Institutional Credentialing
CareFirst BlueCross BlueShield Networks Management
Provider Information & Credentialing Department
PHONE 410.872.3532
FAX 410.505.2414


**Jaime Hanson/ITD/BCBSMD**
04/02/2009 09:49 AM

To  Janet Chavarria/IMD/BCBSMD@CareFirst
cc
Subject  Re: Follow-up Feldman's Pharmacy


Good morning Janet!  Yes, Feldman's Medical Center Pharmacy.

Thanks for your help.

Jaime M. Hanson, CPC
Medicare Part D Investigator
Phone:  410-998-7329
Fax:     410-720-5603


**Janet Chavarria/IMD/BCBSMD**
04/02/2009 09:24 AM

To  Lisa Anuszewski/MD/CareFirst@CAREFIRST
cc  Andrea Cherenzia/MD/CareFirst@CareFirst, Betty
      Foreman/ITD/BCBSMD@CareFirst, Jaime
      Hanson/ITD/BCBSMD@CareFirst
Subject  Re: Follow-up Feldman's Pharmacy


Is this Feldman's Medical Center Pharmacy?

2

CFI 03695

EXHIBIT 31

Page 1

1             UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3   ----------------------------x

4   FELDMAN'S MEDICAL CENTER          )

5   PHARMACY INC.,                    )

6               Plaintiff,     )   Civil Action No.

7        v.                    )   1:10-CV-0254-WDQ

8   CAREFIRST, INC.,                  )

9               Defendants.    )

10  ----------------------------x

11

12          Deposition of BARBARA FAGAN

13          Catonsville, Maryland

14          Friday, June 18, 2010

15                 9:37 a.m.

16

17

18

19

20

21

22  Reported by: Tracy Obering, RPR, CSR

Page 16

| | | |
|---|---|---|
| 1 | surveyed? | 09:48:35 |
| 2 | A.   Who is being surveyed?  They go out to the | 09:48:36 |
| 3 | different providers.  So they would, for example, go to | 09:48:39 |
| 4 | a hospice provider and will look at their -- some | 09:48:44 |
| 5 | patient records, staff records, will interview staff and | 09:48:50 |
| 6 | patients, will make observations.  And that's the basic | 09:48:54 |
| 7 | survey process of any of those programs. | 09:49:00 |
| 8 | Q.   Okay.  And is it statewide, the surveys? | 09:49:10 |
| 9 | A.   Yes, yes. | 09:49:13 |
| 10 | Q.   And do you actually survey all the different | 09:49:14 |
| 11 | health care providers? | 09:49:17 |
| 12 | A.   Yes. | 09:49:18 |
| 13 | Q.   On some type of time basis, is it annually? | 09:49:19 |
| 14 | A.   Yes, all the different programs.  Some we do | 09:49:22 |
| 15 | annually, some we do every three years, some we do every | 09:49:25 |
| 16 | six or seven years.  Some are complaint -- are driven by | 09:49:29 |
| 17 | complaints that we might receive from the public. | 09:49:34 |
| 18 | Q.   So for -- what's an RSA? | 09:49:38 |
| 19 | A.   That's a Residential Service Agency provider. | 09:49:42 |
| 20 | Q.   What does an RSA do? | 09:49:46 |
| 21 | A.   They basically provide services to an | 09:49:49 |
| 22 | individual. | 09:49:53 |

Page 17

1          Let me rephrase that:  It's an option as          09:49:58

2     opposed to going to an assisted living or a nursing     09:50:03

3     home.  They can have somebody come into their home and  09:50:06

4     help provide whatever care is identified by a registered 09:50:09

5     nurse that would do the initial assessment.             09:50:14

6          MR. PADUANO:  Could you read that one back to      09:50:20

7     me, please.                                             09:50:39

8          (Record read)                                      09:50:39

9     BY MR. PADUANO:                                         09:50:40

10        Q.   So could you give me an example of the         09:50:40

11    services an RSA provider would have?                    09:50:43

12        A.   We have many residential service agencies      09:50:52

13    where a registered nurse will do the initial assessment 09:50:55

14    and will determine that there are -- the individual     09:50:58

15    needs assistance with activities of daily living, such  09:51:04

16    as bathing, toileting, dressing, grooming.  And then    09:51:10

17    we'll develop a care plan and an aide would then come in 09:51:15

18    and provide whatever the tasks are that are on that     09:51:20

19    plan.                                                   09:51:26

20        Q.   So if I understand first, the RSA would have   09:51:28

21    an RN do an assessment of the patient's needs?          09:51:34

22        A.   With the skilled nursing and aides, yes.       09:51:39

Page 24

| | | |
|---|---|---|
| 1 | do; correct? | 09:58:42 |
| 2 | A.   Yes. | 09:58:43 |
| 3 | Q.   But you don't issue analysis, or opinion | 09:58:43 |
| 4 | pieces, or write papers regarding rules and regulations, | 09:58:45 |
| 5 | do you? | 09:58:50 |
| 6 | A.   No, sir. | 09:58:50 |
| 7 | Q.   So home infusion, the category we said an RSA | 09:58:51 |
| 8 | is required, what is home infusion? | 09:58:58 |
| 9 | A.   Again, I'm not a clinical person, but it would | 09:59:03 |
| 10 | be, for example, somebody that had to be on IV | 09:59:05 |
| 11 | antibiotic, say for example.  So if they were able to | 09:59:15 |
| 12 | have that done at home as opposed to being in the | 09:59:18 |
| 13 | hospital and there will be folks that do that. | 09:59:21 |
| 14 | Q.   So you are talking about somebody physically | 09:59:26 |
| 15 | being hooked up to an IV in their home; is that right, | 09:59:43 |
| 16 | in that situation? | 09:59:46 |
| 17 | A.   Yes, yes. | 09:59:47 |
| 18 | Q.   And if a provider were to come in and either | 09:59:48 |
| 19 | setup that equipment or set up the IV itself, you would | 09:59:52 |
| 20 | expect that provider to have an RSA license; is that | 09:59:56 |
| 21 | correct? | 09:59:59 |
| 22 | A.   Yes. | 09:59:59 |

Page 23

1       A.   No.                                              09:57:43

2       Q.   Do you have any authority, whether it be for     09:57:44

3   the State of Maryland or the OHCQ, to interpret any rule  09:57:46

4   or regulation?                                            09:57:52

5       A.   I think on a regular basis we interpret the      09:57:53

6   regulations.                                              09:57:56

7       Q.   You apply the regulations, right, in your job?   09:57:57

8       A.   Yes, yes.                                         09:58:00

9       Q.   And for that purpose, for your own use, you      09:58:00

10  make your own interpretations; right?                     09:58:03

11      A.   I would say, yes.                                 09:58:05

12      Q.   Do you have any authority, ma'am, to bind OHCQ    09:58:06

13  regarding any interpretation of any rule or regulation    09:58:10

14  of the state?                                             09:58:14

15      A.   I don't understand the question.                 09:58:17

16      Q.   Sure.  Is it part of your job as program         09:58:18

17  director to issue opinions for OHCQ?                      09:58:21

18      A.   We don't offer opinions.                         09:58:28

19      Q.   OHCQ does not offer opinions regarding rules     09:58:30

20  and regulations; right?                                   09:58:35

21      A.   We will interpret the regulations.               09:58:38

22      Q.   Within the context of what OHCQ is supposed to   09:58:38

Page 25

1    Q.   So is there another example of when an RSA          10:00:00

2    license is required in the home infusion context?       10:00:03

3    A.   I can't really think of any other example          10:00:10

4    right off the top of my head.                           10:00:14

5    Q.   How about just by way of example for those         10:00:15

6    antibiotics, if a pharmacy delivered those drugs to a   10:00:17

7    patient's door, would that pharmacy, in your opinion,   10:00:22

8    your personal opinion, be required to have an RSA       10:00:26

9    license?                                                10:00:29

10   A.   If they are just acting as a mail service, no.     10:00:29

11   Q.   As a licensed pharmacy authorized by the State     10:00:33

12   of Maryland to dispense and deliver those antibiotics in 10:00:35

13   that context, would the deliveries made to the patient's 10:00:39

14   door, would that pharmacy need an RSA license?          10:00:43

15   A.   If the pharmacy is a simply mailing the            10:00:50

16   antibiotics to the individual's home, we would not      10:00:54

17   expect them to need an RSA license.                     10:00:57

18   Q.   Right.  Because your expectation would be if       10:01:01

19   the pharmacy then dispatched a license to an authorized 10:01:02

20   nurse or skilled assistant to the patient to set up the 10:01:09

21   equipment and infuse the patient, at that point you     10:01:12

22   believe an RSA is required?                             10:01:14

Page 26

```
 1      A.   Yes.                                      10:01:17

 2      Q.   Is there any ambiguity about that?        10:01:17

 3           That is, in order to require the RSA, the 10:01:19

 4  provider must have someone cross the threshold, set up 10:01:21

 5  equipment and infuse the patients; is that what I    10:01:26

 6  understand you to be saying?                         10:01:29

 7      A.   Yes.                                       10:01:30

 8      Q.   So absent the provider sending someone through 10:01:30

 9  the front door, an RSA is not required; correct?    10:01:34

10      A.   Correct.                                   10:01:37

11      Q.   And for that person -- once that person   10:01:38

12  actually passes through the front door, that person then 10:01:40

13  is going to actually treat the patient and set up the 10:01:42

14  equipment?  Is both required?                       10:01:46

15      A.   It depends on the service that the actual 10:01:51

16  residential service agency is going to provide.  We 10:01:55

17  would expect to have policy and procedures based on what 10:01:59

18  level of service they are going to provide.         10:02:03

19      Q.   So when you say policies and procedures, what 10:02:05

20  do you mean, ma'am?                                 10:02:08

21      A.   We ask all our residential service agency 10:02:11

22  providers to give us policy and procedures in how they 10:02:14
```

Page 27

| | | |
|---|---|---|
| 1 | are going to operate, anywhere from how they do -- set | 10:02:18 |
| 2 | up their client records and what they are going to | 10:02:22 |
| 3 | document in a record, what they are going to do in | 10:02:25 |
| 4 | emergency situations, how are they going to handle | 10:02:27 |
| 5 | biohazard items.  Just overall standard operating | 10:02:31 |
| 6 | procedures of everything that they would do. | 10:02:41 |
| 7 | Q.   So do you have a list of RSA license holders | 10:02:43 |
| 8 | in Maryland? | 10:02:46 |
| 9 | A.   Do I have a list? | 10:02:47 |
| 10 | Q.   Yes, ma'am. | 10:02:49 |
| 11 | A.   Yes, we do. | 10:02:49 |
| 12 | Q.   How many RSA license holders are there? | 10:02:50 |
| 13 | A.   Oh, approximately 650. | 10:02:56 |
| 14 | Q.   And how often does the list change? | 10:03:01 |
| 15 | A.   Probably on a daily basis. | 10:03:03 |
| 16 | Q.   Is the list publicly available? | 10:03:06 |
| 17 | A.   Yes, it is. | 10:03:08 |
| 18 | Q.   How could I access the list? | 10:03:09 |
| 19 | A.   It's on our website. | 10:03:11 |
| 20 | Q.   Are you aware of any specialty pharmacy that | 10:03:17 |
| 21 | holds an RSA license, off the top of your head? | 10:03:20 |
| 22 | A.   No, I am not. | 10:03:24 |

Page 28

| | | |
|---|---|---|
| 1 | Q. Why is that? | 10:03:25 |
| 2 | A. Why? | 10:03:27 |
| 3 | Q. Yes. | 10:03:28 |
| 4 | A. It's just not something I would be attuned to. | 10:03:33 |
| 5 | Q. Specialty pharmacy is a different business | 10:03:38 |
| 6 | than a home health care provider; right? | 10:03:40 |
| 7 | A. I am not sure what a specialty pharmacy is, | 10:03:44 |
| 8 | so -- | 10:03:47 |
| 9 | Q. Okay. In what you just mentioned in terms of | 10:03:47 |
| 10 | your view as to when an RSA license is required, what's | 10:03:57 |
| 11 | the source of your knowledge for that? | 10:04:02 |
| 12 | A. The source of my knowledge, I guess when I | 10:04:04 |
| 13 | came to take this job, just when I was educated on this | 10:04:17 |
| 14 | program, that's how, if you want to say, it was | 10:04:23 |
| 15 | interpreted at that time and it's continued that way. | 10:04:28 |
| 16 | Q. So what was the "it" being interpreted when | 10:04:30 |
| 17 | you came on 21 years ago? | 10:04:34 |
| 18 | What was the "it" that you referred to that | 10:04:37 |
| 19 | would need to be interpreted? | 10:04:39 |
| 20 | A. You had talked earlier about "we interpret | 10:04:40 |
| 21 | regulations." | 10:04:44 |
| 22 | Q. Sure. | 10:04:44 |

Page 43

1    license based on what is described in here, my answer to      10:31:37

2    that person would be yes.                                     10:31:41

3         Q.   You did get this one.  It says, "Via Federal        10:31:43

4    Express."  Do you see that up there?                          10:31:46

5         A.   Yes.                                                10:31:48

6         Q.   You don't know if you ever responded to it?         10:31:49

7         A.   I don't know right off.                             10:31:52

8         Q.   Well, who issues the residential agency -- the      10:31:53

9    RSA licenses?                                                 10:31:56

10        A.   I have a support person that helps me manage        10:31:59

11   that program.                                                 10:32:01

12        Q.   Who actually issues the licenses?                   10:32:02

13        A.   Our office actually issues the license.            10:32:04

14        Q.   What office?                                        10:32:07

15        A.   The Office of Health Care Quality.                  10:32:08

16        Q.   Who makes the decision as to whether a license      10:32:11

17   is needed or not?                                             10:32:13

18        A.   Who makes the decision?  Well, normally people      10:32:19

19   will call and if somebody was to call and ask me and         10:32:24

20   they give me a description like this, I would tell them       10:32:29

21   they would need a residential service agency license.         10:32:32

22        Q.   I understand.  But do you make a decision as        10:32:34

EXHIBIT 32

Westlaw.

