**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____
                                                            )
FELDMAN'S MEDICAL CENTER                )
PHARMACY, INC.,                                    )
                                                            )
            Plaintiff,                                     )
                                                            )
            v.                                               )        Civil Action No. 1:10-cv-00254-SKG
                                                            )
CAREFIRST, INC.,                                    )
                                                            )
            Defendant.                                  )
_____)

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR**
**ATTORNEYS' FEES AND COSTS**

Defendant CareFirst, Inc. ("CareFirst") respectfully submits this Opposition to Plaintiff's

Motion for Attorneys' Fees and Costs (DE Nos. 157-58).

## Introduction

Despite landing on the losing side of every single substantive ruling by this Court,

Plaintiff Feldman's Medical Center Pharmacy, Inc. ("Feldman's") now demands that CareFirst

pay every cent of its purportedly nearly $1.2 million in attorneys' fees.  Feldman's asks the Court

to determine the reasonableness of its seven-figure request by sorting through an undifferentiated

mass of attorney time records, submitted in direct contravention of the Local Rules of this Court.

Fortunately, the Court need not waste its time making sense of Feldman's submission, as

Feldman's has failed to satisfy not only the Court's own rules, but also the threshold

requirements for a fee award under § 502(g) of the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1132(g).

Feldman's entire Motion for Attorneys' Fees rests on a false premise:  namely, that "[i]t

is indisputable that had Plaintiff not commenced this lawsuit, CareFirst still would not have paid

any of the more than $1.5 million in outstanding claims which formed the basis of this lawsuit." Pl.'s Mem. in Support of Mot. for Attorneys' Fees ("Pl.'s Mem.") at 1 (DE No. 158).  Feldman's thus attempts to cast its Complaint as the "catalyst" for CareFirst's decision to pay the claims. But in reality, the reason why CareFirst ultimately paid the claims at issue had nothing at all to do with Feldman's Complaint, which demanded payment in the first instance under the terms of Feldman's Participating Professional Provider Agreement ("PPP Agreement").  The Court explicitly found, in fact, that the PPP Agreement *did not* cover the claims at issue.  Instead, CareFirst paid Feldman's as a non-participating provider, and only after Feldman's corrected a factual misimpression that it had consistently conveyed to CareFirst prior to this litigation.  As the Court explained, this case "paints a picture of legitimate confusion, on both sides."  Mem. Op. at 44 (DE No. 146).  Feldman's easily could have cleared up this confusion in a single e-mail or phone call years ago.  It should not be rewarded for its decision instead to launch, and unreasonably continue, an expensive lawsuit.

## Argument

### I.   FELDMAN'S MOTION SHOULD BE DENIED FOR FAILING TO COMPLY WITH THE LOCAL RULES' FORMATTING REQUIREMENTS

While Feldman's motion has a number of substantive defects, this Court can deny Feldman's motion without even reaching the merits.  The Local Rules of this Court establish clear rules governing the format for attorneys' fees motions.  Because Feldman's submission blatantly violates those rules, it should be denied for this reason alone.

Local Rule 109.2(b) provides that, "[i]f the Rules and Guidelines for Determining Attorneys' Fees in Certain cases contained in Appendix B to these Rules are applicable, any motion for attorneys' fees also *shall be prepared in accordance with such Rules and Guidelines*."  (Emphasis added.)  Appendix B, in turn, applies to cases governed by fee-shifting

statutes that "do not . . . authorize fees based on a fixed percentage or other formula, such as social security cases." Appendix B to Local Rules at n.1. Because Feldman's is seeking attorneys' fees under ERISA's statutory fee-shifting provision, 29 U.S.C. § 1132(g), and because that provision does not authorize fees "based on a fixed percentage," Appendix B applies.

Appendix B establishes detailed guidelines for submitting attorney time records in support of attorneys' fees applications. As pertinent here, it states that "[f]ee applications, accompanied by time records, shall be submitted in the following format organized by litigation phase:

| | | |
|---|---|---|
| i. | case development, background investigation and case administration; |
| ii. | pleadings; |
| iii. | interrogatories, document production, and other written discovery; |
| iv. | depositions (includes time spent preparing for depositions); |
| v. | motions practice; |
| vi. | attending Court hearings; |
| vii. | trial preparation and post-trial motions; |
| viii. | attending trial; |
| ix. | ADR; and |
| x. | fee petition preparation. |

*See* Section 1(b), App. B to Local Rules for the U.S. District Court for the District of Maryland.

Appendix B's formatting requirements allow attorneys' fees motions to be resolved with the promptness and efficiency envisioned by Fed. R. Civ. P. 54. Rule 54(d)(2)(B) provides that attorneys' fees motions "must be filed no later than 14 days after the entry of judgment." The Advisory Committee Notes explain that "[p]rompt filing affords an opportunity for the court to

resolve fee disputes shortly after trial, while the services performed are freshly in mind."  Adv.

