IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FELDMAN'S MEDICAL CENTER     *
PHARMACY, INC.
           Plaintiff       *

   v.                     *         CIVIL NO. SKG-10-254

CAREFIRST, INC.,          *

          Defendant.      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>MEMORANDUM OPINION AND ORDER</u>

This is an ERISA case. Pursuant to an Amended Memorandum Opinion and Order dated **November 9, 2011**, the Court entered judgment in this case on **December 5, 2011**. Thereafter, plaintiff filed its Motion for Attorney's Fees and Costs. (ECF No. 158). Briefing is complete. No hearing is necessary. Local Rule 105.6. For the reasons set forth in this opinion, the Court DENIES the motion.

## I. History of the Dispute and Factual Record[1]

Feldman's Medical Center Pharmacy, Inc. ("FMCP" or "Feldman's") is a Maryland specialty pharmacy and during the relevant time period dispensed drugs used to treat hemophilia,

---

[1] The Court has reviewed the factual record in this case, presented in the briefing on all the parties' motions and other pleadings and in the briefing on the instant motion. The Court sets forth the essential facts of the case. This extensive recitation is necessitated by the findings the Court must make under the governing law, principally <u>Hardt</u> and <u>Quesinberry</u>. The facts are largely undisputed; where disputed, the Court has identified them and either determined that they are not material or has recited them in the light most favorable to moving party.

von Willebrand disease, hepatitis, and HIV.  (ECF No. 2, ¶ 1).
The claims at issue here were for provision of factor drugs to
patients with hemophilia – CareFirst's insureds.  CareFirst is a
Maryland health insurer and independent licensee of the Blue
Cross Blue Shield Association.  (Id., ¶ 2).

FMCP submitted claims to, and was reimbursed by, CareFirst
and its predecessors, starting from FMCP's inception in the mid-
1980s, for certain durable medical equipment and prescription
drugs.  (SUMF, ECF No. 100-2, ¶ 52; Bostwick Decl., ECF No. 104,
¶ 33).  Beginning in the 1990s, FMCP submitted certain
prescription drug claims through CareFirst's "EPIC" contract.
(White Decl., ECF No. 120-5, ¶ 4) (EPIC was a consortium of
pharmacies to which FMCP was a party that joined together to
obtain certain efficiencies).  Thereafter, under a subscriber
agreement dated **August 12, 1997** (the "Participating Professional
Provider Agreement" or "PPP Agreement"), FMCP became a
"participating" or "par" provider in CareFirst's network and
secured its entitlement to direct payment for insurance claims
submitted for "covered services."  (ECF No. 2, Ex. A); see also
(Becker Decl., ECF No. 46-2, ¶ 5).  Factor Health Management
("FHM"), a Florida company, purchased FMCP from its founder in
**October 2007**.  (Bostwick Decl., ECF No. 104, ¶ 20).  After FMCP
was purchased by FHM, it continued to dispense prescription
drugs and DME, but also began to distribute "factor drugs" to

patients with hemophilia. (White Decl., ECF No. 120-5). FMCP reports that the medication dispensed to patients in connection with the claims at issue in this case consisted of self-injectable synthetic recombinant clotting factor replacement medication, of which Advate is an example. (ECF No. 100-2, ¶ 140, Bostwick Decl., ECF No. 104, ¶ 87). FMCP asserts that it submitted claims to CareFirst directly for services that were not covered by the EPIC contract and that CareFirst paid FMCP directly for these claims pursuant to the PPP Agreement, or if there was no applicable contract, FMCP was paid as a non-participating provider at reimbursement rates set by CareFirst. (White Decl., ECF No. 120-5, ¶ 4). There is no dispute that CareFirst had paid FMCP for claims for factor drugs (ECF No. 104, ¶ 56) but CareFirst states that payment was inadvertent as a result of automated processing. See (Hanson Decl., ECF No. 116, ¶¶ 27-31).

In **2007**, the Special Investigations Unit ("SIU") of CareFirst began an investigation of FMCP's parent company, based on a fraud alert. (ECF No. 104-4, 9). Hanson, of SIU, asked that FMCP's claims be pended to allow SIU review. During this investigation, it was discovered that FMCP lacked proper licensure. (ECF No. 67, 4; ECF No. 104, Ex. 17, 3).

Accordingly, and in **early 2008**, CareFirst initiated the re-credentialing process of FMCP as a par provider. In that

3

process, CareFirst requested that FMCP provide a copy of its Residential Services Agency ("RSA") license, (ECF No. 12, 20), which had been identified as a requisite for FMCP's participation.  There was an email exchange between CareFirst and FMCP and internal email exchanges within FMCP on the RSA license requirement in the **spring of 2008** with FMCP questioning – both internally, (ECF No. 121, 19), and with CareFirst – whether an RSA was required.  (ECF No. 120-3, ¶ 8).  On **April 30, 2008**, Janet Gardner, Senior Vice President of Clinical Operations for FMCP's parent, "spoke with Isabella Thornton at CareFirst and explained to her that Feldman's did not need an RSA because it did not provide home care to patients." (Gardner Decl., ECF No. 120-3, ¶ 8).  In his Declaration (ECF No. 163, ¶ 14), Patrick de Gravelles, in-house lawyer for CareFirst on this matter, stated that "[t]here is no record . . . that either the Plaintiff or Plaintiff's counsel prior to filing suit ever claimed that Plaintiff did not need an RSA."  For purposes of this motion, the Court will assume that this Gardner-Thornton conversation occurred, as reported.  There is, however, as Mr. de Gravelles indicates, no "record" of the conversation or its content.  Moreover, Gardner's email of **April 30** to FMCP staff suggests that there was some difference of opinion within FMCP as to the need for a RSA license.  (ECF No. 121, 19).  ("[I]f we continue to pursue the RSA (as of yesterday, Willard thought

4

that we should.")) While Gardner of FMCP states in her declaration that she told Thornton of CareFirst on **April 30, 2008** that FMCP did not need an RSA, she shortly thereafter instructed Adams of her staff to direct a letter of inquiry to OHCQ on this exact question. Moreover, Ms. Adams of FMCP stated that at the time FMCP was not certain whether it needed an RSA. (ECF No. 121, 29). Janet Gardner was trying to figure out "whether we needed it" [an RSA]. (ECF No. 121, 33).

On **May 12, 2008**, Amy Adams of FMCP sent a letter to Barbara Fagan of the Office of Health Care Quality ("OHCQ") of the Maryland Department of Health and Mental Hygiene ("DHMH") asking whether it was necessary for FMCP, as a retail pharmacy which occasionally delivers durable medical equipment and supplies to patients, sometimes brings the items into the home and explains how to use the items, needs an RSA. (ECF No. 121, 46). The written state response, if there was one, is not in the factual record. Ms. Adams could not remember a response. (ECF No. 121, 31). However, Ms. Adams understood that the State of Maryland required FMCP to have an RSA. (ECF No. 121, 45). Fagan testified that an RSA would be necessary in these circumstances. (ECF No. 190-2, 4-10).

On **May 23, 2008**, another division of the State DHMH – Office of Health Services asked FMCP for its RSA, believing it was delivering DME and oxygen services to Medicaid beneficiaries

in their residences, thus necessitating an RSA.  (ECF No. 121, 49).   FMCP responded on **June 13** that while it did not provide such services in the residences, it was  "currently working on obtaining our RSA license." (ECF No. 121, 47).[2] **On June 10, 2008**, Chavarria of CareFirst emailed Gardner of FMCP that its credentialing documents were incomplete because, inter alia, no RSA was included.  (ECF No. 121, 24).  On **June 18, 2008**, Gardner responded that FMPC was in the "process of submitting RSA application and completing RSA requirements," noting that "initially, the requirement for licensure was unclear as Feldman's Medical Center is a retail pharmacy." (ECF No. 121, 23).

On **July 22, 2008**, Gardner sent to CareFirst the "letter previously sent to State regarding our inquiry as to whether or not RSA applies to us" and assured CareFirst that the RSA application will be submitted by **July 31, 2008** (ECF No. 121, 25).[3]  On **July 30, 2008**, FMCP applied to OHCQ for an RSA license. (ECF No. 190-1, 2)[4](ECF No. 121, 47).

---

[2] There is no indication that this FMCP communication disavowing provision of services was sent to or received in residences by CareFirst.

[3] The actual letter is not in the record, as far as the Court can determine.

[4] White Fagan did not review FMCP's application for an RSA license at the time of its submission, Fagan testified based on her review of the submission at her deposition that it appeared that FMCP was going to go into patients' homes (ECF No. 190-2, 9) and that again based on FMCP's submissions to OCHQ that FMCP needed an RSA.  Id. at 10).  Fagan also testified that if it were clear that FMCP was not going into patients' homes, no RSA would be

CareFirst informed FMCP on **August 22, 2008** that it could not reimburse claims for factor drugs because – according to CareFirst – FMCP did not have the correct type of contract with CareFirst. (ECF No. 100-2, ¶ 120; Bostwick Decl., ECF No. 104, ¶ 55 and Ex. 27). CareFirst informed FMCP that it needed a Home Infusion Therapy ("HIT") contract in order to dispense factor drugs as a CareFirst participating professional provider and that FMCP only had a Durable Medical Equipment ("DME") contract. (ECF No. 100-2, ¶ 120; Bostwick Decl., ECF No. 104, ¶ 55). CareFirst advised FMCP that it needed to obtain a Residential Services Agency ("RSA") license to qualify for the HIT contract. (ECF No. 100-2, ¶ 124; Gardner Decl., ECF No. 12-3, ¶¶ 8 & 9; ECF No. 17, ¶ 6). (It had already been determined by the OCHQ that FMCP needed an RSA license for its delivery set-up and explanation regarding durable medical equipment and supplies, and as of this time, FMCP had already applied to OCHQ for an RSA license). Sometime in the **summer of 2008**, FMCP submitted an application to become a Home Infusion Therapy ("HIT") provider (ECF No. 117-1, 25), and in that process, Judy Gilmore of

---

necessary. Additionally, in filling out the form application FMCP indicated that the home care services to be provided was "infusion therapy," (ECF No. 190-1, 5) and further identified itself as an "infusion company." (ECF No. 190-1, 9). Appended to the application was FMCP's "Assessment/Reassessment of Patients" policy which stated that "[t]he Pharmacist will conduct an initial assessment of all patients to determine their pharmaceutical needs, and if required, the type of care and/or services to be provided" and that that assessment "preferably . . . take place in person at the patient's home . . ." (ECF No. 190-1, 20).

CareFirst asked in an email to Joel Yerton of FMCP whether "you have been providing home infusion therapy services for CareFirst members based on your existing DME contract.  Please provide clarification on this point."  (Id.).