West's Annotated Code of Maryland Currentness
  Health--General
      Title 19. Health Care Facilities
          Subtitle 4A. Residential Service Agencies

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to
117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479,
589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw.

West's Annotated Code of Maryland Currentness
  Health--General
    Title 19. Health Care Facilities (Refs & Annos)
      Subtitle 4A. Residential Service Agencies (Refs & Annos)
      → § 19-4A-01. Definitions


### In general

(a) In this subtitle the following words have the meanings indicated.


### Home health care

(b) "Home health care" includes any of the following services:

  (1) Audiology and speech pathology;

  (2) Dietary and nutritional services;

  (3) Drug services;

  (4) Home health aid;

  (5) Laboratory;

  (6) Medical social services;

  (7) Nursing;

  (8) Occupational therapy;

  (9) Physical therapy;

  (10) Provision of invasive medical equipment; and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(11) Home medical equipment services.

## Home medical equipment services

(c) "Home medical equipment services" means the delivery, installation, maintenance, or replacement of, or instruction in the use of, medical equipment used by a sick or disabled individual to allow the individual to be maintained in a noninstitutional environment.

## Medical equipment

(d) "Medical equipment" means technologically sophisticated medical devices including:

(1) Oxygen and oxygen delivery systems;

(2) Ventilators;

(3) Respiratory disease management devices;

(4) Electronic and computer driven wheelchairs and seating systems;

(5) Apnea monitors;

(6) Transcutaneous electrical nerve stimulator (T.E.N.S.) units;

(7) Low air loss cutaneous pressure management devices;

(8) Sequential compression devices;

(9) Neonatal home phototherapy devices;

(10) Feeding pumps; and

(11) Other similar equipment as defined in regulations established by the Secretary.

## Residential service agency

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(e)(1) "Residential service agency" means any person that is engaged in a nongovernmental business of employing or contracting with individuals to provide home health care for compensation to an unrelated sick or disabled individual in the residence of that individual.

(2) "Residential service agency" includes any agency that employs or contracts with individuals directly for hire as home health care providers.

(3) "Residential service agency" does not include:

(i) A home health agency that is licensed under the provisions of Subtitle 4 of this title;

(ii) A person required to be licensed as a home health agency under the provisions of Subtitle 4 of this title;

(iii) A home-based hospice care program that is licensed under the provisions of Subtitle 9 of this title;

(iv) A hospital that is licensed under the provisions of Subtitle 3 of this title;

(v) A related institution that is licensed under the provisions of Subtitle 3 of this title;

(vi) Personal care providers under the Medical Assistance Personal Care Program;

(vii) Any person practicing a health occupation that the person is authorized to practice under the Health Occupations Article;

(viii) A nursing referral service agency that is licensed under Subtitle 4B of this title;

(ix) A group of persons licensed under the same title of the Health Occupations Article practicing as a business; or

(x) Residential rehabilitation services providers approved under regulations adopted by the State Mental Health Authority.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990. Amended by Acts 1992, c. 26, § 2, eff. Oct. 1, 1992; Acts 1993, c. 354, § 1, eff. July 1, 1993; Acts 1994, c. 183, § 1, eff. Oct. 1, 1994; Acts 1995, c. 3, § 1, eff. March 7, 1995; Acts 2003, c. 316, § 3, eff. July 1, 2003; Acts 2004, c. 132, § 1, eff. April 27, 2004; Acts 2006, c. 44, § 1, eff. April 8, 2006.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

West's Annotated Code of Maryland Currentness
  Health--General
    Title 19. Health Care Facilities (Refs & Annos)
      Subtitle 4A. Residential Service Agencies (Refs & Annos)
      → § 19-4A-02. Scope of Subtitle

This subtitle does not:

(1) Limit the right of any person who holds a license under this article to act as authorized by that license; or

(2) Prohibit the care of an individual who relies on treatment in accordance with the tenets and practices of a recognized church or religious denomination and, with or without compensation, is provided care in accordance with those tenets and practices.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw

West's Annotated Code of Maryland Currentness
  Health--General
    Title 19. Health Care Facilities (Refs & Annos)
      Subtitle 4A. Residential Service Agencies (Refs & Annos)
      → § 19-4A-03. Regulations

### In general

(a) The Department shall adopt regulations that set standards for the care, treatment, health, safety, welfare, and comfort of individuals who receive home health care services through a residential service agency.

### Licensing of residential service agencies

(b) The regulations shall provide for the licensing of residential service agencies and the annual renewal of licenses.

### Fees

(c) The regulations shall require the Secretary to charge fees in a manner which will produce funds sufficient to at least cover the actual direct or indirect costs of the inspection and licensure of residential service agencies under this subtitle.

### License qualifications, standards

(d) The regulations shall include provisions that:

  (1) Provide for the establishment of residential service agencies;

  (2) Establish qualifications for licensure;

  (3) Set minimum standards for individuals who provide home health care services through a residential service agency; and

  (4) Require the residential service agency to screen and verify the character references of all home health care providers that are employed by the residential service agency.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990. Amended by Acts 1993, c. 354, § 1, eff. July 1, 1993.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

West's Annotated Code of Maryland Currentness
  Health--General
    Title 19. Health Care Facilities (Refs & Annos)
      Subtitle 4A. Residential Service Agencies (Refs & Annos)
    → § 19-4A-04. License required to operate a residential service agency

Except as otherwise provided in this subtitle, a person shall be licensed by the Department before the person may operate a residential service agency.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

West's Annotated Code of Maryland Currentness
   Health--General
      Title 19. Health Care Facilities (Refs & Annos)
         Subtitle 4A. Residential Service Agencies (Refs & Annos)
         → **§ 19-4A-05. License qualifications**

To qualify for a license, an applicant:

  (1) Shall show that the residential service agency will provide appropriate home health care providers to sick or disabled individuals who may be provided care in the individual's residence, instead of in a hospital;

  (2) Shall meet any additional requirements that the Department adopts; and

  (3) May not be required to meet the requirements of Subtitle 1 of this title for certificate of need.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

MD Code, Health - General, § 19-4A-06                                                    Page 1

West's Annotated Code of Maryland Currentness
   Health--General
      Title 19. Health Care Facilities (Refs & Annos)
         Subtitle 4A. Residential Service Agencies (Refs & Annos)
         → **§ 19-4A-06. Inspections, issuance of license**

The Department shall:

(1) Inspect the operations of each residential service agency to determine whether the agency is meeting the requirements of this subtitle and the regulations adopted under this subtitle; and

(2) Issue, deny, suspend, or revoke a residential service agency license in accordance with the regulations adopted under this subtitle.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

West's Annotated Code of Maryland Currentness
  Health--General
    ⁀ Title 19. Health Care Facilities (Refs & Annos)
      ⁀ Subtitle 4A. Residential Service Agencies (Refs & Annos)
        ➡ **§ 19-4A-07. Operation of a residential service agency without a license prohibited**

A person may not operate, attempt to operate, or hold one's self out as operating a residential service agency, unless the person is licensed under this subtitle.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

MD Code, Health - General, § 19-4A-08                                                    Page 1

West's Annotated Code of Maryland Currentness
  Health--General
    Title 19. Health Care Facilities (Refs & Annos)
      Subtitle 4A. Residential Service Agencies (Refs & Annos)
→ **§ 19-4A-08. Fines and penalties**

A person who operates a residential service agency without a license is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 for the first offense and not exceeding $10,000 for each subsequent offense.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

MD Code, Health - General, § 19-4A-09                                           Page 1

West's Annotated Code of Maryland Currentness
  Health--General
    Title 19. Health Care Facilities (Refs & Annos)
      Subtitle 4A. Residential Service Agencies (Refs & Annos)
        → § 19-4A-09. Fines and penalties

A person who operates a residential service agency in violation of the regulations adopted under this subtitle is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000. Each day a violation is continued after the first conviction is a separate offense.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

MD Code, Health - General, § 19-4A-10                                              Page 1

West's Annotated Code of Maryland Currentness
  Health--General
     Title 19. Health Care Facilities (Refs & Annos)
        Subtitle 4A. Residential Service Agencies (Refs & Annos)
        → **§ 19-4A-10. Third party reimbursement**

Except as provided by federal law, licensure under this subtitle does not entitle a residential service agency to reimbursement by a third party payor.

CREDIT(S)

Added by Acts 1990, c. 529, § 1, eff. July 1, 1990.

The statutes and Constitution are current through chapters 1, 3, 10, 17, 35, 56 to 57, 62, 65, 68, 71 to 72, 116 to 117, 172 to173, 189, 198 to 199, 233 to 234, 298 to 299, 332 to 333, 372, 378 to 379, 415, 428, 452, 476, 479, 589 to 590, and 651 of the 2010 Regular Session of the General Assembly effective through May 20, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Westlaw

MD Health & Men. T. 10, Subt. 07, Ch. 05, Refs & Annos

Code of Maryland Regulations Currentness
   Title 10 Department of Health and Mental Hygiene
      Subtitle 07 Hospitals
         Chapter 05 Residential Service Agencies

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.


  Authority: Health-General Article, Title 19, Subtitle 4A, Annotated Code of Maryland


COMAR T. 10, Subt. 07, Ch. 05, Refs & Annos, MD ADC T. 10, Subt. 07, Ch. 05, Refs & Annos



END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

COMAR 10.07.05.01                                                                 Page 1

MD Health & Men. 10.07.05.01

C

Code of Maryland Regulations Currentness
    Title 10 Department of Health and Mental Hygiene
        Subtitle 07 Hospitals
            ⌐ Chapter 05 Residential Service Agencies (Refs & Annos)
            → .01 Definitions.

A. In this chapter, the following terms have the meanings indicated.

B. Terms Defined.

    (1) "Agency" means a residential service agency as defined in §B(13) of this regulation.

    (2) "Clinical record" means a written account of all services provided to a patient by the agency, as well as all pertinent medical information necessary to provide care.

    (3) "Department" means the State Department of Health and Mental Hygiene.

    (4) "Governing authority" means the individual, partnership, agency, group, corporation, or other entity designated to assume full responsibility for the policy determination, management, operation, and financial liability of the agency.

    (5) "Home health aide" means a nonlicensed individual who:

        (a) Has:

            (i) At least 1 year of practical experience in a hospital, nursing home, home care program, hospice, or

            (ii) Satisfactorily completed the Maryland Red Cross Home Care Course or an equivalent program; and

        (b) Provides personal and health care services to an individual in the individual's residence.

    (6) "Home health care" includes any of the following services:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.01

    (a) Audiology and speech pathology;

    (b) Dietary and nutritional services;

    (c) Drug services;

    (d) Home health aide;

    (e) Laboratory;

    (f) Medical social services;

    (g) Nursing;

    (h) Occupational therapy;

       (i) Physical therapy;

       (j) Provision of invasive medical equipment; and

       (k) Home medical equipment.

(6-1) "Home medical equipment services" means the delivery, installation, maintenance, or replacement of, or instruction in the use of, medical equipment used by a sick or disabled individual to allow the individual to be maintained in a noninstitutional environment.