Comm. Notes to 1993 Amendments to Fed. R. Civ. P. 54.  "It also enables the court in

appropriate circumstances to make its ruling on a fee request in time for any appellate review of

a dispute over fees to proceed at the same time as review on the merits of the case."  *Id.*  But

where (as here) attorneys, instead of complying with Appendix B's litigation-phase requirement,

support their fee petitions with a disorganized mass of documents and ask the opposing party --

and the Court -- to make sense of it, Rule 54's promptness and efficiency objectives are

undermined.  And allowing additional opportunity for a fee applicant subsequently to comply

with Appendix B undermines Rule 54's objectives, since it draws out the Court's consideration

of attorneys' fees issues and necessitates even more time and resources of the parties to be spent

on an ancillary matter that could have, and should have, been properly presented to the Court in

the first instance.

 This Court has previously rejected a fee application for failing to comply with the

formatting requirements of Appendix B.  In *Trustees of the Operating Engineers Trust Fund v.

Dominion Caisson Corp.*, No. 10-cv-0227, 2010 U.S. Dist. LEXIS 121521, at *14 (D. Md. Nov.

17, 2010), the Court explained that "Appendix B of the Local Rules of this Court . . . provides

that . . . '[f]ee applications, accompanied by time records, shall be submitted' in accordance with

a specified format." (Quoting Appendix B, § 1(b).)  Because the plaintiffs in that case did not

"provide[] any time records, nor have they otherwise itemized the time expended by specific

attorneys on specific tasks at specific rates," the Court said that it was " unable to assess the

reasonableness of Plaintiffs' request for attorneys' fees." *Id.* at *15.

 The Court also stressed the importance of Appendix B's formatting requirements in *Essex

v. Randall*, No. 2003-cv-3276, 2006 U.S. Dist. LEXIS 682, at *10 n.5 (D. Md. Jan. 11, 2006).

The Court explained that "[t]he Guidelines specifically require fee applications to be organized by litigation phase," and noted that it did not look like the "Plaintiffs made any effort to organize their fees accordingly." *Id.* This Court admonished the plaintiffs for "mak[ing] it much more difficult for this court to determine what fees should be granted by not submitting a properly formatted request." *Id.* While the Court ultimately opted not to deny the plaintiff's fee request entirely for non-compliance with Appendix B, it clearly signaled that failure to comply with Appendix B was cause for denial. *See id.* (stating that it was "*choos[ing]* not to deny attorneys' fees entirely, based on this deficiency") (emphasis added).

Here, Feldman's motion does not even attempt to comply with Appendix B. Rather than organize its fee application by litigation phase, Feldman's has simply attached hundreds of pages of attorney time records in no discernible format. Even if Feldman's were entitled to a fee award under ERISA (which it is not), its motion makes it impossible for CareFirst -- and this Court -- adequately to assess the reasonableness of the fees it seeks. *See id.*

Because Feldman's has failed utterly to comply with the clear Local Rules governing attorneys' fees applications, Feldman's motion should be denied for this reason alone.

## II.   FELDMAN'S MOTION SHOULD BE DENIED BECAUSE FELDMAN'S DID NOT ACHIEVE SOME SUCCESS ON THE MERITS

Even if Feldman's had complied with Appendix B, this Court can still deny the attorneys' fees motion without even looking at Feldman's reams of attached time records, since Feldman's has not met the threshold requirement for a fee award under ERISA: some success on the merits.

Any decision to award attorneys' fees must be considered against the backdrop of "the bedrock principle known as the 'American Rule': Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Hardt v. Reliance Standard Ins. Co.*, 130 S. Ct. 2149, 2156-57 (2010). While § 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1), provides

that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party," the Supreme Court recently confirmed that "Congress failed to indicate clearly in § 1132(g)(1) that it 'meant to abandon historic fee-shifting principles and intuitive notions of fairness.'" *Hardt,* 130 S. Ct. at 2158 (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 686 (1983)).  Thus, the Court held, "a fees claimant must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1)." *Hardt*, 130 S. Ct. at 2158. The some-degree-of-success standard, however, is not satisfied merely by "trivial success on the merits or a purely procedural victory." *Id.* (internal citations and quotations omitted).  Because Feldman's has, at best, achieved only trivial success in this case, it has not satisfied this threshold requirement for attorneys' fees.

### A.     Feldman's Has Lost Every Significant Substantive Ruling Issued By This Court

Feldman's has not succeeded on the merits of its case for a simple reason:  it has lost at virtually every step of the way.  Feldman's seeks to gloss over its litigation record by mischaracterizing -- and oversimplifying -- the some-degree-of-success inquiry.  According to Feldman's, "[i]t is not necessary for the court to conduct a 'lengthy inquir[y] into the question whether a particular party's success was "substantial" or occurred on a "central issue."'"  Pl.'s Mem. at 8 (quoting *Hardt*, 130 S. Ct. at 2158, quoting *Ruckelshaus*, 463 U.S. at 688 n.9) (DE No. 158).  Feldman's thus implies that a court need not take a hard look at how a plaintiff achieved its success; only a cursory review of the case is necessary.  Against this lenient standard, Feldman's believes it has achieved some degree of success simply because CareFirst ultimately paid the claims at issue.  Indeed, Feldman's devotes all of two pages to explaining the basis for its claimed success on the merits.  *See* Pl.'s Mem. at 8-9 (DE No. 158).