On **August 21, 2008**, FMCP's application was denied by the credentialing division "due to improper licensure."  (ECF No. 117-1, 24).  The next day, **August 22**, Joel Yerton emailed Judy Gilmore that "I think we may have gotten confused on IV vs Med Specialty.  FMCP pharmacy is not a traditional Home Infusion Company.  They are more aligned with your Medical Specialty Agency."  (ECF No. 117-1, 13).  Gilmore responded that "[i]t does make more sense . . . I'll research for you."  (ECF No. 104, Ex. 27, 1-2).  However, that same day, Onorato, Gilmore's superior in CareFirst Credentialing, affirmed that denial of the FMCP's application – "These drugs were being billed under the DME agreement and therefore were rejecting.  The only way that Factor VIII drugs are covered is under our Home Infusion Therapy Agreements." [for which FMCP needed an RSA license.] "Contracting as a Medical Specialty Pharmacy will not make a difference with this issue."  (ECF No. 117-1, 5).

On **December 16, 2008**, FMCP notified CareFirst that it had received an RSA license as of **December 11, 2008**.  (ECF No. 117, Ex. A).  CareFirst promptly responded with form application and list of credentialing  requirements (in addition to an RSA

license) for a HIT contract stating that:  "Factor VIII is covered under the Home Infusion Therapy Agreement only."  (ECF No. 117-1, 9-10).  On **January 9, 2009**, FCMP submitted its application for a HIT agreement, noting its provision of "injectables." (ECF No. 104, Bostwick Decl. ¶ 63 and Ex. 29).  FMCP states that it "only applied to become a HIT provider for CareFirst because CareFirst advised Feldman's that it would only receive reimbursement for factor as HIT participating provider." (ECF No. 104, Bostwick Decl. ¶ 62 and Ex. 27).  Apparently during the **January — April, 2009** time period[5], while the credentialing process was underway, an issue arose as to whether FMCP would be reimbursed for factor supplied when FMCP lacked an RSA license.  (ECF No. 117-1, 3-4).

On **May 4, 2009**, FMCP sent a letter to CareFirst demanding $1,588.127.77 in unpaid claims under the PPP agreement of **August 12, 1997**.  (ECF No. 5-4).  On **May 15, 2009**, CareFirst responded, rejecting the demand on several bases, including but not limited to the fact that any service FMCP provided prior to its **December 11, 2008** receipt of its RSA license were not "covered services" and that FMCP was only a credentialed provider of DME and has

---

[5] On April 2, 2009, Hanson of the CareFirst, Special Investigations Unit ("SIU") emailed Chavarria, CareFirst, Contracting, reporting that "Feldman's was telling me that State of Maryland doesn't require them to have an RSA to provide infusion therapy meds to patients.  Are you familiar with these regulations?  I've gotten different information from The Pharmacy Board than the SI unit Capital BC."  (ECF No. 104, Ex. 30).  Chavarria responded that FMCF was already approved as an RSA by OCHQ.  [ECF No. 104, Ex. 30, 1)

not met all credentialing criteria for HIT.  Accordingly, all

post **December 11, 2008** claims would be on a non-participating

provider basis.  (ECF No. 157-1, Ex. C).  Finally, CareFirst

referred FMCP to the appeal process for denied claims under its

PPP agreement.[6]  (Id.).

On **June 1, 2009**, FMCP filed a complaint in state court,

alleging that CareFirst had failed to correctly and timely pay

$1,588,127.77 in legitimate claims for reimbursement submitted

by FMCP for provision of factor to CareFirst's insureds.  (ECF

No. 2, ¶ 9).  In Counts I and II (breach of contract and unjust

enrichment), FMCP pled alternative theories of recovery:  breach

of contract and unjust enrichment because "[FMCP] properly

provided Covered Services to patients pursuant to the PPP

Agreement and is entitled to be paid thereunder," (ECF No. 2, ¶¶

29, 35), or, "[a]lternative[ly], [FMCP] is entitled to be

reimbursed as an out-of-network provider for the Covered

Services it provided to CareFirst's insureds."  (Id.).  The

complaint focuses on the PPP, under which FMCP became an "in-

network" or "participating" provider for covered services

provided to CareFirst Members, see (Id., ¶¶ 8-9, 13-16), but did

not state the basis of FMCP's alternative claim that it is

entitled to reimbursement as an "out-of-network provider."

---

[6] There is no evidence that FMCP ever appealed.  Neither party made reference
to any legal significance of this failure in its briefing.

(Id., ¶¶ 29, 35).[7]  FMCP sought payment of $1,588.127.77 in

claims, unspecified consequential and punitive damages and

interest under Section 15-1005 of the Insurance Article of

Maryland Annotated Code.  Concurrent with the filing of the

complaint, FMCP filed a motion for a preliminary injunction,

request to schedule a hearing for a preliminary injunction and

an order permitting expedited discovery, (ECF No. 5), asking,

inter alia,  for immediate payment of the $1,588.127.77 in

claims plus interest.  (ECF No. 5-1).  In its response,

CareFirst clearly stated its position on the merits of FMCP's

contract argument and further identified the lack of RSA

licensure as a bar to payment:  "Plaintiff attempted to supply

Factor VIII to insureds under a DME contract with CareFirst and

that DME contract did not cover dispensing Factor VIII.

Moreover, for many months Plaintiff shipped Factor VIII to

patients' homes in violation of Maryland law because Plaintiff

was not a licensed RSA."  (ECF No. 7, 6).

      In **early June 2009,** there was an exchange between CareFirst

and Barbara Fagan of OHCQ, apparently initiated by CareFirst

about "what an RSA with service of 'infusion therapy' allowed

---

[7]On **September 11, 2009**, in the state litigation, FMCP responded to an
interrogatory about agreements with CareFirst that FMCP relied on in
asserting its claims.  (ECF No. 53-4).  The response stated that "[FMCP] is
entitled to provide factor to . . . patients as an out-of-network provider to
the extent any such patient's health benefits provide for such coverage."
(Id.).

the provider to do and . . . if a RSA was required to ship

Factor VIII". (ECF No. 104-18, 54). Fagan's answer, as

reported, was to "refer . . . [CareFirst] to COMAR regulation

10.07.05.04 (IV) and 10.07.05.05 (VENT) both of these components

are covered under the service "infusion therapy."[8] The RSA

license with service 'infusion therapy' does not monitor what is

infused by the provider." (Id.). At the same time there was a

reported  exchange with Anna Jeffers of the Maryland Pharmacy

Board who "informs that a Pharmacy license . . . licenses the

provider to sell individuals and compound drugs.  They do not

monitor was [sic] mixed  CDS, DEA and Pharmacy License is the

full license set for a Maryland Pharmacy," (Id.).  It was

further reported that neither Fagan nor Jeffers was familiar

with Factor VIII.  (Id.).[9]

---

[8] It is not entirely clear from the email whether it was Fagan's opinion that these "components" were covered under the referenced regulations and therefore fell within RSA licensure or whether it was CareFirst's interpretation of the referenced regulations that the components of FMCP required RSA licensure.

[9] In his reply declaration, Paduano states that "[b]y letter dated August 23, 2010 the Board of Pharmacy confirmed its previous verbal communication that Feldman's did not need an RSA license," only the August 23, 2010 written opinion citing (ECF No. 37, Ex. 37).  Nowhere in the record did the Court locate any evidence of any verbal opinion of the Board of Pharmacy to this effect.  This email does relate a CareFirst – Board of Pharmacy conversation but no reasonable reading of this email would indicate that it was a no RSA license determination for infusion therapy services.  This fairly read is detailing the activities that a pharmacy license authorizes not that there might be other regulatory provisions governing other services.

On or about **October 1, 2009**, CareFirst received records

from FMCP necessary to process post **December 11, 2008** claims.[10]

On **November 25, 2009**, CareFirst filed a Third-Party

Complaint and Counter-Complaint for Interpleader, naming FMCP

patients "John Does 1 and 2" ("the Does") as third-party

defendants.  (ECF No. 17).  The Interpleader Complaint alleged

that FMCP was a "non-participating provider" of factor because

the PPP did not cover that treatment – it covered only "durable

medical equipment" – not factor products.  (ECF No. 17, ¶¶ 8-

11).  Because FMCP was a "non-participating provider," any

CareFirst member who obtained factor from FMCP was required to

submit a claim to CareFirst, which would reimburse the member —

not FMCP.  (Id., ¶ 14).  FMCP could then seek payment from the

member.  (Id.).  CareFirst alleged that the Does were members

who had obtained factor from FMCP, and asserted that the

interpleader was necessary because FMCP and the Does had

potentially adverse claims.  CareFirst maintained that if the

court found that FMCP was a participating provider of factor,

---

[10] CareFirst alleged that it had sought "on several occasions" records from FMCP necessary to process post **December 11, 2008** claims, but only received them on or about **October 1, 2009** (Id., ¶¶ 24-26).  There is a **July 22, 2009** inquiry from Hanson of CareFirst to FMCP asking for specific information as to specific patients and dates of service.  (ECF No. 116, Ex. A, 3).  There is no response in the record.  In its Answer, FMCP admitted to giving CareFirst records in support of its post **December 11, 2008** claims on or about **October 1, 2009**, but denied it was the first time it provided the requested records.  (ECF No. 21, ¶ 26).

CareFirst would have to reimburse FMCP; if FMCP was a non-participating provider, CareFirst would have to reimburse the Does.  (Id., ¶¶ 36-37).

On **January 4, 2010** FMCP moved for summary judgment on the FMCP's Third-Party Complaint and opposed the interpleader.  (ECF No. 46-7).  FMCP argued that the interpleader was inappropriate because FMCP's claims were not adverse to the Does' claims.  As FMCP explained:  "Whether or not [FMCP] is a 'Participating Provider' or a 'Non-Participating Provider' — one of the critical issues in the underlying suit — makes no difference in determining whether there are any adverse claims.  If [FMCP] is a participating provider, then even CareFirst acknowledges that [it] would be obligated to pay [FMCP] for factor . . . . If [FMCP] is a non-participating provider, then the Service Agreement/Assignment of Benefits and the affidavits of John DOES 1 and 2 conclusively prove that FMCP is the party entitled to receive payment from CareFirst."  (Id., 7-8) (internal citation and quotation marks omitted).  FMCP attached to its motion the Service Agreements/Assignments of Benefits (the "Assignments") from the Does.  (Id., Ex. A).[11]  These Assignments stated that "[u]nder no circumstances" was the insured to retain any payment from his insurer for FMCP products and authorized FMCP "to bill

---

[11] Patrick de Gravelles stated that this was the first time that CareFirst was informed of the assignments.  (ECF No. 163, § 25).  There is nothing in the record to indicate earlier CareFirst knowledge.

for services and receive payment directly from [the patient's]
private health Insurance." (Id.).  FMCP opposed the
interpleader action and thus the deposit of some of disputed
claim monies in the court's registry.[12]

On **February 1, 2010**, CareFirst removed the case to this
Court.  (ECF No. 1).  CareFirst's Notice of Removal alleged that
at least some of FMCP's state law claims are "completely
preempted" by § 502 of ERISA.  (Id. at ¶ 13).  On **March 3, 2010**,
FMCP moved to remand, arguing, inter alia, that "[a]ssignments
are not relevant to this litigation, because Plaintiff sued
Defendant for breach of contract."  (ECF No. 46).