    (7) "Household and family support services" means performance of tasks necessary to supplement the recipient's capabilities in such areas as:

    (a) Light housekeeping and home management;

    (b) Meal planning and preparation;

    (c) Shopping and errands; and

    (d) Care of children who require no medical attention.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(8) "Intravenous therapy" means provision of services, monitoring, and instruction related to substances that are administered intravenously, including but not limited to:

(a) Total parenteral nutrition (TPN);

(b) Hydration therapy;

(c) Chemotherapy;

(d) Antibiotic therapy; and

(e) Blood and blood products.

(9) "Invasive medical equipment" means any device that invades tissue or a body cavity for the purpose of maintaining treatment modalities, including but not limited to:

(a) Intravenous lines whether enteral or parenteral;

(b) Catheters;

(c) Ventilators;

(d) Respirators;

(e) Gastric or nasogastric tubes;

(f) Stomas; and

(g) Ostomies.

(9-1) "Medical equipment" means technologically sophisticated medical devices including but not limited to:

(a) Oxygen and oxygen delivery systems;

(b) Ventilators;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.01

(c) Respiratory disease management devices;

(d) Electronic and computer-driven wheelchairs and seating systems;

(e) Apnea monitors;

(f) Transcutaneous electrical nerve stimulator (T.E.N.S.) units;

(g) Low air loss cutaneous pressure management devices;

(h) Sequential compression devices;

(i) Neonatal home phototherapy devices;

(j) Feeding pumps; and

(k) Electrically powered hospital beds.

(10) Personal Care.

(a) "Personal care" means a service that a resident normally would perform personally, but for which the patient needs physical assistance because of advanced age, infirmity, or physical or mental limitation.

(b) "Personal care" may include providing assistance to a patient in the following activities:

(i) Ambulation-physically assisting a patient who otherwise would be unable to move about independently;

(ii) Personal hygiene-bathing a patient;

(iii) Dressing-physically applying a patient's clothing to the patient's body;

(iv) Toileting-assisting a patient to go to and from toileting facilities and in the activities of toileting; or

(v) Eating-hand-feeding a patient who is incapable of self-feeding.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.01

(11) "Pharmacotherapy" means provision, administration, and monitoring of medications taken by mouth, injection, or other means, and obtained either by prescription or as an over-the-counter drug.

(12) "Physician" means an individual who is currently authorized to practice medicine under Health Occupations Article, §14-101, Annotated Code of Maryland.

(13) Residential Service Agency.

(a) "Residential service agency" means:

(i) Any individual, partnership, firm, association, corporation, or other business entity of any kind that is engaged in a nongovernmental business of employing or contracting with individuals to provide at least one home health care service for compensation to an unrelated sick or disabled individual in the residence of that individual; or

(ii) An agency that employs or contracts with individuals directly for hire as home health care providers.

(b) "Residential service agency" does not include:

(i) A home health agency that is licensed under Health-General Article, Title 19, Subtitle 4, Annotated Code of Maryland;

(ii) An individual, partnership, firm, association, corporation, or other business entity of any kind that is required to be licensed as a home health agency under Health-General Article, Title 19, Subtitle 4, Annotated Code of Maryland;

(iii) A home-based hospice care program that is licensed under Health-General Article, Title 19, Subtitle 9, Annotated Code of Maryland;

(iv) A hospital that is licensed under Health-General Article, Title 19, Subtitle 3, Annotated Code of Maryland;

(v) A related institution that is licensed under Health-General Article, Title 19, Subtitle 3, Annotated Code of Maryland;

(vi) A nurse registry that is licensed under Business Regulation Article, Title 9, Annotated Code of Maryland, that screens or refers individuals for a patient's selection or rejection as its sole business op-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.01

eration, and does not itself provide any home health care service;

(vii) A personal care provider under the Medical Assistance Personal Care Program;

(viii) An individual practicing as a solo practitioner in a health occupation for which the individual is licensed under Health Occupations Article, Annotated Code of Maryland;

(ix) A business entity consisting of a group of individuals licensed under the same title of Health Occupations Article, Annotated Code of Maryland, which provides only that same, single, licensed, health care service to its patients; or

(x) A residential rehabilitation services provider approved under regulations adopted under Health-General Article, §10-902, Annotated Code of Maryland.

(14) "Secretary" means the Secretary of Health and Mental Hygiene.

(15) "Shopping or errand services" means services to purchase or otherwise obtain or deliver routine household items that are needed for day-to-day living, when the provider is entrusted with the property or the funds of the patient.

(16) "Skilled care" means a medical service or services for which a practitioner shall be licensed or certified under Health Occupations Article, Annotated Code of Maryland.

COMAR 10.07.05.01, MD ADC 10.07.05.01

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

MD Health & Men. 10.07.05.02

C

Code of Maryland Regulations Currentness
   Title 10 Department of Health and Mental Hygiene
      Subtitle 07 Hospitals
         Chapter 05 Residential Service Agencies (Refs & Annos)
         → **.02 Licensure Required for Operation.**

A. A person, partnership, corporation, association, or other business entity may not conduct, operate, or maintain an agency in the State before being licensed by the Department.

B. Exemption from Licensure.

   (1) An agency that provides only household or family support services, including shopping or errands, does not require licensure.

   (2) This exemption does not apply if an agency is providing personal care as defined in Regulation .01B(10) of this chapter.

C. Criteria for Issuance of a License.

   (1) An applicant for licensure shall file an application, on a form provided by the Secretary, with the Department at least 30 days before initiation of services.

   (2) An applicant for licensure whose past or current performance as a health care provider, whether located within or outside of this State, causes the Secretary to question the applicant's ability to maintain a related service agency in compliance with this chapter, shall be required to submit evidence documenting the applicant's ability to provide health care services under this chapter, and the Secretary may deny an application or revoke an agency's license based on past or current performance.

   (3) Along with the application for the agency's first year of licensure, the applicant shall submit a nonrefundable fee of $500 payable to the Department.

D. The Department shall:

   (1) Review the application to determine whether the applicant will provide appropriate home health care services to sick or disabled individuals who may require care in the individual's residence;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.02

 (2) Determine whether the applicant meets the regulatory requirements of this chapter;

 (3) Issue an operating license only to the agency named in the application;

 (4) Void an operating license if the agency ceases to operate;

 (5) Issue a license which expires 1 year from the date of issuance, unless suspended or revoked by the Department before expiration of the 1 year; and

 (6) Issue a provisional license for a term of less than 1 year when:

  (a) The agency applicant or licensed provider has substantial deficiencies which, in the opinion of the Department, do not constitute a life, safety, or health hazard, and which will be corrected, but the agency is unable to correct the deficiencies within a time frame established by the Department, or

  (b) Departmental administrative delays have occurred which are beyond the control of the applicant.

E. An agency license is not transferable or reassignable.

F. An agency shall return its operating license to the Department when the agency ceases to operate or is sold.

G. License Renewal.

 (1) The Department shall notify an agency when its annual license is due to expire, and shall mail a license renewal application form before expiration of licensure.

 (2) A licensee shall submit to the Department an application for annual license renewal and an annual non-refundable license renewal fee of $500 payable to the Department.

H. Inspection.

 (1) When appropriate, an agency shall assist the Department in gaining access to sites where home health services are being provided for conducting inspections to:

  (a) Ensure that each agency is in compliance with regulations of this chapter; and

  (b) Enable the Department to investigate and resolve complaints filed against the agency.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.02

(2) Licensees shall keep records and make reports in the manner and form as the Secretary prescribes. Agencies shall ensure that all records are open to inspection by the Department.

(3) An agency shall provide a written plan of correction for deficiencies and submit the plan to the Department within 10 days of receipt of the Department's notice of deficiencies.

COMAR 10.07.05.02, MD ADC 10.07.05.02

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

MD Health & Men. 10.07.05.03

C

Code of Maryland Regulations Currentness
    Title 10 Department of Health and Mental Hygiene
        Subtitle 07 Hospitals
            Chapter 05 Residential Service Agencies (Refs & Annos)
            → .03 Responsibilities of a Residential Service Agency.

A. An agency shall:

(1) Provide, either directly or through contractual arrangements, at least one home health care service to an unrelated sick or disabled individual in the residence of that individual;

(2) Ensure that when skilled care services are provided, the services are provided in compliance with the applicable sections of Health Occupations Article, Annotated Code of Maryland;

(3) Develop policies for the delivery of its services to patients, including:

(a) Scope of services;

(b) Skill assessments;

(c) Admission criteria;

(d) Emergency procedures;

(e) Administration of drugs;

(f) Enteral and parenteral nutrition;

(g) Billing and service records, maintenance of charges, etc., except for those patients receiving services through a managed-care health benefits plan;

(h) Clinical record maintenance;

(i) Health requirements for employees and contractors;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.03

(j) Provision of personal care services by a home health aide;

(k) Policies regarding skilled care services which address at least the following:

(i) Job descriptions and educational qualifications on all staff members,

(ii) Evaluation of potential patients before their acceptance into the program,

(iii) Frequency of patient monitoring,

(iv) Preparation and storage of enteral formulas, intravenous therapies, other supplies, equipment, etc.,

(v) Clinical management,

(vi) Infection control procedures,

(vii) Disposal of biomedical waste,

(viii) Clinical record maintenance,

(ix) Training and retraining of patients,

(x) Training and retraining of patient representatives,

(xi) Maintenance of equipment, and

(xii) Responsibilities of the licensed health professional;

(l) Coordination of care when appropriate, including:

(i) Delineation of services provided by the agency, and

(ii) Notification to the patient of the agency's responsibilities;

(m) A quality assurance program; and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.03

     (n) A procedure for resolution of complaints, including referral to the Office of Licensing and Certification Programs;

  (4) Conduct a reference check on each applicant selected for employment, consisting of:

     (a) Face-to-face interview between agency representatives and the applicant;

     (b) Documented contact with the applicant's identified character references;

     (c) Documented efforts at verification of past employment history;

     (d) Completion of a skills assessment and demonstration; and

     (e) Verification of applicable licenses or certificates;

  (5) Maintain a personnel folder at the agency's business office for each employee, and retain the folder for 3 years after termination of employment;

  (6) Provide the patient or the patient's representative with the following:

     (a) Name and phone number of an agency contact person;

     (b) Name of the caregiver referred by the agency to provide the service;

     (c) Statement clarifying the patient's or the patient's representative's liability for cost of service if insurance does not cover the cost;

     (d) Itemized billing statement; and

     (e) Estimate of costs associated with the services requested;

  (7) Provide a mechanism for the receipt and timely investigation of written complaints in which:

     (a) Disruption of service does not result from the filing of a complaint;

     (b) Complete files are maintained on the source, category, and disposition of the complaint;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.03

        (c) A summary report of the complaint investigation is made available to the Department upon request; and

        (d) A summary report of the complaint investigation is made available for public inspection, upon request; and

    (8) If the agency does not conduct a complaint investigation, document its reason and forward the complaint and its reason to the Department.

B. An agency that provides invasive equipment or supplies such as intravenous therapy shall arrange for 24-hour-a-day equipment maintenance service in case of equipment failure.

COMAR 10.07.05.03, MD ADC 10.07.05.03

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

MD Health & Men. 10.07.05.04

C

Code of Maryland Regulations Currentness
  Title 10 Department of Health and Mental Hygiene
    Subtitle 07 Hospitals
      ⁿ⃞ Chapter 05 Residential Service Agencies (Refs & Annos)
      → .04 Special Requirements for the Provision of Intravenous or Related Therapies.

A. This regulation applies to intravenous or related therapy provided in the home, including but not limited to:

  (1) Antibiotic therapy;

  (2) Chemotherapy;

  (3) Enteral nutrition;

  (4) Parenteral nutrition;

  (5) Hydration therapy;

  (6) Blood and blood products; and

  (7) Education and training of the patient or caregiver on the administration of intravenous or related therapy.

B. Specialized intravenous therapies and nutritional support services administered enterally or parenterally are considered skilled nursing functions.

C. Medications and preparations used in the provision of intravenous or nutritional support shall be obtained from a licensed pharmacy.