Contrary to Feldman's characterization of *Hardt*, the Supreme Court did not say that district courts need only conduct a superficial inquiry into the plaintiff's claimed success. Rather, the Court said that a plaintiff satisfies the some-degree-of-success standard "if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue." *Hardt*, 130 S. Ct. at 2158 (internal quotation marks omitted). In other words, a plaintiff achieves some success on the merits only in those cases where the plaintiff's success on the merits is so obvious that a lengthy inquiry is not required. Here, if anything is obvious, it is that any "success" Feldman's feels it has achieved had nothing to do with the "merits" of this case.

There have been two significant rulings by this Court, neither of which reached the merits of the Complaint and both of which Feldman's unequivocally lost. First, after CareFirst removed this case from state court, Feldman's moved to remand. *See* DE No. 46. Judge Quarles denied Feldman's motion, explicitly rejecting Feldman's attempt to escape ERISA complete preemption by foreswearing the assignments of benefits it received from CareFirst subscribers. *See generally* DE No. 53.

Then, after CareFirst paid the outstanding claims on its own volition, this Court issued a Memorandum Opinion that focused primarily on the issue of whether Feldman's was entitled to prejudgment interest. Feldman's had argued that it was entitled to prejudgment interest under the Maryland Prompt Pay Statute, Md. Code Ann., Insur. § 15-1005(f), in the amount of $886,483.93. *See* DE No. 100-1. The Court disagreed, squarely rejecting Feldman's contention that it is a "preferred provider" entitled to interest pursuant to Maryland law. The Court instead ruled -- against Feldman's wishes -- that Feldman's could obtain interest only under the

significantly lower federal rate prescribed for post-judgment interest under 28 U.S.C. § 1961.

*See* Mem. Op. at 42-43 (DE No. 146).  After crediting the $23,017 in interest that CareFirst had

previously paid to Feldman's, *id.* at 60, the Court ordered that CareFirst pay an additional

$11,983.00 in interest (*see* DE No. 153) -- approximately $875,000 *less than* Feldman's

requested.  Even if the Court's decision to award Feldman's $11,983.00 in interest can be

deemed a success, it is only a "trivial" one, for it was minor in amount and directly contrary to

the position taken by Feldman's.  *Hardt*, 130 S. Ct. at 2158.

       In sum, because the Court nowhere made a ruling on the merits favorable to Feldman's,

and indeed Feldman's essentially *lost* on every issue the Court did reach, Feldman's has not

achieved "some degree of success on the merits."  *Id.*; *see Templin v. Independence Blue Cross,*

No. 09-4092, 2011 U.S. Dist. LEXIS 98482, at *23 (E.D. Pa. Aug. 19, 2011) (rejecting

plaintiff's motion for attorneys' fees in ERISA case because the "relief was provided by

Defendants, not the Court, and was not achieved by any substantive determination by the

Court"); *Reimann v. Prudential Ins. Co. of Am.*, No. 10-CV-456, 2010 U.S. Dist. LEXIS 111375,

at *6 (E.D. Wis. Oct. 19, 2010) ("[T]he court cannot say that Reimann achieved any success

based on the actual merits in this case.  No merits were ever reached.").

### B.     This Lawsuit Was Not The Catalyst For CareFirst's Decision To Pay The Claims At Issue

       Notwithstanding that the only arguably favorable ruling Feldman's received from this

Court was a trivial award of $11,983 in interest, Feldman's argues it has succeeded on the merits

because "CareFirst paid 100% of the face value of the outstanding claims at issue *as a result of*

the filing of this action."  Pl.'s Mem. at 9 (DE No. 158) (emphasis added).  Feldman's appears to

rely on the so-called "catalyst theory," which holds that "parties who obtain, through settlement

or otherwise, substantial relief prior to adjudication on the merits" might be eligible for

attorneys' fees when a statute affords courts the discretion to shift fees.  *See Ohio River Valley*

*Envtl. Coalition, Inc. v. Green Valley Coal Co.*, 511 F.3d 407, 414 (4th Cir. 2007) (internal

quotation marks omitted).  The Fourth Circuit has held that recovery of attorneys' fees under a

catalyst theory is strictly limited to situations where a plaintiff can show three things:  (1) that the

defendant's actions provided the plaintiff with "some of the benefit sought in the lawsuit"; (2)

that the plaintiff's claims in the lawsuit were not frivolous; and (3) that the plaintiff's lawsuit was

a "substantial or significant cause" of the defendant's actions in providing relief.  *Id.* at 415

(internal quotation marks omitted).