On **April 14, 2010**, CareFirst inquired in writing to Barbara
Fagan of OHCQ "whether or not a retail pharmacy that is licensed
in the State of Maryland also requires a Residential Service
Agency License to operate as a Home Infusion Therapy agency in
Maryland?"  (ECF No. 65-10, Ex. 10).  Ms. Fagan responded
referring, inter alia, to the regulatory definition of
"Residential Service Agency," and responded that "if a company
that providers [sic] Home Infusion Therapy to a patient in their
home including delivery, setup and maintenance, that company is
required to be licensed as a Residential Service Agency by the
Office of Health Care Quality."  (ECF No. 65-10, 2).

---

[12] de Gravelles' memo to Schweber of FMCP's law firm that [CareFirst]
attempting to pay post **December 11, 2008** claims into court registry."  (ECF
No. 63, Ex. A).

On **April 19, 2010**, de Gravelles of CareFirst gave the Fagan opinion letter to counsel for FMCP, who denied that the opinion was determinative.  (ECF No. 163, ¶ 34).  Thereafter, (it is unclear if before or after Fagan's deposition), de Gravelles stated that he learned from subsequent conversations with FMCP counsel that "the reason Feldman's counsel was contending that the opinion was not determinative was because in fact Feldman's was not providing home infusion therapy, but only drop shipping Factor VIII at patients' homes by way of common carrier."  (ECF No. 163, ¶ 36).

On **June 18, 2010,** the deposition of Fagan was taken where she clearly expressed her view on RSA licensure requirement for an agency providing durable medical equipment or drugs if that agency entered the patient's home to provide services related to that equipment or drugs.  (ECF No. 190-2, 4-10).  It was not necessary for the agency to actually infuse a drug such as factor to require an RSA.  (Id. at 5.)

On **June 23, 2010**, CareFirst in a letter to the Court, in resisting what it considered excessive and unnecessary discovery demands, stated that "the only critical issue to be resolved in this case is whether Feldman's needed an RSA to operate the way it did with regard to factor products."  (ECF No. 52, 1).[13]

---

[13] On July 26, 2010 in a submission to the discovery judge in the case, CareFirst reiterated its position that the determination of the RSA license

On **June 29, 2010**, this Court (Judge Quarles) denied FMCP's motion for remand on the ground that "one of FMCP's claims was completely preempted by § 502(a) of ERISA, thus providing federal question jurisdiction," (ECF No. 53, 1), and denied FMCP's motion for injunctive relief.  (ECF No. 55).

On **July 1**, CareFirst emailed an inquiry to the Maryland Board of Pharmacy regarding the requirements for a pharmacy that drop-ships Factor VIII and never enters the patient's home.  In posing this inquiry, CareFirst notes that if no RSA required, there will be no one to "conduct on-going evaluations of patient safety."  (ECF No. 104, Ex. 36).

After an **August 8** public hearing on the inquiry, the Maryland Board of Pharmacy issued a letter opinion, concluding that if a pharmacy "only shipped the factor products and supplies to patients' homes via common carrier and there was no other healthcare provider who had an RSA overseeing the home-based therapy," . . . the pharmacy was acting in accordance with its full service license prior to receiving an RSA."  (ECF No. 104, Ex. 37).[14]  The Board added that "the pharmacy is not obligated to train the patient."  (Id.).

---

was key and laid out its argument under the governing status and regulations why it thought an RSA license was required.  (ECF No. 67, 2-3).

[14] The letter opinion is less clear as to whether a pharmacy was authorized under its license to provide support for the home based therapy; however, this would in any event appear to be an OHCQ question regarding additional licensure requirements.

On **August 20, 2010**, CareFirst submitted a letter to the Court reporting that it had received an "opinion" from the Maryland Board of Pharmacy regarding the RSA licensing issue. (ECF No. 74).  CareFirst stated that, on the basis of the Pharmacy Board's opinion, it was "now ready to pay the claims at issue." (Id.).  These claims were paid to FMCP between **September 17, 2010** and **December 24, 2010,** totaling $1,547.054.87 (ECF No. 145).  On **January 6, 2011**, CareFirst paid FMCP $23,017 in interest.

On **March 4, 2011**, FMCP moved for summary judgment, seeking as relief: (i) judgment on Counts I through III for non-payment of invoices in the amount of $109,989.32; (ii) interest on the unpaid contributions in the amount of $886,483.93; (iii) attorneys' fees and costs; and (iv) such other and further relief as the Court deems just and proper.  (ECF No. 100, 1-2). FMCP asserted alternative theories of recovery: Maryland contract law; § 502 of ERISA, 29 U.S.C. § 1132; and unjust enrichment.  (ECF No. 100-1).  FMCP asserted entitlement to prejudgment interest under Md. Code Ann., Insur. § 15-1005 (the "Maryland Prompt Pay Statute") or, alternatively, under ERISA, § 502.  (Id.).  CareFirst opposed FMCP's motion for summary judgment and moved for partial summary judgment with respect to FMCP's claims for non-payment of the invoices in the amount of $109,989.32 and any additional prejudgment interest.  (ECF No.

109).  During the pendency of the motions, FMCP essentially

withdrew its claims for $109,989 for three patients[15], leaving

FMCP's claim for prejudgment interest the only issue pending

before the Court.  (ECF No.  121, 2).  FMCP asserted entitlement

to prejudgment interest under Md. Code Ann., Insur. § 15-1005

(the "Maryland Prompt Pay Statute") or, alternatively, under

ERISA § 502.  (Id.).  The central issue was whether FMPC was a

"par provider" of factor drugs under its PPP agreement with

CareFirst.  (Id., 16).  If so, FMPC was entitled to pre-judgment

interest under the Maryland Prompt Pay Statute.  (Id.).  If not,

FMPC's entitlement to reimbursement derived from insurance

contracts between CareFirst and the insureds to whom FMPC

dispensed factor drugs, and was governed by ERISA.  (Id., 16-

17).

---

[15] CareFirst in its combined opposition and motion for partial summary judgment
disputed FMCP's claim for non-payment of invoices totaling $109,989.32, which
it referred to as claims pertaining to patients "A, B, and C," on the basis
that these three claims are for services rendered after the filing of the
Complaint on **June 1, 2009**.  (ECF No. 109, 1).  The parties subsequently
stipulated that "Plaintiff is not seeking any relief in this matter with
respect to the claims identified in Defendant's Motion for Partial Summary
Judgment relating to patients "A, B, and C."  (ECF No. 120-2).  Thus, the
Court did not address the claims pertaining to patients A, B, and C totaling
$109,989.32 or the issue of whether payment is due on the claims included in
the Complaint.  Similarly, the Court did not address FMCP's entitlement to
attorneys' fees and costs under ERISA, as FMCP has clarified that it "only
mentioned the attorneys' fees issue in its Motion to put the Court on notice
that it intends to seek attorneys' fees if it is successful in this case,"
but does not seek such relief at this time.  (ECF No. 120, 5 n.2).  After
judgment is entered, the Court indicated that it would consider and award
attorneys' fees under ERISA, as appropriate.

In **November 2011**, this Court granted FMPC's motion for summary judgment with respect to its claim for prejudgment interest under ERISA § 502 and denied FMPC's motion for summary judgment with respect to its claim for prejudgment interest under the Maryland Prompt Pay Statute.  (ECF No. 150, 3).  (The Court also rejected CareFirst's argument that no additional interest was due).  In so doing, the Court found that "FMPC is not, as a matter of law, a participating provider with respect to factor under the PPP Agreement." (ECF No. 150, 29). FMPC was, however, a "valid assignee with standing to assert the rights of Carefirst's insureds under their employer-sponsored health benefit plans for the factor as a covered service." (Id. at 35).  As a valid assignee under employer-sponsored health benefit plans, this Court held that Feldman's was entitled to prejudgment interest under ERISA §502 at the post judgment rate set forth in 28 U.S.C. 1961.  (ECF No. 150, 4).  The Court chose the 28 U.S.C. § 1961 post judgment rate as "adequately compensat[ing] FMCP for loss of the use of its funds . . ." and satisfying the "essential rationale for awarding prejudgment interest . . . to insure that an injured party is fully compensated for its loss." City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 195 (1995); (ECF No. 150, 42).

In choosing this interest rate, the Court rejected FMCP's view of the law that a higher interest rate could be imposed to

punish CareFirst for its alleged wrongful conduct in insisting
that an RSA license was necessary for FMCP to provide factor to
CareFirst's insureds.  Nonetheless, the Court noted that in its
view "[t]he evidence paints a picture of legitimate confusion
[about the need for an RSA license], on both sides and indeed on
the part of the agencies.  There is arguably a picture of
bureaucratic miscommunication, not venality . . . [T]here is no
clear basis in fact that CareFirst's position [on the RSA
license] was frivolous or ill-motivated, and even if so shown,
no basis in the law to impose a high interest rate to punish
CareFirst for its conduct."  (Id. at 44-45).

Now pending before the Court is FMCP's motion for
attorneys' fees and costs.  Obviously, the Court must now
examine the conduct of  the parties and the conduct of the
litigation under a different set of legal principles to
determine the appropriateness of the relief FMCP requests here –
an award of $1,181.939.47 in attorneys' fees and costs.

For the reasons set forth below, the Court declines to
award any attorneys' fees[16] or costs.[17]

---

[16] While the Court need not evaluate the actual fees incurred,  it is an
enormous number.  However, in review of the chronology of the dispute, it is
apparent that a considerable amount of the cost was self-inflicted, such as
its opposition to remand and extensive discovery.

[17] As ERISA dictates that costs be analyzed under the same standard as
attorney's fees, the Court also denies plaintiff's motion for costs.  29
U.S.C. § 1132(g)(1); 1 Lincoln Fin. Co. v. Metro. Life Ins. Co., 428 Fed.
Appx. 394, 395 (5th Cir. 2011).

## II. __Analysis__

A district court in an ERISA action has discretionary authority to "award reasonable attorneys' fees to either party" under 29 U.S.C. § 1132(g)(1)." Rinaldi v. CCX, Inc., 388 Fed. Appx. 290, 297 (4th Cir. 2010). The purpose of ERISA's fee shifting provision, like other fee shifting statutes, "is to encourage the bringing of meritorious . . . claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." Anderson v. AB Painting & Sandblasting, Inc., 578 F.3d 542, 545 (7th Cir. 2009)(internal quotation marks and citations omitted). A motion for attorney's fees under § 1132(g)(1) requires the court to perform a two-step analysis. Williams v. Metro. Life Ins. Co., 609 F.3d 622, 634-35 (4th Cir. 2010).