D. An agency shall:

  (1) Provide education and training and written instructions to the patient, the patient and patient representative, or the representative caring for the patient before the initiation of treatment, and shall provide retraining as needed;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.04

(2) Maintain a clinical record for a patient receiving intravenous or nutritional support services which includes the following:

(a) Results of training or retraining of the patient or representative,

(b) Composition, role, and mode of administration of feeding formulas and all medications, and

(c) Summary statement at termination of specialized nutritional support or intravenous therapy which includes the results of therapy, complications, outcome, and disposition of the patient;

(3) Notify the patient's physician of any adverse reactions associated with the therapy; and

(4) Provide education to the patient or patient representative in:

(a) Feeding formulation and medication preparation,

(b) Administration of the therapy,

(c) Accessing private care,

(d) Equipment maintenance, and

(e) Recognition of complications and equipment malfunctions.

COMAR 10.07.05.04, MD ADC 10.07.05.04

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

MD Health & Men. 10.07.05.05

c

Code of Maryland Regulations Currentness
  Title 10 Department of Health and Mental Hygiene
    Subtitle 07 Hospitals
      ⌐ Chapter 05 Residential Service Agencies (Refs & Annos)
        → .05 Special Requirements for the Provision of Ventilator Services.

A. Medications and preparations used in the provision of ventilator services shall be obtained from a licensed pharmacy.

B. An agency shall:

  (1) Use either a licensed registered nurse or a licensed respiratory care practitioner to supervise the provision of education and training and written instruction to the:

    (a) Patient,

    (b) Patient and representative, or

    (c) Representative caring for the patient;

  (2) Provide a copy of the education and training and written instruction to the prescribing physician before the initiation of treatment;

  (3) Provide retraining and review on a monthly basis, and as frequently as necessary;

  (4) Maintain a clinical record for a patient receiving ventilator services which includes the following:

    (a) Documentation of the patient's level of comprehension or that of the representative about the use of ventilator, suction, alarms, nebulizers, exhalation valves, circuitry, power sources, emergency backup systems, emergency resuscitation, and oxygen use and misuse, and

    (b) Composition, role, and mode of administration of ventilator services and all specialized services, including the results of therapy, complications, outcome, and disposition of the patient.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.07.05.05


COMAR 10.07.05.05, MD ADC 10.07.05.05

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

COMAR 10.07.05.05-1                                                                 Page 1

MD Health & Men. 10.07.05.05-1

Code of Maryland Regulations Currentness
  Title 10 Department of Health and Mental Hygiene
    Subtitle 07 Hospitals
      Chapter 05 Residential Service Agencies (Refs & Annos)
      → .05-1 Special Requirements for the Provision of Home Medical Equipment Services.

A. A provider of home medical equipment services shall meet the requirements of this regulation in addition to meeting the requirements of Regulations .02-.03 of this chapter.

B. An agency shall:

    (1) Ensure that personnel demonstrate competency in delivering and installing the equipment;

    (2) Provide education, training, and written instructions to the patient and his or her caregivers on the use of the equipment before the equipment is used, and provide retraining as needed;

    (3) Provide the patient and caregivers with the telephone number of persons who can deliver critical care on an emergency basis;

    (4) Provide the prescribing physician with a copy of the:

        (a) Qualifications, duties, and responsibilities of agency personnel who deliver the services, and

        (b) Instructions given to the patient and the patient's caregivers;

    (5) Maintain a clinical record for each patient receiving home medical equipment services; and

    (6) Ensure that the installation, maintenance, repair, and storage of home medical equipment meet with manufacturer's specifications.

COMAR 10.07.05.05-1, MD ADC 10.07.05.05-1

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

COMAR 10.07.05.05-1

MD Health & Men. 10.07.05.05-1

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

MD Health & Men. 10.07.05.06

C

Code of Maryland Regulations Currentness
    Title 10 Department of Health and Mental Hygiene
        Subtitle 07 Hospitals
            Chapter 05 Residential Service Agencies (Refs & Annos)
            → .06 Denial or Revocation of a License.

The Secretary may deny, revoke, or refuse to reissue any license issued for inability or failure to comply with these regulations. Any action taken to deny or revoke a license is subject to provisions of the Administrative Procedure Act, State Government Article, §10-201 et seq., Annotated Code of Maryland.

COMAR 10.07.05.06, MD ADC 10.07.05.06

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

COMAR 10.07.05.07                                                           Page 1

MD Health & Men. 10.07.05.07

C

Code of Maryland Regulations Currentness
    Title 10 Department of Health and Mental Hygiene
        Subtitle 07 Hospitals
            Chapter 05 Residential Service Agencies (Refs & Annos)
            → .07 Penalty for Unlicensed Operation.

A person who operates an agency without a license is guilty of a misdemeanor, and on conviction is subject to a fine not exceeding $1,000 for the first offense and $10,000 for each subsequent offense.

COMAR 10.07.05.07, MD ADC 10.07.05.07

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

MD Health & Men. 10.07.05.08

C

Code of Maryland Regulations Currentness
    Title 10 Department of Health and Mental Hygiene
        Subtitle 07 Hospitals
            Chapter 05 Residential Service Agencies (Refs & Annos)
                ➡ **.08 Penalty for Violation of Regulations.**

A person who operates an agency in violation of the regulations adopted under this chapter is guilty of a misdemeanor, and on conviction is subject to a fine not exceeding $1,000. Each day a violation is continued after the first conviction is a separate offense.

COMAR 10.07.05.08, MD ADC 10.07.05.08

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

COMAR T. 10, Subt. 07, Ch. 05, Administrative History                                    Page 1

MD Health & Men. T. 10, Subt. 07, Ch. 05, Administrative History

Code of Maryland Regulations Currentness
   Title 10 Department of Health and Mental Hygiene
      Subtitle 07 Hospitals
         Chapter 05 Residential Service Agencies (Refs & Annos)

ADMINISTRATIVE HISTORY

Effective date: January 17, 1994 (21:1 Md. R. 33)

Regulation .01B amended effective June 2, 1997 (24:11 Md. R. 793)

Regulation .02 amended effective June 2, 1997 (24:11 Md. R. 793)

Regulation .03C repealed effective June 2, 1997 (24:11 Md. R. 793)

Regulation .05-1 adopted effective June 2, 1997 (24:11 Md. R. 793)

COMAR T. 10, Subt. 07, Ch. 05, Administrative History, MD ADC T. 10, Subt. 07, Ch. 05, Administrative History

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

COMAR T. 10, Subt. 34, Ch. 25, Refs & Annos                                     Page 1

MD Health & Men. T. 10, Subt. 34, Ch. 25, Refs & Annos

Code of Maryland Regulations Currentness
   Title 10 Department of Health and Mental Hygiene
      Subtitle 34 Board of Pharmacy
         Chapter 25 Delivery of Prescriptions

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

  Authority: Health Occupations Article, §12-205(a)(3)(ii), Annotated Code of Maryland

COMAR T. 10, Subt. 34, Ch. 25, Refs & Annos, MD ADC T. 10, Subt. 34, Ch. 25, Refs & Annos

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

MD Health & Men. 10.34.25.01

Code of Maryland Regulations Currentness
    Title 10 Department of Health and Mental Hygiene
        Subtitle 34 Board of Pharmacy
            Chapter 25 Delivery of Prescriptions (Refs & Annos)
            → .01 Scope.

This chapter governs a pharmacy's delivery of filled prescriptions for individual patients by United States Postal Service, common carrier, or delivery system to an address within the State.

COMAR 10.34.25.01, MD ADC 10.34.25.01

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

MD Health & Men. 10.34.25.02

Code of Maryland Regulations Currentness
    Title 10 Department of Health and Mental Hygiene
        Subtitle 34 Board of Pharmacy
            Chapter 25 Delivery of Prescriptions (Refs & Annos)
        → **.02 Definitions.**

A. In this chapter, the following terms have the meaning indicated.

B. Terms Defined.

  (1) "Delivery" means to send a prescription medication from a pharmacy by the United States Postal Service, common carrier, or delivery system to an address within the State.

  (2) Depot.

    (a) "Depot" means a location where filled prescriptions are stored before delivery to the intended patient or the intended patient's authorized agent.

    (b) "Depot" does not include:

      (i) A licensed health care facility;

      (ii) A prescriber's office;

      (iii) The prescription area of a pharmacy as defined by COMAR 10.34.05.01;

      (iv) The United States Postal Service or common carrier's warehouse; or

      (v) A multiple family residence.

  (3) "Patient" means the individual for whom a prescription is written and to whom a prescription medication will be administered.

  (4) "Patient profile" means a record of dispensing activity maintained by a pharmacist for a specific patient.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MD Health & Men. 10.34.25.02

(5) "Residence" means the street address at which a patient resides.

(6) "Storage" means the maintenance of a supply of medication before receipt of the medication by the patient or an agent authorized by the patient.

COMAR 10.34.25.02, MD ADC 10.34.25.02

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

MD Health & Men. 10.34.25.03

Code of Maryland Regulations Currentness
    Title 10 Department of Health and Mental Hygiene
        Subtitle 34 Board of Pharmacy
            Chapter 25 Delivery of Prescriptions (Refs & Annos)
        → .03 Requirements for Delivery of Prescription Medication.

A. A prescription medication may be delivered to the patient for whom the prescription is prescribed, wherever the patient is located; or

B. Instead of delivering medication directly to the patient under §A of this regulation, medication may be delivered to:

    (1) An agent authorized by the patient; or

    (2) The residence of the patient, regardless of whether the patient is present at the residence at the time of delivery.

COMAR 10.34.25.03, MD ADC 10.34.25.03

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

COMAR 10.34.25.04                                                              Page 1

MD Health & Men. 10.34.25.04

Code of Maryland Regulations Currentness
   Title 10 Department of Health and Mental Hygiene
      Subtitle 34 Board of Pharmacy
         Chapter 25 Delivery of Prescriptions (Refs & Annos)
            → **.04 Depots.**

A pharmacy may not knowingly deliver prescription medications to a depot, or establish or cooperate in the establishment of a depot.

COMAR 10.34.25.04, MD ADC 10.34.25.04

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

MD Health & Men. 10.34.25.05

Code of Maryland Regulations Currentness
  Title 10 Department of Health and Mental Hygiene
    Subtitle 34 Board of Pharmacy
      Chapter 25 Delivery of Prescriptions (Refs & Annos)
      → **.05 Record Keeping.**

A. If a patient authorizes delivery of prescription medication to an agent at a location other than the pharmacy, or the patient's residence, the pharmacist shall document the authorization:

> (1) On the prescription;

> (2) In the patient profile; or

> (3) In another record maintained in the pharmacy and established for this purpose.

B. If prescription medication is sent to an agent authorized by the patient at a location other than the patient's residence, or the place of business of the patient's authorized prescriber, the pharmacy shall maintain a record of the:

> (1) Identity of the agent to whom the medication is sent;

> (2) Location where the medication is sent;

> (3) Date and time the medication is sent; and

> (4) Prescription number or description of the medication sent.

COMAR 10.34.25.05, MD ADC 10.34.25.05

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

MD Health & Men. 10.34.25.06

Code of Maryland Regulations Currentness
   Title 10 Department of Health and Mental Hygiene
      Subtitle 34 Board of Pharmacy
         Chapter 25 Delivery of Prescriptions (Refs & Annos)
         ➡ **.06 Packaging.**

Prescription medications delivered under this chapter to individuals in the State, shall be:

A. Enclosed in a container that reveals to the patient any tampering of the container that occurred during delivery or storage;

B. Packaged in a manner which does not indicate that the contents are medications;

C. Packaged in a manner that indicates:

    (1) The name and address of the patient or authorized agent; and

    (2) Any special storage conditions or requirements; and

D. Packaged to contain:

    (1) Written information regarding the prescription drug or device which is considered significant in the professional judgment of the pharmacist; and

    (2) A local or toll free telephone number for the pharmacy.

COMAR 10.34.25.06, MD ADC 10.34.25.06

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

COMAR T. 10, Subt. 34, Ch. 25, Administrative History                               Page 1

MD Health & Men. T. 10, Subt. 34, Ch. 25, Administrative History

Code of Maryland Regulations Currentness
  Title 10 Department of Health and Mental Hygiene
    Subtitle 34 Board of Pharmacy
      ¶⧉ Chapter 25 Delivery of Prescriptions (Refs & Annos)

ADMINISTRATIVE HISTORY

Effective date: December 10, 2001 (28:24 Md. R. 2128)

COMAR T. 10, Subt. 34, Ch. 25, Administrative History, MD ADC T. 10, Subt. 34, Ch. 25, Administrative History

Complete through Maryland Register Vol. 37, Issue 8, dated April 9, 2010.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

10.13.12.01

## .01 Definitions.

A. In this chapter, the following terms have the meanings indicated.

B. Terms Defined.

(1) "Authorized prescriber" means:

(a) A licensed dentist, licensed physician, licensed podiatrist, licensed veterinarian, or to the extent permitted under Health Occupations Article, §8-601, Annotated Code of Maryland, certified nurse midwife;

(b) A certified nurse practitioner to the extent permitted under Health Occupations Article, §8-508, Annotated Code of Maryland; or

(c) Another individual authorized by law to prescribe prescription or nonprescription drugs or devices.