Even assuming the catalyst theory were a viable one in the ERISA context (and it is

important to note that the Fourth Circuit has never so ruled), Feldman's cannot meet the test

because Feldman's has not shown that its lawsuit was a "substantial or significant" cause of

CareFirst's decision to pay the claims.  *Id.*  Feldman's omits any explanation of why or how its

lawsuit supposedly caused CareFirst's decision to pay the claims; it merely offers the unadorned

conclusion that "it received payment for all of the claims at issue solely because it filed and

prosecuted this lawsuit."  Pl.'s Mem. at 9 (DE No. 158).  Feldman's attempt to avoid the facts is

not surprising, since the facts demonstrate that CareFirst did not pay the claims at issue by

somehow being cowed into paying as a result of Feldman's lawsuit or because CareFirst

suddenly saw the wisdom of Feldman's legal position.  Rather, CareFirst paid the claims only

because Feldman's  -- in the middle of this lawsuit -- changed the story it had been consistently

telling CareFirst prior to filing suit.

The critical facts of this case are not in dispute.  In 1997, Feldman's and CareFirst

entered into a PPP Agreement.  Declaration of Lisa Anuszewski ("Anuszewski Dec.") ¶ 19 (DE

No. 117).[1]  CareFirst's participating provider contracts are specific to a type of service; a provider is considered to be "participating" only for the type of service covered by its contract, not for all purposes.  *Id.* ¶ 13.  For example, Feldman's PPP Agreement covered only durable medical equipment ("DME") such as wheelchairs, catheters, and the like.  *Id.* ¶ 19; *see also* Mem. Op. at 29 (DE No. 146).

In 2007, however, Feldman's was purchased by Factor Health Management, a Florida-based entity that supplies specialty pharmaceuticals.  DE No. 104 ¶ 20.  One of those pharmaceuticals is Factor VIII, a drug for hemophiliacs.  *Id.* ¶ 4.  As the Court explained, "[b]ecause hemophiliacs' bodies do not produce sufficient clotting factor to stop bleeding quickly, they must inject or infuse blood clotting factor ('factor' or 'factor drugs') in order to prevent a fatal bleed out."  Mem. Op. at 8 (DE No. 146) (citing DE No. 100-2 ¶¶ 3-5).  Due to the need to infuse factor drugs like Factor VIII, it had been CareFirst's policy that providers of factor drugs who wished to contract with CareFirst join CareFirst's Home Infusion Therapy ("HIT") network.  Anuszewski Dec. ¶ 29 (DE No. 117).  Prior to a healthcare provider joining a particular network like the HIT network, the provider must satisfy CareFirst's credentialing process, which entails, among other things, ensuring that the provider has all of the requisite state licenses.  *Id.* ¶¶ 7-8.  One of the required credentials for a provider of home infusion services is to obtain a Residential Services Agency ("RSA") license from Maryland's Office of Health Care Quality ("OHCQ"), *id.* ¶ 33, unless the provider is exempt due to its status as a Home Health Agency.  *Id.* ¶ 35.

---

[1] Participating providers agree to accept CareFirst's allowed benefit amount for the services covered by the contract.  Anuszewski Dec. ¶ 5.  In return, participating providers have ready access to CareFirst's large subscriber base and receive payment directly from CareFirst.  *Id.* ¶ 6.  In contrast, when CareFirst's subscribers are treated by out-of-network providers, CareFirst pays the subscriber, with the subscriber then responsible for paying the provider.

On August 22, 2008, nine months before Feldman's filed suit, CareFirst informed Feldman's that it could not reimburse claims for Factor VIII because Feldman's was not part of CareFirst's HIT network, but was instead a participant in CareFirst's DME network.  DE No. 100-2, ¶ 120; Mem. Op. at 8 (DE No. 146).  As CareFirst explained in its August 22, 2008 email to Joel Yerton and Nurys Puente at Feldman's, "[t]he only way that Factor VIII drugs are covered is under our Home Infusion Therapy Agreements"; and, in order for Feldman's to become part of CareFirst's HIT network, it would need to satisfy CareFirst's credentialing requirements, including an RSA license.  *See* CareFirst SJ 003-004 attached to Anuszewski Dec. (DE No. 117-1).  After being informed that it needed to join CareFirst's HIT network, Feldman's obtained an RSA license from the State of Maryland on December 16, 2008, and submitted it to CareFirst along with its HIT application as part of the credentialing process.  *See* CareFirst SJ 009-010 attached to Anuszewski Dec. (DE No. 117-1).