First, the Court must determine whether the moving party achieved "some degree of success on the merits," as required by Hardt v. Reliance Std. Life Ins. Co., 130 S.Ct. 2149, 176 L.Ed. 2d 998 (2010). Prior to the Supreme Court's decision in Hardt, the  rule in the Fourth Circuit was that only a "prevailing party" was eligible for an award of attorney's fees in an ERISA action. Williams, 609 F.3d at 634. Hardt held that ERISA § 1132(g)(1) does not require a party to prevail to qualify for fees, instead it adopted the lesser "some success on the merits" standard, taken from Ruckelshaus v. Sierra Club, 463 U.S. 680,

694 (1983)(interpreting fees provision of the Clean Air Act). _Hardt_, 130 S. Ct. at 2158.  _Hardt_ therefore broadened the scope of eligibility for attorney's fees under § 1132(g)(1).

Second, if the court finds that a party is eligible for fees under _Hardt_, under Fourth Circuit precedent the court must consider the five factors identified in _Quesinberry v. Life Ins. Co. of N. Am._, 987 F.2d 1017, 1029 (4th Cir. 1993) (en banc), that guide a court's determination of whether an award of fees is proper.  _Williams_, 609 F.3d at 634-635.

## A. **_Hardt_: Some Degree of Success on the Merits**

To meet the standard of "some degree of success on the merits," a party must demonstrate that it did not merely achieve "trivial success on the merits or a purely procedural victory." _Hardt_, 130 S.Ct. at 2158.  Instead, a fee claimant must have achieved enough that "the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue."  _Id._ (internal citations and quotations omitted).

Plaintiff argues that the _Hardt_ standard has been met here because "CareFirst paid 100% of the face value of the outstanding claims at issue as a result of the filing of this action." (ECF No. 158, 15).  "[W]here the lawsuit produces voluntary action by the defendant that affords plaintiff some or

all the relief it sought through judgment," FMCP argues, "the
Hardt standard has been met." (ECF No. 165, 12). Feldman's in
its complaint sought payment on more than 1.5 million dollars in
claims, and contends that it achieved this goal. (Id. at 11).
Because FMPC received "payment for all claims at issue solely
because it filed and prosecuted this lawsuit," it argues it has
achieved a victory "well beyond" some degree of success. (ECF
No. 158, 15).

    Defendant makes two arguments in response.  First,
CareFirst contends that FMPC has not meet the Hardt standard
because the Court's November, 2011 opinion 1) did not reach the
merits of the dispute and 2) was ultimately not decided in favor
of FMCP. (ECF No. 162, 7).  Second, CareFirst questions FMCP
reliance on the "catalyst theory" (which allows for attorney's
fees when a party obtains relief, through settlement or
otherwise, without an adjudication on the merits) in arguing
that it achieved some success on the merits.  The legal question
is whether the Hardt test of "some degree of success on the
merits" can be satisfied by relief achieved without a
"judicially sanctioned change in the legal relationship of the
parties" as required in Buckhannon Bd. & Care Home v. W. Va.
Dep't of Health & Human Res., 532 U.S. 598, 605 (2001).

    The Court will first consider defendant's argument as to
the inapplicability of catalyst theory in ERISA fee cases, and

then consider defendant's argument that the Court's adjudication of the parties' motions for summary judgment, resulting in the award to FMCP of some prejudgment interest constitutes a sufficient degree of success of the merits to satisfy Hardt.

### 1. The Catalyst Theory

Defendant correctly notes that the Fourth Circuit is yet to explicitly apply the "catalyst theory" in the ERISA context. (ECF No. 162, 9).  Further research has revealed no court of appeals decision in any circuit that has explicitly addressed this matter post-Hardt.  Indeed, this Court has only found one district court opinion that has explicitly discussed and applied the catalyst theory in an ERISA case.  Even there, the court notes that "it is not clear whether the catalyst theory even applies to § 1132(g)(1)," but assumes for its analysis that it does.  Kenseth v. Dean Health Plan, Inc., 784 F.Supp.2d 1081, 1095 (W.D. Wis. 2011). See also Franklin v. H.O. Wolding, Inc., Group Health & Welfare Plan, 2004 U.S. Dist. LEXIS 26592 (S.D. Ind. Dec. 8, 2004)(noting but not resolving the potential issue lurking here: whether the plaintiff may recover a fee award under 29 U.S.C. § 1132(g)(1) when her lawsuit acts as a catalyst in prompting the defendant to change its position and give her the relief she had sought).

While most district courts have not explicitly discussed the status of the catalyst theory in the ERISA context, several have implicitly embraced the theory by granting fees where there is no judicially sanctioned change in the parties' legal relationship as required under Buckhannon 532 U.S. 598. See Flores v. Life Ins. Co. of N. Am., 770 F.Supp.2d 768, 775-76 (D. Md. 2011) (finding some degree of success, despite no ruling on the merits, where litigation "was the catalyst for [defendant's] decision to award . . . [plaintiff] the very prayer for relief which she sought by her original complaint"), Hewel v. Long Term Disability Income Plan for Choices Eligible Emples. of Johnson & Johnson, 2010 U.S. Dist. LEXIS 67340 (D.N.J. July 7, 2010) (granting fees where plaintiff "[b]y bringing the Complaint and through subsequent correspondence" caused defendant to grant an administrative appeal where benefits were reinstated).  One Southern District of New York case cited by plaintiff goes further, holding that an ERISA plaintiff qualifies for fees if defendants grant complete relief on a claim, regardless of whether the merits of plaintiff's lawsuit were the cause of defendant's decision to grant relief.  Taaffe v. Life Ins. Co., 769 F.Supp.2d 530, 540 (S.D.N.Y. 2011).[18]

---

[18] While this Court may agree that the Catalyst Theory should be available to avoid abuse in certain circumstances, this is not one of them.  This is a somewhat unique situation.  While the Court can appreciate the Taaffe court's concern that "any insurer who settled an ERISA claim could avoid paying

Other courts have, however, declined to find some degree of success on the merits absent a positive, formal court ruling. In Reimann v. Prudential Ins. Co. of Am., 2010 U.S. Dist LEXIS 111375 (E.D. Wisc. Oct. 19, 2010), the court denied a fees claim where two days after the filing of the suit defendant changed course and paid the benefits in question. Because "this court was never even given the opportunity to make a finding that ERISA's procedure was violated," the court found the merits were never reached. Id. at *6.  Similarly, in Templin v. Independence Blue Cross, 2011 U.S. Dist. LEXIS 98482 (E.D. Pa. Aug. 19, 2011), the court denied a fees claim where defendants agreed to pay the benefits in question during an independent administrative review process.  Because the court "never made a judicial ruling that [plaintiffs] were qualified to receive benefits under the Plan," or a "substantive determination of the adequacy of the process provided by defendants," plaintiffs were denied fees. Id. at *21.  The court noted that "[i]f a party achieved success on the merits merely by obtaining the relief

---

attorneys' fees simply by citing a reason unrelated to the litigation why it allegedly had settled.  This approach would seem to open the door to abuse." Id.

  However, here as discussed in more detail elsewhere, the factual chronology demonstrates that CareFirst's proffered reason for its change of position on non payment of the claims – the lack of a requisite state license – was not "made up."  CareFirst consistently insisted on an RSA license and the record did not demonstrate that CareFirst knew that a predicate for the RSA license – entry into the home – was missing in FMCP's business model.

requested, then a party could achieve success on the merits on purely procedural grounds." Id. Finally, in Scarangella v. Group Health, Inc., 2012 U.S. Dist. LEXIS 92433 (S.D.N.Y. July 3, 2012), the court definitively stated that "the catalyst doctrine does not apply to attorneys' fee applications under ERISA."[19] (internal citations and quotations omitted).

There is some support, however, for the view that ERISA allows for a catalyst theory. While Buckhannon, 532 U.S. 598 (2001), barred use of the catalyst theory in "prevailing party" statutes, several cases including notably a Fourth Circuit decision, hold that the catalyst theory survived Buckhannon for environmental statutes allowing for fees "whenever appropriate." See Kenseth 784 F.Supp.2d at 1095, Ohio River Valley Envtl. Coalition, Inc. v. Green Valley Coal Co., 511 F.3d 407, 415 (4th Cir. 2007)(interpreting Surface Mining Control and Reclamation Act, finding Buckhannon does not apply to "whenever appropriate" provisions), Sierra Club v. EPA, 322 F.3d 718, 355 U.S. App. D.C. 258 (D.C. Cir. 2003) (interpreting Clean Air Act), Loggerhead

---

[19] Scarangella relies on Enright v. N.Y.City Dist. Council of Carpenters Welfare Fund, 2001 U.S. Dist. LEXIS 6681 (S.D.N.Y. May 21, 2001) for this proposition. Enright, however, precedes both Buckhannon and Hardt, and was written during the period when the catalyst theory was solely applied to prevailing party statutes. Accordingly, the Enright Court found that the catalyst theory was inapplicable to ERISA because it did not contain a prevailing party provision. Id. at *7-8 ("section 1132(g)(1) does not speak of a 'prevailing party,' it permits attorneys' fees to either party"). The landscape has changed significantly since Enright, however, and several courts have applied the catalyst doctrine to statutes that do not contain prevailing party language and which permit fees to either party. See infra.

Turtle v. County Council, 307 F.3d 1318, 1326 (11th Cir. 2002) (interpreting Endangered Species Act, finding that Buckhannon applies only to "prevailing party" statutes).  Like ERISA § 1132(g)(1) after Hardt, the "whenever appropriate" fee provisions of these statutes are governed by the Ruckelshaus "some degree of success on the merits" standard.  (Id.).   These cases together lend support to the broader position that "the catalyst theory . . . survives under fee-shifting statutes that do not contain a prevailing party requirement."  Matthew Bender, Court Awarded Attorney's Fees, §8.02.

Assuming that the catalyst theory is available, a secondary question is what framework, if any, should guide its application. CareFirst cites Ohio River, 511 F.3d at 415, a case arising under the Surface Mining Control and Reclamation Act (SMRCA), for the proposition that a party asserting the catalyst theory must meet three thresholds to obtain fees: (1) that defendant's actions provided a plaintiff with "some of the benefit sought" in the lawsuit; (2) that plaintiff's claims were not frivolous; and (3) that plaintiff's lawsuit was a substantial or significant cause of defendant's actions providing relief.  (ECF No. 162, 8-9).  Feldman's rejects the thresholds test, arguing that it is specific to fee claims under SMCRA and inapplicable to ERISA, but suggests no other framework under which to analyze its claim.  (ECF No. 165, 15).