(2) "Board" means a health occupation licensing board:

(a) Authorized to issue a permit, license, or certificate under Health Occupations Article, Annotated Code of Maryland; and

(b) That has regulatory authority over the permit holder or authorized prescriber who is responsible for the drugs or prescription records subject to impoundment.

(3) "Department" means the Department of Health and Mental Hygiene, or its authorized agent.

(4) "Drug" means a prescription drug or device or a nonprescription drug, as defined in Health-General Article, §21-1113(a), Annotated Code of Maryland.

(5) "Impoundment order" means an order issued by the Department to impound drugs or prescription records in accordance with Health-General Article, §21-1113, Annotated Code of Maryland, and this chapter.

(6) "Permit holder" means a holder of, or applicant for:

(a) A pharmacy permit, manufacturer's permit, or distributor's permit issued by the State Board of Pharmacy under Health Occupations Article, Title 12, Annotated Code of Maryland; or

(b) A dispensing permit issued by the board under the authority of Health Occupations Article, §12-102(c)(2), Annotated Code of Maryland.

(7) "Prescription records" means records maintained by a permit holder or authorized prescriber which identify a patient and any medical information relating to that patient.

(8) "Transfer" means the release of impounded drugs or prescription records by the department to a transferee.

(9) "Transferee" means a permit holder or authorized prescriber to whom impounded drugs or prescription records are transferred in accordance with this chapter.

EXHIBIT 33



# MARYLAND
## DEPARTMENT OF HEALTH AND MENTAL HYGIENE
## OFFICE OF HEALTH CARE QUALITY
SPRING GROVE CENTER
BLAND BRYANT BUILDING
55 WADE AVENUE
CATONSVILLE, MARYLAND 21228

License No. R2716                    Registration No.   22258

Issued to: FELDMAN'S MEDICAL CENTER PHARMACY, INC.
11055 LITTLE PATUXENT PARKWAY
COLUMBIA, MD  21044

Type of Facility or Community Program:
RESIDENTIAL SERVICE AGENCY

Date Issued:  12/11/2008

SERVICES:  DURABLE MEDICAL EQUIPMENT AND INFUSION THERAPY

Number of Residents or Clients:  N/A

Number of Beds:    N/A

Other:    N/A

Authority to operate in this State is granted to the above entity pursuant to The Health-General Article, Section 19-4A et Seq., Annotated Code of Maryland and is subject to any and all statutory provisions, including all applicable rules and regulations promulgated thereunder. This document is not transferable.

Expiration Date:  12/11/2009

_____
Director

*Falsification of a license shall subject the perpetrator to criminal prosecution and the imposition of civil fines.*

EXHIBIT 34

**Hanson, Jaime**

| | |
|---|---|
| From: | Chavarria, Janet |
| Sent: | Tuesday, June 16, 2009 10:55 AM |
| To: | Hanson, Jaime |
| Cc: | Anuszewski, Lisa; Benton, Stephanie |
| Subject: | RSA License & Maryland Board of Pharmacy |

Hi Jaime,

Barbara Fagan of Office of HealthCare Quality referred me to COMAR regulation 10.07.05.04 (IV) & 10.07.05.05 (Vent) both of these components are covered under the service "infusion therapy". I have a copy if anyone wants it. The RSA license with service "infusion therapy" does not monitor what is infused by the provider.

Anna Jeffers of the Maryland Board of Pharmacy (410 764.4755) informs that a Pharmacy License issued by the MD Board of Pharmacy licenses the provider to sell to individuals and compound drugs. They do not monitor was is mixed. CDS, DEA, and Pharmacy License Is the full license set for a Maryland Pharmacy. If a manufacturer or an out of state pharmacy is shipping into Maryland they are required to be Maryland Licensed as a non-resident pharmacy or a wholesale distributor.

Neither is familiar with Factor VIII. They did not inquire about the name of the pharmacy, and Feldman's was not disclosed as the subject of my inquiry.

Ms. Jeffers has offered to speak directly with Legal or other CareFirst associates who need clarification to her reponses. I hope this information is helpful. Thank you,

Janet Chavarria
Business Analyst - Institutional Credentialing
Provider Information & Credentialing
CareFirst BlueCross BlueShield
410.872.3532 phone
410.505.2414 fax

---

**From:** Chavarria, Janet
**Sent:** Friday, June 12, 2009 2:27 PM
**To:** Hanson, Jaime
**Cc:** Anuszewski, Lisa
**Subject:** DHMH

Jaime,

I left a voice main with Barbara Fagan @ the DHMH - she's out this afternoon. Specifically I asked her what an RSA with service of "infusion theray" allowed the provider to do and I asked if a RSA was required to ship Factor VIII.

I'll f/u with you next week when I hear back from her.

thanks,

Janet Chavarria
Business Analyst - Institutional Credentialing
Provider Information & Credentialing
CareFirst BlueCross BlueShield

-1-

Confidential

CFL03168

EXHIBIT 35

APR-14-2010 WED 02:22 PM                          FAX NO.                          P. 04

CareFirst BlueCross BlueShield
10455 Mill Run Circle
Owings Mills, MD 21117-5559
www.carefirst.com



April 14, 2010

Barbara Fagan, Program Director
Maryland Department of Health and Mental Hygiene
Office of Health Care Quality
Spring Grove Center – Bland Bryant Building
55 Wade Avenue
Catonsville, Maryland 21228

Dear Ms. Fagan;

I contacted your office to inquire about Residential Service Agency License requirements for Home Infusion Therapy agencies in Maryland. Your staff instructed me to inquire directly to you since you are the program director.

Clarification of the Maryland Department of Health and Mental Hygiene Residential Service Agency License requirements for HIT is needed so I can respond to an inquiry. Can you provide a written response to my attention specifically addressing whether or not a retail pharmacy that is licensed by the State of Maryland also requires a Residential Service Agency License to operate as a Home Infusion Therapy agency in Maryland?

Your help is greatly appreciated. If you need to contact me directly please call 410 872 3532. Thank you for your assistance.

Sincerely,

Janet Chavarria
Janet Chavarria
Business Analyst
Provider Information and Credentialing



STATE OF MARYLAND

# DHMH

Maryland Department of Health and Mental Hygiene
Office of Health Care Quality
Spring Grove Center • Bland Bryant Building
55 Wade Avenue • Catonsville, Maryland 21228-4663

Martin O'Malley, Governor – Anthony G. Brown, Lt. Governor – John M. Colmers, Secretary

April 16, 2010

Ms. Janet Chavarria
Care First, BlueCross BlueShield
Fax 410 505 2414

Dear Ms. Chavarria,

Please be advised if a company that providers Home Infusion Therapy to a patient in their home, including delivery, set up and maintenance, that company is required to be licensed as a Residential Service Agency by the Office of Health Care Quality. As COMAR 10.07.05.01 (13) Residential Service Agency. (a) "Residential service agency" means: (i) Any individual, partnership, firm, association, corporation, or other business entity of any kind that is engaged in a nongovernmental business of employing or contracting with individuals to provide at least one home health care service for compensation to an unrelated sick or disabled individual in the residence of that individual; or (ii) An agency that employs or contracts with individuals directly for hire as home health care providers.

If you have any questions, feel free to call me at (410) 402-8040.

Sincerely,

*Barbara Fagan*

Barbara Fagan, Program Manager
Office of Health Care Quality

EXHIBIT 36

**de Gravelles, Patrick**

| | |
|---|---|
| From: | Anna D Jeffers [ADJeffers@dhmh.state.md.us] |
| Sent: | Wednesday, July 07, 2010 10:57 AM |
| To: | de Gravelles, Patrick |
| Cc: | Linda Bethman |
| Subject: | Re: Ms. Bethman, |

Good Morning Mr. de Gravelles:

The Maryland Board of Pharmacy has received your inquiry.  Please be advised that your inquiry will be presented at the monthly Practice Committee Meeting that is usually scheduled on the fourth Wednesday of the month.  If the Practice Committee recommends Board approval of their response, then that response will be considered at the August 18, 2010 Public Board Meeting.

The Maryland Board of Pharmacy requests your patience as a response will be forthcoming. Thank you for contacting the Maryland Board of Pharmacy.

Kindest regards,


Anna D. Jeffers, Esq.
Legislative and Regulations Manager
Maryland Board of Pharmacy
4201 Patterson Avenue
Baltimore, Maryland 21215
(410) 764-4755 (Ofc)
(410) 358-6207 (Fax)
ADJeffers@dhmh.state.md.us

>>> "de Gravelles, Patrick" <Patrick.deGravelles@carefirst.com> 7/1/2010 4:57 PM >>>
Ms. Bethman,

Thank you for taking your time to speak with me today.  As we discussed, I am sending this request to you for an opinion by the Maryland Board of Pharmacy.

The question I have is whether a full service pharmacy licensed in the State of Maryland can legally operate as described below.

In about 2008, the pharmacy, located in Columbia, Maryland, began filling prescriptions for factor products.  The factor products, along with the necessary supplies such as needles and syringes, were shipped to hemophiliacs' homes.  According to the pharmacy, the hemophiliacs would self-infuse the products.  There was no other healthcare provider involved, such as a nurse or other home-based assistant.

In the summer of 2008, the pharmacy applied for a residential services agency license ("RSA") from the Office of Health Care Quality.  The pharmacy has stated that it did so only because CareFirst instructed the pharmacy to do so.  At the time, the pharmacy was in discussions with CareFirst over the possibility of becoming a contracted Home Infusion Therapy provider.

In its RSA application, the pharmacy represented that as part of its program, it would support the home-based therapy.  Part of this support included initial and on-going home evaluations to ensure that those environments were appropriate for home-based therapy.  Recently, however, the pharmacy's attorney has indicated that the pharmacy never entered any patient's home and simply shipped the supplies to the patients' homes via common carrier.

1

A question has arisen concerning the propriety of payments to the pharmacy for factor products and supplies sent to patients before the pharmacy received its RSA.  Therefore, we would greatly appreciate it if the Board could answer the following two questions:

1)  Assuming that the pharmacy or its personnel entered patients' homes to provide support as outlined above, was the pharmacy acting in accordance with its full service license prior to receiving an RSA; and
2)  Assuming that the pharmacy only shipped the factor products and supplies to patients' homes via common carrier, and there was no other healthcare provider who had an RSA overseeing the home-based therapy, was the pharmacy acting in accordance with its full service license prior to receiving an RSA?

We have no indication that the pharmacy ever made any demonstration of competency pursuant to COMAR 10.34.17.04(C).

If you can do anything to expedite this inquiry it would be appreciated as the pharmacy and CareFirst are currently involved in litigation over this matter.  It is our understanding that the pharmacy could not provide the services under either scenario outlined above without an RSA as that would have left no one in a position to conduct on-going evaluations of patient safety.  However, if the Board determines otherwise, we are prepared to pay all of the claims.

Thank you very much in advance for your assistance and please let me know if you need any further information.

Patrick de Gravelles
Litigation General Counsel
CareFirst Blue Cross Blue Shield
Office of Corporate Counsel
840 1st Street, N.E., DC12-08
Washington, D.C.  20065
Tel:  202-680-7457
Fax: 202-680-7620

*********************************************************************
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you..
*********************************************************************

**de Gravelles, Patrick**

| | |
|---|---|
| From: | Anna D Jeffers [ADJeffers@dhmh.state.md.us] |
| Sent: | Wednesday, July 07, 2010 11:06 AM |
| To: | de Gravelles, Patrick |
| Cc: | Linda Bethman |
| Subject: | RE: Ms. Bethman, |

Hi,

The August 18, 2010 Public Board Meeting will be held at 4201 Patterson Avenue, Baltimore 21215.  It begins at 9 am. The room location is on the first floor, but sometimes the room number changes.  Check the Board's website at the following link for more information.

http://www.mdbop.org/about/index.htm

Kindest regards,

Anna Jeffers

>>> "de Gravelles, Patrick" <Patrick.deGravelles@carefirst.com> 7/7/2010 10:56 AM >>>
Ms. Jeffers,

Thanks very much.  Can you possibly provide me with the time and place of the August 18 Public Board Meeting?  We look forward to receiving your response and should you need any further information, please do not hesitate to contact me.