Yet, even with the RSA license, any claims by Feldman's for benefits for Factor VIII that were incurred *prior to* obtaining the RSA license still were, in CareFirst's view, ineligible for reimbursement, because Feldman's lacked the necessary license at the time the claims were incurred to provide home infusion services.  At no point prior to this lawsuit did Feldman's inform CareFirst that it was not, in fact, providing home infusion services in connection with Factor VIII.  To the contrary, the obvious implication of Feldman's effort to join CareFirst's "Home Infusion Therapy" network, and especially in obtaining an RSA from the OHCQ, was that Feldman's was providing home infusion services, just like every other Factor VIII provider in CareFirst's HIT network.  *See* Anuszewski Dec. ¶ 35 (DE No. 117).  Indeed, in its sworn application for its RSA license in 2009, Feldman's checked "yes" in the row labeled "Infusion Company."  *See* CareFirst SJ 009-10, attached as Ex. H to First Patrick de Gravelles Declaration

(DE No. 115-8).  Even Feldman's counsel, in his May 4, 2009 demand letter to CareFirst -- the one and only time counsel for Feldman's communicated with CareFirst before resorting to litigation -- never indicated that Feldman's was not providing home infusion services.  Rather, Feldman's counsel simply demanded payment for the outstanding Factor VIII claims under the terms of Feldman's PPP Agreement for DME, with no further explanation.  *See* DE No. 5-4 (Ex. C to Motion for Preliminary Injunction).

Feldman's Complaint tracked the same theory articulated in Feldman's counsel's demand letter.  It simply argued that CareFirst was obligated to pay the outstanding Factor VIII claims under the terms of Feldman's PPP Agreement with CareFirst.  *See* Compl. ¶¶ 28-33 (DE No. 2). It never once asserted that Feldman's was not providing home infusion services.  To the contrary, Feldman's asserted in its Complaint that CareFirst improperly denied the claims notwithstanding that "Plaintiff has complied with all of CareFirst's requests regarding clarification of Plaintiff's provider status . . . as a Home Infusion Therapy Provider."  *Id.* ¶ 12 (DE No. 2).

Believing Feldman's to be a provider of home infusion services, CareFirst on three occasions offered to stay the case so that both parties could get a ruling on whether Feldman's needed an RSA to provide the services in question, since resolution of that regulatory issue with respect to the claims incurred prior to the time that Feldman's obtained the license would, in turn, resolve the payment dispute between the parties.  Second Patrick de Gravelles Declaration ("Second de Gravelles Dec.") ¶ 28 (filed in accompaniment with this Opp.).  That is, if the license actually was unnecessary under Maryland law, then Feldman's pre-license claims could be reimbursable (as out-of-network provider claims).  But Feldman's counsel did not respond to a single one of CareFirst's requests to stay the litigation.  *Id.* ¶ 29.  Thus, CareFirst, acting *on its*

*own accord*, sought clarification from the OHCQ as to whether a pharmacy like Feldman's needed an RSA to provide home infusion services. *Id.* ¶ 32. The OHCQ informed CareFirst that an RSA was required. *Id.* ¶ 33.

Only after CareFirst informed Feldman's counsel of OHCQ's opinion regarding the need for an RSA license to provide home infusion services did Feldman's counsel revealed that Feldman's was not, in fact, providing home infusion services. *Id.* ¶¶ 34-36. Rather, Feldman's counsel informed CareFirst that Feldman's was merely *drop shipping* Factor VIII at patients' homes via common carrier. *Id.* ¶ 36. This was the first time Feldman's communicated this critical fact; as explained, in none of its prior communications with CareFirst did Feldman's indicate that it was not providing home infusion services. If anything, Feldman's prior statements and actions suggested the opposite. Once CareFirst learned this new piece of information, it soon thereafter sought an opinion from the Maryland Board of Pharmacy -- again on CareFirst's own volition -- as to whether Feldman's needed an RSA to drop ship Factor VIII. *Id.* ¶ 37. When the Board of Pharmacy informed CareFirst that an RSA was not required, CareFirst agreed to pay the claims at issue. *Id.* ¶ 40.

In short, the reason why CareFirst paid the claims was because Feldman's -- nearly a year into this case -- changed its story from what it had been consistently telling CareFirst (and the State of Maryland) prior to filing suit. CareFirst's decision to pay the claims had nothing to do with any substantive rulings by this Court, which uniformly favored CareFirst, or with the merits of Feldman's Complaint. Feldman's tries to imply otherwise by taking out of context an excerpt from the Court's decision on the pre-judgment interest issue, which Feldman's unequivocally lost. Specifically, Feldman's frames its brief by quoting the Court's statement that, "'by refusing payment on grounds that [Feldman's] was not properly licensed, CareFirst accepted the risk that

its position was inaccurate.'"  Pl.'s Mem. at 1 (DE No. 158) (quoting Mem. Op. at 49 (DE No.

146).  But by that statement, the Court was merely explaining why interest should not be

calculated based on the date the OHCQ informed CareFirst that Feldman's did not need an RSA

license (as CareFirst had urged), but rather based on the date Feldman's submitted the claims.

*See* Mem. Op. at 49 (DE No. 146).  The Court was not issuing a ruling on the merits of

Feldman's Complaint.

The Court, in fact, explicitly rejected the central plank of Feldman's Complaint, finding

that Feldman's PPP Agreement for DME services *did not* cover Factor VIII.  *Id.* at 29.  The

Court instead described CareFirst's failure earlier to pay Feldman's claims as a function of

"bureaucratic miscommunication" and "legitimate confusion, on both sides."  *Id.* at 44.