There is considerable merit to CareFirst's argument that the _Ohio River_ factors are the appropriate framework for analyzing a catalyst fee claim under ERISA. Similar to ERISA, SMCRA gives courts discretionary authority to grant fees to either party.  42 U.S.C. § 7607(f).  Although SMCRA's "whenever appropriate" language does not exactly mirror 29 U.S.C. §1132(g)(1), the _Hardt_ Court found sufficient similarity in the fee provisions to hold that §1132(g)(1), like "whenever appropriate" statutes, is governed by the "some degree of success on the merits" _Ruckelshaus_ standard. _Hardt_, 130 S. Ct. at 2158.  As both ERISA and SMCRA allow for a discretionary approval of fees to either party, and both require an analysis of whether a party achieved "some  success on the merits," there is a strong basis for applying the three _Ohio River_ thresholds to catalyst theory claims under ERISA.[20]

Assuming the catalyst theory does apply, and the _Ohio River_ guidelines serve as the appropriate framework for analyzing a catalyst fee claim under ERISA, Feldman's has made a

---

[20] Indeed, there is a strong argument that the three thresholds test applies to all viable catalyst theory fee claims. The test originates from dicta in _Buckhannon_, where the four dissenting Justices articulated the test as the standard for analyzing a catalyst claim.  _Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res._, 532 U.S. 598, 627-628 (2001)(Ginsberg, R., dissenting).  The majority, while rejecting the catalyst theory for prevailing party statutes, expressed no doubt in "the ability of district courts to perform the nuanced 'three thresholds' test _required_ by the catalyst theory." _Id._ at 610 (emphasis added), _see also_  _Sierra Club v. EPA_, 322 F.3d 718, 727 (D.C. Cir. 2003).

respectable, but in this Court's view, not winning case that it achieved some success on the merits.  As to the first Ohio River element, in receiving $1,547,054.87 for unpaid claims, (ECF No. 150, 2), and approximately $35,000 in total prejudgment interest, Feldman's has undoubtedly received some of the benefit sought in its complaint. CareFirst does not argue otherwise. CareFirst also does not argue that FMPC's claims were frivolous. The parties differ, however, on the third element: a showing that the lawsuit was "a substantial or significant cause of [defendant's] actions providing relief."  Ohio River, 511 F.3d at 415.  Feldman's argument for meeting this threshold is its weakest.

In the Fourth Circuit, the causation element of the catalyst test has traditionally turned on "whether as a quite practical matter the outcome . . . is one to which the plaintiff fee claimant's efforts contributed in a significant way." Bonnes v. Long, 599 F.2d 1316, 1319 (4th Cir. 1979).[21]  The moving party bears the burden of establishing causation. Ohio River, 511 F.3d at 415.  In Nadeau v. Helgemoe, 581 F.2d 275,

---

[21] Bonnes was overruled by the Fourth Circuit in S-1 by & Through P-1 v. State Bd. of Educ., 21 F.3d 49, 51 (4th Cir. 1994), which held, as Buckhannon did seven years later, that the catalyst theory was not available under prevailing party statutes.  Bonnes is cited here only to demonstrate the workings of the catalyst theory in the Fourth Circuit prior to  S-1 by & Through and Buckhannon, as the Court deems this analysis informative to the present application of the theory. Nadeau, infra, is cited for a similar purpose.

280 (1st Cir. 1978), a frequently cited pre-Buckhannon catalyst
opinion, the court reasoned that the "key issue is the
provocative role of the plaintiff's lawsuit, not the motivations
of the defendant."[22]   Accordingly, it is irrelevant whether
defendant changed course to avoid the costs of further
litigation or because it saw the merits of plaintiff's claims,
so long as the lawsuit catalyzed the change. Id.

In determining the provocative role of the lawsuit, "the
strongest evidence of causation [is] an inference made from the
chronology of events." Matthew Bender, Court Awarded Attorney
Fees, § 9.02, see also S-1 by & Through P-1 v. State Bd. of
Educ., 6 F.3d 160, 172 (4th Cir. 1993)(Wilkinson, dissenting).
A simple showing that defendant changed behavior following the
filing of the lawsuit may not, however, suffice to establish
causation.  Ctr. for Biological Diversity v. Norton, 262 F.3d
1077, 1082 (10th Cir. 2001).  Defendant may still produce
evidence suggesting, for example, that the action that led to a
grant of relief was begun prior to the lawsuit, and was merely
completed after the filing of the suit.  Id.  Alternately,
defendant may show that evidence produced in an independent

---

[22] Nadeau also required a showing that defendant's actions were "required by
law." Nadeau, 581 F.2d at 275.  This requirement was generally taken to mean
only that the defendant did not respond gratuitously to a frivolous or
groundless complaint.  Matthew Bender, Court Awarded Attorney's Fees, §8.02.
CareFirst does not dispute that FMCP made this second showing.

administrative appeal was the catalyzing event, rather than the lawsuit.  See Zacharkiw v. Prudential Ins. Co. of Am., 2012 U.S. Dist. LEXIS 21242 (E.D. Pa. Feb. 21, 2012).  Generally, however, if "defendant had ample opportunity to remedy the plaintiff's grievances, but did so only after the suit was filed, causation was properly inferred."  Matthew Bender, Court Awarded Attorney's Fees, §8.02.

On the catalyzing effect of its lawsuit, FMCP argues that:

> it is undisputable that had Plaintiff not
> commenced this lawsuit, CareFirst would not have
> paid any of the more than $1.5 million in
> outstanding claims which formed the basis of this
> lawsuit.  It was only after the institution of
> this lawsuit and the ensuing thirty months of
> intense and difficult litigation that CareFirst
> paid 100% of the claims at issue, and $23,017.00
> interest.

(ECF No. 158, 1).

CareFirst vehemently denies that the lawsuit was "a substantial or significant cause" of CareFirst's decision to pay the claims.  "Rather," CareFirst asserts [it] paid the claims only because Feldman's – in the middle of the lawsuit – changed the story it had been consistently telling CareFirst prior to filing suit." (ECF No. 162, 9).  CareFirst further asserts that at no time prior to the spring of 2009 de Gravelles – Paduano discussion, did FMCP assert that it was not providing home infusion services.  CareFirst essentially argues that it did not have, in words of Bender any much less "ample opportunity to

remedy plaintiff's grievances" because FMCP did not clearly describe its business model – only drop shipping of factor by common carrier and did not protest much less explain why an RSA was unnecessary as a matter of law for provision of factor and, therefore, payment of its claims.

To support that point, CareFirst cites to record references consistent with FMCP's provision home infusion services.  (ECF No. 162, 1-13).  The Court agrees with CareFirst's analysis: FMCP's representations in its July 2008 application to OHCQ for an RSA are consistent with the provision of home infusion therapy services.  (de Gravelles Dec., ECF No. 115, Ex. H). Moreover, OHCQ in reviewing that RSA application of FMCP found FMCP qualified for an RSA.  (ECF No. 115, Ex. I to de Gravelles Dec. at ¶ 164).  Significantly, Fagan of OHCQ interpreted those same application materials as indicating that FMCP was going to be providing its services in the home.  (ECF No. 115, Ex. I).

While perhaps a small detail, CareFirst points out – and FMCP does not dispute – that FMCP historically submitted its claims for reimbursement on the HCFA 1500 form which is for filing claims for professional services rather than on the Universal Prescription Drug Claim Form, which is the sole instrument for filing claims for prescription drugs under state regulations (See ECF No. 110, 22).  This certainly suggests that

FMCP is providing more than just drugs, but is also providing related services.

In rejoinder to CareFirst's statement that: "[a]t no point prior to this lawsuit did Feldman's inform CareFirst that it was not, in fact, providing home infusion services in connection with Factor VIII," (ECF No. 162, 11), Paduano declares in his affidavit that "CareFirst was always on notice that CareFirst was wrong about Feldman's and its operations," and cites three pieces of evidence in support of CareFirst's knowledge.[23]  None of these three pieces of evidence in fact can fairly be said to have put CareFirst on such "notice."[24]  In the email exchange in **August 2008**, FMCP questions whether it shouldn't be considered a "medical specialty" agency as it is not "a traditional home infusion agency" but under CareFirst procedures for PPP eligibility a provider was required to have an HIT agreement

---

[23] The Court will ignore the Paduano statement itself as it appears without personal knowledge; it is merely a lawyerly conclusion he drew from the emails discussed thereafter.

[24] In earlier pleadings, FMCP had asserted as pivotal the April 30, 2008 Gardner conversation with Thornton, insisting that she told CareFirst that FMCP did not need an RSA.  However, FMCP does not explain why less than two weeks later Amy Adams of FMCP made a written inquiry to Fagan of OCHQ asking whether it was necessary for FMCP to have an RSA (ECF No. 121, 46).  At a minimum, this inquiry itself shows uncertainty on FMCP's part, as to its position on RSA licensure as to DME and possibly factor drugs (though there is no specific reference in this time frame to factor drugs).  Moreover, there is no dispute as to fact that Fagan's response was in the affirmative – that an RSA was necessary.  (ECF No. 121, 45).  It is disingenuous to the point of misleading for FMCP to argue that CareFirst knew or should have known (at least in 2008) that FMCP did not need an RSA when FMCP, on its own, describing its activities as it felt appropriate, sought and received an opinion from OHCQ that it needed an RSA!  (ECF No. 121, 45).

(not a medical specialty agreement) to be a par provider for factor drugs.  (See ECF No. 117-1, Ex. A, CFI 3195).

Moreover, this email exchange occurred during the negotiations on a further PPP agreement with FMCP to cover factor drugs.  It did not appear that Mr. Onotorio, CareFirst's credentialing expert, was focused at all on the state licensure requirements, to provide Factor or infusion therapy or indeed what, if any, services FMCP provided or whether FMCP entered in insureds' residences, but rather on CareFirst historic requirements for a PPP agreement for factor drugs.  Moreover, the context of the negotiations is important:  CareFirst's experience was that all its Factor VIII providers either had an RSA or where exempt due to status as a home health agency. (ECF No. 104, Ex. 6, 2).

A few other facts may make the confusion between the parties (and the government) more understandable.  As FMCP's expert noted:  "because hemophilia is so rare – I believe the latest numbers from the Centers for Disease Control indicate that approximately 22,000 patients suffer from hemophilia A and B in the United States with only about 13,700 of these patients requiring regular treatment – most doctors and hospitals do not really know anything about the disorder."  (ECF No. 8-1, A9).  Indeed, it was reported that neither Fagan at OCHQ nor Jeffers at the Maryland Pharmacy Board were knowledgeable about factor

drugs.  (ECF No. 104, Ex. 34).  Moreover, there was additional confusion because many use the term – injectable – and – infusible interchangeably, as Factor VIII goes into a vein. (ECF No. 115-6, Ex. F, 53-56).  Due to the need to infuse factor drugs, like Factor VIII, it had been CareFirst's policy that providers of factor drugs who wished to contract with CareFirst join CareFirst's Home Infusion Therapy ("HIT") network.  (ECF No. 117, ¶ 29).  Lastly, the terminology is, of course, confusing and misleading.  FMCP indicated that it provided "home infusion therapy" at different points in the record.  For example, in its Answers to CareFirst's Third Party Complaint, asserted that the PPP Agreement covers "home infusion therapies."  (ECF No. 18, 3 ¶16).