Patrick de Gravelles
Litigation General Counsel
CareFirst Blue Cross Blue Shield
Office of Corporate Counsel
840 1st Street, N.E., DC12-08
Washington, D.C.  20065
Tel:  202-680-7457
Fax: 202-680-7620

**From:** Anna D Jeffers [mailto:ADJeffers@dhmh.state.md.us]
**Sent:** Wednesday, July 07, 2010 10:57 AM
**To:** de Gravelles, Patrick
**Cc:** Linda Bethman
**Subject:** Re: Ms. Bethman,

Good Morning Mr. de Gravelles:

The Maryland Board of Pharmacy has received your inquiry.  Please be advised that your inquiry will be presented at the monthly Practice Committee Meeting that is usually scheduled on the fourth Wednesday of the month.  If the Practice Committee recommends Board approval of their response, then that response will be considered at the August 18, 2010 Public Board Meeting.

The Maryland Board of Pharmacy requests your patience as a response will be forthcoming. Thank you for contacting the Maryland Board of Pharmacy.

Kindest regards,

1

Anna D. Jeffers, Esq.
Legislative and Regulations Manager
Maryland Board of Pharmacy
4201 Patterson Avenue
Baltimore, Maryland 21215
(410) 764-4755 (Ofc)
(410) 358-6207 (Fax)
ADJeffers@dhmh.state.md.us

>>> "de Gravelles, Patrick" <Patrick.deGravelles@carefirst.com> 7/1/2010 4:57 PM >>>
Ms. Bethman,

Thank you for taking your time to speak with me today.  As we discussed, I am sending this request to you for an opinion by the Maryland Board of Pharmacy.

The question I have is whether a full service pharmacy licensed in the State of Maryland can legally operate as described below.

In about 2008, the pharmacy, located in Columbia, Maryland, began filling prescriptions for factor products.  The factor products, along with the necessary supplies such as needles and syringes, were shipped to hemophiliacs' homes.  According to the pharmacy, the hemophiliacs would self-infuse the products.  There was no other healthcare provider involved, such as a nurse or other home-based assistant.

In the summer of 2008, the pharmacy applied for a residential services agency license ("RSA") from the Office of Health Care Quality.  The pharmacy has stated that it did so only because CareFirst instructed the pharmacy to do so.  At the time, the pharmacy was in discussions with CareFirst over the possibility of becoming a contracted Home Infusion Therapy provider.

In its RSA application, the pharmacy represented that as part of its program, it would support the home-based therapy.  Part of this support included initial and on-going home evaluations to ensure that those environments were appropriate for home-based therapy.  Recently, however, the pharmacy's attorney has indicated that the pharmacy never entered any patient's home and simply shipped the supplies to the patients' homes via common carrier.

A question has arisen concerning the propriety of payments to the pharmacy for factor products and supplies sent to patients before the pharmacy received its RSA.  Therefore, we would greatly appreciate it if the Board could answer the following two questions:

1) Assuming that the pharmacy or its personnel entered patients' homes to provide support as outlined above, was the pharmacy acting in accordance with its full service license prior to receiving an RSA; and
2) Assuming that the pharmacy only shipped the factor products and supplies to patients' homes via common carrier, and there was no other healthcare provider who had an RSA overseeing the home-based therapy, was the pharmacy acting in accordance with its full service license prior to receiving an RSA?

We have no indication that the pharmacy ever made any demonstration of competency pursuant to COMAR 10.34.17.04(C).

If you can do anything to expedite this inquiry it would be appreciated as the pharmacy and CareFirst are currently involved in litigation over this matter.  It is our understanding that the pharmacy could not provide the services under either scenario outlined above without an RSA as that would have left no one in a  position to conduct on-going evaluations of patient safety.  However, if the Board determines otherwise, we are prepared to pay all of the claims.

Thank you very much in advance for your assistance and please let me know if you need any further information.

Patrick de Gravelles

2

Litigation General Counsel
CareFirst Blue Cross Blue Shield
Office of Corporate Counsel
840 1st Street, N.E., DC12-08
Washington, D.C.  20065
Tel: 202-680-7457
Fax: 202-680-7620

****************************************************************************
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you..
****************************************************************************

****************************************************************************
Unauthorized interception of this communication could be a violation of Federal and State Law. This communication and any files transmitted with it are confidential and may contain protected health information. This communication is solely for the use of the person or entity to whom it was addressed. If you are not the intended recipient, any use, distribution, printing or acting in reliance on the contents of this message is strictly prohibited. If you have received this message in error, please notify the sender and destroy any and all copies. Thank you..
****************************************************************************

EXHIBIT 37



STATE OF MARYLAND

# DHMH

Department of Health and Mental Hygiene
*Martin O'Malley, Governor – Anthony G. Brown, Lt. Governor – John M. Colmers, Secretary*

*MARYLAND BOARD OF PHARMACY*
*4201 Patterson Avenue● Baltimore, Maryland 21215-2299*
*Michael N. Souranis, Board President - LaVerne G. Naesea, Executive Director*

August 23, 2010

Patrick de Gravelles
Litigation General Counsel
CareFirst Blue Cross Blue Shield
Office of Corporate Counsel
840 1st Street, N.E., DC12-08
Washington, D.C. 20065
Patrick.deGravelles@carefirst.com

Dear Mr. de Gravelles:

Thank you for contacting the Maryland Board of Pharmacy concerning the following scenario:

In about 2008, a pharmacy, located in Columbia, Maryland, began filling prescriptions for factor products. The factor products, along with the necessary supplies such as needles and syringes, were shipped to hemophiliacs' homes. According to the pharmacy, the hemophiliacs would self-infuse the products. There was no other healthcare provider involved, such as a nurse or other home-based assistant.

In the summer of 2008, the pharmacy applied for a residential services agency license ("RSA") from the Office of Health Care Quality. The pharmacy has stated that it did so only because CareFirst instructed the pharmacy to do so. At the time, the pharmacy was in discussions with CareFirst over the possibility of becoming a contracted Home Infusion Therapy provider.

In its RSA application, the pharmacy represented that as part of its program, it would support the home-based therapy. Part of this support included initial and on-going home evaluations to ensure that those environments were appropriate for home-based therapy. Recently, however, the pharmacy's attorney has indicated that the pharmacy never entered any patient's home and simply shipped the supplies to the patients' homes via common carrier.

A question has arisen concerning the propriety of payments to the pharmacy for factor products and supplies sent to patients before the pharmacy received its RSA. Therefore, we would greatly appreciate it if the Board could answer the following two questions:

1)      Assuming that the pharmacy or its personnel entered patients' homes to provide support as outlined above, was the pharmacy acting in accordance with its full service license prior to receiving an RSA; and

Patrick de Gravelles
August 23, 2010
Page Two

Yes, the pharmacy was acting in accordance with its full service license under the Maryland Pharmacy Act. A full service pharmacy may provide medications if it is pursuant to a valid patient specific prescription.

2)    Assuming that the pharmacy only shipped the factor products and supplies to patients' homes via common carrier, and there was no other healthcare provider who had an RSA overseeing the home-based therapy, was the pharmacy acting in accordance with its full service license prior to receiving an RSA?

Dispensing a prescription pursuant to a patient specific prescription is in compliance with the Maryland Pharmacy Act. The pharmacy is not obligated to train the patient.

Please be advised that this response was prepared with the knowledge of only the facts presented. Any person who wishes to republish or reproduce, in whole or in part, any material issued by the Board should contact the Board for prior consent. This response is not intended to be legal advice. Although references to current laws and regulations may be included in this response, keep in mind that laws may change annually and regulations may be changed at any time. Further, the information provided is based on state pharmacy laws and regulations. Federal rules and state requirements that are not included under the Maryland Pharmacy Practice Act, however, may also apply. To insure that all current applicable laws have been considered, you may want to consult with your own legal counsel.

Should you have questions or additional concerns, please feel free to contact Anna D. Jeffers, Legislation and Regulations Manager at (410) 764-4794.

Sincerely,

LaVerne G. Naesea
Executive Director

cc:    Reid Zimmer, Chair, Practice Committee, Board of Pharmacy
       Anna D. Jeffers, Legislation and Regulations Manager

EXHIBIT 38

Westlaw.

**C**

West's Annotated Code of Maryland Currentness
  Insurance (Refs & Annos)
    Title 15. Health Insurance
      Subtitle 10. Claims and Utilization Review
      → **§ 15-1005. Prompt payment of claims**

(a) In this section, "clean claim" means a claim for reimbursement, as defined in regulations adopted by the Commissioner under § 15-1003 of this subtitle.

(b) To the extent consistent with the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001, et seq., this section applies to an insurer, nonprofit health service plan, or health maintenance organization that acts as a third party administrator.

(c) Within 30 days after receipt of a claim for reimbursement from a person entitled to reimbursement under § 15-701(a) of this title or from a hospital or related institution, as those terms are defined in § 19-301 of the Health--General Article, an insurer, nonprofit health service plan, or health maintenance organization shall:

  (1) mail or otherwise transmit payment for the claim in accordance with this section; or

  (2) send a notice of receipt and status of the claim that states:

    (i) that the insurer, nonprofit health service plan, or health maintenance organization refuses to reimburse all or part of the claim and the reason for the refusal;

    (ii) that, in accordance with § 15-1003(d)(1)(ii) of this subtitle, the legitimacy of the claim or the appropriate amount of reimbursement is in dispute and additional information is necessary to determine if all or part of the claim will be reimbursed and what specific additional information is necessary; or

    (iii) that the claim is not clean and the specific additional information necessary for the claim to be considered a clean claim.

(d)(1) An insurer, nonprofit health service plan, or health maintenance organization shall permit a provider a minimum of 180 days from the date a covered service is rendered to submit a claim for reimbursement for the service.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2) If an insurer, nonprofit health service plan, or health maintenance organization wholly or partially denies a claim for reimbursement, the insurer, nonprofit health service plan, or health maintenance organization shall permit a provider a minimum of 90 working days after the date of denial of the claim to appeal the denial.

(3) If an insurer, nonprofit health service plan, or health maintenance organization erroneously denies a provider's claim for reimbursement submitted within the time period specified in paragraph (1) of this subsection because of a claims processing error, and the provider notifies the insurer, nonprofit health service plan, or health maintenance organization of the potential error within 1 year of the claim denial, the insurer, nonprofit health service plan, or health maintenance organization, on discovery of the error, shall reprocess the provider's claim without the necessity for the provider to resubmit the claim, and without regard to timely submission deadlines.

(e)(1) If an insurer, nonprofit health service plan, or health maintenance organization provides notice under subsection (c)(2)(i) of this section, the insurer, nonprofit health service plan, or health maintenance organization shall mail or otherwise transmit payment for any undisputed portion of the claim within 30 days of receipt of the claim, in accordance with this section.

(2) If an insurer, nonprofit health service plan, or health maintenance organization provides notice under subsection (c)(2)(ii) of this section, the insurer, nonprofit health service plan, or health maintenance organization shall:

(i) mail or otherwise transmit payment for any undisputed portion of the claim in accordance with this section; and

(ii) comply with subsection (c)(1) or (2)(i) of this section within 30 days after receipt of the requested additional information.

(3) If an insurer, nonprofit health service plan, or health maintenance organization provides notice under subsection (c)(2)(iii) of this section, the insurer, nonprofit health service plan, or health maintenance organization shall comply with subsection (c)(1) or (2)(i) of this section within 30 days after receipt of the requested additional information.

(f)(1) If an insurer, nonprofit health service plan, or health maintenance organization fails to pay a clean claim for reimbursement or otherwise violates any provision of this section, the insurer, nonprofit health service plan, or health maintenance organization shall pay interest on the amount of the claim that remains unpaid 30 days after receipt of the initial clean claim for reimbursement at the monthly rate of:

(i) 1.5% from the 31st day through the 60th day;

(ii) 2% from the 61st day through the 120th day; and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(iii) 2.5% after the 120th day.

(2) The interest paid under this subsection shall be included in any late reimbursement without the necessity for the person that filed the original claim to make an additional claim for that interest.

(g) An insurer, nonprofit health service plan, or health maintenance organization that violates a provision of this section is subject to:

(1) a fine not exceeding $500 for each violation that is arbitrary and capricious, based on all available information; and

(2) the penalties prescribed under § 4-113(d) of this article for violations committed with a frequency that indicates a general business practice.