Feldman's easily could have avoided this confusion if it had simply informed CareFirst in 2008

that it was merely drop shipping Factor VIII and not providing home infusion services, rather

than withholding that information and instead filing suit under a different (and ultimately

erroneous) legal theory.  If Feldman's receipt of payment from CareFirst can be construed as

"success," that success occurred in spite of this case, not because of it.

Because this lawsuit was not a "substantial or significant cause" of CareFirst's decision

to pay Feldman's claims, *Ohio River Valley Envtl. Coalition, Inc. v. Green Valley Coal Co.,* 511

F.3d 407, 415 (4th Cir. 2007), Feldman's has not achieved "some degree of success on the

merits," even under a catalyst theory.  *See Hardt*, 130 S. Ct. at 2158.

## III.  EVEN IF FELDMAN'S ACHIEVED SOME SUCCESS ON THE MERITS, ITS MOTION SHOULD BE DENIED BECAUSE THE FIVE *QUIESENBERRY* FACTORS DO NOT JUSTIFY AN AWARD OF ATTORNEYS' FEES

Even where a plaintiff achieves some success on the merits, an award of attorneys' fees

in ERISA cases is hardly automatic.  Rather, "ERISA places the determination of whether

attorneys' fees should be awarded in an ERISA action completely within the discretion of the

district court." *Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1028 (4th Cir. 1993). The Fourth

Circuit in *Quesinberry* outlined five factors "to guide the district court's exercise of discretion in

awarding attorneys' fees under ERISA." *Id.* at 1029. The five factors are:

> (1) degree of opposing parties' culpability or bad faith;
>
> (2) ability of opposing parties to satisfy an award of attorneys' fees;
>
> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
>
> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
>
> (5) the relative merits of the parties' positions.

*Id.*

In weighing these factors, a plaintiff is not entitled to a thumb on the scale. "In contrast

to the fee shifting rule prevalent in civil rights cases under 42 U.S.C. § 1988, there is no

presumption in an ERISA case that a successful plaintiff is entitled to attorneys' fees and

expenses." *Am. Med. Sec., Inc. v. Larsen*, 31 F. Supp. 2d 502, 505 (D. Md. 1998); *see also*

*Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 635 (4th Cir. 2010) (explaining that under 29

U.S.C. § 1132(g), "even a successful party such as Williams does not enjoy a presumption in

favor of an attorneys' fees award"). It is only the "unusual case in which the judge may shift

fees to further the policies of [ERISA]." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 422 (4th

Cir. 1993). This is not that case.

Feldman's argues that the five *Quesinberry* factors "clearly weight [sic] in favor of

awarding Plaintiff attorneys' fees." Pl.'s Mem. at 11 (DE No. 158). But for each factor,

Feldman's devotes all of one sentence -- with no discussion of the case law -- to explaining why

that particular factor tilts in its favors. *See id.* Feldman's then proceeds to string cite a litany of

cases where courts have awarded attorneys' fees in ERISA cases, but nowhere explains how any of those cases interpreted any of the five *Quesinberry* factors. *See id.* at 11-14.  With an individualized analysis of each of the five factors, as the Fourth Circuit demands, it becomes clear that not a single one weighs in Feldman's favor.

As to the first *Quesinberry* factor -- the degree of CareFirst's "culpability or bad faith" -- the Fourth Circuit has explained that "'[c]ulpability' and 'bad faith' require more than 'mere negligence or error.'"  *Carolina Care Plan, Inc. v. McKenzie*, 467 F.3d 383, 390 (4th Cir. 2006). In its October 24, 2011 Memorandum Opinion (DE No. 146), the Court expressly found that CareFirst did not act in bad faith or with any untoward purpose.  Rather, as the Court explained, "[t]here is arguably a picture of bureaucratic miscommunication, but not of venality."  Mem. Op. at 44 (DE No. 146).  The Court similarly described the evidence as "paint[ing] a picture of *legitimate confusion*, on both sides."  *Id.* (emphasis added).  While CareFirst believes the evidence indicates that it was Feldman's, not CareFirst, that is culpable for any miscommunication that transpired, *see supra* Section II(B), it ultimately matters little.  If "'[c]ulpability' and 'bad faith' require more than 'mere negligence or error,'" *Carolina Care Plan, Inc.,* 467 F.3d at 390, they certainly require more than "bureaucratic miscommunication" and "legitimate confusion," Mem. Op. at 44 (DE No. 146), no matter which party is more blameworthy for it.  As a result, the first factor weighs in favor of CareFirst.  *See Larsen*, 31 F. Supp. 2d at 505-06 (finding that the first *Quesinberry* factor "favors the defendant" because "the Court concludes that he did not act culpably or in bad faith").