More significantly, FMCP did not explain how FMCP was an "[un]traditional Home Infusion company."  Possibly FMCP did not understand the consequences of a determination that it needed an RSA licensure to its entitlement to payment for factor supplied when it did <u>not</u> have an RSA license.  It too may have been concentrating simply on getting the RSA license to qualify for the HIT agreement.

FMCP does not dispute that it could only be paid for services and drugs if fully licensed as a matter of public

policy.[25]  Nor does FMCP dispute that it could only be paid

directly under a PPP agreement.  Finally, FMCP does not dispute

that it had no <u>entitlement</u> to a PPP agreement for any line of

business.  It should be understood that as long as FMCP was

properly licensed, it could provide factor drugs to CareFirst's

insureds; it needed a HIT agreement to qualify for the favorable

"participating professional provider" contract status.

Finally, it should be noted that as set forth in the

history, the OCHQ of the State DHMH <u>already</u> had concluded that

FMCP needed an RSA for its durable medical equipment ("DME") and

supplies business.[26]  It was with this background that FMCP

already needed an RSA license for its DME and supplies business

(known to FMCP and perhaps to CareFirst), that the parties began

an exploration of FMCP's qualification for a HIT contract, to

allow FMCP to receive payment directly from CareFirst as a

---

[25] When a statute requires licensing in order to protect the public from "being imposed upon by person not qualified to render a professional service," parties generally may not enforce contracts for services rendered while unlicensed.  <u>See</u>, <u>e.g.</u>, <u>Stalker Bros., Inc. v. Alcoa Concrete Masonry, Inc.</u>, 422 Md. 410, 416-17 (Md. 2011), <u>Harry Berenter, Inc. v. Berman</u>, 258 Md. 290, [265 A.2d 759](1970), <u>Donmar Maryland Corporation v. Kenneth Hawkesworth</u>, 46 Md. App. 575, 420 A.2d 295 (1980); <u>see also</u>, <u>RCDI Constr. V. Spaceplan/Architecture, Planning & Interiors, P.A.</u>, 148 F. Supp. 2d 607, 613 (W.D.N.C. 2001)("Contracts entered into by unlicensed . . . contractors, in violation of a statute passed for the protection of the public . . . are unenforceable.).

[26] FMCP had described to OCHQ that in its DME and supplies business it "occasionally delivers durable medical equipment and supplies to patients, sometimes brings them into the home and explains how to use items."  (ECF No. 121, 46 & 45; ECF No. 190-2, 4-10).

"participating professional provider" for factor drugs, as it did for DME under its 1997 contract.

The second piece of evidence on which CareFirst relies for CareFirst's knowledge, is Janet Chavarria's interpretation in her deposition of Mr. Yerton's comment in the above email that "based on what he's saying here, it's not a home infusion company." (ECF No.104, Ex. 6, 26). The relevance of Ms. Chavarria's interpretation of Mr. Yerton's statement is marginal at best to the point before the Court. While Ms. Chavarria was copied on the email at the time and was apparently part of the Institutional Contracting section of CareFirst, it was Mr. Onorato who was the credentialing specialist whose judgment was deferred to as determinative on this point. (ECF No. 117-1, Ex. A, CF 03193-94). Moreover, saying what a company is not, does not, of course, say what it is and what it does.

The last piece of FMCP's evidence – an email between Jaime Hanson of SI unit of CareFirst and Janet Chavarria of CareFirst, Institutional Credentialing simply recounts a comment (apparently from someone at FMCP) – "they are telling me that the state of Maryland doesn't require them to have an RSA to provide infusion therapy meds to patients." (ECF No. 104, Ex. 30). The email goes on to say that she has "gotten different info from the Pharmacy Board that the SI Unit @ Capital Blue Cross." Id. Chavarria responds that FMCP has already gotten an

RSA license, (id.) apparently in her mind mooting the issue, at least from a credentialing point of view.  This exchange was, of course, after FMCP had obtained an RSA (in December, 2008).

The Court agrees that until the spring of 2009, there is no evidence that CareFirst knew or indeed should have known that, FMCP did not provide any home infusion services and therefore did not need an RSA license to legally provide the factor drugs.

Moreover, a review of the factual record convinces the Court that neither side "drilled down" on the issues.  To some extent, it was like two ships passing in the night.  For example, while Joel Yeaton of FMC commented that "Feldman's is not a traditional Home Infusion Company . . . [but] is more aligned with your Medical Specialty Agency," he did not explain what he meant by "[non]traditional."  (ECF No. 104, Ex. 27). While CareFirst responded that the matter would be "researched" (id.), the next substantive CareFirst response is that "Contracting as a Medical Specialty Pharmacy will not make a difference . . ." (id.), and FMCP needed to be approved as "HIT provider."  (Id.).  While FMCP asserts in the Bostwick Declaration that "CareFirst always knew that Feldman's did not provide services in any patient's home . . . ," (Bostwick Decl. ECF No. 161, ¶ 59), and further that "on information and belief, CareFirst knew . . . [that Feldman's [did not need [  ] a residential services agency ("RSA") license to be eligible for a

HIT contract with CareFirst." (Id. at ¶ 57), the factual record does not support this conclusory argument.

Indeed, CareFirst asked a very clear question on **August 20, 2008** "Do I understand correctly that you have been providing home infusion therapy services for CareFirst members based on your existing DME contract?  Please provide clarification on this point."  (Ex. A to Declaration of Anuszewski, ECF No. 117, CF 20156).  The record does not reflect a full response to this question from FMCP.  However, on **August 22, 2008**, Mr. Yerton does reply that "Feldman's is not a traditional Home Infusion Company" (ECF No. 117-1, Dec. of Anuszewski, CF 103196) but does not explain how FMCP is different from a "traditional Home Infusion Company."

The Court agrees that CareFirst could have asked more questions, to fully understand the nature of FCMP's business. But it is equally true that FMCP could have provided CareFirst with a clear, complete explanation of its business model and its understanding of the legal requirements.  FMCP clearly did not.[27]

So, assuming that up to the filing of FMCP's lawsuit there was confusion about the nature of FMCP's business practice, FMCP argues that the filing of the lawsuit caused CareFirst to change its position and pay the claims – something that had not been

---

[27] For example, it could have brought to CareFirst's attention the point it argues now – that FMCP never billed for home care services – to show that it merely provided factor drugs, without any services.

achieved pre-suit.  However, and notably, FMCP's **June 2009**
lawsuit was not focused on CareFirst's allegedly wrongheaded
demand to FMCP to obtain an RSA license to legally provide
factor drugs and/or to receive a HIT agreement under CareFirst's
credentialing and contracting standards.  Rather, the complaint
alleged that FMCP was entitled to payment under its 1997 PPP
agreement (a theory independent of the RSA licensure issue),
which was controverted by CareFirst and rejected by the Court.

When FMCP was confronted with CareFirst's argument that
FMCP needed an RSA early in this litigation (July 1, 2009) in
CareFirst's opposition to FMCP's motion for preliminary
injunction (ECF No. 7, 3-4), FMCP did not controvert the
position as a matter of fact or law – it simply ignored it.  See
reply (ECF No. 8).

In sum, Feldman's has not provided the court with evidence
that the payment it did receive from CareFirst came,
"significantly or substantially," as a result of the Feldman's
suit.  The chronology actually demonstrates the contrary.  While
Feldman's ultimately did receive payment on its claims,
defendant argues that this "success" was due to the resolution
of long-standing mutual confusion regarding Feldman's business
practice in the provision of Factor VIII for its patients.
Plaintiff has provided the court with some evidence of the
confusion and miscommunication that pervaded the CareFirst-FMCP

relationship.  It has not produced, however, evidence
demonstrating that CareFirst—or indeed, either side—was fully
aware of the factual circumstances underlying the case or their
import until well into the litigation.

Once FMCP advised CareFirst in response to the 2010 OCHQ
opinion,  that it only drop shipped the factor, CareFirst acted
promptly to assess and then act on this critical change in its
understanding of the nature of FMCP's provision of factor drugs.
Fagan's deposition was promptly taken, which deposition
thoroughly explored her opinion (and that of her agency that an
RSA license was necessary) and the effect on that opinion if
only drop shipping was involved.  Then CareFirst sought an
opinion of the only other involved state regulatory agency – the
State Pharmacy Board, in light of this new understanding.  Very
shortly after receiving the Maryland Pharmacy Board opinion,
CareFirst advised the Court that it would pay the claims as the
legal impediment of inadequate licensing had been removed.

Thus, the facts and chronology favor CareFirst's position
that it was FMCP's belated revelation of the limited nature of
its business – only drop shipping - that triggered the payment
of claims – not the filing of a complaint over two years before
on a theory unrelated to the RSA licensure issue.  Belatedly
resolving at best mutual confusion over the basic facts of
FMCP's business model is not tantamount to triggering relief

through the filing of a lawsuit.  Accordingly, FMCP has not demonstrated the requisite success under the Hardt standard through a catalyst theory.

### 2. Some Degree of Success on the Merits Based on the Rulings of the Court

Because it is uncertain as to whether a plaintiff may rely on a catalyst theory under ERISA, and because a catalyst analysis does not establish that FMCP has met the Hardt standard, the Court will also consider whether this Court's decision on the cross motions for summary judgment, granting FMCP some  prejudgment interest, constitutes "some degree of success" on the merits  under Hardt.  Under the Court's analysis, it does not.

A threshold issue in this analysis is whether a prejudgment interest decision is "on the merits."  CareFirst suggests that it is not.  (ECF No. 162, 7).  In Osterneck v. Ernst & Whinney, 489 U.S. 169 (1989), however, the Supreme Court considered whether a motion for discretionary prejudgment interest is properly considered a Fed. R. Civ. P. 59(e) motion; the central issue was whether the motion involves "reconsideration of matters properly encompassed in a decision on the merits." Id. at 174.  The Court held that it did.  A decision examines matters encompassed in the merits, the Court held, when considering "whether prejudgment interest is necessary to

compensate the plaintiff fully for his injuries, the degree of personal wrongdoing on the part of the defendant . . . and other fundamental considerations of fairness." Id. at 176.