CREDIT(S)

Added by Acts 1997, c. 35, § 2, eff. Oct. 1, 1997. Amended by Acts 1997, c. 590, § 1, eff. Oct. 1, 1997; Acts 1999, c. 472, § 1, eff. Oct. 1, 1999; Acts 2000, c. 410, § 1, eff. June 1, 2000; Acts 2001, c. 406, § 1, eff. Oct. 1, 2001; Acts 2004, c. 155, § 1, eff. June 1, 2004; Acts 2005, c. 276, § 1, eff. Oct. 1, 2005; Acts 2009, c. 66, § 1, eff. Oct. 1, 2009; Acts 2009, c. 67, § 1, eff. Oct. 1, 2009.

**Formerly** Art. 48A, §§ 354Z, 470U, 477AA.

The statutes and Constitution are current through all chapters of the 2010 Regular Session of the General Assembly, effective through October 1, 2010.

(c) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 39

Feldman's Penalty Interest Calculation

| Inv # | Member Name | Policy | DOS | HCPC | Units Billed | Voucher Date | CareFirst Previously Paid | Price per Unit | PENALTY INTEREST START DATE | Adjustment Date PAID | Adjusted Amount PAID | Final Comments | Billed Amount Less Previously Paid | Billed vs. Adjusted Amount Paid | Penalty Interest Based on Adjustment Date Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15239 | | XUP200422453 | 9/17/08 | J7192 | 31,090 | 3/27/09 | $ 1,128.87 | $ 1.13 | 9/16/2010 | 9/24/10 | 33,957.63 | | $ 33,957.63 | $ - | $ 149.93 |
| 13912 | | YXH301447901 | 5/28/08 | J7192 | 31,800 | 2/13/09 | $ 36,252.00 | $ 1.22 | 9/16/2010 | 9/24/10 | 2,544.00 | | $ 2,544.00 | $ - | $ 11.23 |
| 13636 | | YXH301447001 | 5/6/08 | J7192 | 16,500 | 2/13/09 | $ 7,920.00 | $ 1.22 | 9/16/2010 | 9/24/10 | 12,200.00 | | $ 12,200.00 | $ - | $ 53.86 |
| 13811 | | YXH301447901 | 1/11/08 | J7192 | 22,260 | | $ - | $ 1.14 | 9/16/2010 | 9/24/10 | 25,376.40 | | $ 25,376.40 | $ - | $ 112.04 |
| 17338 | | YXH301447901 | 3/14/09 | J7192 | 30,300 | | $ - | $ 1.14 | 8/17/2010 | 9/24/10 | 34,542.00 | | $ 34,542.00 | $ - | $ 665.74 |
| 17629 | | QCI8023669900 | 3/27/09 | J7192 | 28,130 | | $ - | $ 1.14 | 8/17/2010 | 11/5/10 | 32,068.20 | | $ 32,068.20 | $ - | $ 1,736.49 |
| 16902 | | QCI8023669900 | 12/23/08 | J7192 | 28,290 | | $ - | $ 1.14 | 8/17/2010 | 9/24/10 | 32,250.60 | | $ 32,250.60 | $ - | $ 621.58 |
| 13202 | | QCI8023669900 | 3/27/08 | J7192 | 38,970 | 5/9/08 | $ 3.60 | $ 1.20 | 9/16/2010 | 10/8/10 | 46,760.40 | 10/8/10 voucher paid $45,586.26 | $ 1,174.14 | 45,586.26 | $ 13.29 |
| 13202 | | QCI8023669900 | 3/27/08 | J7192 | 38,970 | 5/9/08 | $ 3.60 | $ 1.20 | 9/16/2010 | 11/5/10 | | 11/5/10 voucher paid $45,586.26 | $ 45,586.26 | (45,586.26) | $ 1,152.34 |
| 13205 | | QCI8026066900001 | 3/29/08 | J7192 | 47,760 | 5/2/08 | $ 572.40 | $ 1.20 | 9/16/2010 | 10/15/10 | 56,739.60 | | $ 56,739.60 | $ - | $ 839.35 |
| | | XIP004223478 | 4/9/09 | J7192 | 30,744 | | $ - | $ 1.14 | 8/17/2010 | 1/08/10 | 35,048.16 | | $ 35,048.16 | $ - | $ 921.15 |
| | | YTP907M65463 | 4/28/09 | J7192 | 29,790 | | $ - | $ 1.14 | 8/17/2010 | 9/17/10 | 33,960.60 | | $ 33,960.60 | $ - | $ 536.13 |
| | | QCI8026069900001 | 5/14/09 | J7192 | 56,620 | | $ - | $ 1.14 | 8/17/2010 | 10/1/10 | 64,546.80 | 10/1/10 voucher paid $56,943.00 | $ 56,943.00 | 7,603.80 | $ 1,296.70 |
| | | QCI8026069900001 | 5/14/09 | J7192 | 56,620 | | $ - | $ 1.14 | 8/17/2010 | 10/22/10 | | 10/22/10 voucher paid $7,603.80 | $ 7,603.80 | (7,603.80) | $ 339.02 |
| | | | | | | | | | | | $ 1,511,486.87 | | $ 1,511,486.87 | $ 0.00 | $ 23,017.00 |

Material Redacted

* The penalty interest start date is determined based on the date (August 17, 2010) the Maryland Board of Pharmacy opined on the necessity of a residential services agency license (RSA). Claims with a date of service prior to the pharmacy's RSA effective date (December 11, 2008) were calculated starting 30 days from the day the opinion was received; claims with a date of service on or after the pharmacy's RSA effective date were calculated starting the same day the opinion was received.

All information attached herein is protected health information made available by CareFirst BlueCross BlueShield and shall be covered by the requirements of Subtitle F of Title II of the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations (45 Code of Federal Regulations Part 160-164) (the "HIPAA Rules") as well as by the Model Regulation prepared by the National Association of Insurance Commissioners to implement the state level Title V of the Gramm-Leach-Bliley Act (15 U.S.C. §6801 et seq.) ("GLB Regulations"). All redisclosure is hereby prohibited and CareFirst shall be indemnified if any such redisclosure occurs and CareFirst incurs any liability thereof.

Feldman's Penalty Interest Calculation

| Inv# | Member Name | Policy | DOS | HCPC | Units Billed | Voucher Date | CareFirst Previously Paid | Price per Unit | PENALTY INTEREST START DATE | Adjustment Date PAID | Adjusted Amount PAID | Final Comments | Billed Amount Less Previously Paid | Billed vs. Adjusted Amount Paid | Penalty Interest Based on Adjustment Date Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12555 | Material Redacted | YTPN07M53463 | 2/6/008 | J7192 | 24,480 | 6/2008 | 619.20 | 1.20 | 9/16/2010 | 9/24/10 | 28,756.80 | | 28,756.80 | | 126.96 |
| 14917 | | YTPN07M53463 | 8/23/08 | J7192 | 28,410 | 10/3/08 | | 1.13 | 9/16/2010 | 9/24/10 | 32,102.17 | | 32,102.17 | | 141.73 |
| 15787 | | YTPN07M53463 | 10/31/08 | J7192 | 28,410 | 12/1/2008 | 320.92 | 1.13 | 9/16/2010 | 9/24/10 | 31,782.38 | | 31,782.38 | | 140.31 |
| 13967 | | YTPN07M53463 | 5/30/08 | J7192 | 28,410 | 6/20/08 | 346.48 | 1.22 | 9/16/2010 | 9/24/10 | 34,313.72 | | 34,313.72 | | 151.50 |
| 13617 | | YTPN07M53463 | 5/7/08 | J7192 | 28,410 | 2/6/09 | 1.22 | 1.22 | 9/16/2010 | 9/17/10 | 34,658.98 | 9/17 - paid $34,568.98 w 590 coins | 34,568.98 | 90.00 | 33.86 |
| 13617 | | YTPN07M53463 | 5/20/08 | J7192 | 28,410 | 2/6/09 | | 1.22 | 9/16/2010 | 10/1/10 | | 10% claim adjusted to also pay 590 coins. | 90.00 | (90.00) | 0.71 |
| 14727 | | YTPN07M53463 | 8/11/08 | J7192 | 28,410 | 9/26/08 | | 1.13 | 9/16/2010 | 9/24/10 | 32,102.17 | | 32,102.17 | | 141.73 |
| 15291 | | YTPN07M53463 | 9/19/08 | J7192 | 28,410 | 10/31/08 | 1,128.87 | 1.13 | 9/16/2010 | 9/24/10 | 30,974.43 | | 30,974.43 | | 136.76 |
| 16500 | Material Redacted | YTPN07M53463 | 12/19/08 | J7192 | 29,460 | 1/6/09 | | 1.14 | 8/17/2010 | 9/24/10 | 33,584.40 | | 33,584.40 | | 647.29 |
| 17675 | | YTPN07M53463 | 3/28/09 | J7192 | 29,550 | 5/1/509 | | 1.14 | 8/17/2010 | 10/29/10 | 33,687.00 | | 33,687.00 | | 1,662.68 |
| 16310 | | YTPN07M53463 | 7/17/08 | J7192 | 28,410 | 8/2008 | 1.22 | 1.22 | 8/17/2010 | 9/24/10 | 34,658.98 | | 34,658.98 | | 153.02 |
| 17360 | | YTPN07M53463 | 3/4/09 | J7192 | 28,800 | 4/2009 | | 1.14 | 8/17/2010 | 9/24/10 | 32,832.00 | | 32,832.00 | | 632.79 |
| 16849 | | YTPN07M53463 | 1/22/09 | J7192 | 31,035 | | | 1.14 | 8/17/2010 | 9/24/10 | 35,379.90 | | 35,379.90 | | 681.89 |
| 14685 | | XIP00531589 | 8/7/08 | J7192 | 60,810 | 10/17/08 | 915.30 | 1.13 | 8/17/2010 | 9/24/10 | 67,800.00 | 1st claim pd $11,356.50 | 11,356.50 | 56,443.50 | 50.14 |
| 14685 | | XIP00531589 | 8/7/08 | J7192 | 60,810 | 10/17/08 | 915.30 | 1.13 | 9/16/2010 | 10/8/10 | | 2nd pd $56,443.50 | 56,443.50 | (56,443.50) | 639.04 |
| 17313 | | XIP04223478 | 2/26/09 | J7192 | 30,456 | | | 1.14 | 8/17/2010 | 9/24/10 | 34,719.84 | | 34,719.84 | | 669.17 |
| 16035 | | XKCW00532996 | 11/7/008 | J7192 | 30,480 | | | 1.14 | 8/17/2010 | 9/24/10 | 34,747.20 | | 34,747.20 | | 153.41 |
| 16948 | | XKCW00532996 | 12/12/008 | J7192 | 30,936 | | | 1.14 | 8/17/2010 | 9/24/10 | 35,267.04 | | 35,267.04 | | 679.72 |
| 14904 | | XKCW00532996 | 8/20/08 | J7192 | 31,464 | 10/3/08 | 1,128.87 | 1.13 | 8/17/2010 | 9/24/10 | 34,425.45 | | 34,425.45 | | 151.99 |
| 15321 | | XKCW00532996 | 9/22/08 | J7192 | 31,464 | | | 1.13 | 9/16/2010 | 9/24/10 | 35,571.32 | payment includes supplies not previously paid | 35,571.32 | | 157.05 |
| 16702 | Material Redacted | XICW00532996 | 1/10/09 | J7192 | 31,596 | | | 1.14 | 8/17/2010 | 9/24/10 | 33,719.44 | mbr had $2,000 coins & $300 ded | 33,719.44 | | 649.89 |
| 16368 | | XIP00854677 | 12/13/08 | J7193 | 73,650 | | | 0.94 | 8/17/2010 | 9/24/10 | 69,231.00 | 1st claim pd $22,278.00 | 22,278.00 | 46,953.00 | 420.37 |
| 16368 | | XIP00854677 | 12/13/08 | J7193 | 73,650 | | | 0.94 | 8/17/2010 | 10/8/10 | | 2nd claim pd $46,953.00 | 46,953.00 | (46,953.00) | 1,234.01 |
| 16843 | | XIP00854677 | 1/17/09 | J7193 | 73,650 | | | 0.94 | 8/17/2010 | 10/1/10 | 69,848.66 | 1st claim paid $22,305.35 | 22,305.35 | 46,743.31 | 507.93 |
| 16843 | | XIP00854677 | 1/17/09 | J7193 | 73,650 | | | 0.94 | 8/17/2010 | 10/8/10 | | 2nd claim paid $46,743.31, Memb. Ri | 46,743.31 | (46,743.31) | 1,228.52 |
| 17514 | | XIP00854677 | 3/11/09 | J7193 | 73,990 | | | 0.95 | 8/17/2010 | 9/24/10 | 70,115.59 | mbr has $ 189.81 coinsurance | 70,115.59 | | 1,351.37 |
| 14609 | | XIP00854677 | 11/15/08 | J7193 | 74,100 | | | 0.94 | 9/16/2006 | 9/24/10 | 69,654.00 | | 69,654.00 | | 307.53 |
| 14914 | | XIP00854677 | 8/23/08 | J7193 | 74,250 | | | 0.95 | 9/16/2006 | 9/24/10 | 70,537.50 | 1st claim pd $23,085.00 | 23,085.00 | 47,452.50 | 101.92 |
| 14914 | | XIP00854677 | 8/23/08 | J7193 | 74,250 | | | 0.95 | 9/16/2006 | 10/8/10 | | 2nd claim pd $47,452.50 | 47,452.50 | (47,452.50) | 537.25 |
| 13463 | | ZAR1116024100 | 4/16/08 | J7192 | 64,032 | | | 1.20 | 9/16/2010 | 10/8/10 | 76,838.40 | | 76,838.40 | | 869.95 |
| 13887 | | ZAR11.6024100 | 5/28/08 | J7192 | 62,940 | 7/4/08 | 71,802.69 | 1.22 | 9/16/2010 | 9/24/10 | 4,984.11 | voucher 9/24/10 took back $12,031.38 | (12,031.38) | 17,015.49 | (33.12) |
| 13887 | | ZAR11.6024100 | 5/28/08 | J7192 | 62,940 | 7/4/08 | 71,802.69 | 1.22 | 9/16/2010 | 10/15/10 | 17,015.49 | voucher 10/15/10 paid $17,066.58 ($1.09 for supplies) | 17,015.49 | (17,015.49) | 251.71 |
| 14900 | Material Redacted | XUP200422453 | 8/21/08 | J7192 | 31,050 | 9/10/08 | 35,086.50 | 1.13 | 9/16/2010 | | | | | | |