Feldman's argues that the second *Quesinberry* factor also favors a fee award, since supposedly "CareFirst is the party with the best ability to satisfy a fee award."  Pl.'s Mem. at 11 (DE No. 158).  But the question posed by the second factor is not answered simply by assessing

the relative financial strength of the plaintiff and defendant.  Rather, "the Court must consider the ability of *both* parties to pay an award and not attempt merely to determine which party has the greatest resources."  *Larsen*, 31 F. Supp. 2d at 506; *see also Reinking v. Phila. Am. Life Ins. Co.*, 910 F.2d 1210, 1218 (4th Cir. 1990) (explaining that the district court should consider whether a fee award "would place a substantial hardship on the [plaintiffs]").  Thus, this Court in *Larsen* held that "[s]ince both sides . . . had the ability to satisfy an award of attorneys' fees, the second [*Quesinberry*] factor does not support plaintiffs' request for attorneys' fees."  *Larsen,* 31 F. Supp. 2d at 506.  Like the plaintiff in *Larsen*, Feldman's is not your typical ERISA plaintiff, such as an individual participant complaining of a wrongful denial of benefits.  It is instead a company with substantial resources, and one that is more than capable of paying its own attorneys' fees.  At best, then, the second *Quesinberry* factor favors neither party.

The third *Quesinberry* factor also does not favor Feldman's, since an award of attorneys' fees in this case would not "deter other persons acting under similar circumstances." *Quesinberry,* 987 F.2d at 1029.  "[T]he degree of bad faith by the party against whom fees would be awarded is 'closely related' to the effectiveness of the award as a deterrent."  *Scott v. PNC Bank Corp*., No. 09-cv-3239, 2011 U.S. Dist. LEXIS 88092, at *8 (D. Md. Aug. 9, 2011).  This is because "[h]onest mistakes are bound to happen from time to time, and fee awards are likely to have the greatest deterrent effect where deliberate misconduct is in the offing."  *Larsen*, 31 F. Supp. 2d at 506.  Because the Court has already found that the dispute at issue in this case emanated from "bureaucratic miscommunication" and "legitimate confusion" -- not "venality," *see* Mem. Op. at 44 (DE No. 146) -- an award of attorneys' fees would have no discernible deterrent effect on other insurers.  The third *Quesinberry* factor thus weighs in favor of CareFirst.  *See Linck v. Arrow Elecs., Inc*., No. 07-cv-3078, 2010 U.S. Dist. LEXIS 58258, at

*11 (D. Md. June 14, 2010) (finding that, because "there is no need to deter [the defendant's] conduct," it follows that "the third factor does not support granting attorneys' fees to [the plaintiff]").[2]

The fourth factor is not a close call.  Feldman's lawsuit clearly did not seek "to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself."  *Quesinberry,* 987 F.2d at 1029.  To the contrary, Feldman's brought suit only on its own behalf, and did not even itself invoke ERISA, let alone set out to resolve a significant ERISA question.  Indeed, Feldman's does not even attempt to argue that the fourth factor weighs in its favor.  *See* Pl.'s Mem. at 11 (DE No. 158) (discussing the other *Quesinberry* factors but omitting any discussion of the fourth factor).  As a result, the fourth *Quesinberry* factor also favors CareFirst.  *See Sedlack v. Braswell Servs. Group*, 134 F.3d 219, 227 (4th Cir. 1998) (affirming denial of attorneys' fee award because "the relief sought in this case was of a purely personal nature; [the plaintiff] did not seek to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA").

If the fifth and final *Quesinberry* factor -- "the relative merits of the parties' positions," *Quesinberry,* 987 F.2d at 1029 -- favors any party, it is CareFirst, not Feldman's.  In its Complaint, Feldman's argued that Factor VIII was covered by the terms of its PPP Agreement, and that CareFirst, by failing to pay claims for Factor VIII, was in breach of that agreement.

---

[2] It is also worth noting that CareFirst's insistence on proper licensing before payment of Feldman's claims is beneficial to CareFirst's members and the public.  Its members have an interest in providers dispensing drugs only with appropriate state licenses.  While CareFirst may have been incorrect that Feldman's needed a license, given that Feldman's had mis-conveyed the facts regarding its dispensing of Factor VIII, CareFirst's insistence that proper licensing occur prior to payment is laudable.  Under these circumstances, an award of fees to Feldman's would not deter misconduct, but chill legitimate efforts by CareFirst and other insurers to protect their members and the public via strict insistence on proper licensing by providers.

Compl. ¶¶ 28-33 (DE No. 2).  This Court, however, found that the PPP Agreement did not in fact

cover Factor VIII.  Mem. Op. at 29 (DE No. 146).  While CareFirst ultimately paid Feldman's as

a non-participating provider, it did so only after Feldman's completely changed its story by

informing CareFirst that it was not providing home infusion services.  Second de Gravelles Dec.

¶¶ 36, 40.  This decision to pay had nothing to do with the merits of Feldman's Complaint.  And

by denying Feldman's motion to remand and awarding Feldman's only a miniscule fraction of

the interest it had initially sought, this Court has also soundly repudiated the merits of Feldman's

positions on the two other substantive issues reached in this case.