Similarly, in this Court's decision on prejudgment interest, the Court took into consideration "the need to fully compensate the wronged party for actual damages suffered," and "considerations of fairness and the relative equities of the award." (ECF No. 150, 38).  In deciding to grant prejudgment interest, the Court found that "interest is necessarily awarded in this case both to fully compensate the FMCP for loss of use of funds wrongly withheld and to prevent Carefirst from unfairly benefitting by its delay in payment." (ECF No. 150, 39).  This Court did not discuss, much less rule on the state law question of RSA licensure.  After receipt of the Pharmacy Board letter opinion (and learning that FMCP only drop-shipped the factor drugs), CareFirst essentially conceded that its interpretation of the law was in error.  At that point, it became clear that CareFirst should not benefit from its delay in payment of the claims.  This victory was, however, far from complete, or indeed, significant.  Feldman's asked for interest to be calculated pursuant to Maryland's Prompt Pay Statute, § 15-1005(f)(1), (ECF No. 2, 12), seeking $886,483.93 in interest (in addition to the $23,017.00 already paid by CareFirst) under this

statute.[28]   (ECF No. 150, 1).  Ultimately, the Court found that

the proper means for calculating interest was the federal post

judgment rate under 18 U.S.C. § 1961 – one of several options

available to courts under their discretion under Rinaldi, and

that Feldman's would be adequately compensated by an award of an

additional $11,983.00, or $874,500.93 less than initially

requested.  (ECF No. 152-1, 1).  CareFirst argues that even if

FMPC won a victory on the merits in this award of interest, that

victory was "trivial," and insufficient to meet the Hardt

standard.  (ECF No. 162, 8).

        The relatively few Fourth Circuit Court of Appeals cases

applying Hardt have not had cause to elaborate substantively on

the distinction between a "trivial" or "purely procedural"

success and one that rises to "some degree of success on the

merits."  See Williams 609 F.3d at 634-35 (court had "no

difficulty in concluding that [Plaintiff] did show 'some degree

of success on the merits'" where motion for summary judgment was

granted), Rinaldi v. CCX, Inc., 290, 297 (4th Cir. 2010)

(finding some degree of success where district court ruled in

Plaintiff's favor), Zacharkiw v. Prudential Ins. Co. of Am.,

---

[28] Feldman's also asked, as part of its initial motion for summary judgment,
for payment on unpaid invoices totally $109,989.32, referred by Carefirst to
as claims pertaining to patients A, B, and C.  (ECF No. 150, 3).  Carefirst
disputed this claim on the basis that these three invoices were for services
rendered after the filing of the Complaint on June 1, 2009.  (ECF No. 109,
1).  Feldman's subsequently dropped these claims.  (ECF No. 120-2).

2012 U.S. Dist. LEXIS 21242, *7-8 (E.D. Pa. Feb. 21, 2012)(noting that the "courts of appeal that have spoken on the issue have ruled narrowly, on the facts before them, rather than endeavoring to define 'some success on the merits' more concretely than the Supreme Court did in Hardt").

Under the Hardt opinion it is important to note, however, that Ruckelshaus, the seminal case for the "some degree of success on the merits" standard, set a low bar for achievement. The standard was drawn from the Court's conclusion that a party that "achieved no success on the merits of its claims" was not entitled to fees.  Ruckelshaus 430 U.S. at 682.  Rejecting "the theory that completely unsuccessful plaintiffs may receive fees," the Court held that at least "some success" was required. Id. at 689.  At its core the Ruckelshaus standard is a lenient one, designed primarily to ensure that a party that achieves no success whatsoever on its claims receives no fees.[29] See Sierra Club v. EPA, 322 F.3d 718, 721 (D.C. Cir. 2003)(summarizing Ruckelshaus, noting that the Supreme Court held that "[The Clean Air Act's] 'whenever . . . appropriate' standard prohibits awards to parties who lose on the merits.")(emphasis in original), Northern Plains Resource Council v. United States

---

[29] Ruckelshaus was a 5-4 opinion, with the dissent arguing that even if a plaintiff's merits case is entirely unsuccessful, a court may still, when appropriate, grant attorney's fees.  Ruckelshaus, 103 S. Ct. at 3291 (Stevens, J., Dissenting).

Environmental Protection Agency, 734 F.2d 408, 409 (9th Cir. 1984) ("[Ruckelshaus] makes clear, however, that parties who achieve no success on the merits are ineligible for attorney's fees. A party, while not "prevailing" overall, must achieve "some success.").

However, even when viewed through the liberal lens of Ruckelhaus, it is difficult to characterize FMCP's win on interest as anything more than "trivial." First, FMCP sought interest according to the Maryland Prompt Payment Statute, on the theory that it was a par provider under the 1997 agreement with CareFirst. This Court examined and rejected this position, which was the centerpiece of its complaint and the theory enabling the high interest award under the Maryland Prompt Pay Statute. So not only was the interest award - $11,983 trivial absolutely, it was trivial in comparison to what was sought – over $800,000. While FMCP won some interest defeating CareFirst's argument that no further interest was due, it lost on the substantive issue at the core of its case, which would have triggered an additional award of fees approaching a million dollars. Accordingly, the Court finds that Hardt has not been met.

However, assuming for purposes of this motion that FMCP can meet the threshold Hardt standard, the Court turns to the second stage of the analysis.

B. **Quesinberry Factors**

The second step in an ERISA fees action is a consideration of the five factors identified in Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1029 (4th Cir. 1993).  Williams v. Metro. Life Ins. Co., 609 F.3d 622, 635 (4th Cir. 2010).  A successful party eligible for attorney's fees under Hardt does not enjoy a presumption in favor of fees: the second step of the test is independent of the first.  Id.  The factors are not a rigid test but serve as guidelines for the court.  Id.  The factors "constitute the nucleus of an inquiry which seeks to identify that unusual case" in which fees may be shifted to further the policies of the statute.  Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 422 (4th Cir. 1993).[30]  In making a determination regarding attorney's fees, however, district courts should consider the remedial purposes of ERISA. Quesinberry 987 F.2d 1017 at 1030.  The five factors to be considered are:  (1) degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees

---

[30] Given the increased liberality in ERISA fee awards under Hardt, it is unclear what, if any, effect, that might have on viability of the Custer "unusual case" test.  However, since Hardt, district courts with the Fourth Circuit have continued to apply the Custer unusual case test.  See e.g., Scott v. PNC Bank Corp., 2011 U.S. Dist LEXIS 88092 *14 (D. Md. Aug. 9, 2011).

against the opposing parties would deter other persons acting
under similar circumstances; (4) whether the parties requesting
attorneys' fees sought to benefit all participants and
beneficiaries of an ERISA plan or to resolve a significant legal
question regarding ERISA itself; and (5) the relative merits of
the parties' positions.  Quesinberry, 987 F.2d at 1029.

## 1. Degree of Opposing Parties' Culpability or Bad Faith

Bad faith has been defined as "serious misconduct
deliberately and intentionally engaged in, for the purpose of
harming another or advancing one's self interest."  Clark v.
Metro Life Ins. Co., 384 F.Supp.2d 894, 898 (E.D. Va. 2005)
(quoting Edmonds v. Hughes Aircraft Co., 1998 WL 782016 (E.D.
Va. Nov. 6, 1998)).  Black's Law Dictionary, 139 (6th Ed., 1990)
similarly defines "bad faith" as "the opposite of 'good faith,'
generally implying or involving actual or constructive fraud, or
a design to mislead or deceive another, or a neglect or refusal
to fulfill some duty or some contractual obligation, not
prompted by an honest mistake as to one's rights or duties, but
by some interested or sinister motive."  Black's goes on to say
that the term "bad faith" is not simply bad judgment or
negligence, but rather it implies "the conscious doing of a
wrong because of dishonest purpose or moral obliquity; it is
different from the negative idea of negligence in that it

contemplates a state of mind affirmatively operating with furtive design or ill will." Id.

Culpability, on the other hand, connotes conduct that is wrongful, albeit not intentional or deliberate. Jani v. Bell, 2005 U.S. Dist. LEXIS 44331, 2-3 (D. Md. Nov. 7, 2005). Culpable is "[t]hat which is deserving of moral blame . . . involves something more than simple negligence and implies conduct which is . . . censurable, involving the breach of a legal duty or conduct spoken of is reprehensible or wrong, but not that it involves malice or a guilty purpose." Black's Law Dictionary, 379 (6th ed. 1990). A mistake such as misinterpretation of evidence does not rise to the level of culpability or bad faith because such faults constitute error, not culpability. Linck v. Arrow Elecs., Inc., 2010 U.S. Dist. LEXIS 58258, 8-9 (D. Md. June 14, 2010). On the other hand, a party can be found culpable "where a plan's decision is discernibly against the weight of the evidence," Cross v. Fleet Reserve Ass'n Pension Plan, 2010 U.S. Dist. LEXIS 13564, 10 (D. Md. Feb 16, 2010), or where a plan administrator performs a cursory, inadequate investigation of a claim. Clark v. Metro. Life Ins. Co., 384 F.Supp.2d 894, 900 (E.D. Va. 2005). Simply a finding that an insurer's denial of coverage was "unreasonable and . . . an abuse of discretion" does not constitute culpability (or bad faith) under the first Quesinberry factor.

Carolina Care Plan, Inc. v. McKenzie, 467 F.3d 383, 390 (4th
Cir. 2006).  To find culpability, there must be more than error.
There must be  error "plus."  The facts must demonstrate
something akin to gross negligence or willfulness or wantonness
in the treatment of the ERISA claims to establish culpability.

     Plaintiff charges that CareFirst acted in bad faith in
withholding the ERISA benefits for almost two and one-half years
without a valid reason for such a delay.  More specifically,
FMCP charges that CareFirst's denial of payment based on its
erroneous view of FMCP's need for a RSA license and continued
denial of payment after FMCP received a RSA license constitutes
culpability.  (ECF No. 165, 18).  Defendant counters that "the
evidence indicates that that it was FMCP, not CareFirst, that is
culpable for any miscommunication that transpired . . .  while
it ultimately matters little [as] "bureaucratic
miscommunication" and "legitimate confusion" [do not constitute
bad faith or culpability under Quesinberry.]  (ECF No. 162, 16).

     The question of CareFirst's bad faith or culpability is a
complex one, requiring a review of the voluminous factual record
of the parties' dealings over the course of this litigation and
a review of the parties' legal positions.