Feldman's Penalty Interest Calculation

| | Based on 365 days/yr – August Penalty Start Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Monthly Interest Rate | 1.5% | 1.5% | 1.5% | 1.5% | 2.0% | 2.0% | 2.0% | 2.0% |
| Number of Penalty days | 32 | 39 | 46 | 53 | 74 | 67 | 81 | |
| Number Payment Periods (in months) | 1.05 | 1.28 | 1.51 | 1.74 | 2.43 | 2.20 | 2.66 | |
| Penalty Interest Start Date | 8/17/2010 | 8/17/2010 | 8/17/2010 | 8/17/2010 | 8/17/2010 | 8/17/2010 | 8/17/2010 | |
| Adjustment Date Paid (Column Q) | 9/17/2010 | 9/24/2010 | 10/1/2010 | 10/8/2010 | 10/29/2010 | 10/22/2010 | 11/5/2010 | |

| | Based on 365 days/yr – September Penalty Start Date | | | | | |
|---|---|---|---|---|---|---|
| Monthly Interest Rate | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Number of Penalty days | 2 | 9 | 16 | 23 | 30 | 51 |
| Number Payment Periods (in months) | 0.07 | 0.30 | 0.53 | 0.76 | 0.99 | 1.68 |
| Penalty Interest Start Date | 9/16/2010 | 9/16/2010 | 9/16/2010 | 9/16/2010 | 9/16/2010 | 9/16/2010 |
| Adjustment Date Paid (Column Q) | 9/17/2010 | 9/24/2010 | 10/1/2010 | 10/8/2010 | 10/15/2010 | 11/5/2010 |

EXHIBIT 40

Additional Interest 1.5%=2%=2.5% Maryland Code §15-1005

| Invoice no | Date of Service | Expected Amount (Provided by Client) | Amt 1 (Original Payment) | Amt 2 (1st Adjustment) | Amt 3 (2nd Adjustment) | Balance Payment | Date 1 (Original Payment) | Date 2 (1st Adjustment) | Date 3 (2nd Adjustment) | Interest on Original Payment | Interest on 1st Adjustment | Interest on 2nd Adjustment | Interest on Unpaid Balance Through 3/4/11 | Total (Additional Interest) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12555 | 2/3/2008 | 29,376.00 | 619.20 | 28,765.80 | | | 6/20/2008 | 9/24/2010 | | 41.80 | 21,735.35 | | | 21,777.14 |
| 14917 | 8/23/2008 | 32,103.30 | 1.13 | 32,102.17 | | | 10/2/2008 | 9/24/2010 | | 0.01 | 18,940.28 | | | 18,940.29 |
| 15787 | 10/31/2008 | 32,103.30 | 320.92 | 31,782.38 | | | 12/12/2008 | 9/24/2010 | | 1.93 | 16,924.12 | | | 16,926.04 |
| 13967 | 5/30/2008 | 34,660.20 | 346.48 | 34,313.72 | | | 6/20/2008 | 9/24/2010 | | | 22,675.65 | | | 22,675.65 |
| 13617 | 5/2/2008 | 34,660.20 | 1.22 | 34,568.98 | 90.00 | | 2/6/2009 | 9/17/2010 | 10/1/2010 | 0.23 | 23,449.29 | 62.10 | | 23,511.62 |
| 14727 | 8/11/2008 | 32,103.30 | 1.13 | 32,102.17 | | | 9/26/2008 | 9/24/2010 | | 0.01 | 18,261.30 | | | 18,261.31 |
| 15291 | 9/19/2008 | 32,103.30 | 1,128.87 | 30,974.43 | | | 10/31/2008 | 9/24/2010 | | 6.77 | 17,877.99 | | | 17,884.76 |
| 16500 | 12/19/2008 | 33,584.40 | | 33,584.40 | | | | 9/24/2010 | | | 16,512.33 | | | 16,512.33 |
| 17675 | 3/28/2009 | 33,687.00 | | 33,687.00 | | | | 10/29/2010 | | | 14,766.14 | | | 14,766.14 |
| 14319 | 7/7/2008 | 34,660.20 | 1.22 | 34,658.98 | | | 9/26/2008 | 9/24/2010 | | 0.04 | 14,766.27 | | | 14,766.31 |
| 17360 | 3/4/2009 | 32,832.00 | | 32,832.00 | | | | 7/4/2009 | | | 14,090.40 | | | 14,090.40 |
| 16849 | 5/22/2009 | 35,379.90 | | 35,379.90 | | | | 9/24/2010 | | | 16,392.89 | | | 16,392.89 |
| 14685 | 8/7/2008 | 68,715.30 | 915.30 | 11,356.50 | 56,443.50 | | 10/17/2008 | 9/24/2010 | 10/8/2010 | 20.44 | 6,851.76 | 34,712.75 | | 41,584.95 |
| 17313 | 2/26/2009 | 34,719.84 | | 34,719.84 | | | | 9/24/2010 | | | 15,074.20 | | | 15,074.20 |
| 16035 | 11/19/2008 | 34,747.20 | | 34,747.20 | | | | 9/24/2010 | | | 17,952.72 | | | 17,952.72 |
| 16348 | 12/12/2008 | 35,267.04 | | 35,267.04 | | | | 9/24/2010 | | | 17,545.35 | | | 17,545.35 |
| 14934 | 6/30/2008 | 30,554.32 | 1,128.87 | 29,425.45 | | | 10/3/2008 | 9/24/2010 | | 7.90 | 20,397.08 | | | 20,404.98 |
| 15321 | 9/22/2008 | 35,554.32 | | 35,554.32 | | | | 9/24/2010 | | | 20,088.19 | | | 20,088.19 |
| 16702 | 1/10/2009 | 36,019.44 | | 33,719.44 | | 2,300.00 | | 9/24/2010 | | | 15,960.53 | | 1,397.25 | 17,357.78 |
| 16368 | 12/13/2008 | 69,231.00 | 22,278.00 | 46,953.00 | | | 9/24/2010 | 10/8/2010 | | 11,064.74 | 23,867.78 | | | 34,932.52 |
| 16943 | 1/17/2009 | 69,231.00 | 22,278.00 | 46,745.31 | | 209.69 | 9/24/2010 | 10/1/2010 | | 10,544.92 | 22,397.84 | | 126.16 | 33,068.92 |
| 17514 | 3/17/2009 | 48,780.50 | 22,838.00 | 47,262.69 | | 189.81 | 9/24/2010 | 10/1/2010 | | 9,668.09 | 20,007.87 | | 105.82 | 29,781.78 |
| 16089 | 11/15/2008 | 69,645.00 | 46,953.00 | 22,701.00 | | | 9/24/2010 | 10/8/2010 | | 24,415.56 | 11,804.52 | | | 36,220.08 |
| 14914 | 8/23/2008 | 70,537.50 | 23,085.00 | 47,452.50 | | | 9/24/2010 | 10/8/2010 | | 13,620.15 | 28,550.59 | | | 42,170.74 |
| 13463 | 4/16/2008 | 76,838.40 | 16,898.40 | 59,940.00 | | | 11/8/2010 | 10/8/2010 | | 11,983.78 | 42,507.45 | | | 54,491.23 |
| 13887 | 5/28/2008 | 76,786.80 | 76,786.80 | | | | 7/10/2010 | | | 251.13 | | | | 251.13 |
| 13887 | 5/28/2008 | | 7,751.60 | | | | 10/15/2010 | | | 3,423.34 | | | | 3,423.34 |
| | | | 5,035.20 | | | | 10/15/2010 | | | 210.55 | | | | 210.55 |
| 14900 | 8/21/2008 | 35,086.50 | 34,298.51 | | 12,031.38 | 787.99 | 9/19/2009 | | 10/15/2010 | 128.88 | 19,327.55 | | 571.95 | 19,456.43 |
| 15259 | 9/17/2008 | 35,086.50 | 1,128.87 | 33,957.63 | 2,544.00 | | 3/27/2009 | 9/24/2010 | 2/13/2009 | 6,253.47 | 1,685.40 | 8,316.33 | | 9,835.25 |
| 13912 | 5/28/2008 | 38,796.00 | 36,252.00 | 2,544.00 | | | 2/13/2009 | 2/13/2009 | | 1,519.92 | 2,990.83 | | | 3,491.79 |
| 17514 | 3/17/2009 | 42,780.50 | 7,830.00 | 34,542.00 | | | 9/24/2010 | 9/24/2010 | | | 24,536.43 | | | 24,536.43 |
| 15811 | 11/11/2008 | 34,376.40 | | 34,542.00 | | | | 11/6/2010 | | | 24,024.43 | | | 24,024.43 |
| 17538 | 3/14/2009 | 32,068.20 | | 32,068.20 | | | | 9/24/2010 | | | 15,749.04 | | | 15,749.04 |
| 17629 | 3/27/2009 | 32,250.60 | | 32,250.60 | | | | 11/6/2010 | | | 35,034.03 | | | 35,034.03 |
| 16602 | 12/23/2008 | 46,704.00 | | 46,704.00 | | | | 11/6/2010 | | 1.14 | 41,419.91 | | | 41,421.05 |
| 15299 | 9/?/2008 | 57,312.00 | 572.40 | 56,739.60 | | | 10/15/2010 | 10/8/2010 | | | 14,398.95 | | | 14,398.95 |
| 13205 | 3/29/2009 | 35,048.16 | | 35,048.16 | | | | 10/8/2010 | | | 12,820.13 | | | 12,820.13 |
| 17790 | 4/9/2009 | 33,960.60 | | 33,960.60 | | | | 9/17/2010 | | | | | | 24,491.91 |
| 17981 | 4/28/2009 | 64,546.80 | 56,943.00 | 7,603.80 | | | 10/1/2010 | 10/22/2010 | | 21,401.08 | 2,990.83 | | | 18,460.33 |
| 18258 | 5/14/2009 | 35,568.00 | 35,568.00 | | | | 12/24/2010 | 12/24/2010 | | 14,464.32 | | | | 15,238.47 |
| 18590 | 6/30/2009 | 32,721.42 | | | | 32,721.42 | | | | | | | 18,460.33 | |
| 18590 | 3/30/2009 | 33,738.30 | | | | 33,738.30 | | | | | | | 15,238.47 | |
| 18771 | 7/16/2009 | 43,529.60 | | | | 43,529.60 | | | | | | | 18,862.83 | 18,862.83 |
| 16968 | 8/7/2009 | | | | | | | | | | | | | |

Assumptions:

Each month is assumed to be 30 days

Total Additional Interest     909,500.93
Cr for int not paid     (23,017.00)
Total Additional Interest Due     886,483.93