Because none of the five *Quesinberry* factors weighs in Feldman's favor, this is not the

"unusual case in which the judge may shift fees to further the policies of [ERISA]." *Custer,* 12

F.3d at 422.

**IV.    IF THE COURT FINDS THAT FELDMAN'S FEE REQUEST IS NOT ALTOGETHER BARRED BY THE LOCAL RULES, AND IF THE COURT DETERMINES THAT FELDMAN'S OTHERWISE IS ENTITLED TO A FEE AWARD, IT SHOULD AT A MINIMUM ORDER FELDMAN'S TO RE-SUBMIT ITS MOTION IN ACCORDANCE WITH APPENDIX B**

Because Feldman's is not entitled to an award of attorneys' fees, the twelve pages it

spends attempting to justify its $1.2 million in fees (which it expended to obtain only slightly

more in claims payments) is irrelevant.  *See* Pl.'s Mem. at 15-27 (DE No. 158).  However,

insofar as this Court finds that the attorneys' fee request is not altogether barred for failure to

comply with the Local Rules, that Feldman's has achieved some success on the merits, and that

an award of attorneys' fees is justified under the five *Quesinberry* factors, CareFirst respectfully

requests that the Court order Feldman's to re-submit its attorney time records in the litigation-

phase format required by Appendix B to the Local Rules, so that CareFirst and the Court can

adequately assess the reasonableness of the fees for which Feldman's seeks payment.

It is particularly important in this case that Feldman's comply with Appendix B's litigation-phase requirement, since plainly some aspects of Feldman's prosecution of its case served no useful purpose, and there are discrepancies on the face of the records. For instance, much of the time-consuming discovery in this case was wasteful. CareFirst, in fact, repeatedly attempted to stay discovery so that the lone relevant issue in this case -- whether Feldman's needed an RSA license to perform the services in question -- could be resolved. *See* Second de Gravelles Dec. ¶¶ 28-31, 41-43, and Exhibits A and B thereto. Each time, Feldman's vehemently opposed any curbs on discovery, and even proceeded to take depositions *after* CareFirst had agreed to pay the claims. *Id.* ¶¶ 44-45.

Some of those depositions, moreover, evince less-than-efficient billing practices. Again by way of example, Feldman's attorney deposed Kandyce Cowart in Baton Rouge on December 13, 2010. Second de Gravelles Dec. ¶ 53. The deposition began at 8:54 AM and ended at 3:18 PM., which is slightly over six hours. *Id.* But for that day, Feldman's attorney recorded 11 hours related to the deposition. *Id.* Similarly, on March 18, 2011, CareFirst's in-house counsel deposed Feldman's expert in Washington, D.C. from 9:39 AM to 12:36 PM. *Id.* ¶ 54. Yet, Feldman's counsel recorded 10.5 hours of deposition-related work for the day, with no travel listed at all. *Id.* Moreover, at several depositions, Feldman's was represented by two attorneys, *see id.*, notwithstanding that Appendix B to the Local Rules provides that, short of extenuating circumstances, "[o]nly one lawyer for each separately represented party shall be compensated for attending depositions." Appendix B, § 2(b). Neither CareFirst nor the Court should be required to identify and sort out these and other inefficiencies and discrepancies by poring through the mass of documents that Feldman's haphazardly attached to its motion.

## Conclusion

For the foregoing reasons, the Court should deny Feldman's Motion for Attorneys' Fees and Costs.

Dated: December 30, 2011

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Anthony F. Shelley
Anthony F. Shelley (Bar No. 26345)
Miller & Chevalier Chartered
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 626-5924
Facsimile: (202) 626-5801
Email: ashelley@milchev.com

A. Dean Stocksdale (Bar No. 28416)
CareFirst BlueCross BlueShield
1501 S Clinton St. Suite 700 CT10 06
Baltimore, MD 21224
Telephone: (410) 581-3000
Facsimile: (410) 528-7956
Email: dean.stocksdale@carefirst.com

Patrick P. de Gravelles (Bar No. 29245)
CareFirst BlueCross BlueShield
840 First St NE, DC12-08
Washington, DC 20065
Telephone: (202) 680-7457
Facsimile: (202) 680-7620
Email: patrick.degravelles@carefirst.com

*Attorneys for CareFirst, Inc.*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2011, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:


Neal Cormac Baroody
Thomas O'Toole
Baroody and O'Toole
201 N Charles St Ste 2102
Baltimore, MD 21201
Tel: 410-539-8410 and 8412
Fax: 410-539-8411
Email: totoolelaw@aol.com
Email: nbaroody@aol.com

Anthony Paduano
Jordan D Becker
Paduano and Wientraub LLP
1251 Avenue of the Americas Ninth Fl
New York, NY 10020
Tel.:212-785-9100
Fax: 212-785-9099
Email: ap@pwlawyers.com
Email: jdb@pwlawyers.com


                                        /s/ Anthony F. Shelley
                                        Anthony F. Shelley