     The Court has done the tedious, time-consuming and careful
review of the record, and having done that affirms its
conclusions in its **November 2011** Memorandum and Order.  There is

no evidence of "bad faith" or "venality" in CareFirst's business dealings with FMCP.  Likewise, there is no culpability on CareFirst's part.  There was "legitimate confusion on both sides" – asymmetric communication, like ships passing in the night - and the failure of each side to "drill down" to a fuller and complete understanding of each other's positions and their consequences, as described earlier in this opinion.  And, finally, there is no evidence that CareFirst's position on the RSA licensure requirement was "frivolous" or "ill-motivated."[31]

There is no evidence presented that CareFirst intentionally or even wantonly withheld payment or disregarded a clear statement that FMPC did not provide in-home services related to infusion drugs or any argument that state law did not require a RSA licensure.  Ultimately CareFirst changed its position on RSA licensure but the chronology demonstrates that was the result of

_____

[31] The Court has reviewed CareFirst's legal argument on the need for an RSA license, set forth in court pleadings and finds it an arguable interpretation of the law and regulations – an interpretation similar to the one Fagan described.  Moreover, CareFirst's reading of the governing law requiring FMCP to have a RSA was not based only on the pharmacy actually crossing an insured's threshold but, in its view, based on the pharmacy "provid[ing] medical services to someone so that person can receive treatment at home, rather than in an institutional setting."  (ECF No. 67, 2).  "CareFirst believes that the plain language of the statutes makes home health delivery of medicines  and items like needles and syringes enough to require an RSA."  (ECF No. 67, 3).  The record indicates that CareFirst was concerned that the insured have access to training and assistance with self-administration.  (ECF No. 104 Ex. 36 & 37).  While the Pharmacy board eventually disabused CareFirst of the notion that a pharmacy had any obligation for training or assistance but could simply drop ship drugs, like Factor for self-administration it was not a frivolous position, both from a health and a legal viewpoint.

clarity on the nature of FMCP's business model for factor drugs. While exposing an "error" on CareFirst's part, even <u>if</u> it was one attributable to CareFirst, certainly does not constitute culpability.

There is also no evidence that Feldman's acted in bad faith in delaying payment for claims <u>after</u> Feldman's December 2008 acquisition of a RSA license. In its summary judgment papers, CareFirst asserts that it delayed payments due to an investigation regarding an "unusual utilization pattern for Factor VIII." (ECF No. 110, 10). As part of its investigative process it "pended" Feldman's post December 2008 claims and requested medical records to support the claims. (<u>Id.</u>, Hanson Decl., ECF No. 116, ¶ 42 ). Once these records were obtained in October 2009, CareFirst filed an interpleader action and requested that the Circuit Court of Baltimore County direct the clerk to accept the amount in dispute until such time as it was determined whether the insured or FMCP should be paid. (<u>Id.</u>). FMCP opposed the request and deposit of funds in the Court's registry. (<u>Id.</u>).

CareFirst appeared ready to stipulate that no evidence of fraud was uncovered. (ECF 163, Ex. B, 2, Hanson Decl., ECF No. 116, ¶ 49;). There is no evidence, however, that CareFirst pended these payments in an intentional effort "to injure Feldman's," as plaintiff contends. (ECF No. 165, 12).

CareFirst was not alone in investigating FHM operations: more than one federal agency was conducting investigations into FHM activities in Florida.  (Hanson Decl., ECF No. 116, ¶ 17). While the investigations revealed no fraudulent activity, the inquiry followed the standard practice of "pending" Feldman's claims.  (Id., ¶¶ 34-35).

As this court stated in its **November 2011** opinion, "[t]he evidence paints a picture of legitimate confusion, on both sides."  (ECF No. 150, 44).  The opinion further noted that "[t]here is arguably a picture of bureaucratic miscommunication, but not of venality," and "there is no clear basis in fact that CareFirst's position was frivolous or ill-motivated."  (Id.). No evidence has been submitted that rebuts this conclusion. Indeed, a close review of the record suggests a greater role of FMCP in creating the state of confusion on the issue.

Accordingly, the first Quesinberry factor strongly favors CareFirst.

### 2. CareFirst's Ability to Satisfy an Award of Attorney's Fees

The second Quesinberry factor weighs the "ability of opposing parties to satisfy an award of attorney's fees." Quesinberry v. Life Ins. Co., 987 F.2d 1017, 1029 (4th Cir. Va. 1993).  The second factor requires consideration of "the ability of both parties to pay an award and not attempt merely to

determine which party has the greatest resources." <u>American Med. Sec., Inc. v. Larsen</u>, 31 F.Supp.2d 502, 506 (D. Md. 1998). Courts have declined to grant fees when fee claimants possess more than "merely moderate means." <u>Id.</u>  On the other hand, if a non-moving party has the ability to pay the fees without hardship, courts generally find this factor weighs on the side of plaintiffs. <u>See</u>, <u>e.g.</u>, <u>Scott v. PNC Bank Corp.</u>, 2011 U.S. Dist. LEXIS 88092, 7-8 (D. Md. Aug. 9, 2011), <u>Dameron v. Sinai Hosp. of Baltimore, Inc.</u>, 644 F. Supp. 551, 553 (D. Md. 1986), <u>Linck v. Arrow Elecs.</u>, Inc., 2010 U.S. Dist. LEXIS 58258 (D. Md. June 14, 2010).  Here, CareFirst, a large regional healthcare insurer with 6.8 billion of revenue in 2009, can satisfy the award of attorney's fees.  (Bostwick Decl., ECF No. 104 ¶ 30). While Feldman's has means beyond that of an individual plaintiff and this is not the classic "David and Goliath" situation of the more common ERISA case of an individual claimant against an insurance company, it may not have had the resources to litigate the case without some hardship Feldman's alleges that its parent company, FHM, had to sell certain assets of Feldman's as a result of this dispute.  (Bostwick Decl., ECF 104 ¶ 2).  This factor therefore weighs moderately for plaintiff.

**3. Deterrent Effects of a Fee Award**

The effectiveness of a fee award as a deterrent is closely related to the degree of bad faith by the non-moving party. Scott v. PNC Bank Corp., 2011 U.S. Dist. LEXIS 88092 (D. Md. Aug. 9, 2011), American Med. Sec., Inc. v. Larsen, 31 F.Supp.2d 502, 506 (D. Md. 1998).  In cases where the degree of bad faith and culpability is minimal, this factor will not likely weigh heavily on the side of the fees claimant.  Id.  As discussed in some detail above, Feldman's has not demonstrated any bad faith or culpability.  As an award of fees is likely to have the "greatest deterrent effect where deliberate misconduct is in the offing," the deterrent effect here would be negligible.  Larsen, 31 F.Supp.2d at 506 (quoting Foltice v. Guardsman Prods., Inc., 98 F.3d 933, 937 (6th Cir. 1996)). This factor therefore weighs on the side of CareFirst.

## 4. Benefits to Others or Resolution of a Significant Legal Question

Feldman's brought the present suit for its own benefit, and does not seek to resolve any significant legal question. Feldman's makes no argument to the contrary in its briefing. This factor weighs on the side of CareFirst.

## 5. The Relative Merits of the Parties' Positions

Feldman's argues that the fifth Quesinberry factor weighs in its favor because "Feldman's in the end was entitled to payment,

plus interest." (ECF No. 165, 23).  CareFirst counters that (1) Feldman's argument that Factor VIII was covered by the terms of the PPP agreement failed, and (2) CareFirst's decision to pay had nothing to do with the merits of Feldman's complaint.  (ECF No. 162, 19).

Several courts have found that when a plaintiff receives all of the relief sought in his or her complaint, the fifth Quesinberry factor weighs in his or her favor. See, e.g., Johannssen v. Dist. No. 1 - Pac. Coast Dist., MEBA Pension Plan, 2001 U.S. Dist. LEXIS 10556 10 (D. Md. July 10, 2001)(finding that the fifth factor "clearly favors plaintiffs, who obtained one hundred percent of the relief they requested."), Metro. Life Ins. Co. v. Leich-Brannan, 812 F.Supp.2d 729, 739 (E.D. Va. 2011) (finding that the fifth factor weighed for plaintiff because "[t]he Court granted precisely the relief requested."), Flores, 770 F.Supp.2d at 775 (finding that Quesinberry factors as a whole weighed for plaintiff because "the suit was the catalyst in securing benefits" for plaintiff.").  On the other hand, where a plaintiff is rewarded some relief, but originally sought "substantially more" than was ultimately granted, a finding that the opposing party's position was meritorious is appropriate.  Scott v. PNC Bank Corp. & Long Term Disability Plan, 2011 U.S. Dist. LEXIS 144217 (D. Md. Dec. 14, 2011).

In its complaint, FMCP sought payment of approximately $1.5 million in claims, unspecified compensatory and punitive damages and interest under § 15-1005 of the Insurance Code.  During the course of the litigation, CareFirst did pay the claims at issue, and the Court did award interest but at the federal rate, not the much more favorable Maryland Prompt Pay Statute rate.  Thus, FMCP did not receive all the relief it sought.  Moreover, as discussed earlier, this Court did not find that the lawsuit catalyzed CareFirst's payment of the claims, as a matter of fact.  Accordingly, under this authority, FMCP, the fifth Quesinberry factor would for favor FMCP.

Alternately, where the "main issue" of a case is resolved in favor of plaintiffs, but where defendants prevail on several of their claims, the factor may be considered neutral.  Cross v. Fleet Reserve Ass'n Pension Plan, 2010 U.S. Dist. LEXIS 13564 (D. Md. Feb. 16, 2010)(reversed on other grounds by Cross v. Fleet Reserve Ass'n Pension Plan, 2010 U.S. Dist. LEXIS 95988 (D. Md. Sept. 13, 2010)); see also Bedrick v. Travelers Ins. Co., 1997 U.S. Dist. LEXIS 21824 (E.D.N.C. Dec. 1, 1997)(factor five is neutral where both sides have presented meritorious arguments to the court).  A court may consider the relative merits of the positions taken at all stages of the litigation; even if plaintiff ultimately receives some of the relief requested, the relative merits of defendant's arguments

throughout the contest may be considered in weighing factor five.  United Food & Commercial Workers Local 204 v. Harris-Teeter Super Markets, Inc., 716 F.Supp. 1561, 1565 (W.D.N.C. 1989).  Thus, courts have also looked at the litigation as a whole, judging the relative merits of all the parties' positions.

Examining the course of this lawsuit, as a whole, it is clear that both sides can claim victory on individual issues. CareFirst, of course, was successful on the centerpiece issue of plaintiff's complaint, that is, whether 1997 PPP agreement between CareFirst and FMCP covered factor drugs.  Similarly, CareFirst was successful (while not defeating any additional award of interest (beyond the $23,017)) in defeating imposition of any rate greater than the "minimum" federal post judgment rate.  Also, CareFirst successfully opposed FMCP's motion for remand and FMCP's motion for preliminary injunction (though a hearing was apparently not held).

FMCP, for its part, was successfully in receipt of some interest, albeit at the very modest federal post judgment rate, to compensate for the delay in payment of claims.  Having considered all the Quesinberry factors as well as the remedial nature of ERISA in these circumstances, it is clear that the analysis strongly favors CareFirst.

### III.  Conclusion

For all the reasons stated, FMCP is not entitled to any fee and cost award, as this is clearly not the "unusual" case compelling an award under the governing law.  Accordingly, FMCP's motion for attorney's fees and costs is DENIED.


Date: 9/28/12 _____               _____/s/_____
                                     Susan K. Gauvey
                                     United States Magistrate Judge